No. 19-742C
(Judge Griggsby)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

SPACE EXPLORATION TECHNOLOGIES CORP.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

UNITED LAUNCH SERVICES, LLC, BLUE ORIGIN, LLC, & ORBITAL SCIENCES CORP.,

Defendant-Intervenors.

---

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

---

OF COUNSEL:

ERIKA WHELAN RETTA
Air Force Legal Operations Agency
Commercial Law and Litigation Directorate
AFLOA/JAQC
Contract and Fiscal Law Division

GREGORY YOKAS
Space and Missile Systems Center
Office of the Staff Judge Advocate

DOUGLAS EDELSCHICK
Trial Attorney
Department of Justice

June 13, 2019

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

DOUGLAS K. MICKLE
Assistant Director

TANYA B. KOENIG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tele: (202) 305-7587

Attorneys for Defendant

## TABLE OF CONTENTS

Page:

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ...........................................................................................................2

STATEMENT OF THE ISSUE ......................................................................................4

STATEMENT OF THE CASE ........................................................................................4

    I.     Nature Of The Case ................................................................................4

    II.    Statutory And Regulatory Framework ...................................................5

          A.  The FGCAA And CICA ............................................................5

          B.  The Department Of Defense's Authority To Use Other Transaction Agreements .....................................................................................6

STATEMENT OF THE FACTS ...................................................................................11

    I.     History Of The EELV Program ............................................................11

    II.    The Air Force's Decision To Use An OT To Develop Launch Systems Prototypes ...........................................................................................14

    III.   The Scope Of The OTs For Launch Service Prototypes .......................17

    IV.   Solicitation And Award ........................................................................18

ARGUMENT .................................................................................................................19

    I.     Standard Of Review:  Jurisdiction .......................................................19

    II.    The Court Does Not Possess Bid Protest Jurisdiction To Entertain Challenges To Non-Procurement Actions ................................................................20

III.    SpaceX's Complaint Is Not "In Connection" With A Procurement Or Proposed
        Procurement .................................................................................................24

        A.    SpaceX's Interpretation Of "In Connection With" Is Contrary To
              Precedent..........................................................................................25

        B.    The OT Is Not "In Connection With" The Phase 2 Procurement..................28

IV.     SpaceX Does Not Allege Any Violation Of Any Procurement Statute................32

CONCLUSION...................................................................................................33

# TABLE OF AUTHORITIES

## CASES

*Aectra Ref. & Mktg. v. United States,*
    565 F.3d 1364 (Fed. Cir. 2009).........................................................................23, 24

*AgustaWestland North America, Inc. v. United States,*
    880 F.3d 1326 (Fed. Cir. 2018)................................................................................26

*BayFirst Solutions, LLC v. United States,*
    104 Fed. Cl. 493 (2012)............................................................................................27

*Blade Strategies, LLC,*
    B-416752, 2018 CPD ¶ 327 (Comp. Gen. Sept. 24, 2018)......................................22

*Cedars-Sinai Med. Ctr. v. Watkins,*
    11 F.3d 1573 (Fed. Cir. 1993)..................................................................................19

*Centech Grp., Inc. v. United States,*
    554 F.3d 1029 (Fed. Cir. 2009)................................................................................22

*Cleveland Assets, LLC v. United States,*
    883 F.3d 1378 (Fed. Cir. 2018)............................................................................3, 32

*CMS Contract Mgmt. Servs. v. United States,*
    745 F.3d 1379 (Fed. Cir. 2014)................................................................................22

*DataMill, Inc. v. United States,*
    91 Fed. Cl. 740 (2010)..............................................................................................30

*Distributed Solutions, Inc. v. United States,*
    539 F.3d 1340 (Fed. Cir. 2008).........................................................................passim

*Ex Parte McCardle,*
    74 U.S. (7 Wall.) 506 (1869) ...................................................................................19

*Exploration Partners, LLC,*
    B-298804, 2006 CPD ¶ 201 (Comp. Gen. Dec. 19, 2006) ......................................22

*Frankel v. United States,*
    842 F.3d 1246 (Fed. Cir. 2016).................................................................................22

*Geiler/Schrudde & Zimmerman v. United States,*
    743 F. App'x 974 (Fed. Cir. 2018) ..........................................................................27

*Gov't Technical Servs. LLC v. United States*,
    90 Fed. Cl. 522 (2009) ........................................................................................... 26

*Griffy's Landscape Maint. LLC, v. United States*,
    51 Fed. Cl. 667 (2001) ........................................................................................... 29

*Guardian Moving & Storage Co. v. United States*,
    122 Fed. Cl. 117 (2015) ......................................................................................... 29

*Hercules Inc. v. United States*,
    516 U.S. 417 (1996) ............................................................................................... 20

*Hopland Band of Pomo Indians v. United States*,
    855 F.2d 1573 (Fed. Cir. 1988) ............................................................................ 20

*Hymas v. United States*,
    810 F.3d 1312 (Fed. Cir. 2016) ..................................................................... passim

*International Genomics Consortium v. United States*,
    104 Fed. Cl. 669 (2012) ......................................................................................... 26

*Kellogg Brown & Root Servs. v. United States*,
    117 Fed. Cl. 764 (2014) ......................................................................................... 26

*MacLean v. United States*,
    454 F.3d 1334 (Fed. Cir. 2006) ............................................................................ 20

*MorphoTrust USA, LLC*,
    *B-412711*, 2016 CPD ¶ 133 (Comp. Gen. May 16, 2016) .............................. 7, 22

*MD Helicopters, Inc.*,
    B-417379, 2019 CPD ¶ 120 (Comp. Gen. April 4, 2019) .................................... 22

*Murphy v. United States*,
    222 Ct. Cl. 685 (1980) ........................................................................................... 20

*R&D Dynamics Corp. v. United States*,
    80 Fed. Cl. 715 (2007) ................................................................................. 3, 27, 31

*RAMCOR Servs. Grp., Inc. v. United States*,
    185 F.3d 1286 (Fed. Cir. 1999) ...................................................................... 25, 33

*Res. Conservation Group, LLC v. U.S. Dep't of the Navy*,
    86 Fed. Cl. 475 (2009) ........................................................................................... 23

*Res. Conservation Group, LLC v. United States,*
    597 F.3d 1238 (Fed. Cir. 2010) ................................................................ passim

*SDS Int'l v. United States,*
    48 Fed. Cl. 759 (2001) ................................................................................ 29

*Smith v. Orr,*
    855 F.2d 1544 (Fed. Cir. 1988) ................................................................. 20

*SRA Int'l, Inc. v. United States,*
    766 F.3d 1409 (Fed. Cir. 2014) ................................................................. 30

*Systems Application & Tech., Inc. v United States,*
    691 F.3d 1374 (Fed. Cir. 2012) ............................................................ 24, 28

*Taylor v. United States,*
    303 F.3d 1357 (Fed. Cir. 2002) ................................................................. 19

*United States v. Sherwood,*
    312 U.S. 584 (1941) .................................................................................... 19

*United States v. Testan,*
    424 U.S. 392 (1976) .................................................................................... 19

*VFA, Inc. v. United States,*
    118 Fed. Cl. 735 (2014) .............................................................................. 26

**STATUTES**

6 U.S.C. § 391 .................................................................................................... 8

10 U.S.C. § 2273 ............................................................................................... 11

10 U.S.C. § 2273(a) .......................................................................................... 12

10 U.S.C. §2273(b) ........................................................................................... 12

10 U.S.C. § 2302(3)(A) ..................................................................................... 21

10 U.S.C. § 2304(a) ............................................................................................ 6

10 U.S.C. § 2304(b) ............................................................................................ 6

10 U.S.C. § 2304(c) ............................................................................................ 6

10 U.S.C. § 2304(f) ............................................................................................. 6

10 U.S.C. § 2358 ........................................................................................................... 9

10 U.S.C. §§ 2351-2374a .............................................................................................. 5

10 U.S.C. § 2358(a) ....................................................................................................... 9

10 U.S.C. § 2358(b)(1) .................................................................................................. 9

10 U.S.C. § 2358(b)(5) .................................................................................................. 9

10 U.S.C. § 2371 ............................................................................................... passim

10 U.S.C. § 2371(a) ............................................................................................. 4, 7, 9

10 U.S.C. § 2371b ............................................................................................. passim

10 U.S.C. § 2371b(a) ..................................................................................................... 9

10 U.S.C. § 2371b(a)(1) ........................................................................................ 4, 31

10 U.S.C. § 2371b(b)(2) .............................................................................................. 11

10 U.S.C. § 2371b(d)(1) .............................................................................................. 10

