IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP.,  ) <br> ) <br> Plaintiff,  ) <br> ) <br> v.  ) <br> ) <br> THE UNITED STATES,  ) <br> ) <br> Defendant,  ) <br> ) <br> and  ) <br> ) <br> BLUE ORIGIN, LLC, *et al.*,  ) <br> ) <br> Defendant-Intervenors.  ) <br> ) | Case No. 19-742-C <br> Judge Lydia Kay Griggsby <br><br> ███████████████ <br><br> FINAL AGREED-TO REDACTED VERSION |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND,
IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

*Of Counsel:*

Kara L. Daniels
David M. Hibey
Sonia Tabriz
Nathaniel E. Castellano
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Craig A. Holman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone: (202) 942-5720
Fax: (202) 942-5999

*Attorney of Record for Space Exploration
Technologies Corp.*

███████████████████████████████████

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     QUESTIONS PRESENTED .......................................................................... 6

III.    STATEMENT OF FACTS ............................................................................ 7

IV.     STANDARD OF REVIEW ......................................................................... 14

V.      ARGUMENT ............................................................................................... 16

        A.      The Court Has Jurisdiction Over SpaceX's Complaint, Which Alleges Non-Frivolous Violations Of Law In Connection With A Procurement Or Proposed Procurement. ...................................................................... 16

                1.      The Federal Circuit's Application of This Court's Broad "In Connection With" Jurisdiction. ................................................... 17

                2.      The Agency Made the LSA Awards "In Connection With" a Procurement or Proposed Procurement. .................................... 19

                3.      Defendant's Arguments That *Hymas* and *R&D Dynamics* Demand an Unstated Exception to the "In Connection With" Jurisdictional Prong of Section 1491(b)(1) are Unsound. ................................ 25

                4.      The Agency Has Violated Multiple Statutes "In Connection With" the Agency's Launch Services Procurement. ............................. 31

                        a.      The Court Has Jurisdiction Because the Agency Violated 10 U.S.C. § 2371b. ............................................................ 32

                        b.      The Court Has Jurisdiction Because the Agency Violated the APA. ................................................................................... 35

        B.      Alternatively, The Court Should Transfer This Action To District Court. ............ 37

VI.     CONCLUSION ............................................................................................ 39

## TABLE OF AUTHORITIES

**CASES**                                                                          **Page(s)**

*Advani Enters., Inc. v. Underwriters at Lloyds,*
    140 F.3d 157 (2d Cir. 1998) ...................................................................15

*Agustawestland N. Am., Inc. v. United States,*
    880 F.3d 1326 (Fed. Cir. 2018) ...............................................................22

*District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.,*
    797 F.2d 1041 (D.C. Cir. 1986) ...............................................................15

*Califano v. Sanders,*
    430 U.S. 99 (1977) ...................................................................................38

*Cleveland Assets, LLC v. United States,*
    883 F.3d 1378 (Fed. Cir. 2018) ....................................................32, 33, 34

*Distributed Sols., Inc. v. United States,*
    539 F.3d 1340 (Fed. Cir. 2008) ........................................................ *passim*

*Emery Worldwide Airlines, Inc. v. United States,*
    264 F.3d 1071 ..................................................................................... *passim*

*Emery Worldwide Airlines, Inc. v. United States,*
    49 Fed. Cl. 211 (2001) .............................................................................36

*Estes Express Lines v. United States,*
    739 F.3d 689 (Fed. Cir. 2014) .................................................................15

*Frankel v. United States,*
    482 F.3d 1246 (Fed. Cir. 2016) ...............................................................27

*Geiler/Schrudde & Zimmerman v. United States,*
    743 F. App'x 974 (Fed. Cir. 2018) ....................................................25, 31

*Hymas v. United States,*
    810 F.3d 1312 (Fed. Cir. 2016) ......................................5, 25, 26, 28

*L-3 Servs. v. United States,*
    104 Fed. Cl. 30, 32-33 (2012) ...........................................................15, 39

*Labat-Anderson, Inc. v. United States,*
    50 Fed. Cl. 99 (2001) ...............................................................................24

*In re Mailman Steam Carpet Cleaning Corp.,*
    196 F.3d 1 (1st Cir. 1999) ..................................................................15, 16

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel,*
606 F.3d 780 (D.C. Cir. 2010)..................................................................15

*Newell Cos. v. Kenney Mfg. Co.,*
864 F.2d 757 (Fed. Cir. 1988)..................................................................26

*OTI Am. Inc. v. United States,*
68 Fed. Cl. 108 (2005) ............................................................................23

*R&D Dynamics Corp. v. United States,*
80 Fed. Cl. 715 (2007) ...............................................................25, 27, 28

*RAMCOR Servs. Grp., Inc. v. United States,*
185 F.3d 1286 (Fed. Cir. 1999)........................................................ *passim*

*Resource Conservation Group, LLC v. United States,*
597 F.3d 1238 (Fed. Cir. 2010).........................................................27, 38

*Rubio v. Monsanto Co.,*
181 F. Supp. 3d 746 (C.D. Cal. 2016) .....................................................38

*SRA Intern., Inc. v. United States,*
766 F.3d 1409 (Fed. Cir. 2014)................................................................29

*Sys. Application & Techs., Inc. v. United States,*
691 F.3d 1374 (Fed. Cir. 2012)........................................................ *passim*

*Team Waste Gulf Coast, LLC v. United States,*
135 Fed. Cl. 683 (2018) ...........................................................................24

*Thrustmaster of Texas, Inc. v. United States,*
59 Fed. Cl. 672 (2004) .............................................................................39

*Vero Technical Support, Inc. v. U.S. Department of Defense,*
733 F. Supp. 2d 1336 (S.D. Fla. 2010) ....................................................30

*White Hawk Grp., Inc. v. United States,*
91 Fed. Cl. 669 (2010) .............................................................................24

**STATUTES**

10 U.S.C. § 2302...........................................................................................34

10 U.S.C. § 2304...........................................................................................34

10 U.S.C. § 2304c.........................................................................................29

10 U.S.C. §§ 2366a-c ...................................................................................34

10 U.S.C. § 2371b ........................................................................................ *passim*

10 U.S.C. § 2373 ................................................................................................ 34

28 U.S.C. § 1331 ................................................................................................ 38

28 U.S.C. § 1391 ................................................................................................ 38

28 U.S.C. § 1491(b) ................................................................................. *passim*

28 U.S.C. § 1631 ............................................................................. 1, 6, 15, 37

28 U.S.C. § 1653 ................................................................................................ 15

39 U.S.C. § 101 ................................................................................................. 36

40 U.S.C. § 3307 ............................................................................................... 33

41 U.S.C. § 111 ................................................................................................. 21

41 U.S.C. § 4106 ............................................................................................... 29

Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat.
       3870 (1996) ............................................................................................. 1, 29

**OTHER AUTHORITIES**

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
       § 1350 (3d ed. 2019) ................................................................................... 15

Plaintiff Space Exploration Technologies Corp. ("SpaceX"), pursuant to the Court's Scheduling Order, hereby timely opposes Defendant's Motion to Dismiss Plaintiff's Complaint and, in the alternative, moves to transfer venue to the U.S. District Court for the Central District of California. *See* 28 U.S.C. § 1631.

## I.   INTRODUCTION

SpaceX's Complaint, which presents "non-frivolous allegations" of violations of law in connection with a procurement or proposed procurement, falls squarely within the exclusive jurisdiction of this Court. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008). Defendant—without support even from the three Intervenor-Defendants—attempts to rewrite the plain language and meaning of 28 U.S.C. § 1491(b)(1), contorts precedent of the United States Court of Appeals for the Federal Circuit addressing that statutory provision, and muddles the allegations of SpaceX's Complaint and the record facts, all in an effort to divest this Court of jurisdiction. Defendant's Motion invites legal error and seeks to strip this Court of jurisdiction Congress has provided. This Court should decline the invitation and deny Defendant's Motion.

In 1996, Congress passed the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110 Stat. 3870 (1996),[1] which provides the United States Court of Federal Claims exclusive jurisdiction over three types of bid protest objections: (i) "to a solicitation by a Federal agency for bids or proposals for a proposed contract"; (ii) "to a proposed award or the award of a contract; *or* (iii) to "*any* alleged violation of statute or regulation in connection with a

---

[1] As originally enacted, ADRA allowed federal district courts and this Court to adjudicate "the full range of cases previously subject to review in either system," *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001 (quoting 142 Cong. Reg. S11849 (daily ed. Sept. 30, 1996) (statement of Sen. Levin)), but included a sunset provision terminating the district court's jurisdiction over bid protest actions on January 1, 2001, in order to "develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum." *Id.* (quoting 142 Cong. Reg. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen)).

procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1);[2] *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012) (finding jurisdiction over corrective action challenge).   Although Defendant devotes much of its Motion to argue that an Other Transaction ("OT") agreement is not a procurement contract, it is the third prong of this jurisdictional statute that is at issue here.

SpaceX's Complaint alleges that the Launch Services Agreement ("LSA") competition was the third step of a multi-stage procurement process that the Air Force Space and Missile Systems Center (the "Agency") devised to fulfill the Agency's identified need to procure domestic launch services in response to Congressional concerns about the Agency's reliance on Russian-made rocket engines.[3]  (ECF No. 1 ¶¶ 29, 98; AR Tab 4 at 164-65.)  The undisputed purpose of this third step was to invest Government dollars in the development of launch vehicles meeting all Agency requirements from multiple domestic providers in order to engender competition for the fourth step of the procurement process, a Federal Acquisition Regulation ("FAR") Part 12 procurement for launch services, denoted by the Agency as "Phase 2."  The LSA solicitation makes clear the connection between the LSA awards and the Phase 2 contract competition: "These LSAs are intended to allow the Air Force to competitively procure launch services in the future from domestic commercial launch service providers that meet EELV requirements...."  (AR Tab 38 at 1260; *see* ECF No. 1 ¶¶ 99, 100.)  In addition, the Agency's LSA award documents reveal that the Agency made only three LSA awards versus four based on the "central theme of the Phase 2 acquisition strategy."  (AR Tab 103 at 31022.)

