1 | John D. Lombardo (Bar No. 187142)
john.lombardo@arnoldporter.com
2 | Arnold & Porter Kaye Scholer LLP
777 South Figueroa Street, 44th Floor
3 | Los Angeles, CA 90017
Telephone: 213.243.4000
4 | Facsimile: 213.243.4199

5 | Craig A. Holman (*admitted pro hac vice*)
craig.holman@arnoldporter.com
6 | Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
7 | Washington, D.C. 20001
Telephone: 202.942.5000
8 | Facsimile: 202.942.5999

9 | Attorneys for Plaintiff
Space Exploration Technologies Corp.

10

11 | [Additional counsel listed on following page]

12 | **UNITED STATES DISTRICT COURT**

13 | **CENTRAL DISTRICT OF CALIFORNIA**

14 | **WESTERN DIVISION**

15 | Space Exploration Technologies Corp.,  |  Case No. 2:19-cv-7927-ODW(GJS)
Honorable Otis D. Wright II

16 | Plaintiff,

17 | v.  |  **SUPPLEMENTAL COMPLAINT**

18 | United States of America,

19 | Defendant,  |  Ctrm:  5D, 5th Floor
First Street Courthouse

20 | v.  |  350 W. First Street
Los Angeles, CA 90012

21 | Blue Origin, LLC, *et al.*,

22 | Defendant-Intervenors.

23

| **REDACTED VERSION** |

24

25 | ██████████████████████████████████████████

26 | ███████████████████████████████

27

28

SUPPLEMENTAL COMPLAINT – ████████████████████████████

1    [Caption page continued]

2    Kara L. Daniels (*admitted pro hac vice*)
      kara.daniels@arnoldporter.com

3    David M. Hibey (*admitted pro hac vice*)
      david.hibey@arnoldporter.com

4    Sonia Tabriz (*admitted pro hac vice*)
      sonia.tabriz@arnoldporter.com

5    Nathaniel Castellano (*admitted pro hac vice*)
      nathaniel.castellano@arnoldporter.com

6    Eric A. Valle (*admitted pro hac vice*)
      eric.valle@arnoldporter.com

7    Arnold & Porter Kaye Scholer LLP
      601 Massachusetts Avenue, N.W.

8    Washington, D.C. 20001
      Telephone: (202) 942-5000

9    Facsimile:  (202) 942-5999

10    Attorneys for Plaintiff
      Space Exploration Technologies Corp.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL COMPLAINT –

Space Exploration Technologies Corp. ("SpaceX") challenges the final award decision by the Air Force Space and Missile Systems Center ("SMC" or "Air Force") under the Launch Service Agreement ("LSA") Request for Proposals, Solicitation No. FA8811-17-9-0001 (the "RFP") as arbitrary and capricious and contrary to law. (*See generally* Tab 38.) Specifically, SpaceX challenges SMC's decision to award the LSAs, so-called Other Transaction ("OT") agreements, to three companies (i.e., the Defendant-Intervenors), but not SpaceX, the only other competitor under the RFP.

The United States Government relies on contractors to launch and insert national security payloads into space through a program called the National Security Space Launch ("NSSL") program formerly known as the Evolved Expendable Launch Vehicle ("EELV") program.[1]  The LSA competition and awards at issue here constitute the third step of a four-step process by which SMC will acquire its launch services needs through 2027. The substantial funding and support provided by SMC to the LSA awardees through unique OT agreements (step three) better situates the awardees to compete for, win, and perform the launch services contract (the final step). SpaceX and each of the Defendant-Intervenors are competing in that (ongoing) procurement (the "Phase 2 Competition").[2]  Each LSA awardee has committed to propose in that competition the launch systems covered by the challenged LSAs. (Tab 142a; 142b.2; Tab 142c.2.) SpaceX does not challenge the Phase 2 Competition in this action—only the LSA competition.

---

[1] SMC renamed the EELV program as the "National Security Space Launch program," effective March 1, 2019. John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1603, 132 Stat. 1636, 2105-06 (2018). For ease of reference, this Supplemental Complaint will refer to the program as the EELV program, which was the common shorthand for the program during its first twenty-five years.

[2] SMC issued the final solicitation for the Phase 2 Competition, Solicitation No. FA8811-19-R-002 ("Phase 2 RFP"), on May 3, 2019. The Phase 2 Competition will result in two requirements contract awards to provide launch services for the NSS missions during the five to eight year performance period. (Phase 2 RFP, Att. 5 at 2, Ex. A.) One awardee will receive approximately 60% of all NSS launch orders and the other will receive approximately 40%, as allocated by SMC. (Phase 2 RFP, Model Contract at 30-31, Ex. B.)

SUPPLEMENTAL COMPLAINT –

By its challenge, SpaceX seeks to remedy SMC's arbitrary and unlawful LSA actions and thereby level the competitive playing field for the Phase 2 Competition and performance. No limit exists to the number of LSA awards SMC can make. The Court, consequently, has numerous options by which to cure the plainly improper agency conduct set forth herein.

## I.   INTRODUCTION

1.   Nearly two decades ago, the U.S. space flight industry had fallen into disarray. The U.S. had largely lost its leadership role in the space race. Government report, after Government report confirmed that the steady demands of the single National Security Service ("NSS") provider (Defendant-Intervenor United Launch Alliance ("ULA"))[3] for more taxpayer dollars had little impact on ULA's inability to keep pace with the rapidly changing market.[4] Even worse than ULA's exorbitant launch prices, ULA relied on Russian rocket engines to put the majority of U.S. national security payloads into space. For the Nation's space industry to survive and thrive, the industrial base needed bottom-up commercial ingenuity and competition, not the top-down bureaucratic control that had resulted in billions sent to a single provider that needed Russian engines to launch national security critical payloads.

2.   Founded in 2002, SpaceX has disrupted both the commercial and Government space flight market, offering rapid, responsive, and reliable space launch

---

[3] ULA is a joint venture between The Boeing Company ("Boeing") and Lockheed Martin ("Lockheed"). The Administrative Record evaluation materials and award decision refer to ULA, but United Launch Services LLC ("ULS"), a wholly-owned subsidiary of ULA, submitted the proposal and entered into the LSA. (Tab 120 at 35188; Tab 140.) The Supplemental Complaint will use ULA to refer to both ULS and ULA.

[4] Government reports show that ULA's per launch prices averaged $366.648 million in 2016, which represented a 256% increase over original estimated pricing. U.S. Gov't Accountability Office, GAO-16-329SP, Defense Acquisitions: Assessments of Selected Weapon Programs 135 (2016), https://www.gao.gov/assets/680/676281.pdf; *see also* U.S. Gov't Accountability Office, GAO-17-333SP, Defense Acquisitions: Assessments of Selected Weapon Programs 137 (2017), https://www.gao.gov/assets/690/683838.pdf. Spiraling cost growth in the program has triggered Nunn-McCurdy breaches, most recently in 2012. U.S. Gov't Accountability Office, GAO-16-329SP, Defense Acquisitions: Assessment of Selected Weapon Programs 79 (2016), https://www.gao.gov/assets/680/676281.pdf.

- 2 -

at a low cost. SpaceX not only restored the U.S. to its leadership role in commercial space flight but also broke ULA's monopoly in, and fundamentally transformed, the NSS market.[5] Today, SpaceX builds U.S. rockets to propel commercial, Air Force, and intelligence community payloads into space. SpaceX delivers research, supplies, and equipment to the International Space Station for NASA. Not only does SpaceX do this with U.S. made rockets, SpaceX also lands the rocket boosters on sea-based platforms so SpaceX can reuse them—driving the cost per mission down drastically. SpaceX has delivered space race changing innovation. By contrast, more than two decades after ULA's predecessor committed to develop an alternative to using Russian rockets, ULA, the only other NSS provider, still needs Russian rockets to fly the vast majority of its missions.

3. As with any disruption, entrenched interests have resisted progress but the transformational changes to U.S. space flight from SpaceX's market entry have been too profound and the risk to U.S. national security interests from ULA's dependence on Russian rockets too significant to ignore. Congress, consequently, directed the Air Force to end reliance on Russian rocket engines, and appropriated funds for (i) the development of alternative, domestically-produced main engines and (ii) existing or planned commercially-available spacecraft to have capabilities required for NSS missions in order to maintain assured access to space under 10 U.S.C § 2273.[6]

---

[5] Charlie Campbell, *From Satellites to the Moon and Mars, China is Quickly Becoming a Space Superpower*, Time Magazine, (July 17, 2019), https://time.com/5623537/china-space/ (reporting that in 2018 alone, SpaceX's share of the global commercial space launch market reached 65%); Michael Sheetz, *SpaceX and ULA win over half a billion dollars in new Air Force launch contracts*, CNBC (Mar. 15, 2018), https://www.cnbc.com/2018/03/15/air-force-awards-half-a-billion-in-new-launch-contracts-to-spacex-ula.html/ (reporting "Once again, with ULA's most recent contracts valuing each launch at $177 million, SpaceX's bids came in at nearly half the cost to the military as its competitor's.").

[6] Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, §§ 1604, 1608, 128 Stat. 3292, 3623, 3626 (2014); National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 1602, 1603, 130 Stat. 2000, 2582-84 (2016); National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, § 1605, 131 Stat. 1283, 1724-25 (2017).

- 3 -

4.     The LSA RFP announced a competition consistent with the Congressional mandate, claiming the Air Force sought "to quickly transition from the use of non-allied space launch engines," "leverage industry's commercial launch solutions and ensure they are modified to meet NSS requirements," "implement sustainable competition" for NSS missions, and "maintain assured access to space."[7] (Tab 38 at 1260.)

5.     Defying Congressional direction and the RFP's clear terms, the Air Force awarded LSAs to a portfolio of three developmental, unproven prototypes: two of which were "purpose-built" to the Government requirements (and thus not commercial at all) and the other offered by a company with *no* orbital launch experience.  Rather than award to the portfolio that best serves the criteria as well as objectives of the RFP and Congress' mandates, SMC awarded to the portfolio that best serves the needs of ULA, the former monopoly provider and the long-standing incumbent.  SMC made LSA awards to ULA and two other offerors that currently develop major components for ULA's new rocket. (Tab 136 at 41753.)[8]  Thus, all three LSAs subsidize the development of the new launch system offered by ULA, while excluding SpaceX, the leader in commercial space flight and the only LSA competitor that offered operational, *domestically-produced* rockets already certified to perform the overwhelming majority of planned NSS missions, the so-called Category A/B missions.

---

[7] Assured access to space means "the availability of at least two space launch vehicles (or families of space launch vehicles) capable of delivering into space any payload designated by the Secretary of Defense or the Director of National Intelligence as a national security payload."  10 U.S.C. § 2273(b)(1).  Notwithstanding its statutory obligation to maintain assured access to space, SMC has never in the past maintained assured access for the heaviest EELV payloads as only ULA's Delta IV Heavy were certified to perform such missions.

[8] SpaceX was the only offeror not proposing to develop a major component of ULA's new "Vulcan" launch system: Defendant-Intervenor Blue Origin, LLC ("Blue Origin") is supplying the Vulcan's main first stage engine, and Defendant-Intervenor Orbital Sciences Corp. ("Orbital") is supplying the Vulcan's strap-on side boosters, which are necessary for ULA's vehicle to meet EELV performance requirements.

- 4 -

6.     This arbitrary and anticompetitive result occurred *despite SMC determining* that SpaceX "not only has more strengths than ULA" (the winner of the largest government investment), "but [SpaceX's] strengths are qualitatively more beneficial to the Government than ULA's strengths."  (Tab 135 at 41734.)  By any reasonable measure under the RFP's stated criteria, SpaceX earned a place in the LSA portfolio.

7.     SpaceX has demonstrated an unmatched commitment to SMC and the broader NSS community for providing reliable, affordable, and innovative space launch.  SpaceX has done so through years of effort and billions of dollars of its own capital investments to meet the demanding requirements of the EELV program, unlike ULA, which, as explained *infra*, has needed annual billion dollar taxpayer subsidies to operate (not innovate) and still charges exponentially more per mission.

8.     To date, SpaceX has successfully launched its Falcon 9 and Falcon Heavy launch vehicle systems more than 70 times in support of NSS, civil space, and commercial space customers, including recent missions for SMC and the National Reconnaissance Office ("NRO").  In December 2018, SpaceX successfully launched the first of the next generation Global Positioning System ("GPS") III satellites to orbit, helping the Department of Defense ("DoD") start a new era for the critically important GPS constellation and mission.

9.     In parallel with its national security commitment, SpaceX has worked tirelessly to become the global leader in commercial launches, conducting more launches than any other commercial launcher over the past two years, with a record twenty-one launches in 2018 alone.[9]  By comparison, ULA launched eight missions in 2018.[10]  SpaceX's commercial business and flight cadence eliminates the burden of

---

[9] Dana Hull and Jack Kaskey, *SpaceX Caps Record 2018 With Launch of Air Force GPS Satellite*, Bloomberg (Dec. 23, 2018), https://www.bloomberg.com/news/articles/2018-12-23/spacex-caps-record-2018-with-launch-of-air-force-gps-satellite.

[10] *Id.*

- 5 -

SUPPLEMENTAL COMPLAINT – ███████████

1    shouldering the full fixed costs of the launch provider's business, which the taxpayer

2    has had to do with ULA.

3         10.   SpaceX's commitment to the Nation's space enterprise has yielded

4    extraordinary results for the Government and the taxpayer: in competitive launch

5    services procurements for NSS missions, SpaceX has won multiple competitive

6    awards at price levels that have saved the DoD hundreds of millions of dollars versus

7    the prior sole source status quo.  At the same time, SpaceX's launch systems have

8    radically advanced the state-of-the-art for rocket technology through reusability and

9    operational responsiveness—a key advantage for the Nation as the space domain

10   becomes increasingly contested—demonstrating the unique ability to maintain a

11   launch cadence of roughly two launches per month.  This cadence is set to increase

12   even further to support the rapid deployment of critical space assets.

13        11.   Beyond its commitment to innovating launch vehicle technology, SpaceX

14   has consistently made private capital outlays to enable its launch vehicle systems to

15   meet the unique and expensive national security launch requirements that yield no

16   commercial benefit; and, SpaceX has borne the expense of certifying its vehicles for

17   NSS missions both in time and money.  SpaceX has shown, throughout, a core

18   commitment to SMC's crucial space mission, and to the mission assurance needs and

19   processes inherent in NSS launch campaigns.

20        12.   As noted, the RFP is part of SMC's ongoing multi-phase acquisition

21   strategy for launch services to place national security satellites into orbit.  Put simply,

22   SMC designed the RFP to *fund the development of launch systems* by awarding LSAs

23   under its OT authority in 10 U.S.C. § 2371b, and required the awardees to propose

24   those taxpayer-funded launch systems for the Phase 2 Competition, which *solicits* two

25   requirements contracts for *launch services*. (Tab 34 at 1035-36, 1045.)

26        13.   An overarching goal of the RFP is to transition from ULA's Atlas V which

27   is powered by a Russian engine.  (*Id*. at 1035; Tab 38 at 1260.)  The RFP also

28   expressly identified two other Congressionally-mandated objectives: (1) to maintain

- 6 -

1  assured access to space; and (2) to leverage commercial launch systems to reduce the

2  time and cost of launch systems development and reduce the cost of launch.  (Tab 38

3  at 1260; Tab 34 at 1036.)

4      14.  SpaceX competed under the RFP to be included in the LSA award

5  portfolio.  In late 2018, SMC excluded SpaceX and awarded hundreds of millions of

6  dollars in development funding to each and every one of SpaceX's direct domestic

7  competitors—including the long-term monopoly provider of NSS launches, ULA—

8  despite determining that SpaceX offered launch systems qualitatively more beneficial

9  to the Government.  (Tab 135 at 41734.)

10      15.  SMC awarded LSAs committing Government investments valued at:

11  (a) $967 million to ULA; (b) $792 million to Orbital; and (c) $500 million to Blue

12  Origin.  (Tab 135 at 41732.)  The only offeror denied an LSA was SpaceX.  *SMC's*

13  *decision to exclude SpaceX from an LSA award undermines every one of the RFP's*

14  *express objectives.*

15      16.  <u>First</u>, by selecting for its LSA portfolio three unbuilt, unflown systems—

16  all of which share major common systems relative to the ULA vehicle—SMC has

17  tilted the playing field steeply in favor of companies proposing unproven rockets that

18  will not be certified by the RFP deadline for the most imminent (and greatest) NSS

19  launch needs (the Category A/B payload missions), risking assured access to space

20  and ensuring continued dependence on Russian rockets.

21      17.  SpaceX was the only competitor to propose currently operational,

22  commercially viable launch vehicles, servicing the majority of NSS missions.

23  Specifically, SpaceX bid its existing, operational Falcon 9 and Falcon Heavy vehicles

24  for all Category A and B missions and a newer, even more capable and cost effective

25  system, the Big Falcon Rocket (now called Starship) for so-called Payload Category

26  C missions, which comprise a minute fraction of the EELV manifest (only one of 31

27  missions at the time of the LSA award) with an RFP "tentative" need date no earlier

28  than September 1, 2025.  (Tab 132 at 41594 (evaluation describing SpaceX's

"innovative and exceptional approach and understanding of the requirements" as providing "benefits ███████████████████████ significantly in excess of the government requirements").)  As of the award decision, SpaceX's Falcon 9 had flown 61 successful missions—including 35 consecutive missions in 2017 and 2018 alone—and was certified by SMC and able to carry most missions on the EELV manifest.[11] SpaceX's Falcon Heavy also had flown successfully[12] and was EELV-certified ████ ███████████.

18.    Conversely, each of the three awardees proposed new rockets, all of which are still in the design phase, for all NSS missions (Category A/B and C) for which SMC has an operational need starting on April 1, 2022.  And, unlike SpaceX, not one of the awardees has demonstrated the ability to develop and manufacture new rockets rapidly.  In fact, it took ULA's parent companies, Lockheed and Boeing, seven years to complete development of the Atlas V and Delta IV Heavy vehicles, even though they were developmental iterations of existing vehicles and also significantly financed by the Government.

19.    The LSA award decision thus undermines assured access to space because, unlike the fully operational American-made launch vehicles that SpaceX proposed, which can already perform every EELV mission scheduled before September 2025, it is not clear when, if ever, the LSA awardees' conceptual rockets will be certified and operationally-ready to perform *any* EELV mission.

