1  John D. Lombardo (Bar No. 187142)
   john.lombardo@arnoldporter.com
2  Arnold & Porter Kaye Scholer LLP
   777 South Figueroa Street, 44th Floor
3  Los Angeles, CA 90017-5844
   Telephone: 213.243.4000
4  Facsimile: 213.243.4199

5  Craig A. Holman (*admitted pro hac vice*)
   craig.holman@arnoldporter.com
6  Arnold & Porter Kaye Scholer LLP
   601 Massachusetts Ave., N.W.
7  Washington, D.C. 20001
   Telephone: 202.942.5000
8  Facsimile: 202.942.5999

9  Attorneys for Plaintiff
   *Space Exploration Technologies Corp.*
10

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13                  **WESTERN DIVISION**

14 | Space Exploration Technologies Corp., | Case No. 2:19-cv-07927-ODW(GJS)
15 |             Plaintiff, | Honorable Otis D. Wright II
16 |       v. | **NOTICE OF MOTION
17 | United States of America, | AND MOTION FOR JUDGMENT
                                | ON THE CERTIFIED
18 |             Defendant, | ADMINISTRATIVE RECORD;
                              | MEMORANDUM OF POINTS
19 |       v. | AND AUTHORITIES IN
                | SUPPORT THEREOF**
20 | Blue Origin, LLC, *et al.*, |
21 |             Defendant-Intervenors. | Date:  March 2, 2020
                                        | Time:  1:30 p.m.
22 |                                     | Ctrm:  5D, 5th Floor
                                        | First Street Courthouse
23 |                                     | 350 W. First Street
                                        | Los Angeles, CA 90012
24
                  **REDACTED VERSION**
25

26

27

28

────────────────────────────────────────

       MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1 [Caption page continued]

2 Kara L. Daniels (*admitted pro hac vice*)
kara.daniels@arnoldporter.com
3 David M. Hibey (*admitted pro hac vice*)
david.hibey@arnoldporter.com
4 Sonia Tabriz (*admitted pro hac vice*)
sonia.tabriz@arnoldporter.com
5 Nathaniel Castellano (*admitted pro hac vice*)
nathaniel.castellano@arnoldporter.com
6 Eric A. Valle (*admitted pro hac vice*)
eric.valle@arnoldporter.com
7 Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
8 Washington, D.C. 20001
Telephone: (202) 942-5000
9 Facsimile:  (202) 942-5999

10 Attorneys for Plaintiff
*Space Exploration Technologies Corp.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 2, 2020 at 1:30 p.m., in Courtroom 5D of the United States District Courthouse located at 350 W. First Street, Los Angeles, California 90012, Plaintiff Space Exploration Technologies Corp. ("SpaceX") will, and hereby does, move for judgment on the Certified Administrative Record as to each claim for relief set forth in SpaceX's Supplemental Complaint (ECF 168) because Defendant United States, acting through the Air Force Space and Missile Systems Center ("SMC" or "Agency") made its Launch Service Agreement ("LSA") awards to the three Defendant-Intervenors (and not SpaceX) based on an anticompetitive process that defied (i) the governing Request for Proposals, Solicitation No. FA8811-17-9-0001 ("RFP"); (ii) principles of fair play and reason incorporated into the Agency's authority to make the award, 10 U.S.C. § 2371b(b)(2); and (iii) Congressional direction to end U.S. reliance on Russian rockets and maintain assured access to space by investing in commercial launch services providers. Accordingly, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, this Court should hold the LSA award decision unlawful and cure the improper agency conduct that is irreparably harming SpaceX and threatening the Nation's assured access to space.

Specifically, SpaceX requests that the Court grant judgment in SpaceX's favor and (a) declare the LSA award decision arbitrary, capricious, and unlawful; (b) award SpaceX an appropriate LSA or enjoin any further investment under the LSAs and any further performance by Defendant-Intervenors United Launch Alliance, Blue Origin, LLC, and Orbital Sciences Corp. under the LSAs; (c) absent a directed award to SpaceX, direct SMC to reevaluate the LSA proposals equally in accordance with the stated criteria in the RFP or revise the RFP to reflect SMC's actual needs, reopen the

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1    competition, and make a new LSA award decision; and (d) provide such other relief
2    as the Court deems just and appropriate.

3         Absent the relief SpaceX requests herein, SpaceX will suffer the irreparable
4    harm of being deprived the opportunity to compete fairly for an LSA. *Parola v.*
5    *Weinberger*, 848 F.2d 956, 959 (9th Cir. 1988) (recognizing "there is no question that
6    a district court may '[e]njoin the performance of a [government] contract if the award
7    was the result of procedures not comporting with the law'") (quoting *Choctaw Mfg.*
8    *Co v. United States*, 761 F.2d 609, 619 (11th Cir. 1985)). In addition, the LSA awards
9    have and will continue to damage SpaceX's ability to compete fairly to provide launch
10   services for National Security Space missions for ongoing and future Air Force launch
11   services procurements. Through the challenged LSA awards, the Defendant-
12   Intervenors will gain insights into the Agency's design priorities and technical
13   requirements that are not available to SpaceX without an LSA award.

14        SpaceX makes this Motion pursuant to the Court's November 21, 2019 Order.
15   SpaceX bases this Motion upon this Notice of Motion and Motion, the attached
16   Memorandum of Points and Authorities and Declaration of ███████████, the
17   Supplemental Complaint (ECF 168), the Certified Administrative Record (ECF 49,
18   56), and all such further oral and documentary evidence and argument as may be
19   presented to the Court at the hearing.

20
21   Dated: December 10, 2019          ARNOLD & PORTER KAYE SCHOLER LLP

22
23                                     By: */s/ Craig A. Holman*
                                            Craig A. Holman (*admitted pro hac vice*)
24
                                       Counsel for Plaintiff
25                                     *Space Exploration Technologies Corp.*

26
27
28

███ MOTION FOR JUDGMENT ON THE CERTIFIED RECORD ███████████

1

## **TABLE OF CONTENTS**

2     I.     INTRODUCTION ................................................................ 1

3     II.    STATEMENT OF FACTS ................................................... 6

4          A.    Historical Context Of The NSS Launch Program ..................... 6

5          B.    The LSA Request For Proposals ......................................... 8

6          C.    The Competition ......................................................... 10

7          D.    The Award Decision ..................................................... 14

8     III.   LEGAL STANDARD....................................................... 15

9     IV.   THE COURT SHOULD GRANT DECLARATORY JUDGMENT IN SPACEX'S FAVOR.................................................. 17

          A.    SMC Violated The RFP And Congressional Direction (Count V)........ 17

          B.    The Cost Evaluation Was Anticompetitive And Irrational (Count I). ................................................................ 21

          C.    SMC's Risk Assessments Were Anticompetitive And Irrational (Counts II-IV). ............................................. 24

               1.    SMC Improperly Discounted Category A/B Mission Risks. ...... 25

               2.    SMC Based SpaceX's High Risk Rating On Unstated Criteria................................................................. 29

               3.    SMC Arbitrarily Concluded That SpaceX's ██████████ ████████████████████████████████ ......................... 31

V.    SPACEX IS ENTITLED TO A PERMANENT INJUNCTION.................... 34

VI.   CONCLUSION ........................................................... 35

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

2

CASES                                                                Page(s)

3
*Arizona Dream Act Coal. v. Brewer*,
4
    757 F.3d 1053 (9th Cir. 2014)..................................................34

5
*Armstrong & Armstrong v. United States*,
6
    514 F.2d 402 (9th Cir. 1975)...................................................15

7
*B.K. Instrument, Inc. v. United States*,
8
    715 F.2d 713 (2d Cir. 1983).................................................6, 16

9
*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.,*
    *Anchorage, Alaska*,
10
    952 F.2d 1173 (9th Cir. 1992).................................................15

11
*Choctaw Mfg. Co. v. United States*,
12
    761 F.2d 609 (11th Cir. 1985).......................................31, 34, 35

13
*CW Gov't Travel, Inc. v. United States*,
14
    110 Fed. Cl. 462 (2013) ..........................................................4

15
*Dubinksy v. United States*,
16
    43 Fed. Cl. 243 (1999) ..........................................................24

17
*Eco Tour Adventures, Inc. v. Zinke*,
18
    249 F. Supp. 3d 360 (D.D.C. 2017)...........................................35

19
*Greater Yellowstone Coal., Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011)..................................................25
20

21
*Hunt Bldg. Co. v. United States*,
    61 Fed. Cl. 243 (2004) ..........................................................15
22

23
*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*,
    730 F.3d 1024 (9th Cir. 2013)..................................................16

24
*Jet Inv. Inc. v. Dep't of the Army*,
25
    84 F.3d 1137 (9th Cir. 1996)...................................................16

26
*Lab. Corp. of Am. Holdings v. United States*,
27
    116 Fed. Cl. 643 (2014).........................................................25

28

*Latecoere Intern., Inc. v. U.S. Dep't of Navy*,
   19 F.3d 1342 (11th Cir. 1994)............................................................23, 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..........................................................................................15

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*,
   625 F.3d 1092 (9th Cir. 2010)......................................................................16

*Salehpour v. INS*,
   761 F.2d 1442 (9th Cir. 1985)......................................................................15

*Seattle Audubon Soc. v. Evans*,
   771 F. Supp. 1081 (W.D. Wash.), *aff'd*, 952 F.2d 297 (9th Cir. 1991)................35

*SMS Data Prods. Grp., Inc. v. United States*,
   853 F.2d 1547 (Fed. Cir. 1988) ....................................................................16

*Space Expl. Techs. Corp. v. United States*,
   No. 14-354C, 2014 WL 3697532 (Fed. Cl. July 24, 2014) ....................................2

*Space Expl. Techs. Corp. v. United States*,
   No. 14-354C (Fed. Cl. Jan. 23, 2015)...........................................................2

*Space Expl. Techs. Corp. v. United States*,
   No. 14-354C, 2015 WL 176629 (Fed. Cl. Jan. 13, 2015) .......................................2

*Superior Oil Co. v. Udall*,
   409 F.2d 1115 (D.C. Cir. 1969) ..............................................................15, 29

*United States v. Benally*,
   843 F.3d 350 (9th Cir. 2016).......................................................................15

## STATUTES

5 U.S.C. § 706.........................................................................................15

10 U.S.C. § 2273 ................................................................................10, 35

10 U.S.C. § 2302 ...................................................................................15

10 U.S.C. § 2304 ...................................................................................15

10 U.S.C. § 2371b ...........................................................................*passim*

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

Pub. L. No. 114-92, § 1608, 129 Stat. 726 (2015) .................................................. 2, 7

