1   Joseph E. Borson (Va. Bar No. 85519)
    joseph.borson@usdoj.gov
2   United States Department of Justice
    Civil Division, Federal Programs Branch
3   1100 L Street NW
    Washington, D.C. 20005
4   Tel: 202-514-1944
    Fax: 202-616-8460                    REDACTED COPY
5   *Counsel for the United States of America*

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                          WESTERN DIVISION

11

12

13   Space Exploration Technologies, Corp.,      Case No. 2:19-cv-7927-ODW(GJS)
                                                  Honorable Otis D. Wright II
14                          Plaintiff,            United States District Judge

15          v.                                    ███ **OPPOSITION TO**
                                                  ██**IFF'S MOTION FOR**
16   United States of America,                    **JUDGMENT ON THE CERTIFIED**
                                                  **ADMINISTRATIVE RECORD**
17                          Defendant,
                                                  Date: March 2, 2020
18          v.                                    Time: 1:30PM
                                                  Ctrm: 5D, 5th Floor
19   Blue Origin, LLC *et al.*,,                           First Street Courthouse
                                                           350 W. First Street
20                   Defendant-Intervenors.                Los Angeles, CA 90012

21

22

23   ███████████ **PURUSANT TO ORDER OF THE COURT DATED**

24   **NOVEMBER 21, 2019 AND ECF NO. 16.**

25

26

27

28

███ Opposition to Plaintiff's Motion for Judgment on the Certified Record – ████

1

## TABLE OF CONTENTS

2

3    INTRODUCTION .................................................................................................. 1

4    FACTUAL AND PROCEDURAL HISTORY ...................................................... 3

5
     A.    EELV Program Background ............................................................. 3
6

7    B.    The Launch Service Agreements Solicitation .................................. 5

8    C.    The LSA Award Decision ................................................................. 6

9
     D.    Procedural History ........................................................................... 7
10

11   STANDARD OF REVIEW .................................................................................. 8

12   ARGUMENT ....................................................................................................... 9

13
     I.    THE AIR FORCE'S RISK ASSESSMENTS WERE REASONABLE. ........... 9
14

15   A.    The Air Force Properly Considered Schedule Risks for Categories A and B
           Missions ......................................................................................... 10
16

17         1.    The Air Force Appropriately Used a Fourteen-Month Benchmark
                 Between the Final Certification Flight and the Criteria Date .......... 11
18

19         2.    The Air Force Did Not Evaluate the Offerors Based on an Unstated
                 Risk Evaluation ............................................................................. 15
20

21   B.    The Air Force Properly Evaluated SpaceX's ████████ .................. 16

22   C.    The Air Force Reasonably Concluded that There Was a Significant
           Likelihood that SpaceX's ████████████████ ......... 19
23

24   II.   THE AIR FORCE'S COST EVALUATION WAS REASONABLE. ............. 26

25
     A.    The Air Force's Cost Evaluation Did Not Arbitrarily Favor ULA ............. 27
26

27         1.    Launch Infrastructure and Personnel .................................... 27

28         2.    ████████████ ............................................ 28

3.  BE-4 ██████████ ……………………………...……………29

B.  The Air Force ██████████████ SpaceX's ███████████████
██████████████. ……………………………...……………32

III. THE AIR FORCE ACTED CONSISTENTLY WITH THE RFP AND
CONGRESSIONAL DIRECTION. ........................................……35

A.  The Air Force Awarded Agreements for Commercial Launch Vehicles ... 35

B.  The Air Force Has Not Risked Assured Access to Space in Contravention
of Congressional Policy. ........................................................ 37

C.  The Air Force's Decision is Consistent with Congressional Direction to
End Reliance on Russian Rocket Engines for NSS Missions.................... 41

IV. PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS
INAPPROPRIATE. ........................................................ 43

CONCLUSION: ........................................................ 45

██████ Opposition to Plaintiff's Motion for Judgment on the Certified Record ██████████

# **TABLE OF AUTHORITIES**

**CASES**

*AquAlliance v. U.S. Bureau of Reclamation*,
  312 F. Supp. 3d 878 (E.D Cal. 2018) ................................................ 44

*Cal. Communities Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) ............................................................ 44

*Cty. of L.A. v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) ........................................................ 44

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ................................................................ 15, 16

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ..................................................... 31, 32

*EarthLink, Inc. v. FCC*,
  462 F.3d 1 (D.C. Cir. 2006) ............................................................... 8

*Forest Guardians v. U.S. Forest Serv.*,
  329 F.3d 1089 (9th Cir. 2003) ........................................................... 8

*ForestKeeper v. La Price*,
  270 F. Supp. 3d 1182 (E.D. Cal. 2017) ............................................ 24

*Idaho Sporting Congress v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) ...................................................... 37, 40

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Fisheries Serv.*,
  109 F. Supp. 3d 1238 (N.D. Cal. 2015) ............................................ 44

*The Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008),
  *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ....................................................................................... 8, 10

*Marsh v. Or. Natural Res. Council.,*
    490 U.S. 360 (1989)................................................................. 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.  v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)................................................................. 9, 12

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S 644 (2007)................................................................. 31

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Federal Motor Carriers Safety
    Admin.,*
    494 F.3d 188 (D.C. Cir. 2007)............................................... 12

*Palisades Gen. Hosp. Inc. v. Leavitt,*
    426 F.3d 400 (D.C. Cir. 2005)........................................... 43, 44

*River Runners for Wilderness v. Martin,*
    593 F.3d 1064 (9th Cir. 2010) .............................................. 8

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ........................................... passim

*Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs,*
    486 F.3d 638 (9th Cir. 2007) ................................................ 44

*Space Exploration Technologies Corp. v. United States,*
    144 Fed. Cl. 433 (2019)......................................................... 8

*Transactive Corp. v. United States,*
    91 F.3d 232 (D.C. Cir. 1996).............................................. 30

*Vermont Yankee Nuclear Power Corp.,*
    435 U.S. 519 (1978).............................................................. 16

**STATUTES**

5 U.S.C. § 706 ....................................................... 8, 31, 43

10 U.S.C. § 2273 .................................................. 4, 38, 39

Opposition to Plaintiff's Motion for Judgment on the Certified Record

51 U.S.C. § 50101 ................................................................................ 36

51 U.S.C. § 50131 ................................................................................ 36

Fiscal Year 2015 National Defense Authorization Act ("2015 NDAA")
Pub. L. 113-291, 128 Stat. 3292 (2014)........................................ 4, 41, 42

Fiscal Year 2017 National Defense Authorization Act ("2017 NDAA")
Pub. L. 114-328, 130 Stat. 1999 (2016)................................................ 42

Fiscal Year 2018 National Defense Authorization Act ("2018 NDAA")
Pub. L. No. 115-91, 131 Stat. 1283 (2017)........................................ 4, 35

**OTHER AUTHORITIES**

DoD Contracts for June 21, 2018,
https://www.defense.gov/Newsroom/Contracts/Contract/Article/1557461/ ......... 28

Evolved Expendable Launch Vehicle (EELV) Phase 2 Launch Service Procurement
(LSP) Request for Proposals (RFP),
https://beta.sam.gov/opp/c3e7f1e342154e92a5779c5daa1b1db0/view ................ 33

Mike Wall,
Why Elon Musk Turned to Stainless Steel for SpaceX's Starship Mars Rocket
(Jan. 23, 2019), https://www.space.com/43101-elon-musk-explains-stainless-steel-
starship.html .......................................................................................... 44

Technology Readiness Level,
https://www.nasa.gov/directorates/heo/scan/engineering/technology/txt_accordion1.htm
.............................................................................................................. 23

Opposition to Plaintiff's Motion for Judgment on the Certified Record

1

**INTRODUCTION**

2      The United States Air Force launches the Nation's most sensitive and important

3 satellites to support critical national security objectives.   In order to further the

4 Congressional requirement that it ensure "assured access to space," the Air Force is

5 promoting the development of the next generation of launch vehicle systems through a

6 multi-stage strategy.   One part of that strategy is the Launch Service Agreement

7 ("LSA") process, where the Air Force invited companies to submit proposals for public-

8 private partnerships to develop new launch system solutions.   These companies must

9 propose launch systems that can meet specific technical and timing requirements,

10 including the delivery of specific payloads to specific orbits by specific dates, while

11 minimizing the cost and risk for the government.

12      Four companies submitted proposals – United Launch Services (hereinafter

13 referred to as United Launch Alliance ("ULA")), Orbital ATK ("Orbital"), Blue Origin,

14 and SpaceX.   The Air Force awarded LSA agreements to ULA, Orbital, and Blue

15 Origin, after determining that their proposals offered the best combination of technical

16 approach, risk, and cost.   The Air Force did not award a LSA agreement to SpaceX.

17 Along with its existing rocket repertoire, SpaceX's ██████████████████

18 ████████████████████████████████████████████████

19 ████████████████.   Although the Air Force concluded that this proposal

20 was ████████████, it also determined that this ██████████████

21 ████████████████████████████████████████████████

22 ██████████ and accordingly was not as advantageous to the Government.

23      SpaceX now challenges that determination under the Administrative Procedure

24 Act ("APA"), but the Air Force's decision was reasonable and should be affirmed.

25 Under the APA's deferential standard of review, an agency determination must be

26 upheld unless it is arbitrary or capricious – and agency technical and predictive

27 determinations, as here, are entitled to the highest deference.

28

SpaceX argues that the government misunderstood the risk posed by the four proposals, overstating its risk and understating its competitors' risks.  This argument depends on a misunderstanding of the relevant LSA criteria.   The Government required launch vehicle systems to meet specific requirements for three types of missions: Categories A, B, and C.   The Air Force determined that SpaceX's competitors had some technical and schedule risk with their Category A and B capabilities, while SpaceX's Category C capability – which relied exclusively on the novel BFR vehicle – ███████████████████████████.  SpaceX tries to minimize its Category C risks, but the LSA program specifically required the offerors to satisfy *all* categories of missions.  In this case, SpaceX proposed a solution that was ████████████████ for certain categories, but was ████████ ████████.  Having proposed a highly innovative spacecraft to satisfy the LSA requirements, SpaceX cannot retreat from the risks entailed by that innovation.  SpaceX also implies that the Air Force understated the other offerors' risks, because it concluded that those schedule risks could be "bought down" by launching payloads on other rockets.  The Air Force, however, did not rely on any such considerations in its decision. The Government's evaluation of risk was reasonable and entitled to deference under APA review.