10 U.S.C. § 2371b(f) .................................................................................................... 31

28 U.S.C. § 604(a)(10)(C) ..................................................................................... 8, 23

28 U.S.C. § 1346 .......................................................................................................... 20

28 U.S.C. § 1491(b) .......................................................................................... passim

28 U.S.C. § 1491(b)(1) ...................................................................................... passim

31 U.S.C. § 6301(2) ....................................................................................................... 5

31 U.S.C. § 6301(3) ....................................................................................................... 5

31 U.S.C. § 6303 ................................................................................................... 2, 5, 6

31 U.S.C. §§ 6301-6308 ................................................................................................ 5

31 U.S.C. § 6304 ............................................................................................................ 5

31 U.S.C. § 6305 ............................................................................................................ 5

41 U.S.C. § 403(2) ............................................................................................ 21, 25, 28

41 U.S.C. § 111 ..................................................................................................... 3, 21, 25

41 U.S.C. § 3301 ......................................................................................................... 2, 5

41 U.S.C. § 3301(a)(1) .................................................................................................... 6

42 U.S.C. § 247d-7e ........................................................................................................ 8

42 U.S.C. § 7256 ............................................................................................................. 8

49 U.S.C. § 106(l)(6) ...................................................................................................... 8

49 U.S.C. § 114(m)(1) .................................................................................................... 8

49 U.S.C. § 5312 ............................................................................................................. 8

51 U.S.C. § 20113(e) .................................................................................................... 23

51 U.S.C. § 50131 ........................................................................................................ 16

51 U.S.C. § 50132 ........................................................................................................ 29

51 U.S.C. § 50132(a) ................................................................................................... 16

Pub. L. No. 85-568, § 203(b)(5), 72 Stat. 426 (1958) ............................................ 7, 23

Pub. L. No. 95-224, § 2(b)(3), 92 Stat. 3 (1978) ........................................................... 5

Pub. L. No. 95-539, § 3(a), 92 Stat. 4043(1978) ..................................................... 8, 23

Pub. L. No. 98-369, § 2711, 98 Stat. 494 (1984).......................................................... 6

Pub. L. No. 101-189, § 251, 103 Stat. 1352, 1403 (1989)....................................... 8, 23

Pub. L. No. 102-190, § 826, 105 Stat. 1290 (1991)....................................................... 8

Pub. L. No. 103-160 § 845, 107 Stat. 1547 (1993)........................................................ 8

Pub. L. No. 104-201, § 804, 110 Stat. 2422 (1996)....................................................... 8

Pub. L. No. 104-320, § 12, 110 Stat. 3874 (Oct. 19, 1996) ....................................... 23

Pub. L. No. 113-291, § 128 Stat. 3292 (Dec. 19, 2014) ............................................. 13

Pub. L. No. 114-92, § 815, 129 Stat. 726 (2005)............................................................. 9

Pub. L. No. 114-328, § 130 Stat. 2000 (Dec. 23, 2016) ................................................ 14

Pub. L. No. 116-9, 133 Stat. 580 (March. 12, 2019) .................................................... 13

## REGULATIONS

4 C.F.R. § 21.5(m) ......................................................................................................... 22

32 C.F.R. § 3.2 ......................................................................................................... 7, 11

32 C.F.R. § 3.5(b)(1)...................................................................................................... 10

## RULES

RCFC 12(b)(1) ........................................................................................................... 1, 19

RCFC 12(h)(3) ................................................................................................................ 19

## LEGISLATIVE HISTORY

H.R. Rep. No. 85-1770 (May 24, 1958) ......................................................................... 8

S. Rep. No. 115-125 (2017).............................................................................................9

## OTHER AUTHORITIES

Congressional Research Service, "Department of Defense Use of Other Transaction Authority: Background, Analysis, and Issues for Congress." at p. 7-8, Feb. 22, 2019, available at Https://crsreports.congress.gov/product/pdf/R/R45521 (herein "CRS OT Report") (last visited June 2, 2019)........................................................................................................................4, 7

Department of Defense Other Transactions Guide (OT Guide), November 2018, available at https://aaf.dau.mil./ot-guide/ (last visited June 12, 2019).....................................................7, 9, 10

*Hearing on Department of Defense Appropriations for Fiscal Year 2016 Before the S. Subcomm. of the Comm. on Appropriations*, 114th Cong. 61 (2015) (statement of Hon. Ashton Carter, Secretary), available at https://www.govinfo.gov/content/pkg/CHRG-114shrg59104641/pdf/CHRG-114shrg59104641.pdf ...............................................................29

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Bid Protest)

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>UNITED LAUNCH SERVICES, LLC, BLUE ORIGIN, LLC, & ORBITAL SCIENCES CORP., )<br><br>Defendant-Intervenors. ) | **FILED UNDER SEAL**<br><br>No. 19-742 C<br>(Judge Griggsby) |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Pursuant to Rule 12(b)(1) of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaint filed by plaintiff, Space Exploration Technologies Corp. (SpaceX), for lack of subject matter jurisdiction because SpaceX challenges an award of an Other Transaction (OT) agreement by the United States Air Force Space and Missile Systems Center (Air Force or agency), there is no dispute that the OT is a non-procurement agreement, and Congress has limited this Court's bid protest jurisdiction to procurements. In support of our motion and opposition, we rely upon the administrative record and the following brief and appendix.[1]

---

[1] We refer to documents and pages in the administrative record as "Tab __, AR __."

## INTRODUCTION

Congress created a clear dichotomy between "other transaction" agreements under
10 U.S.C. §§ 2371 and 2371b, and "procurement contracts" under the Federal Grant and
Cooperative Agreement Act (FGCAA), 31 U.S.C. § 6303 and the Competition in Contracting
Act (CICA), 41 U.S.C. § 3301.  In conferring bid protest jurisdiction upon this Court, Congress
only authorized challenges "in connection with a procurement or a proposed procurement."
28 U.S.C. § 1491(b)(1).  In *Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016), the Court of
Appeals for the Federal Circuit (Federal Circuit) held that this Court does not possess bid protest
jurisdiction to entertain challenges to transactions that are not procurements under the FGCAA.
*Hymas*, 810 F.3d at 1329-30.  The Federal Circuit emphasized that agencies possess broad
discretion when making a policy choice to use non-procurement agreements rather than
procurement contracts for particular programs.  *Id.* at 1329.  A straightforward application of
*Hymas* requires dismissal of this action for lack of jurisdiction.

There is no dispute that the Air Force has properly exercised its authority under 10 U.S.C.
§ 2371b to award OT agreements to develop "launch system prototypes."  Tab 38, AR 1261.
Likewise, SpaceX does not challenge the basic premise that OTs are not procurement contracts
or that the Court lacks jurisdiction over non-procurement agreements.  Rather, SpaceX bases its
contention that the Court possesses jurisdiction to entertain its complaint on a misreading of this
Court's jurisdictional statute.

Section 1491(b) of the Tucker Act, providing jurisdiction over bid protests, states that
interested parties may challenge "a solicitation by a Federal agency for bids or proposals for a
proposed award or the award of a contract or any alleged violation of statute or regulation *in
connection with a procurement or a proposed procurement*."  28 U.S.C. § 1491(b)(1) (emphasis

added).  SpaceX has not objected to a procurement or proposed procurement.  Instead, SpaceX

alleges that this Court may hear its objection to an OT award (a non-procurement agreement)

because that award is "in connection with" a later procurement, the Phase 2 procurement for

launch services, merely because these multiple contracting instruments are part of the same

Evolved Expendable Launch Vehicle (EELV) program.

SpaceX's interpretation of the phrase "in connection with" stretches the language beyond

recognition and does not find support in either this Court's or the Federal Circuit's cases.  In

*Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008), the Federal Circuit

found the government's request for information to be in connection with a procurement because

"[t]he statute explicitly contemplates the ability to protest these kinds of pre-procurement

decisions," but also recognized that other steps in a "procurement" as defined by 41 U.S.C. § 111

do not give rise to a viable protest under § 1491(b), such as "adding work to an existing contract

that is clearly within the scope of the contract."  *Distributed Solutions*, 539 F.3d at 1346.  And in

*R&D Dynamics Corp. v. United States*, 80 Fed. Cl. 715 (2007), this Court found that a Phase II

research and development contract was not in connection with a later procurement, despite the

fact that it "may ultimately lead to the development of a capacity to provide goods or services in

Phase III."  *Id.* at 722.

Moreover, SpaceX has not alleged that the Air Force has violated a procurement statute

or regulation, as required by the Federal Circuit.  *See Cleveland Assets, LLC v. United States*,

883 F.3d 1378 (Fed. Cir. 2018).  Neither of the statutes that SpaceX alleges to have been violated

is a procurement statute.