---

[2] All emphasis of quoted material in this brief is added unless otherwise expressly noted.
[3] Defendant seeks to assign some tactical purpose to the Complaint's use of the term "Launch Service Agreement" and "LSA," yet SpaceX merely adopted the Agency's terminology.  (*See, e.g.*, AR Tab 35 at *passim*; AR Tab 38 at *passim* ("Launch Service Agreement (LSA) Request for Proposal (RFP) Amendment #3").)

The Agency made the LSA awards using the Department of Defense ("DoD") OT authority for prototype projects, yet the Agency failed to adhere to the competitive processes required by the applicable statute and the solicitation itself. (ECF No. 1 ¶¶ 14, 117-210.)  Instead, the Agency based the LSA award decisions on material deviations from the stated criteria and prejudicial unequal treatment, violations of law that significantly disadvantage SpaceX in the ongoing Phase 2 FAR-based competition and provide an unearned advantage to each of SpaceX's competitors in that procurement.   Specifically, as a consequence of the unlawful LSA awards, SpaceX's competitors are receiving over two billion dollars of total Government investment into the launch systems that these competitors are proposing for the Phase 2 launch services procurement, as well as Agency cooperation in getting these systems certified for the Phase 2 mission requirements. Defendant-Intervenor's filings in this very matter evidence the undeniable connection between the LSA awards challenged by SpaceX's Complaint and the Phase 2 procurement.  For instance, in its Motion to Intervene, Blue Origin notes that the LSA award it received "is critical to Blue's proposal for the Phase II contract effort for the Launch Services Procurement."  (ECF No. 9 at 2-3.) Accordingly, whether the LSA awards constitute part of the larger acquisition strategy to procure the domestic launch services or a "pre-procurement decision" made in connection with the Phase 2 launch service procurement, no doubt exists that SpaceX has alleged non-frivolous allegations of violations of law in connection with a procurement or proposed procurement, triggering the exclusive jurisdiction of this Court.  *See Distributed Sols.*, 539 F.3d at 1345-46; *see also infra* Section V.A.2 (describing connectedness of LSA awards and Phase 2 procurement).

Ignoring the operative facts, Defendant's arguments can be distilled to the following flawed premise—the Court lacks jurisdiction over violations of law in connection with a procurement or proposed procurement if an OT agreement is involved.  Defendant asks this Court to create by

judicial ruling an exception to the "in connection with" prong of section 1491(b)(1).  Neither the statutory text, nor applicable case law, nor ADRA's legislative history will permit what Defendant seeks.

First, the plain language of section 1491(b)(1) provides this Court jurisdiction over an action objecting to "*any* alleged violation of statute or regulation in connection with a procurement or proposed procurement."  28 U.S.C. § 1491(b)(1).  This language on its face cannot be read, as Defendant attempts to do, as applying to "any alleged violation of statute or regulation, except for those related to OTs, in connection with a procurement or proposed procurement."  Nor does 10 U.S.C. § 2371b, the statute authorizing DoD's use of OTs for prototype projects, provide an exception to this Court's jurisdiction.  Equally significant, both the statutory structure and the plain language of section 2371b disprove Defendant's unsupported claim that section 2371b is not a procurement statute.  (*See infra* Section V.A.4 (describing the violations of law).)

Second, Defendant's request is at odds with Federal Circuit precedent applying the "in connection with" prong of the statute.  Contrary to Defendant's arguments, the Federal Circuit has held expressly that "[t]he operative phrase 'in connection with' is very sweeping in scope," *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999), and "covers a broad range of potential disputes arising during the course of the procurement process."  *Sys. Application & Techs.*, 691 F.3d at 1380.  None of these binding decisions supports Defendant's proposition that an exception to the statute's broad language exists for potential disputes that involve OTs arising during the procurement process.  To the contrary, the *RAMCOR* decision expressly rejects Defendant's argument that, to qualify for jurisdiction, the statute "require[s] an objection to the actual contract procurement," *RAMCOR*, 185 F.3d at 1289, recognizing instead that such an interpretation would improperly render the "in connection with a procurement or

4

proposed procurement" language superfluous. *Id.*

A close reading of Defendant's Motion reveals that Defendant's ill-conceived request stems from Defendant's reliance on inapposite decisions that do not address the "in connection with" prong of this Court's jurisdiction. For instance, Defendant relies principally on *Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016), contending that the Court lacks jurisdiction under section 1491(b)(1) because an OT is not a procurement contract. Notably, however, the parties in *Hymas* did *not* argue, and the Federal Circuit did *not* decide, whether challenges to the cooperative agreements at issue involved "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." *See id.* at 1312. Nor did the Federal Circuit hold that an unlawful cooperative agreement award made "in connection with a procurement" fell outside of the Court's jurisdiction under the third prong of section 1491(b)(1). Rather, *Hymas* concerned whether an agency had authority to use a cooperative agreement or whether the law required it to use a procurement agreement. *Id.* at 1317-18, 1324, 1327.

In its protest, SpaceX does not question the Agency's authority to use an OT nor does SpaceX assert that the Agency should have used another procurement vehicle. Instead, SpaceX objects to the Agency's violations of law in selecting the portfolio of LSA awards—a selection decision the Agency made in connection with (and which profoundly and unlawfully impacts) the Phase 2 procurement. (*See infra* Section V.A.3 (distinguishing each of the inapposite cases relied on by Defendant).)

Finally, the Court should deny Defendant's Motion because the exception Defendant seeks to the "in connection with" prong would frustrate Congress's purpose for enacting ADRA. Both the plain language of section 1491(b)(1) and ADRA's legislative history make clear that Congress intended for *all* objections connected to a procurement or proposed procurement to be heard

exclusively by this Court. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) (noting Congress enacted ADRA to prevent forum shopping and promote uniformity of law governing procurement-related disputes). Defendant's exception would divide stages of the same phased-procurement process in such a way that certain stages would fall outside of this Court's jurisdiction while connected, subsequent stages (impacted by the others) would fall exclusively within it. Congress did not intend such a jurisdictional labyrinth. Nor did Congress intend to give agencies the discretion to avoid this Court's jurisdiction merely by choosing to introduce OTs into their procurement processes, as the Agency has done here.

Although obscured by Defendant's Motion, the point remains that exercising jurisdiction over SpaceX's Complaint does not require the Court to declare as a matter of law that all OT awards fall under section 1491(b)(1). Under the third prong of section 1491(b)(1), the fact that the LSAs are OTs is largely immaterial. What matters is that the Agency took an action in connection with what is indisputably a procurement or proposed procurement of launch services, and that action violated at least two statutes that each provide an independent path to jurisdiction. The Court's inquiry should end there and when it does, the plain language of section 1491(b)(1) and the Federal Circuit's binding precedent support only one outcome—this Court has jurisdiction over SpaceX's protest. But, if this Court finds otherwise, SpaceX requests that the Court transfer this matter to the U.S. District Court for the Central District of California in accordance with 28 U.S.C. § 1631. (*See infra* Section V.B.)

## II.    QUESTIONS PRESENTED

1.    Whether SpaceX's Complaint has alleged non-frivolous allegations of statutory violations in connection with a procurement or proposed procurement, thereby falling within this Court's jurisdiction under 28 U.S.C. § 1491(b)(1).

2.      Alternatively, if this Court finds that it lacks jurisdiction, whether the Court should transfer this case to the U.S. District Court for the Central District of California.

## III.    STATEMENT OF FACTS

In its Standard of Review, Defendant admits that the Court "typically assume[s] as true all facts alleged in a complaint." but then suggests that, "where 'the factual basis for the court's subject matter jurisdiction' is challenged, 'only uncontroverted factual allegations are accepted as true.'" (ECF No. 51 at 19 (citations omitted, alteration in original).)  Because Defendant does not engage with the Complaint allegations, it is not apparent what alleged facts, if any, Defendant believes are "controverted."  The record, nevertheless, confirms all of SpaceX's factual allegations related to the Court's jurisdiction.

SpaceX's Complaint alleges that the Agency issued the LSA awards as the third of a four-step procurement process to fulfill the Agency's need for domestic launch services in response to Congressional concerns of reliance on Russian-powered rockets:

> The Air Force's strategy is a *four step approach* to transitioning to domestic propulsion while assuring access to space.  Step 1, started last year, matures the technology to reduce the technical risk of engine development…. Step 2 initiates investment in rocket propulsion systems in compliance with the fiscal year 2015 NDAA.  The Air Force will partner with propulsion system or launch system providers by awarding multiple contracts that co-invest in on-going development efforts.  In step 3, the Air Force will continue the public-private partnership approach by entering into agreements with launch system providers to provide domestically powered launch capabilities.  In step 4, the Agency will compete and award contracts with certified launch providers for launch services for 2018 and beyond….

(ECF No. 1 ¶¶ 29, 98; *see* AR Tab 2 at 107 (noting that Congress found the Evolved Expendable Launch Vehicle ("EELV") program's dependence on Russian-made RD-180 rocket engines to present serious national security concerns and create a need "to transition EELV launch service providers off of the RD-180 engine"); AR Tab 4 at 164-65 (LSA Industry Day Charts showing

"Tech Maturation," "RPS Investment," "Launch Service Agreements," and "Phase 2 Competition" all "Focused on Replacing RD-180 Capability")); *see also* National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, §§ 1608(c), (d)(1)(C), 129 Stat. 726, 1101 (2015) (requiring the Agency to "develop and carry out a 10-year phased acquisition strategy" for assured access to space, which includes "procedures for fair competition").