20.    In addition, as noted, the awardees' proposed rockets share major subsystems: Blue Origin's New Glenn and ULA's Vulcan will both use Blue Origin's BE-4 first stage engine (Tab 132 at 41420), and Orbital's OmegA and ULA's Vulcan will both use Orbital's GEM 63XL solid side boosters and the RL-10C upper stage

---

[11] In the space launch industry, a "manifest" refers to the schedule of missions. The management of satellite systems, including replacing satellites as they reach the end of their planned life, involves long lead planning, and launches are often scheduled—and put on the manifest—years in advance.

[12] The Falcon Heavy has successfully performed a second mission since the LSA award decision.

1    engine developed by Aerojet Rocketdyne.  (*Id* at 41420-21.)  If SMC were to award

2    Phase 2 contracts to ULA and either of the other LSA awardees, this overlapping use

3    of critical propulsion systems—a key risk area for new launch vehicle development—

4    will ensure that a problem with a single subsystem in the development phase, or a

5    single launch failure, could ground the United States' ability to launch any NSS

6    payloads for long periods of time; this is the opposite of assuring access to space.

7         21.    Even though SMC recognized the substantial risk the awardees' pose to

8    the Air Force's operational needs and found that none proposed what SMC deemed

9    the necessary mitigation, at least 14-months of margin between the last certification

10   flight and RFP's Category A/B mission need date, SMC evaluated their proposals as

11   Low or Moderate risk because SMC planned to obtain launch services from other

12   sources to mitigate the undeniable, catastrophic risk to assured access to space.  (Tab

13   101, LSA Convo with O5 [ULA] on Rating at 39:45 through 42:27 ("█████████████

14   ████████████████████████████████████████████████████████████████████████,

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ████████████████████████) (emphasis added);  Tab 101, LSA Convo with

18   O7 [Orbital] on Rating at 40:40 through 41:27 ("… ████████████████████████

19   ████████████████████████████████████████████████████████████ because

20   we do have mitigations, that drives the consequence of not getting that date down; so

21   therefore, ████████████████████████████████████████████████████████████

22   ████████████████████.") (emphasis added); Tab 101, LSA Convo with O6

23   [Blue Origin] on Rating at 24:40 to 28:20 (advising that SMC would "dual integrate"

24   on either a SpaceX Falcon or ULA Atlas V a year out to mitigate ████████████

25   ████████████████████████████████████).)  Stated otherwise, SMC improperly

26   reduced the evaluative impact of the known ████ risk in the awardees' proposals

27   based on other rocket resources available to the Government.

28

SUPPLEMENTAL COMPLAINT – ██████████████████████████

22.   Conversely, for the one design-phase rocket that SpaceX proposed, the "groundbreaking technological" Starship vehicle servicing the Category C missions (Tab 132 at 41594), SpaceX proposed ███████ of margin between the last certification flight and the earliest (tentative) need date in the RFP—more than ████ SMC's Low risk benchmark (*id.* at 41618), yet SMC inexplicably deemed SpaceX's proposal ████████. (Tab 136 at 41752-53.) Notably, SMC did not similarly assume other resources were available to launch the Category C payloads to mitigate any perceived risk. This uneven appraisal of risk not only contravenes the stated evaluation criteria and the purposes of the LSA competition but was anticompetitive contrary to SMC's authority under 10 U.S.C. § 2371b(b)(2).

23.   Second, the LSA award decision will not end the Government's reliance on Russian rocket engines for NSS missions. SMC knew that none of the design-phase rockets it chose for LSA award has a meaningful chance of being ready in time for the Phase 2 RFP performance period (i.e., ready to order in 2020 and launch Payload Category A and B missions by April 2022). Instead, as noted, the evaluators assumed during the evaluation that SMC would continue relying on ULA's Russian-powered Atlas V or SpaceX's Falcon 9 to mitigate the significant risks to the Category A/B need date created by the awardees' proposed approaches. So, while awarding an LSA to SpaceX would have ensured the quickest end to the EELV program's reliance on Russian engines, the award decision essentially guarantees such reliance will continue years beyond the Congressionally-mandated end date of December 31, 2022.

24.   Third, the LSA award decision does not leverage commercial launch systems—an RFP requirement and Congressional mandate. Unlike SpaceX, whose Falcon 9 flies more commercial missions than any rocket in the world, none of the LSA awardees has ever demonstrated commercial viability. The inability of Boeing and Lockheed to win commercial launches is the very reason they had to merge to form ULA and acquire a monopoly in the EELV market in the first place. And, on the rare occasion that ULA has won a commercial contract, its offering was heavily

- 10 -

subsidized by anticompetitive "launch capability" contracts through which U.S. taxpayers have long covered ULA's overhead (to the tune of some $1 billion per year). More to the point, ULA has acknowledged that the launch system it proposed for the RFP—the Vulcan—is not designed to succeed in the commercial market, but rather was "purpose-built" for the Government's requirements: "Vulcan was purpose built for [NSS] requirements, it was a deliberate choice that we made.... *Had we designed our rocket to be optimized for the commercial marketplace, it would have been smaller.*"[13]

25.   Orbital, now a wholly-owned subsidiary of Northrop Grumman Corporation ("Northrop") named Northrop Grumman Innovation Systems, Inc., has no commercial launch business and likewise acknowledged that its LSA design is "purpose-built" for Government missions.[14]  Orbital offered a solution involving solid rocket motors used in several other government programs (not the commercial marketplace), including the Air Force's next generation intercontinental ballistic missile.[15]

26.   And in nearly 20 years of existence, Blue Origin has yet to reach orbit, let alone put a commercial payload into orbit.[16]   Choosing these awardees cannot

---

[13] Sandra Erwin, *ULA CEO Bruno: Launch industry challenged by tougher national security missions*, SpaceNews (May 7, 2019), https://spacenews.com/ula-ceo-bruno-launch-industry-challenged-by-tougher-national-security-missions/ (emphasis added); *see also United Launch Alliance, Vulcan Centaur: Purpose-Built for National Security Space*, YouTube (May 2, 2019), https://www.youtube.com/watch?v=UVblBykNvdw; Press Release, United Launch Alliance, United Launch Alliance Progresses Towards Purpose-Built Vulcan Centaur for National Security Space Missions: First Flight Hardware Being Manufactured and Launch on Track for 2021 (Apr. 8, 2019), https://www.ulalaunch.com/about/news/2019/04/08/united-launch-alliance-progresses-towards-purpose-built-vulcan-centaur-for-national-security-space-missions.

[14] Emre Kelly, *Northrop Grumman is ready to 'start cutting metal' at KSC for new Omega rocket*, Florida Today (Apr. 9, 2019), https://www.floridatoday.com/story/tech/science/space/2019/04/09/northrop-grumman-time-start-cutting-metal-ksc-new-omega-rocket/3404407002/; Sandra Erwin, *For OmegA, U.S. Air Force launch competition is a must-win*, SpaceNews (Apr. 8, 2019), https://spacenews.com/for-omega-u-s-air-force-launch-competition-is-a-must-win/.

[15] Sandra Erwin, *Northrop Grumman confident Air Force will continue to fund the company's new rocket*, SpaceNews (Sept. 20, 2018), https://spacenews.com/northrop-grumman-confident-air-force-will-continue-to-fund-the-companys-new-rocket/

[16] Blue Origin's lack of commercial success is perhaps why its founder, the richest man in the world by most accounts, injects billions of dollars of his own money into the company; he has even stated

- 11 -

credibly be said to leverage any commercial launch solutions, certainly not in comparison to SpaceX's offering. Instead, this award portfolio risks perpetuating the same critical problems that have plagued the EELV program for decades: uncontrolled costs and a lack of competition based on a lack of commercial viability. (Tab 2 at 109 (EELV Business Case Analysis for LSA competition stating: "*A commercially viable launch system is vital to reducing the risk to the Air Force of having to keep launch service providers financially viable during periods of low demand for NSS launches.*") (emphasis added); Tab 46 at 1343 (Air Force Memorandum Re: Compliance with Fiscal Year ("FY") 2018 National Defense Authorization Act ("NDAA") ("the scope of each LSA is to develop a launch prototype that is a commercial domestically produced … system … not limited in scope to only the NSS capabilities….").)

27. Had SMC followed Congress' mandates and properly applied the RFP's stated criteria consistently, SpaceX's LSA proposal most certainly would have been deemed "most advantageous in achieving the Government's goal of assured access to space," earning an LSA award. (Tab 38 at 1285.)

28. In addition to undermining the RFP's stated objectives, the LSA award decision was based on material and demonstrable deviations from the stated evaluation criteria and prejudicial unequal treatment. For example:

(a) SMC determined that SpaceX's proposal presented a higher risk than the others even though SpaceX's proffered rockets can already launch nearly every payload on the EELV manifest, and indeed *every* EELV payload scheduled to launch before late 2025. To reach this conclusion, the Source Selection Authority ("SSA"), the government official tasked with making the final award decision, determined that Starship—the one developmental

that he may need to manage that company as a "non-profit." Eugene Kim, *Jeff Bezos says Amazon will announce HQ2 Decision before the end of the year*, CNBC (Sept. 14, 2018), www.cnbc.com/2018/09/13/jeff-bezos-speaks-at-the-economic-club-in-washington-dc.html.

- 12 -

launch vehicle that SpaceX offered to launch one or two planned Category C payload missions no earlier than late 2025 (and potentially much later)—rendered the entire SpaceX solution higher risk than the three design-phase rockets that the awardees proposed to use for *all* mission categories first needed for launch by April 2022.[17]  This finding, which provides greater weight to Payload Category C solutions than the RFP will permit and resulted from the unequal presumption that SMC would rely on other vehicles to mitigate Category A/B mission risks (but not Category C mission risks), is particularly unreasonable in that the underlying evaluation made a false comparison to the Space Shuttle development and ignored SpaceX's demonstrated ability—unique among the offerors—to design reliable, reusable, and cost-effective launch vehicles rapidly from the ground up. Equally anticompetitive, the high risk determination also resulted from unwarranted findings based on unstated criteria.  Specifically, SMC assessed risk to SpaceX's Category C solution because SpaceX ███████████████ ██████████████████████████████████████████—processes and facilities that were *not* EELV requirements.

(b)   SMC understated the Government's total investment in ULA's LSA solution by hundreds of millions of dollars by failing to account for the significant contract awards the Air Force has made, and continues to make, to ULA to pay for the ████████████████████████████████████████████ ████████████████████████, among other cost evaluation errors that benefitted ULA.  These prejudicial errors reflect an unequal evaluation because, opposite to its treatment of ULA, SMC increased SpaceX's

---

[17] This determination was particularly odd given SMC's significant, multi-year investment—via the Rocket Propulsion System program—into SpaceX's development of the Raptor engine that will power the Starship.

- 13 -

proposed price by the contract value of ███████████████████
████████████████████████████████████████████

(c)    SMC also overstated SpaceX costs to the Government by ███████████,
upwardly adjusting SpaceX's proposed price to include ███████████
████████████████████, even though the Phase 2 RFP
confirms that SMC has no need ████████████████████.
And, having increased SpaceX's proposed price by the ███████████
██████, it was unreasonable and unfair for SMC also to assign a ██████
███ to SpaceX by assuming ████████████████████.
SpaceX cannot reasonably be burdened with both an evaluated risk <u>and</u> the
cost of overcoming that risk.

(d)    SMC also failed to assess the serious risks arising from the fact that all three
LSA awardees effectively serve one launch vehicle because ULA's proposed
Vulcan depends upon critical components built by the two other LSA
awardees for their own proposed launch vehicles.  SMC dismissed the fact
that this overlap of critical-but-undeveloped systems proliferates these
systems' substantial risks across all current LSA awardees' proposed launch
vehicles, reasoning that the RFP—which required SMC to assess risk of the
proposed approach—did not include an express criterion related to use of
common components.[18]    Another example of unequal treatment that
benefited ULA.

29.    In sum, SMC's evaluation and award decision were so flawed as to be
arbitrary and capricious, and contrary to the competitive procedures required by 10
U.S.C. § 2371b(b)(2) and the RFP.

30.    The improper LSA awards, which provide significant Government
investment and cooperation for certification of the launch systems developed by

---

[18] SMC also ignored the impact that these relationships—which mean that a Phase 2 RFP award for
ULA is also a win for the other two LSA awardees—could have on competition.

- 14 -

SpaceX's competitors in the ongoing Phase 2 Competition, irreparably harm SpaceX and impede Congress' mandate to end reliance on Russian rocket engines, invest in the modification of commercially viable launch systems, and maintain rapid, reliable, and low cost assured access to space.

## II.   STATEMENT OF FACTS

### A.   EELV Program Before SpaceX: Non-Competitive And Highly-Subsidized.

31.   "Competition is fundamental to our free enterprise system": "[i]t is the single most important source of innovation, efficiency, and growth in our economy."[19] But it is precisely the lack of competition that has bedeviled the EELV program and anti-competition procedures that resulted in the unlawful LSA award decision.

32.   The EELV program was initiated more than two decades ago to achieve affordable, assured access to space for national security payloads.[20] The approach then was similar to the approach SMC is using now:  through OT agreements, the Government gave money to Boeing[21] and Lockheed to develop launch systems—the Delta IV and Atlas V, respectively—and related infrastructure that they would then use to compete with each other for EELV missions, giving SMC the direct benefits of head-to-head competition.

33.   The success of the approach, however, was premised on Boeing and Lockheed winning commercial launches to spread their overhead costs and keep their suppliers busy, and neither proved capable of securing any meaningful commercial business, even with their taxpayer-funded launch systems.  This left both Boeing and Lockheed to rely exclusively on Government launches to cover their respective

---

[19] Memorandum from Ronald Reagan on Competition in Federal Procurement to the Heads of Departments and Agencies (Aug. 11, 1983), https://www.reaganlibrary.gov/research/speeches/81183f.

[20] Steven Hildreth, Cong. Research Serv., R44498, National Security Space Launch at a Crossroads 2 (2016), https://fas.org/sgp/crs/natsec/R44498.pdf.

[21] The award was made to McDonnell Douglas, which was later acquired by Boeing in 1997.

overhead, support a supply chain, and still generate a return on the modest investments they themselves made in their launch systems. To make matters worse, Boeing won numerous competed EELV missions using misappropriated Lockheed pricing data. SMC was forced to reallocate the missions (at great cost), and Boeing was barred from competing for 20 months.[22] So after investing well over one billion taxpayer dollars to help Boeing and Lockheed develop launch systems on the premise that competition would provide affordable EELV launches,[23] SMC ended up with no commercially or competitively-viable launch systems and massive fraud to clean up.

34. The inability of both companies to win commercial launches (and the malfeasance of Boeing) forced SMC to abandon any hope for true competition, and instead to let Boeing and Lockheed merge their launch businesses in 2006 to form ULA. After that, ULA enjoyed a complete monopoly in the EELV program, with SMC awarding all missions to ULA on a sole source basis.

35. In addition, because ULA was not commercially viable, the Government had to cover ULA's entire overhead. The Government did so using an unusual and complicated two-part contracting mechanism.[24] Specifically, one contract line item, called the EELV Launch Services ("ELS"), paid ULA for the launch vehicles for each mission and the other contract line item, called the EELV Launch Capability ("ELC"),

---

[22] Press Release, Dep't of Justice, Boeing to Pay United States Record $615 Million to Resolve Fraud Allegations (June 30, 2006), https://www.justice.gov/archive/opa/pr/2006/June/06_civ_412.html.

[23] From the start of the EELV program until Boeing and Lockheed merged their launch businesses to create ULA, the Government invested approximately $1.27 billion into Boeing ($696.983 million) and Lockheed ($569.853 million). The Government spent an additional $124.695 million in Research, Development, Test, and Evaluation oversight. Dep't of the Air Force Fiscal Year (FY) 2009 Budget Estimates Research, Development, Test and Evaluation (RDT&E) Descriptive Summaries, Volume II Budget Activities 4-6 (Feb. 2008) at 974, https://www.saffm.hq.af.mil/Portals/84/documents/FY09/AFD-080130-061.pdf?ver=2016-08-22-141512-193 (listing "Total Prior to FY 2007 Cost" of System Development and Demonstration for EELV program).

[24] Indeed, former Under Secretary of Defense for Acquisition, Technology, and Logistics Frank Kendall told the Senate Armed Services Committee in 2016 that he was aware of no other such contracting instrument in the entire DoD portfolio. *Hearing on Military Space Launch and the Use of Russian-Made Rocket Engines Before the S. Comm. on Armed Services*, 114th Cong. 14 (2016) (statement of Frank Kendall, Under Secretary of Defense for Acquisition, Technology and Logistics), https://fas.org/irp/congress/2016_hr/engines.pdf.

1  paid ULA an annual subsidy that has—for ULA's entire existence and to this day—
2  covered all of its overhead, costing U.S. taxpayers nearly $1 billion per year
3  regardless of whether ULA performs a single launch. This structure has made it
4  essentially impossible for anyone, even SMC or the Government Accountability
5  Office ("GAO"), to calculate precisely how much ULA actually charges for each
6  EELV launch.[25]   What is known, however, is that the billion-dollar-a-year ELC
7  subsidy has undermined full and open competition in both the national security and
8  civil space launch markets by enabling ULA, with U.S. taxpayers covering its
9  overhead, to offer launch services at artificially low prices.[26] What is also known is
10  that this billion-dollar annual subsidy is what enables Boeing and Lockheed to rake
11  in profits,[27] because ULA would operate at a substantial loss without it.  This ELC
12  contract structure is so problematic that Congress ordered SMC to end it.[28]

13      36.    The results of ULA's monopoly were predictable: costs skyrocketed and
14  innovation stagnated.

15      **B.    SpaceX's Limited Entry Into The EELV Program**

16      37.    While ULA was enjoying massive taxpayer subsidies to maintain its
17  capability and a sole-source monopoly for EELV launches, SpaceX was developing

---

[25] *See generally* U.S. Gov't Accountability Office, GAO-14-377R, Space Launch Vehicle
Competition: The Air Force's Evolved Expendable Launch Vehicle Competitive Procurement
(2014), http://www.gao.gov/assets/670/661330.pdf; U.S. Gov't Accountability Office, GAO-11-
641, Evolved Expendable Launch Vehicle: DOD Needs to Ensure New Acquisition Strategy is
Based on Sufficient Information (2011), http://www.gao.gov/new.items/d11641.pdf.

[26] *See* S. Rep. No. 114-49, at 259-60 (2015).