Pub. L. No. 114-328, § 1603, 130 Stat. 2000 (2016) .......................................... 2, 3, 7

Pub. L. No. 115-91, § 1605, 131 Stat. 1283 (2017) ............................................... 2, 7

Pub. L. No. 115-232, § 1618, 132 Stat. 1636 (2018) ................................................ 31

**OTHER AUTHORITIES**

DoD Contracts for September 27, 2017 (Sept. 27, 2017),
    https://www.defense.gov/Newsroom/Contracts/Contract/
    Article/1327363/ ................................................................................. 22

DoD Contracts for September 27, 2018 (Sept. 27, 2018),
    https://dod.defense.gov/News/Contracts/Contract-View/
    Article/1647166/ ................................................................................. 22

*Hearing on Military Space Launch and the Use of Russian-Made Rocket Engines
    Before the S. Comm. on Armed Services*, 114th Cong. (2016),
    https://fas.org/irp/congress/2016_hr/engines.pdf ......................................... 1, 7, 20

S. Rep. No. 98-50 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2174 ........................... 16

U.S. Gov't Accountability Office, GAO-14-259T, Evolved Expendable Launch
    Vehicle: Introducing Competition into National Security Space Launch
    Acquisitions (2014),
    https://www.gao.gov/assets/670/661337.pdf .................................................. 6, 7

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

## GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| COFC | U.S. Court of Federal Claims |
| CONOPs | Concept of Operations |
| DoD | Department of Defense |
| EELV | Evolved Expendable Launch Vehicle |
| FY | Fiscal Year |
| ILC | Initial Launch Capability |
| LSA | Launch Service Agreement |
| NDAA | National Defense Authorization Act |
| NSS | National Security Space |
| OT | Other Transaction |
| SMC | Air Force Space and Missile Systems Center |
| SSA | Source Selection Authority |
| VAFB | Vandenberg Air Force Base |

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In 2016, the late Senator John McCain, then Chairman of the Senate Armed Services Committee, bluntly assessed U.S. military space launch capabilities:

> With Russia and China aggressively weaponizing space, we can no longer take for granted the relative peace we have enjoyed in space for nearly 60 years. Both Russia and China are pursuing unprecedented counter-space programs and investing robust resources to challenge United States superiority in space. . . .
>
> Today, Russia holds many of our most precious national security satellites at risk before they ever get off the ground. Yet the Department of Defense has actively sought to undermine, with the support of the United Launch Alliance, ULA, and the parochial motivations of Senator Shelby and Senator Durbin, the direction of this committee to limit that risk and end the use of the Russian-made RD-180 by the end of this decade.
>
> Our hearing today will closely evaluate the arguments of those making the same empty promises and proposing the same gradual transition that ha[s] been promised since the Department of Defense first allowed the use of Russian made engines in 1995. . . . Yet 20 years later, after numerous stalling efforts rooted in corporate greed and naïve assertions of defense cooperation with Russia, little progress has been made in limiting the influence of Russia on space launch. This is unacceptable.[1]

Over twenty years ago, the Department of Defense ("DoD") directed that a United Launch Alliance ("ULA")[2] predecessor wean itself off of Russian rockets within four years.[3]  It did not happen.  Equally problematic, National Security Space ("NSS") mission costs skyrocketed and innovation lagged as the Air Force Space and Missile Systems Center ("SMC" or "Agency") sole sourced contract after contract to ULA.  In 2014, after Russia invaded Crimea, Congress again directed SMC to stop using Russian-powered rockets and to compete the NSS work.  Notwithstanding ULA's staggering

---

[1] *Hearing on Military Space Launch and the Use of Russian-Made Rocket Engines Before the S. Comm. on Armed Services* ("*SASC Hearing*"), 114th Cong. 2-3 (2016) (opening statement of Sen. John McCain, Chairman), https://fas.org/irp/congress/2016_hr/engines.pdf.

[2] The evaluation materials and award decision in the Administrative Record refer to ULA, but United Launch Services LLC ("ULS"), a wholly-owned subsidiary of ULA, submitted the proposal and entered into the LSA. (Tab 120 at 35188; Tab 140.)  This Memorandum will use ULA to refer to both ULS and ULA, for ease of the Court's reference.

[3] *See SASC Hearing*, 114th Cong. 2-3 (2016) (opening statement of Sen. John McCain, Chairman).

charges to the American taxpayer across decades and ULA's continued reliance on Russian engines, SMC sole sourced even more launch work to ULA.  (ECF 168 ¶ 38.) Were it not for U.S. Court of Federal Claims ("COFC") involvement to enforce Congress' 2014 direction, the United States would still have no option but ULA and its overpriced Russian rockets.[4]

To be clear, ULA still cannot fly most NSS missions without Russian rockets. ULA (far too expensive to effectively compete in the commercial marketplace) also cannot operate without massive taxpayer funding.  After successfully breaking the ULA monopoly through its 2014 COFC action, Plaintiff Space Exploration Technologies Corp. ("SpaceX") (a California-headquartered company and the leading commercial space flight provider worldwide) has competed for, won, and successfully performed numerous NSS missions at a fraction of the amount charged by ULA, using American-made, reusable rockets.  Having seen the benefits of competition (including lower prices, better American-made rockets, and increased national security), Congress has directed still further change.  Specifically, by several subsequent National Defense Authorization Acts ("NDAAs"), Congress directed that the Evolved Expendable Launch Vehicle ("EELV") program quickly transition *entirely* from the use of Russian engines, leverage commercial solutions to reduce the cost to the taxpayer and improve technology, and implement sustainable competition for NSS missions.  NDAA for Fiscal Year ("FY") 2015, Pub. L. No. 113-291, § 1608, 128 Stat. 3292, 3626 (2014); FY 2017 NDAA, Pub. L. No. 114-328, § 1603, 130 Stat. 2000, 2582-84 (2016), FY 2018 NDAA, Pub. L. No. 115-91, § 1605, 131 Stat. 1283,

---

[4] COFC preliminarily enjoined and (after dissolving the injunction) directed mediation in SMC's 2014 attempt to undermine Congressionally-directed competition.  *Space Expl. Techs. Corp. v. United States*, No. 14-354C, 2015 WL 176629 (Fed. Cl. Jan. 13, 2015) (denying motion to dismiss and reiterating Congress' direction to stop using Russian rockets).  Following alternative dispute resolution, the parties resolved the matter.  *Space Expl. Techs. Corp. v. United States*, No. 14-354C, 2014 WL 3697532 (Fed. Cl. July 24, 2014) (directing mediation); *Space Expl. Techs. Corp. v. United States*, No. 14-354C (Fed. Cl. Jan. 23, 2015) (dismissing based on mediated settlement).

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1    1724-25 (2017).[5]   SMC's actions, however, have once again thwarted Congress'

2    direction, necessitating this Court's involvement.

3         SMC's decision to invest more than $2.3 billion of taxpayer money with

4    Defendant-Intervenors ULA, Blue Origin, LLC ("Blue Origin"), and Orbital Sciences

5    Corp. ("Orbital") for the development of new launch systems for future NSS launch

6    services, and to exclude SpaceX, has subverted the specific Congressional mandates

7    that authorized the funding for the Launch Service Agreements ("LSA"), so-called

8    Other Transaction ("OT") agreements, challenged here.   Equally problematic, the

9    record confirms that the decision arose from an anticompetitive evaluation that treated

10   the offerors unequally and deviated from the LSA Request for Proposals ("RFP"),

11   contrary to the "competitive procedures" mandated in 10 U.S.C. § 2371b(b)(2).

12        Although the challenged evaluation and award at the center of this action may

13   involve rocket science, the legal questions presented to this Court are straightforward

14   Administrative Procedure Act ("APA") issues of the precise nature that courts

15   routinely redress: that agency decisionmaking be rational and follow the law.

16   Consistent with Congressional direction, SMC designed the LSA competition

17   purportedly to invest in (i) commercial launch providers, (ii) which could satisfy the

18   urgent need to provide launch services without Russian engines, and (iii) remain cost

19   effective through commercial launch operations.  (Tab 2 at 107, 109; Tab 46 at 1343,

20   Tab 38 at 1260.)  In fact, the RFP announced that SMC would award LSAs to the

21   solutions that were "most advantageous in achieving the Government's goal of

22   assured access to space via two or more domestic commercial launch service

23   providers that also meet NSS requirements."  (Tab 38 at 1285.)

24        Had SMC fairly applied the RFP terms, SpaceX would have received an LSA

25   award.  Founded in 2002, SpaceX has disrupted both the commercial and Government

26   space flight market, offering rapid, responsive, and reliable space launch at a low cost.

27

28   ---

[5] Congress renamed the EELV program the "National Security Space Launch program."  FY 2019 NDAA, Pub. L. No. 115-232, § 1603 132 Stat. 1636, 2105-06 (2018).

- 3 -

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

(Tab 123 at 39786.)  "SpaceX has increased US market share in global commercial space launch from 0% in 2010 to over 65% of launches manifested for 2018." (*Id.*) Today, SpaceX builds rockets to propel commercial, Air Force, and intelligence community payloads into space. (*Id.* at 39752.)  SpaceX also delivers research, supplies, and equipment to the International Space Station for NASA. (*Id.* at 39756.) Not only does SpaceX do this with American-made rockets, SpaceX also lands the rocket boosters on platforms so SpaceX can reuse them—driving the cost per mission down drastically. (*Id.*; Ex. A, Declaration of ███████ ("███ Decl.") ¶¶ 8, 10.)[6]

SpaceX took the RFP objectives and requirements seriously and at face value, proposing its currently operational, EELV-certified, commercially-viable Falcon 9 and Falcon Heavy launch vehicles, to meet the so-called Category A/B missions, the Agency's most imminent (by April 1, 2022) and greatest operational needs. (Ex. A, ███ Decl. ¶ 25; Tab 132 at 41421.)  For the limited Category C missions (a capability not required until September 1, 2025 at the earliest), SpaceX offered its Starship—a "groundbreaking design" leveraging proven technologies—to provide the lowest mission cost of any Category C capable launch vehicle. (Tab 132 at 41594.) Per the Agency: "The technologies and capabilities of the [Starship] greatly exceed those of the other offered launch systems and greatly exceed the current EELV requirements. Successful completion of the [Starship] would be game-changing for national security space because of its ability to ███████████████ at a low cost ...." (*Id.* at 41656.)

In stark contrast, Defendant-Intervenors had to develop new launch systems, all of which are still in the design phase, for all NSS missions (Category A/B and C).