Similarly, the Government's cost assessments of each of the proposals were reasonable.  SpaceX quibbles with the inclusion or exclusion of certain costs, but the LSA solicitation made clear which costs were and were not to be included, and the Air Force's compliance with those requirements was not arbitrary or capricious.

The Air Force's decision also complied with Congress's mandates concerning commercial launch services and assured access to space.  SpaceX implies that it is the only true "commercial" launch provider, but "commercial" in the space launch services context refers to launch services provided by non-government-owned entities, which ULA, Orbital, and Blue Origin clearly are.  And in any event, the Air

- 2 -

1   Force concluded that the launch services solutions developed under the awarded
2   LSAs would serve non-governmental as well as governmental clients.  Furthermore,
3   the LSA program was part of an Air Force developed multi-step process to assure
4   access to space.  The successful offerors all certified they were in compliance with
5   statutory requirements and the Air Force reasonably determined that those
6   certifications were proper.   SpaceX's remaining statutory arguments are merely
7   restated complaints about the Air Force's LSA risk assessment and are without merit.
8        Finally, SpaceX improperly seeks injunctive relief in the form of an order
9   requiring the Air Force to issue it an LSA.  The only relief the APA provides for is
10  remand, potentially with vacatur, not the award of a contract.  Nor, for that matter, is
11  vacatur appropriate at this stage, even if the agency had acted inappropriately (which
12  it has not).
13       For these reasons, the Court should deny SpaceX's motion for judgment on the
14  certified administrative record, and enter judgment in favor of the United States.

15                    **FACTUAL AND PROCEDURAL HISTORY**
16       **A.    EELV Program Background**
17        The National Security Space Launch ("NSSL") program, previously called the
18  Evolved Expendable Launch Vehicle ("EELV") program, is charged with procuring
19  launch services to meet National Security Space ("NSS") launch requirements.[1]  *See*
20  Tab 19, 786.  NSS satellites provide the nation's eyes and ears using intelligence
21  community satellites; secure communications for our nation's leaders through the Air
22  Force's communications satellites; reliable position, navigation and timing through
23  the Air Force's Global Positioning System ("GPS") satellites; weather imaging; and
24  other valuable warfighter capability. *Id.*  NSS launch requirements are generally more
25  demanding than standard civilian commercial services.  "NSS payloads are typically
26
27  _____
    [1] To maintain consistency with the record documents and SpaceX's complaint, we will refer to the
    program as EELV rather than NSSL throughout this brief.
28                                     - 3 -

heavier, require higher precision for orbit insertion accuracy, and are less risk tolerant because of the criticality of the mission and the time and cost required to replace a satellite that was destroyed in a failed launch." *Id.* at 791.

The EELV program effectuates the United States' policy of "assured access to space," *i.e.*, ensuring "that the United States has the capabilities necessary to launch and insert United States national security payloads into space whenever such payloads are needed in space." 10 U.S.C. § 2273(a). In order to assure that access, it is also U.S. policy to ensure "the availability of at least two space launch vehicles (or families of space launch vehicles) capable of delivering into space any payload designated by the Secretary of Defense or the Director of National Intelligence as a national security payload," *id.* § 2273(b)(1), as well as the "robust space launch infrastructure" and "rapid, responsive, and reliable space launches" necessary to serve those policy goals, *id.* §§ 2273(b)(2), (3). Finally, the United States is phasing out the use of "non-allied space launch engines," *i.e.*, those produced by the Russian Federation, in the EELV program. *See* Fiscal Year 2015 National Defense Authorization Act ("2015 NDAA") § 1604(a), Pub. L. 113-291, 128 Stat. 3292 (2014); Fiscal Year 2018 National Defense Authorization Act ("2018 NDAA") § 1605, Pub. L. No. 115-91 (2017); Tab 19, 787.

The United States Air Force is ensuring that these policy objectives are satisfied in the future through a multi-stage plan called the EELV Phase 2 Acquisition Strategy. *See* Tab 132, 41415. The first phase of that strategy was a "technology maturation" effort in Fiscal Years 2014 and 2015, which was designed "to raise the technology readiness level and increase the knowledge base for the entire U.S. rocket propulsion industrial base." *Id.* The second phase was the Air Force award of Rocket Propulsion System ("RPS") agreements, to encourage the development of prototype rocket engines in the United States. *Id.*; *see also* Tab 19, 788. These agreements were awarded in 2016 to four companies, SpaceX, Orbital, ULA, and Aerojet Rocketdyne. Tab 132, 41415. The third phase is the one at issue here – the Air Force's award of

- 4 -

1  LSAs to develop EELV Launch System prototypes to meet future NSS needs.  Tab

2  38, 1260.  Finally, the Air Force will select two NSS launch providers for Phase 2

3  launch service procurements, *i.e.*, launching operational missions on behalf of the

4  United States.  *Id.*  The Phase 2 launch services procurement is open to all interested

5  offerors – it is not limited to companies that received LSA awards.  Tab 19, 786, 807.

### B.  The Launch Service Agreements Solicitation

7  The Air Force issued a final Request for Proposals ("RFP") for the LSA

8  competition on April 27, 2018.  Tab 38, 1256.  The RFP made clear that proposals

9  would be evaluated on three total factors.  Factor 1 was EELV Approach, *i.e.*, the

10  ability of the proposed LSA solution to meet eight specific technical requirements.

11  *See id.* at 1280-82.  These include, for example, the ability to deliver specific payloads

12  to specific orbits, as well as the ability to meet certain payload orientation

13  requirements, such keeping sensitive payloads in a vertical orientation during pre-

14  launch processing.  *Id.* at 1282-83.  The Air Force evaluated the EELV Approach

15  factor across two independent dimensions:  a technical rating, *i.e.*, whether the

16  proposal met the technical requirements, and a technical risk rating, *i.e.*, whether there

17  were weaknesses or significant weaknesses that could disrupt the proposed schedule,

18  increase the cost, or degrade the performance of the launch system.  *Id.* at 1282.

19  Factor 2 was a technical evaluation, which had two subfactors: Design, which

20  looked at the technical feasibility of the booster and upper stages specifically, and

21  Schedule, which looked at the likelihood that the offerors could meet specific

22  schedule criteria, *i.e.* the ability to launch certain categories of missions by certain

23  dates.  *Id.* at 1283-84.  For example, Category A and B missions had to meet certain

24  orbital parameters and mass requirements, while Category C missions involved

25  heavier and larger payloads.  *Id.* at 1286.

26  Factor 3 evaluated the total investment cost, which considered both the amount

27  of government money requested as well as the total amount of non-government

28

- 5 -

money provided by the offeror. *Id.* at 1284.  With respect to the relative importance of these factors, Factor 1 was more important than Factor 2; Factor 2 is of equal importance to Factor 3; and Factors 2 and 3 combined were more important than Factor 1. *Id.* at 1281.  For Factor 2, the Design subfactor was more important than the Schedule subfactor. *Id.*

The Air Force received four proposals.  ULA proposed the "Vulcan" launch system, which incorporated significant technologies from previous heritage launch vehicles (*i.e.*, those vehicles that are already operational).  Tab 132, 41420.  Blue Origin proposed a new, semi-reusable "New Glenn" launch system, which would incorporate the new BE-4 first stage engine. *Id.*  ULA also proposed to use the BE-4 engine in the Vulcan first stage. *Id.*  Orbital (now part of Northrop Grumman), proposed the "OmegA" system with a solid rocket booster for its first stage. *Id.* at 41421.

SpaceX proposed a launch system that included three vehicles.  The first two, the Falcon 9 and the Falcon Heavy, were already developed, and could meet some of the NSS requirements. *Id.* at 41421.  The third vehicle, which was necessary to meet the remaining NSS requirements, was called the Big Falcon Rocket ("BFR"),[2] and was to be a "███████████████████████████████████████████████████████ ████████████████████████████████████. ██████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████. *Id.* at 41421-22.

**C.   The LSA Award Decision**

After an extensive evaluation and review process, *see* Tab 132, 41417-19, the Air Force awarded LSAs to ULA, Blue Origin, and Orbital.  *See* Tab 136, 41752-53.

---

[2] In its brief, SpaceX repeatedly refers to the "BFR" as the "Starship."  However, the Starship appears to be a materially different vehicle than the one SpaceX proposed. *See infra* § IV.  In any event, this brief will refer to the vehicle as the "BFR," the name used in the administrative record.

████ Opposition to Plaintiff's Motion for Judgment on the Certified Record ████

1   It concluded that while all "four proposals offer innovative design approaches," the

2   proposals submitted by ULA, Blue Origin, and Orbital would be better able to meet

3   the Government's requirements for *all* missions – Category A, B, and C – at lower

4   risk and lower cost than SpaceX's proposal. *See id.* at 41752. Notably, the Air Force

5   concluded that ULA was the ███████████████████████████████████

6   ████████████████████████████████ *id.* at 41753, while Blue Origin had an

7   ████████████████████████████████, and Orbital had a ███████████████

8   ████   *Id.*   The Air Force determined that while SpaceX had an ██████████

9   ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████   *Id.*

12      Among these risks, the Air Force determined that SpaceX's proposal required

13  a ████████████████████████████████████ for the BFR, which would

14  ████████████████████████████████████████████████████████████,

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████   *Id.* at 41750.  The Air Force also judged that

18  the BFR's ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████   *Id.* at 41751.

21      **D.    Procedural History**

22      After the Air Force denied its proposal, SpaceX brought an administrative

23  objection to the award pursuant to the RFP. *See* Tabs 150, 150a, 151. After that was

24  denied, SpaceX filed suit in the Court of Federal Claims, which dismissed its suit for

25  lack of jurisdiction. *See Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433

26  (2019).  The case was transferred to this Court, and SpaceX filed a supplemental

27  complaint on December 4, 2019.  Supp. Compl., ECF No. 168.  It filed a sealed

28

████████ Opposition to Plaintiff's Motion for Judgment on the Certified Record ████████

1    motion for judgment on a certified administrative record on December 10, 2019. ECF

2    No. 170 ("Pl.'s Br.").

3                          **STANDARD OF REVIEW**

4         Plaintiff brings this action under the Administrative Procedure Act ("APA").

5    "Section 706(2)(A) of the APA requires a reviewing court to uphold agency action

6    unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

7    accordance with the law.'" *San Luis & Delta-Mendota Water Auth. v. Locke*, 776

8    F.3d 971, 994 (9th Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). "The arbitrary or

9    capricious standard is a deferential standard of review under which the agency's

10   action carries a presumption of regularity." *Id.* "It is not the reviewing court's task

11   to 'make its own judgment' about the appropriate outcome." *Id.* (quoting *River*

12   *Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010)).