This case involves a challenge to an award of a non-procurement action based upon

purported violations of non-procurement statutes.  SpaceX's argument that its challenge is "in

connection with a procurement" is without merit.  The Court should dismiss SpaceX's complaint

because it lacks jurisdiction to entertain this bid protest challenge to a non-procurement action.

## STATEMENT OF THE ISSUE

Whether the Court's bid protest jurisdiction under the Tucker Act, 28 U.S.C.

§ 1491(b)(1), to entertain challenges "in connection with a procurement or a proposed

procurement," extends to other transactions, or OTs, that are not procurement contracts.

## STATEMENT OF THE CASE

I.    Nature Of The Case

In this case, SpaceX challenges the Air Force's decision not to select it for an award

under a solicitation issued pursuant to the Air Force's other transaction authority codified at

10 U.S.C. § 2371b.  The Air Force's OT authority permits it to enter into transactions "other than

contracts, cooperative agreements, and grants" to carry out prototype projects.  10 U.S.C.

§§ 2371(a); 2371b(a)(1).  Such transactions are not procurement contracts and are exempt from

the typical panoply of federal procurement statutes and regulations including the Federal

Acquisition Regulations (FAR), the Defense Federal Acquisition Regulation Supplement

(DFARS), CICA, and the Contracts Disputes Act (CDA).[2]

The OTs awarded to defendant-intervenors Blue Origin, LLC (Blue Origin), United

Launch Services, LLC (ULA), and Orbital Sciences Corp. (Orbital ATK), provide the awardees

investment funding to develop "launch system prototypes, to include the development and test of

any required RPSs, the launch vehicle and its subsystems, infrastructure, manufacturing

---

[2]  *See* Congressional Research Service, "Department of Defense Use of Other Transaction
Authority: Background, Analysis, and Issues for Congress" at p. 7-8, Feb. 22, 2019, available at
https://crsreports.congress.gov/product/pdf/R/R45521 (herein "CRS OT Report") (last visited
June 2, 2019).

processes, test stands, and other items required for industry to provide domestic commercial launch services that meet all [National Security Space (NSS)] requirements." Tab 38, AR 1261. SpaceX challenges the Air Force's evaluation of its proposal and decision not to award an OT to SpaceX as arbitrary and capricious, challenges various provisions of the solicitation, and seeks permanent injunctive and declaratory relief. SpaceX does not seek a preliminary injunction, and the awardees have been performing under the OTs since they were awarded in October 2018.

## II.     Statutory And Regulatory Framework

This case requires consideration of the interplay between the FGCAA (31 U.S.C. §§ 6301-6308), CICA (41 U.S.C. § 3301), and Chapter 139 of Title 10 of the United States Code (10 U.S.C. §§ 2351-2374a).

### A.     The FCGAA And CICA

In 1978, Congress passed the FGCAA to "promote increased discipline in selecting and using procurement contracts, grant agreements, and cooperative agreements." Pub. L. No. 95-224, § 2(b)(3), 92 Stat. 3 (1978), *codified at* 31 U.S.C. § 6301(3). The FGCAA "prescribe[s] criteria for executive agencies in selecting appropriate legal instruments to achieve (A) uniformity in their use by executive agencies; (B) a clear definition of the relationships they reflect; and (C) a better understanding of the responsibilities of the parties to them." 31 U.S.C. § 6301(2). To promote these goals, Congress made a clear distinction in the FGCAA between "procurement contracts," "grants," and "cooperative agreements." 31 U.S.C. §§ 6303, 6304, 6305.

Specifically, the FGCAA requires that "[a]n executive agency shall use a *procurement contract* as the legal instrument reflecting a relationship between the United States Government" and a recipient, when "the principal purpose of the instrument is to acquire (by purchase, lease,

or barter) property or services for the direct benefit of the United States Government." 31 U.S.C.

§ 6303 (emphasis added).  Congress understood and intended that, when properly using a

cooperative agreement or grant under the FGCAA, executive agencies are not subject to the

statutes and regulations that govern procurement contracts.  *Id.* at 11 ("[W]hen an agency

change[s] the award mechanism from a type of procurement contract to a type of grant, the

regulations and statutes applying to procurement contracts would no longer apply," and, instead,

"[t]he regulations and statutes applying to transactions of Federal assistance would apply.").

     In 1984, Congress passed CICA, which establishes a general requirement that executive

agencies "obtain full and open competition through the use of competitive procedures" when

"conducting a *procurement* for property or services."  Pub. L. No. 98-369, § 2711, 98 Stat.

494(1984), codified at 41 U.S.C. § 3301(a)(1) (emphasis added); 10 U.S.C. § 2304 (CICA

requirements for Dep't of Def. (DOD)).  There are numerous exceptions to CICA's "full and

open competition" requirement, including an "except[ion] in the case of procurement procedures

otherwise expressly authorized by statute."[3]  10 U.S.C. § 2304(a).  CICA does not apply to

transactions that are not procurements under the FGCAA.  *Hymas*, 810 F.3d at 1320, 1324,

1329-30.

     B.    <u>The Department Of Defense's Authority To Use Other Transaction Agreements</u>

     While most Federal agencies are authorized to enter into contracts, grants and

cooperative agreements, Congress has granted select Federal agencies the additional authority to

enter into "other transactions."  "Other transactions" are defined by what they are not.  Other

---

[3]  Other exceptions to CICA's requirement for full and open competition are not applicable
here.  *See* 10 U.S.C. § 2304(b); (exclusions of particular sources, small business set asides),
§ 2304(c) (when noncompetitive procedures may be used), § 2304(f) (simplified procedures for
small acquisitions).

transactions are *not* procurement contracts, cooperative agreements, or grants. *See, e.g.*, 10

U.S.C. § 2371(a); (authorizing "transactions (other than contracts, cooperative agreements, and

grants")); 32 C.F.R. § 3.2 (defining "other transactions" as "transactions other than contracts,

grants or cooperative agreements"); DOD Other Transactions Guide (OT Guide) at 6, November

2018, available at https://aaf.dau.mil/ot-guide/ (last visited June 12, 2019) (defining OTs as

"NOT: a) FAR-based procurement contracts; b) Grants; c) Cooperative Agreements; or

d) Cooperative Research and Development Agreements (CRADAs)"; CRS OT Report at page

7-8. According to the Government Accountability Office (GAO):

> An 'other transaction' agreement is a special type of legal
> instrument used for various purposes by federal agencies that have
> been granted statutory authority to use 'other transactions.' GAO's
> audit reports to the Congress have repeatedly reported that 'other
> transactions' are 'other than contracts, grants, or cooperative
> agreements' that generally are not subject to federal laws and
> regulations applicable to procurement contracts.

*MorphoTrust USA, LLC*, B-412711, 2016 CPD ¶ 133, at *4 (Comp. Gen. May 16, 2016).

The National Aeronautics and Space Administration (NASA) was the first agency to

receive other transaction authority in 1958, as the United States was working to keep pace

technologically with the Soviet Union. CRS OT Report at page 4. Congress, mindful of the

importance of American prominence in outer space, granted NASA "broad authority" to "enter

into and perform contracts, leases, agreements, and other transactions as may be necessary in the

conduct of its work and on such terms as it may deem appropriate." National Aeronautics and

Space Act of 1958, Pub. L. No. 85-568, 72 Stat. 426, 430 (1958); *see* H.R. Rep. No. 85-1770,

Establishment of National Space Program (May 24, 1958). Since that time, Congress has

authorized additional agencies the ability to enter into OTs in a variety of circumstances and

scopes. *See e.g.*, 49 U.S.C. § 114(m)(1) (TSA); 49 U.S.C. § 106(l)(6) (FAA); Court Interpreters

████████████████████████

Act of 1978, Pub. L. No. 95-539, § 3(a), 92 Stat. 4043 (1978) (authorizing Executive Office of

United States Courts to use OTs), codified at 28 U.S.C. § 604(a)(10)(C); 6 U.S.C. § 391 (Dep't

of Homeland Sec. (DHS)); 10 U.S.C. § 2371 (DOD); 42 U.S.C. § 247d-7e (Dep't of Health and

Human Servs. (HHS)); 42 U.S.C. § 7256 (Dep't of Energy (DOE)); 49 U.S.C. § 5312 (Dep't of

Transp. (DOT)).

In 1989, Congress granted DOD its first "other transaction" authority, which applied to

advanced research projects performed by the Defense Advanced Research Projects Agency

(DARPA).  National Defense Authorization Act (NDAA) for Fiscal Years 1990 and 1991, Pub.