Contrary to Defendant's unsupported suggestion that the LSA awards and Phase 2 procurement are "two separate competitions with two separate acquisition strategies" (ECF No. 51 at 29), the record confirms that these actions constitute connected steps in the same "Launch Service Strategy"—inextricably linked and built upon each other to satisfy the Agency's stated need for assured access to space from two certified, domestic launch service providers:





UNCLASSIFIED

## *Launch Service Strategy Snapshot*

*SPACE AND MISSILE SYSTEMS CENTER*

- Competitively award 2 FFP procurement contracts in FY19 for NSS launch services
  - Select 2 long-term launch service providers that meet future NSS launch needs
  - FAR-based FY20-FY24 procurements for FY22-FY27 NSS launches
  - Will also assess Offeror's capability to launch heavy-class payloads
  - Off-ramp non-selected companies from Launch Service Agreements

AR 168

Protected Information – FOR DISCLOSURE Only in Accordance with DoD-SOUTH OH Central Claims Protective Order

*Building the Future of Military Space*

24

8

(AR Tab 4 at 168; *see also* AR Tab 19 at 792.)  The LSA Request for Proposals, Solicitation No. FA8811-17-9-0001 (the "LSA Solicitation") (ECF No. 1 ¶¶ 31-37; AR Tab 35), makes clear the pivotal role the LSA awards play in the Agency's procurement goals:

> While the technical maturation [step 1] and RPS investments [step 2] are important enablers, the key step to transition from the use of non-allied space launch engines, maintain assured access to space, and introduce sustainable competition for future EELV NSS launch services [step 4] will be public private partnership agreements that partially fund industry's new and/or upgraded launch system solutions [step 3].

(AR Tab 38 at 1260.)  There was no "separate" purpose for the LSA awards, as claimed by Defendant.  (*See* ECF No. 51 at 30.)  Per the LSA Solicitation, the LSA evaluation and award process "*continues* the [EELV] Program strategy to quickly transition from the use of non-allied space launch engines, implement sustainable competition for National Security Space (NSS) launch services, and maintain assured access to space as required by [10 U.S.C. § 2273]." (AR Tab 38 at 1260.)

The LSA Solicitation further confirms the LSA awards' specific connection to the Phase 2 procurement, stating that the LSAs would allow the Agency to procure the launch services competitively:

### 1.1.1 Launch Service Agreements

> …. These LSAs are intended to allow the Air Force to competitively procure launch services in the future from domestic commercial launch service providers that meet EELV requirements….

(AR Tab 38 at 1260; *see* ECF No. 1 ¶¶ 99, 100.)[4]  The LSA Solicitation also describes the Phase 2 procurement, during which the Agency would "competitively award Federal Acquisition

---

[4] Throughout its Motion, Defendant tries to deny the obvious connection between the awarded LSAs and the Phase 2 procurement by claiming that the Agency "cannot award procurement contracts to produce and deliver launch vehicle systems for NSS missions." (ECF No. 51 at 16; *id.* at 29 ("Indeed, by statute, the Step 3 OT prototyping effort could not be conducted 'in connection with' the Step 4 Phase 2 acquisition, which must be accomplished as a FAR part 12 procurement of commercial services.").)  The legal underpinnings of why the Agency used an OT

Regulation (FAR)-Part 12 based firm fixed price (FFP) contracts to two launch providers for NSS launch procurements as soon as possible, but no later than 2020 for 2022 launches," and notes that "LSAs with ongoing development w[ould] continue" only if the launch service provider also won a contract.  (AR Tab 38 at 1261; ECF No. 1 ¶¶ 34, 99, 100.)  In other words, any LSA recipient that did not receive a FAR Part 12 contract would be "offramped" and no longer receive Government investment to develop its launch system.  (AR Tab 3 at 44 (explaining Agency strategy to "carry three LSA OTs" and then "select two providers in 2019 for Phase 2 procurements … and offramp third from LSA"); AR Tab 4 at 168.)

On May 3, 2019, the Agency issued the National Security Space Launch Phase 2 Launch Service Procurement Request for Proposal (the "Phase 2 RFP").[5]  (ECF No. 1 ¶ 81.)  Proposals are due on August 1, 2019.  (ECF No. 1 ¶ 85.)  As discussed at the EELV Industry Day and in the LSA Solicitation, the Phase 2 RFP proposes to split the Agency's requirement for launch services for Fiscal Year ("FY") 2020 through 2024 between "two requirements contract awards."  The "Requirement 1" provider will perform approximately 60% of the launch services, while the "Requirement 2" provider will perform approximately 40% of the launch services.  (*Compare* AR Tab 4 at 195 *with* ECF No. 1 ¶ 82.)

---

to fund development of the launch systems is irrelevant to whether those awards were made in connection with the launch service procurement.  In any event, the applicable legislative history shows that the Agency is misinterpreting the Commercial Space Act.  *Department of Defense Appropriations for FY 2016; Hearing Before the Subcomm. on Defense of the H. Comm. on Appropriations*, 114th Cong. (Pt. 1) 293 (2015) (question of Rep. Aderholt, Member, H. Subcomm. on Defense) ("[I]t is clear to me that the Air Force is misinterpreting the Commercial Space Act of 1998…. The Act sets up a commercially procured versus US government produced framework, and in no way prohibits the Air Force from directing the production of very specific components to build or retrofit a space launch system….").)  Curiously, in its effort to evade this Court's review, the Agency appears to be arguing that it circumvented the Act's perceived proscription by using an OT to fund development of that which it purportedly cannot procure.
[5] *National Security Space Launch (NSSL) Phase 2 Launch Service Procurement (LSP) Request for Proposal (RFP)*, FedBizOpps.gov (May 3, 2019), https://www.fbo.gov/index?s=opportunity&mode=form&id=060106f33d702e2e9b10311daa59e2fe&tab=core&_cview=0.

Internal LSA award documents also confirm the direct connection between the LSA awards and the Phase 2 procurement. For instance, the Portfolio Direction Document for the LSA Source Selection observes that the Agency has "positioned [itself] to be able to award at least three agreements [LSAs], thus increasing the likelihood that the Phase 2 procurement will have effective competition." (AR Tab 103 at 31018.) This same document *counsels against four LSA awards because that "deviates from the central theme of the Phase 2 acquisition strategy*," i.e., "choos[ing] three companies to partner with during the LSA competition and then narrow[ing] down to two long term partners with the upcoming Phase 2." (*Id.* at 31022; *see also* AR Tab 33a at 1026 ("***Both*** the Rocket Propulsion System OTA Agreements ***and*** the future Procurement Contracts ***are related to the subject*** acquisition…. RPS, LSA, and Procurement were all developed to satisfy the 2015 NDAA and all have acquisition strategies that build off of the previous programs.").)

To this end, the Final Portfolio Recommendation to the LSA Source Selection Authority confirms that the Agency selected three LSA awards in connection with the Phase 2 procurement: "It is in the *best interest of the Government to award three agreements so that the Phase 2 launch service procurement* is highly competitive in order to lower costs and boost performance." (AR Tab 135 at 41744; AR Tab 134 at 41678 ("Require [LSA] portfolio of 3 … better Phase 2 competition").) Thereafter, the Agency awarded three LSAs committing Government investments into launch system solutions for launch services valued at: (a) $967 million to United Launch Services, LLC ("ULS");[6] (b) $792 million to Orbital Sciences Corporation ("Orbital");[7] and (c)

---

[6] In its Complaint, SpaceX referred to United Launch Alliance, LLC ("ULA"), the parent company of United Launch Services, LLC, the entity that intervened in this protest and received an LSA award. (ECF Nos. 11, 12.)

[7] In its Complaint, SpaceX referred to Northrop Grumman Corporation, the parent company of Orbital Sciences Corporation, the entity that intervened in this protest and received an LSA award.

11

$500 million to Blue Origin.  (ECF No. 1 ¶ 10.)  The only other offeror, SpaceX, did not receive an LSA.  (*Id.*)

The LSA Solicitation advises that the Agency would use a competitive process to award the LSAs under the DoD OT authority for prototype projects.  (ECF No. 1 ¶ 94; AR Tab 38 at 1262-63.)  SpaceX's Complaint alleges that the LSA award decision contravenes the LSA Solicitation and applicable law because the Agency did not adhere to the competitive process, but instead made the LSA portfolio decision based on an underlying evaluation record riddled with material and demonstrable deviations from the stated evaluation criteria and prejudicial unequal treatment.  (ECF No. 1 ¶¶ 14, 117-210.)  Among the anticompetitive procedures and errors, the Agency applied an unstated preference for reliance on existing Government processes and facilities—the reverse of what the Agency announced in the LSA Solicitation—rather than investing in commercial systems adaptable to the Government's needs, as required by the National Defense Authorization Act for Fiscal Year 2018 ("FY 2018 NDAA").  (*Id.* at ¶ 104; National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1605, 131 Stat. 1283, 1724 (2017).)  The Agency also weighed purported risks (risks assessed based on the planned launch service schedule) contrary to the terms of the LSA Solicitation to SpaceX's competitive prejudice.  (ECF No. 1 ¶¶ 105-06.)  For example, the Agency deviated from the evaluation criteria by assigning the greatest risk to SpaceX's proposed performance of Payload Category C missions— missions the Agency admits it will not need until late 2025, if at all, during the Phase 2 contract ordering period.  (*Id.* at ¶ 105.)

The Agency also errantly gave ULS a nine-figure discount on its Total Evaluated Price. (*Id.* at ¶ 107.)  Although the Agency included in SpaceX's Total Evaluated Price the value of a

---

(ECF No. 13.)

current contract that SpaceX proposed to leverage, the Agency did not similarly increase ULS's Total Evaluated Price by the hundreds of millions of dollars the Government will pay for the launch infrastructure and integration facilities that ULS proposed to leverage. (*Id.*)

SpaceX's Complaint also alleges that the Agency's LSA evaluation undermines numerous statutory objectives: (i) the LSA decision thwarts assured access to space contrary to 10 U.S.C. § 2237; (ii) the LSA decision will not end reliance on Russian-made RD-180 rocket engines, as evidenced by the fact that the Agency will allow each LSA awardee to propose a secondary, already-operational vehicle (other than the ones they are being paid hundreds of millions of dollars to develop) in the near-certain event the LSA launch solutions are not ready in time for the Phase 2 missions; and (iii) the LSA award decision fails to leverage commercial launch systems as required by the FY 2018 NDAA and instead, the Agency invested in solutions touted as "purpose-built" for the Agency's missions. (*See, e.g., id.* at ¶¶ 6, 11-13, 211-29.)