[27] *See* The Boeing Co., 2017 Annual Report 31 (2018) ("BDS earnings from operations include
equity earnings of $183 million, $249 million and $202 million primarily from our ULA joint
venture in 2017, 2016 and 2015."), http://s2.q4cdn.com/661678649/files/doc_financials
/annual/2017/2017-Annual-Report.pdf; Lockheed Martin Corp., 2017 Annual Report 42 (2018)
("Total equity earnings recognized by Space (primarily ULA) represented approximately $205
million, $325 million and $245 million, or 21%, 25% and 21% of this business segment's operating
profit during 2017, 2016 and 2015."), https://www.lockheedmartin.com/content/dam/lockheed-
martin/eo/documents/annual-reports/2017-annual-report.pdf.

[28] *See* National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, § 1608, 129
Stat. 726, 1100-01 (2015).

- 17 -

SUPPLEMENTAL COMPLAINT – ███████████

1  innovative and successful launch solutions and winning more launches than any other

2  launch services provider in the competitive global commercial launch market.

3      38.   SpaceX was also actively seeking Air Force approval to compete for

4  EELV missions.  But only days before SpaceX's final Falcon 9 EELV certification

5  launch,[29] SMC sole-sourced to ULA a 28-mission block buy and then cut the number

6  of missions available for competition in half, thus minimizing any competition in the

7  EELV program for many years.  At that point, SpaceX was compelled to file a

8  complaint at the United States Court of Federal Claims challenging the block buy

9  award and seeking the opportunity to compete for EELV launch contracts.[30]  On

10  January 23, 2015, SMC settled SpaceX's legal challenge by agreeing to "expand[] the

11  number of *competitive* opportunities for launch services" going forward.[31]

12      39.   Once SMC permitted SpaceX to compete for EELV missions, it was

13  evident that the ELC payments to ULA created an uneven playing field.  As a key Air

14  Force official acknowledged in Congressional testimony:

15      The EELV Launch Capability (ELC) was created in 2005 by the Air
16  Force to augment a fragile domestic industrial base and maintain a national
   capability to launch national security payloads as set forth in the National
17  Security Presidential Directive-40 (NSPD-40).  Since 2005, the Air Force
   has spent billions of dollars supplementing the infrastructure and capacity
18  of the incumbent launch provider.  Also since 2005, new launch providers
   have entered the market and created competition.  The committee believes
19  that with the introduction of space launch competition, *launch capability
   subsidies inappropriately inhibit fair competition and are no longer
20  necessary*.  The Commander of Air Force Space Command testified to this

---

[29] To perform EELV missions, a launch system must be certified by SMC.  SMC set up a rigorous, lengthy, and expensive process for SpaceX to get Falcon 9 and Falcon Heavy certified to perform EELV missions.

[30] *See generally* Am. Complaint, *Space Exploration Technologies Corp. v. United States et al.*, No. 14-354C (Fed. Cl. May 19, 2014), ECF No. 53, https://www.spacex.com/sites/spacex/files/spacex_amended_complaint.pdf.

[31] Christian Davenport, *Elon Musk's SpaceX Settles Lawsuit Against Air Force*, The Washington Post (Jan. 23, 2015), https://www.washingtonpost.com/business/economy/elon-musks-spacex-to-drop-lawsuit-against-air-force/2015/01/23/c5e8ff80-a34c-11e4-9f89-561284a573f8_story.html?noredirect=on&utm_term=.490e207c883e (emphasis added).

- 18 -

SUPPLEMENTAL COMPLAINT –

point before Congress on March 25, 2015 when he stated "I don't think you can have fair competition with [the ELC] contract in place."[32]

As a result, Congress required SMC to discontinue the ELC payments to ULA by FY 2020.[33]

40.   If there were any doubts that the EELV program and the public fisc would benefit from competition, they were quickly put to rest.  Although the block buy from ULA kept the vast majority of EELV missions from being competed, SMC has competed a handful of missions.  Notably, SpaceX, offering a fully burdened price without the benefit of the billions in ELC subsidies that ULA has received, has still proposed launch services *at substantially lower prices than ULA* in these competitions.  Specifically, SpaceX has offered to provide the same services at an approximately ███ cost savings.  For example, while SMC paid ULA some $380 million per launch in the block buy, through competition, SMC has awarded SpaceX seven missions using its Falcon 9 for less than ██████ each, and SMC purchased a launch service utilizing the Falcon Heavy for ██████.

41.   As explained to Congress by Elon Musk, Chief Executive Officer and Chief Designer for SpaceX:

> With respect to the EELV program ... the Air Force and other agencies are simply paying too high a price for launch.  The impacts of relying on a monopoly provider since 2006 were predictable, and they have borne out.  Space launch innovation has stagnated, competition had been stifled, and prices have risen to levels that General Shelton has called "unsustainable."
>
> When the merger between Boeing and Lockheed's business occurred, the merger promised, in the press release, $150 million of savings.  Instead, there were billions of dollars of cost overruns and a Nunn-McCurdy breach for the program exceeding 50 percent of its cost projections.
>
> According to congressional records, in fiscal year 2013, the Air Force paid an average of $380 million for each national security launch, while subsidizing ULA's fixed costs to the tune of more than $1 billion a year, even if they never launch a rocket.

---

[32] S. Rep. No. 114-49, at 259-60 (2015) (emphasis added).

[33] *See* National Defense Authorization Act for Fiscal Year 2016 § 1608.

- 19 -

By contrast, SpaceX's price is well under $100 million, meaning a savings of almost $300 million per launch, which in many cases would pay for the launch and the satellite combined. So if you took something like a GPS satellite, which is about $140 million, you could actually have a free satellite with the launch. So our launch plus the satellite would costs less than just their launch, which is an enormous difference. And we seek no subsidies to maintain our business.

To put this into perspective, had SpaceX been awarded the missions ULA received under its recent noncompeted 36-core block buy, we would have saved the taxpayers $11.6 billion.[34]

42.    Unsurprisingly, competition has had a salutary impact on ULA's pricing. For example, in FY 2012, SMC was paying ULA around $190 million per mission for the ELS component of each launch (plus over $200 million per launch under the ELC for a total average launch cost of nearly $400 million per mission).[35] In the recent head-to-head competitions with SpaceX, ULA is bidding around $145 million per Atlas V mission for the ELS component (ULA continues to receive ELC payments through 2019 and will receive payment for some ELC-like costs in 2020 and beyond).[36]

## C.    The EELV Program's Next Phase—Multi-Step Procurement Of Domestic, Commercially-Viable Launch Services

43.    ULA's Atlas V vehicle is powered by the Russian-designed and Russian-made RD-180 engine. (Tab 2 at 107.) When Lockheed first proposed using the RD-180 more than two decades ago, it was subject to a DoD requirement that the engines be manufactured domestically within *four* years. That never happened, and *more than*

---

[34] *Hearing on National Security Space Launch Programs Before the S. Subcomm. of the Comm. on Appropriations*, 113th Cong. 19-20 (2014) (statement of Elon Musk, Chief Executive Officer and Chief Designer of SpaceX), https://www.govinfo.gov/content/pkg/CHRG-113shrg49104594/pdf/CHRG-113shrg49104594.pdf.

[35] *See generally* Dep't of Defense Fiscal Year (FY) 2013 President's Budget Submission, Missile Procurement, Air Force, Justification Book Volume 1 at 219 (Feb. 2012), https://www.saffm.hq.af.mil/Portals/84/documents/FY13/AFD-120207-052.pdf?ver=2016-08-24-090237-167.

[36] *See* Press Release, U.S. Air Force, Air Force Awards $739M Launch Services Contracts (Feb. 22, 2019), https://www.af.mil/News/Article-Display/Article/1764306/air-force-awards-739m-launch-service-contracts/; *see generally* Dep't of Defense Fiscal Year (FY) 2019 Budget Estimates, Space Procurement, Air Force, Justification Book Volume 1 of 1 at 67 (Feb. 2018), https://www.saffm.hq.af.mil/Portals/84/documents/FY19/Proc/Air%20Force%20Space%20Procurement%20FY19.pdf?ver=2018-02-12-190223-850.

- 20 -

*twenty years later* ULA still performs most EELV missions using engines developed and manufactured in Russia.  And, with the LSA award decision, it is likely that ULA will continue to do so—contrary to SMC's stated objectives and Congressional mandates—through at least 2024.

44.    In 2014, after Russia invaded Crimea and concerned with the national security risks of relying on Russian engines to launch national security payloads, Congress directed the Air Force "to transition EELV launch service providers off of the RD-180 engine" (Tab 2 at 107), and a few years later passed legislation ending the use of Russian rocket engines by December 31, 2022.[37]

45.    In response, ULA reported that it purchased an additional 20 RD-180 engines in 2015 to keep the Atlas V flying national security launches into the early 2020s.[38]

46.    Replacing the Russian-made engine is not as simple as integrating a new engine in the Atlas V.  Rather, as DoD officials explained to Congress in early 2016:

> To deliver a payload to orbit safely, rocket engines must release and direct tremendous amounts of energy in order to escape gravity, while protecting the payload from the shock and vibration unleashed by that energy…. *To handle the stresses, every modern rocket is designed around its engine and the performance envelope defined by its payloads*. For example, the Atlas V was built around the RD-180 engine to efficiently deliver a wide range of payloads into a variety of orbits. As a result, any effort to simply replace the RD-180 with a substitute engine would require extensive design and engineering changes, as well as significant dynamic and acoustic testing, and would ultimately result in a new launch system, which would require recertification.[39]

---

[37] Can Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 § 1608; National Defense Authorization Act for Fiscal Year 2017 § 1602.

[38] *See generally* Space Foundation, Fact Sheet: Russian Rocket Engines Used by the United States, https://www.spacefoundation.org/wp-content/uploads/2019/08/RussianRocketEnginesUsedByThe UnitedStates.pdf.  In 2016, Congress passed legislation phasing out any contractor's ability to use Russian rocket engines for NSS missions by the end of December 31, 2022 and capping the use of such engines to 18 total for NSS launches.  National Defense Authorization Act for Fiscal Year 2017 § 1602.

[39] *Hearing on Military Space Launch and the Use of Russian-Made Rocket Engines Before the S. Comm. on Armed Services*, 114th Cong. 9-10 (2016) (Joint Prepared Statement by the Hon. Deborah Lee James, Secretary of the Air Force and the Honorable Frank Kendall III), https://fas.org/irp/congress/2016_hr/engines.pdf (emphasis added).

- 21 -

47.    Although SpaceX offered a viable launch vehicle with domestic engines, SMC implemented a four-phased acquisition approach to maintain competition for national security launch services:

> The Phase 2 acquisition strategy uses a four step plan to achieve the goal of two or more domestic, commercially viable launch providers that also meet NSS requirements by the end of Phase 2. Step 1 consists of technology maturation to raise the knowledge for the entire U.S. rocket engine propulsion industrial base. Step 2, investment in RPS [Rocket Propulsion Systems], will initiate the RPS development partnerships with industry. Step 3 Launch System Development, will expand the partnerships with industry for launch systems to provide assured access to space for NSS missions. In Step 4, the Air Force will competitively award launch services using certified heritage launch systems or newly certified launch systems developed through Step 3 (FY18- FY22 procurements for FY20-FY24 launches).

(Tab 2 at 127.)

48.    Subsequently, SMC completed Step 2 by awarding four domestic Rocket Propulsion Systems ("RPS") agreements.[40] SpaceX and Orbital each received an award[41] and ULA partnered with Blue Origin and Aerojet Rocketdyne, respectively, for the other two awards.[42] These RPS agreements formed part of the technology maturation process for launch systems proposed by SpaceX, ULA, Orbital, and Blue Origin for the RFP.  (Tab 4 at 168; Tab 38 at 1260; Tab 129 at 41332 (explaining Blue Origin is "a subcontractor on the ULA RPS Agreement ... in which the Government is investing in the BE-4 boost engine").)

49.    Following the Government investments in engine prototypes, SMC transitioned to Step 3, the LSA competition for public-private partnerships covering

---

[40] Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 § 1604 (directing DoD to "develop a next-generation rocket propulsion system that enables the effective, efficient, and expedient transition from the use of non-allied space launch engines to a domestic alternative for national security space launches").

[41] Press Release, Air Force Space Command, Air Force Awards Two Rocket Propulsion System Prototype OTAs (Jan. 13, 2016), https://www.afspc.af.mil/News/Article-Display/Article/730913/air-force-awards-two-rocket-propulsion-system-prototype-otas/.

[42] Marcia Smith, *ULA Wins Big with Two AF Propulsion Contracts, One with Blue Origin, One with Aerojet Rocketdyne*, Space Policy Online (Feb. 29, 2016), https://spacepolicyonline.com/news/ula-wins-big-with-two-af-propulsion-contracts-one-with-blue-origin-one-with-aerojet-rocket dyne/.

SUPPLEMENTAL COMPLAINT –

the development of the new or upgraded domestically-produced launch vehicles and other infrastructure—the focus of this action.

**D.   The RFP—Investing In Commercial, Domestic Launch Systems**

50.   In October 2017, SMC issued the RFP under its OT authority for prototype projects in 10 U.S.C. § 2371b.   The RFP sets forth the procedures for evaluating and awarding the LSAs.

51.   The RFP defined the prototype as a complete launch service capability, i.e., "[a] fully developed and certified EELV Launch System," which includes "[a]ll activities from initial concept up to, and including production," and covers not only the launch vehicle that meets the full range of the EELV mission requirements but "associated operation and support services and personnel that provide the capability to perform all EELV missions." (Tab 38 at 1261.)

52.   The RFP advised offerors that SMC would tailor each agreement "to each launch service provider's needs in order to enable commercial launch systems to meet all NSS requirements." (*Id.* at 1260.)

53.   The RFP confirmed SMC's intent to award the LSAs to multiple awardees to mature their launch systems for the next procurement phase: the Phase 2 Competition—a multiple-award Federal Acquisition Regulation ("FAR") Part 12 acquisition for NSS launch services.   (*Id.* ("The Launch Service Agreements (LSAs) facilitate development of at least three EELV Launch System prototypes as early as possible, allowing those launch systems to mature prior to a future selection of two NSS launch service providers for Phase 2 launch service procurements, starting in FY20.").)

54.   Specifically, the RFP stated SMC's intent to "competitively award [FAR-based] firm fixed price (FFP) contracts to two launch providers … as soon as possible, but no later than 2020 for 2022 launches." (*Id.* at 1261.)

55.   The RFP identified nine EELV reference orbits that each proposed commercial launch system must meet to satisfy SMC's requirements, dividing the

- 23 -

missions into those involving Payload Categories A, B, and C, reflecting the size of
the payload involved:

**Table 10: Reference Orbits**

| Orbit Description | Apogee Altitude (nmi) | Perigee Altitude (nmi) | Inclination (deg) | Mass to Orbit (lbm) | Payload Category* | | |
|---|---|---|---|---|---|---|---|
| | | | | | A | B | C |
| LEO | 500 | 500 | 63.4 | 15,000 | X | X | -- |
| Polar 1 | 450 | 450 | 98.2 | 15,500 | X | X | -- |
| Polar 2 | 450 | 450 | 98.2 | 37,500 | -- | -- | X |
| MEO Direct 1 | 9,815 | 9,815 | 50.0 | 11,750 | X | X | -- |
| MEO Transfer 1 | 10,998 | 540 | 55.0 | 9,000 | X | X | -- |
| GTO | 19,323 | 100 | 27.0 | 18,000 | X | X | -- |
| Molniya | 21,150 | 650 | 63.4 | 11,500 | X | X | -- |
| GEO 1 | 19,323 | 19,323 | 0.0 | 5,000 | X | X | -- |
| GEO 2 | 19,323 | 19,323 | 0.0 | 14,500 | -- | -- | X |

\* In order to standardize terms with respect to payload size, SIS Rev C is implementing payload
categories.  Reference EELV SIS Rev C, Section 3.1.1.4.
- Payloads in Category A fit within a 4-meter envelope
- Payloads in Category B fit within a 5-meter envelope
- Payloads in Category C fit within an extended 5-meter envelope

(*Id.* at 1286.)

56.     Seven of the nine referenced orbits carry Category A/B payloads,
representing the greatest number of missions and the most imminent missions on the
NSSL manifest, and two carry Category C payloads.  (*Id.*) The RFP advised offerors
that the future Phase 2 Competition would cover launch services for Payload Category
A and B and noted expressly that SMC may procure Payload Category C launch
services separately.  (*Id.* at 1261.)

57.     The Category A/B need date—i.e., the Initial Launch Capability ("ILC")
date—is most imminent, April 1, 2022, while the two Category C missions, Polar 2
and GEO 2, are not scheduled until September 1, 2025 (tentative) and October 1, 2026
(firm), respectively.  (*Id.* at 1288.)  The earlier need of the Category A/B missions
drives significantly higher risk to assured access to space than the later Category C
payload missions.

58.     As the Agreements Officer explained to Orbital:

If we look at Criteria 1, and that's the need date for the A/B.  It's the nearest
term, so in a way it's the hardest, because, you know, for Cat C and for
Polar 2 you have more time to hit it. So even though those are harder
missions, you know, significantly more time makes a big difference, right.

- 24 -

(Tab 101, LSA Convo with O7 [Orbital] on Rating Debrief 27 July @0800 at 29:10
through 29:35.)

59.   It is thus clear from the RFP that Category A/B missions drive the
Government's most immediate and numerous requirements.

**E.    The RFP's Stated Criteria**

60.   The RFP (like 10 U.S.C. § 2371b) required SMC to use a competitive
process, evaluating proposals against three factors (EELV Approach, Technical, and
Investment Cost), and awarding to the portfolio of solutions that "are most
advantageous in achieving the Government's goal of assured access to space via two
or more domestic commercial launch service providers that also meet NSS
requirements." (*Id.* at 1262, 1281-85.)

61.   The RFP provided the following factor weighting:  EELV Approach is
more important than Technical, and Technical and Investment Cost are of equal
importance and when combined, more important than EELV Approach. (*Id.* at 1281,
1283-84.) The Technical factor consists of two subfactors, Technical Design and
Technical Schedule, with the former more important than the latter. (*Id.* at 1283-84.)

62.   For the EELV Approach factor, the RFP required SMC to evaluate the
extent to which each offeror's development and qualification approach demonstrates
that it will meet the following requirements, ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████:

(1)   The ability to meet all EELV reference orbits defined in Table 10 at
the orbital insertion accuracy required in [System Performance
Requirements Document] 3.2.4[43]

(2)   The ability to support up to five NSS launches per year

(3)   The ability of the launch system to meet the payload orientation
requirements in SPRD 3.2.7

---

43 The EELV System Performance Requirements Document, or SPRD, sets forth certain
requirements for EELV-certified launch vehicles.