---

[6] Courts applying APA review have recognized the need for declarations for the limited purpose of showing irreparable harm and competitive prejudice. *See e.g., Souza v. Cal. Dep't of Transp.*, No. 13-CV-04407-JD, 2014 WL 1760346 (N.D. Cal. May 2, 2014) (court may consider declaration "for the limited purpose of assessing irreparable harm."); *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 483 (2013) (granting protester relief and noting that "evidentiary submissions filed in support of the prospective relief sought" "rests on a separate and distinct footing" and "is admitted, not as a supplement to the administrative record, but as part of this court's record.").

1   And, unlike SpaceX, not one of the awardees has demonstrated the ability to develop
2   and manufacture new orbital rockets rapidly or with commercial viability.  Rather,
3   contrary to Congress' direction and the RFP criteria seeking investment in
4   commercially-viable solutions that "also meet" NSS requirements (Tab 38 at 1285),
5   both ULA and Orbital offered launch system designs "purpose-built" for NSS
6   missions.  (ECF 168 ¶¶ 24, 25.)  Blue Origin, which lacks any orbital launch
7   experience (Tab 98 at 30663), offered a design so immature that Blue Origin could
8   not provide ███████████████████████████████████████████████
9   ████████████████████████████.  (*Id.* at 30591-93.)  And, Blue Origin
10  premised its solution on an undeveloped ████████████████████████
11  ████████████████████████████████████████████████████████████
12  ███████████████████████████████████████████████████████.

13       Abandoning the stated award criteria and again defying Congress' direction,
14  SMC awarded the LSAs to the three, unproven prototypes offered by Defendant-
15  Intervenors.   In doing so, SMC improperly excluded SpaceX, the only LSA
16  competitor capable of assuring access to space with proven, certified operational
17  rockets for the Category A/B missions—the Agency's most imminent and
18  predominant mission needs.  Instead, SMC has irrationally awarded Government
19  funds to the portfolio of solutions that best serves the needs of ULA, the former
20  monopoly holder and the long-standing incumbent.  Indeed, SMC made LSA awards
21  to ULA and the two other offerors currently developing major components for ULA's
22  new rocket.  (Tab 136 at 41753).  Thus, SMC incredibly used all three LSA awards
23  to subsidize the development of a new launch system offered by ULA.  This arbitrary
24  and anticompetitive result occurred *despite SMC determining* that SpaceX "not only
25  has more strengths than ULA" (the winner of the largest government investment),
26  "but [SpaceX's] strengths are qualitatively more beneficial to the Government than
27  ULA's strengths."  (Tab 135 at 41734.)
28

- 5 -

1    As described below, the Court should grant declaratory judgment in SpaceX's
2    favor on the Administrative Record because the decision to exclude SpaceX and make
3    award to Defendant-Intervenors (i) undermines the stated RFP criteria and
4    Congressional mandates; (ii) arose from an anticompetitive cost evaluation that
5    understated the true costs to the Government of the Defendant-Intervenor solutions
6    and overstated SpaceX's cost; and (iii) included an irrational risk assessment in which
7    SMC diminished awardee risks to the numerous Category A/B missions and
8    overstated SpaceX risks to the limited Category C missions.  Incredibly, the Agency,
9    recognizing that all three awardees may well miss Category A/B dates, declared it
10   would "buy down" the manifest risk that the LSA awardees will fail to perform
11   through still *more* ULA Russian rockets and use of SpaceX (the company purportedly
12   too risky for an LSA award).  (Tab 101, LSA Convo with O5 [ULA] on Rating at
13   39:45 through 42:27.)

14       Money damages are not available or sufficient to cure the irreparable harm
15   caused by the Agency's arbitrary and unlawful award decision.  (Ex. A, ███ Decl.
16   ¶¶ 47-51.)   Without the relief requested, SpaceX will face both financial (i.e.,
17   Government Investment) and technical guidance disadvantages in ongoing and future
18   NSS competitions. *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 719 (2d Cir.
19   1983).

20   **II.    STATEMENT OF FACTS**
21   **A.    Historical Context Of The NSS Launch Program**
22       The flawed LSA decision bears striking parallels to past failed attempts of the
23   Agency to engender sustainable competition and maintain assured access to space.
24   DoD created the EELV program in 1995 to achieve affordable, assured access to
25   space for national security payloads. *See* U.S. Gov't Accountability Office, GAO-14-
26   259T, Evolved Expendable Launch Vehicle: Introducing Competition into National
27   Security Space Launch Acquisitions at 4 (2014), https://www.gao.gov/assets/670/
28   661337.pdf.)  In 1998, DoD competitively awarded OT agreements to two companies,

- 6 -

███ MOTION FOR JUDGMENT ON THE CERTIFIED RECORD ███

1    Boeing and Lockheed Martin ("Lockheed"), to develop launch vehicles and related

2    infrastructure. *Id.* By selecting two awardees, DoD hoped to enjoy the benefits of

3    head-to-head competition, i.e., increased innovation at lower costs. *See id.* The

4    success of that strategy then, as now, depended on the companies securing

5    commercial launch business. *See id.*

6        When neither company did, these two large government contractors relied on

7    taxpayer money to finance their space launch operations and ultimately merged their

8    space operations to form ULA. *Id.* Until SpaceX successfully fought for the ability

9    to compete for NSS missions, the EELV program was captive to the massive costs of

10   the sole source provider.  Under the single source contracting regime and continuing

11   today, ULA has charged the Government for costs that DoD officials recognized were

12   "increas[ing] at an unsustainable rate" including: (i) the costs of each mission; and (ii)

13   the "launch capability" costs of maintaining ULA's launch infrastructure and work

14   force, i.e., ULA's operating costs, *id.* at 4-5, an annual subsidy of nearly $1 billion.

15   *See SASC Hearing*, 114th Cong. 2-3 (2016) (opening statement of Sen. John McCain,

16   Chairman); (ECF 168 ¶ 35).

17       Worse, ULA has not used the significant subsidies to innovate.  Instead, ULA

18   has bought the Russian-designed and manufactured RD-180 rocket engine to launch

19   the majority of U.S. national security payloads into space.  In 1995, DoD limited use

20   of the Russian-made RD-180 engine to four years. *Id.* at 2.  Nearly two decades later

21   (in 2014), however, ULA still depended on Russian rockets.  (Tab 2 at 107.)  After

22   Russia invaded Crimea and concerned with the national security risks of relying on

23   Russian engines to launch national security payloads, Congress directed the Agency

24   "to transition EELV launch service providers off of the RD-180 engine." (*Id.*); FY

25   2015 NDAA, Pub. L. No. 113-291, § 1608, 128 Stat. 3292, 3626 (2014); FY 2017

26   NDAA, Pub. L. No. 114-328, § 1603, 130 Stat. 2000, 2582-84 (2016).  Congress also

27   directed the Agency to implement a new acquisition strategy that provides for "fair

28   competition," discontinues the subsidy to ULA, and invests in commercially-

- 7 -

1    available launch systems in order to maintain assured access space.  FY 2016 NDAA,

2    Pub. L. No. 114-92, § 1608, 129 Stat. 726, 1100-01 (2015); FY 2018 NDAA, Pub. L.

3    No. 115-91, § 1605, 131 Stat. 1283, 1724-25 (2017).

4         The LSA competition and awards at issue constitute the third step of the four-

5    step acquisition process SMC adopted pursuant to Congress' latest direction to acquire

6    NSS launch service needs competitively.  (Tab 4 at 168; Tab 19 at 792.)  The

7    substantial funding and support provided by SMC to the LSA awardees through

8    unique OT agreements (step three) better situates the awardees to compete for, win,

9    and perform the launch services contract (step four).  (Tab 38 at 1260 ("These LSAs

10   are intended to allow the Air Force to competitively procure launch services in the

11   future."); Tab 34 at 1035.)  SpaceX and each of the Defendant-Intervenors are

12   competing in that ongoing procurement (the "Phase 2 Competition").  (Ex. A, ▮▮▮▮

13   Decl. ¶ 22.)  Each LSA awardee has committed to propose in the Phase 2 Competition

14   the launch systems developed under the LSAs.  (Tab 142a; 142b.2; Tab 142c.2.)

15       **B.    The LSA Request For Proposals**

16        In October 2017, SMC issued the LSA RFP, which set forth the procedures for

17   evaluating proposals and for awarding the agreements.  (Tab 38 at 1256.)  SMC

18   amended the RFP three times.  (*Id.*)  The RFP purportedly sought to leverage

19   industry's commercial launch solutions and modify them to meet NSS requirements.

20   (*Id.* at 1260.)  The RFP also advised that the "public-private agreements," the LSAs,

21   "will be tailored to each launch service provider's needs in order to enable commercial

22   launch systems to meet all NSS requirements."  (*Id.*; Tab 47b at 1347 ("LSA is

23   designed to work in synergy with commercial launch vehicle development efforts").)

24        Internally, the Agency reported that "[t]he goal of partnering with industry to

25   invest at the launch vehicle level is to have two or more launch systems" capable of

26   meeting the EELV requirements, "while being commercially competitive."  (Tab 2 at

27   109; Tab 34 at 1035.)  According to the Agency:  "A commercially viable launch

28   system is vital to reducing the risk to the Air Force of having to keep launch service

- 8 -

1    providers financially viable during periods of low demand for NSS launches." (Tab

2    2 at 109; Tab 46 at 1343 (noting that launch systems must be "commercial" and "not

3    be limited" to "NSS capabilities" to meet FY 2018 NDAA).)

4        The NSS missions fall into two payload categories: (i) Category A/B, which

5    comprise the majority of NSS launches and the most imminent operational need; and

6    (ii) Category C, two potential latest-in-time missions that carry the heaviest payload.

7    (*Id.* at 1261.) The RFP identified nine reference orbits that each launch system

8    prototype must meet to satisfy SMC's requirements. (*Id.* at 1286.) Seven of the orbits

9    carry Category A/B payloads and two carry Category C payloads. (*Id.*) The Category

10   A/B need date—i.e., the Initial Launch Capability ("ILC") date—is April 1, 2022.

11   (*Id.* at 1288.) The ILC dates for the two Category C missions, Polar 2 and GEO 2,

12   are years later—September 1, 2025 (tentative) and October 1, 2026 (firm),

13   respectively. (*Id.*) SMC recognized that development solutions for Category A/B

14   missions drive higher risk to assured access to space than the later Category C

15   missions given the earlier need date. (Tab 101, LSA Convo with ███████ on

16   Rating Debrief ███████ at 29:10 through 29:35 ("The need date for the A/B.

17   It's the nearest term, so in a way it's the hardest….").)

18       The RFP, like 10 U.S.C. § 2371b, required SMC to use "competitive

19   procedures" to award the LSAs, detailing an evaluation against three factors (EELV

20   Approach, Technical, and Investment Cost). (Tab 38 at 1262, 1281-85.) For the

21   EELV Approach factor, the RFP required SMC to evaluate the extent to which each

22   offeror's development and qualification approach demonstrates that it will meet the

23   launch system requirements. (*Id.* at 1282-83.) Notably, the RFP ███████

24   ████████████████████████████████████

25   █████████████████████. (*Id.*; Ex. A, ███ Decl.