13        "This traditional deference to the agency is at its highest where a court is

14   reviewing an agency action that required a high level of technical expertise." *Id.*

15   (citing *Marsh v. Or. Nat. Res. Council.*, 490 U.S. 360, 377 (1989)); *see also Marsh*,

16   490 U.S. at 377 (when the agency's analysis "requires a high level of technical

17   expertise," courts "must defer to the informed discretion of the responsible federal

18   agenc[ies]."). This deference extends to technical predictions: courts are "to be 'most

19   deferential' when the agency is 'making predictions, within its [area of] special

20   expertise, at the frontiers of science.'" *The Lands Council v. McNair*, 537 F.3d 981,

21   933 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def.*

22   *Council*, 555 U.S. 7 (2008) (quoting *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d

23   1089, 1099 (9th Cir. 2003)); *see also id.* ("we are to conduct a 'particularly deferential

24   review' of an 'agency's predictive judgments about areas that are within the agency's

25   field of discretion and expertise . . . so long as they are reasonable.'") (quoting

26   *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)).

27

28

- 8 -

1    While such deference "is not unlimited," the agency decision should be

2    affirmed so long as the agency has not "relied on factors which Congress has not

3    intended it to consider, entirely failed to consider an important aspect of the problem,

4    offered an explanation that runs counter to the evidence before the agency, or is so

5    implausible that it could not be ascribed to a difference in view or the product of

6    agency expertise." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994 (quoting

7    *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

8    29, 43 (1983)).

9                              **ARGUMENT**

10   **I.     THE AIR FORCE'S RISK ASSESSMENTS WERE REASONABLE.**

11           SpaceX's LSA strategy was ███████████████████. It proposed

12   a design with an ████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ███████████████████████████ Tab 136, 41750; *see also id.*

17   at 41751 (concluding that SpaceX's EELV Approach Factor risk rating was ████

18   ████████████████████████████████████████████████████

19   ██████████. By contrast, the Air Force judged SpaceX's competitors to have less

20   risky proposals overall that could still meet the Government's technical and schedule

21   requirements. *See id.* at 41745-49.

22           Now, SpaceX attempts to retreat from the consequences of its own proposal

23   and design choices, and argues that the Air Force erred in making its risk evaluations.

24   In doing so, it distorts the LSA's requirements to serve its own preferences, and

25   minimizes the significant risk and cost its proposal entailed.  The Air Force's

26   technical judgments and risk evaluations – which are entitled to the "highest"

███████ Opposition to Plaintiff's Motion for Judgment on the Certified Record ████████

deference, *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994; *Lands Council*,
537 F.3d at 933 – were reasonable and should be affirmed.

SpaceX's core argument depends on an essential misunderstanding of the LSA
RFP's requirements.  The Air Force required that the LSA offerors propose complete
launch system prototypes that could meet *all* of the RFP's requirements, including
nine specific mass-to-orbit requirements ("reference orbits") – Categories A, B, *and*
C.  *See* Tab 38, 1264; *see also* Tab 18, at 753.  SpaceX's primary complaint is that
the Air Force discounted the fact that SpaceX had existing vehicles that could meet
Categories A and B, in the form of the Falcon 9 and Falcon Heavy, and ████████
████████  SpaceX's Category C entrant, the BFR.  But this claim fundamentally
twists the nature of the LSA RFP: it was not enough for SpaceX (or any entrant) to
do well on *some* of the requirements; the entrant had to demonstrate that it could
satisfy *all* of the requirements – and that it could do so without unacceptable risk or
cost. Even though the Air Force judged SpaceX's Category A and B capabilities to
have ████████, *see* Tab 132, 41581, SpaceX's Category C proposal entailed
████████ faced by the other offerors, and for this reason, the Air Force
concluded that the other offerors offered the best approach for the Government.

A. **The Air Force Properly Considered Schedule Risks for Categories
A and B Missions.**

Plaintiff first complains that the Air Force "improperly negated [schedule]
risks" to its competitors' Category A and B missions.  "Schedule risk" refers to the
proposals' ability to meet three date criteria: (1) the ability to launch Category A and
B payloads by April 1, 2022 from either the east coast or the west coast ("Criteria 1");
(2) the ability to launch Category A and B payloads from the west coast by October
1, 2024 ("Criteria 2"); and (3) the ability to launch Category C payloads to a specific
orbit, Polar 2, by September 1, 2025 ("Criteria 3").  *See* Tab 132, 41427.  The Air
Force's schedule risk evaluations were reasonable and should be affirmed.

### 1. The Air Force Adequately Used a Fourteen Month Benchmark Between the Final Certification Flight and the Criteria Date.

Part of mitigating schedule risk is ensuring adequate time between the offeror's final certification flight (where it can demonstrate success, or not, of the integrated launch system) and the RFP's specific schedule thresholds, *i.e.* the April 2022 Criteria 1 deadline for Category A and B missions. This ensures that there is sufficient time to incorporate any lessons learned from those flights into the final vehicle. In evaluating this schedule risk, the Air Force was guided by "[t]he Government's historical experience . . . [that] shows that [14] months [from certification flight to deadline] represents a low risk approach." Tab 132, 41457. Fourteen months, as a general rule, provides adequate time to respond to issues discovered during the certification flight. *See id.*

SpaceX pounces on this historical benchmark, and states that the Air Force "determined that a low risk approach *required* at least 14 months between the last certification flight and the RFP need date." Pl.'s Br. at 26 (emphasis added). And, it says, its competitors did not propose enough schedule time to meet this benchmark. *Id.* at 26-27. This argument misstates both the 14-month benchmark and the Air Force's actual evaluation of schedule risk.

First, the 14-month benchmark between certification flight and schedule date was neither a necessary nor a sufficient condition for a low schedule risk determination. Rather, it is a margin "typical of a low risk schedule," Tab 135, 41725, and a schedule margin that "has been historically experienced by the Government as a low risk approach to launch." Tab 132, 41457. In other words, it is a guideline, for which deviation may be appropriate depending on the specific facts of a specific situation; it is not an absolute requirement for a low schedule risk, as SpaceX implies. *See, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carriers Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (agency must provide a "reasoned

- 11 -

explanation" for its choices under the APA's arbitrary and capricious standard) (citing *State Farm*, 463 U.S. at 43).

The Air Force appropriately considered schedule risk in light of this benchmark. For ULA, the Air Force determined that ███████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ *See* Tab 132, 41457. The Air Force further noted that █████████████ ███████████████████████ *Id.* Nonetheless, based on the specific facts before it, the agency concluded that ████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████ *Id.* The Air Force further determined that there ███████████████████ ██████████████████████████████ *See id.* at 41458-60. Collectively, the Air Force thus determined that ULA's technical risk rating for schedule was "low." *Id.* at 41460. In doing so, it recognized there █████████ ██████████████████, but concluded that this ███████████████ ███████████████████████████████████████████████ ██████████████████████████████ *Id.* at 41461. This technical risk evaluation – which specifically considered and evaluated an important issue, schedule risk – is entitled to significant deference, *see San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 994; *see also State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem").

For Orbital and Blue Origin, SpaceX's objection has even less foundation, ███████████████████████████████████████████████ █████████████████████████████████. With respect to Orbital, the Air Force ██████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████  Tab 132, 41555.  The Air Force determined, however, ██████████

4 ████████████████████████████████████  *id.*, and that there were no

5 weaknesses for the Criteria 2 and 3 deadlines, *id.* at 41556-57.  Collectively, the Air

6 Force concluded that the proposal had a █████████████████.  *Id.* at 41558.

7 Similarly, for Blue Origin, the Air Force again recognized ██████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████  *Id.* at 41510.[3]  The Air

10 Force further recognized ████████████████████████

11 ████████████████████████████████████████████████

12 ████████████.  *See id.* at 41511-12.  ██████████████  for Criteria 2 and 3,

13 and ████████████████████████████████

14 ████████████████████████  *Id.* at 41512-15.

15     SpaceX also minimizes its own schedule risk for the Category A and B

16 missions.  The company asserts that *only* its proposal would "guarantee" success, as

17 its launch system was "already capable of launching all Category A/B payloads."

18 Pl.'s Br. at 28.  This assertion ignores the facts.  SpaceX██████████████

19 ████████████████████████████  *See* Tab 132, 41584 (SpaceX had

20 ████████████████████████████████████████████████

21

_____

22 [3] SpaceX complains that Blue Origin █████████████████████  *see* Pl.'s Br. at
27, and thus the Air Force's risk evaluation was unreasonable.  However, the Air Force

23 determined that Blue Origin "██████████████████████████████████████████

24 ██████████  AR 98, 30593.  This satisfied the RFP requirements, since
██████████  are not required by the RFP, only the requirement to address

25 ████████████████████████████████████"  *Id.*  Blue Origin also
discussed ██████████████████████████████████████.  *Id.*

26 Accordingly, the Air Force's conclusion that "[Blue Origin]██████████████
██████████  *id.* was reasonable.

27 [4] ██████████████████████████████████████████████

28 ████████████████████████████  - 13 -

1      ██████████  And, with respect to this requirement, the Air Force concluded that

2 there was schedule weakness with SpaceX's Criteria 1 deadline.  It judged that there

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6     ████████  Tab 132, 41616.  SpaceX asserts that █████████████████,

7 but the Air Force reasonably judged that ███████████████████████

8 ████████████████████████████[5] *Id.*  Indeed, this is █████████

9 ████████████  risk that SpaceX argues should be disqualifying for its

10 competitors.  Furthermore, the Air Force judged that SpaceX had ███████ for

11 Criteria 2 schedule requirements, and ████████████ for Criteria 3.  *See id.*

12 at 41617-21.  Despite having the ██████ and █████████, the Air

13 Force still concluded the ██████████████████ *id.* at

14 41620-21 – the ████████████, which had o███████████

15 █████.  Thus, SpaceX was not disfavored.

16     Ultimately, SpaceX argues that the Air Force should have "found it likely that

17 neither ULA nor Orbital nor Blue Origin would meet the Government's Category A/B

18 timeline."  Pl.'s Br. at 28.  But the Air Force judged the risk differently – and its

19 evaluation was reasonable.