L. No. 101-189, § 251, 103 Stat. 1352, 1403 (1989).  In 1991, Congress provided DOD with

permanent other transaction authority and expanded that authority to use the agreements for

advanced research projects, previously limited to DARPA, throughout DOD.  NDAA for Fiscal

Years 1992 and 1993, Pub. L. No. 102-190, § 826, 105 Stat. 1290, 1442 (1991).  Congress

further expanded DARPA's other transaction authority for weapons and weapons systems

prototype projects in 1993.  NDAA for Fiscal Year 1994, Pub. L. No. 103-160, § 845, 107 Stat.

1547, 1721 (1993).  Congress later expanded authority for prototype projects to the DOD in

1996.  NDAA for Fiscal Year 1997, Pub. L. No. 104-201, § 804, 110 Stat. 2422, 2605 (1996).

Section 815 of the NDAA for Fiscal Year 2016 (FY 2016 NDAA) created permanent

authority for DOD to use OTs for prototyping and production purposes.  Pub. L. No. 114–92,

§ 815, 129 Stat. 726, 893 (2015), codified at 10 U.S.C. §2371b.  Congress wrote these provisions

"in an intentionally broad manner" to counter what has historically been a dearth of knowledge

about OTs, leading to "an overly narrow interpretation of when [OTs] may be used, narrow

delegations of authority to make use of [OTs], a belief that [OTs] are options of last resort for

when [FAR] based alternatives have been exhausted, and restrictive, risk averse interpretations

of how [OTs] may be used." S. Rep. No. 115-125, at 189-190 (2017). Thus, the broadly written statutory authority is meant for DOD to use OTs more often, and to "[recognize] that it has the authority to use [OTs] with the most flexible possible interpretation unless otherwise specified in those particular sections." *Id.*

DOD is authorized, pursuant to 10 U.S.C. § 2358, to "engage in basic research, applied research, advanced research, and development projects" that are both "necessary to the responsibilities of such Secretary's department in the field of research and development" and either "relate to weapon systems and other military needs" or are of potential interest to DOD. 10 U.S.C. § 2358(a). The DOD may accomplish these research and development projects through a variety of methods, including "by contract, cooperative agreement, or grant, in accordance with chapter 63 of title 31" or "by transactions (other than contracts, cooperative agreements, and grants) entered into pursuant to section 2371 or 2371b of this title." 10 U.S.C. § 2358(b)(1), (b)(5). DOD's statutory authority to use OTs is set forth in 10 U.S.C. §§ 2371 and 2371b. Section 2371 provides DOD with authority to use OTs for "basic, applied, and advanced research projects." 10 U.S.C. § 2371(a). Under § 2371b, DOD can use its other transaction authority to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." 10 U.S.C. § 2371b(a). In November 2018, DOD issued the OT Guide to provide advice and guidance on use of DOD's other transactions authority. OT Guide at 1.

For purposes of the DOD's OT authority under section 2371b, the OT Guide defines "prototype project" as one that "addresses a proof of concept, model, reverse engineering to

address obsolescence, pilot, novel application of commercial technologies for defense purposes, agile development activity, creation, design, development, demonstration of technical or operational utility, or combinations of the foregoing." OT Guide at 31. DOD may only use its other transaction authority under 2371b if one of the following conditions are met:

> (A) there is at least one nontraditional defense contractor participating to a significant extent in the prototype project;
>
> (B) all significant participants in the transaction other than the Federal Government are small businesses or nontraditional defense contractors;
>
> (C) at least one-third of the total cost of the prototype projects is to be paid out of funds provided by parties to the transaction other than the Federal Government; or
>
> (D) the senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that (a) provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or (b) would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

10 U.S.C. § 2371b(d)(1); OT Guide at 13-14; 32 C.F.R. § 3.5(b)(1).

OTs are intended "to give D[O]D the flexibility necessary to adopt and incorporate business practices that reflect commercial industry standards and best practices into its award instruments." OT Guide at 4. OTs can be used to "provide the Government with access to state-of-the-art technology solutions from traditional and non-traditional defense contractors (NDCs)." *Id.* Specifically, an OT may allow DOD to "[l]everage commercial industry investment in technology development and partner with industry to ensure D[O]D requirements are incorporated into future technologies and products." OT Guide at 5. These "[o]ther transactions" are "generally not subject to the Federal laws and regulations limited in applicability to contracts, grants or cooperative agreements" and "are not required to comply

**Contains** ███████████████████████

with the Federal Acquisition Regulation (FAR) and its supplements (48 CFR)." 32 C.F.R. § 3.2.

However, "[t]o the maximum extent practicable, competitive procedures shall be used when

entering into agreements to carry out the prototype projects under subsection (a)." 10 U.S.C.

§ 2371b(b)(2).

STATEMENT OF THE FACTS

I.    History Of The EELV Program

The National Security Space Launch (NSSL) program, previously the EELV program, is

charged with procuring launch services to meet NSS launch requirements.[4]  Tab 19, AR 786.

The EELV program handles all of DOD's medium and heavy launches.  NSS satellites provide

the nation's eyes and ears using intelligence community satellites; secure communications for

our nation's leaders through the Air Force's communications satellites; reliable position,

navigation and timing through the Air Force's Global Positioning System (GPS) satellites;

weather imaging; and other valuable warfighting capability.  Tab 19, AR 786.

The EELV program has an overarching need through FY30 to address the challenges of

maintaining affordability and assured access to space, which requires the agency to sustain the

availability of at least two families of space launch vehicles and robust space launch

infrastructure and industrial base.  Tab 19, AR 787; *see also* 10 U.S.C. § 2273.  Pursuant to

10 U.S.C. § 2273, "[i]t is the policy of the United States for the President to undertake actions

appropriate to ensure, to the maximum extent practicable, that the United States has the

capabilities necessary to launch and insert United States national security payloads into space

whenever such payloads are needed in space." 10 U.S.C. § 2273(a).  The appropriate actions

---

[4]  To maintain consistency with the record documents and SpaceX's complaint, we will refer
to the program as EELV rather than NSSL throughout this brief.

necessary to ensure continued access to space are defined to include: 1) "the availability of at least two space launch vehicles (or families of space launch vehicles) capable of delivering into space any payload designated by the Secretary of Defense or the Director of National Intelligence as a national security payload"; 2) "a robust space launch infrastructure and industrial base"; and 3) the "availability of rapid, responsive, and reliable space launches for national security space programs to (A) improve the responsiveness and flexibility of a national security space system; (B) lower the costs of launching a national security space system; and (C) maintain risks of mission success at acceptable levels." 10 U.S.C. §2273(b).



Figure 1 - Overall EELV Strategy. Tab 19, AR 788.

As shown in "Figure 1," above, between FY15 and FY19, in Phase I of the EELV program, the Air Force has been procuring launch services through a competition for certified launch service providers. *Id.* There are currently two companies with three families of certified

launch systems competing in the Phase IA Competition to perform the EELV mission, ULA and SpaceX.  Tab 19, AR 789.

In addition to the goals of maintaining assured access to space and implementing sustainable competition for NSS launch services, Phase 2 of the EELV Program seeks to accomplish a third goal, "to quickly transition from the use of non-allied space launch engines." Tab 38, AR 1260.  Section 1608 of the FY 2015 NDAA, as amended through Pub. L. No. 116-9 (enacted March 12, 2019), specifies that, with some exceptions, "the Secretary of Defense may not award or renew a contract for the procurement of property or services for space launch activities under the evolved expendable launch vehicle program if such contract carries out such space launch activities using rocket engines designed or manufactured in the Russian Federation."  Pub. L. No. 113-291, Section 1608(a).

Three primary events led the Air Force to determine that it must take additional action to ensure continued access to space in the future.  Tab 19, AR 789.  First, one of the currently-certified launch systems, ULA's Atlas V system, uses non-allied rocket engines.  *Id.*  As stated above, DOD is required through the FY15 NDAA to decrease reliance on non-allied (Russian) rocket engines.  *Id.*  The prohibition on the use of Russian-manufactured engines limits ULA's ability to compete for NSS launch services using its current Atlas V system after 2022.  *Id.* Second, ULA announced in March 2015 that a second of the currently-certified launch systems, the Delta IV, will be discontinued.  *Id.*  Finally, the third certified launch system, the Falcon system owned by SpaceX, cannot currently service all of the DOD reference orbits.  *Id.*

Because of the challenges DOD will soon face ensuring satellites can be launched to their intended orbits, the Air Force had to devise an overarching programmatic acquisition strategy that accounts for full coverage of the EELV mission.  Tab 19, AR 791.  The Air Force's

acquisition strategy had to encompass not just award of the EELV launch services contracts, but also development of the necessary launch technology.  *Id.*  NSS launch service requirements are generally more arduous to meet than standard commercial launch service requirements because NSS payloads are typically heavier, require higher precision for orbit insertion accuracy, and are less risk tolerant because of criticality of the mission and the time and cost required to replace a satellite that was destroyed in a failed launch.  *Id.*  Many of the NSS space vehicles also require more complicated payload processing facilities and procedures at the launch site than commercial payloads.  *Id.*

II.      The Air Force's Decision To Use An OT To Develop Launch Systems Prototypes

To facilitate successful development of launch systems for its NSS payloads, the Air Force determined that it would use its OT authority to establish Launch Service Agreements (LSA) that leverage industry's ongoing efforts to develop new and/or upgraded commercial launch systems.  Tab 19, AR 795.  "Section 1603 of the National Defense Authorization Act (NDAA) for FY 2017 (Public Law 114-328), initiated 'Launch System Investments' for development of a launch system capable of delivering all NSS payloads to orbit."  Tab 47c, AR 1351.