Prior filings of the Defendant-Intervenors in this very matter belie the Agency's attempts to sever the connection between the LSA award and the Phase 2 procurement, supporting SpaceX's allegations that their LSA performance will provide an unearned advantage over SpaceX in the ongoing Phase 2 procurement. For instance, in its Motion to Intervene, Blue Origin states that its **LSA award "*is critical to Blue's proposal for the Phase II contract*** effort for the Launch Services Procurement." (ECF No. 9 at 2.) Blue Origin further contends that, as an LSA awardee, relief for SpaceX may deny Blue Origin "the opportunity to perform and *receive tangible technical benefits from the LSA award*, and *to obtain the performance benefits for its proposal in the Phase II procurement*." (*Id.* at 3.) Similarly, ULS notes in its Motion to Intervene that through the LSA, ULS plans "to receive *nearly $1 billion in economic benefits*" and observes that "ULS has already received funding under the ULS OTA and is continuing to *perform development activities upon*

13

*which it has based continued receipt of funding.*"  (*See* ECF No. 11 at 2-3.)  ULS also has acknowledged that LSA awardees will propose the launch systems funded by the challenged LSA awards to perform the launch services solicited in the Phase 2 RFP.  (ECF No. 44 at 2; *see also* ECF No. 1 ¶ 6 (both ULS and Orbital have confirmed that their LSA vehicles are being developed specifically for the launch services in Phase 2).)

ULS's comments on the LSA Industry Day further establish the undeniable connection between the LSA awards and the Phase 2 procurement, as well as the harm to SpaceX in the Phase 2 procurement resulting from the anticompetitive LSA portfolio decision.  For instance, ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (AR Tab 6d at 213.)  Other exchanges between the Agency and ULS evidence that the LSA awards cover the non-recurring costs of developing the launch system solutions, while the Phase 2 contracts will cover the recurring "Launch Service Support" costs.  (AR Tab 6d at 287 (Agency response to ULS question about "business case to invest in the Launch Service Agreement": "The LSA OTA will be the means to meet EELV requirements to include the Heavy capability, therefore non-recurring costs would be covered up to 2/3. To offset recurring costs, the Air Force intends to include a Launch Service Support (LSS) task order as part of the Phase 2 launch services contracts.").)

## IV.     STANDARD OF REVIEW

The Tucker Act, 28 U.S.C. § 1491(b)(1), "grants jurisdiction over objections to a solicitation, objections to proposed award, objections to an award, *and* objections related to a statutory or regulatory violation so long as these *objections are in connection with a procurement or proposed procurement*." *Sys. Application & Techs.*, 691 F.3d at 1380-81 (finding jurisdiction over corrective action challenge).  "[A] narrow application of section 1491(b)(1) does not comport

14

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

with the statute's broad grant of jurisdiction over objections to the procurement process." *Id.* at 1381 ("The Army has not shown that this protest has no 'connection with a procurement.'") Consequently, for this Court to exercise jurisdiction, a protester need only assert a "non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement." *Distributed Sols.*, 539 F.3d at 1345 n.1.

"In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) (reversing lower court finding of no jurisdiction). "[I]f the allegation of the [] court's jurisdiction is insufficient or entirely lacking but there are facts pleaded in the complaint from which the court's jurisdiction may be inferred, then the motion to dismiss under Rule 12(b)(1) motion also must be denied." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2019); *see, e.g., Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 606 F.3d 780, 788 (D.C. Cir. 2010); *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 5 (1st Cir. 1999). Only if the pleading involves an incurable defect should the court dismiss (or transfer as requested) the complaint rather than permit leave to amend it to invoke jurisdiction. *See Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 161-62 (2d Cir. 1998); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1044 (D.C. Cir. 1986); *see also* 28 U.S.C. § 1653.

With respect to a motion to transfer, under 28 U.S.C. § 1631, "a federal court may transfer an action to another federal court when (1) the transferring court lacks subject matter jurisdiction; (2) the action could have been brought in the transferee court at the time it was filed; and (3) such a transfer is in the interest of justice." *L-3 Servs. v. United States*, 104 Fed. Cl. 30, 32-33 (2012)

15

(citing *Palacios v. United States*, 100 Fed. Cl. 656, 658 (2011)). "[T]he transfer statute language 'persuasively indicates that transfer, rather than dismissal, is the option of choice.'" *Id.* at 35.

## V.    ARGUMENT

### A.    The Court Has Jurisdiction Over SpaceX's Complaint, Which Alleges Non-Frivolous Violations Of Law In Connection With A Procurement Or Proposed Procurement.

SpaceX's Complaint asserts non-frivolous allegations that the Agency violated applicable law (e.g., 10 U.S.C. § 2371b and 5 U.S.C. § 706) in connection with a procurement or proposed procurement (i.e., the Phase 2 procurement of launch services from domestic providers) by the challenged LSA decision. *Compare* ECF No. 1 ¶¶ 93-108, 211-29 *with Distributed Sols.*, 539 F.3d at 1345 n.1. The plain language of 28 U.S.C. § 1491(b)(1), the Federal Circuit's clear precedent, and the undeniable record facts all support the same conclusion: the "in connection with prong" of section 1491(b)(1) grants this Court jurisdiction over SpaceX's Complaint and the Court should deny Defendant's Motion.

Rather than engage with the operative facts, Defendant devotes much of its Motion to explaining why the Agency used its OT authority to award the LSAs and arguing that OT awards are not procurement contracts. (ECF No. 51 at 20-24.) Defendant submits that "what SpaceX is objecting to is *not* a procurement, given that the OT at issue is a non-procurement agreement," and contends that, for that reason alone, section 1491(b)(1) does not confer jurisdiction over SpaceX's Complaint. (*Id.* at 28 (emphasis in original).) It is Defendant, not SpaceX, that mischaracterizes and misapplies the applicable law. SpaceX has never disputed that the LSA awards are OTs, and not FAR-governed procurement contracts. But, contrary to Defendant's supposition, that fact (which the Agency finds so critical) does not somehow constrict this Court's jurisdiction over SpaceX's Complaint. To the contrary, the issue before the Court is whether the "very sweeping,"

16

plain language of section 1491(b)(1) granting jurisdiction over unlawful agency actions made "in connection with a procurement" somehow excepts unlawful OT decisions made "in connection with a procurement." Neither the statutory text nor Federal Circuit case law recognize such an exception, or permit what Defendant asks the Court to do. The Agency plainly made the LSA awards as a direct part of its Phase 2 procurement and, therefore, SpaceX's challenge to the LSA portfolio decision falls squarely within this Court's jurisdiction.

1. **The Federal Circuit's Application of This Court's Broad "In Connection With" Jurisdiction.**

Section 1491(b)(1) waives sovereign immunity and "confers exclusive jurisdiction upon the Court of Federal Claims over bid protests against the government." *Distributed Sols.*, 539 F.3d at 1344. Specifically, this statutory grant of jurisdiction covers *three* categories of objections:

> [T]he Unite[d] States Court of Federal Claims ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract <u>or</u> to a proposed award or the award of a contract <u>or</u> *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1).[8]  By the statute's plain language, the Court's jurisdiction under section 1491(b)(1) is not limited to objections to the merits of a contract award or a proposed contract award, ***nor does the statute even "require any objection to the actual contract procurement."***[9]

---

[8]  Defendant does not dispute that SpaceX is an interested party. SpaceX, a prospective offer in the Phase 2 procurement and an actual offeror for an LSA, is an interested party with standing to challenge the Agency's unlawful and irrational LSA award decision committing the Government to invest over two billion dollars in the development of, and to cooperate in the certification of, new launch systems that SpaceX's three competitors will propose in the Phase 2 procurement. (ECF No. 1 ¶¶ 1, 109-12.)

[9]  Ignoring the Federal Circuit's express guidance in *RAMCOR*, Defendant errantly suggests that SpaceX's Complaint is defective because SpaceX has not filed a pre-award protest challenging the Phase 2 RFP for launch services. *Compare RAMCOR*, 185 F.3d at 1289 *with* ECF No. 51 at 24. Additionally, Defendant further errs when it states that "SpaceX admittedly does not challenge the procurement activity." (ECF No. 51 at 24.) As explained herein and in SpaceX's Complaint, the LSA awards are a "procurement activity" as they were made in connection with a procurement or proposed procurement.

17

*RAMCOR*, 185 F.3d at 1289 (finding jurisdiction over an objection to Competition in Contracting Act ("CICA") stay override, not a procurement contract).  For purposes of the third prong of section 1491(b)(1), the agency action at the heart of the protest need not be a procurement or a procurement contract.  Indeed, the Federal Circuit specifically has rejected similar arguments, observing that a requirement to object to the procurement itself (as advocated by Defendant) would render the third prong of the jurisdictional grant in section 1491(b)(1)' superfluous, contrary to a "basic tenet of statutory construction."  *Id.* (rejecting interpretation as violating statutory construction rule that all parts of a statute are to be given effect) (citing *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973)).

Contrary to Defendant's premise, the Federal Circuit has held that "[t]he operative phrase 'in connection with' is *very sweeping in scope*," *id.*, and "*covers a broad range of potential disputes arising during the course of the procurement process*," *Sys. Application & Techs.*, 691 F.3d at 1380.  Nothing in the plain language of section 1491(b)(1) somehow excepts violations of law "in connection with a procurement or proposed procurement" merely because the violations involve an OT.  Rather, based on the statute's language, the Federal Circuit has held that the Court has jurisdiction over objections involving agency awards generally exempt from procurement laws.  *Emery Worldwide Airlines*, 264 F.3d at 1079 & n. 7, 1084 (concluding that section 1491(b)(1) provides jurisdiction over United States Postal Service ("USPS") award notwithstanding that "USPS is exempted from all federal procurement laws not specifically enumerated in 39 U.S.C. § 410(a)" and "CICA does not apply to the USPS").