- 25 -

(4)     The ability of the launch system to meet the basing requirement in SPRD 3.2.11

(5)     The ability of the launch system to meet the EELV mated payload protection requirements in the SPRD 3.3.2

(6)     The ability of the launch system to meet the payload envelope requirement in [Standard Interface Specification] 3.1.1[44]

(7)     The proposed mission assurance approach to ensure low risk and high confidence in launching NSS missions

(8)     The ability to slow or surge production to accommodate uncertain NSS, commercial, and civil launch forecasts.

(*Id.* at 1282-83.)  SMC advised offerors that it would assess both a Technical Rating and a Technical Risk Rating based on any identified weaknesses, significant weaknesses, strengths, and deficiencies.  (*Id.* at 1282.)

63.     The RFP also did not require offerors to launch ███████████████. Instead, in response to offeror questions, SMC confirmed the absence of ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████     (*See* Tab 150a at 43028 (Response to Industry Comment ████).)  In RFP Amendment 2, SMC specifically removed ████████████████ █████████████████████████     (*See* Tab 37 at 1246 (removing the phrase ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████).)

64.     The Factor 2, Technical Design subfactor covered (i) design risk for the booster systems, e.g., plan to progress to Technical Readiness Level ("TRL") 9, new

---

[44] The EELV Standard Interface Specification, or SIS, defines the standard interface between the payload and the EELV launch system and standardizes equipment, processes and services across launch providers.

and existing technologies, materials, and processes, and timeline and plan for risk mitigation, and (ii) design risk for the upper stage, e.g., plan to progress to TRL 9, new and existing technologies, materials, and processes, approach to address long duration coast, engine re-light, thermal environments, guidance and control, and radiation environments driven by certain missions including GEO 2, and the timeline and plan for risk mitigation.  (Tab 38 at 1283.)

65.   The Factor 2, Technical Schedule subfactor required SMC to "evaluate the Offeror's schedule to determine the risk of delayed development" for:

> 1. Launch system(s) capable of launching Category A and Category B payloads by 1 April 2022 from Cape Canaveral Air Force Station/Kennedy Space Center or Vandenberg Air Force Base
>
> 2. Launch system(s) capable of launching Category A and Category B payloads from Vandenberg Air Force Base by 1 October 2024
>
> 3. Launch system(s) capable of launching Category C payloads to Polar 2 by 1 September 2025.

(*Id.* at 1284.)

66.   For Factor 3, Investment Cost, the RFP required SMC to evaluate the Investment Cost factor based on five equally-weighted criteria: (1) Total Government Investment (i.e., "the total dollar amount of Government investment requested by the offeror"); (2) Total Non-Government Investment (i.e., "the total dollar amount of non-Government investment provided by the offeror"); (3) Total Combined Investment; (4) Industry Cost Share (i.e., "the proportion of the Combined Total Investment that will be funded by Non-Government sources"); and (5) Time Phasing of Government Investment.  (*Id.*)

**F.    The LSA Proposals**

67.   Four contractors submitted proposals: SpaceX, ULA, Orbital, and Blue Origin.

68.   SpaceX proposed a family of launch vehicles: (i) the EELV-certified Falcon 9, (ii) the EELV-certified ███████████ Falcon Heavy, and (iii) the Starship. (Tab 132 at 41421.)[45]

69.   ███████████████████████████████████████████████████ ████████████████████████████████████████████ (*Id.* at 41569.)   The ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████ (*Id.*)   The ██████████████████████████ ████████████████████████ (*Id.* at 41421-22.)   SpaceX has proven the ability to reuse the first stages boosters. (Tab 123 at 39754.)

70.   The Falcon 9 has successfully performed over 70 missions since 2010, including over 40 consecutive missions in 2017, 2018, and 2019.   It is the first intermediate launch vehicle ever to employ a reusable first stage, and it is far and away the most cost effective intermediate-lift launch vehicle available today. (Tab 123 at 39752.)   The Falcon Heavy also has launched successfully, and is the most powerful operational rocket in the world; it is capable of lifting more than twice the payload of ULA's Delta IV Heavy █████████████████████.[46]

71.   The Starship, which SpaceX proposed ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████. (Tab 132 at 41421-22.)   Starship leverages technologies developed for the Falcon 9 and Falcon Heavy as well as SpaceX's Dragon spacecraft. (Tab 123 at 39754.)   In accordance with the RFP Statement of Objectives, SpaceX has designed the ██████████████████████████████████████████████

---

[45] It appears the Falcon 9 and Falcon Heavy can perform all ███████████ of the 34 missions SMC expects to order through the Phase 2 Competition.   Although only the Payload Category C missions require the super heavy lift capabilities introduced by Starship, this launch vehicle will also be capable of providing assured access to space for Category A/B missions served by the Falcon 9 and Falcon Heavy vehicles under SpaceX's LSA approach.

[46] SpaceX, Falcon Heavy, https://www.spacex.com/falcon-heavy.

- 28 -

1  ███████████████████████    ███████████████████████

2  ██████      Per the government evaluators: "The technologies and capabilities of the

3  [Starship] greatly exceed those of the other offered launch systems and greatly exceed

4  the current EELV requirements. Successful completion of the [Starship] would be

5  game-changing for national security space because of its ability to ████████████

6  ████████████ at a low cost ...." (Tab 132 at 41656.)

7  72. In other words, SpaceX's family of launch vehicles combined (a) flight-

8  proven and dependable solutions to the vast majority of the RFP reference orbits

9  through the Falcon 9 and Falcon Heavy, ██████████████████████

10  ████████████████████████████████████, and (b) a truly

11  revolutionary technological solution through the Starship for the two potential

12  Category C missions (Polar 2 and GEO 2) not required until September 1, 2025 at the

13  earliest.

14  73. SMC recognized both that SpaceX was the only LSA offeror to propose

15  currently operational launch vehicles and that SpaceX's business model offerors

16  schedule flexibility and is not solely dependent on any one market segment to remain

17  viable. (Tab 132 at 41583, 41593.) The evaluators stated that SpaceX's "innovative

18  and exceptional approach and understanding of the requirements provides benefits

19  ████████████████████████ significantly in excess of the Government

20  requirements, and their commercial market viability, which drives a robust ops temp

21  throughput and ability to accommodate launch rate market swings." (*Id.* at 41594.)

22  74. In contrast to SpaceX's proven solution for the Government's greatest and

23  most imminent Category A/B needs, ULA, Orbital, and Blue Origin all proposed only

24  conceptual launch solutions: Vulcan, OmegaA, and New Glenn, respectively. (*See*

25  *generally id.* at 41420-21.)

26  75. The evaluators noted that ULA itself has never "████████████████

27  ████████████████████" (*Id.* at 41429.) Nevertheless, ULA proposed to

28  develop a new launch system, the Vulcan, under the LSA. (*Id.* at 41420.) The lower

- 29 -



stage booster will be powered by BE-4 engines, under development by Blue Origin. (*Id.*) For the upper stage, ULA proposed ███████████████████ ██████████ for the Category C payloads. (*Id.* at 41420, 41429.) The upper stage █████████████████████████████████████████████████████████ ████████████████████. (Tab 120 at 35189, 35229.) The Vulcan's ability to reach certain missions is also dependent on Orbital's development of the GEM 63 motors. (Tab 132 at 41458.) ██████████████████████ ████████████.

76.   Orbital proposed to develop the new OmegA launch system ████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ██████. (*Id.* at 41421, 41532.) █████████████████████████████. (*Id.* at 41545.)  Like the ULA Vulcan, ██████████████████ depend on Orbital's development of the GEM 63 motor (*id.*), ████████████████████████████ ██████████.

77.   Blue Origin, which does not have any experience developing orbital launch vehicles (Tab 98 at 30663), proposed to develop the New Glenn under the LSA. (Tab 132 at 41420.) ████████████████████████████████████ ██████████████████████████████, ██████████████████████████████, ██████████████, ███████████████████████ █████████████████████████████████████████████████████████ ██████. (*Compare* Tab 121 at 36797 *with* Tab 132 at 41502-03, 41506 (████████ ███████████████████).)  The New Glenn first stage booster is powered by Blue Origin's BE-4 engine, and the second stage is ████████████████████ ██████. (Tab 132 at 41420.)

78.   Blue Origin's proposed approach involves ████████ ████████ ████ ██████████████ and assumes ██████████████████████████ ██████████. (Tab 121 at 36931, 36951; Tab 132 at 41654.)  But Blue Origin has



. (Tab 132 at 41484

); *id.* at 41493 (      ); Tab 135 at 41735

).)

79.    Due to the premature nature of its proposed design, Blue Origin could not and did not propose                    (Tab 98 at 30591-93.)  The evaluators nevertheless determined that the RFP required only the "                                      " and that Blue Origin proposed a "                                    "  (Tab 132 at 41481-82.)  Without support, the evaluators also credited Blue Origin with a                        (*Id.* at 41480.)

80.    As noted above, both the Vulcan and New Glenn rely on Blue Origin's BE-4 first stage booster engine, which is still in development and has yet to demonstrate the ability to reach orbit, and both the Vulcan and OmegA rely on Orbital's GEM 63XL solid side boosters, which also are still in development, and on Aerojet Rocketdyne's RL-10C upper stage engine.  (*See* Tab 136 at 41752.)  Selecting a portfolio of awardees that rely on common propulsion systems is the opposite of assured access to space because a developmental delay or a failure in a common system would ground multiple providers.[47]  The SSA recognized the risk of common

---

[47] *See* Sandra Erwin, *Atlas 5 and Delta 4 launch delays caused by common component in upper stage*, SpaceNews (July 2019), https://spacenews.com/atlas-5-and-delta-4-launch-delays-caused-by-common-component-in-upper-stage/.

components, but noted "the Government did not include an RFP evaluation criteria related to the use of common engines." (Tab 136 at 41753.)

### G.   SMC's Anticompetitive Risk Evaluation

#### 1.   Factor 1: EELV Approach Evaluation

81.   With the currently operational, EELV-certified Falcon 9 and Falcon Heavy capable of launching the vast majority (if not all) of the manifested Phase 2 RFP missions, and the developmental Starship required only for limited missions scheduled to launch in late 2025 and after (if at all), SpaceX proposed the least risky approach for SMC's needs and the assured access to space objective. However, rather than assess risk based on SMC actual needs and the RFP requirements, SMC deemed SpaceX the riskiest approach. This decision stemmed from an anticompetitive and flawed underlying evaluation.

82.   Under the EELV Approach factor, SpaceX earned an Outstanding Technical rating (Tab 136 at 41750), demonstrating that SpaceX's proposal offered "an exceptional approach and understanding of the requirements and contains multiple strengths." (Tab 38 at 1282.) The evaluators identified seven technical strengths, three that provided a "significant benefit to the Government." (Tab 136 at 41750.)

83.   The seven strengths identified for SpaceX's proposed EELV Approach are:

- All three launch vehicles offered performance that exceed requirements, which could reduce Government costs by enabling  the manifesting of multiple payloads per launch and reduce the risk of inaccurate orbital insertion. (Tab 132 at 41580.)

- Starship offered "potentially groundbreaking technology" ███████ ███████████████████████████████ and "provide unheard-of mass-to-orbit capacity and orbit insert flexibility." (*Id.*)

- SpaceX has demonstrated the ability to exceed five missions per year and offered multiple ████████████████████ which provides "sufficient infrastructure to maintain the Government's requirements while servicing demand from the commercial and civil markets." (*Id.* at 41583.)

- 32 -

- Starship offered ████ ████ providing SMC with "increased resiliency, schedule flexibility and responsiveness ████" (*Id.* at 41587.)

- Starship offered ████████ that exceeds Government requirements by a significant margin, which offers flexibility in the future design of spacecraft for national security payloads. (*Id.* at 41590.)

- SpaceX proposed an approach that "focuses on the initial and evolving designs for low risk and high reliability," as well as a certification approach that will drive a "high level of reliability. (*Id.* at 41591.)

- SpaceX, unlike the other offerors, has a successful civil and commercial launch business, and thus provides the Government "assured access to space ... regardless of global launch market fluctuations or increased competition for Category A/B missions utilizing the Falcon family of rockets." (*Id.* at 41592.)

84.    The evaluation reports reveal that SpaceX's technical merit surpassed the LSA recipients under the EELV Approach factor. For instance, SMC stated that SpaceX "not only has more strengths than ULA, but its strengths are qualitatively more beneficial to the Government than ULA's strengths." (Tab 135 at 41734.)

85.    Nevertheless, SMC unfairly nullified SpaceX's Outstanding EELV Approach rating by attributing two significant weaknesses and one weakness to SpaceX under the risk evaluation based on unstated criteria and a misreading of SpaceX's proposal.

86.    SMC based the first "significant weakness" on an unstated criterion focused on the Government's current facilities and processes omitted from the RFP requirements: "The Government assessed [SpaceX's] design approach for [Starship] *against the current processing requirements for Government reference missions to include [G]overnment facilities, Government and LSP tooling, facility throughput capacity, spacecraft design requirements, and spacecraft integration CONOPS* driven by both spacecraft and launch vehicle design approaches." (Tab 146a at 42674 (Response to Question No. 8a) (emphasis added).) This evaluation directly contradicts the RFP's stated purpose of leveraging industry's commercial launch systems, and SMC's statements that each "public-private agreement[] will be tailored

- 33 -

1  to each launch service provider's needs in order to enable commercial launch systems

2  to meet all NSS requirements."  (Tab 38 at 1260.)  SMC's unstated evaluation focus

3  on current Government processes and facilities clearly favors Government-specific

4  launch systems like ULA's Vulcan, which ULA itself says is "purpose-built" for NSS

5  missions.[48]  Had the SMC required offerors to propose launch systems tailored to the

6  Government's current Category C payload processes and facilities to consider them

7  complete, the RFP should have made such processes and facilities a requirement.  By

8  electing not to do so, it was irrational for SMC to find SpaceX's Outstanding technical

9  solution incomplete.  (Tab 132 at 41586, 41595.)

10      87.   The evaluators based the second "significant weakness" also on an

11  unstated requirement.  Specifically, SMC assessed a High risk based on SpaceX's

12  proposal to ███████████████████████████████ (*id.*), even though SMC

13  revised the RFP expressly not to require ██████████████████████████████

14  ██████████   The evaluators also ignored SpaceX's commitment to work with the

15  Government to determine the optimal ████████████████████████████████

16  ████████████████████████████████████ (Tab 123 at 39987-88 (§

17  2.7.1.2).)

18      88.   The one "weakness" SMC assessed to SpaceX under the EELV Approach

19  factor—that SpaceX ████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████ (Tab

22  132 at 41582)—misreads SpaceX's proposal, which proposed to perform ██████

23  ████████████████   SpaceX's approach provides nearly ██████████ of

24  schedule margin, well in excess of the margin SMC required for a Low risk approach

25  and the margin offered by each Intervenor for its launch vehicle concepts.  (*See* Tab

26

27  [48] United Launch Alliance, *Vulcan Centaur: Purpose-Built for National Security Space*, YouTube (May 2, 2009), https://www.youtube.com/watch?v=UVblBykNvdw  ("Vulcan Centaur—a rocket

28  purpose-built to meet all of the requirements of our nation's national security space launch needs.").

████ SUPPLEMENTAL COMPLAINT – ████████████

1   135 at 41738 (stating that Blue Origin's schedule margin was "███████████,"

2   ULA's schedule margin was "██████████," and Orbital's schedule margin was

3   "████████").)

4       89.   All three flawed findings pertain to Category C missions.   Thus, the

5   flawed High risk assessment that eliminated SpaceX from the portfolio of LSAs

6   centered on a capability that SMC will not need until September 1, 2025 at the earliest

7   (if at all for the Phase 2 competition).   (*See* Tab 132 at 41582, 41585, 41587.)

8   Ironically, and irrationally, these unsupported findings obscured SpaceX's clear

9   advantage in being the only competitor with proven, Low risk solutions to the far

10   more imminent Category A/B missions that predominate the Government's NSS

11   mission needs.

12       90.   Equally problematic, the evaluators failed to advise the selection official

13   of the true extent of the awardees' risks to the Category A/B missions.   Instead, SMC

14   unfairly and unequally held the awardees to less scrutiny and reduced the evaluative

15   consequence of the substantial risks inherent in their developmental approaches

16   because the evaluators assumed SMC would procure alternative vehicles for the

17   earliest Category A/B missions.   (Tab 101, LSA Convo with O5 [ULA] on Rating at

18   39:45 through 42:27; Tab 101, LSA Convo with O7 [Orbital] on Rating at 40:40

19   through 41:27; Tab 101, LSA Convo with O6 [Blue Origin] on Rating at 24:40 to

20   28:20.)   In other words, the awardees' proposals were not evaluated on their own

21   merits.

22       91.   For example, despite noting that Blue Origin's "███████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ███████—two of the expressed EELV criteria—Blue Origin received only a

26   Moderate risk under the EELV Approach factor.   (Tab 132 at 41484, 41493, 41496.)

27       92.   Also in contrast to the skeptical eye cast on SpaceX's proposed approach

28   to developing the Starship, SMC took for granted that Blue Origin could meet all of

1    required █████████████████████████. During discussions, SMC

2    informed Blue Origin that its "████████████████████████

3    ████████████████████" and requested "███████████████

4    █████" for the ████████████ as well as a description of Blue Origin's

5    "████████████████████████████████████

6    █████████████████" (Tab 98 at 30591.) Blue Origin responded that ████

7    ████████████████████████████████████,

8    ████████████████████████████████████

9    █████████. (*Id.* at 30592.) Blue Origin explained that its methods to "████

10    ████████████████████████████████████

11    ████████████," and therefore "████████████████

12    █████████." (*Id.*)

13      93. But the evaluators nevertheless credited Blue Origin ████████

14    ████████████████████████████████████

15    ████████████████████ (Tab 132 at 41479-80.) Specifically,

16    the evaluators stated that Blue Origin's design "██████████████████

17    ████████████████████████████████████

18    ██████████" and that "██████████████████████

19    ████████████████████████████████████"

20    (*Id.* at 41480.)

21      94. SMC's willingness to assume that Blue Origin could eventually satisfy

22    the ███████████ requirements, finds no support in the record. Rather, SMC's

23    knowledge that Blue Origin's design was ██████████████████████

24    ████████████████ renders unsupported SMC's finding that Blue Origin

25    offered ██████████████████.