26   ¶ 43.) The RFP also ████████████████████

27   ██████. (Ex. A, ███ Decl. ¶ 44.) Instead, SMC removed ███████

28

- 9 -

1 ████████████████████████████████████████████████

2 ██████████. (██████████.)

3       The Technical factor consisted of two subfactors—Design and Schedule. (Tab

4 38 at 1281.)  The Design subfactor assessed risks associated with the design of the

5 launch vehicle's booster system(s) and upper stage(s). (*Id.* at 1283-84.)  The Schedule

6 subfactor directed SMC to "evaluate the Offeror's schedule to determine the risk of

7 delayed development" for the April 1, 2022 need date for Category A/B missions and

8 the September 1, 2025 need date for the Category C Polar 2 mission.  (*Id.* at 1284.)

9 Finally, for the Investment Cost factor, the RFP required SMC to evaluate whether

10 the proposed costs were complete and reasonable, considering not only total

11 Government Investment, but also the total amount of private investment each offeror

12 proposed to contribute. (*Id.* at 1284.)

13       The RFP directed SMC to make awards to the "portfolio of solutions that, based

14 on the evaluation factors … are most advantageous in achieving the Government's

15 goal of assured access to space via two or more domestic commercial launch

16 providers that *also* meet NSS requirements." (*Id.* at 1285.)[7]  Section 2273 of Title 10

17 details the actions DoD must take to assure access to space, including (i) ensuring the

18 availability of at least two space launch vehicles capable of meeting the NSS

19 requirements; (ii) maintaining a robust space launch infrastructure and industrial base;

20 and (iii) guaranteeing the availability of rapid, responsive, and reliable space launches

21 to improve flexibility and lower costs.  10 U.S.C. § 2273(b).

22     **C.**    **The Competition**

23       Four companies competed for the LSAs: SpaceX, ULA, Orbital (now

24 Northrop), and Blue Origin.  (Tab 132.)   SpaceX proposed a family of launch

25 vehicles: (i) the EELV-certified Falcon 9; (ii) the EELV-certified Falcon Heavy; and

26 (iii) the Starship (formerly the Big Falcon Rocket).  (*Id.* at 41421.)  SpaceX's family

27

28 ─────────────────────────
[7] All emphasis to quoted material has been added unless otherwise noted.

of launch vehicles combined (a) flight-proven and dependable solutions for all Category A/B missions through the Falcon 9 and Falcon Heavy, ████████ ███████████████████████████████████████████████████████; and (b) a "groundbreaking technological" solution through the Starship for the two potential Category C missions. (*Id.* at 41579, 41594, 41651, 41656; Tab 123 at 39752-55.)

"██████████████████████████████████████████ ██████████████████████████████████████" (Tab 132 at 41579, Ex. A, ████ Decl. ¶ 11.) The "█████████████████ █████ ████████████████ ███████████████████████████████████████████████████ ████████████████████████████." (Tab 132 at 41579.) The ████████ ████████████ ████████████████████. (*Id.* at 41421-22.) The Falcon 9 is the first intermediate launch vehicle ever to employ a reusable first stage, and is the most cost effective intermediate-lift launch vehicle available today. (Tab 123 at 39752; Ex. A, ██████ Decl. ¶¶ 8-9.) Prior to the Falcon 9's entrance into the commercial satellite launch market, the United States held zero percent of the market share. (Tab 123 at 39786-87.) Today, SpaceX holds roughly 65% of the global commercial launch market. (*Id.*) "The ability to compete around the globe means that SpaceX is not solely dependent on any one market segment to remain viable." (*Id.* at 39787.) In fact, fewer than half of SpaceX's launches to date have been executed for U.S. Government customers. (*Id.*)

The Falcon Heavy entered service in February 2018. (*Id.* at 39753.) As the most powerful launch vehicle in operation, with more than 5.1 million pounds of thrust at liftoff, the Falcon Heavy builds on the proven, highly reliable design of Falcon 9 ███████████████████████████████. (*Id.*) The second Falcon Heavy launch occurred on April 11, 2019 and the three booster rockets successfully returned to earth. (Ex. A, █████ Decl. ¶ 10.) The two outer cores successfully landed on dual concrete landing pads at Cape Canaveral, while the center

- 11 -

1   core landed on a drone ship in the Atlantic.  (*Id.*)  SpaceX has a growing manifest of

2   Government and commercial missions using Falcon Heavy.  (Tab 123 at 39754.)

3        The Starship, which SpaceX proposed to develop under the LSA ██████

4   ████████████████████████████████████████████████████████████████████

5   ████████.  (Tab 132 at 41421-22, 41633.)  Starship leverages technologies

6   developed for the Falcon 9 and Falcon Heavy as well as SpaceX's Dragon spacecraft.

7   (Tab 123 at 39754; Ex. A, ████ Decl. ¶ 12.)  The Starship ████████████

8   ████████████████████████████████████████████████████"  (*Compare*

9   Tab 38 at 1291 *with* Tab 132 at 41651.)

10       In contrast to SpaceX's proven solution for the Agency's predominant and most

11  imminent Category A/B needs, ULA, Orbital, and Blue Origin all proposed yet-to-be

12  developed launch systems for Category A, B, *and* C missions.  (Tab 132 at 41420-

13  21.)  ULA, which itself has never "████████████████████████████████

14  ████████"  (*id.* at 41429), proposed to develop the Vulcan.  (*Id.* at 41420.)  The

15  lower stage booster will be powered by BE-4 engines, under development by Blue

16  Origin.  (*Id.*)  For the upper stage, ULA proposed ██████████████████

17  ████████████████████████████████████████████████.  (*Id.* at

18  41420, 41429.)  ULA will ████████████████████████████████████

19  ████████████████████████.  (Tab 120 at 35189, 35229.)  The

20  Vulcan's ability to perform certain missions also depends on Orbital's development of

21  the GEM 63 motors.  (Tab 132 at 41458, 41545.)  ████████████████████

22  ████████████████.  (*Id.* at 41653-54.)

23       Orbital   proposed   to   develop   the   new   OmegA   launch   system ████

24  ████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████.  (*Id.* at 41421, 41532.)

26  Like the ULA Vulcan, ████████████████████ depend on Orbital's development

27  of the GEM 63 motor (*id.*), ████████████████████████████████.  (*Id.* at

28  41653-54.)

████ MOTION FOR JUDGMENT ON THE CERTIFIED RECORD ████████████

████████████████████████████████████████

Blue Origin, which does not have any experience developing orbital launch vehicles (Tab 98 at 30663), proposed to develop the New Glenn. (Tab 132 at 41420.) ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████ (*Compare* Tab 121 at 36795-96 *with* Tab 132 at 41502-03, 41506 (██████████████████████████).) The New Glenn first stage booster is powered by Blue Origin's BE-4 engine, and the second stage is ████████ ██████████████. (Tab 132 at 41420.)

Blue Origin's proposed approach contemplates █████████████████████ █████████████ and assumes Blue Origin can ██████████████████████████ █████████. (Tab 121 at 36931, 36951; Tab 132 at 41654.) But Blue Origin has never ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ (Tab 132 at 41484 ("████████████████████████████████████████████████████ ████████████████████████████████"); *id.* at 41493 (████████); Tab 135 at 41735 ("██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████").)

Due to the premature nature of its design, Blue Origin did not propose ████ ████████████████████████████████████████████ (Tab 98 at 30591-93.) The evaluators nevertheless determined that the RFP required only the "█████████ ██████████████████████████████████████████████████" and that Blue Origin proposed a "██████████████████████████████████████" (Tab 132 at 41481-82.) Without support, the evaluators also credited Blue Origin with a ████████ ████████████████████████████████████████████████████████████████" (*Id.* at 41480.)

- 13 -

Both the ULA Vulcan and the Blue Origin New Glenn rely on Blue Origin's undeveloped and untested BE-4 first stage booster engine (*id.* at 41420), and both the Vulcan and the Orbital OmegA rely on Orbital's still in development GEM 63XL solid side boosters, and on Aerojet Rocketdyne's RL10C upper stage engine. (*Id.* at 41420-21, 41458, 41545.)

**D.    The Award Decision**

On October 9, 2018, SMC awarded LSAs committing Government Investments valued at: (i) $967M to ULA; (ii) $792M to Orbital; and (iii) $500M to Blue Origin. (Tab 136 at 41752-53; Tab 135 at 41732.) SMC denied only one competitor (SpaceX) an LSA. (*See* Tab 136.) The Agency's evaluation demonstrates that SpaceX submitted the best technical proposal by far, noting that: "██████████ ████████████████████████████████████████████████████████████████ " ████████████████ (Tab 132 at 41579), and SpaceX's "innovative and exceptional approach and understanding of the requirements provides benefits ███████████ ████████████ significantly in excess of the Government requirements, and their commercial market viability … drives a robust ops temp throughput and ability to accommodate launch rate market swings." (*Id.* at 41594.) Per the evaluators: "The technologies and capabilities of the [Starship] greatly exceed those of the other offered launch systems and greatly exceed the current EELV requirements. Successful completion of the [Starship] would be game-changing for national security space because of its ability to ████████████████████████ at a low cost ...." (*Id.* at 41656.)

Nevertheless, the Source Selection Authority ("SSA"), the Agency official responsible for the award decision, determined that Defendant-Intervenors offered "more advantageous proposals for the Government than [SpaceX]," explaining that "the outstanding technical approach proposed by [SpaceX] is ██████████████ █████████████████████████ " (Tab 136 at 41753.) The SSA observed that, although SpaceX ████████████████████████████████████████████████████

- 14 -

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████.