---

[5] SpaceX states that the proper time should be █████████, since the Air Force "tentatively"
did not plan to require an east coast launch that would require vertical integration capacity until
late 2023 (later than the 2022 Criteria 1 deadline).  *See* Pl.'s Br. at 28 n.13.  However, the Air
Force recognized that "the Government's launch manifest is subject to change," Tab 132, 41615,
and therefore reasonably used the RFP dates.  SpaceX similarly states that it ████████████
██████████████████ Pl.'s Br. at 28 n.13 (citing Tab 123, 39864), but that offer was
conditional on SpaceX's mutual agreement: ████████████████████
████████████ Tab 123, 39864.  The Air Force was entitled to proceed based on the
terms of the proposal, not SpaceX's conditional hypothetical.

## 2. The Air Force Did Not Evaluate the Offerors Based on an Unstated Risk Evaluation.

Throughout its brief, SpaceX repeatedly claims that the Air Force "gave each awardee a pass in the risk evaluation" because the Air Force had a "backup plan" to use existing rockets to launch national security payloads, and thus, apparently, that the awardees' Category A/B schedule risks could be discounted. *See, e.g.*, Pl.'s Br. at 20, 26, 28; *see also id.* at 27 (referring to the Air Force's "intent to 'buy down' the risk"). This simply is not so – no such "backup plan" was used as part of the schedule risk evaluation, nor was one used to "discount" any existing risk.

None of the final evaluation documents prepared by program staff mention any such "backup plan." The evaluation document prepared by the Agreements Officer and Evaluation Team Chairperson does not evaluate schedule risk using such a metric. *See generally* Tab 132, 41413-41660. Nor does the Source Selection Authority Award Briefing document. *See* Tab 134, 41664-41713. Or the Portfolio Recommendation document. *See* Tab 135, 41714-41744. Nor, most importantly, does the award decision itself consider such factors. *See* Tab 136, 41745-53.

Rather, in support of its "backup" claim, SpaceX relies exclusively on discussions *predating* the final proposal submission and evaluations, which, at best, reflect what factors individual program officers may have considered at that time. *See* Pl.'s Br. at 27 (quoting AR Tab 101). But these are not the bases for the agency action – those bases are articulated in the written evaluation documents and final decisions provided in Tabs 132-136. Plaintiff's attempt to have those interim discussions supplant the actual grounds for the Air Force's decision contradict black-letter administrative law.

It is a "settled proposition" that "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 139 S. Ct. 2551,

- 15 -

1  2573 (2019) (citing *Vt. Yankee Nuclear Power Corp.*, 435 U.S. 519, 549 (1978)).

2  Here, the record is clear as to the bases for the agency decision – and it did not include

3  any discussion of a "backup plan" to manage schedule risk. Furthermore, even if the

4  agency did silently consider whether risk could be "bought down," *see* Pl.'s Br. at 26-

5  27, and it did not, "a court may not reject an agency's stated reasons for acting simply

6  because the agency might also have had other unstated reasons." *Dep't of Commerce*,

7  139 S. Ct. at 2573. In other words, the Air Force's assessment of schedule risk stands

8  on the sufficient grounds stated in the record, not on any silent considerations SpaceX

9  may ascribe to it.

10  **B.    The Air Force Properly Evaluated SpaceX's** █████████████

11       The Air Force determined that although SpaceX had an █████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████ *see id.* at 41594-96. This was a reasonable technical judgment, particularly

15  in light of the deference the Air Force is due under the APA.

16       SpaceX disagrees with that risk evaluation. It first states that the Air Force

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ███████████ Pls.' Br. at 29. This contention is simply wrong. To begin, the Air

21  Force *never* deemed SpaceX's proposal "incomplete" – if it had, it would have stated

22  that SpaceX's plan had a "deficiency," which is a "material failure of a proposal to

23  meet a Government requirement." Tab 135, 41716. Rather, it concluded that there

24  was a ███████████████████████, Tab 132, 41585, which is a █████

25  ██████████████████████████████████████████ Tab 135,

26  4176.

27

28

1   Moreover, the Air Force explained the basis for the █████████████

2   █████████████████████████████████████.  The ███████████

3   ███████████████████████████████████████████████████████

4   ███████████████████████████████  The ██████████████████

5   ███████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████

10  ████████████████████████████████████████  Tab 132, 41585.

11  This approach introduces significant risk:

12

13  The Government's current approach processes Category C payloads

14  ███████████████████████████████████████████████████████

15  ██████████████████████████████████████  Conversely,  [SpaceX's]

16  ████████████████████████████████████████  [SpaceX's]

17

18

19  ████████  ████████  ████████  ████ ████████

20                                           [6]

21

22

23  ─────────────────────
    [6] SpaceX says that it ███████████████████████████.  *See* Pl.'s Br. at 29

24  n.14.  But the proposal did not include such a █████████████████████
    ███████████████████████████, *see* Tab 123, 39775-76, 39899,

25  █████████████████████████████████████████████.  SpaceX

26  also complains that the Air Force "wrongly discouraged SpaceX from proposing
    ██████████████████  *See* Pl.'s Br. at 29 n.14.  But the record shows that the Government

27  neither encouraged nor discouraged any particular solution. SpaceX was the master of its own
    proposal, responsible for submitting its most competitive bid in accordance with RFP

28  requirements

████  Opposition to Plaintiff's Motion for Judgment on the Certified Record  ████



1

2  *Id.* at 41586.  Said differently, SpaceX's proposal is risky and costly, particularly

3  relative to its competitors.  Furthermore, SpaceX's ███████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████  *Id.*  SpaceX chose to develop ████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████  For those reasons – which, notably, SpaceX

9  does not dispute on the merits in its brief – the Air Force judged its proposal to have

10  a ████████████████████████

11      SpaceX similarly misstates the RFP and evaluation process with respect to

12  ████████████████████████████  SpaceX notes, correctly, that the Air Force

13  ████████████████████████████████████████████████████

14  ████████████████████████  *See* Pl.'s Br. at 30.  That is why the Air Force

15  specifically stated that SpaceX's ███████████████████████████████████

16  ████████████████████████████████  *See* Tab 132, 41586-87.

17      But the Air Force also concluded that SpaceX's novel proposal to ████████

18  ████████████████████████████████████████████████████

19  ████████████.  The Air Force determined that SpaceX's ██████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  Tab 132, 41588. ████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████  which could ████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████  *Id.*  In other words,

28  ████████████████████████████████████████████████████



- 18 -

by ███████████████████████████████████████████
███████████████████████████████████ The Air Force reasonably accounted
for such risk – and, indeed, Plaintiff does not meaningfully dispute the Air Force's
risk assessment.  *See* Pl.'s Br. at 29-30.

Finally, SpaceX complains that the Air Force's conclusion that SpaceX ██████
█████████████████████████████████████████████████████████████
█████ runs counter to the evidence.  Tab 132, 41584; *see also* Pl.'s Br. at 31.  SpaceX
says that it ███████████████████████████████████████████████████
██████████████████ *See* Pl.'s Br. at 31 (quoting Tab 123 at 39987-88).  What
SpaceX actually said in its proposal is that it will ██████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████ *Id.* at 39987-88.  In other words, SpaceX was
committing to █████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████ *See id.*  This is not the same as actively planning ████████████
█████, much less committing to do so.  Accordingly, the Air Force's determination
was consistent with the evidence before the agency, *i.e.*, SpaceX's own proposal.

**C.**   **The Air Force Reasonably Concluded that There Was a Significant**
**Likelihood that SpaceX's BFR Would Not Meet the 2025 Deadline.**

The Air Force determined that while SpaceX's BFR "is a truly revolutionary
concept for a launch vehicle," ██████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████████████ *See* Tab 132, 41620; Tab 146, 41753.  While SpaceX criticizes
this determination on three specific grounds, the Air Force's reasonable technical
judgment ought to be affirmed.

- 19 -

First, the Air Force judged that there was schedule risk because of SpaceX's

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████ Tab 132, 41620, 41651;

*see also id.* at 41651 ███████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████. Notably, the BFR ███████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████, *id.* at

41422, a ██████████████████████████████████.

███████████████████████████████, and SpaceX ██████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* at 41620.

The Air Force concluded that this option ████████████████████████████████

████████████████████. At the outset, █████████████████████████████

████████████████████████ *Id.* Moreover, while SpaceX ███████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ *Id.*

The Air Force thus concluded that ██████████████████████████████████████

███████████████████████████████████████████████████████████ *Id.*

SpaceX never contradicts this assessment. *See* Pl.'s Br. at 31.

The Air Force had further concerns with an ██████████████████████████.

Because ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████ and therefore ███████████████████████████

- 20 -

1 ██████████████████████████████████████████████████████████

2 ██████████ Tab 132, at 41620.  That is, because the ██████████████████

3 ██████████████████████████████████████████████████████████

4 ████████████████████████████████.

5     The Air Force also concluded that SpaceX's ████████████████

6 ██████████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████████

8 ████████████████████████ *Id.* at 41620-21.  Plaintiff pounces on this

9 statement, contending that its proposal had stated that ████████████████

10 ██████████████████████████████████████████████████████████

11 ████████████████████████████ *See* Pl.'s Br. at 31 (quoting Tab

12 123, 39831).  Again this contention is wrong.  First, even in its proposal, SpaceX

13 depends on ██████████████████████ ████████████████████

14 ██████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████████

18 ██████████ *See* Tab 123, 39381.  But if ██████████████████████

19 ██████████████████████████████.  SpaceX states that it

20 will ██████████████████████████████████████ *id.* at 39392,

21 but ████████████████████████████████████████.

22     Even assuming that there were ██████████████████, however, that

23 would not negate the Air Force's concern.  Recall that the ████████████████

24 ████████████████████████████████  As the Air Force concluded, ████████

25 ██████████████████████████████████████████████████████████

26 ████████████████████████████  Accordingly, "[t]he Government reasonably

27 ────────────────────────

28 █ ██████████████████████████████████████████████████



1    concluded that █████████████████████████████████████████████████

2    ████████████████████████████████████████████████████████████████

3    Tab 152, 43103.  SpaceX's proposal assumes that if ████████████████

4    ████████████████████████████████████████████████████████████████

5    that is an assumption the Air Force reasonably chose not to make.