The Air Force considered whether it was appropriate to use an OT or whether it should use a traditional procurement vehicle, but ultimately concluded that an OT would best suit its needs.  Tab 19, AR 794 ("The use of FAR-type contracts, grants, and cooperative agreements was carefully considered, but these instruments were found not suitable for this effort.").  Specifically, the Air Force noted that "FAR-based contracts focus on procuring goods and services, not sharing investment in commercial end items that can also be adapted for D[O]D purposes."  *Id.*  Relevant to its decision included the fact that "OT agreements and the National

Aeronautics and Space Agency (NASA) equivalent, Commercial Space Act Agreements, were used to successfully develop all of the current EELV class launch vehicles, including the Atlas V, Delta IV (EELV Development and Initial Launch Service Program), and Falcon 9 (Commercial model for NASA Public-Private Partnerships) launch vehicles." Tab 19, AR 795. In addition, the Air Force noted that "OT agreements are currently being used by the EELV program office to share the cost of development of domestic RPSs with industry partners." *Id.* Moreover, the Air Force found that "[t]here is no substantiated indication that current or future commercial launch demand is sufficient for industry to develop new or upgraded launch systems that meet all EELV requirements without government investment." Tab 19, AR 802.

The Air Force also determined that the use of an OT agreement would provide benefits that would not be available if it used a FAR-based procurement. Among other benefits, OTs allow for shared investment to encourage technological innovation and promote maturation of new/improved industry capabilities. The Air Force elected to use OTs because they are the ideal instrument for modifying commercial items for use by the military. For example, the use of OTs allowed the Air Force to fund research and development efforts on a cost sharing basis without requiring prospective offerors to maintain stringent Cost Accounting Standards. It also allowed the Air Force to tailor the approach to intellectual property in a way that protected the Government's interests and industry's interests, and was more attractive to non-traditional companies than the normal procurement approach. Tab 19, AR 809 ("the EELV program is not a standard acquisition in that it never takes ownership of any hardware. The program purchases launch services, which means the responsibility for infrastructure sustainment falls upon the service provider."). "In addition, the OT agreements provide flexibility to execute varying deliverables and payment plans depending on each company's business structure and

development maturity levels." Tab 19, AR 795. Finally, "[e]ach agreement will afford the Air Force unilateral termination rights" that "are not ordinarily permitted, under the Federal Acquisition Regulations," such as "investment claw-back provisions," "while also ensuring that any investment contributed by the Air Force is protected through 'sell or payback' provisions." Tab 47c, AR 1353.

In addition, the Air Force is required to procure its space transportation requirements, including NSS missions, through commercial item services contracts. 51 U.S.C. § 50131 and 50132(a) ("Acquisitions of space transportation services by the Federal Government shall be carried out in accordance with applicable acquisition laws and regulations (including chapters 137 and 140 of title 10). For purposes of such law and regulations, space transportation services shall be considered to be a commercial item."). As such, the Air Force cannot award procurement contracts to produce and deliver launch vehicle systems for NSS missions, but instead must obtain the services of commercial providers under FAR part 12 to launch NSS payloads into orbit. Because the NSS commercial launch service procurements must be separate and distinct from any government-funded development of underlying launch vehicle systems providing the commercial services, the Air Force determined that an OT was the appropriate instrument for the launch vehicle prototypes.

Thus, on March 21, 2018, the Assistant Secretary of the Air Force (Acquisition, Technology & Logistics) determined that "exceptional circumstances surrounding the EELV prototype program and the domestic launch industry justify use of a transaction that provides for innovative business arrangements and provide an opportunity to expand the defense supply base in a manner that would not be feasible under a contract." Tab 47b, AR 1349.

III.     The Scope Of The OTs For Launch Service Prototypes

Once the Air Force determined that an OT was the appropriate vehicle, it had to

determine the scope of the OT agreement.  Specifically, the Air Force sought to develop "launch

system prototypes, to include the development and test of any required RPSs, the launch vehicle

and its subsystems, infrastructure, manufacturing processes, test stands, and other items required

for industry to provide domestic commercial launch services that meet all NSS requirements."

Tab 38, AR 11260.  The prototype sought includes "[a] fully developed and certified EELV

Launch System, including the validation of all non-recurring engineering (NRE) work."  *Id.*

"The LSA participants will perform prototype development, including system design and

development, risk reduction activities, test and evaluation activities, and technical demonstration

of system capabilities."  Tab 19, AR 796.  The Air Force expects that its use of an OT agreement

"will result in a prototype launch system that can be used to demonstrate whether the system has

the capability to meet EELV requirements."  Tab 19, AR 793.

The OTs for launch service prototypes do not include the production of the launch

vehicles.  Rather, the development consists of "[a]ll activities from initial concept up to, but not

including, production."  Tab 38, AR 1261.  The Air Force also expects that, following its

investment "in the development of prototypes for launch systems," those systems can be "used to

provide commercial launch services that will also be extended to provide NSS launch services."

Tab 19, AR 793.  Such development may lead to "[s]ubsequent procurements," such as the

Phase 2 procurement, which "will allow launch system fixed costs to be shared across more

launches, including commercial and civil, and will reduce the overall cost to the Air Force."  Tab

38, AR 1260-61.  The Phase 2 procurement for launch services is specifically described as a

"follow-on activit[y]."  Tab 19, AR 807; *see also* Tab 19, AR 810 ("The follow-on activity will

be procurement of launch services."). "LSA is designed to work in synergy with commercial launch vehicle development efforts that will lead in space for decades to come." Tab 47c, AR 1351. The Phase 2 launch services procurement is open to all interested offerors, and is not limited to entities that received LSA OT awards.

IV.    Solicitation And Award[5]

Once the Air Force determined that OTs were the appropriate way to develop the launch service prototypes, it competitively awarded the OT agreements for launch service agreements in accordance with the Air Force's OT authority for prototype projects under 10 U.S.C. § 2371b, which, as discussed above, authorizes the Air Force to use OTs for prototype project efforts that are directly relevant to enhancing mission effectiveness of military personnel and supporting platforms, systems, components, or materials to be acquired or developed by the Air Force.

The Air Force issued a solicitation for OTs on October 5, 2017. Four companies provided proposals: Blue Origin, ULA, Orbital ATK and SpaceX. The Air Force engaged in competitive procedures including discussions, negotiations, and soliciting revised proposals.

In October 2018, the Air Force awarded OTs to ULA, Blue Origin, and Orbital ATK. Tab 136, AR 41753. SpaceX filed an objection with the Air Force on December 10, 2018. The Air Force denied SpaceX's objection on April 18, 2019. This lawsuit followed on May 17, 2019.

ARGUMENT

I.    Standard Of Review:  Jurisdiction

Rule 12(b)(1) provides that "a party may assert . . . by motion" the defense of "lack of subject-matter jurisdiction." RCFC 12(b)(1). "If the court determines at any time that it lacks

---

[5] We include an abbreviated statement of facts necessary to give context to the jurisdictional motion, but will provide additional facts if briefing on the merits becomes necessary.

subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3). Indeed, the

Court must "satisfy itself of its jurisdiction over the subject matter before it considers the merits

of a case." *Hymas*, 810 F.3d at 1316-17 (citation omitted). "Jurisdiction is power to declare the

law, and when it ceases to exist, the only function remaining to the court is that of announcing

the fact and dismissing the cause." *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869).