The Federal Circuit also has recognized the broad scope of the term "procurement" in section 1491(b)(1), adopting CICA's definition, i.e., "*all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services

18

and ending with contract completion or closeout." *See Distributed Sols.*, 539 F.3d at 1345-46 (citing 41 U.S.C. § 403(2), now codified at 41 U.S.C. § 111). Consequently, the Federal Circuit has observed that "the phrase, 'in connection with a procurement or proposed procurement,' by definition *involves a connection with any stage of the federal contracting acquisition process*, including 'the process for determining a need for property or services.'" *Id.* at 1346. Under this statutory framework, the Federal Circuit has held that a cramped interpretation of section 1491(b)(1), like the one Defendant advocates here, "does not comport with the statute's broad grant of jurisdiction over objections *to the procurement process*." *Sys. Application & Techs.*, 691 F.3d at 1381.

> **2.      The Agency Made the LSA Awards "In Connection With" a Procurement or Proposed Procurement.**

The plain language of section 1491(b)(1), coupled with binding Federal Circuit precedent, confirms that this Court has jurisdiction over SpaceX's allegations that the Agency made an arbitrary and unlawful LSA award decision "in connection with" the Agency's procurement of launch services. Whether construed as a procurement or proposed procurement, no question exists that the Phase 2 competition for launch services is a "procurement," as the Federal Circuit has defined that term. *See Distributed Sols.*, 539 F.3d at 1345-46. Throughout its Motion, Defendant confuses the fact that OT's are a "non-procurement *contract*" with Defendant's contention that OTs are a "non-procurement *action*" that cannot be connected with a procurement. While OTs are not procurement contracts, neither the law nor the facts support Defendant's general contention that no OT-related violation can constitute a "violation of statute or regulation in connection with a procurement or a proposed procurement," conferring this Court with jurisdiction. 28 U.S.C. § 1491(b)(1). Defendant's implication that the LSAs lack the requisite connection to the launch

19

services procurement is untenable in light of the definition of "procurement" adopted by the Federal Circuit.

The Federal Circuit's holding in *Distributed Solutions* is instructive. Applying the broad statutory language, the Federal Circuit concluded that section 1491(b)(1) confers jurisdiction over a preliminary challenge to a market research decision that caused the agency to forego a procurement altogether, and instead acquire services through subcontracts under an existing prime contract. *Id.* The agency initially issued a Request for Information ("RFI") with "[t]he primary objective ... to select and implement acquisition and assistance solutions that meet the unique functional requirements." *Id.* at 1346. The agency moved to dismiss the challenge, arguing that the RFI "was not part of any procurement process" because the RFI "specified on its face that it was 'for market research purposes only' and would 'not result in a contract award.'" *Id.* In opposing the dismissal motion, the protester identified agency statements indicating an intent to use the RFI to determine the parameters of the software procurement. *Id.* The Federal Circuit reversed the dismissal decision of the Court of Federal Claims and found jurisdiction, noting that the government used the information received from the RFI "to determine the scope of services required by the government." *Id.* Even though "the government ultimately decided not to procure software itself," the Federal Circuit held that section 1491(b)(1) "does not require an actual procurement." *Id.* Instead, the "statute explicitly contemplates the ability to protest ... pre-procurement decisions by vesting jurisdiction in the Federal Circuit over 'proposed procurements.'" *Id.*

Whether considered part of the larger acquisition strategy to procure the domestic launch services or as a "pre-procurement decision" made in connection with the launch services procurement, the Agency made the LSA awards in connection with a procurement or proposed

procurement.  The connection between the LSA awards and the Agency's procurement of launch services is far more discernable than the RFI (itself not a procurement contract) was to the agency's decision to forego a procurement in *Distributed Solutions*.  By the challenged action here, the Agency did not merely request information about potential launch systems available for a potential future procurement or to determine some future need.  The LSA's core purpose was the development of launch solutions to compete in the Phase 2 procurement.  By the time the Agency made the LSA decision, it had long "determine[d] the scope of services required by the government"—launch services from domestic, commercially-viable providers.  *See id.*  Upon awarding the challenged LSAs, the Agency made specific investments in specific launch systems, and chose the number of solutions in which to invest, all in direct connection with the Phase 2 procurement.

The Agency's LSA evaluation and awards are inextricably connected to the Agency's procurement of launch services. The Agency initiated the procurement after Congress articulated the need for space launches that do not rely upon the Russian-made RD-180 rocket engines as memorialized in the FY 2015 NDAA.  Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 1604, 128 Stat. 3292, 3623 (2019).  At Congress's direction, the Agency developed a ***multi-phased strategy to competitively procure domestic, commercially viable launch services*** to fulfill this need.  The Agency developed each stage of its four-step procurement process "to satisfy the 2015 NDAA." (AR Tab 33a at 1026.)  Each intervening step builds off the other, thereby constituting a critical "stage[] of the process of acquiring" the Phase 2 launch services.  *See* 41 U.S.C. § 111.  In fact, the LSA Solicitation itself advised offers of the direct connection between the LSA awards and the Agency's Phase 2 launch services procurement: "These LSAs are intended to allow the Agency

21

to competitively procure launch services in the future from domestic commercial launch service providers that meet EELV requirements." (AR Tab 38 at 1260; *id.* at 1261 ("the Air Force intends to competitively award Federal Acquisition Regulation (FAR)-Part 12 based firm fixed price (FFP) contracts to two launch providers for NSS launch procurements as soon as possible, but no later than 2020 for 2022 launches").) The Agency's Business Case further confirms that "the Air Force will competitively award launch services" among the "newly certified launch systems developed through step 3," i.e., the LSA awards. (AR Tab 2 at 107.)

In sum, the LSA award decision finalized the next-to-last phase of the Agency's acquisition strategy to procure launch services, and the Agency chose to make three LSA awards in order to achieve competition for its award of two FAR Part 12 contracts in the Phase 2 procurement. (AR Tab 135 at 41744 ("It is in the best interest of the Government to award three agreements so that the Phase 2 launch service procurement is highly competitive in order to lower costs and boost performance."); AR Tab 103 at 31018 ("we have positioned ourselves to be able to award at least three agreements, thus increasing the likelihood that the Phase 2 procurement will have effective competition").) The Agency's Portfolio Direction Document for the LSA Source Selection expressly counseled against four awards because that approach would "deviate from the central theme of the Phase 2 acquisition." (AR Tab 103 at 31022.)[10]

---

[10] In *Agustawestland N. Am., Inc. v. United States*, 880 F.3d 1326 (Fed. Cir. 2018), cited by Defendant, the Federal Circuit held that a challenge to an Army Executive Order designating the UH-72 as its Institutional Training Helicopter was not within this Court's jurisdiction because the challenged Executive Order "did not ... direct or even discuss the procurement of UH-72A Lakota helicopters" and "in fact, the initiative only contemplated using existing Army assets." *Id.* at 1330-31. Unlike the directly-connected LSA and Phase 2 procurement, no jurisdiction existed over the Executive Order in *Agustawestland* because the protester had not and could not "demonstrate that the government at least initiated a procurement or initiated the process for determining a need for acquisition." *Id.* (citing *Distributed Sols.*, 539 F.3d at 1346) (internal quotation omitted).

The Agency's contention that SpaceX may "be competitive in the Phase 2 procurement despite not being awarded an OT agreement" (ECF No. 51 at 30) has no bearing on whether this Court possesses jurisdiction over a challenged agency action that occurred in connection with a procurement, as contemplated by section 1491(b)(1). Although the Phase 2 RFP is open to non-LSA holders, the negative impact of competing against a field of offerors that each received hundreds of millions of development dollars as well as Agency cooperation in the certification process for their proposed launch solutions is undeniable.[11] (*See, e.g.*, ECF No. 9 at 2-3 (Blue Origin claiming that its LSA "is critical to Blue's proposal for the Phase II contract effort for the Launch Services Procurement").)   And, SpaceX's Complaint sufficiently pled allegations establishing the connection between the violations alleged (anticompetitive LSA award decisions) and their impact on the award and performance of the solicited Phase 2 procurement contracts for launch services. *Compare RAMCOR*, 185 F.3d at 1289 ("Where an agency's actions under a statute so clearly affect the award and performance of a contract, this court has little difficulty concluding that a statute has a 'connection with a procurement.'") *with* Section III *and* ECF No. 1 ¶¶ 87-89, 100-08, 112.

Notably, several other decisions of the Federal Circuit and this Court reaffirm that unlawful non-contract actions occurring before, during, and after the solicitation and award of a procurement contract may satisfy the broad "in connection with" prong to trigger this Court's jurisdiction under section 1491(b)(1). *See, e.g., Sys. Application & Techs*, 691 F.3d at 1381 (holding that corrective action decision constitutes a protestable event made "in connection with a procurement"); *OTI Am.*

---

[11]  Defendant's Motion incorrectly suggests that SpaceX's "Big Falcon Rocket" and "Starship" are two different launch vehicles, but Starship is a new name for the same launch vehicle. (*Compare* ECF No. 51 *with* ECF No. 1 ¶ 5); *see also* BBC News, Elon Musk renames his BFR spacecraft Starship (Nov. 20, 2018), https://www.bbc.com/news/business-46274158.

*Inc. v. United States*, 68 Fed. Cl. 108, 113-17 (2005) (holding that third prong of section 1491(b)(1) provides jurisdiction where an agency uses "a set of identically phrased contracts … as a means of winnowing candidates for a procurement to determine which candidate or candidates will receive or share the ultimate award"). For instance, in *Labat-Anderson, Inc. v. United States*, 50 Fed. Cl. 99 (2001), this Court rejected Defendant's same arguments to find jurisdiction over a protest challenging the award of a Blanket Purchase Agreement ("BPA") under FAR 8.404(b)(4). Despite that a BPA itself is not a binding contract, the Court found jurisdiction because the BPA award was made in connection with a procurement: ***The award of the BPA to JHM is one of the 'stages' in the process of acquiring records management and forms processing services*** that occurred after the [agency] 'determined a need for … services,' the point at which the procurement process begins under the statutory definition." *Id.* at 104. The Court, following *RAMCOR,* also held that the protester's allegations of arbitrary and capricious behavior contrary to the Administrative Procedure Act ("APA") alone were sufficient allegations of statutory violation to support jurisdiction. *Id.* ("Just as an agency may 'violate' the agency override provision at issue in *RAMCOR* 'by issuing a written finding that does not meet the substantive review criteria of 1491(b)(4),' an agency may 'violate' FAR 8.404(b)(4) by acting arbitrarily and capriciously when entering into a BPA.").