26      95. Similarly, SMC did not scrutinize Blue Origin's ability to ████████

27    ████████ mission performance within the required schedule. Blue Origin explained

28    that its ability to ██████████ depended on ████████████████



1  ████████████████████████████████████████████████

2  ███████████████████████████. (Tab 121 at 36980.)  Unlike the scrutiny

3  applied to SpaceX's Starship design, SMC required no other details to find Blue

4  Origin's approach "████████████████████████████████

5  ██████" (Tab 132 at 41482.)

## 2. Factor 2, Subfactor 2: Technical Schedule

96.  Under the Technical Schedule subfactor, SMC again overlooked the fact that SpaceX is the only offeror proposing a system currently available to launch the most imminent Category A/B missions, and instead assessed a significant weakness and overall Moderate risk rating to SpaceX based on ██████████████████████ ████████████████████████████████████. (*See id.* at 41618-21.)  Even worse, by rejecting SpaceX's detailed schedule and proposal and imposing instead the 11 years it took the Government to develop the space shuttle, the evaluators advised the SSA that the Starship "████████████████████████ ██████████████████████████████████" (*Id.* at 41619-20.)

97.  Demonstrating both disparate treatment and misleading discussions, SMC also assessed a weakness based on SpaceX's proposed options to provide vertical integration for the Falcon 9 and Falcon Heavy, notwithstanding that SpaceX structured the options exactly as the Agreements Officer instructed. (*See id.* at 41615-17.)

98.  SMC premised the single "weakness" assessed to SpaceX under Subfactor 2 on the evaluators' erroneous finding that if SMC executed the option for vertical integration on the earliest date of the ordering period, it would have ████████ ██████ to validate the capability, which the evaluators claimed was ████████ ██████████ (*Id.* at 41615-16, 41621-22.)  But SpaceX's proposal allowed the parties to exercise the vertical integration option ████████████████████ "to provide greater schedule confidence." (Tab 123 at 39864; *see also id.* at 39922 (§ II.B.6.d).)

- 37 -

99.   With respect to SMC's assessment of schedule risk, it is worth noting that immediately after receiving their awards, all three awardees announced delays in the development of their proposed launch systems, and Blue Origin even has publicly called for delaying the Phase 2 Competition by "at least 12 months" to enable the awardees time to develop their systems.[49]

### 3.   Factor 3: Investment Cost

100.   SpaceX proposed to cover ███ of the launch system solution costs, the highest Industry Cost Share of all offerors.  (Tab 144 at 42647.)  When calculating the Government Investment, SMC added to SpaceX's baseline proposal: (i) ███████ associated with a separate Falcon Heavy mission ████████████ ███████████████[50] and (ii) ████████ for SpaceX's proposed vertical integration option at the Eastern Range launch complex ("LC-39A") and ██████████ for SpaceX's proposed vertical integration option at the Western Range launch complex, despite instructing SpaceX during discussions to price the vertical integration efforts out separately as "options." (*Id.*)

101.   SMC did not similarly account for Government monies paid to the other offerors when calculating the Total Evaluated Price and Government Investment for their proposals.  For example, although ULA proposed to ████████████ ███████████████████████████████████████████ ████████████████████████, SMC did not add any of the those amounts to ULA's proposed price, a necessary step to compare each offeror's Total Evaluated Price on an equal basis.

---

[49] Sandra Erwin, *Blue Origin urging Air Force to postpone launch competition*, SpaceNews (Apr. 8, 2019), https://spacenews.com/blue-origin-urging-air-force-to-postpone-launch-competition/.

[50] SpaceX performed the ████████████████████████████. SpaceX proposed ██████████████████ (Tab 123 at 39762-63.)

- 38 -

## H.   The Award Decision

102.  After completing its evaluation, SMC assigned ratings to each offeror's proposal:

|  | EELV Approach Technical & Risk | Technical Design Risk | Technical Schedule Risk |
|---|---|---|---|
| **ULA** | Outstanding / Low | Low | Low |
| **Blue Origin** | Outstanding/ Moderate | Moderate | Moderate |
| **Orbital** | Good / Low | Low | Moderate |
| **SpaceX** | Outstanding / High | Moderate | Moderate |

(Tab 136 at 41752.)

103.  SMC found each offeror's proposed Investment Cost to be both "Complete" and "Reasonable." (*Id.*)

104.  SMC compared SpaceX's total Government Investment of approximately ███████ against ULA's total Government Investment of $1.080 billion, Orbital's total Government Investment of $795 million and Blue Origin's total Government Investment of $500 million.  (*Id.*)

105.  Based on its flawed and unequal investment calculations and purported funding limitations, SMC elected to fund Blue Origin, Orbital, and ULA because they proposed the three lowest "overall total Government investment" options.  (Tab 135 at 41739.)

106.  Notably, SMC did not exercise its right to negotiate with the offerors to obtain the cost allocations, and ultimately the portfolio of LSAs, that best met SMC's assured access to space needs.  (*See* Tab 150a at 43019 (Response to Industry Comment No. 40); Tab 38 at 1285.)  Instead, SMC chose the portfolio that best served the needs of ULA, the long-standing incumbent, by awarding an LSA to ULA and an LSA to each of the two offerors that currently develop major components for ULA's system.

- 39 -

107. The LSA award decision to invest in three launch solutions concepts that depend on common critical systems is at odds with the RFP's stated objective, per national policy, "to ensure that there are two reliable sources for all national security launches." (Tab 38 at 1261.)

108. In a procurement focused on investing in solutions to meet the Phase 2 RFP schedule and mission needs, SMC elected to invest only in conceptual rockets and Government-specific solutions instead of including in the portfolio the single commercially-viable launch services provider that is operational and can today meet nearly every Government mission need, including all imminent mission needs, without a Russian engine.

109. Moreover, given that the reasonably anticipated delay in the development of new, untested launch systems would lead to a gap in readiness to meet the Phase 2 RFP mission requirements, Government investment in the Falcon 9 and Falcon Heavy launch systems offered by SpaceX would have best served Congress' mandate for "rapid, responsive, and reliable" commercial launch services at lower cost and acceptable risk levels. 10 U.S.C. § 2273(b)(3).

110. An LSA award to SpaceX also would further 10 U.S.C. § 2273's mandate of facilitating a robust base of commercial launch providers available to support the Government's missions in order to reap the benefits of competition—lower costs, better quality, and innovation—as well as the stated purpose of the RFP: investing in modifying commercial launch solutions to position SMC to share launch costs across commercial, civil, and NSS missions.

## I.    SpaceX's Agency-Level Objection To LSA Evaluation And Award

111. On December 10, 2018, SpaceX timely filed with SMC its objection to the evaluation of proposals and award decision, in accordance with the process provided in the RFP. (Tab 38 at 1263; *see generally* Tab 150.)

112. Both prior to and following the submission of its objection, SpaceX sought to engage SMC in Alternative Dispute Resolution ("ADR") with a third party

- 40 -

neutral to resolve its concerns with the unfair and unlawful LSA competition and mitigate the prejudicial impact on SpaceX's ability to compete fairly in the Phase 2 Competition.[51]  (*See generally* Tab 151 (renewed request for ADR).)

113.  SMC refused to engage in ADR.

114.  Instead, on April 18, 2019, SMC sent SpaceX a six-page letter rejecting all of SpaceX's arguments in summary fashion.  (Tab 152.)  Although it had five months to consider and resolve SpaceX's objections, SMC's decision did "not detail [the] analysis on every objection ground" and instead "summarized" its "analysis of some of the objection grounds." (Tab  152 at 43102.)  By addressing only a few objections and even then, in a cursory manner, SMC reinforced that the LSA award process did not comply with the stated procedures and competition principles set forth in the RFP and 10 U.S.C. § 2371b.

115.  SpaceX then filed this action at the Court of Federal Claims, which transferred the matter to this Court on September 10, 2019.  (ECF No. 79.)

**J.      The Phase 2 Competition**

116.  SMC issued the Phase 2 RFP on May 3, 2019.

117.  The Phase 2 RFP proposes to split SMC's requirement for NSS launch services for FY 2020 through FY 2024 between "two requirements contract awards." (Phase 2 RFP, Att. 5 at 2, Ex. A.)  The "Requirement 1" provider will perform approximately 60% of the launch services while the "Requirement 2" provider will perform approximately 40% of the launch services.  (Phase 2 RFP, Model Contract at 30-31, Ex. B.)

118.  To address its well-founded concerns that the conceptual launch systems funded by the LSAs will not be operational in time for SMC's mission needs, the Phase 2 RFP permits the LSA awardees to propose their respective LSA solution and

---

[51] Air Force Policy Directive 51-12 and the Air Force Federal Acquisition Regulation Supplement 5333.214(c) direct acquisition personnel to use ADR to the maximum extent practicable to resolve challenges to award decisions.

- 41 -

a secondary launch vehicle, the latter of which will not be evaluated.  (*Id.* at 26 ("The Certified [Secondary] Launch Vehicle Segment that mitigates schedule risk while meeting the mass to orbit requirement for the orbit defined for the reference mission in the applicable ordering period FY20 and FY21, but is not the Primary Launch Vehicle Segment.").)

119.  The only available "secondary launch vehicle" is ULA's Russian-engine-powered Atlas V rocket.  This provision in the Phase 2 RFP will permit ULA—and likely the other LSA awardees, given their subcontracting relationships with ULA—to propose the Atlas V even though the very purpose of the Government's significant LSA investments was to end reliance on Russian engines for NSS missions.  Indeed, provisions in the Phase 2 RFP expressly tie the secondary vehicle to one employing Russian rocket engines, permitting the use of secondary launch vehicles for precisely the time frame during which the Atlas V (and its Russian rocket engine) can legally be used.  (*Id.* at 28.)

120.  Proposals were due in response to the Phase 2 RFP on August 12, 2019. (Phase 2 RFP, Am 1, Ex. C.)

## K.    Harm To SpaceX, Public Interest, And Lack Of Harm To SMC

121.  The balance of harms and public interest favor the injunctive relief SpaceX seeks.

122.  Absent injunctive relief, SpaceX will suffer the irreparable harm of being deprived of the opportunity to compete fairly under competitive procedures for an LSA.  *Parola v. Weinberger*, 848 F.2d 956, 959 (9th Cir. 1988) (holding "there is no question that a district court may '[e]njoin the performance of a [government] contract if the award was the result of procedures not comporting with the law'") (quoting *Choctaw Mfg. Co v. United States*, 761 F.2d 609, 619 (11th Cir. 1985)); *see also Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018); *General Electric Co. v. Seamans*, 340 F. Supp. 636, 640 (D.D.C. 1972) (granting injunctive relief).

123. The challenged LSA awards provide Government funding and certification support of the launch vehicles that SpaceX's competitors are proposing in the Phase 2 Competition. (Tab 47b at 1347 (justification noting that LSAs will enable SMC "to shape early design decisions through co-investment"); Tab 47c at 1353 (noting SMC "seeks extraordinary insights and oversight of the technology and processes" through the LSAs).)

124. In response to LSA bidder questions, SMC explained that the Government investment under the LSAs will fund Phase 2 competition capabilities: "The LSA OTA will be the means to meet EELV requirements to include the Heavy capability, therefore non-recurring costs would be covered up to 2/3. To offset recurring costs, the Air Force intends to include a Launch Service Support (LSS) task order as part of the Phase 2 launch services contracts." (Tab 8D at 287.)

125. Thus, the flawed LSA awards have conferred an unearned advantage to each of SpaceX's competitors of up to two-thirds of the nonrecurring costs of meeting the EELV requirements, giving each competitor a significant price advantage in the Phase 2 Competition.

126. For instance, in its Motion to Intervene, Blue Origin stated that its LSA award "is critical to Blue's proposal for the Phase II contract effort for the Launch Services Procurement." (ECF No. 9 at 2.)

127. Similarly, ULA noted in its intervention motion that, through the LSA, ULA plans "to receive nearly $1 billion in economic benefits" and observed that ULA "has already received funding … and is continuing to perform development activities upon which it has based continued receipt of funding." (ECF No. 11 at 2-3.)

128. SMC's flawed decision not to invest in SpaceX's proposed launch system solutions based on unstated criteria and unequal treatment thus also will cause substantial competitive harm to SpaceX in the Phase 2 Competition.

129. No adequate remedy exists other than directing an LSA award to SpaceX or an injunction preventing further investment and performance of the LSAs. *See,*

- 43 -

*e.g., Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 386 (D.D.C. 2017) ("[A]s a consequence of [the agency's] improper actions, the plaintiff has been put in a less favorable position as a bidder for the [agency] contracts than it would have been as an incumbent concessioner. Absent equitable relief, this injury simply will not be redressed.").

130. Conversely, awarding an appropriate LSA to SpaceX or evaluating all offerors equally against the RFP criteria (as stated or as amended) will cause no harm to SMC but will serve the public's interest in ensuring Government business is conducted with open, honest, and fair competitive procedures as the law requires.

## III.  THE PARTIES

131. Plaintiff SpaceX is a pioneering space technology provider.  It delivers space launch services to the Government and commercial customers worldwide.  To date, SpaceX has successfully completed more than 70 commercial, civil space, and national security missions.  In less than 20 years of existence, SpaceX has transformed the space launch industry and dramatically lowered the cost of access to space in all markets, for example by pioneering the ability to return first stages from orbit for rapid and cost-effective refurbishment and reuse.

132. The Defendant is the United States acting through SMC (i.e., the Air Force Space and Missile Systems Center).  SMC manages the EELV program, implemented in the mid-1990s to achieve affordable, assured access to space.  SMC has stated publicly the program's intent of making launch services "more agile and effective for the warfighter," as well as "leverag[ing] the U.S. commercial launch industry."[52]

## IV.  STANDING, VENUE AND JURISDICTION

133. "It is well settled that a 'disappointed bidder' has standing to challenge a federal agency's illegal award of a contract."  *Big Country Foods, Inc. v. Bd. of Educ.*

---

[52] Sandra Erwin, *EELV is no more.  It is now 'National Security Space Launch'*, SpaceNews (Mar. 3, 2019), https://spacenews.com/eelv-is-no-more-it-is-now-national-security-space-launch/.

SUPPLEMENTAL COMPLAINT –

1 | *of Anchorage Sch. Dist., Anchorage, Alaska*, 952 F.2d 1173, 1176 (9th Cir. 1992);

2 | *Armstrong & Armstrong, Inc. v. United States*, 514 F.2d 402, 403 (9th Cir. 1975).

3 | 134. SpaceX, an actual offeror for an LSA and a disadvantaged competitor in

4 | the Phase 2 Competition, is an interested party with standing to challenge SMC's

5 | unlawful and irrational LSA award decision committing significant Government

6 | investment in the development and certification of launch systems that SpaceX's three

7 | competitors are proposing in the ongoing Phase 2 Competition for launch services.

8 | 135. Venue is proper pursuant to the Court of Federal Claims' order to transfer

9 | and 28 U.S.C. § 1391(e)(1).  (ECF 79.)  SpaceX's principal place of business is in

10 | Hawthorne, California which is located in this district and the agency action giving

11 | rise to this challenge occurred in Los Angeles, California, also in this district. *Rubio*

12 | *v. Monsanto Co.*, 181 F. Supp. 3d 746, 761-62 (C.D. Cal. 2016).

13 | 136. The Court has jurisdiction over SpaceX's challenge pursuant to 28 U.S.C.

14 | § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

15 | 137. The APA requires the courts to "hold unlawful and set aside agency

16 | action, findings, and conclusions" that are "arbitrary and capricious, an abuse of

17 | discretion, or not otherwise in accordance with law." *Id.* § 706(2)(A).

18 | 138. Agency action is arbitrary and capricious, if, for example, the agency

19 | "failed to consider an important aspect of the problem" or "offered an explanation for

20 | its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs.*

21 | *Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency also acts

22 | arbitrarily when it violates its own regulations or congressional statute. *Armstrong*,

23 | 514 F.2d at 403.

24 | 139. SpaceX alleges that SMC acted arbitrarily, capriciously, and violated 10

25 | U.S.C. § 2371b when SMC made the LSA awards based on an anticompetitive

26 | evaluation.  SMC's improper conduct will cause SpaceX irreparable harm.

27 | 140. The APA requires SMC to evaluate proposals and make an award that is

28 | both reasoned and consistent with the "competitive procedures" required by law. *See*

- 45 -

SUPPLEMENTAL COMPLAINT –

1    5 U.S.C. § 706(2).  The LSA evaluation and selection decision violated 10 U.S.C.

2    § 2371b(b)(2) because, contrary to the requirement to use "competitive procedures"

3    to "the maximum extent practicable," SMC deviated from the RFP criteria and treated

4    the offerors unequally in several material ways to SpaceX's competitive prejudice.

5           141.  Among the anticompetitive procedures and errors, SMC assumed that it

6    would use other available launch systems to reduce the noted substantial risk that

7    none of the awardees' development systems would be available by the Category A/B

8    mission need date of April 1, 2022.   Conversely, SMC assumed no alternative

9    resources would reduce the purported risk of SpaceX's proposed approach for the

10   Category C missions that the Government said it would not need until September 1,

11   2025 at the earliest if at all during the Phase 2 RFP ordering period.  Moreover, SMC

12   based the risk on deviations from the stated criteria and misreadings of SpaceX's

13   proposal, among other errors.  As a result, SMC irrationally discounted SpaceX's clear

14   advantage of proposing the only currently operating and proven launch system

15   solution; a solution that can already perform SMC's most frequent and most imminent

16   launch capability needs (Category A/B payloads).

17          142.  SMC also adopted an unstated preference for reliance on existing

18   Government processes and facilities—the reverse of what SMC announced in the

19   RFP—rather than investing in commercial systems adaptable to the Government's

20   needs as Congress mandated.[53]

21          143.  SMC also evaluated the offerors' schedules and respective total

22   Government Investment unequally.  For instance, SpaceX's proposal has no risk of

23   schedule delay for the overwhelming majority of missions (Category A/B)

24   contemplated in the RFP and provided nearly ███████ of schedule margin for the

25   Category C capability—a margin that far surpasses the margin provided by other

26   offerors (███████ (Blue Origin), ███████ (ULA), and ███████ (Orbital)) for

27

28   ───────────────
     [53] National Defense Authorization Act for Fiscal Year 2018 § 1605.

all mission categories.   Yet, SMC found these other offerors, each of which announced significant schedule delays almost immediately after award, to have lower schedule and overall risk than SpaceX due to the improper assumption that the Government would "buy down the risk" by contracting for the use of another rocket to perform the Category A/B missions.