3  (*Id.*)  Specifically, the SSA found that "██████████████████████████

4  ████████████████████████████████████████████████████████

5  ██████████████████████████ "  (*Id.*)  The SSA also observed that ULA and Blue

6  Origin rely on Blue Origin's BE-4 engine development, which introduces risk to

7  assured access to space, but found the risk did not warrant a different portfolio

8  decision, stating that "the Government did not include an RFP evaluation criteria

9  related to the use of common engines." (*Id.*)

10  **III.  LEGAL STANDARD**

11  "It is well settled that a 'disappointed bidder' has standing to challenge a federal

12  agency's illegal award of a contract." *Big Country Foods, Inc. v. Bd. of Educ. of*

13  *Anchorage Sch. Dist., Anchorage, Alaska*, 952 F.2d 1173, 1176 (9th Cir. 1992);

14  *Armstrong & Armstrong v. United States*, 514 F.2d 402, 403 (9th Cir. 1975).  The

15  APA requires the Court to "hold unlawful and set aside agency action, findings, and

16  conclusions" that are "arbitrary, capricious, an abuse of discretion, or not otherwise

17  in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and

18  capricious, if, for example, the agency "failed to consider an important aspect of the

19  problem" or "offered an explanation for its decision that runs counter to the evidence

20  before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

21  U.S. 29, 43 (1983).  An agency also acts arbitrarily when it violates its own

22  regulations or a congressional statute. *Salehpour v. INS*, 761 F.2d 1442, 1445-48 (9th

23  Cir. 1985); *Armstrong*, 514 F.2d at 403.

24  SMC relied on DoD's OT authority in 10 U.S.C. § 2371b to make the

25  challenged award decision.  The APA required SMC to evaluate proposals and make

26  an award that is both reasoned and consistent with the "competitive procedures"

27  required by 10 U.S.C. § 2371b(b)(2).  5 U.S.C. § 706(2).  The statutory mandate that

28  "competitive procedures shall be used" when awarding OTs is a verbatim reference

- 15 -

██ MOTION FOR JUDGMENT ON THE CERTIFIED RECORD ██████████

to the competition procedures mandated by the Competition in Contracting Act. *Compare* 10 U.S.C. § 2371b(b)(2) *with id.* § 2302(2); 10 U.S.C. § 2304(a); *see also United States v. Benally*, 843 F.3d 350, 354 (9th Cir. 2016) (recognizing that when "wording of [ ] two statutes is virtually identical, [the Court] interpret[s] their plain language in the same manner").  Those principles require that an agency (i) treat all offerors equally, and (ii) adhere to the solicitation criteria.  *See Superior Oil Co. v. Udall*, 409 F.2d 1115, 1120 (D.C. Cir. 1969) ("The requirement of steadfast compliance with competitive bidding procedures comports best with the need to promote the integrity of the bidding process."); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004) (finding arbitrary agency's failure to follow solicitation terms); S. Rep. No. 98-50, at 3, 18 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2174, 2176, 2191 (Congress noting "possibly the most important … benefit of competition is its inherent appeal of 'fair play'" and identifying five components of effective competition).

The Court should grant declaratory judgment in SpaceX's favor because the record confirms that the Agency violated Section 2371b(b)(2)'s direction to use "competitive procedures" by deviating from the RFP criteria and treating the offerors unequally in several material ways to SpaceX's competitive prejudice.  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109, 1122 (9th Cir. 2010) (reversing judgment for agency under APA); *Jet Inv. Inc. v. Dep't of the Army*, 84 F.3d 1137, 1142-43 (9th Cir. 1996) (same).

The Court also should grant SpaceX a permanent injunction because (i) SpaceX has achieved success on the merits; (ii) SpaceX will suffer irreparable injury if injunctive relief does not issue; (iii) the harm to SpaceX without an injunction outweighs the harm to SMC with one; and (iv) an injunction serves the public interest.[8]   *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus.*

---

[8] The Federal Circuit has held that where an agency fails to satisfy its statutory obligation to foster competition to the maximum extent practicable, an injunction directing termination of even partially

- 16 -

*Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013); *B.K. Instrument*, 715 F.2d at 719 (arbitrary deprivation of government contract constitutes a "serious wrong").

## IV. THE COURT SHOULD GRANT DECLARATORY JUDGMENT IN SPACEX'S FAVOR

### A. SMC Violated The RFP And Congressional Direction (Count V).

This Court should hold the award decision unlawful because SMC's decision to make LSA awards to Defendant-Intervenors, and to exclude SpaceX from an LSA award, contravenes the RFP criteria and Congressional direction.

As noted in a series of NDAAs, Congress directed the Air Force to end reliance on Russian rocket engines, to increase reliance on commercial launch solutions, and maintain competition. (*See supra* at II.)  The LSA RFP thus stated that SMC sought to "quickly transition from the use of non-allied space launch engines," "*leverage industry's commercial launch solutions* and ensure they are modified to meet NSS requirements," "implement sustainable competition" for NSS missions, and "maintain assured access to space." (Tab 38 at 1260.)  And the RFP directed SMC to select the portfolio of solutions that "are most advantageous in achieving the Government's goal of *assured access to space* via two or more *domestic commercial launch service providers* that *also meet* NSS requirements." (*Id*. at 1285.)

In other words, consistent with Congressional direction, the RFP required SMC to invest in commercial launch providers that (i) could satisfy the urgent need to provide launch services without relying on Russian engines, and (ii) win commercial business to keep the EELV program costs sustainable.  But, based on a flawed and unequal evaluation, SMC invested in every offeror except the one LSA competitor that (a) leads commercial space flight with the only currently viable, commercial launch vehicles; (b) offered the Agency operational, domestically-produced rockets already certified to perform the overwhelming majority of planned NSS missions; and

---

completed contracts is well within the range of a proper remedy. *See SMS Data Prods. Grp., Inc. v. United States*, 853 F.2d 1547, 1554-54 (Fed. Cir. 1988).

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

(c) has saved the taxpayer and the EELV program hundreds of millions of dollars in the last few years.  By committing $2.3 billion to SpaceX's direct competitors and excluding SpaceX due to an irrational and unbalanced evaluation, the Agency's irrational decision has caused SpaceX irreparable harm.

First, SMC adopted an unstated preference for reliance on existing Government processes and facilities rather than investing in commercial systems adaptable to the Government's needs, as the RFP required.  (Tab 46 at 1342-43.)  SpaceX is the only LSA competitor that offered existing, certified, American-made launch vehicles that have a meaningful share of the commercial launch market and do not rely on Russian engines.  (Tab 132 at 41583.)  None of the other offerors proposed a launch vehicle that is even operational, let alone commercially available.  Yet, SMC awarded LSAs to a portfolio of three developmental, unproven prototypes: two of which were "purpose-built" to the Government requirements (and thus not commercial at all) and proposed by historic government contractors (ULA and Orbital) with little to no commercial launch experience, and the third offered by Blue Origin, a company without any orbital launch experience.[9]  Consequently, the award decision does not leverage commercial launch systems—an RFP requirement and Congressional mandate.  (*Cf.* Tab 2 at 109 (Air Force Business Case Analysis stating: "A commercially viable launch system is *vital* to reducing the risk to the Air Force of having to keep launch service providers financially viable during periods of low demand for NSS launches."); Tab 46 at 1343 (Air Force Mem. noting that FY 2018 NDAA prohibits launch system prototypes limited to NSS capability).)  The award decision does not address this divergence from Congressional direction and the RFP.

---

[9]   Sandra Erwin, *ULA CEO Bruno: Launch industry challenged by tougher national security missions*, SpaceNews (May 7, 2019), https://spacenews.com/ula-ceo-bruno-launch-industry-challenged-by-tougher-national-security-missions/ (quoting ULA CEO "Vulcan was purpose built for those [NSS mission] requirements"); Emre Kelly, *Northrop Grumman is ready to 'start cutting metal' at KSC for new Omega rocket*, Florida Today (Apr. 9, 2019), https://www.floridatoday.com/story/tech/science/space/2019/04/09/northrop-grumman-time-start-cutting-metal-ksc-new-omega-rocket/3404407002/ (reporting based on quote from company executive that OmegA is being developed primary for national security missions).

1         <u>Second</u>, by favoring companies proposing developmental solutions for all NSS

2    missions (Category A, B and C), including those for which SMC has an operational

3    need starting on April 1, 2022, SMC has risked assured access to space and ensured

4    continued dependence on Russian rockets.  Not one of the launch vehicles the Air

5    Force selected has yet been built, tested, launched, or certified.  Further, each awardee

6    proposed less than the Agency's low risk benchmark of 14 months of margin between

7    the last certification date flight and the RFP's Category A/B operational need date.

8    (Tab 135 at 41737-38 (stating that Blue Origin's schedule margin was "███████

9    ███████" ULA's schedule margin was "████████████," and Orbital's schedule

10   margin was only "███████").)  And, unlike SpaceX, not one of the awardees has

11   demonstrated the ability to develop and manufacture new rockets rapidly.

12        Conversely, SpaceX proposed fully operational launch vehicles (Falcon 9 and

13   Falcon Heavy) capable of every EELV mission scheduled before September 1, 2025,

14   and a newer, even more capable and cost effective system, the Starship for the two

15   Category C missions.  (Tab 132 at 41579 (███████████████████████

16   ███████████); *id.* at 41594.)  And, for the "groundbreaking technological"

17   Starship vehicle (*id.* at 41594), SpaceX proposed ███████ of margin between the

18   last certification flight and the earliest (tentative) Category C need date—███████

19   ███████ SMC's low risk benchmark.  (*Id.* at 41618.)  Rather than including SpaceX

20   into the portfolio to assure access to space, SMC's LSA decision invests in the

21   portfolio that best serves the needs of ULA, the entrenched historic provider that—

22   with two decades of time and a blank taxpayer check—still could not wean itself of

23   dependence on Russian engines.  By its decision, SMC funded ULA and the two

24   offerors that currently develop major components for ULA's new launch system.  (Tab

25   136 at 41753.)  As noted, ULA and Blue Origin both require that Blue Origin—

26   founded in 2000, two years before SpaceX and which to date has ***never*** performed an

27   orbital launch—successfully develop the BE-4 engine.  Likewise, ULA and Orbital

28   both require that Orbital successfully develop the GEM 63XL solid side booster.  If

- 19 -

the development of either propulsion system encounters problems, then at least two of the three providers in which the Agency has invested hundreds of millions of dollars will be unavailable for launch.[10]  The Agency recognized that the selected portfolio presented the common components risk, but claimed "the Government did not include an RFP evaluation criteria related to the use of common engines."  (Tab 136 at 41753.)  Even were this the case, the Agency should have amended the LSA, not ignored the risk.  As DoD acknowledged in 2016: "The loss of access to space would have an immediate and devastating effect on Department operations."  *SASC Hearing*, 114th Cong. 7 (2016) (joint statement by Hon. Deborah Lee James and Hon. Frank Kendall III).  The very purpose of two *separate* provider fleets is to allow for "continued access to space should one system suffer a fleet grounding event."  *Id.*

Finally, the LSA award decision is arbitrary and capricious because it thwarts Congressional direction to end reliance on Russian rocket engines for NSS missions.  The record confirms that SMC recognized the substantial risk that none of the conceptual rockets it selected for award would meet SMC's operational need for Category A/B missions by April 1, 2022.  SMC nevertheless gave each awardee a pass in the risk evaluation because the evaluators assumed SMC would use ULA's Russian-powered Atlas V or SpaceX's Falcon 9 to meet its mission demands.  (Tab 101, LSA Convo with O5 [ULA] on Rating at 39:45 through 42:27; Tab 101, LSA Convo with O7 [Orbital] on Rating at 40:40 through 41:27; Tab 101, LSA Convo with O6 [Blue Origin] on Rating at 24:40 through 28:20.)  So, while awarding an LSA to SpaceX would have ensured the quickest end to the nation's reliance on Russian engines, the award decision essentially guarantees such reliance will continue.  Equally striking, SMC's plan to "buy down" the LSA awardees' risk includes reliance on SpaceX, the very market leading company SMC knows can assure access to space,

---

[10] *See* Sandra Erwin, *Atlas 5 and Delta 4 launch delays caused by common component in upper stage*, SpaceNews (July 17, 2019), https://spacenews.com/atlas-5-and-delta-4-launch-delays-caused-by-common-component-in-upper-stage/.