6    　　　　　Second, the Air Force concluded that SpaceX's ███████████████

7    ████████████████████████████████████████████████████████████████

8    ██████████████.  *See* Pl.'s Br. at 32; Tab 132, 41619-20.  In doing so, the Air Force

9    acknowledged that this margin exceeded the normal 14-month historical benchmark,

10   but provided justifications why that additional time was still not enough.  For

11   example, SpaceX was developing a ██████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████  Tab 132, 41582.  More fundamentally, the Government judged

14   that the BFR required more time because it ████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████████  *Id.* at 41620.  "█████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████  *Id.*  Again, the 14-month historical benchmark is

19   just that – an historical benchmark.  When a company tries to do numerous things that

20   were never done before, that benchmark may be inadequate – which is exactly what

21   the Air Force reasonably concluded in this case.

22   　　　　　Notably, SpaceX does not seriously challenge this conclusion.  *See* Pl.'s Br. at

23   32-33.  Rather, it takes potshots at its competitors.  For ULA, the Air Force concluded

24   that the Criteria 3 2025 schedule requirement (to meet the Polar 2 mission) would be

25   satisfied by ███████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ██████████████████████  *See* Tab 132, at 41459.  SpaceX says this is an error – that

28   　　　　　　　　　　　　　　　　　　　　　　- 22 -

1  instead, ULA would need to ███████████████████████████████

2  ████████████████████████████████████████████████████████████

3  █████████████   *See* Pl.'s Br. at 32.  It concludes this based on a single line in ULA's

4  proposal, where it stated that ████████████████████████████████████

5  █████████████   *See* Pl.'s Br. at 32.  SpaceX is taking a single sentence out of context -

6  ULA proposed ████████████████████████████████████████████

7  ████████████████████████████████████████████████.  *See* Tab 120,

8  35254; Tab 132, 41459.

9        SpaceX similarly criticizes Blue Origin's proposal for offering ████████████

10 ████████████████████████████████████████████████████████████

11 █████████████████████████   *See* Pl.'s Br. at 33.  But Blue Origin proposed a

12 ████████████████████████████████   *See* Tab 132, 41650-51

13 (noting that Blue Origin ███████████████████████████████████████

14 ████████████████████).[8]  SpaceX fails to compare like systems to like systems.

15       Finally, SpaceX criticizes the Air Force's use of the Space Shuttle as an

16 analogy for determining the potential completion time for the BFR.  *See* Pl.'s Br. at

17 33.  This argument fails for several reasons.

18       First, in making it, SpaceX relies entirely on unsupported assertions in a

19 declaration attached to its motion.  *See id.* (citing ██████ Decl. ¶¶ 30, 37, 39, 41).

20 This is inappropriate.  "In general, a court reviewing agency action under the APA

21 must limit its review to the administrative record."  *San Luis & Delta-Mendota Water*

22 *Auth.*, 776 F.3d at 992.  There are "narrow" exceptions to this rule, and such extra-

23 record evidence is permitted only if  "(1) [it] is necessary to determine whether the

24 ─────────────

25 [8] "Technology Readiness Levels (TRL) are a type of measurement system used to assess the
   maturity level of a particular technology. Each technology project is evaluated against the
   parameters for each technology level and is then assigned a TRL rating based on the projects

26 progress. There are nine technology readiness levels. TRL 1 is the lowest and TRL 9 is the
   highest."  Technology Readiness Level,

27 https://www.nasa.gov/directorates/heo/scan/engineering/technology/txt_accordion1.html (last
   visited Jan. 16, 2020).

28

agency has considered all relevant factors and has explained its decision, (2) [it] is necessary to determine whether the agency has relied on documents not in the record, (3) whe[re] supplementing the record . . . to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *Id.; see also ForestKeeper v. La Price*, 270 F. Supp. 3d 1182, 1227-28 (E.D. Cal. 2017) (discussing factors justifying extra-record evidence in APA litigation).

SpaceX has failed to meet these standards.[9] It does not assert, much less show, bad faith on the part of the Air Force; the declaration is not necessary to explain technical terms; and it is not being used to determine whether the agency has relied on documents not in the record (the Air Force's use of the Space Shuttle as an analogue is clearly justified *in* the record). Finally, the declaration is not necessary to determine whether the Air Force has considered the relevant factors, as this "exception does not apply" "[w]here the record contains sufficient information to explain how [the agency used the information before it] and why it reached its decision." *ForestKeeper*, 270 F. Supp. 3d at 1228. Ultimately, SpaceX is simply attempting to use "the extra-record declaration as a basis for judging the wisdom of the agency's [technical] analysis," *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 993, and that is not proper. *See id.* ("Even if a reviewing court properly admits extra-record evidence under [these exceptions], it may not *use* the admitted extra-record evidence to determine the correctness or wisdom of the agency's decision. Such use is never permitted.").

In any event, the Air Force reasonably used the development of the Space Shuttle as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tab 132, 41619, 41620; *see also id.* at 41641 ▮▮▮▮▮▮▮

---

[9] Indeed, Plaintiff claims to only use this declaration "for the limited purpose of showing irreparable harm and competitive prejudice," Pl.'s Br. at 4 n.6, despite clearly using the declaration to support its merits argument.

- 24 -

▮▮▮▮ Opposition to Plaintiff's Motion for Judgment on the Certified Record ▮▮▮▮

1   ██████████████████████████████████████████████

2   ████████████████████  This conclusion was amply supported by the record.

3   The Air Force noted that, for example, ████████████████████████

4   ████████████████████████████████████  *id.* at 41651, involving a

5   ███████████████████████████  *id.* at 41620; *see also id.* at 41655

6   ████████████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████  Given these differences, including ███████

10  ████████████████████████████████  the Air Force

11  reasonably determined that the Space Shuttle was "the most appropriate operational

12  analogue." *Id.* at 41656.

13       Moreover, contrary to SpaceX's claims, the Air Force *did* "█████

14  ████████████████████████████████  Pl.'s Br. at 33.

15  SpaceX argues that the Air Force failed to consider that technology is more advanced

16  now than in the 1970s.  *See id.*  But the Air Force did so consider.  It noted, for

17  example, that █████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████  Tab 132, 41658.  And, contrary to Plaintiff's

20  claim, *see* Pl.'s Br. at 33, the Air Force noted that BFR's "overall architecture" was

21  ████████████████████████████████████████████

22  ██████████████████████████████████████████  Tab

23  132, 41658.  SpaceX says that the Air Force ignored the advantages of ██████

24  ███████████████████████  but the Air Force acknowledged the

25  benefits of such an approach.  *See* Tab 132, 41583 ████████████

26  ████████████████████████████████████████████

27  ██████████████████████████████████  Finally, the

28

Opposition to Plaintiff's Motion for Judgment on the Certified Record

1   Air Force acknowledged the experience and heritage benefits of SpaceX's existing
2   fleet. *Id.* at 41579; Pl.'s Br. at 33.

3        Fundamentally, however, SpaceX's argument fails because the Air Force did
4   not rely exclusively on the Space Shuttle in determining schedule risk.  The Shuttle
5   was merely "[a] relevant benchmark," Tab 132, 41619 – the Air Force mainly based
6   its determination on the fact that the BFR ████████████████████████████
7   ████████████████████████████████████████████████████████████████
8   ███████████████████████████████████████ *Id.* at 41620.
9   That underlying complexity drove SpaceX's risk; the Shuttle was a helpful
10  comparison, but like any analogy, was not perfect, nor was it expected to be.

11  **II.     THE AIR FORCE'S COST EVALUATION WAS REASONABLE.**

12       Cost was an important factor in evaluating the LSA program. *See* Tab 136,
13  41746 (investment cost was equally important as Factor 2, Technical, which included
14  design and schedule considerations).  In establishing the evaluation criteria for the
15  LSA program, the Air Force specifically informed the offerors that, "[g]iven the
16  Government's funding reality," it was "financially constrained," and that the award
17  decision would "take into consideration Government funding limitations," Tab 38,
18  1254-85; *see also* Tab 132, 41415-16.   Accordingly, in making its funding
19  determinations, the Air Force considered both the total costs of each offerors proposal
20  and the total cost to the Government. *See* Tab 38, 1271-72, 1284; Tab 132, 41428.
21  SpaceX had – █████ – the highest total cost ████████████, compared to the next
22  closest cost, Blue Origin's ████████████), *and* the highest cost to the government
23  ████████████, compared to the next closest cost, ULA's ████████). *See* Tab 132,
24  41752.

25       The Air Force judged all four proposals to be complete, *i.e.,* to have provided
26  all required information, to be substantiated with supporting evidence and rationale,
27  to have used reasonable cost methodologies, and to be reasonable (for costs to be

- 26 -

reasonable means they would be accepted by a prudent person). *See* Tab 136, 41745-54; Tab 132, 41428, 41423. Nonetheless, SpaceX criticizes several aspects of the Air Force's cost methodology as artificially favoring ULA and disfavoring SpaceX. *See* Pl.'s Br. at 21-23. The Air Force's judgment was reasonable, was supported by the evidence, and was not arbitrary or capricious.

**A.    The Air Force's Cost Evaluation Did Not Arbitrarily Favor ULA.**

### 1.    Launch Infrastructure and Personnel

As part of its proposal, ULA highlighted the ability to take advantage of past investments in its launch infrastructure and personnel that the U.S. government made before the LSA solicitation. *See, e.g.*, Tab 120, 35243, 35236. SpaceX argues that "[b]ecause ULA proposed ██████████████████████████ ████████████████████████████████, ULA should have included those payments as *Government Investment* in its proposed costs and SMC should have accounted for these Government Investments when evaluating ULA's total price." Pl.'s Br. at 22.

This argument, however, depends on a misunderstanding on the nature of the LSA program requirements. The RFP explicitly *excludes* "costs incurred before" February 21, 2018 from the LSA proposals. *See* Tab 38, 1276. It also excludes "[p]arallel research or investment (i.e., research or other investments that might be related to the proposed project but which will not be part of the [statement of work]; typically these activities will be undertaken regardless of whether the proposed project proceeds." *Id.* at 1277.