"The party seeking to invoke the . . . Court's jurisdiction must establish that jurisdiction

exists by a preponderance of the evidence." *Hymas*, 810 F.3d at 1317 (citing *Taylor v. United

States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002)). "Although, for purposes of jurisdiction," the

Court "typically assume[s] as true all facts alleged in a complaint, where 'the factual basis for the

court's subject matter jurisdiction' is challenged, 'only uncontroverted factual allegations are

accepted as true.'" *Hymas*, 810 F.3d at 1317 (quoting *Cedars-Sinai Med. Ctr. v. Watkins*,

11 F.3d 1573, 1583-84 (Fed. Cir. 1993)). In this case, the Court does not possess jurisdiction to

entertain this bid protest regarding OTs, which lie beyond the limited bounds of bid protest

jurisdiction under 28 U.S.C. § 1491(b).

"[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued

. . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain

the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v.

Sherwood*, 312 U.S. 584, 586 (1941)); *accord Hymas*, 810 F.3d at 1317. "Consistent with this

principle, the Tucker Act confers limited jurisdiction on the . . . Court to adjudicate claims

against the United States." *Hymas*, 810 F.3d at 1317. With respect to bid protests, the Tucker

Act states:

> [T]he United States Court of Federal Claims . . . shall have
> jurisdiction to render judgment on an action by an interested party
> objecting to a solicitation by a Federal agency for bids or proposals
> for a proposed award or the award of a contract or any alleged

> violation of statute or regulation *in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1) (emphasis added).

"The Tucker Act operates as a waiver of sovereignty by the United States and" the Court is "obliged to construe such waivers strictly." *Smith v. Orr*, 855 F.2d 1544, 1552-53 (Fed. Cir. 1988) (discussing Little Tucker Act, 28 U.S.C. § 1346); *accord MacLean v. United States*, 454 F.3d 1334, 1336 (Fed. Cir. 2006) ("a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity . . . must be strictly construed") (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)). Thus, "notions of fairness and equity do not operate to enlarge" the "rigid jurisdictional limitations . . . in the Tucker Act." *Murphy v. United States*, 222 Ct. Cl. 685, 686 (1980); *accord Hercules Inc. v. United States*, 516 U.S. 417, 430 (1996) (similar).

II.    **The Court Does Not Possess Bid Protest Jurisdiction To Entertain Challenges To Non-Procurement Actions**

In its complaint, SpaceX challenges "the Agency's [OT] award decision."[6] Compl. at 1. SpaceX's challenge, however, does not grant the Court jurisdiction to entertain its complaint. Rather, as we will explain below, the Court lacks jurisdiction under 28 U.S.C. § 1491(b) to entertain a bid protest challenging a non-procurement action.

Procurement contracts do not "encompass the entire universe of instruments at executive agencies' disposal." *Hymas*, 810 F.3d at 1325. As stated above, several agencies, including DOD, have been authorized to conduct non-procurements using OTs. 10 U.S.C. §§ 2371 and

---

[6] Throughout its complaint, SpaceX avoids referring to the agreement as an OT agreement, instead referring to the award as a "Launch Service Agreement [LSA]," presumably to minimize its obvious jurisdictional defect. However, SpaceX has not disputed that the Air Force awarded an OT agreement pursuant to 10 U.S.C. § 2371b, nor does SpaceX challenge that the Air Force properly exercised its OT authority.

2371b.  On the other hand, bid protest jurisdiction pursuant to section "1491(b)(1) in its entirety

is exclusively concerned with *procurement* solicitations and contracts."  *Res. Conservation*

*Group, LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010) (emphasis added); *accord*

*Hymas*, 810 F.3d at 1317, 1324.

The term "procurement" is not defined in § 1491(b).  *See* 28 U.S.C. § 1491(b)(1); *Hymas*,

810 F.3d at 1324; *Res. Conservation*, 597 F.3d at 1242-45.  As explained in *Hymas*, the Federal

Circuit at times has "relied upon the definition of 'procurement' in 41 U.S.C. § 111" (previously

codified at 41 U.S.C. § 403(2)) for purposes of § 1491(b).  *Hymas*, 810 F.3d at 1324-25;

*Distributed Solutions*, 539 F.3d at 1345-46; *see also* 41 U.S.C. § 111 ("procurement" may

include "all stages of the process of acquiring property or services, beginning with the process

for determining a need for property or services and ending with contract completion and

closeout."); *see also* 10 U.S.C. § 2302(3)(A).  However, *Hymas* clarified that the term

"procurement" must be construed harmoniously for purposes of the Tucker Act, the FGCAA,

and CICA.  *Hymas*, 810 F.3d at 1327 (courts "must respect the concinnity between the separate

yet interrelated statutes that Congress has enacted" and should not "rely solely upon 41 U.S.C.

§ 111").

Accordingly, the Federal Circuit held in *Hymas* that, when an agency exercises its

statutory authority to use a non-procurement instrument, and the FGCAA does not require the

use of a procurement contract, the agency is not required to comply with CICA, and the Court

does not possess §1491(b) jurisdiction to review the non-procurement action.  *Id.* at 1324-30; *see*

*also CMS Contract Mgmt. Servs. v. United States*, 745 F.3d 1379, 1381 (Fed. Cir. 2014)

("agencies escape the requirements of federal procurement law" when using a non-procurement

action).

Although to our knowledge, the Court has not previously considered the question of whether bid protest jurisdiction under 28 U.S.C. § 1491(b) extends to challenges regarding the specific type of non-procurement transactions at issue here – OTs – GAO has determined that agreements issued by an agency under its "other transaction" authority are not procurement contracts and, therefore, GAO generally does not review protests of the award of OTs under its bid protest jurisdiction.[7] *E.g., MD Helicopters, Inc.*, B-417379, 2019 CPD ¶ 120 (Comp. Gen. April 4, 2019); *MorphoTrust USA, LLC*, B-412711, 2016 CPD ¶ 133 (Comp. Gen. May 16, 2016); *Exploration Partners*, LLC, B-298804, 2006 CPD ¶ 201 (Comp. Gen. Dec. 19, 2006). And although GAO opinions are not binding on this Court, they may be "instructive in the area of bid protests." *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009).

Moreover, the Federal Circuit's conclusion in *Hymas* that the Court lacks jurisdiction to review non-procurement actions is hardly a novel one. In *Frankel v. United States*, 842 F.3d 1246 (Fed. Cir. 2016), the Federal Circuit upheld this Court's determination that the plaintiff lacked standing because his challenge to the award of a "prize competition" contract did not constitute a procurement contract. 842 F.3d at 1250-51. And in *Resource Conservation*, the Federal Circuit affirmed this Court's finding that it lacked jurisdiction under § 1491(b) because "bid protests involving leases of land where the government is the lessor" are "not 'in connection with a procurement or proposed procurement.'" *Res. Conservation*, 597 F.3d at 1242 (citing *Res. Conservation Group, LLC v. U.S. Dep't of the Navy*, 86 Fed. Cl. 475, 486 (2009)). The

---

[7] GAO has found that, with respect to an OT agreement, it possesses limited jurisdiction to review "a timely pre-award protest that an agency is improperly using its other transaction authority to procure goods or services." *MD Helicopters, Inc.*, B-417379, 2019 CPD ¶ 120 (Comp. Gen. April 4, 2019) (citing 4 C.F.R. § 21.5(m); *Blade Strategies, LLC*, B-416752, 2018 CPD ¶ 327 at 2 (Comp. Gen. Sept. 24, 2018)). SpaceX has not made such allegations here.

principles in *Hymas* and others lead to a straightforward conclusion that the Court does not possess bid protest jurisdiction to entertain challenges to OTs that are not procurement contacts.

Moreover, the legislative history additionally confirms that this Court lacks jurisdiction here. In 1996, Congress amended the Tucker Act to provide for bid protest jurisdiction. Admin. Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3874-76 (Oct. 19, 1996), codified at 28 U.S.C. § 1491(b)(1). At that time, Congress had already authorized DOD to use OTs and had recently expanded its authority to use OTs for prototype projects in 1994, codified at 10 U.S.C. §2371b, and the use of OTs had been well-established for decades. *See*, *e.g.*, National Aeronautics and Space Act of 1958, Pub. L. No. 85-568, §203(b)(5), 72 Stat. 426, 430 (1958) (authorizing NASA to use OTs), codified at 51 U.S.C. 20113(e); Court Interpreters Act of 1978, Pub. L. No. 95-539, § 3(a), 92 Stat. 4043 (1978) (authorizing Executive Office of United States Courts to use OTs), codified at 28 U.S.C. § 604(a)(10)(C); NDAA for Fiscal Years 1990 and 1991, Pub. L. No. 101-189, § 251(a), 103 Stat. 1352, 1403 (1989) (authorizing DOD to use OTs), codified at 10 U.S.C. § 2371. "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Hymas*, 810 F.3d at 1327 (quoting *Aectra Ref. & Mktg. v. United States*, 565 F.3d 1364, 1370 (Fed. Cir. 2009)). Congress presumably would not have used the term "procurement" in §1491(b) if it had intended to authorize bid protests challenging OTs that separately are permitted under numerous Federal statutes. *See id.* Likewise, Congress presumably would not have used the term "transactions (other than contracts, cooperative agreements, and grants)" in § 2371b if it had meant "procurements" within the meaning of the FGCAA and CICA. *See Hymas*, 810 F.3d at 1327; *Aectra*, 565 F.3d at 1370.