This Court likewise reviews decisions of the Small Business Administration ("SBA") regarding whether a particular contractor qualifies for small business status in relation to a particular procurement, notwithstanding that the SBA decision itself is not a procurement or a procurement contract. *See, e.g.*, *Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 686-87 (2018) (finding "in connection with" jurisdiction to review SBA decision that offeror did not qualify as small business eligible for award); *White Hawk Grp., Inc. v. United States*, 91 Fed.

Cl. 669, 679 (2010) (exercising jurisdiction over SBA decision because it was "in connection with" an underling procurement, notwithstanding that "plaintiffs' primary objections relate to determinations made by a separate agency, which has no direct role either in the procurement itself or in administering the resulting contract"). *Cf.*, *Geiler/Schrudde & Zimmerman v. United States*, 743 F. App'x 974, 976-79 (Fed. Cir. 2018) (rejecting jurisdiction over protest of determination that offeror did not qualify for Service Disabled Veteran Owned Small Business ("SDVOSB") status where protester failed to identify a particular procurement that the loss of status would impact)).

In sum, the relevant jurisdictional inquiry for this Court is not whether an OT is a procurement contract or itself a procurement, but whether the Agency made the allegedly unlawful LSA award decision in connection with a procurement or proposed procurement. The operative facts of this case and well-settled precedent answer that question in the affirmative and establish that this Court has jurisdiction over SpaceX's Complaint under section 1491(b)(1).

> ### 3. Defendant's Arguments That *Hymas* and *R&D Dynamics* Demand an Unstated Exception to the "In Connection With" Jurisdictional Prong of Section 1491(b)(1) are Unsound.

Defendant, relying on the *Hymas* and other inapposite case law, contends that the Court lacks jurisdiction under section 1491(b)(1) because an OT is not a procurement contract. (ECF No. 51 at 20-24.) But, as noted, a protester need not object to a "procurement contract" or even to a procurement to fall within the "in connection with" jurisdictional prong of section 1491(b)(1). *RAMCOR*, 185 F.3d at 1289. Moreover, the language of section 1491(b)(1) and the Federal Circuit cases applying it do not provide a jurisdictional exception for challenges of legal violations in connection with a FAR-based procurement or proposed procurement merely because an OT agreement or non-FAR based contract is involved. Rather, the plain language and binding precedent support the opposite result.

Contrary to Defendant's intimation, the parties in *Hymas* did *not* argue, and the Federal Circuit did *not* decide, whether challenges to the cooperative agreements at issue involved "any alleged violation of statute or regulation in connection with a procurement or proposed procurement." *See* 810 F.3d at 1312.[12] Nor did the Federal Circuit hold that an unlawful cooperative agreement award made "in connection with a procurement" fell outside of the Court's jurisdiction under the third prong of section 1491(b)(1). Rather, the questions presented in *Hymas* involved whether the agency had authority to issue the cooperative agreements and whether the agency had used a cooperative agreement where the law required a procurement contract. *Id.* at 1317-18, 1324, 1327. For this reason, the *Hymas* court looked to the Federal Grant and Cooperative Agreement Act, which dictates when an agency "shall use a procurement contract" as opposed to a grant or cooperative agreement. *Id.* at 1324-30.

Here, SpaceX's Complaint does not object to the Agency's decision to use its OT authority to enter into the LSAs versus its procurement authority. SpaceX objects to the Agency's violations of law in selecting the LSA portfolio awards—*a selection decision the Agency made in connection with (and that profoundly and unlawfully impacts) the Phase 2 procurement*. The Federal Circuit has long used CICA's broad definition of the procurement process to answer whether a violation of law occurred in connection with a procurement or proposed procurement. *See, e.g., Distributed Sols.*, 539 F.3d at 1345-46. The *Hymas* decision does not hold otherwise, nor could *Hymas* have altered the prior precedential decisions of *RAMCOR* and *Distributed Solutions*.[13]

---

[12] The *Hymas* decision only mentions the operative phrase "in connection with" once in a block quote of section 1491(b)(1). 810 F.3d at 1317.

[13] *See Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc. Where there is direct conflict the precedential decision is the first.") (citation omitted).

For the same reason, Defendant's reliance on the Federal Circuit's decisions in *Frankel v. United States*, 482 F.3d 1246 (Fed. Cir. 2016) and *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010) is unavailing.   The *Frankel* decision considered only whether a prize contest qualified as a "procurement contract," and again did ***not*** involve the Court's jurisdiction under the "in connection with" prong of section 1491(b)(1). 482 F.3d at 1250-51. Conversely, *Resource Conservation Group* involved a disappointed bidder for a lease of real property, arguing that the agency unreasonably failed to timely notify the bidder that any proposal to mine sand and gravel on the leased property would render its bid unacceptable.   597 F.3d at 1241.    The Federal Circuit, relying on *Distributed Solutions* and CICA's definition of "procurement," found that the bidder had not made its objection "in connection with" a procurement because the alleged "procurement" involved the government "seeking to lease its own property" and not the "act of obtaining or acquiring ... goods or services." *Id.* at 1244.   Here, however, no question exists that the Agency's Phase 2 launch services procurement constitutes the "act of obtaining or acquiring ... services," and Defendant does not contend otherwise.

The Agency also relies heavily on the Court of Federal Claims decision in *R&D Dynamics Corp. v. United States*, 80 Fed. Cl. 715 (2007), which found no jurisdiction over an objection to non-selection for a Phase II research and development award under the Small Business Innovation Research ("SBIR") program. *Id.* at 722. Aside from its plain break with Federal Circuit precedent, the non-binding decision has received heavy criticism from leading commentators as unsound— and, if anything, demonstrates the uncertain ground upon which Defendant asks this Court to shrink its jurisdiction and dismiss SpaceX's protest.[14]  This Court, however, need not grapple with

---

[14] *See* JOHN CIBINIC, JR., RALPH C. NASH, JR. & CHRISTOPHER R. YUKINS, FORMATION OF GOVERNMENT CONTRACTS 14 (4th Ed. 2011) (describing decision as "very questionable"); Ralph C. Nash, Jr., *Small Business Innovation Research Procurements: They're Not Procurements!*, 22

the flawed logic of *R&D Dynamics*, because the decision does not support Defendant's position in any event. As with *Hymas*, the issue confronting the *R&D Dynamics* court was whether an SBIR Phase II selection process was itself a competitive procurement, and not whether the Court has jurisdiction over a flawed SBIR Phase II selection decision made "in connection with a procurement or proposed procurement." *Id.* at 719–722.

Each of Defendant's other arguments likewise fails. Unable to escape the plain statutory "in connection with" language and the Federal Circuit's interpretation of section 1491(b)(1), Defendant suggests that the OT statute itself resolves the question for the Court. For instance, in trying to contrive a distinction from the holding in *Distributed Solutions*, Defendant asserts:

> For example, in *Distributed Solutions*, the Federal Circuit determined that the Government's request for information soliciting information from outside vendors "to determine the scope of services required by the [G]overnment" supplied the Court with jurisdiction because "[t]he statute explicitly contemplates the ability to protest these kinds of pre-procurement decisions." In this case, on the other hand, the statute explicitly defines OTs as non-procurement agreements and contemplates that they are not subject to normal procurement regulations and procedures, including this Court's jurisdiction. *See* 10 U.S.C. § 2317b.

(ECF No. 51 at 25 (internal citation omitted, alteration in original).) Defendant's argument errs in at least two material respects. First, Defendant suggests that the scope and source of this Court's jurisdiction here differs from the source of jurisdiction at issue in *Distributed Solutions*. Not so. The "statute" at issue in both cases is the same—*section 1491(b)(1)*. Second, Defendant's statement that 10 U.S.C. § 2371b provides that OTs are not subject to this Court's jurisdiction is false. Section 2371b does not speak to jurisdiction at all. *See generally* 10 U.S.C. § 2371b. Still further, as noted in Section V.A.4.a, the statute itself falls within the zone of statutes connected with the procurement process to trigger jurisdiction here.

---

No. 1 Nash & Cibinic Rep. ¶ 2 (2008) ("It is astounding that it would occur to a Government lawyer to even make such an argument and even more astounding that the court would buy it.")

28

Defendant's attempt to devise an exception for unlawful OT actions made "in connection with a procurement or proposed procurement" is not reconcilable with the plain language of section 1491(b)(1), or the Federal Circuit's binding interpretations of "in connection with" and "procurement." There is no statutory exception that renders OT awards immune from this Court's jurisdiction when they otherwise fall within the purview of section 1491(b)(1). Had Congress intended to exempt OTs from judicial review under section 1491(b)(1), Congress easily could have done so, just as it did when expressly dictating that task orders issued under indefinite delivery/indefinite quantity contracts could only be protested to the Government Accountability Office. *See* 10 U.S.C. § 2304c(e) (DoD task order protest bar); 41 U.S.C. § 4106(f) (same for civilian agency task orders); *see also SRA Intern., Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (confirming Congress's unambiguous prohibition on judicial review of task orders). Unless and until Congress passes similar legislation pertaining to OT awards, the broad language of section 1491(b)(1), and the Federal Circuit's interpretation of that jurisdictional scope, control.