144. SMC also provided ULA what amounts to a ███████ discount on its total Government Investment.   Although SMC included in SpaceX's total Government Investment the value of ████████████████████████████ ██████████, SMC did not similarly increase ULA's total Government Investment by █████████████████████████████████ ██████████████████████████████, among other cost evaluation errors.  Had SMC equally included the Government dollars that ULA proposed ██████████, ULA's total Government Investment would have been nearly ██████ what was reported to the SSA, rendering ULA's LSA proposal far more expensive than SpaceX's.

145. Accordingly, SMC's anticompetitive evaluation process and the flawed LSA award decision fall within the Court's jurisdiction. *Armstrong*, 514 F.2d at 403.

146. Without an LSA award, SpaceX, America's leading commercial space provider and a company that less than five years ago filed legal action to break ULA's unlawful stranglehold on the EELV program and to compete, will not be able to compete fairly in the Phase 2 Competition to provide the solicited NSS launch services.

## COUNT I: SMC BASED THE LSA AWARDS ON AN ARBITRARY AND UNEQUAL INVESTMENT COST EVALUATION

147. SpaceX incorporates paragraphs 1 through 146 of the Supplemental Complaint by reference.

148. This Court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without

- 47 -

observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).  The Court must also set aside any agency action that fails to use the "competitive procedures" required to "the maximum extent practicable" under 10 U.S.C. § 2371b(b)(2).

149. The "competitive procedures" requirement incorporated by Congress into the DoD's prototype OT authority is used throughout the Title 10 procurement provisions as an analog for the principles of fair play and effective competition mandated by Competition in Contracting Act. *Compare* 10 U.S.C. § 2371(b) *with id.* § 2302(2) (defining competitive procedures for full and open competition); *id.* § 2304(a) (incorporating the FAR); *see also United States v. Benally*, 843 F.3d 350, 354 (9th Cir. 2016) (recognizing that when "wording of [ ] two statutes is virtually identical, [the Court] interpret[s] their plain language in the same manner"). Competitive procedures require the agency to treat all offerors equally and apply and to follow the solicitation consistently. *See, e.g., PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (Fed. Cl. 2010) ("[A]gencies must apply the stated evaluation factors in a fair and evenhanded manner across competing proposals."); *Armstrong*, 514 F.2d at 403 (holding that allowing one competitor opportunity to second guess price after bid opening "subverts the competitive bidding process").

150. Affording disparate treatment to offerors competing under the same competition ground rules is arbitrary and capricious behavior that must be set aside under the APA. *Armstrong*, 514 F.2d at 403.

151. SMC's evaluation of the Investment Cost factor violated these bedrock principles of competitive procedures in several material ways to SpaceX's competitive prejudice.

152. First, the record exposes ULA's proposal as "Incomplete" and SMC's evaluation of the Government Investments and ULA's Total Evaluated Price as artificially and unfairly low because, contrary to the RFP instructions and how SMC evaluated SpaceX's proposal, SMC did not account for Government payments made

- 48 -

to ULA under separate contracts for critical components that ULA proposed to leverage for its LSA solution.

153. For example, ULA's "costs of maintaining launch infrastructure and a skilled workforce, came through a contract vehicle with the Government known as the EELV Launch Capability Arrangement, otherwise known as the ELC."[54]

154. ULA based its proposed LSA prototype solution on ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ "████████████████████████████████████████

████████████████████████████████████████████████." (Tab

120 at 35243; *id.* at 35230 (offering a ████████████████████████

████████████████████████████████████████████████████

████████████████████████); *id.* at 35236 ("████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████"); *id.*

("████████████████████████████████████████████████████

████████████████████████████████████").)

155. ULA also proposed ████████████████████████████████

████████████████████ ████████████████ as a result of the nearly $900M

annual ELC subsidies. (*Id.* at 35249 ("████████████████████████

████████████████████████████████████████████████████

████████████████████"); *id.* at 35319 ("████████████████████

████████████████████████████████████████████████████

████████████████████").)

---

[54] *Hearing on Military Space Launch and the Use of Russian-Made Rocket Engines Before the S. Comm. on Armed Services*, 114th Cong. 5 (2016) (Joint Prepared Statement by the Hon. Deborah Lee James, Secretary of the Air Force and the Honorable Frank Kendall III at 10), https://fas.org/irp/congress/2016_hr/engines.pdf.

██████ SUPPLEMENTAL COMPLAINT – ████████████

156. ULA may be right that its LSA approach "saves a bunch of money," but most of the money it is saving is ULA's, ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.

157. Neither ULA's proposal nor SMC's evaluation accounted for the fact that these significant ELC payments are ongoing.

158. Although Congress directed the discontinuance of the ELC in the FY 2016 NDAA, relevant here, SMC awarded ULA two such annual subsidiaries that the Government will pay ULA during the LSA negotiation and performance period.[55] The first, awarded on September 27, 2017 with performance through September 30, 2018, is "an $832,413,250 cost-plus-incentive-fee, cost-plus-fixed fee, firm-fixed-price modification (P00177)" covering "mission assurance, program management, systems engineering, and integration of space vehicle with launch vehicle, launch site and range operations, and launch infrastructure maintenance and sustainment."[56]

159. The second ELC modification was for an additional $867 million covering the same scope, announced on September 27, 2018 and expected to complete on September 30, 2019, i.e., during the entire first year of ULA's LSA performance period.[57]

160. Given that ULA proposed to ████████████████████████████ ████████████████████████████████████ based on the ongoing Government ELC payments, ULA should have included those payments as *Government Investment* in its proposed costs and SMC should have accounted for

---

[55] Although the RFP does not address the start date for Government investment, the LSA RFP sets February 21, 2018 as the relevant start date for Non-Government investment. (Tab 38 at 1276; *see also id.* at 1274 ("The Offeror shall identify it is expending funds between 21 Feb [estimated start of negotiations] and … [expected award date] toward the proposed prototype."))

[56] Press Release, DoD Contracts for September 27, 2017 (Sept. 27, 2017), https://www.defense.gov/Newsroom/Contracts/Contract/Article/1327363/.

[57] Press Release, Dep't of Defense, Release No. CR-187-18, Contracts for September 27, 2018 (Sept. 27, 2018), https://dod.defense.gov/News/Contracts/Contract-View/Article/1647166/. This figure does not account for classified ELC contributions, which are not made public.

- 50 -

these Government investments when evaluating ULA's total price to the Government. (Tab 38 at 1261 (defining a "fully developed and certified EELV Launch System" as including "the launch vehicle and its subsystems, infrastructure, manufacturing processes, test stands and other items required for industry to provide domestic commercial launch services that meet all NSS requirements").)

161. ULA also failed to include the costs of certain ███████████ ███████ leveraged for its LSA solution, i.e., the ████████████ ████████████████████████████████████████████████████████████ ████████. (Tab 120 at 35331-32.) According to ULA, ████████ ████████████████████████████████████████████████████████████ ████████████████████. (*Id.* at 35377; *id.* at 35249.)

162. Although ULA planned for "████████████████████████████" to complete during the LSA period of performance—ULA omitted their costs from its proposal and the evaluators failed to calculate and account for these costs in the Investment Cost evaluation of ULA's proposal. (Tab 120 at 35377 (ULA "Proposal Groundrules and Assumptions"); *id.* at 35235 (stating ULA had "████████ ████████████████████████).)

163. In addition, despite that ULA's proposal was contingent upon the development of the BE-4 engine, ULA did not include █████████████ ████████████████ in its proposal. (Tab 120 at 35235 (stating "████████ ███████"); Tab 132 at 41644 (noting "██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████").) Instead, ULA limited the BE-4 engine related costs to ████████████████████████████████████████████████████████████. (Tab 120 at 36063, 36261, 35981-83, 35892.)

164. SMC recognized that ULA's proposal was "████████████████ ███████████" it proposed to incorporate into its launch system, but deviated

- 51 -

from the stated evaluation criteria and accepted ULA's "Incomplete" proposal. (Tab 132 at 41664.)

165. SMC's failure to add the costs of the ███████████████████ ████████████, the █████████████████████, and ████████████ ████, significantly understated the Government's investment in ULA's proposed approach and amounted to an irrational evaluation.

166. SMC's treatment of ULA also constituted unequal treatment from how SMC evaluated SpaceX under the Investment Cost factor. When evaluating SpaceX, SMC added the costs of ███████████████████—payments SMC would make to SpaceX *under a separate Government contract* originally awarded in 2012. (Tab 131 at 41390-91.) SMC fails to confront this inequity in denying SpaceX's objection to the LSA awards.[58] (Tab 144 at 42659; Tab 152 at 43104-05.)

167. Had SMC properly accounted for the additional investments the Government has, will, or may make in ULA's launch system prototype, SpaceX's proposed solution would have constituted an ████████████ cost savings to the Government—a material fact not considered by the SSA in the award decision. The SSA's failure to understand the true cost to the Government of ULA's LSA proposal renders the award decision arbitrary and capricious.

168. Second, when evaluating SpaceX under the Investment Cost factor, SMC assumed the "most expensive scenario" (Tab 146a at 42680), adding to SpaceX's proposed price the ████████████████████████████████████████ ████████████████████████████████ under the assumption the Government would ████████████. (Tab 144 at 42647.) But the Phase 2 RFP expressly states that █████████████████████████████████████████

---

[58] The Air Force budgeted $737.273 million for ULA's ELC in FY 2017 and $918.609 million in FY 2018—these amounts do not include the other 25% of ELC costs paid by the NRO. Air Force, DoD FY2018 Budget Estimates, Justification Book Volume 1 of 1 at 105 (May 2017), https://www. saffm.hq.af.mil/Portals/84/documents/Air%20Force%20Space%20Procurement%20FY18.pdf?ver =2017-05-23-155547-107.

████ SUPPLEMENTAL COMPLAINT – ███████████████████

████████████████, making clear that only one of SpaceX's proposed options ███████████████ would conceivably be exercised. (Phase 2 RFP, Att. 1 at 23, Ex. D.)

169. Thus, SMC overstated SpaceX's total price to the Government by ████ ██████ (Tab 144 at 42655.) ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████.

170. Equally troubling, SMC did not equally account for the worst case scenario price for ULA—█████████████████████████████████ ████████████████████████. (Tab 120 at 35371, 35863.) ULA explained that while ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (*Id.* at 35863-64.) Accordingly, ULA included a caveat in its proposal that in the event ULA is not ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████. (*Id.* at 35864.)

171. In an earlier evaluation of ULA's proposal, SMC found ULA's qualification "████████████." (Tab 97 at 30566-67.) But in the final evaluation, despite ULA's same approach of ████████████████████████████████ ████████████████████████████, SMC took the opposite tack, finding the approach acceptable and agreeing that the parties could modify "█ ████████████████████████████████████████████████████. (Tab 140 at 42321.)

172. Yet, when calculating ULA's total price to the Government, SMC assumed the best case scenario, i.e., that ULA would ████████████████████

- 53 -

1    ███████████████████. Given ████████████████████████████

2    ██ the caveat in ULA's proposal, this was unreasonable.  SMC should have assumed

3    the "most expensive scenario" for ULA as it did for SpaceX.

4         173. Similarly, although the evaluators assumed they would "buy down" the

5    risk posed by the awardees' developmental solutions to the most imminent mission

6    needs, SMC did not add the cost of these mitigations to the total government

7    investment.

8         174. Accordingly, SMC did not account for the other Government investments

9    of ULA's proposed approach  or the most expensive scenario of the other competitors

10   proposed approach.  (Tab 38 at 1284 (requiring SMC to evaluate "the total dollar

11   amount of all investment required for development of the EELV Launch System

12   prototype").)

13        175. Thus, the evaluation wrongly reported to the SSA that SpaceX proposed

14   the ████████████ LSA solution, with a total Government Investment of ██████

15   ██████, while the total Government Investment in other competitors solutions

16   purportedly were $1,080 million for ULA, $795 million for Orbital, and $500 million

17   for Blue Origin.  (Tab 135 at 41732; Tab 136 at 41752; *id.* at 41753 (stating SSA's

18   inaccurate belief that SpaceX's proposed solution "████████████████████████

19   ███████████████").)

20        176. By making a tradeoff between competing contract proposals based on a

21   flawed cost evaluation, SMC has "entirely failed to consider an important aspect of

22   the problem," i.e., the relative expense associated with each proposal. *Motor Vehicle*

23   *Mfrs. Ass'n of U.S.*, 463 U.S. at 43 (agency decisionmaking lacks a rational basis

24   where agency "entirely fail[s] to consider an important aspect of the problem," or

25   "runs counter to the evidence before the agency").

26        WHEREFORE, SpaceX respectfully requests that the Court grant judgment in

27   favor of SpaceX on Count I and (a) declare that the LSA awards violate the

28   requirement for competitive procedures because SMC based the awards on an

- 54 -

1  Investment Cost evaluation that was unequal and deviated from the stated

2  requirements; (b) either award SpaceX an appropriate LSA or enjoin any further

3  investment by the Government under the LSAs and any further performance by ULA,

4  Blue Origin, and Orbital under the LSAs; (c) absent a directed award, reevaluate the

5  LSA proposals equally in accordance with the stated evaluation criteria and SMC's

6  needs and make a new award decision, or revise the RFP and reopen the competition

7  and make a new award decision; and (d) provide such other relief as the Court deems

8  just and appropriate.

9  **COUNT II: SMC BASED THE LSA AWARDS ON AN UNEQUAL RISK**
   **ASSESSEMENT THAT CONTRAVENES THE RFP AND SMC'S ACTUAL**

10  **NEEDS**

11  177.  SpaceX incorporates paragraphs 1 through 176 of the Supplemental

12  Complaint by reference.

13  178.  This Court must set aside any agency action that is "arbitrary, capricious,

14  an abuse of discretion, or otherwise not in accordance with law" or "without

15  observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

16  179.  The fundamental requirement to evaluate offerors equally against stated

17  ground rules is not limited to competitions subject to the Competition in Contracting

18  Act, but necessarily extends to any competition subject to "competitive procedures,"

19  such as the LSA competition. *See* 10 U.S.C. § 2371b(b)(2). Moreover, affording

20  disparate treatment to offerors competing under the same ground rules in the same

21  competition is arbitrary and capricious behavior that must be set aside under the APA

22  standard. 5 U.S.C. § 706(2).

23  180.  The RFP contemplated a risk assessment based on the quantity and timing

24  of the mission needs.  To inform each offeror's proposed EELV Approach, SMC

25  identified the reference orbits in RFP Table 10 and the Significant EELV Dates in

26  RFP Table 13.  Of the nine listed reference orbits, seven fall under Category A/B

27  payloads that have an ILC date of April 1, 2022.  (*See* Tab 38 at 1286, 1288.)

28

- 55 -

SUPPLEMENTAL COMPLAINT –

181. Importantly, only two Category C payload orbits are referenced in the RFP Tables, and they are scheduled to launch (one tentative and one firm) years later than the Category A/B mission (ILC dates of September 1, 2025 (tentative) and October 1, 2026 (firm)).  (*Id.* at 1288.) Thus, the RFP specifies that all but a minimal number of missions, including all launches before at least September 1, 2025, will involve Category A/B payloads.

182. SMC, however, skewed its risk assessment under each of the factors arbitrarily and unfairly in favor of offerors that present significantly greater risk for the Category A/B payload launches that comprise most of the reference orbits and SMC's greatest and nearest-in-time needs.  Consequently, SMC broke from the stated criteria and unreasonably made its LSA investment decisions based on <u>unwarranted</u> risks assessed to SpaceX for the fewest and most distant future Category C missions. Equally significant, SMC ignored the fact that SpaceX offered the best value solution for SMC's vastly more numerous and imminent Category A/B missions and thus best met the RFP award criteria of "most advantageous in achieving the Government's goal of assured access to space." (*Id.* at 1285.)

183. *Of the competing offerors, only SpaceX offered a proven commercial launch system already capable of launching all Category A/B payloads.*  But SMC irrationally and unequally assigned a lesser risk to conceptual launch system designs that have no proven ability to launch *any* payloads (Category A/B or C), relative to the already-operational SpaceX approach, which has essentially no risk regarding the ability to launch Category A/B payloads.

184. In the debriefing, SMC acknowledged that the stated RFP evaluation process does not prioritize Category C missions or otherwise indicate that the evaluation of Category C risks would drive SMC's investment decisions. Yet, SMC stated what was not in the RFP: that SMC had in fact considered the offerors' proposals for meeting the Category C payload missions to be the "absolute ... driving factor in this RFP." (Tab 143, Debriefing Audio File at 35:15 through 36:50 ("The

- 56 -

1   other overarching goal has to [INAUDIBLE] the missions effectiveness is to get off

2   the Delta IV Heavy because [INAUDIBLE] beyond these three purchases that we are

3   doing sole source for the Delta IV Heavy, if we can't get off the Delta IV Heavy we

4   have to decide between launching fewer missions [INAUDIBLE] on the Delta IV

5   Heavy, or finding a replacement for it and launching as many missions as we actually

6   want to do. So it was an absolute, like, driving factor in this RFP....").)

7       185. But the RFP did not advise offerors that SMC deemed the Category C

8   payload approach as a "driving factor" for award.  Instead, the EELV Approach factor

9   required SMC to evaluate each offeror's ability to "to meet all EELV reference orbits"

10  in the RFP, all but two of which fall under Payload Category A/B and with those two

11  exceptions scheduled for launch tentatively on September 1, 2025 and later.

12      186. It is contrary to the "competitive procedures" required by law to evaluate

13  proposals based on an unstated basis. *See, e.g., Lab. Corp. of Am. Holdings v. United*

14  *States*, 116 Fed. Cl. 643, 650-51 (2014) (holding that agency decision lacked rational

15  basis when it adopted a "'critical element' in scoring proposals" and "the predominant

16  differentiator," but solicitation did not indicate that agency would evaluate offerors

17  on that basis).

18      187. The competitive harm to SpaceX from SMC inflating the weight of

19  Category C risk beyond what the RFP contemplated was magnified by SMC's failure

20  to account equally for the significant Category A/B risk of the remaining offerors.

21      188. Contrary to the RFP and "competitive procedures" required for a fair

22  government contract process, SMC gave the developmental approaches proposed by

23  ULA, Orbital, and Blue Origin the benefit of reduced risk findings because SMC

24  intended to use alternative launch vehicles for the Category A and B mission needs—

25  an intention not mentioned in the RFP.