- 20 -

but which SMC deemed too risky for an LSA award.  (Tab 101, LSA Convo with O5 [ULA] on Rating at 39:45 through 42:27.)

Had SMC followed Congress' mandates and properly applied the RFP's stated criteria consistently, SpaceX's LSA proposal most certainly would have been included in the portfolio "most advantageous in achieving the Government's goal of assured access to space," earning an LSA award.  (Tab 38 at 1285.)

**B.**     **The Cost Evaluation Was Anticompetitive And Irrational (Count I).**

The Agency wrongly concluded that SpaceX required the greatest Government Investment based on an anticompetitive cost evaluation.  (Tab 136 at 41753.)  Rather than apply the RFP criteria in a fair and evenhanded manner, the Agency deviated from the criteria to ULA's significant benefit.

First, the record exposes ULA's proposal "Incomplete" and SMC's calculation of the total Government Investment to ULA artificially low.  Contrary to the RFP (Tab 138 at 1284) and how SMC evaluated SpaceX, SMC did not account for Government payments made to ULA under separate contracts for critical components that ULA proposed to leverage for its LSA solution.

████████████████████████████████: ULA proposed to ████████

██████████████████████████████████████████████████████████

██████████████████████████████████. (Tab 120 at 35243

("██████████████████████████████████████████████████████

██████████████████████████████████"); id. at 35236

("██████████████████████████████████████████████████████

██████████████████████████████████"); id. at 35319 ("████████

██████████████████████████████████████████████████████████

██████████████████████████████████").)  Neither ULA's proposal nor SMC's evaluation accounted for the fact that ██████████████████

██████████████████████████████████████████████████████████

████████████████████████████.  Relevant here, SMC awarded ULA two such

- 21 -

1 annual subsidies ("ELC modifications") during the LSA negotiation and performance

2 period.   SMC awarded ULA $832M to cover "mission assurance, program

3 management, systems engineering … launch site and range operations, and launch

4 infrastructure maintenance and sustainment" from September 27, 2017 through

5 September 30, 2018.[11] More recently, SMC awarded ULA an ELC modification for

6 an additional $867M covering the same scope through September 30, 2019, i.e.,

7 during the first year of ULA's LSA performance period.[12]

8      Because ULA proposed ███████████████████████

9 █████████████████████, ULA should have included those

10 payments as *Government Investment* in its proposed costs and SMC should have

11 accounted for these Government Investments when evaluating ULA's total price.

12 (Tab 38 at 1261 (defining a "fully developed and certified EELV Launch System" as

13 including "the launch vehicle and its subsystems, infrastructure, manufacturing

14 processes," etc.); *id.* at 1271 (requiring disclosure of all costs).)

15      ████████████: ULA also failed to include the costs of certain launch

16 service components for its LSA solution, e.g., ████████████████████

17 ████████████████████████. (Tab 120 at 35331-32.)

18 According to ULA, its subcontractor ███████████████████

19 ████████████████████████████. (*Id.*

20 at 35377, 35249.) Although ULA planned for "███████████████████"

21 to complete during the LSA, ULA omitted the costs from its proposal and SMC failed

22 to account for these Government Investments during its evaluation.   (Tab 120 at

23 35375, 35377; *id.* at 35235.)

---

[11] DoD Contracts for September 27, 2017 (Sept. 27, 2017), https://www.defense.gov/Newsroom/
Contracts/Contract/Article/1327363/.

[12] DoD Contracts for September 27, 2018 (Sept. 27, 2018), https://dod.defense.gov/News/Contracts/
Contract-View/Article/1647166/.  This figure does not account for classified ELC contributions,
which are not made public.

**BE-4 Development:** Despite that ULA proposed a solution contingent on the development of the BE-4 engine, its proposal did not include ████████████ ████████████. (Tab 132 at 41644 (noting "████████████████████ ███████████████████████████████████████████████ ████████████████████").) Instead, ULA limited the BE-4 engine related costs to ███████████████████████████████████████████████. (Tab 120 at 36063, 36261, 35981-83, 35892.) SMC recognized that ULA's proposal was "████████████████████████████," but deviated from the evaluation criteria and accepted ULA's "*Incomplete*" proposal. (Tab 132 at 41644.)

SMC's failure to account for all Government funding made to ULA to develop its LSA solution understated the total Government Investment in ULA's approach to SpaceX's competitive prejudice and renders the SSA's decision irrational. *Latecoere Intern., Inc. v. U.S. Dep't of Nav*y, 19 F.3d 1342, 1362 (11th Cir. 1994) (reversing decision where Navy arbitrarily evaluated and treated cost). It also constitutes unequal treatment because SMC added to SpaceX's proposed costs ████████████ ████████████████████—payments SMC would make to SpaceX *under a different Government contract* originally awarded in 2012—because SpaceX ████████████████████████████. (Tab 131 at 41390-91.)

Second, SMC overstated SpaceX's total price to the Government by ████████. (Tab 144 at 42655.) When evaluating SpaceX costs, SMC assumed the "most expensive scenario" (Tab 146a at 42680), adding ████████████████ ████████████████████. (Tab 144 at 42647.) But SMC knew it had *no need for* ████████████████████ *during the entire performance period*, making clear that only ████████████ would conceivably be exercised. (Ex. A, ████ Decl. ¶ 46.)

Equally troubling, SMC did not assume the "most expensive scenario" when evaluating the other offerors. For example, ULA conceded it was "likely" that ULA would not ███████████████████████████████████████████████

- 23 -

1  ███████████████████████████████. (Tab 120 at 35863-

2  64, 35371.)   ULA thus proposed to ███████████████████

3  ████████.   (*Id.* at 35863-64.)   Despite initially rejecting such a proposal as

4  "███████████" (Tab 97 at 30566-67), SMC ultimately agreed that the parties could

5  modify "███████████████████████████████████████████

6  ████████████████.   (Tab 140 at 42321.)   Thus, when calculating ULA's total price

7  to the Government, SMC assumed the best case scenario, i.e., that ULA would ████

8  █████████████████████████████████.

9      Similarly, although SMC assumed it would "buy down" risk posed by the

10  awardees' developmental solutions to the Category A/B mission date, SMC did not

11  add the cost of these mitigations to the awardees' proposed prices, thereby

12  understating Government Investment in each.  (*See infra* at IV.C.)  SpaceX suffered

13  prejudice as a result of each cost evaluation error and the resultant flawed tradeoff

14  analysis because SMC wrongly deemed SpaceX the most expensive LSA solution,

15  impeding SpaceX's ability to receive an award. (Tab 135 at 41732; Tab 136 at 41753.)

16  ### C.   SMC's Risk Assessments Were Anticompetitive And Irrational
17  (Counts II-IV).

18      The fundamental requirement to evaluate offerors equally against stated ground

19  rules extends to any competition subject to "competitive procedures," such as the LSA

20  competition.   10 U.S.C. § 2371b(b)(2).   SMC's risk assessments contravened these

21  statutory mandates and principles of fair play.  *Dubinksy v. United States*, 43 Fed. Cl.

22  243, 259 (1999) ("[M]aking offerors aware of the rules of the game in which they

23  seek to participate is fundamental to fairness and open competition.").

24      SpaceX was the only LSA competitor offering a proven commercial launch

25  system already capable of launching all Category A/B payloads—representing the

26  majority and most imminent (April 1, 2022) mission needs.  Nevertheless, the Agency

27  determined SpaceX's operational and certified Falcon 9 and Falcon Heavy—in

28  combination with the Starship, SpaceX's only developmental launch vehicle offered

- 24 -

1   for the few distant Category C missions (September 1, 2025 or later)—posed *more*

2   *risk* to assured access to space than Defendant-Intervenors' three conceptual launch

3   solutions that have not been built, tested, launched, or certified for *any* missions.  This

4   anomalous result occurred because SMC effectively ignored the most significant risk

5   to the Category A/B mission needs.  Specifically, SMC held the awardees to less

6   scrutiny and assessed lesser risk because SMC planned a backup—SpaceX (despite

7   being deemed too risky for an LSA award) or ULA (using a Russian-powered rocket)

8   to assure space access.  *See Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d

9   1015, 1028 (9th Cir. 2011) (noting it was irrational for agency to express a need and

10   to rely on something less to meet it).

11       Equally problematic, the Agency held SpaceX to higher scrutiny based on

12   unstated criteria.  This anticompetitive risk assessment and deviation from the RFP

13   constitutes an abuse of the Agency's discretion.  *See, e.g., Lab. Corp. of Am. Holdings*

14   *v. United States*, 116 Fed. Cl. 643, 650-51 (2014).  By allowing the unwarranted risks

15   assessed to SpaceX for the fewest and most distant future Category C missions to

16   drive the award decision—risks that, as explained below, deviated from the RFP's

17   terms—the Agency has let the proverbial tail wag the dog.

18       **1.    SMC Improperly Discounted Category A/B Mission Risks.**

19       The record confirms that the evaluation improperly negated risks to the

20   Agency's most imminent and highest volume missions: the Category A/B missions.

21   The RFP, however, did not advise offerors that the Agency deemed these risks less

22   critical to assured access to space or that the Agency would excuse offeror risks based

23   on an unstated backup plan.  Had SMC announced in the RFP that Category C mission

24   risks would drive the Agency's LSA investment decisions, SpaceX would have

25   proposed differently.  (Ex. A, ████ Decl. ¶ 35.)