To the extent that ULA relies on its heritage experience without specifically demarcating those costs, *see, e.g.*, Tab 120, 3524-43, that is based on the structure of the RFP itself. These investments either predated the LSA solicitation, or were based on independent contractual requirements outside of the specific LSA statement of work. For example, the 2018 Department of Defense contract award upon which

- 27 -

1  SpaceX relies, where ULA was awarded $867 million for launch operations for the

2  Delta IV and Atlas V families of launch vehicles, *see* Pl.'s Br. at 22 n.12, was for

3  work that was not included in the LSA statement of work and that would "be

4  undertaken regardless of whether the [LSA] project proceeds."  Tab 38, 1277.

5      Indeed, SpaceX's own actions demonstrate that it knew exactly how this

6  requirement works.  SpaceX has received billions of dollars of federal funds from

7  NASA and the Department of Defense to support its launch vehicles over the years.

8  *E.g.*, Tab 123, 39786 (discussing SpaceX contracts with NASA).  For example, on

9  June 20, 2018 – after the February 21, 2018 RFP trigger date – SpaceX was awarded

10  a $130 million contract to launch the Air Force Space Command-52 ("AFSPC-52")

11  satellite.        *See*      DoD      Contracts      for      June      21,      2018,

12  https://www.defense.gov/Newsroom/Contracts/Contract/Article/1557461/        (last

13  visited Jan. 16, 2020).  And in its proposal, SpaceX █████████████████████████

14  ████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████  Under SpaceX's

19  litigation position, these costs should have been included in its proposal, and yet they

20  – appropriately – were not.  Accordingly, the Air Force appropriately calculated costs

21  for infrastructure and personnel.

22      **2.**  ████████████████████████████████

23      SpaceX also asserts that ULA failed to properly account for the costs of certain

24  launch  components  produced  by  █████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ████████████████  *See* Pl.'s Br. at 22 (citing Tab 120, 35531-32).  But ULA properly

27  accounted for these costs as well, by distinguishing between those subcontractor costs

28

- 28 -

1  that were chargeable to the LSA program, and those that were being accomplished

2  independently – exactly what the RFP requires.  *See supra*.

3      As ULA noted, ███████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10  Tab 120, 35377.  In other words, components that were developed specifically for the

11  LSA program, and the costs to incorporate general-purpose components into the LSA

12  vehicles, were included in ULA's cost accounting; general-purpose components that

13  were developed independently were not.  The Air Force did not act arbitrarily or

14  capriciously in accepting this cost determination.

15    **3.  BE-4** ███████████████

16      SpaceX also calls out the Air Force's acceptance of ULA's ████████████

17  ████████████████████████████████████  *See* Pl.'s Br. at 23.  But this

18  argument misunderstands the nature of the BE-4 development; the Air Force-accepted

19  ULA cost estimates were reasonable.

20      Blue Origin is developing the BE-4 first stage engine, which is going to be used

21  in both the ULA and Blue Origin launch vehicles.  *See* Tab 132, 41644.   ULA

22  adequately accounted for its share of those engine costs.  ████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  █████████████████  Furthermore, Blue Origin  █████████████████████

27  ████████████████████████████████████████████████████

28                                   - 29 -

See Tab 98, 30705.  Thus, to the extent that SpaceX is concerned that ULA ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the BE-4, that concern is misplaced.

Moreover, because it is not primarily responsible for developing the BE-4 engine, ULA included approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the BE-4 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  See, e.g., Tab 120, 36063, 36261; Tab 132, 41644.  ULA also accounted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  See, e.g., Tab 120, 35373.  These costs reasonably represented *its* share of the total BE-4 development.  SpaceX's argument, which apparently seeks for the entirety of the post-February 21, 2018 BE-4 development costs to be double-counted for both Blue Origin and ULA, *see* Pl.'s Br at 23, ignores the nature of the shared-cost arrangement.  In essence, ULA is able to take advantage of the fact that it is paying to modify and purchase a product, rather than to completely develop that product in-house.  Accordingly, the Government reasonably evaluated ULA's proposed costs with respect to the BE-4 development.

SpaceX contrasts the BE-4 development cost accounting to how ▮▮▮▮▮▮▮▮▮▮ was accounted for, and says that these two situations were treated differently.  SpaceX focuses on the fact that the Air Force accounted, as part of the total SpaceX investment costs, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  See Tab 132, 41623; *see also* Pl.'s Br. at 23.  The Air Force reasonably accounted for costs in both circumstances.

While a federal agency treating "similar situations differently" can violate the APA, *Transactive Corp. v. United* States, 91 F.3d 232, 237 (D.C. Cir. 1996), that is not what happened here.  The RFP requires that every LSA offeror include a

- 30 -

certification plan as part of their statement of work, in order to demonstrate the

efficacy of their launch system. *See* Tab 38, 1278. Costs that are part of the statement

of work must be included in the LSA proposals. *Id.* at 1277. Only SpaceX included

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ *See* Tab 132, 41623, *see also id.* at 41622 (noting

that the proposal ████████████████████████████████████████

██████████). The Air Force repeatedly noted that these costs "████████████████

███ *id.* at 41623, and SpaceX itself ████████████████████████

████████████████████████████. *See* Tab 123, 39868. This

accounting choice was necessary to allow apples-to-apples comparison of the costs

██████████████████████ and given that SpaceX's ████████████████

██████, the Air Force did not irrationally treat like situations differently.

Finally, even if the Air Force acted arbitrarily and capriciously in accepting

ULA's cost evaluations – and it did not – any error would be harmless. "Relief is

available under the APA only for 'prejudicial error.'" *Drakes Bay Oyster Co. v.*

*Jewell*, 747 F.3d 1073, 1090-91 (9th Cir. 2014) (quoting 5 U.S.C. § 706); *see also* 5

U.S.C. § 706 ("due account should be taken of the rule of prejudicial error" when

reviewing agency action under arbitrary and capricious review); *Nat'l Ass'n of Home*

*Builders v. Defenders of Wildlife*, 551 U.S 644, 659 (2007) ("In administrative law,

as in federal civil and criminal litigation, there is a harmless error rule.") (internal

quotation marks and citation omitted).  Here, even if the Air Force should have

included additional ULA costs, SpaceX would not have been prejudiced by this

alleged error.  Adding these costs would have increased the ████████████████

portion of ULA's proposal, not the ██████████████████████. *See* Tab 38,

1272-73 (discussing cost methodology); Tab 140, 42321 ████████████████

- 31 -

██████ Opposition to Plaintiff's Motion for Judgment on the Certified Record – ██████

1   ███████████████████████████████████████████████ This would have

2   had the effect of ███████ ULA's government cost share, while likely not appreciably

3   changing the total combined investment amount, which in any event was ███████████

4   █████████████ *See* Tab 136, 41752 █████████████████████████████████

5   ████████████████████████████████████████). Given that the Source Selection

6   Authority was concerned by the fact that SpaceX ████████████████████████

7   ██████████████ *id.* at 41753, and that none of the changes to ULA's cost treatment

8   would alter that conclusion, SpaceX cannot show prejudice from those choices. *See*

9   *Drakes Bay Oyster*, 747 F.3d at 1091 (rejecting challenge when plaintiff "has shown

10   no prejudice from these claimed violations").

11       **B.     The Air Force Did Not Overstate SpaceX's Total Price By** ███████████

12           ████████████████████████████

13       The RFP specifically required that LSA offerors have ██████████████████

14   ██████████████████████ *See*, *e.g.*, Tab 38, 1282 (referencing

15   SPRD 3.2.7), 1288.  In order to comply with this requirement, SpaceX ████████████

16   ███████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████

18   █████████████████.  Those circumstances would be if SpaceX ████████████████

19   ███████████████████████████████████████████████████████████████

20   ███████████████████████████████████ *See* Tab 123, 39922; *see also* Tab

21   132, 41584.  In other words, SpaceX ███████████████████████████████

22   ██████████████████████████ rather than simply agreeing to build those

23   capabilities directly as part of its proposal.  Accordingly, the Air Force considered the

24   costs of ███████████████████████████████████, since that was the only

25   way of ensuring that the RFP requirement for ███████████████████████████

26   ██████████ Had the Air Force ████████████████████, SpaceX's proposal ████████

27

28                                        - 32 -

1   ███████████████████████████████████████████████████████████

2   ████████████████████.

3       SpaceX nonetheless states that the government overstated its costs.  *See* Pl.'s

4   Br. at 23.  It argues, based on two sentences in an extra-record declaration, that the

5   ████████████████████████████████████████████████ in the EELV Phase

6   2 RFP.  *See* ██████ Decl. ¶ 46.  This argument fails for at least three independent

7   reasons.  First, SpaceX relies exclusively on an extra-record declaration.  As discussed

8   previously, extra-record declarations are inappropriate in APA cases, particularly

9   where, as here, they discuss activities that *post-date* the agency decision in question.

10      Second, SpaceX does not contest that ██████████████████████████

11   █████ (it is), but says that it is not required for *a different* Air Force contract, EELV

12   Phase 2.  But the LSA requirements are clear, and absent the Air Force's ████████

13   ████████████████████████ SpaceX would not be in compliance.  Moreover, the

14   EELV Phase 2 RFP was published on May 3, 2019, well after the LSA decision was

15   made on October 9, 2018.  *See* Tab 136, 41753; Evolved Expendable Launch Vehicle

16   (EELV) Phase 2 Launch Service Procurement (LSP) Request for Proposals (RFP).[10]

17   Accordingly, the Air Force could not have considered the Phase 2 requirements in its

18   LSA decision because those requirements had not yet been finalized.  Notably, the

19   LSA development effort was geared at satisfying all NSS requirements, not just the

20   requirements for the tentative EELV Phase 2 LSP.

21      Finally, even the quotation (which includes no citation) that SpaceX includes

22   as part of its declaration does not definitively state that ██████████████████

23   ████████████████████████████████████████████ rather it says that "[t]here

24   is not *currently* a requirement for ████████████████ for those missions.  *See*

25

26

27   [10] https://beta.sam.gov/opp/c3e7f1e342154e92a5779c5daa1b1db0/view (last visited Jan. 16, 2020).

28                                         - 33 -
     ████████ Opposition to Plaintiff's Motion for Judgment on the Certified Record ████████

Decl. ¶ 46 (emphasis added).   That says nothing, however, about whether a requirement could be included in a later date.