For these reasons, the Court should apply *Hymas* when deciding this legal issue of first impression, and hold that the Court does not possess bid protest jurisdiction to entertain challenges to OTs.

III.   SpaceX's Complaint Is Not "In Connection With" A Procurement Or Proposed Procurement

On its face, this Court's bid protest jurisdictional statute "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement" *Systems Application & Tech., Inc. v United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012); *see also* 28 U.S.C. § 1491(b)(1).

SpaceX does not allege that the Air Force did not lawfully use its authority under § 2371b to award an OT agreement. *See generally* Compl. Nor does SpaceX allege that the OT itself is a procurement. *Id.* Instead, SpaceX alleges that an *entirely separate* procurement can provide the Court jurisdiction to entertain a challenge to an instrument, an OT agreement, that all parties agree is a non-procurement agreement. Specifically, SpaceX alleges that the awarded OTs were "in connection with, and for the purpose of, the FAR Part 12 procurement for NSS launch services covered by the Phase 2 RFP." Compl. ¶ 96. The primary defect with SpaceX's argument is that SpaceX admittedly does *not* challenge the procurement activity (the Phase 2 solicitation for launch support services). *See* Compl. at 1 ("SpaceX . . . does not also challenge the related National Security Space ("NSS") Launch Phase 2 Launch Service Procurement."). Nor do the statutes that SpaceX claims the Air Force violated, the Administrative Procedure Act (APA) and 10 U.S.C. § 2371b, relate to the Phase 2 procurement. Compl. ¶ 101.

SpaceX relies on the Phase 2 solicitation *solely* to provide SpaceX a jurisdictional hook to challenge the non-procurement OT award. SpaceX's allegation that the phrase "in connection

with" should be interpreted in this way is contrary to this Court's and the Federal Circuit's precedent and may lead to unintended and absurd results.

A.      SpaceX's Interpretation Of "In Connection With" Is Contrary to Precedent

SpaceX mischaracterizes *Distributed Solutions* to conclude that the Air Force's non-procurement OT award was made "in connection with" the Phase 2 launch services award. Compl. ¶ 97 (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1288-89 (Fed. Cir. 1999)). In that case, the Federal Circuit noted that the definition of "procurement" in 41 U.S.C. § 111 (previously codified at § 403(2)), "includes all stages of the process of acquiring property or services, *beginning with the process for determining a need* for property or services and ending with contract completion and closeout." *Distributed Solutions*, 539 F.3d at 1345-46 (quoting 41 U.S.C. § 403(2) (emphasis added)). However, neither *Distributed Solutions* nor any of the other cases relied on by SpaceX considered whether the phrase "in connection with" a procurement or proposed procurement can provide jurisdiction over a separate non-procurement action and these cases are, therefore, distinguishable.

For example, in *Distributed Solutions*, the Federal Circuit determined that the Government's request for information soliciting information from outside vendors "to determine the scope of services required by the [G]overnment" supplied the Court with jurisdiction because "[t]he statute explicitly contemplates the ability to protest these kinds of pre-procurement decisions." *Id.* at 1346. In this case, on the other hand, the statute explicitly defines OTs as non-procurement agreements and contemplates that they are not subject to normal procurement regulations and procedures, including this Court's jurisdiction. *See* 10 U.S.C. § 2371b.

If read in an overly expansive fashion, *Distributed Solutions* could stand for the proposition that every single decision, from a requirements definition through contract

administration, could be "in connection with" a procurement. However, *Distributed Solutions* and its progeny have defined § 1491(b) bid protest jurisdiction to be far more limited in scope. *See, e.g.*, *Distributed Solutions*, 539 F.3d at 1346 ("adding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under § 1491(b)(1)"); *VFA, Inc. v. United States*, 118 Fed. Cl. 735, 743 (2014) (12(b)(1) dismissal of protest challenging agency decision not to procure property or service from private contractor); *Kellogg Brown & Root Servs. v. United States*, 117 Fed. Cl. 764, 768-70 (2014) (12(b)(1) dismissal of protest filed by contract awardee challenging agency contract administration decision). Moreover, in *International Genomics Consortium v. United States*, 104 Fed. Cl. 669 (2012), the court cautioned that adopting an overbroad reading of *Distributed Solutions* would "unlock a veritable Pandora's box of bid protest challenges to many internal agency decisions that never ripen into procurements." *Id.* at 676; *see also Gov't Technical Servs. LLC v. United States*, 90 Fed. Cl. 522, 528 (2009) (holding that *Distributed Solutions* does not extend bid protest jurisdiction to agency decisions not to exercise options on existing contracts).

This Court and the Federal Circuit have also specifically considered the phrase "in connection with" and interpreted it to be significantly less broad that SpaceX suggests in its complaint. *See AgustaWestland North America, Inc. v. United States*, 880 F.3d 1326, 1331 (Fed. Cir. 2018) (finding that an execution order converting the Army's training helicopters is not a decision "in connection with" a procurement); *Geiler/Schrudde & Zimmerman v. United States*, 743 F. App'x 974, 977 (Fed. Cir. 2018) (finding that the revocation of an offeror's service-disabled veteran owned small business status did not occur "in connection with a procurement or proposed procurement"). Specifically, this Court in *BayFirst Solutions, LLC v. United States*, 104 Fed. Cl. 493 (2012), discussed the limits on the phrase "in connection with." The Court

considered whether the Federal Acquisition Streamlining Act's (FASA) bar on challenges that are "in connection with the issuance or proposed issuance of a task or delivery order" would bar the cancellation of a solicitation. *Id.* at 507. Although the Court analyzed both sides of the issue, it ultimately determined that the cancellation is not "in connection with" the task order. *Id.* Relevant to its decision was the fact that "[t]he cancellation of the [s]olicitation may be viewed as a discrete procurement decision and one which would have been the subject of a separate protest." *Id.* In other words, the "connection" to a procurement ends when there is a separate procurement decision.

In a factually similar scenario, this Court found that it lacked jurisdiction over a challenge to an award of a Small Business Innovation Research (SBIR) Phase II contract, which by definition concerned a "major research and development effort, resulting in a deliverable prototype." *R&D Dynamics Corp. v. United States*, 80 Fed. Cl. 715, 716 (2007). This Court found relevant to its determination, among other things, that "no FAR provisions apply specifically to the SBIR award program," and that the SIBR's implementing "statute does not mention 'procurement' or a purpose of obtaining property or services through a competitive contract process as a purpose of the SBIR program." *Id.* at 720-21. This Court came to its conclusion despite the fact that the source selection plan "points out that a Phase III award may lead to a competitive procurement." *Id.* at 721. Rather, the Court concluded that, although "[t]he resources expended by the government in Phase II of the SBIR program may ultimately lead to the development of a capacity to provide goods or services in Phase III," "the court does not find that a procurement occurs in Phase II of the SBIR program" and thus, that the plaintiff lacked "a 'connection with a procurement or a proposed procurement.'" *Id.* at 722.

As the Federal Circuit has described it, "*once a party objects to a procurement*, section 1491(b)(1) provides a broad grant of jurisdiction because '[p]rocurement includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" *Sys. App.. & Tech.*, 691 F.3d at 1381 (emphasis added) (quoting *Res. Conservation*, 597 F.3d at 1244 (emphasis omitted) (quoting 41 U.S.C. § 403(2))). Here, on the other hand, what SpaceX is objecting to is *not* a procurement, given that the OT at issue is a non-procurement agreement. Thus, the phrase "in connection with" has limits, and the Federal Circuit's and this Court's cases do not support SpaceX's use of the phrase to impermissibly assert jurisdiction over a separate non-procurement action.