With neither the law nor the facts to rely on, Defendant pounds the proverbial table, demanding that the Court disregard the plain language of section 1491(b)(1) and the Federal Circuit's binding interpretation thereof to avoid purported floods of OT protests should the Court find jurisdiction over SpaceX's Complaint. Defendant's "parade of horribles" argument rings hollow. The supposed threat of increased case load is defied by Defendant's own history lesson, which confirms that OT authority has existed since the 1960s (ECF No. 51 at 7), long before Congress granted section 1491(b)(1) jurisdiction through ADRA, Pub. L. 104-320, § 12, 110 Stat. 3870 (1996). If it was by any measure common for agencies to use OT awards as part of multi-stage procurements like the launch services procurement at issue here, then the unique jurisdictional issue raised in this protest—which Defendant acknowledges is one of first

impression (ECF No. 51 at 22)—would not have taken more than fifty years to arise. As DoD acknowledges in its own OT guide: "Protests to the U.S. Court of Federal Claims are also possible but are a rare occurrence."[15] Where violations of law involving an OT are so plainly interconnected with a procurement, this Court's jurisdiction under section 1491(b)(1) is undeniable. That SpaceX's Complaint may present a "rare occurrence," to borrow from DoD, does not somehow take it outside of the Court's jurisdiction.

In any event, Defendant's flawed interpretation of section 1491(b) would not cure or avoid the purported flood of protests Defendant seeks to avoid. Defendant's position merely pushes the challenges to various federal district courts, and here would ensure inconsistent and fragmented law and potentially conflicting outcomes, dividing stages of the same phased-procurement process in such a way that certain stages would fall outside of this Court's jurisdiction while connected and related stages would fall exclusively within it. Congress did not intend such a jurisdictional labyrinth. To the contrary, both the plain language of the section 1491(b)(1) and ADRA's legislative history make clear that Congress intended for all objections connected to a procurement or proposed procurement to be heard by "a single judicial tribunal," the Court of Federal Claims. *See Emery Worldwide Airlines*, 264 F.3d at 1079; *Vero Technical Support, Inc. v. U.S. Department of Defense*, 733 F. Supp. 2d 1336, 1342 (S.D. Fla. 2010) ("The ADRA, through its expansive language, endeavored to create in the COFC a place of uniform jurisdiction over all manner of bid protest, contract award, and procurement-related disputes") (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1300 (Fed. Cir. 2001).

Finally, to find jurisdiction for SpaceX here does not require the Court to declare as a matter

---

[15] Department of Defense, Other Transactions Guide at "Common OT Myths and Facts" (Nov. 2018) ("Myth 5: OTs Cannot be Protested"), https://aaf.dau.edu/ot-guide/.

of law that all OT awards fall within section 1491(b)(1). SpaceX's Complaint argues only that the unlawful LSA evaluation and award process, made as an incontrovertible integral part and plainly in connection with the Agency's Phase 2 launch services procurement, provides this Court with jurisdiction under the third prong of section 1491(b)(1). This Court can readily distinguish this case on the facts from future challenges to OT agreements that attempt to invoke this Court's jurisdiction based on an agency's "ultimate[] hopes and inten[t]" to procure some as-yet-to-be determined product or service in the future, if and when the offeror successfully develops a prototype. (ECF No. 51 at 32.) That is exactly what occurred in *Geiler/Schrudde & Zimmerman*, cited by Defendant (ECF No. 51 at 26), in which the Federal Circuit affirmed this Court's dismissal for lack of jurisdiction where a plaintiff attempted to protest its loss of SDVOSB status without first identifying a *particular* procurement impacted by the loss of status. 743 App'x at 977-78. Conversely, here, as explained above, SpaceX's Complaint specifically objects to the Agency's unlawful LSA determinations as made in connection with a specific procurement—the Phase 2 launch services procurement—and alleges that the violations of law for this Court to resolve, competitively prejudiced SpaceX and impeded Congress's mandate to maintain assured access to space. The Court therefore has jurisdiction over SpaceX's Complaint under section 1491(b)(1).

### 4. The Agency Has Violated Multiple Statutes "In Connection With" the Agency's Launch Services Procurement.

SpaceX's Complaint also alleges a violation of at least two statutes "in connection with" the Agency's launch services procurement that prevented an LSA award to SpaceX and will irreparably harm SpaceX's ability to compete fully and fairly for the FAR Part 12 contract awards. (ECF No. 1 ¶¶ 101-08.) First, the Agency violated 10 U.S.C. § 2371b(b)(2) upon deviating from the LSA Solicitation criteria and treating the offerors unequally to SpaceX's competitive prejudice. (*Id.* at ¶ 103.) Second, the Agency violated the APA, 5 U.S.C. § 706, upon issuing LSA awards

that are arbitrary and capricious, an abuse of discretion, and otherwise contrary to law. (*Id.* at ¶ 102.) Each violation serves as an independent basis for jurisdiction under section 1491(b)(1).

In the final three paragraphs of its Motion, Defendant contorts the Federal Circuit's holdings in *Cleveland Assets, LLC v. United States*, 883 F.3d 1378 (Fed. Cir. 2018) (finding no jurisdiction over an appropriations statute untied to a procurement) and *RAMCOR* (finding jurisdiction over a CICA override made in connection with a procurement) to claim that neither section 2371b nor the APA constitute "procurement statutes" and therefore, violations of those statutes cannot fall within this Court's jurisdiction even when made in connection with a procurement or proposed procurement. (ECF No. 51 at 32.) The Federal Circuit decisions disprove Defendant's conclusion.

<blockquote>a. <strong>The Court Has Jurisdiction Because the Agency Violated 10 U.S.C. § 2371b.</strong></blockquote>

First, SpaceX has alleged a violation of 10 U.S.C. § 2371b(b)(2), which requires that the Agency use "competitive procedures" to "the maximum extent practicable" when entering into OT agreements for prototype projects, like the LSA awards here. (ECF No. 1 ¶¶ 103-07.)

The Federal Circuit instructs that there should be "little difficulty" concluding that a statutory violation has a "connection with a procurement" so long as the violation "affect[s] the award and performance of a contract." *RAMCOR*, 185 F.3d at 1289. This is not a high bar. *Id.* (recognizing that a "broad category" of statutory violations fall within the Court's jurisdiction). Here, the anticompetitive award decision has fundamentally tilted the competitive playing field for the Phase 2 procurement in favor of the LSA awardees and will thereby impede the Agency's stated goal of assured access to space and non-reliance on Russian rocket engines as described in SpaceX's Complaint. The alleged violations plainly have affected the award and performance of

the pending FAR-based contracts for launch services—a competition premised upon the Agency's LSA investment in providers that will comprise the competitive field.  (AR Tab 38 at 1260.)

The Federal Circuit's analysis in *Cleveland Assets* does not disrupt this longstanding precedent, or warrant a different result.  Rather, the Federal Circuit's analysis supports SpaceX's position that a violation of section 2371b in connection with a procurement or proposed procurement triggers this Court's jurisdiction.  In that case, the protester alleged that the General Services Administration ("GSA") exceeded its authority to solicit offers under 40 U.S.C. § 3307(d), a statute that requires the GSA to seek approval of certain Congressional committees before obligating funds on leases that exceed a particular threshold.  *Cleveland Assets*, 883 F.3d at 1380.  To assess whether a violation of section 3307(d) triggered jurisdiction, the Federal Circuit relied on the definition of procurement in *Distributed Solutions*, observed that section 1491(b)(1) extends "only to actions in which the 'government at least initiated a procurement, or initiated the process for determining a need for acquisition,'" *id.* at 1381, and found no such procurement or proposed procurement connected to the alleged violation at issue.  For the reasons stated in Section V.A.2, unlike the violation at issue in *Cleveland Assets*, the Agency has made the violations alleged by SpaceX in connection with the Phase 2 FAR Part 12 procurement.

Second, the Federal Circuit looked to 40 U.S.C. § 3307(d)'s plain language and structure, noting that that the word "procurement" was nowhere to be found in the statute and that none of surrounding statutory sections cover GSA's procurement procedures.  *Id.*  Thus, the Federal Circuit concluded that the violation at issue pertained only to an "appropriation statute," which did not confer jurisdiction under section 1491(b)(1).  *Id.* at 1381-82.  Again, the plain language of 10 U.S.C. § 2371b and its statutory structure warrant a different result here.

Section 2371b is in the Research and Development Chapter (Chapter 139) of Part IV of

33

Title 10, entitled "Service, Supply, and *Procurement*." The surrounding provisions in Chapter 139, unlike the appropriation statute at issue in *Cleveland Assets*, speak directly to procurement issues, including "major defense acquisition programs," *see, e.g.*, 10 U.S.C. §§ 2366a-c, and "procurement for experimental purposes," *id.* § 2373. The plain language of 10 U.S.C. § 2371b itself belies Defendant's claim that the DoD OT authority is not a procurement statute:

- Before awarding a prototype project OT valued between $100 million and $500 million, the agency must obtain "a written determination by the *senior procurement executive*." 10 U.S.C. § 2371b(a)(2)(A). The *senior procurement executive* is also vested with authority to determine that exceptional circumstances justify using a prototype project OT where other statutory conditions for doing so are not satisfied. *Id.* § 2371b(d)(1)(D).

- Paragraph (b) of section 2371b requires that "*competitive procedures*" be used to the maximum extent practicable when awarding prototype project OTs. "Competitive procedures" is a term of art expressly defined in and used repeatedly within CICA when describing the methods used to award procurement contracts. *See* 10 U.S.C. § 2302(2) (definition of "competitive procedures"); *id.* § 2304(a)(1)(A), (c) (requiring use of competitive procedures in procurement contracting except in limited circumstances).

- Paragraph (c) of section 2371b provides for audits by the Comptroller General for any transaction that involves payments made in excess of $5,000,000 unless the "*head of the contracting activity* that is carrying out the agreement" waives the requirement and transmit the waiver notice to Congress and the Comptroller General before entering into the agreement.