26      189. SMC's portfolio of the ULA, Orbital and Blue Origin developmental

27  approaches for the April 1, 2022 Category A/B need date is fraught with peril.  The

28  weaknesses SMC noted for each awardee—that "may adversely affect their ability to

- 57 -

meet the Government launch requirements" or "potentially cause disruption of schedule, increased cost, or degradation of performance"—have program-wide implications and should have been weighed as such in the evaluation and LSA award decision. (Tab 136 at 41746-50.) A development delay for any of the awardees will have a cascading effect across a significant number of missions, jeopardizing not just the few later-in-time Payload Category C launches, but most importantly the near-term Payload Category A/B launches, which again constitute the vast majority of EELV missions (and the orbits referenced in the RFP).

190.   Had SMC properly weighed the risks inherent in the competing solutions based on the mission needs in the RFP (both in quantity and time) and not given the Category A/B development solutions the unstated benefit of other government resources, SMC would have determined that investment in SpaceX's LSA was most advantageous in achieving the Government's goal of assured access to space as set forth in 10 U.S.C. § 2273.  (Tab 32 at 1285.)

191. Alternatively, had SpaceX known that the "absolute ... driving factor" of this competition and SMC's investment decision was the Category C payload capability and that SMC intended to favor risks to Category A/B missions, SpaceX would have proposed differently.  The law requiring "competitive procedures" does not permit SMC to announce its needs in the RFP and then evaluate in a manner inconsistent with those stated needs. *Dubinsky v. United States*, 43 Fed. Cl. 243, 259 (1999) (holding that "making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition").

WHEREFORE, SpaceX respectfully requests that the Court grant judgment in favor of SpaceX on Count II and (a) declare the LSA award decision violates the requirement for competitive procedures because SMC based the awards on risk assessment at odds with both the stated criteria and SMC's actual needs, and reflected unequal treatment of the offerors; (b) either award SpaceX an appropriate LSA or enjoin any further investment by the Government under the LSAs and any further

- 58 -

performance by ULA, Blue Origin, and Orbital under the LSAs; (c) absent a directed award, reevaluate the LSA proposals equally in accordance with the stated evaluation criteria and SMC's needs and make a new award decision, or revise the RFP and reopen the competition and make a new award decision; and (d) provide such other relief as the Court deems just and appropriate.

## COUNT III: SMC BASED THE LSA AWARDS ON AN ARBITRARY AND UNEQUAL EELV APPROACH EVALUATION

192. SpaceX incorporates paragraphs 1 through 191 of the Supplemental Complaint by reference.

193. Under the most important EELV Approach factor SMC found that SpaceX's payload integration approach met all requirements, and rated SpaceX's proposed launch system solution Outstanding, reflecting an "exceptional approach and understanding of the requirements." (Tab 136 at 41750.) The evaluators identified seven technical strengths.  (Tab 132 at 41593-94.)

194. The discrepant risk evaluation, which assessed SpaceX a prejudicial High risk rating based on two significant weakness findings that improperly rely on unstated criteria and one weakness finding that misstates SpaceX's proposed approach, violated the competitive procedures process required by law.

195. First, SMC improperly assigned a significant weakness to SpaceX's proposal because SpaceX did not tailor it Category C solution to the Government's current, unstated Category C payload processes and facilities:



(*Id.* at 41595.)

196. This evaluation finding contravenes the RFP, which

SUPPLEMENTAL COMPLAINT –

expressly advised offerors that SMC sought to "*leverage industry's ongoing efforts to develop new and/or upgraded commercial launch systems*," and that SMC would "*tailor[]*" the public-private agreements "*to each launch service provider's needs* in order to enable commercial launch systems to meet all NSS requirements." (Tab 38 at 1260 (emphasis added).)

197. To remedy this significant error, SMC must reevaluate SpaceX's proposal based on the stated criteria and award SpaceX an LSA contract or revise the RFP so that SpaceX can fairly compete for an LSA award.

198. If SMC considered its existing, specifically designed and tailored Government Category C payload processing procedures, CONOPs, and infrastructure critical to its objectives, then SMC had an obligation to amend the RFP to include these procedures in the requirements so that SpaceX could compete fairly against the ground rules employed by the evaluators but not stated in the RFP. *Dubinsky*, 43 Fed. Cl. at 259.

199. <u>Second</u>, SMC's assessment of a significant weakness for SpaceX's proposal to ███████████████████████████████████, also deviated from the RFP and ignored SpaceX's proposal. (Tab 132 at 41595-96.)

200. SMC specifically removed any requirement that offerors █████████ ███████████████████ by Amendment 2. (*Compare* Tab 38 at 1284 *with* Tab 37 at 1246.) SMC further confirmed that "the Air Force does not require ████ ███████████████" (Tab 150a at 43018 (Response to Industry Comment ████).)   The Agreements Officer's Decision reaffirmed this and specifically stated: "The Government did not require ████████████████ ████████████, as evidenced by the fact that SpaceX was not found to be deficient for proposing to ██████████████████████████████" (Tab 152 at 43102.)

201. Nevertheless, SMC contends that it was reasonable to rate SpaceX's approach High risk for not proposing what the RFP did not require. Not so. The RFP

- 60 -

defines a significant weakness as "a *flaw* that appreciably increases the risk of unsuccessful *agreement* performance." (Tab 38 at 1281 (emphasis added).) The RFP thus limits the assessment of risk to those proposal flaws that will impact the LSA performance, i.e., whether any risk exists to the offeror completing the development and certification of its EELV launch system.

202. Given that the NSS requirements do not require ███████████████ ██████, SpaceX's proposal to ████████████████████████████ is not a "flaw that appreciably increases the risk of unsuccessful agreement performance."

203. If SMC believed that certain missions must ████████████████ due to other Government processes, then SMC should have required offerors to ██████████████████████████████. Amending the RFP to allow for ███ ████████████, and then assessing High risk to SpaceX for proposing that exact approach constitutes arbitrary agency action. SMC cannot reasonably advise offerors that they need not ████████████████████████████ and then assess a High risk for failing to propose ███████████████████ This is the definition of evaluating an offeror based upon unstated criteria contrary to competitive procedures.

204. In any event, SpaceX specifically committed to consider several alternatives in partnership with the Government to "ensure satisfaction of NSS requirements," including ████████████████████████████ ████████████████ (Tab 123 at 39987-88 (§ 2.7.1.2) (emphasis added).) Thus, SMC's assessment of High risk and a significant weakness because SpaceX purportedly ████████████████████████████ ████████████████ also runs counter to the evidence before SMC. (Tab 132 at 41584.)

205. To remedy this prejudicial error, SMC must either remove the significant weakness and find SpaceX's solution Low risk under the EELV Approach factor and

1    provide SpaceX an LSA award, or reopen the competition and revise the RFP to
2    reflect SMC's actual requirements.

3        206. <u>Third</u>, SMC improperly assigned SpaceX a weakness upon the mistaken
4    belief that SpaceX ████████████████████████████████████████████
5    ██████████████████████████████████████████████████████████████
6    ███████████████████████████████████████████ (*Id.* at 41595.)

7        207. Contrary to this finding, SpaceX's proposal specifically states that ███
8    ██████████████████████████████████████████████████████████████
9    ██████████████████████████████████████████ (Tab 150a at
10   43036 (SpaceX Category C Integrated Master Schedule, Unique ID #596); Tab 123
11   at 39830.)

12       208. SpaceX offered significantly more time to address any concerns in the
13   Category C design than ULA, which did not propose ██████████████████
14   ██████████████████████████████████████████████████████████████
15   ████████████████████████████████████████████████████████. (Tab
16   120 at 35316.)

17       209. Similarly, with regard to Blue Origin's ████████████████████
18   ██████████████████████████████████████████████████████████████
19   ████ (Tab 134 at 41708), Blue Origin did not propose ████████████████
20   ██████████████████████████████████████████████████████████████
21   ████████. (Tab 121 at 37006.)  Yet only SpaceX, which offered the greatest margin,
22   received a weakness for its ████████████████████.

23       210. But for SMC's failure to properly employ the legally-mandated
24   competitive procedures, SpaceX would have received an LSA.

25       WHEREFORE, SpaceX respectfully requests that the Court grant judgment in
26   favor of SpaceX on Count III and (a) declare the LSA award decision violates the
27   requirement for competitive procedures because SMC based the awards on an EELV
28   Approach factor evaluation that deviated from the stated criteria and SpaceX's

proposed approach, and held the offerors to different standards; (b) either award
SpaceX an appropriate LSA or enjoin any further investment by the Government
under the LSAs and any further performance by ULA, Blue Origin, and Orbital under
the LSAs; (c) absent a directed award, reevaluate SpaceX's proposal equally in
accordance with the stated evaluation criteria and award SpaceX an LSA contract, or
revise the RFP and reopen the competition and make a new award decision; and (d)
provide such other relief as the Court deems just and appropriate.

### COUNT IV: SMC BASED THE LSA AWARDS ON A FLAWED AND UNEQUAL EVALUATION UNDER THE SCHEDULE SUBFACTOR

211. SpaceX incorporates paragraphs 1 through 210 of the Supplemental
Complaint by reference.

212. In the schedule evaluation, SMC attributed a significant weakness to
SpaceX's solution for Category C payloads based on the same evaluation errors made
in the EELV Approach factor evaluation.

213. Specifically, the evaluators raised the following concerns: (i) █████████
████████████████████████████████████████████████████████████████
████████████████████████████; (ii) completion of the Starship certification
and "the Government's use of the [Starship] is dependent ███████████████
██████████████████████; and (iii) the potential future ████████████████
████████████████. (Tab 132 at 41621.)

214. SMC improperly based each of these concerns on either a misreading of
SpaceX's proposed approach or on an unstated criterion.

215. First, contrary to the evaluation, SpaceX's proposal clearly states that ███
████████████████████████████████████████████ and will afford SpaceX
nearly ████████████ schedule margin, far surpassing the schedule margin provided
by the three awardees for their Payload Category A/B. (Tab 150a at 43036 (SpaceX
Category C Integrated Master Schedule, Unique ID #596); Tab 123 at 39830.)

216. <u>Second</u>, SpaceX's proposal also contradicts SMC's second stated rationale, providing expressly that the third Starship certification flight ████████ ████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

(Tab 123 at 39831 (emphasis added).)

217. <u>Finally</u>, it was irrational and anticompetitive to assess a significant weakness to SpaceX under the Schedule subfactor for ████████████████ ████████████████████████████████████ because the RFP did not require such, but rather encouraged offerors to propose and leverage their commercial solutions. (Tab 38 at 1260.)

218. The evaluators also misreported to the SSA that ████████████ ████████████████████████████████████████ ██████████████████ (Tab 132 at 41620.) Based on this finding, the SSA wrongly concluded that ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████ (Tab 136 at 41753.)

219. Notably, however, the evaluators based their schedule evaluation not on the information SpaceX provided, but on the eleven years it took for "development of the Space shuttle ... between the start of 1971 and the end of 1981." (Tab 132 at 41619-20.)  This reliance on the decades-old Space Shuttle experience as a benchmark to assess the realism of SpaceX's proposed schedule lacks a rational basis.

- 64 -

220. SpaceX, a modern aerospace company, uses development technology and capabilities that were barely beyond science fiction in the early 1970s and that enable far more accurate, in-depth pre-flight technical analysis and faster development. For example, modern engineers employ much more advanced computer aided design and analysis methods, including three-dimensional computational fluid dynamics ("CFD"), to enable design and test cycles orders of magnitude faster than possible in 1971. These are key capabilities for launch vehicle design. The first practically-applicable CFD had only just been realized at the start of Shuttle development. Today, SpaceX engineers employ far more powerful analysis methods for rapid design iteration. (*See, e.g.*, Tab 123 at 39804-05.) Miniaturized electronics and more capable flight computers also eliminate many of the restrictions and challenges that made computer hardware and software such a challenging aspect of the Space Shuttle development.

221. SpaceX builds on lessons learned and actual technology developed during other launch vehicle development programs, including the Shuttle program. For example, the Shuttle provided valuable lessons ████████████████████ ████████████████████████████████████████████████████████ The ability to learn from prior programs will only accelerate Starship's development timeline in comparison to earlier development programs.

222. The Starship vehicle configuration is also considerably simpler than that of the Space Shuttle.[59] Starship has fewer ████████████████████████ ████████████████████ than the Shuttle did. Starship also has a ████████████ ████████████████████████████ than that of the Shuttle. This results in lower

---

[59] This may be illustrated by the stark difference in development cost. SpaceX projects Starship development costs at ████████████ which SMC found "Reasonable." Based on the initial development commitment of $5.15 billion in 1971 dollars for the Space Shuttle development, the non-recurring cost of that program would have been approximately $31.7 billion in 2017 dollars. *See* Humboldt Mandell, *Space Shuttle Cost Analysis: A Success Story?*, ICEAA Annual Conference at 4 (June 10-24, 2014), http://www.iceaaonline.com/ready/wp-content/uploads/2014/06/BA-9-Handout-Space-Shuttle-Cost-Analysis-A-Success-Story.pdf.

████ SUPPLEMENTAL COMPLAINT – ████████████

relative complexity of design, test, and manufacture —obvious and material facts that the evaluation ignores.

223. Finally, SpaceX has a proven record of developing a launch vehicle and a spacecraft in less than half of the eleven year Shuttle development. Specifically, SpaceX needed only ███████ to develop the Dragon spacecraft and less than that to develop the Falcon 9 launch vehicle, much more recent and relevant development efforts than the Space Shuttle.[60] (*See, e.g.,* Tab 123 at 39763; *id.* at 39848-49.) SpaceX demonstrated the ability to recover the first stage of its Falcon 9 within ███ ███ of its first launch, has successfully recovered almost 30 boosters to date, and reflown these over 20 times. (*Id.* at 39763.) SpaceX has also completed more than 70 successful launches using the Falcon 9 and Falcon Heavy and berthed its Dragon spacecraft with the International Space Station nearly 20 times.

224. SpaceX is not only using common processes and hardware between Falcon 9, Falcon Heavy, Dragon, and Starship, ███████████████████ ██████████████████████████████████████████ The Starship design is well underway with experienced professionals building on their proven successes. In addition, while a host of subcontractors developed most of the Shuttle's systems, SpaceX is developing Starship in house. SpaceX's experienced team, together with SpaceX's lack of reliance on major subcontractors, constitute additional distinguishing features from the Shuttle program, making it a particularly inappropriate comparison for schedule estimation. Again, SMC failed to consider any of these obvious and material differences in its evaluation, rendering the schedule risk assessment arbitrary and capricious.

---

[60] Of note, ULA's Vulcan launch vehicle and Blue Origin's BE-4 engine already have been under development for longer than it took SpaceX to develop and fly the Falcon 9, and ULA announced the first flight of Vulcan is still not anticipated until at least 2021. Jeff Foust, *ULA now planning first launch of Vulcan in 2021,* SpaceNews (Oct. 25, 2018), https://spacenews.com/ula-now-planning-first-launch-of-vulcan-in-2021/. This confirms that SpaceX can develop and fly launch vehicles significantly faster than its current competitors, let alone in comparison to 1970s era development efforts.

225. The single weakness assigned to SpaceX's proposal under the Schedule subfactor—risk of development delays for launch systems capable of launching Category A/B payloads by April 1, 2022 from Cape Canaveral or Vandenberg—also lacks reason because SpaceX proposed as SMC directed.

226. In discussions, ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████. (*See* Tab 101, LSA Convo with O8 [SpaceX] on VI - 28 Aug. @ 1230 at 2:10 through 3:10 (████████████████████████); *id.* at 8:50 through 9:17 (████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████"); *id.* at 17:55 through 18:20 (████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████).)

227. As SMC directed, SpaceX included the options for vertical integration, ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████. (Tab 123 at 39922.) In other words, the Government could execute the options unilaterally ████████████████████████████████████.

228. Nevertheless, the evaluators concluded that SpaceX's vertical integration option did not provide for SMC validation ████████████████████████████████, which the evaluators deemed ████████████████████████
████████████████ (Tab 132 at 41616.) Yet the evaluators themselves noted that the first launch for which the Government has a need for vertical integration is planned for the fourth quarter of 2023, giving SpaceX's vertical integration capability actually ████████ margin. (*Id.* at 41615.)

- 67 -

229. It is arbitrary and capricious for SMC to direct SpaceX to take a certain approach to the vertical integration options and then assign a weakness when SpaceX followed SMC's instructions and to base a risk on ▆▆▆▆▆▆ of margin when in actuality ▆▆▆▆▆ are available against the Government's actual need.  Such an evaluation approach cannot withstand scrutiny under the APA standard and is inconsistent with the "competitive procedures" required by 10 U.S.C. § 2371b(b)(2).

230. The evaluators also based this weakness finding on a misreading of SpaceX's Model Agreement.  According to the evaluators, under SpaceX's proposed approach, SMC can exercise the vertical integration option ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆.  (Tab 132 at 41615.)  But the Model Agreement's terms expressly permit ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (*See* Tab 123 at 39922.)  To this end, SpaceX's proposal states that ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ (Tab 123 at 39864.)

231. Given that SMC included the costs of both vertical integration projects in the Total Evaluated Price of SpaceX's proposed approach (Tab 144 at 42655), SMC could have exercised the East Coast option and funded the LC-39A vertical integration project sooner ▆▆▆▆▆▆▆▆▆ in order to address SMC's schedule concerns.  Having elected not to do so, it was unfair to assess a weakness to SpaceX's proposed approach when this option was available.  (Tab 136 at 41751.)  SpaceX cannot reasonably be burdened with both an evaluated risk and the cost of the option to overcome that risk.

232. Finally, the evaluation of SpaceX's proposal against the schedule criterion was not only irrational, it was also unequal to the detriment of SpaceX, assured access to space, and the EELV program.

- 68 -

SUPPLEMENTAL COMPLAINT – ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

233. The Portfolio Recommendation explains that SMC has set a 14-month margin between the last certification flight and the ILC need date as a benchmark for a Low risk schedule. (*See* Tab 135 at 41725.)

234. As noted above, SpaceX offered ███████ of schedule margin for the earliest (tentative) Category C need date, yet was deemed Moderate risk.

235. Although ULA proposed only ███████ of margin between the last Category A/B certification flight and the required ILC date of April 1, 2022 for its developmental launch vehicle, over ███████ less than the SMC's Low risk benchmark, SMC deemed ULA's proposed approach Low risk, purportedly because ULA has experience executing NSS launches and due to SMC's intent to burn down the risk with other Government resources. (Tab 136 at 41747; Tab 135 at 41734.) SpaceX, however received no such credit for its NSS launch experience or other available resources.