26       The RFP identified the reference orbit requirements as well as the operational

27   need dates.  (*See* Tab 38 at 1286, 1288.)  Of the nine listed orbits, seven fall under

28   Category A/B payloads needed by April 1, 2022.  The two Category C payload orbits

- 25 -

are scheduled to launch years later (September 1, 2025 (tentative) and October 1, 2026 (firm)).   (*Id.* at 1288.)  Thus, the RFP specifies that a substantial percentage of missions, including all launches before at least September 1, 2025, will involve Category A/B payloads.

With no operational alternatives, Defendant-Intervenors each proposed to develop new launch systems, all of which are still in the design phase, for all NSS missions (Category A/B and C).  In discussions, SMC advised Defendant-Intervenors that, unlike the typical DoD development program, SMC had operational missions driving the RFP April 1, 2022 need date.  (*See, e.g.,* Tab 101, LSA Convo with ▮▮▮ ▮▮▮▮▮ on Rating at 33:10 through 35:00; Tab 101, LSA Convo With O5 [ULA] on Rating at 39:47 through 42:27; *see also* Tab 38 at 1284.)  SMC recognized that the "need date" for the Category A/B missions created the "hardest" task because the offerors had significantly more time to complete development of capabilities satisfying the Category C Polar 2 need date (September 1, 2025).  (Tab 101, LSA Convo with ▮▮▮▮▮▮ on Rating at 29:10 through 29:35.)  SMC also recognized, based on past experience, a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (*see id.* at 33:40 through 34:30), which result in ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Tab 101, LSA Convo with O5 [ULA] on Rating at 37:20 through 38:00.)  Consequently, SMC determined that a low risk approach required at least 14 months between the last certification flight and the RFP need date.  (*See* Tab 135 at 41725.)

Neither ULA, Orbital, nor Blue Origin proposed what SMC's benchmark required for a low risk approach.  Although ULA itself has never "▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (Tab 132 at 41429), and proposed a developmental vehicle composed of new components and systems acquired from subcontractors like Blue Origin and Orbital, ULA proposed "▮▮▮▮▮▮▮▮▮" of margin between the last Category A/B certification flight and the need date of April 1, 2022.  (Tab 135 at 41738.)  SMC nevertheless deemed ULA's proposed approach

- 26 -

1   Low risk, due to SMC's intent to "buy down" the risk with other Government

2   resources.  (Tab 136 at 41747; Tab 101, LSA Convo with O5 [ULA] on Rating at

3   39:47 through 42:27 ("███████████████████████████████████████████████████████

4   █████████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████.")

6        Orbital proposed to develop the new OmegA launch system and planned "████

7   ████████" of margin between the last Category A/B certification flight and April 1,

8   2022.  (Tab 135 at 41725-26, 41738.)  Even though Orbital has no EELV experience,

9   SMC deemed this approach only Moderate risk due to SMC's backup plan to contract

10  with incumbent providers.  (Tab 135 at 41725-26; Tab 101, LSA Convo with O7

11  [Orbital] on Rating at 40:40 through 41:27 ("██████████████████████████████████

12  █████████████████████████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████████████████████

14  █████████████████████████████████████████████████████████████████████████████

15  █████████████████████████████").)

16       Blue Origin, which has no "██████████████████████████████████████

17  ████████████" (Tab 98 at 30663), offered a design so immature that Blue Origin could

18  not ███████████████████████████████████████████████████████████████████████

19  ██████████████████████████████████.  (*Id.* at 30591-93.)   The Agency

20  nevertheless found Blue Origin proposed a "███████████████████████████████████

21  ████████████" (Tab 132 at 41481-82), and credited Blue Origin with a ██████████ for

22  "██████████████████████████████████████████████████████████" (*Id.* at

23  41480.)  Blue Origin also premised its solution on ████████████████████████, which

24  SMC characterized as a "████████████████████████████████████████████" for Blue

25  Origin (Tab 132 at 41496), ████████████████████████████████████████████████████

26  █████████████████████████████████████████████████████████████████████████████

27  ██████████████████████SMC███████████████████████████████████████████████████

28

- 27 -

1   ███████████████████████████████████████████████████████

2   ██████████." (Tab 135 at 41735.)

3          Despite these significant risks and that Blue Origin proposed "██████

4   ██████" of margin between the last Category A/B certification flight and April 1,

5   2022 (Tab 135 at 41738), SMC found Blue Origin also proposed less risk than

6   SpaceX.[13]  (Tab 101, LSA Convo with O6 [Blue Origin] on Rating at 24:40 through

7   28:20 (advising that SMC would "dual integrate" on either a Falcon 9 or Atlas V a

8   year out ████████████████████████████████████); Tab 135 at

9   41741.) SMC thus found Blue Origin less risky because it (like the other offerors)

10  could fall back on the purportedly more risky SpaceX—the only American-made

11  rocket company currently capable of performing any of this work.

12         Under a reasonable evaluation that did not negate the impact of risk to the

13  Category A/B missions, SMC would have found it likely that ████████████

14  ███████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  Only a portfolio award that included SpaceX's proposal, with its proven commercial

17  launch systems already capable of launching all Category A/B payloads, would

18  guarantee the return on investment.  *Latecoere Intern.*, 19 F.3d at 1362 (reversing

19  decision in favor of Navy).

20

21

22  ────────────────────

23  [13] The risk to the April 1, 2022 date assessed to SpaceX's ████████████
    illustrates the higher standard to which SMC held SpaceX compared to the other offerors.  As SMC
    directed, SpaceX proposed ████████████████████████████████

24  ██████████████████████████████████████. (ECF 168 ¶¶ 226-27;
    Tab 123 at 39922.) SMC nevertheless deemed SpaceX's approach ████████████

25  ██████████████████████████████████████████████████████.
    (Tab 132 at 41616.) SMC recognized, however, that the RFP date was well before the Agency's

26  need, which when used as the measurement, increased the margin of
    SpaceX's approach to ██████████. (*Id.* at 41615.) Worse still, SpaceX offered to begin ████████

27  ████████████████ earlier if SMC sought greater schedule confidence, yet SMC evaluated SpaceX

28  as if this opportunity did not exist. (Tab 123 at 39864.)  SMC thus ignored material mitigators that
    eliminated the perceived risk of SpaceX's approach.

- 28 -

### 2. SMC Based SpaceX's High Risk Rating On Unstated Criteria.

The risk assessment also was anticompetitive because SMC assigned High risk to SpaceX's Category C solution based on unstated criteria that deviated from the RFP. <u>First</u>, SMC erroneously deemed SpaceX's solution incomplete because SpaceX

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████.[14]  (Tab 132 at 41586; Tab 146a at 42674-75 (Response to Question ███ █).)  SMC's concern departs from the RFP and was irrationally assessed. *Superior Oil Co.*, 409 F.2d at 1121.

None of the RFP requirements directed offerors ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████. (Ex. A, █████ Decl. ¶ 43.)  Nor does the RFP indicate that if an offeror proposes ███████████████████████████████████

███████████████████████████████████████████████████████

████████████. Quite the contrary, the RFP advised offerors that SMC sought "to leverage industry's commercial launch solutions" and SMC would tailor the LSAs "to each launch service providers needs in order to enable commercial launch systems to meet all NSS requirements." (Tab 38 at 1260.)  If SMC considered its █████████

███████████████████████████████████████████████████████

---

[14] Based on SMC's focus in the negotiations on ████████████████████, SpaceX proposed to ███████████████████████████████████████ In the final evaluation, however, the Agency concluded that ██████████████████████████████████████, SpaceX's fully compliant launch system ████████████████████. (Tab 132 at 41586.)  Worse, the negotiations wrongly discouraged SpaceX from proposing ████████████ by advising SpaceX that this option rendered █████████ without eliminating all technical risks. (Tab 101, Convo with O8 [SpaceX] on Rating from 1:11:05 through 1:12:50, 1:24:10 through 1:25:20; Tab 101, Convo with O8 [SpaceX] on New Proposal (1 Aug) from 00:30 through 01:25, 10:00 through 12:00).)  But this option, ████████████ ██████████████████████████████, would have mitigated any perceived Starship risks.

- 29 -

1   ███████████████████████████ critical for a complete launch solution, then

2   SMC had an obligation to amend the RFP to include these procedures in the

3   requirements so that SpaceX could compete fairly against the ground rules employed

4   by the evaluators but not stated in the RFP.

5          SpaceX suffered prejudice as a result of this anticompetitive evaluation.  Had

6   the Agency evaluated SpaceX consistent with the EELV requirements, SMC █████

7   ████████████████████████████████████████████, thereby

8   requiring a new award decision.  Conversely, had SMC amended the RFP to ██████

9   ████████████████████████████████████████████████

10  ██████, SpaceX would have proposed differently.  (Ex. A, █████ Decl. ¶ 43.)

11         Second, SMC's assessment of a significant weakness under the EELV

12  Approach factor and Schedule subfactor based on SpaceX's proposal to ██████

13  ███████████████████████ also deviated from the RFP and

14  ignored SpaceX's proposal.   (Tab 132 at 41595-96, 41621.)   SMC, by RFP

15  Amendment 2, removed any requirement ████████████████████████

16  ███████.  (*Compare* Tab 38 at 1284 *with* Tab 37 at 1246.)  Had the Agency stated

17  in the RFP that offerors █████████████████████████,

18  SpaceX would have proposed differently.  (Ex. A, █████ Decl. ¶ 45.)  Instead, SpaceX

19  noted that ████████████████████████████████████

20  ███████████████████████████████████████, which

21  SpaceX has successfully used during Government missions.   (Tab 123 at 39780.)

22  SpaceX explained that ██████████████████████████████

23  ██████████████████████████████████████████████

24  ███████████████████████████████ (*Id.*)  SMC

25  cannot reasonably ███████████████████████████████

26  ██████████████████████████████████████████████

27  ████████████████████████.

28

- 30 -

Further disproving the Agency's unfounded concern, SpaceX specifically committed to consider several alternatives in partnership with SMC to "ensure satisfaction of NSS requirements," including "███████████████████ ████████████████████████████" (Tab 123 at 39987-88.)  Thus, SMC's determination that SpaceX "████████████████████████████████ ████████████████████" also runs counter to the evidence before SMC.[15]  (Tab 132 at 41584.)  To remedy this prejudicial error, SMC should remove the errant findings, earning SpaceX an LSA award, or reopen the competition and revise the RFP to reflect SMC's actual requirements.  *Choctaw Mfg. Co. v. United States*, 761 F.2d 609, 619 (11th Cir. 1985) (affirming directed award).