SpaceX also argues that the Air Force treated other offerors differently, by not assuming "the most expensive scenario" for them, as it claims the Air Force did with respect to the █████████████████████████████████ SpaceX.  *See* Pl.'s Br. at 23-24, 34.  It claims that the Air Force assumed "ULA ████████████ ███████████████████████████████████████ and posited that the government ██████████████████████████████████████████████ ███████████████████, were ULA ████████████████████████. *See id.*  That is not what happened.  Rather, the Air Force ██████████████████ ULA ████████████████████ULA's ████████████████, and notified ULA that ████████████████████████████.  Tab 85, 16275-76.  In response, ULA ██████████████████████████████████████████████ ████████████████.  Tab 120, 35863; Tab 132, 41462; Tab 140, 42320.  ULA bears any cost ████████████████████████████████████████████. *See* Tab 132, 41462 ██████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ The Air Force thus evaluated the ULA proposal as accounting for the "most expensive scenario" for funding the proposed certification flights.[11]

---

[11] SpaceX also claims, quoting the awarded LSA agreement, that ULA and the Air Force ████████ █████████████████████.  Pl.'s Br. at 24 (quoting Tab 140, 42321).  But that same agreement makes clear that ██████ █████████████████████████████████████████████████████ Tab 140, 42321.  In other words, the government investment would be the same, █████████████████████████ ██████████████ Nor, in any event, would the Government be obligated to agree to any future modifications to incur additional costs in the future.

III.    **THE AIR FORCE ACTED CONSISTENTLY WITH THE RFP AND CONGRESSIONAL DIRECTION.**

SpaceX also claims that the Air Force's award decision violated the LSA's RFP and Congressional direction.  *See* Pl.'s Br. at 17-21.  In advancing its argument, SpaceX twists the RFP and relevant statutes in a way that fundamentally distorts their meaning, in an attempt to impose requirements that neither the Air Force nor Congress ever established.

A.    **The Air Force Awarded Agreements for Commercial Launch Vehicles**

First, SpaceX argues that the Air Force violated the RFP because it "adopted an unstated preference for reliance on existing Government processes and facilities rather than investing in commercial systems adaptable to the Government's needs, as the RFP [supposedly] required." Pls.' Br. at 18.  SpaceX thus states that the Air Force did "not leverage commercial launch systems." *Id.*  This argument fails because the Air Force acted consistently with the underlying statutes and the RFP.

SpaceX is correct that the purpose of the LSA solicitation "is to leverage industry's commercial launch solutions and ensure that they are modified to meet NSS requirements." Tab 38, 1260.  The 2018 NDAA similarly directs the Secretary of Defense to "develop capabilities necessary to launch existing or planned commercially available space launch vehicles or infrastructure that are primarily for national security space missions." 2018 NDAA § 1605(a)(1)(C).  That is exactly what the Air Force did.

To begin, SpaceX complains that the awarded companies proposed launch vehicles that are not "even operational, let alone commercially available," Pl.'s Br. at 18.  But there is no such "operational" requirement in the statute; indeed, the 2018 NDAA explicitly provides that "existing *or planned* commercially available" vehicles may be awarded LSAs.    2018 NDAA § 1605(a)(1)(C) (emphasis added).

- 35 -

1    Additionally, the LSA program is fundamentally a development effort, and the RFP

2    explicitly stated that the key step to statutory compliance, including transitioning from

3    the use of non-allied space launch engines and maintaining assured access to space,

4    would be "public private partnership agreements that partially fund industry's *new*

5    and/or upgraded launch system solutions." Tab 38, 1260 (emphasis added).

6         Nor does SpaceX's argument that the awardees did not propose "commercially

7    available" vehicles hold water.   Notably, SpaceX never offers a definition of

8    "commercially available", although it appears to use the term to refer to missions

9    launched for private clients, as opposed to soliciting government missions from

10   private companies. *See, e.g.*, Pl.'s Br. at 18 (distinguishing between its own vehicles

11   and those "proposed by historic government contractors."). But "commercial" is a

12   term of art in the context of space launch services.  Title 51 of the U.S. Code, which

13   governs National and Commercial Space Programs, defines "commercial provider"

14   as "any person providing space transportation services or other space-related

15   activities, primary control of which is held by persons other than Federal, State, local,

16   and foreign governments." 51 U.S.C. § 50101(1); *see also id.* § 50131 (stating default

17   that United States Government "shall acquire space transportation services from

18   United States commercial providers"). Here, ULA, Blue Origin, and Orbital are all

19   private companies, not governments, and thus are "commercial" as required by the

20   RFP and governing statutes.

21         Additionally, while not a formal RFP requirement, the Air Force also

22   concluded that the awardees were likely to have a market to sell their commercial

23   launch vehicles to private (*i.e.*, non-governmental) clients. *See* Tab 132, 41432

24   (describing ULA's ability to ███████████████████████████████████████

25   ███████████████████████████████████████ *id.* at 41492 (noting that Blue

26   Origin stated that "███████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

28                                    - 36 -

1  ████████████████████████ (emphasis added); *id.* at 41534 (concluding

2  that Orbital ███████████████████████████████████████████

3  ██████████████████████████   Thus, even by SpaceX's own apparent

4  definition, the Air Force complied with the RFP and statute.

5  Moreover, consistent with FY 2018 NDAA Section 1605, the RFP required all

6  offerors to certify that the proposed Government cost share will only be for

7  development of capabilities necessary to enable "existing or planned commercially

8  available space launch vehicles or infrastructure" that are primarily for national

9  security space missions.  Each awardee certified compliance, and the Government

10  determined that each awardee was "compliant" with this statutory requirement.  *See,*

11  *e.g.,* Tab 128, 41303; Tab 129, 41333; Tab 130, 41359-41360.

12  In any event, to the extent that SpaceX's true complaint is that the RFP did not

13  include an explicit, additional requirement that the offferors sell or plan to sell launch

14  vehicles to private companies, despite no statutory requirement for the Government

15  to include such a criteria, the time to object to the RFP on that basis has long since

16  passed.  The RFP explicitly required claimants to raise objections to the solicitation

17  terms at the time of the solicitation itself.  *See* Tab 38, at 1263 ("Any objection to the

18  [RFP] . . . must be presented in writing to the [agency] within [10] calendar days of

19  (1) the release of this solicitation or (2) the date the objector knows or should have

20  known the basis for its objection.").   Plaintiff's failure to do so constitutes

21  administrative exhaustion.  *See, e.g., Idaho Sporting Congress v. Rittenhouse*, 305

22  F.3d 957, 965 (9th Cir. 2002) ("The [APA] requires that plaintiffs exhaust available

23  administrative remedies before bringing their grievances to federal court.").

24  **B.     The Air Force Has Not Risked Assured Access to Space in**

25  **Contravention of Congressional Policy.**

26  Congress has declared that "[i]t is the policy of the United States for the

27  President to undertake actions appropriate to ensure, to the maximum extent

28

- 37 -

1   practicable, that the United States has the capabilities necessary to launch and insert

2   United States national security payloads into space whenever such payloads are

3   needed in space." 10 U.S.C. § 2273(a).  This includes sustaining "the availability of

4   at least two space launch vehicles (or families of space launch vehicles) capable of

5   delivering into space any payload designated by the Secretary of Defense or the

6   Director of National Intelligence as a national security payload."  *Id.* § 2273(b)(1).

7   　　　SpaceX first claims that the Air Force has "risked assured access to space"

8   because it selected companies "proposing developmental solutions for all NSS

9   missions (Category A, B, and C)," rather than selecting its existing Falcon line, which

10  could provide some – but not all – of those missions.  Pl.s' Br. at 19.  This argument

11  misconstrues the nature of the assured access to space policy – which requires that

12  the United States have the capacity to deliver *all* payloads to orbit, not just some – as

13  well as the deferential standard of review imposed by the APA.

14  　　　SpaceX notes, correctly, that it proposed a "fully operational launch vehicle"

15  that could meet Category A and B missions.  *See id.*  The Air Force explicitly

16  acknowledged this as a strength.  *See* Tab 132, 41579 ███████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ███████████████████████████████████████████").

21  As is thoroughly explained in the Government's evaluation and decision documents,

22  the overall SpaceX offering ██████████████, and SpaceX did not receive an

23  award because its proposal was not among the most advantageous proposals.

24  　　　Merely satisfying *some* of the existing requirements does not comply with the

25  assured access to space requirement or the RFP itself, which require the system to be

26  able to launch "the heaviest and most complex payloads," Tab 38, 1260.  SpaceX –

27  whose ████████████████████████████████ suggests it

28

- 38 -

should get disposition form the risk posed by its Category C solution because it had
already developed capabilities for the easier and less demanding Category A and B
requirements.  But the RFP required that the company meet *all* requirements.  And,
as discussed *supra*, the Air Force reasonably judged the risk to determine that the
awarded offerors were most likely to be able to satisfy all the technical requirements
on the timeline provided.

Furthermore, the Air Force considered the potential impacts on maintaining
assured access to space from the selected portfolio of launch systems solutions.  First,
the Air Force selected three awards to help ensure multiple launch providers available
to meet NSS requirements in the future.  Second, the Air Force specifically evaluated
whether the approaches of the presumptive portfolio of three awardees would have
impacts on the maintenance of assured access to space.  The Air Force's decision
concluded, "based on the ratings, [its] decision is that the Government will award
LSA agreements to [ULA, Blue Origin, and Orbital] because this portfolio is most
advantageous in achieving the goal of assured access to space via two or more
domestic commercial launch service providers that also meet National Security Space
requirements on the required timeline.  This selection represents the best value to the
Government, both technically and financially, toward achieving this objective."  Tab
136, 41753.

SpaceX also observes that certain of the awarded offerors use common
components/common elements, *i.e.*, ULA and Blue Origin both use the BE-4 first
stage engine, and ULA and Orbital both use the GEM 63XL solid side booster.  Pl.'s
Br. at 19.  From this, SpaceX argues that these commonalities increased the risk that
the Air Force would not be able to satisfy the multiple vehicle requirements of 10
U.S.C. § 2273(b).  But the Air Force considered this risk mitigated.

At the onset, the Air Force expressly evaluated "whether a portfolio that
includes two approaches . . . that rely on a single company's engine development . . .