      B.      <u>The OT Is Not "In Connection With" The Phase 2 Procurement</u>

The Air Force does not disagree that the Phase 2 procurement is part of the same overall EELV program as the OT award, but this fact does not make the LSA non-procurement OT agreement and the Phase 2 procurement "in connection with" each other for purposes of determining this Court's jurisdiction. As shown in Figure 1 above, the EELV strategy involves several discrete steps, going back to FY2013. The OTs for launch service agreements are one discrete step, and the Phase 2 procurement is another. The overall goal of the EELV program is to "leverage the commercial market place in order to assure access to space (AATS) for NSS satellites, meet statutory requirements to transition off Russian-manufactured rocket engines, maintain program affordability, and create a sustainable competitive environment in the future." Tab 19, AR 786. As SpaceX states in its complaint, the Air Force is in the process of accomplishing this goal using a multi-step approach. *See* Compl. ¶ 98 (citing *Hearing on Department of Defense Appropriations for Fiscal Year 2016 Before the S. Subcomm. of the*

*Comm. on Appropriations*, 114th Cong. 61 (2015) (statement of Hon. Ashton Carter, Secretary), available at https://www.govinfo.gov/content/pkg/CHRG-114shrg59104641/pdf/CHRG-114shrg59104641.pdf).  However, each step has its own separate processes.  Specifically, Step 3, the OT competition for launch service prototypes, and Step 4, the Phase 2 procurement for launch services, have different competitions and different goals.  Indeed, by statute, the Step 3 OT prototyping effort could not be conducted "in connection with" the Step 4 Phase 2 acquisition, which must be accomplished as a FAR part 12 procurement of commercial services. *See* 51 U.S.C. § 50132.

The OT award process and the Phase 2 solicitation are two separate competitions with two separate acquisition strategies.  It is a tenet of procurement law that "[e]ach procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement."  *SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001) (quoting *Renic Corp.*, B-248100, 92-2 CPD ¶ 60 (Comp. Gen. July 29, 1992)); *see also Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 132 (2015) (contracting officer not bound by determinations made in separate procurement); *Griffy's Landscape Maint. LLC, v. United States*, 51 Fed. Cl. 667, 671 (2001) ("[A]n attack upon a new solicitation or upon any other aspect of the administration of the previous contract, must stand on its own.").  The OTs were awarded as a result of a non-FAR-based competition, whereas the Phase 2 is a FAR-based competition.  Tab 19, AR 807.  Notably, the Phase 2 competition is not limited to the awardees of the OT agreements.  *Id.* (noting that, "*[i]f* any of the [Phase 2] awardees have LSAs, those LSA OT agreements would continue") (emphasis added); Tab 19, AR 786 ("FAR-based procurement contracts will be competitively awarded to certified EELV launch service providers, which could include companies that were not previously awarded LSAs").  Thus, as SpaceX

acknowledges, it is still eligible to compete in the Phase 2 competition. *See, e.g.* Compl. ¶¶ 77, 87. Nor is SpaceX bound in its Phase 2 bid by what it bid in the OT procurement.[8] Thus, the two competitions are not "mutually dependent" so as to be "in connection with" each other. *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 756 (2010); *see also SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (requiring that the procurement action be "directly and causally connected" to a procurement).

Moreover, the purposes of each competition are separate. For the OT, the Air Force intended to increase the pool of launch vehicles that meet the agency's needs. Specifically, through the OT awards, the Air Force "will invest in industry to develop enhanced configurations to support all NSS requirements." Tab 19, AR 789. An OT is appropriate to accomplish this goal because "the Air Force will be investing in the development of prototypes for launch systems." Tab 19, AR 793. The goal of the Phase 2 procurement, on the other hand, is to procure, through requirements contract awards, "launch services delivering multiple National Security Space (NSS) missions with annual ordering periods from Fiscal Year (FY) 2020 through FY 2024." ECF No. 1-1 at 38 (Phase 2 RFP at 2). If SpaceX's statements are true that it already possesses commercial launch vehicles capable of meeting the agency's requirements for launch services, *see, e.g.*, Compl. ¶¶ 2, 5, 11, then SpaceX will be competitive in the Phase 2 procurement despite not being awarded an OT agreement.

Under SpaceX's theory, every step in the Air Force's multi-phase approach would be deemed "in connection" with one another for purposes of § 1491(b). However, as the Court found in *R&D Dynamics Corp.*, a prototype agreement that is not in itself a procurement is not

---

[8] For example, SpaceX would not be bound to bid the Big Falcon Rocket (BFR) that it proposed in the OT solicitation, *see* Tab 51, AR 4294, and may instead bid the Starship rocket that it references throughout its complaint. *See generally* Compl.

"in connection with" a later competitive procurement.  80 Fed. Cl. at 722 (quoting 28 U.S.C.

§ 1491(b)(1) (2001)).  In this case specifically, SpaceX ignores the relationship among the

various phases of the EELV program.  "[T]he EELV strategy includes a combination of

development, procurement and launch activity targeting a sustainable competitive launch

environment that includes transitioning off use of the Russian RD-180 engine."  Tab 19, AR 787.

SpaceX's argument, if adopted, would permit it to circumvent the procedures (and time

limitations) to challenge each individual procurement conducted in Phases 1, 1A, 2, and 3,

merely by alleging that putative violations of statutes or regulations in one Phase were "in

connection with" awards made under another Phase, over a 14 or more year period.

In fact, SpaceX's argument goes even farther; it would make nearly *every* OT subject to

this Court's bid protest jurisdiction, contrary to *Resource Conservation*.  *Res. Conservation*,

597 F.3d at 1245.  Prototypes acquired by OTs, when successful, will nearly always be related to

subsequent acquisition of goods or services, as the prototypes must be "directly relevant to

enhancing the mission effectiveness of military personnel and the supporting platforms, systems,

components, or materials proposed to be acquired or developed by the Department of Defense."

10 U.S.C. § 2371b(a)(1).  In fact, § 2371b(f) provides for follow-on production contracts or

transactions in certain circumstances.  Thus, Congress contemplated that prototypes may, and in

many cases, would lead to production and that the Government would often enter into a sole-

source procurement contract after completion of a non-procurement OT.

Indeed, the Government would not spend time and money developing prototypes if it did

not intend to acquire any related goods or services in the future.  But, Congress did not provide

that alleged violations of statutes concerning the OT evaluation and award process may be

deemed "in connection with" follow-on FAR based procurements.  Rather, Congress expressly

31

excluded OTs from the definition of procurement contracts. Every cooperative agreement research project, OT, and similar transactions would be protestable under SpaceX's theory simply because the Government ultimately hopes and intends – consistent with statutory requirements – that the prototypes it seeks to develop are successful and will result in a product that it may procure in the future. This absurd result is contrary to the express will of Congress.

SpaceX's jurisdictional theory is inconsistent with controlling precedent and the statutory scheme for OT non-procurements, and it should be rejected.

IV.     SpaceX Does Not Allege Any Violation Of Any Procurement Statute

SpaceX's allegations here additionally fail to come within this Court's jurisdiction because SpaceX does not allege any violation of any procurement statute.

In *Cleveland Assets*, the Federal Circuit cautioned that, "[i]f plaintiffs could allege any statutory or regulatory violation tangentially related to a government procurement, § 1491(b)(1) jurisdiction risks expanding far beyond the procurement context." 883 F.3d at 1381. Thus, the Court "decline[d] to read out the meaning of 'procurement' from the text of § 1491(b)(1) regarding the statutes and regulations that an interested party may challenge." *Id.* Accordingly, the Federal Circuit affirmed this Court's dismissal of plaintiff's complaint where it alleged a violation of only "an *appropriation*, not a procurement, statute." *Id.* (emphasis in original).

Here, SpaceX faces an additional jurisdictional hurdle because it has alleged violations of two statutes, the APA and §2371b, neither of which are procurement statutes. Rather, as explained above, § 2371b authorizes DOD to use OTs, a non-procurement vehicle. Therefore, § 2371b cannot be considered a procurement statute. Neither is the APA a procurement statute. *See RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999) ("INS allegedly only violated the APA, not a procurement statute").

Thus, this Court lacks jurisdiction over SpaceX's complaint for the additional reason that

it does not allege any violation of any procurement regulation or statute.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss SpaceX's complaint for

lack of subject matter jurisdiction.

Respectfully Submitted,

JOSEPH H. HUNT
Assistant Attorney General

OF COUNSEL:

ROBERT E. KIRSCHMAN, JR.
Director

ERIKA WHELAN RETTA
Air Force Legal Operations Agency
Commercial Law and Litigation Directorate
AFLOA/JAQC
Contract and Fiscal Law Division

/s/ Douglas K. Mickle
DOUGLAS K. MICKLE
Assistant Director

GREGORY YOKAS
Space and Missile Systems Center
Office of the Staff Judge Advocate

/s/ Tanya B. Koenig
TANYA B. KOENIG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tele: (202) 305-7587

DOUGLAS EDELSCHICK
Trial Attorney
Department of Justice

June 13, 2019

Attorneys for Defendant