- Paragraph (f)(2) of section 2371b expressly authorizes that the award of a prototype project OT may provide for the award of "*follow-on production contract or transactions*" *on a sole source basis* if the competitive procedures set forth in paragraph (b) were used for the underlying transaction;

- Paragraph (f)(5) of section 2371b otherwise *incorporates Chapter 137 of Title 10 (the CICA procurement provisions)* to contracts or transactions entered into under subsection (f); and

- Paragraph (h) of section 2371b incorporates the Procurement Integrity Act, stating: "An agreement entered *under the authority of this section shall be treated as a Federal agency procurement* for the purposes of chapter 21 or title 41."

In view of the foregoing, there can be no doubt that a violation of 10 U.S.C. § 2371b made

34

in connection with an undisputed procurement or proposed procurement as is present here, falls within the third prong of this Court's jurisdiction under 28 U.S.C. § 1491(b)(1). Defendant's contrary arguments should be denied.

        b.        **The Court Has Jurisdiction Because the Agency Violated the APA.**

SpaceX has also alleged a violation of the APA, which precludes the Agency from acting in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise contrary to law. (ECF No. 1 ¶¶ 102, 104-107.) The Agency's issuance of the LSA award decision in violation of the APA independently confers jurisdiction over SpaceX's challenge.

To support its opposite view, Defendant errantly cites *RAMCOR,* relying upon the following quoted language: "INS allegedly only violated the APA, not a procurement statute." (ECF No. 51 at 32.) The Agency's omission of the remainder of that sentence reveals its misreading of the law. The full sentence reads: ***"This court is not persuaded that the trial court lacks jurisdiction because INS allegedly only violated the APA, not a procurement statute.***" *RAMCOR,* 185 F.3d at 1290. The Federal Circuit goes on to explain why a violation of the APA alone confers jurisdiction under section 1491(b)(1).

According to the Federal Circuit, ADRA, as codified at 28 U.S.C. § 1491(b), "explicitly imports the APA standards of review" when the Court of Federal Claims assesses agency decisions. *RAMCOR,* 185 F.3d at 1290. Specifically, section 1491(b)(4) provides that "the court[] shall review the agency's decision pursuant to the standards set forth in section 706 of title 5," i.e., the APA. 28 U.S.C. § 1491(b)(4). Therefore, any allegation that an agency failed to comply with the APA—including a claim that the agency acted in a manner that is arbitrary and capricious or contrary to law—"falls squarely within the jurisdictional ambit of § 1491(b)(1)," *RAMCOR,* 185 F.3d at 1290, by virtue of the fact that section 1491(b)(4) identifies the APA as setting the bar for

agency action.  To be sure, the alleged violation must still be "in connection with a procurement or proposed procurement."  But, as discussed in Section V.A.2, above, the Agency made the unlawful LSA award decision in connection with the Phase 2 launch services procurement.

In *RAMCOR*, the Federal Circuit concluded that it had jurisdiction over the protester's allegations that the agency improperly overrode the automatic CICA stay triggered upon the filing of a protest, in violation of the APA.  However, an APA violation need not be premised on an agency's failure to comply with CICA to give rise to jurisdiction under section 1491(b)(1).  In *Emery Worldwide Airlines*, the Federal Circuit (and the Court of Federal Claims before it) exercised section 1491(b)(1) jurisdiction over a protest alleging that the USPS violated the APA.  The protester "alleged that the USPS violated the Administrative Procedure Act … and pointed to no fewer than ten alleged defects in the procurement process."  264 F.3d at 1076.  These defects included the following: USPS "failed to seek competition," "failed to treat all potential suppliers fairly and equally," conducted an "irrational and improperly restricted competition," "failed to perform a proper or rational market assessment," and "performed an insufficient or irrational analysis of intervenor's price."  *Emery Worldwide Airlines, Inc. v. United States*, 49 Fed. Cl. 211, 218 (2001).  Additionally, the protester alleged that the USPS violated a statutory policy set forth in 39 U.S.C. § 101(f) requiring it to "make a fair and equitable distribution of mail business to carriers providing similar modes of transportation."  *Emery Worldwide Airlines*, 264 F.3d at 1077.

The similarities between the protester's allegations in *Emery Worldwide Airlines* and SpaceX's allegations before this Court are undeniable.  SpaceX, too, has alleged that the Agency violated the APA for defects in its LSA award decision including, but not limited to, the adoption of a preference for relying on existing Government processes and facilities, weighing assigned risks in a manner that is contrary to the terms of the LSA Solicitation, evaluating the offerors'

schedules and Total Evaluated Prices unequally, and awarding a significant discount to ULS's Total Evaluated Price while failing to consider the millions of dollars already invested by the Government into ULS's proposed launch system. (*See supra* Section III.)

SpaceX also has alleged that the Agency failed to "comply with the law," i.e., 10 U.S.C. § 2371b. Like the statute at issue in *Emery Worldwide Airlines*, which required "fair and equitable distribution," 264 F.3d at 1077, section 2371b invokes a similar (and in fact, more definitive) statutory directive that the Agency use "competitive procedures" to "the maximum extent practicable" when awarding the LSAs. The APA, in turn, demands that the Agency act rationally and in accordance with that law upon conducting the competition and making its LSA awards. Federal Circuit precedent confirms that, under the APA alone, this Court has jurisdiction over SpaceX's Complaint.

Thus, even if this Court concludes that a violation of section 2371b alone does not confer jurisdiction under section 1491(b)(1)—it does—this Court must exercise jurisdiction over SpaceX's allegations that the Agency has acted in a manner that is arbitrary, capricious and contrary to that law in violation of the APA.

### B.     Alternatively, The Court Should Transfer This Action To District Court.

For the aforementioned reasons, SpaceX believes that this Court has exclusive jurisdiction over SpaceX's Complaint. Assuming *arguendo* this Court disagrees, the Court should transfer the case to another federal court that would have jurisdiction—the U.S. District Court for the Central District of California—because as a result of any such ruling, SpaceX would easily satisfy the remaining requirements for transfer. *See* 28 U.S.C. § 1631.

First, if this Court determines that it lacks exclusive jurisdiction over SpaceX's Complaint on the ground that SpaceX's claims are non-procurement objections, then the appropriate federal

district court would have jurisdiction to hear SpaceX's APA challenges that the Agency's LSA award decision was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. *Res. Conservation Grp.*, 597 F.3d at 1246 n.12 (explaining that post-sunset effect of ADRA was to repeal express grant of district court jurisdiction over procurement actions, but ADRA does not affect district court's jurisdiction in non-procurement context); 28 U.S.C. § 1331 (granting district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"); *see also Califano v. Sanders*, 430 U.S. 99, 105 (1977) (holding that 28 U.S.C. § 1331 "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate").

As for venue, under 28 U.S.C. § 1391, the appropriate federal district court for transfer is the U.S. District Court for the Central District of California because SpaceX's principal place of business is in Hawthorne, California which is located in this district. Moreover, the Agency that made the challenged decision is located in Los Angeles, California, also in this district. "'A civil action may be brought in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.'" *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 761-62 (C.D. Cal. 2016) (alteration in original) (quoting 28 U.S.C. § 1391(b)(2)).

Second, if this Court declines to exercise jurisdiction, a transfer would be in the interest of justice. As discussed above, and in SpaceX's Complaint, the Agency made the challenged LSA awards in connection with the Agency's Phase 2 launch services procurement and the decision will disadvantage SpaceX's ability to compete in that ongoing competition as well as risk Congress's mandate to assure access to space. (ECF No. 1 ¶¶ 93–108.) Initial proposals are currently due on August 1, 2019. Defendant-Intervenors have advised this Court that continued LSA performance

38

(and the associated economic benefit) directly relates to the proposals they intend to submit. (ECF No. 9 at 3; ECF No. 11 at 3.) Thus, it would be in the interest of justice (and the Agency's launch services procurement) for SpaceX's challenges to be heard and the issues resolved without delay. Granting a transfer would ensure that a court of competent jurisdiction could hear this matter promptly—without the need for refiling pleadings, intervention motions, and the record—and render a decision with appropriate alacrity.

As demonstrated in the preceding sections of this brief, SpaceX's Complaint falls squarely within this Court's jurisdiction under the Tucker Act, because SpaceX asserts violations of law "in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). Nevertheless, if this Court agrees with the premise of Defendant's Motion and finds this matter outside of the Court's exclusive protest jurisdiction, SpaceX requests that the Court transfer this case to the U.S. District Court for the Central District of California. *See e.g., L-3 Servs.*, 104 Fed. Cl. at 35; *Thrustmaster of Texas, Inc. v. United States*, 59 Fed. Cl. 672, 674 (2004).

## VI.   CONCLUSION

For the aforementioned reasons, this Court should exercise jurisdiction over SpaceX's Complaint pursuant to 28 U.S.C. § 1491(b)(1) and deny Defendant's Motion to Dismiss or, in the alternative, transfer venue to the U.S. District Court for the Central District of California.

Dated: June 28, 2019

*Of Counsel:*

Kara L. Daniels
David M. Hibey
Sonia Tabriz
Nathaniel E. Castellano
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Respectfully Submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ Craig A. Holman
Craig A. Holman
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone: (202) 942-5720
Fax: (202) 942-5999
*Attorney of Record for Space Exploration Technologies Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of June 2019, I caused a true and correct copy of the

foregoing Opposition to be served by electronic delivery on:

Tanya B. Koenig
U.S. Department of Justice – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Email: tanya.b.koenig@usdoj.gov
*Counsel for Defendant*

Scott E. Pickens
Barnes & Thornburg, LLP (DC)
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20006-4623
Email: scott.pickens@btlaw.com
*Counsel for Defendant-Intervenor Blue Origin, LLC*

Todd R. Steggerda
McGuireWoods, LLP (DC)
2001 K Street, NW
Suite 400
Washington, DC 20006
Email: tsteggerda@mcguirewoods.com
*Counsel for Defendant-Intervenor United Launch Services, LLC*

Kevin Patrick Mullen
Morrison & Foerster, LLP (DC)
2000 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006
Email: kmullen@mofo.com
*Counsel for Defendant-Intervenor Orbital Sciences Corporation*

/s/ Craig A. Holman