236. Equally troubling, although SMC evaluators used a flawed benchmark (the Space Shuttle) for assessing SpaceX's development schedule, the evaluators did not draw on ULA's own history of taking seven years to develop the Atlas V and Delta IV vehicles, a simpler development effort involving an existing vehicle compared to the development of the new Vulcan rocket.

237. The Vulcan comprises almost entirely new components and systems—often acquired from entirely new subcontractors like Blue Origin and Orbital—and SMC's own award document acknowledges that receiving timely certifications for new systems in a compressed time period is risky. (Tab 136 at 41747 ("The Offeror's proposal only has ███████ margin, which is less than required based on the Government's historic experience. Any anomalies or outstanding certification liens have the potential to result in delays to the Government's ILC.") (emphasis in original).)

238. Blue Origin proposed ███████ of margin between the last Category A/B certification flight and the required ILC date of April 1, 2022 for its

- 69 -

developmental launch vehicle, and SMC deemed Blue Origin's proposed approach
Moderate risk even though Blue Origin has no experience whatsoever putting any
kind of satellites into orbit, let alone performing NSS missions. (Tab 135 at 41723,
41738.)

239. Orbital proposed only ████████ of margin between the last Category
A/B certification flight and the required ILC date of April 1, 2022 for its
developmental launch vehicle, and SMC deemed Orbital's proposed approach
Moderate risk even though Orbital has no EELV experience. (*Id.* at 41725-26.)

240. The record reveals that these discrepant results arose because SMC
improperly favored the offerors that posed the greatest schedule risk to the Category
A/B missions by improperly assuming that SMC would mitigate the significant risk
to the April 1, 2022 need date proposed by each of the other offerors' proposals with
another launch vehicle. (Tab 101, LSA Convo with O5 [ULA] on Rating at 39:45
through 42:27 ("█████████████████████████████████████████████
████████████████████████████     ██████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████;
Tab 101, LSA Convo with O7 [Orbital] on Rating at 40:40 through 41:27 ("… ████
████████████████████████████████████████████████████████████████████
████████████████ because we do have mitigations, that drives the consequence of not
getting that date down; ███████████████████████████████████████████
███████████████████████████"); Tab 101, LSA Convo with
O6 [Blue Origin] on Rating at 24:40 to 28:20 (advising that SMC would "dual
integrate" on either a Falcon or Atlas a year out to mitigate ████████████████
████████████████).

241. SMC's approach to schedule risk here is unreasonable, unequal, and
irresponsible. It is unreasonable because SMC is opting to dismiss its own evaluation
criteria concerning the reasonable margin of time between launches. It is unequal

████ SUPPLEMENTAL COMPLAINT – ████████████████         ████████
████████

because SMC is eliminating the one offeror that has reasonably proposed a margin
███████████████████████████████████████████████ and SMC has held SpaceX
to higher standard than the other offerors.  Finally, it is irresponsible because SMC is
introducing undue risk and uncertainty to the EELV program, as evidenced by SMC's
decision to permit the LSA awardees to use the Atlas V—Russian engines and all—
as a back-up launch vehicle when their developmental rockets are inevitably not ready
in time for Phase 2 Competition  (undercutting a key stated goal of the RFP).

242.  In short, the awardees' proposed LSA solutions present greater schedule
risk for most of the missions, all scheduled and near term, while SMC saddled SpaceX
with unwarranted risk related to (at most) two unscheduled missions in the distant
future.  Yet, SMC found the awardees presented the lesser risk under the Schedule
subfactor and overall, an unreasonable and unequal result.  *See, e.g., CliniComp Int'l,
Inc. v. United States,* 117 Fed. Cl. 722, 741 (2014) ("Such uneven treatment 'goes
against the standard of equality and fair-play that is a necessary underpinning" the
competitive procedures required for federal government contracting "and amounts to
an abuse of the agency's discretion.'") (quoting *PGBA, LLC v. United States*, 60 Fed.
Cl. 196, 207, *aff'd* 389 F.3d 1219 (Fed. Cir. 2004)).

243.  SMC also misread ULA's proposed approach when assessing a low risk
for meeting the September 1, 2025 need date for the Category C Polar 2 mission.

244.  Criteria 3 requires an evaluation of "the Offeror's schedule to determine
the risk of delayed development for … Launch system(s) capable of launching
Category C payloads to Polar 2 by 1 September 2025."  (Tab 38 at 1284.)  Based on
the Air Force's historical experience with launch delays, SMC observed that a low
risk schedule requires 14 months between the last certification flight and ILC date.
(*See* Tab 132 at 41457.)

245.  ULA's  proposal  describes  ████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████.  (Tab 120 at 36479; *see also id.* at 36426 (████████████

); *id.* at 36433 (█████████████████████████

███████████████).

246. ULA explained that its launch system involves ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ (Tab 120 at 35229,

35245-46.)  ULA added ██████████ to the final proposal costs specifically for ███

████████████████████████████████████████████████████

████████ (*Id.* at 36385.)

247. Although the proposal also suggests that ULA's █████████████

████████████████████████████████, ULA's schedule and

certification plan make clear that ULA proposed to rely on the ██████████

███████████ to meet both Category C payload missions (Polar 2 and GEO 2).  In

fact, ULA does not propose to complete the design and build of the ██████████

████████ confirming that ULA does not propose to ███████████████████

████████████████.[61] (*Id.* at 35358.)

248. SMC ignored ULA's certification plan and schedule, finding that ULA

will complete ███████████████████ related to the Polar 2 mission in

████████████ based on the unsupported assumption that ULA will certify the

████████████████████████████████████████████████████

████████████████████. (Tab 132 at 41459, 41532; Tab 120

at 35279-80.)  The evaluation does not square with ULA's proposal statements.

249. ULA's certification plan states that ULA intends to certify only the

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ (Tab 120 at 36486 (emphasis added); *see*

---

[61] ULA also does not propose to complete the development of the ██████████████████
██████. (Tab 132 at 35357.)

*also id.* at 35317 (Figure 3.1.3.2.3-2 (showing separate schedule for "[redacted].)) ULA proposed [redacted]. (*Compare* Tab 120 at 35316 *with* Tab 38 at 1288; *see also* Tab 120 at 35314 (indicating that the [redacted]); *id.* at 35319 (describing Category C critical path beginning with the [redacted].) Thus there was no rational basis for the evaluators to find that ULA will compete [redacted].

250. Curiously, ULA ignores the [redacted] in its proposal [redacted]. (Tab 120 at 35311-12 (describing approach to [redacted]); *see also id.* at 35312 ([redacted]); *id.* at 35313 ([redacted].)

251. Nevertheless, ULA's "[redacted]" evidence that development of [redacted] (*Id.* at 35312 (emphasis added).) Given that [redacted], ULA's own schedule ground rule makes the [redacted]. Thus, per ULA's own proposal, the critical path for ULA to meet the [redacted]. (*Id.* (explaining that the "[redacted]

1

2   ))

3   252. The ████████████████, and ULA itself conceded that "████████

4   ████████████████████████████████" (*Id.* at 35280.)

5   253. ULA, however, does not propose to complete ████████████████

6   ████████████████████████████.  Based on ULA's own schedule,

7

8   ████████████████████████████; an insufficient schedule margin by

9   SMC's standards.

10   254. Had the SMC equally evaluated each of the offerors' proposed solutions

11   against the Schedule criteria, the Schedule subfactor would have been an award

12   discriminator in SpaceX's favor.

13   WHEREFORE, SpaceX respectfully requests that the Court grant judgment in

14   favor of SpaceX on Count IV and (a) declare the LSA award decision violates the

15   requirement for competitive procedures because SMC based the awards on an

16   Schedule subfactor evaluation that deviated from the stated requirements, ignored

17   SpaceX's proposed approach, and held the offerors to disparate standards; (b) award

18   SpaceX an appropriate LSA or enjoin any further investment by the Government

19   under the LSAs and any further performance by ULA, Blue Origin, and Orbital under

20   the LSAs; (c) absent a directed award, reevaluate the LSA proposals equally in

21   accordance with the stated evaluation criteria and on an equal basis and make a new

22   award decision; and (d) provide such other relief as the Court deems just and

23   appropriate.

24   **COUNT V: THE LSA AWARD DECISION VIOLATES THE ASSURED**
      **ACCESS TO SPACE REQUIREMENTS**

25

26   255. SpaceX incorporates paragraphs 1 through 254 of the Supplemental

27   Complaint by reference.

28

- 74 -

256. This Court will grant relief where an offeror demonstrates that the agency acts violates its own regulations or congressional statute. *Armstrong*, 514 F.2d at 403; *see also* 5 U.S.C. § 706(2)(A), (D).

257. The RFP advised offerors that the SSA would "select a portfolio of solutions that, based on the evaluation factors in Section 4.1, are most advantageous in achieving the Government's goal of assured access to space via two or more domestic commercial launch service providers that also meet NSS requirements." (Tab 38 at 1285.)

258. In turn, 10 U.S.C. § 2273 requires the Secretary of Defense to sustain the availability of at least two space launch vehicles (or families of space launch vehicles) capable of delivering the NSS payloads, a robust space launch infrastructure and industrial base, and the availability of rapid, responsive and reliable space launches to improve responsiveness, lower costs, and maintain acceptable risks.  10 U.S.C. § 2273(b).

259. The LSA evaluation and selection decision contravenes the RFP award criteria and Congress' mandate for assured access to space.

260. As revealed by a long history of Congressional hearings, legislation, and the clear terms of the RFP, the entire purpose of the LSA competition was to ensure SMC has *at least two* providers of *domestic and commercial* launch services.  (Tab 38 at 1260-61, 1285.)

261. Despite the stated purpose, SMC eliminated from its LSA portfolio the only bidder that can reasonably be identified as a reliable, domestic, commercial launch provider.

262. SpaceX is the only offeror with existing launch vehicles that have a meaningful share of the commercial launch market (indeed the greatest share of any family of launch vehicles) and do not rely on Russian engines.  None of the other offerors proposed a launch vehicle that is even operational, let alone commercially available.  As SMC recognized in its evaluation, SpaceX "is the only provider

- 75 -

proposing use of a launch vehicle currently flying missions today, and has demonstrated their ability to accommodate more than three times the Government requirement in a given year." (Tab 132 at 41583.)

263. Contrary to the RFP's stated purpose and the mandate of the FY 2018 NDAA,[62] SMC chose to invest in the development of new, Government-specific launch solutions. (Tab 38 at 1260.) Two of the three selected contractors—ULA and Orbital—are historic government contractors with little to no material commercial launch experience and which admittedly designed their launch systems "purpose-built" for the NSS missions.

264. The other awardee—Blue Origin—has no orbital launch experience whatsoever, and its design was so premature that the offeror could not provide ███. ██████████████████████████████████████████████████ ████████████████████████████████████████. Worse still, the Blue Origin's approach relied on ███████████████████████ ████████████. The evaluators realized that Blue Origin's ███████████ ██████████████████████ (Tab 132 at 41496), and that "██████ ████████████████████████████████████████████████ ██████████████████████" and "█████████████████████ █████████████████████" (Id. at 41484, 41493.)

265. In other words, SMC set out, as Congress directed, to invest in a portfolio of *commercial launch providers* that could satisfy the urgent need to provide launch services without relying on Russian engines. Yet, based on a flawed and unequal evaluation, SMC decided to invest in every offeror <u>except</u> the one company that provides commercial launch services for those missions without Russian engines. SMC selected a portfolio of concepts, which the offerors promised to develop to the

---

[62] National Defense Authorization Act for Fiscal Year 2018 § 1605.

- 76 -

SUPPLEMENTAL COMPLAINT –

Government's specifications based on Government investment of hundreds of millions of dollars.

266. Despite the glaring irrationality of this approach and its divergence from Congress' direction and the Air Force's needs, SMC's contemporaneously documented award decision never recognizes this issue nor the stated purpose of the RFP.  (Tab 2 at 109 (Air Force Business Case Analysis stating: "*A commercially viable launch system is vital to reducing the risk to the Air Force of having to keep launch service providers financially viable during periods of low demand for NSS launches.*") (emphasis added).)

267. Although the award decision never addresses the issue, the Agreements Officer's post-award explanation of what SMC believes it means to "leverage commercial launch solutions" is baffling: despite the NDAA's and the RFP's direction to leverage commercial launch systems, the Agreements Officer's Decision refused to recognize any difference between a commercial launch system and a Government launch system.  (Tab 152 at 43102 ("I reject the false distinction between 'commercial' and 'Government-specific' launch systems in SpaceX's objection.").)  This refusal to distinguish between commercial and Government-specific launch systems counters the RFP, which specifies the Air Force's intent to share the launch systems fixed costs across more launches, including commercial and civil, to "reduce the overall cost to the Air Force."  (Tab 38 at 1261.)

268. The Agreements Officer's view also contravenes the Congressional mandate approving the funding for the LSA acquisition.[63]  (Tab 46 at 1343 (Air Force Memorandum Re: Compliance with FY 2018 NDAA noting that the launch system prototype cannot be limited to NSS capability).)

---

[63] National Defense Authorization Act for Fiscal Year 2018 § 1605 (providing funding for development of capabilities for NSS missions to existing or planned commercially available space launch vehicles).

SUPPLEMENTAL COMPLAINT –

269. SMC's award decision also fails to account equally for one of the most problematic risks associated with ULA's proposed EELV Approach: ULA's launch system relies on critical components still being developed by the two other LSA awardees, Blue Origin and Orbital.

270. ULA and Blue Origin rely on a common first-stage engine (BE-4) and ULA and Orbital rely on the same solid side booster system and upper stage (RL10) engine. Consequently, there is risk associated with ULA's lack of oversight and control regarding the development and integration of those key components into the system ULA proposes. The evaluators ignored the risks associated with ULA's reliance on the development efforts of two of its competitors that ULA will not control. ULA's dependence on coordinating its solution with its third-party competitors presents an additional measure of risk that deserved consideration yet received none.

271. Selecting a portfolio of awardees that rely on common propulsion systems is the opposite of assured access to space because a developmental delay or a failure in a common system would ground multiple providers.[64] The SSA recognized the risk of common components, but noted "the Government did not include an RFP evaluation criteria related to the use of common engines." (Tab 136 at 41753.)

272. The Agreements Officer's Decision reaches the same conclusion quoting directly from the LSA award decision. (Tab 152 at 43104.) Both rationales are contrary to the competitive procedures requirement.

273. The first results in an unequal evaluation in which SMC assigned the most risk to SpaceX's proposed solution based on unstated criteria and ignores the fact that the RFP required SMC to consider risk. The second ignores the fact that selecting multiple contractors with common systems undermines the primary RFP goal (and

---

[64] *See* Sandra Erwin, *Atlas 5 and Delta 4 launch delays caused by common component in upper stage*, SpaceNews (July 17, 2019), https://spacenews.com/atlas-5-and-delta-4-launch-delays-caused-by-common-component-in-upper-stage/.

SUPPLEMENTAL COMPLAINT –

1   Congress' mandate) of maintaining assured access to space because a failure involving
2   the common system could ground multiple providers.

3       274. ULA and Blue Origin both require that Blue Origin—which to date has
4   never performed an orbital launch—successfully develop the BE-4, and likewise,
5   ULA and Orbital both require that Orbital successfully develop the GEM 63XL solid
6   side booster. If the critical path of either the BE-4 or GEM 63XL encounters problems
7   (and propulsion systems are among the most challenging and highest risk systems in
8   rocket development), then two of the three providers in which the Government has
9   invested hundreds of millions of dollars will be unavailable for launch.

10      275. For this reason, the LSA award decision is also at odds with the RFP's
11  award criteria, and Congress' mandate, "to ensure that there are two reliable sources
12  for all national security launches." (Tab 38 at 1261.)

13      WHEREFORE, SpaceX respectfully requests that the Court grant judgment in
14  favor of SpaceX on Count V and (a) declare the LSA award decision violates
15  Congress' mandate for assured assess to space by not investing in the only domestic,
16  commercial offeror and instead investing only in those providers that create the
17  greatest risk by relying on development of common components and systems; (b)
18  award Space an appropriate LSA or enjoin any further investment by the Government
19  under the LSAs and any further performance by ULA, Blue Origin, and Orbital under
20  the LSAs; (c) absent a directed award, reevaluate the LSA proposals equally in
21  accordance with the stated evaluation criteria and SMC's needs and make a new award
22  decision; and (d) provide such other relief as the Court deems just and appropriate.

- 79 -

SUPPLEMENTAL COMPLAINT –

## V.   PRAYER FOR RELIEF

SpaceX, accordingly, respectfully requests that this Court:

A.   Order the declaratory and injunctive relief set forth above; and

B.   Provide such other and further relief as the Court deems just and proper.

Dated:  December 5, 2019                ARNOLD & PORTER KAYE SCHOLER LLP


By:  */s/ Craig A. Holman*
         Craig A. Holman (*admitted pro hac vice*)
         Kara L. Daniels (*admitted pro hac vice*)
         David M. Hibey (*admitted pro hac vice*)
         Sonia Tabriz (*admitted pro hac vice*)
         Nathaniel Castellano (*admitted pro hac vice*)
         Eric A. Valle (*admitted pro hac vice*)
         John D. Lombardo

         Attorneys for Plaintiff
         *Space Exploration Technologies Corp.*

- 80 -

1

## PROOF OF SERVICE

2    I hereby certify that on this 5th day of December 2019, I caused a true and correct

3    copy of the foregoing Sealed Supplemental Complaint to be served by email on:

4
5
6
7
8

Joseph Evan Borson
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel:  202-514-1944
Fax:  202-616-8460
Email: joseph.borson@usdoj.gov
*Counsel for United States of America*

9
10
11
12
13

Scott E. Pickens
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel:  202-371-6349
Fax:  202-289-1330
Email: Scott.Pickens@btlaw.com
*Counsel for Blue Origin, LLC*

14
15
16
17

Todd R. Steggerda
McGuireWoods LLP
2001 K Street, N.W., Suite 400
Washington, D.C. 20006
Tel:  202-857-2477
Fax:  202-828-2968
Email: tsteggerda@mcguirewoods.com
*Counsel for United Launch Services, LLC*

18
19
20
21
22

Kevin P. Mullen
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel:  202-887-1500
Fax:  202-887-0763
Email: KMullen@mofo.com
*Counsel for Orbital Sciences Corporation*

23    Dated:  December 5, 2019            ARNOLD & PORTER KAYE SCHOLER LLP

24
25    By:  */s/ Craig A. Holman*
      Craig A. Holman (*admitted pro hac vice*)

26    Counsel for Plaintiff
      *Space Exploration Technologies Corp.*

27
28

SUPPLEMENTAL COMPLAINT –