### 3.    **SMC Arbitrarily Concluded That SpaceX's ██████████** ████████████████████████.

The Agency determined that "███████████████████████████ ████████████████████████████████████████ ████████████████" based on three findings that the record disproves.  (Tab 136 at 41753.)  First, SMC improperly concluded that █████████████████ ████████████████████████████," tying SMC's use of the Starship to ██ ██████████████.  (Tab 132 at 41620-21.)  But SpaceX's proposal states the opposite, noting that ████████████████████████████████████ ████████████.  (Tab 123 at 39831 (proposing to use ███████████ ████████████████████████████, and stating: "████████████ █████████████████████████████████████████████████ ████████████"))

_____

[15]  Significantly, nearly two months prior to the LSA award decision, Congress directed the Secretary of Defense to conduct a study on space launch locations that "identif[ies] the capacities of current and new space launch locations, in light of the rapid increase in using commercial space services to support national security space missions and military requirements," and report to Congress about the costs associated with these additional locations and whether they should be borne by DoD, State governments, or private entities.  FY 2019 NDAA, Pub. L. No. 115-232, § 1618, 132 Stat. 1636, 2116 (2018).

- 31 -

1    Second, SMC found that █████████████████████████████

2    ███████████████████████████" (Tab 132 at 41595, 41621.)  But, SpaceX

3    proposed ██████████████████████████████████████████████

4    ████████████████, far surpassing the Agency's 14-month benchmark and the

5    schedule margin offered by the three awardees for Category A/B missions.  (Tab 150a

6    at 43036 (Unique ID #596); Tab 123 at 39830.)

7         Unlike the other offerors, SpaceX could ████████████████████

8    █████████████████████.  (Tab 132 at 41421-22.)  Moreover, SpaceX's █

9    █████████ margin offered significantly more time to address any concerns in the

10   Category C development than ULA, which proposed to ████████████████

11   ████████████████████, █████████████████ before the September 1,

12   2025 capability date.  (Tab 120 at 35316.)  In fact, the record reveals that SMC

13   misread ULA's proposal when assessing ULA a ████ Category C schedule risk.

14        Although ULA does not ████████████████████████████████████

15   ████████ (Tab 120 at 35311-12), ULA's "█████████████████████████"

16   evidence that █████████████████████████████████████████████

17   █████████████████████████████████████████████████████

18   (Id. at 35312.)  Given that ████████████████████████████████

19   ████████████████████, ULA's own ████████████████████████████

20   ████████████████████████████████████████████.  (Id. (explaining

21   that the "████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████))

23   ULA, however, does not propose ██████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ██████████████████████—an insufficient margin by SMC's

26   benchmark.

27        Similarly, although SMC only criticized the perceived "████████████" of

28   SpaceX's Starship (Tab 132 at 41621), ████████████████████████████

██████ MOTION FOR JUDGMENT ON THE CERTIFIED RECORD ████████████████
████████████████████████████████████████

| | |
|---|---|
| 1 | ███████████████████████████████████████ |
| 2 | ███████████████████████████████████████ |
| 3 | ███████████████████████████. (*Compare* Tab |

132 at 41483, 41496 *and* Tab 134 at 41708 *with* Tab 132 at 41597.)  Blue Origin

proposed to ████████████████████████████████

████████████████████. (Tab 121 at 37006.)  But only SpaceX,

which offered the greatest margin for its Category C solution ████████ against the

Agency's 14-month benchmark), received a risk for ██████████████.

      Finally, the Agency improperly concluded that "████████████████

███████████████████,

██████████████ (Tab 132 at 41620.)  Notably, however, SMC based this finding

not on SpaceX's proposal as the RFP required, but on the 11 years NASA took for

"development of the Space shuttle ... between the start of 1971 and the end of 1981."

(*Compare* Tab 38 at 1284 *with* Tab 132 at 41619-20.)  SMC's reliance on the decades-

old Space Shuttle experience as a benchmark to assess the realism of SpaceX's

proposed schedule lacks reason.  SMC failed to consider critical distinguishing facts,

e.g., (i) SpaceX uses development technology and capabilities that did not exist in the

early 1970s and that enable far more accurate, in-depth pre-flight technical analysis

and faster development (Ex. A, ████ Decl. ¶ 37); (ii) the Starship vehicle

configuration is considerably simpler than that of the Space Shuttle (*id.* ¶ 41); (iii)

SpaceX has a proven record of developing launch vehicles and spacecraft in *less than*

*half* of the 11-year Space Shuttle development and uses common processes and

hardware between Falcon 9, Falcon Heavy, Dragon, and Starship as ████████████

███████████████████████ (*id.* ¶ 39); and (iv) unlike the Space

Shuttle development, which relied on a host of subcontractors, SpaceX controls and

develops all major systems in house with a common plan and purpose.  (*Id.* ¶ 30; Tab

123 at 39760 (explaining that lack of major subcontractors gives SpaceX ██████

████████████████████████████████████).)

1   Each of these obvious and material differences between SpaceX's proposed approach

2   and Space Shuttle development, render the Schedule assessment arbitrary and

3   capricious.

4      In sum, SMC's approach to risk was unreasonable and unequal.   It is

5   unreasonable because SMC's concerns regarding SpaceX's solution for the latest-in-

6   time Category C missions are unfounded.   It is unequal because SMC excused the

7   significant risk each of SpaceX's competitors posed to SMC's most imminent and

8   greatest mission needs (Category A/B missions) in part because SMC knew SpaceX

9   could perform those missions, while holding SpaceX's proposal to higher standards.

10   **V.   SPACEX IS ENTITLED TO A PERMANENT INJUNCTION**

11      As demonstrated in Section IV, SMC's award decision violates the law because

12   it resulted from an anticompetitive and irrational evaluation.   Having demonstrated

13   entitlement to declaratory relief, SpaceX also readily satisfies each of the remaining

14   elements for injunctive relief.

15      Absent the relief SpaceX requests herein, SpaceX will suffer the irreparable

16   harm of being deprived the opportunity to compete fairly for an LSA. *Arizona Dream*

17   *Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *Choctaw Mfg. Co.*, 761

18   F.2d at 619.   In addition, the LSA awards have and will damage SpaceX's ability to

19   compete to provide launch services for NSS missions for the ongoing Phase 2

20   Competition and future Air Force launch services procurements. (Ex. A, ▆▆▆ Decl.

21   ¶¶ 47-51.)   Pursuant to the awarded LSAs, SMC will be extensively involved in

22   technical decision-making regarding the various components of each offeror's

23   proposed launch solutions, providing the LSA awardees with unique and solution-

24   specific insights regarding the Agency's launch service needs in the Phase 2

25   Competition and beyond. (*Id.* ¶¶ 49-50.) Similar insights are not available to SpaceX

26   without an LSA award, impeding SpaceX's ability to anticipate and fully address the

27   Agency's design priorities and technical requirements for the Phase 2 Competition

28   and in the future. *See, e.g., Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360,

1  386 (D.D.C. 2017) ("[A]s a consequence of [the agency's] improper actions, the

2  plaintiff has been put in a less favorable position as a bidder for the [agency] contracts

3  than it would have been as an incumbent concessioner. Absent equitable relief, this

4  injury simply will not be redressed.").

5      The public interest also favors injunctive relief to remedy the contracting errors

6  and violations of law identified herein and to prevent lack of public trust and

7  confidence in the integrity of the process. "This invokes a public interest of the

8  highest order: the interest in having government officials act in accordance with law."

9  *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash.), *aff'd*, 952

10 F.2d 297 (9th Cir. 1991). Moreover, the public and SMC have an interest in the SSA

11 properly selecting the portfolio of solutions that are "most advantageous in achieving

12 the Government's goal of assured access to space via two or more domestic

13 commercial launch service providers that also meet NSS requirements." (Tab 38 at

14 1285; 10 U.S.C. § 2273.) And, Defendant-Intervenors have no cognizable interest in

15 the agreements that they did not fairly win. Given that the RFP did not limit the

16 number of LSA awards SMC can make, the Court, consequently, has numerous

17 options by which to cure the plainly improper agency conduct. *Choctaw Mfg. Co.*,

18 761 F.2d at 619.

19 **VI. CONCLUSION**

20      For the reasons detailed above, the Court should grant judgment in SpaceX's

21 favor on the Certified Administrative Record.

22 Dated: December 10, 2019          ARNOLD & PORTER KAYE SCHOLER LLP

23                                   By: */s/ Craig A. Holman*

24                                       Craig A. Holman (*admitted pro hac vice*)

25                                   Attorneys for Plaintiff
                                     *Space Exploration Technologies Corp.*

26

27

28

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1    **PROOF OF SERVICE**

2        I hereby certify that on this 10th day of December 2019, I caused a true and

3    correct copy of the foregoing Sealed Notice of Motion and Motion for Judgment on the

4    Certified Administrative Record and Memorandum of Points and Authorities to be

5    served by email on:

6

7                        Joseph Evan Borson
                      U.S. Department of Justice
                Federal Programs Branch - Civil Division
8                      1100 L Street, N.W.
                      Washington, D.C. 20005
9                      Tel:  202-514-1944
                        Fax:  202-616-8460
10              Email: joseph.borson@usdoj.gov
                *Counsel for United States of America*
11

12                        Scott E. Pickens
                      Barnes and Thornburg LLP
13          1717 Pennsylvania Avenue, N.W., Suite 500
                      Washington, D.C. 20006-1313
14                      Tel:  202-371-6349
                        Fax:  202-289-1330
15              Email: Scott.Pickens@btlaw.com
                  *Counsel for Blue Origin, LLC*
16

17                        Todd R. Steggerda
                        McGuireWoods LLP
18                2001 K Street, N.W., Suite 400
                      Washington, D.C. 20006
19                      Tel:  202-857-2477
                        Fax:  202-828-2968
20              Email: tsteggerda@mcguirewoods.com
                *Counsel for United Launch Services, LLC*
21

22

23

24

25

26

27

28

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1

Kevin P. Mullen
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel:  202-887-1500
Fax:  202-887-0763
Email: KMullen@mofo.com
*Counsel for Orbital Sciences Corporation*

2

3

4

5

6    Dated:  December 10, 2019          ARNOLD & PORTER KAYE SCHOLER LLP

7

8                                        By: */s/ Craig A. Holman*
                                         Craig A. Holman (*admitted pro hac vice*)

9
                                         Counsel for Plaintiff
10                                       *Space Exploration Technologies Corp.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR JUDGMENT ON THE CERTIFIED RECORD