- 39 -

introduces risk to the Government in achieving assured access to space with two different domestic suppliers." Tab 136, 41753. In the final decision document, the Air Force "determined that the risk associated with two Offerors relying on a single engine development does not warrant a different portfolio outcome." The Air Force went on to express that "[t]he Government has used common propulsion systems in its current launch systems, demonstrating that this is an acceptable approach." *Id.* SpaceX claims that "the [Air Force] should have amended the LSA RFP, not ignored the risk," to introduce a new requirement related to common engines, Pl.'s Br. at 20, but this argument has not been administratively exhausted. *See, e.g.*, *Rittenhouse*, 305 F.3d at 965; *see also* Tab 38, 1263 ("Any objection to the [RFP] . . . must be presented in writing to the [agency] within 10 calendar days of (1) the release of this solicitation or (2) the date the objector knows or should have known the basis for its objection."). In any event, the Air Force chose not to do so because any attendant risk "was not considered critical in assessing the design approaches or the likelihood of achieving the Government's objectives." Tab 136, 41753. Plaintiff does not carry its burden in showing how such a determination was arbitrary or capricious.

Moreover, the Air Force explicitly considered the risks involved in both sets of common components, and considered those risks sufficiently mitigated. For the BE-4 engine, the Air Force noted that the engines are developing well, and that ULA had a ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ *See* Tab 132, 41445-46; *see also id.* at 41448 ("▌▌▌▌▌▌▌▌▌▌

- 40 -

1 ████████████████████████████████████████████

2 ████████████████████████ Blue Origin, which is developing the BE-4 engine,

3 also demonstrated its ability to mitigate the risks of such development. *See id.* at

4 41497-98 (discussing Blue Origin's adequate approach for BE-4 development).

5 Similarly, both ULA and Orbital █████████████████████████████

6 ███████████████████████████████████████.

7 *See, e.g., id.* at 41448, 41532. The Air Force's technical determinations and risk

8 assessments are entitled to deference, and SpaceX provides no reason to question the

9 Air Force's judgment.

10      **C.     The Air Force's Decision is Consistent with Congressional Direction**

11             **to End Reliance on Russian Rocket Engines for NSS Missions.**

12      Congress has directed that the Department of Defense "develop a next-

13 generation rocket propulsion system that enables the effective, efficient, and

14 expedient transition from the use of non-allied space launch engines to a domestic

15 alternative for national security space launches," 2015 NDAA § 1604(a)(1), *as

16 amended*. Congress prohibited the Department of Defense from awarding a contract

17 for the procurement of space launch activities using Russian rocket engines under

18 certain circumstances, *id.* § 1608, *as amended*.

19      The Air Force has been complying with Congressional direction to quickly

20 transition from the use of non-allied space launch engines since FY 2014, including

21 by undertaking technology maturation efforts to raise the technology readiness level

22 and increase the knowledge base for the domestic rocket propulsion industrial base,

23 and issuing RPS prototype development agreements to four domestic commercial

24 companies. *See* Tab 38, 1260. The Air Force also incorporated the RPS mandates

25 into the LSA RFP where continued RPS development was enabled, *see id.* at 1260,

26 1280; Tab 132, 41416, and all the awardees certified that they were in compliance

27 with these requirements. *See* Tab 120, 36724-26 (████████████████████

28                                    - 41 -

1    ███████████); Tab 121, 36779 (████████████████████

2    ████████████████████████████████████); Tab 122,

3    39684 (███████████████████

4    ██████████████████████).    Additionally, at no time has the

5    Government violated the requirements of the 2015 NDAA § 1608, nor has SpaceX

6    alleged any violation.  Rather, SpaceX claims that the LSA award decision "thwarts

7    Congressional direction to end reliance on Russian rocket engines for NSS missions,"

8    because, it states, "[t]he record confirms that [the Air Force] recognized the

9    substantial risk that none of the conceptual rockets it selected for award would meet"

10    the 2022 Category A/B deadline.  Pl.'s Br. at 20.  This is not so.

11    Section 1602 of the 2017 NDAA allowed the EELV Program to award launch

12    services contracts that include the use of Russian rocket engines until December 31,

13    2022 (with certain limitations on the amount of engines that could be used).  *See* Tab

14    38, 1288; *see also* Fiscal Year 2017 National Defense Authorization Act ("2017

15    NDAA") § 1602, Pub. L. No. 114-328, 130 Stat. 1999.  Moreover, the RFP Schedule

16    evaluation criteria considered the risk of Category A/B launch capability readiness by

17    April 1, 2022.  *Id.* at 1284.  The readiness date/capability date in the RFP for Category

18    A/B payloads is nine months earlier than the NDAA deadline to cease procurement

19    of launch services using Russian engines.  Thus, the Government specifically assessed

20    whether each Offeror's proposed launch system solution would have Category A/B

21    capability well before the last date that the Government could procure launch services

22    with Russian engines.

23    SpaceX's sole basis for objection is a retread of its quibble with the Air Force's

24    reasonable assessment of schedule risk.  It states that the Air Force "gave each

25    awardee a pass in the risk evaluation" because it assumed that the Air Force "would

26    use ULA's Russian-powered Atlas V or SpaceX's Falcon 9 to meet its mission

27    demands."  Pl.'s Br. at 20.  As previously discussed, *see supra* § I.A.2, this is simply

28
- 42 -

not so.   And contrary to SpaceX's assertions, the Government did not find "substantial" risk that the offerors' solutions would meet the RFP Category A/B capability timeline.   In fact, ULA received a ███████ rating for the Schedule subfactor.   Tab 132, 41460-61.   Additionally, although Blue Origin and Orbital received ██████████ ratings for the Schedule subfactor, the Government determined ████████████████████████████████████████████ ████████████████████████████.   *See id.* at 41514, 41558.   The Air Force ultimately concluded that "the Government will award LSA agreements to [ULA, Blue Origin, and Orbital] because this portfolio is most advantageous in achieving the goal of assured access to space via two or more domestic commercial launch service providers that also meet National Security Space requirements *on the required timeline*." Tab 136, 41753 (emphasis added).

## IV.   PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF IS INAPPROPRIATE.

In its complaint, Plaintiff seeks two forms of injunctive relief: (1) directing that an LSA contract be issued to SpaceX; or, as an alternative, (2) vacating and remanding the Air Force's LSA decision.  *See* Compl. ¶¶ 176, 191, 210, 254, 275; Pl.'s Br. 34-35.  It has not shown that either is appropriate.

The APA does not provide district courts "jurisdiction to order specific relief," such as the award of a contract.  *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).  Rather, "[t]he reviewing court shall hold unlawful and *set aside* agency action . . . found to be arbitrary [or] capricious."  5 U.S.C. § 706(2)(A). "Unlike a district court managing a 'garden variety civil suit,' a district court reviewing a final agency action 'does not perform its normal role but instead sits as an appellate tribunal.'  Thus, 'under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action

- 43 -

consistent with the correct legal standards.'" *Palisades Gen. Hosp*, 426 F.3d at 403 (quoting *Cty. of L.A. v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)); *see also Aqu Alliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 880 (E.D Cal. 2018) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action. In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.") (quoting *Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007).

Accordingly, SpaceX's request to be awarded an LSA under the APA fails as a basic matter of black-letter law. But it also fails on the facts. Since the LSAs were awarded, SpaceX has fundamentally changed the BFR spacecraft; renaming it the "Starship," and more importantly, making it out "of stainless steel rather than carbon fiber." Mike Wall, Why Elon Musk Turned to Stainless Steel for SpaceX's Starship Mars Rocket (Jan. 23, 2019), https://www.space.com/43101-elon-musk-explains-stainless-steel-starship.html (last visited Jan. 16, 2020); *see also* Tab 132, 41597 ("The primary structures for the [BFR] booster and the upper stage, including the propellant tanks, will be made of carbon fiber composite compatible with cryogenic liquids."). Given these fundamental changes in technical design, the Air Force should not be forced to award a contract to support a launch vehicle that Plaintiff is apparently no longer building.

Therefore, if any relief is proper, it is remand to the agency. Although the default remedy may be to also vacate the underlying agency action, "[t]he Ninth Circuit . . . does not mandate vacatur." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015); *see also Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curium). Rather, courts look to two factors in determining whether to vacate: "(1) the seriousness of an agency's errors and (2) the disruptive consequences that would result from vacatur." *AquAlliance v. U.S. Bureau of*

- 44 -

1  *Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018).  Here, the LSA program is

2  designed to meet important national security and foreign policy objectives, Tab 38,

3  1260, and there would be significant disruption if these LSAs, which have been in

4  place for a considerable period of time, were to be vacated.  For example, vacatur

5  would impact the NDAA-imposed deadlines for ending reliance on Russian engines;

6  a goal that would be frustrated to the extent that the LSA program is significantly

7  delayed.   Moreover, SpaceX has not shown that the Air Force has made *any* error,

8  much less significant ones.  Accordingly, the United States submits that if this court

9  determines that the APA requires remand – and it does not – the court should remand

10  without vacatur, or, at a minimum, request further briefing before determining

11  whether vacatur is appropriate.

## CONCLUSION:

13      For the aforementioned reasons, this Court should deny SpaceX's motion for

14  judgment on a certified administrative record and enter judgment in favor of the

15  United States.

17  Dated January 17, 2020                    Respectfully submitted,

18                                             JOSEPH H. HUNT
19                                             Assistant Attorney General

20                                             ANTHONY J. COPPOLINO
                                               Deputy Branch Director

21                                             */s/ Joseph E. Borson*
22                                             JOSEPH E. BORSON (Va. Bar No. 85519)
                                               Trial Attorney, U. S. Dept. of Justice
23                                             Civil Division, Federal Programs Branch
                                               1100 L St., NW
24                                             Washington, D.C. 20005
                                               Tel.   (202) 514-1944
25                                             Email:  joseph.borson@usdoj.gov

26                                             *Counsel for the United States of America*

- 45 -

## **PROOF OF SERVICE**

I hereby certify that on this 17th day of January 2020, I caused a true and correct copy of the foregoing Sealed Opposition to Plaintiff's Motion for Judgment on the Certified Record to be served by email on:

John D. Lombardo, Craig A. Holman, and Kara L. Daniels, Counsel for SpaceX

Scott E. Pickens, Counsel for Blue Origin, LLC

Todd R. Steggerda, Counsel for United Launch Services, LLC

Kevin P. Mullen, Counsel for Orbital Sciences Corporation.

Dated January 17, 2020                   Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
Trial Attorney, U. S. Dept. of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, D.C. 20005
Tel.   (202) 514-1944
Email:  joseph.borson@usdoj.gov

*Counsel for the United States of America*

- 46 -

Opposition to Plaintiff's Motion for Judgment on the Certified Record