1   **MORRISON & FOERSTER LLP**
    KEVIN P. MULLEN (*admitted pro hac vice*)
2   KMullen@mofo.com
    2000 Pennsylvania Ave., N.W.
3   Washington, D.C. 20006-1888
    Telephone: 202.887.1500
4   Facsimile: 202.887.0763

5   Attorney for Defendant-Intervenor
    Orbital Sciences Corporation
6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12   SPACE EXPLORATION                    Case No. 2:19-cv-07927-ODW-GJS
     TECHNOLOGIES CORP.,
13                                        Honorable Otis D. Wright II

14              Plaintiff,               **RESPONSIVE BRIEF TO
                                         PLAINTIFF'S MOTION FOR
15        v.                             JUDGMENT ON THE
                                         CERTIFIED RECORD**
16   UNITED STATES OF AMERICA,
                                         Date:  March 2, 2020
17              Defendant.               Time:  1:30 p.m.
                                         Ctrm:  5D, 5th Floor
18   and                                        First Street Courthouse
                                                350 W. First Street
19   UNITED LAUNCH ALLIANCE, LLC,               Los Angeles, CA 90012
     BLUE ORIGIN, LLC, and ORBITAL
20   SCIENCES CORPORATION,

21              Defendant-Intervenors.

22

23

24

25

26   ██████████████████████████████████████████

27        ████████████████████████████

28

─────────────────────────────────────────────────
**ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR –** ████████

1

# TABLE OF CONTENTS

2

Page

3 INTRODUCTION ..................................................................................... 1

4 STATEMENT OF FACTS ........................................................................ 4

DISCUSSION ............................................................................................ 8

5 I.      THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
6         WEIGH STRONGLY AGAINST INJUNCTIVE RELIEF ............................ 9

7         A.      Injunctive Relief Will Interfere with the National Security Mission of
                  this Critical Space Launch Program. ..................................................... 10

8         B.      Injunctive Relief Will Waste Significant Government and Contractor
                  Resources. .............................................................................................. 13

9         C.      SpaceX Has Failed to Show Irreparable Harm. .................................... 16

10 II.     PLAINTIFF HAS NOT SUCCEEDED ON THE MERITS. .......................... 18

          A.      Standard of Review ................................................................................ 19

11        B.      The Air Force Was Not Required, By The RFP Or By Statute, To
12                Award SpaceX An LSA To Promote Its Commercial Spaceflight
                  Aspirations. ............................................................................................ 22

13        C.      The Air Force's Cost Evaluation Was Fair and Reasonable. ............... 25

14                1.      The Air Force Properly Considered Government Investments in
                          ULA's and SpaceX's Respective LSA Solutions. ...................... 25

15                2.      The Air Force Did Not Overstate SpaceX's Total Costs or
                          Understate the Awardees' Total Costs. ...................................... 30

16        D.      The Air Force's Evaluation of Technical Risk Was Reasonable. ........ 35

17                1.      The Air Force Reasonably Considered Risks in SpaceX's
                          Category C Missions, Like It Considered Risks in the Other
18                        Offerors' Category A/B Missions. .............................................. 37

19                2.      The Air Force Reasonably Applied the RFP's Evaluation
                          Criteria. ....................................................................................... 41

20                3.      The Air Force Reasonably Assessed Weaknesses in SpaceX's
                          Category C Solution. .................................................................. 43

21 CONCLUSION ......................................................................................... 45

22 CERTIFICATE OF SERVICE ................................................................ 46

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aero Corp., S.A. v. United States,*
   38 Fed. Cl. 237 (1997)............................................................. 11

*Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,*
   56 Fed. Cl. 502 (2003)............................................................. 11

*Am. Corr. Healthcare, Inc. v. United States,*
   137 Fed. Cl. 395 (2018).............................................................. 8

*Animal Legal Def. Fund v. U.S. Dep't of Ag.,*
   223 F.Supp.3d 1008 (C.D. Cal. 2016)..................................... 20

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, Bureau of Land Mgmt,*
   273 F.3d 1229 (9th Cir. 2001) ................................................. 37

*Armstrong & Armstrong, Inc. v. United States,*
   514 F.2d 402 (9th Cir. 1975)................................................... 17

*Aurora World, Inc. v. Ty Inc.,*
   719 F.Supp.2d 1115 (C.D. Cal. 2009)..................................... 17

*Blue & Gold Fleet, L.P. v. United States,*
   492 F.3d 1308 (Fed. Cir. 2007) ........................................*passim*

*C.S. McCrossan Const., Inc. v. Minnesota Dep't of Transp.,*
   946 F. Supp. 2d 851 (D. Minn. 2013) ..................................... 21

*City and County of San Francisco v. United States,*
   130 F.3d 873 (9th Cir. 1997)....................................... 19, 20, 37

*Clarke v. Secs. Indus. Ass'n,*
   479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ............. 22

*Computer Scis. Corp. v. United States,*
   51 Fed. Cl. 297 (2002).............................................................. 11

ii

*CSE Construction Co., Inc. v. United States*,
   58 Fed. Cl. 230 (2003).........................................................................................12

*CW Gov't Travel, Inc. v. United States*,
   61 Fed. Cl. 559 (2004).........................................................................................13

*E.W. Bliss Co. v. United States*,
   77 F.3d 445 (Fed. Cir. 1996) ..............................................................................20

*Electra-Med Corp. v. United States*,
   140 Fed. Cl. 94 (2018)...........................................................................................8

*Femme Comp Inc. v. United States*,
   83 Fed. Cl. 704 (2008).........................................................................................21

*Furniture by Thurston v. United States*,
   103 Fed. Cl. 505 (2012).......................................................................................14

*Gentex Corp. v. United States*,
   58 Fed. Cl. 634 (2003).........................................................................................11

*Global Dynamics, LLC v. United States*,
   138 Fed. Cl. 207 (2018).........................................................................................8

*Gull Airborne Instruments, Inc. v. Weinberger*,
   694 F.2d 838 (D.C. Cir. 1982).............................................................................18

*Hazardous Waste Treatment Council v. Thomas*,
   885 F.2d 918 (D.C. Cir. 1989).............................................................................23

*Hi-Tech Bed Sys. Corp. v. United States Gen. Servs. Admin.*,
   No. 11-CV-293-S, 2012 WL 12871622 (D. Wyo. Mar. 8, 2012).......................21

*IBM Corp. v. United States*,
   118 Fed. Cl. 677 (2014).......................................................................................14

*JSA Healthcare Corp.*,
   B-242313; B-242313.2, Apr. 19, 1991, 91-1 CPD ¶ 388 at (Apr. 19,
   1991) ....................................................................................................................21

*McVey Co., Inc. v. United States*,
   111 Fed. Cl. 387 (2013).......................................................................................20

**ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR –**

*Nat'l Mall Tours of Washington, Inc. v. United States Dep't of the Interior*,
No. CV 15-0529 (ABJ), 2016 WL 8711706 (D.D.C. Mar. 18,
2016), aff'd in part, vacated in part, 862 F.3d 35 (D.C. Cir. 2017) ................... 21

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir. 2005) ................................................................................ 37

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) .............................................................. 8, 11, 19

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2015) ............................................................................. 16

*RX Joint Venture, LLC v. United States*,
140 Fed. Cl. 13 (2018) ......................................................................................... 21

*S.J. Amoroso Constr. Co. v. United States*,
981 F.2d 1073 (9th Cir. 1992) ............................................................................. 19

*Statistica, Inc.* v. *Christopher*,
102 F.3d 1577 (Fed. Cir. 1996) ..................................................................... 32, 33

*Twin Rivers Paper Co. LLC v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) ............................................................................ 22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................... 11, 19

**Statutes**

5 U.S.C. § 706 ................................................................................................ 18, 19

10 U.S.C. § 2273 ................................................................................... 10, 22, 23

10 U.S.C. § 2371b .................................................................................................. 18

23 U.S.C. §1346 .................................................................................................... 17

28 U.S.C. § 1491 .......................................................................................... 11, 19

Pub. L. 97-164, 96 Stat. 25, Sec. 132 (Apr. 2, 1982) ......................................... 11, 19

Pub. L. 113-291, 128 Stat. 3292, Sec. 1604 (Dec. 19, 2014) .................................. 12

**ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR –**

Pub. L. No. 114-92, § 1608, 128 Stat. 3292, 3626 (2014) ........................................22

**Other Authorities**

DEP'T OF DEF., INSPECTOR GENERAL, REPORT OF INVESTIGATION .............................3

Kenneth Chang, <u>SpaceX Unveils Silvery Vision to Mars: 'It's Basically an I.C.B.M. That Lands'</u>, N.Y. Times, Sept. 29, 2019..........................1

(Mar. 1, 2019), *https://www.losangeles.af.mil/News/Article-Display/Article/1776502/air-force-establishes-national-security-space-launch-program/* .......................................................................10

SpaceNews (Dec. 5, 2019), *https:// spacenews.com/air-force-soon-to-release-revised-launch-solicitation-in-response-to-gaos-ruling/* .........................8

SpaceNews (July 12, 2019), *https://spacenews.com/spacex-preparing-for-first-starship-test-flight/;*....................................................................7

SpaceNews (June 28, 2019), *https://spacenews.com/spacex-targets-2021-commercial-starship-launch/* .......................................................7

*U.S. Air Force*, SpaceNews (May 22, 2019), *https://spacenews.com/spacex-launches-new-legal-battle-against-u-s-air-force/* ...............................................................................................8

v

**INTRODUCTION**

Plaintiff Space Exploration Technologies Corp. ("SpaceX") asks the Court to enjoin the United States Air Force ("Air Force" or "Agency") and SpaceX's competitors from further developing launch systems that will deliver national security payloads into orbit, more than a year and hundreds of millions of dollars into development. As justification, SpaceX proffers its opinions, a number of news articles, and other extra-record evidence to challenge the expertise of the Agency evaluators, who reasonably concluded that SpaceX's proposed launch system did not merit award. Because the Agency's decision was sound, and because the relief SpaceX seeks will disrupt a critical defense initiative, impair national security, and waste millions in taxpayer dollars, the Court should deny SpaceX's request.

When the Air Force issued the Launch Services Agreement ("LSA") request for proposals ("RFP") in October 2017, it asked offerors to provide a plan for developing launch systems that could reliably deliver medium to heavy national security payloads into designated orbits with minimal risk of schedule disruption, cost increases, or degraded performance. *See* Certified Admin. R. ("AR") Tab 35, at AR 1065-67, 1087. Orbital Sciences Corporation ("Orbital") proposed its OmegA vehicle, United Launch Alliance ("ULA") proposed its Vulcan Centaur vehicle, and Blue Origin, LLC ("Blue Origin") proposed its New Glenn vehicle, each of which have an Intermediate and a Heavy variant that together will meet the Agency's needs. *See* AR Tab 132 at 41420-21. SpaceX, on the other hand, proposed a family of three launch vehicles: its existing Falcon 9 and Falcon Heavy for medium and intermediate payloads (Payload Categories A and B), and for heavy (Category C) payloads, a "truly revolutionary concept" vehicle called the Starship. *See id*. at AR 41421, 41620. With the Starship, SpaceX has not merely shot for the Moon – it has aimed for Mars.[1]

---

[1] *See* Kenneth Chang, <u>SpaceX Unveils Silvery Vision to Mars: 'It's Basically an I.C.B.M. That Lands'</u>, N.Y. Times, Sept. 29, 2019, *at https://www.nytimes.com/2019/09/29/science/elon-musk-spacex-starship.html* (citing Elon Musk, founder and Chief Executive Officer of SpaceX, for saying the company's "ultimate goal is for the Starship to take people to Mars").

1

1   Whereas the other offerors proposed commercial vehicles that can be scaled up to
2   meet the Air Force's unique national security needs, SpaceX proposed its vision for
3   an interplanetary taxi that, if it ever comes to fruition, could deliver national security
4   payloads into Earth orbit too. Not surprisingly, and as is clear from the Agency's
5   evaluation record, SpaceX's Starship proposal was too risky and too expensive, in
6   the Air Force's judgment.

7          The Air Force reasonably declined to subsidize SpaceX's Mars-shot, for
8   reasons clearly explained in its Final Evaluation Document (AR Tab 132), Portfolio
9   Recommendation for Award (AR Tab 135), and Award Decision Document (AR Tab
10  136). Contrary to SpaceX's suggestion otherwise, the Agency recognized the benefits
11  of SpaceX's "flight proven" Falcon 9 and Falcon Heavy for Category A/B missions,
12  noting "ample margin" in the schedule for horizontally integrated payloads (although
13  recognizing a risk in SpaceX's plan for ████████████████████, which it does
14  not currently support). *See* AR Tab 132 at 41616-17. The Agency also acknowledged
15  the "potentially groundbreaking technological capabilities" of the Starship vehicle
16  "if [that] approach proves viable." *Id*. at AR 41594.

17         But exactly because of the "technical complexity" of the Starship design,
18  which provides capabilities "notably in excess of Government requirements," the Air
19  Force identified significant risks in SpaceX's approach. *Id*. at AR 41593-94, 41621.
20  Not the least of these risks was presented by the Starship's ████████████████
21  ████████████████████████████████████████████, requiring
22  significant changes in Government infrastructure and operations, particularly for
23  ████████████████████████████████████████████████████████
24  ████████████████████████ *See id*. at AR 41588, 41595.

25         Taking this all into account, the Air Force's Source Selection Authority
26  concluded "the outstanding technical approach proposed by [SpaceX] is offset by the
27  risk of their approach and schedule," in which there was a "significant likelihood"
28  that the Starship would not be ready for Category C missions in 2025. AR Tab 136,

2

1   at 41753. Moreover, it would cost ***more than*** ████████—almost ████████

2   ████████████████████—of which SpaceX asked the Government to provide

3   ███████████████████████████████████.

4   *See id*. at 41752. The Air Force's Source Selection Authority thus determined SpaceX

5   "present[ed] the ██████████████████████████████," and she

6   reasonably selected the other three proposals as "the best value to the Government,

7   both technically and financially, toward achieving [the Agency's national security

8   space launch] objective." *Id*. at 41753. SpaceX's mere disagreement with that

9   decision does not make it arbitrary or capricious.[2]

10     SpaceX not only fails to overcome the deference to the Air Force's evaluation

11   judgment under the Administrative Procedure Act ("APA"), the relief it seeks is

12   futile: in the 14 months since their award, the LSAs have been substantially

13   performed, and award of follow-on Launch Services Procurement ("LSP") contracts

14   is just a few months away. Despite the urgency of the United States' mission to

15   establish these national security launch capabilities, SpaceX waited seven months

16   after award to file its court challenge, and has not sought preliminary injunctive relief

17   at any point in the seven months since. In that time, the Government, Orbital, and the

18   other awardees have invested significant resources performing the LSA awards.

19   Orbital, for one, has invested more than ████████ and significant labor to develop

20   its OmegA launch services vehicle, and that investment increases daily.

21     SpaceX asks the Court to undo all of this LSA work, at grave risk to national

22   security, and for what? To have the Air Force reevaluate proposals that are years out-

23   of-date, related to LSA development efforts that are well underway? There simply is

24   no case for injunctive relief here. The balance of harms and national security interest

25   militate so strongly against such drastic measures that, even if SpaceX's claims had

26

---

[2] Even SpaceX's founder, Chief Executive Officer, and lead designer Elon Musk has recognized

27   SpaceX wrote "a poor proposal that 'missed the mark.'" *See* Dep't of Def., Inspector General,
Report of Investigation: Mr. Patrick M. Shanahan, Acting Sec'y of Def. 27 (April 25,

28   2019).

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████████

1   merit (they do not), SpaceX's relief should be limited to its monetary damages (*i.e.*,

2   its bid and proposal costs).

3         Because the case against injunctive relief is so overwhelming, and because the

4   Government has more than adequately defended the merits of the LSA award

5   decision, this Brief first addresses the three non-merits factors for a permanent

6   injunction: (i) the threat to the Government's national security mission (Section I),

7   (ii) the substantial waste of taxpayer and contractor investment (Section II), and (iii)

8   SpaceX's inability to show irreparable harm (Section III). Then, in Section IV, the

9   Brief discusses the merits of SpaceX's APA claims. Because SpaceX cannot prevail

10   on any of these four legal prongs, the Court should deny SpaceX's requests for

11   injunctive and declaratory relief.

12   **STATEMENT OF FACTS**

13         In this Brief, Orbital relies on following facts, which emphasize and

14   supplement the facts set forth by Plaintiff and Defendant:

15         1.    The Air Force expressed the urgency of the Government's requirements

16   when requesting proposals for launch vehicle prototypes, describing its need to

17   "facilitate development of at least three EELV Launch System prototypes as early as

18   possible," and to "quickly transition from the use of non-allied space launch engines,

19   implement sustainable competition for National Security Space (NSS) launch

20   services, and maintain assured access to space" for the United States. AR Tab 35

21   (RFP) at 1065.

22         2.    On October 10, 2018, the Government and Orbital executed an LSA

23   with a total value of ▮▮▮▮▮▮▮▮, of which ▮▮▮▮▮▮▮ will be invested by

24   Orbital. To date, the Government has obligated more than ▮▮▮▮▮▮ to that LSA.

25   *See* Exh. A, Decl. of ▮▮▮▮▮▮▮ ("▮▮▮▮ Decl."), ¶ 3.

26         3.    Under the LSA, Orbital is developing and will qualify and certify, the

27   OmegA launch vehicle. *See* AR Tab 139a.1 at 42056. Successful performance of the

28   LSA "will provide the foundation for reliable and certified launch services for all

4

EELV-class National Security Space (NSS) missions and for civil and commercial missions." *Id*. The LSA "provides the foundation for recurring reliable launch services and assured access to space" by the United States. *Id*.; *see also* AR Tab 122 (Orbital Final Updated Proposal) at 37036 (recognizing "decisions made in the [EELV] development program have critical implications for the United States' national security for decades to come").

4. Orbital is developing three critical systems under the LSA: (1) the Intermediate series OmegA vehicle (for Category A and B class missions); (2) the Heavy series OmegA vehicle (for Category C class missions); and (3) a Rocket Propulsion System ("RPS") to support them both. *See* AR Tab 139a.1 at 42056. Orbital also is developing and building vehicle processing and launch infrastructure, including production, integration, and testing facilities in multiple states, as well as an East Coast and a West Coast Launch Site. *See id*. at 42060; ▮▮▮ Decl. ¶¶ 1-2

5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6. The LSA recognizes that the research findings and technology developments made under the agreement may "constitute a significant enhancement to the national defense, and to the economic vitality of the United States." AR Tab 139 at 42045.

7. Orbital's LSA contains numerous milestones, many of which Orbital has completed and received payment from the Air Force. *See* AR Tab 139a.2 at 42097.

8.    For example, █████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

9.    ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

10.    ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

11.    ███████████████████████████████████████
████████████████████████████████████████████████

12.    To date, the Government has invested more than ████████████ in Orbital's LSA alone, and nearly ████████████ in the OmegA launch system. ████████ Decl. ¶ 12. Orbital has expended approximately ████████████ performing the LSA. *See id.* This is just a mere fraction of the overall ████████████ Orbital has spent developing its OmegA launch vehicle and RPS. *Id.*

13.    Those investments are not fungible. The components Orbital is building are unique, optimized for the OmegA launch system, and cannot readily be used on other programs. *Id.* ¶ 13.

14.    Orbital currently has more than ████ employees working full-time on its OmegA launch system, many of whom could be laid off if the program is terminated. *Id.* ¶ 14. Even in the event of a temporary work stoppage, Orbital likely would lose many highly skilled employees to turnover or layoffs. *Id.*

15.    Termination or temporary work stoppage also would cause severe harm to Orbital's subcontractors and suppliers, which are many and span the country. *Id.*

6

¶ 15.  Orbital  has  designated  substantial  work  to  major  subcontractors ███ ███████████████████ as  well  as  many  small  businesses,  such  as ███████ ███████████████████████████████████████████████████, all of whom would be affected by removal of Government funding from Orbital's LSA. *Id.*

16.  The availability of the launch system Orbital is developing under the LSA, like those being developed by Blue Origin and ULA, is very important to the United States. Each of the LSAs contains a liquidated damages provision forecasting damages of $385 million if any one of the systems is not available under the EELV Phase 2 launch services procurement. *See* AR Tab 139 at 42050.

17.  The ultimate goal of the LSAs is certification of each launch services vehicle for production and provision of National Security Space Launch ("NSSL") services. *See* AR Tab 139a.1 at 42058 ("Development includes all efforts leading up to and including EELV certification . . . .").

18.  SpaceX proposed two launch vehicles that are already EELV-certified, along with its proposed Starship launch vehicle under development. *See* Compl. ¶ 11 (stating both the Falcon and Falcon Heavy vehicles are currently certified).

19.  SpaceX has continued to develop and test the Starship after losing the LSA competition. *See* Jeff Foust, *SpaceX preparing for first Starship test flight*, SpaceNews (July 12, 2019), *https://spacenews.com/spacex-preparing-for-first-starship-test-flight/*; Caleb Henry, *SpaceX targets 2021 commercial Starship launch*, SpaceNews (June 28, 2019), *https://spacenews.com/spacex-targets-2021-commercial-starship-launch/*.[3] LSA or no LSA, SpaceX intends to submit a proposal under the Phase 2 LSP procurement. *See* Compl. ¶ 87.

20.  The Air Force expects to award the Phase 2 LSP procurement contracts by June 2020. *See* Sandra Erwin, *Air Force soon to release revised launch*

---

[3] These articles are relevant to the Court's consideration of the injunctive relief SpaceX seeks, and are not intended to supplement the administrative record.

1  *solicitation in response to GAO ruling*, SpaceNews (Dec. 5, 2019), *https://*
2  *spacenews.com/air-force-soon-to-release-revised-launch-solicitation-in-response-*
3  *to-gaos-ruling/* (quoting Col. Robert Bongiovi); *see also* ▮▮▮▮▮ Decl. ¶ 16.

4      21.   Despite filing this protest, SpaceX has stated it "support[s] the Air Force
5  moving forward with its Phase 2 acquisition strategy for national security space
6  launches as currently planned." *See* Sandra Erwin, *SpaceX launches new legal battle*
7  *against U.S. Air Force*, SpaceNews (May 22, 2019), *https://spacenews.com/spacex-*
8  *launches-new-legal-battle-against-u-s-air-force/* (quoting a company spokesperson).

9  ## DISCUSSION

10      SpaceX asks the Court to halt work on the LSAs and direct the Air Force to
11  repeat an evaluation it performed more than 16 months ago. The grounds on which
12  SpaceX asks the Court to do so are lacking. But even if they had merit, the substantial
13  harms to the Government, the current LSA performers, and the American public
14  greatly outweigh the limited, speculative harm to SpaceX injunctive relief might
15  avoid.

16      For the Court "to grant a permanent injunction, Plaintiff must demonstrate:
17  (1) actual success on the merits; (2) a likelihood of irreparable injury if injunctive
18  relief is not granted; (3) a balance of hardships favoring Plaintiff; and (4) that an
19  injunction will advance the public interest." *Wecosign, Inc. v. IFG Holdings, Inc.*,
20  845 F.Supp.2d 1072, 1083-84 (C.D. Cal. 2012) (citing *Winter v. Natural Res. Def.*
21  *Council*, 555 U.S. 7, 129 S.Ct. 365, 368, 172 L.Ed.2d 249 (2008)).

22      SpaceX's protest is on the losing side of all four factors, but it is particularly
23  outweighed in the balance of hardships and public interest. *See Earth Island Inst. v.*
24  *Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quoting *Winter*, 129 S.Ct. at 368, to
25  instruct that, before granting injunctive relief, "courts must 'give serious
26  consideration to the balance of equities and the public interest'"). In bid protests like
27  this, where "the harm to the plaintiffs is somewhat speculative, while the harm to the
28  agency is real and potentially grave," and the "public interest favors avoiding those

1   harms," courts will deny an injunction even for a meritorious challenge to an agency

2   award decision. *See Electra-Med Corp. v. United States*, 140 Fed. Cl. 94, 107 (2018)

3   (denying injunction despite holding contract modifications violated law); *see also*

4   *Global Dynamics, LLC v. United States*, 138 Fed. Cl. 207, 211 (2018) (despite clear

5   error in procurement, the court could not "in good conscience, grant an injunction

6   that would risk an interruption in medical services to military personnel and their

7   dependents," particularly given the significant extent to which the contract would

8   have already been performed by the time at transition could be made).

9   **I.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
10        WEIGH STRONGLY AGAINST INJUNCTIVE RELIEF.**

11        SpaceX seeks injunctive relief preventing further government investment or

12   contractor expenditures under the LSAs until the Air Force reopens the competition,

13   reevaluates proposals, and makes new award decisions. SpaceX thus asks this Court

14   to disregard what will be at least 17 months of performance by each LSA awardee

15   and hundreds of millions of dollars expended to date on this critical national security

16   program, in order to allow SpaceX the chance to overcome the shortcomings in its

17   proposal, recompete, and potentially receive an award. At this point, however, the

18   Agency cannot simply reevaluate the proposals offerors submitted on November 20,

19   2017—the proposals are long outdated. Instead, offerors would need to draft new

20   proposals, and the Agency would have to undertake a new evaluation from scratch,

21   a process that would take months (the first time around, the LSA competition took

22   nearly a year), dragging well past the LSP awards in June 2020 and derailing the

23   Agency's mission-critical path to national security space launches by 2022.[4]

24   ───────────────

25   [4] To the extent SpaceX claims it seeks only that the Air Force issue a fourth LSA based on SpaceX's
     proposal, and not to disrupt the existing LSAs, such relief is impractical. SpaceX's proposal, like
     the others, is more than two years out of date, and during that time SpaceX's development efforts
26   for its Starship have proceeded unabated. *See supra* at 7, ¶ 19. Furthermore, the Air Force's budget
     constraints prevent it from funding four LSAs. ████████████████████████████████

27   ████████████████████████████████████████████████████████████████████

28

**ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR –** ████████

1   Even more problematic, SpaceX asks the Court to insert itself into this critical

2   national security program – the importance and urgency of which is recognized by

3   both Congress and the Executive – that is intended to establish multiple competitive

4   proposals for rapid, responsive, and reliable services to launch national security

5   payloads into space. For the Court to do so would result in great harm, not only to

6   the Government and the LSA awardees, but to the national security of the United

7   States, by impeding this critical Air Force mission.

8   The Air Force expressed the urgency of this mission when requesting

9   proposals for launch vehicle prototypes, describing its need to "facilitate

10  development of at least three EELV Launch System prototypes as early as possible,"

11  and to "quickly transition from the use of non-allied space launch engines, implement

12  sustainable competition for National Security Space (NSS) launch services, and

13  maintain assured access to space" for the United States. AR Tab 35 (RFP) at 1065.

14  Even if SpaceX's protest had merit, the balance of hardships and public interest so

15  strongly favor continuing work under the LSAs, SpaceX would not be entitled to

16  injunctive relief.

17      **A.    Injunctive Relief Will Interfere with the National Security Mission
            of this Critical Space Launch Program.**

18

19  "[T]his is one of the most critical times in the national security space history."[5]

20  Consistent with national policy set by Congress and the Executive, "the Air Force

21  intends to ensure that there are two reliable sources for all national security launches,"

22  and plans to award launch services contracts "as soon as possible, but no later than

23  2020 for 2022 launches." AR Tab 35 (RFP) at 1066; *see* 10 U.S.C. § 2273(a) ("It is

24  the policy of the United States for the President to undertake actions appropriate to

25  ensure, to the maximum extent practicable, that the United States has the capabilities

26

27  _____
    [5] Press Release, Space and Missile Systems Center Public Affairs, "Air Force establishes National
    Security Space Launch program" (Mar. 1, 2019), *https://www.losangeles.af.mil/News/Article-*
    *Display/Article/1776502/air-force-establishes-national-security-space-launch-program/* (quoting

28  Space and Missile Systems Center Launch Enterprise Directorate director Col. Robert Bongiovi).

necessary to launch and insert United States national security payloads into space whenever such payloads are needed in space."). To grant SpaceX the relief it seeks, the Court would unnecessarily insert itself into that critical national security policymaking process and impede the Air Force's mission.

The courts owe "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (recognizing "neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people" (quoting *Boumediene v. Bush*, 553 U.S. 723, 797 (2008))). Congress has expressed the need for courts to "give due regard to the interests of national defense or national security," in particular when reviewing challenges to government acquisition decisions. *See* Pub. L. 97-164, 96 Stat. 25, Sec. 132 (Apr. 2, 1982); 28 U.S.C. § 1491(b)(3) (requiring the U.S. Court of Federal Claims to give due regard to national defense and national security in shaping its relief in bid protests); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-27 (Fed. Cir. 2004) (emphasizing that the court is not required to set aside even an arbitrary, capricious, or otherwise unlawful award if doing so would jeopardize national defense or national security interests).

Accordingly, courts routinely deny injunctive relief in bid protests where the underlying solicitation implicates national defense and security. *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 241-42 (1997) ("The fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harms factor on defendant's side of the scale."); *Computer Scis. Corp. v. United States*, 51 Fed. Cl. 297, 323 (2002) ("The impact of delaying the transition period for the Contract will adversely affect the support required by this country's critical defense programs, thus creating possible severe national security ramifications during this unique time."); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 656 (2003) (denying injunctive relief, even though protester succeeded on

11

1   merits, because procurement was critical to national security); *Al Ghanim Combined*

2   *Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 521-22

3   (2003) (denying injunctive relief on national security grounds because contract

4   involved construction of housing for U.S. military personnel in Kuwait, which was

5   "of paramount import"); *CSE Construction Co., Inc. v. United States*, 58 Fed. Cl.

6   230, 262-63 (2003) (holding national security concerns and balance of equities tipped

7   scales decisively against injunctive relief where contract for firing range renovations,

8   if delayed, would raise national defense concerns).

9         There can be no doubt the National Security Space Launch ("NSSL") program

10   advances national security interests. As Congress determined at the outset of the

11   program, "sustaining two launch vehicles or families of launch vehicles is important

12   to ensuring that the United States can deliver critical national security payloads into

13   orbit." H.R. Conf. Rept. 108-354. The LSA RFP, and resulting LSA awards, provide

14   for "critical milestones in the development of a launch system," development that

15   "constitute[s] a significant enhancement to the national defense." *See* AR Tab 35

16   (RFP) at 1114, 1148. Moreover, the LSAs include continued development,

17   qualification, and certification of domestically manufactured Rocket Propulsion

18   Systems ("RPSs"), furthering the goal of "develop[ing] a next-generation rocket

19   propulsion system that enables the effective, efficient, and expedient transition from

20   the use of non-allied space launch engines to a domestic alternative for national

21   security space launches," which Congress has directed the Department of Defense to

22   complete by "not later than 2019." Pub. L. 113-291, 128 Stat. 3292, Sec. 1604 (Dec.

23   19, 2014).

24         The development and testing being performed under the LSAs is urgent. To be

25   able to perform under the Phase 2 procurement, each launch system must be certified

26   for NSSL (previously "EELV") launches within two years of LSP award. *See* ████

27   Decl. ¶ 16. SpaceX already has two certified vehicles to offer, but the other

28   competitors do not. Removal of any other offeror will jeopardize the Government's

12

1   mission. In this regard, the Government recognized the importance of each offeror's
2   availability in the text of LSAs, which requires payment of damages of approximately
3   $385 million if any offeror withholds its launch vehicles from the LSP competition.
4   *See, e.g.*, AR Tab 139 at 42050.

5   In fashioning its judgment in this case, regardless of the outcome on the merits,
6   the Court must give due regard to these national security interests, their urgency, and
7   the severe negative effect an injunction would have on the United States' ability to
8   deliver payloads for national security purposes into orbit. Those interests
9   overwhelmingly weigh against granting an injunction for any aspect of the ongoing
10   LSA work.

11   **B.   Injunctive Relief Will Waste Significant Government and**
12   **Contractor Resources.**

13   In addition to frustrating the United States' mission to establish reliable launch
14   services for national security payloads, an injunction on further LSA performance
15   also would waste hundreds of millions of dollars invested to date by the Government
16   and the LSA awardees. Should SpaceX actually receive the ultimate relief it seeks—
17   its own LSA award—the Government and at least one of the current awardees will
18   see a significant portion of that investment effectively wasted. This is the inevitable
19   consequence of the relief SpaceX demands because the Air Force's budget for the
20   LSA phase of the NSSL program will accommodate only three LSA awardees. ███
21   ████████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████████
23   ████████████████████████████████████████████ AR Tab 4 at
24   172 (stating intent to award "up to 3 LSAs"); AR Tab 15b at 557.5, 557.13 (briefing
25   for peer review by ██████████████████████████████, noting intent
26   to award "up to 3 LSAs" and addressing ███████████████████
27   ███████████).

28

13

Injunctive relief is not available where it would result in a significant waste of resources. *See CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 578 (2004) (denying injunctive relief where the government and the awardee had "expended a significant amount of time, effort, and resources in the development of the thus far elusive and highly complex" system); *Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 522 (2012) (finding injunctive relief inappropriate where awardee had performed a substantial portion of the contract, despite plaintiff prevailing on the merits of its bid protest). Courts have found the balance of the hardships militates against injunctive relief that will "upset, rather than preserve, the status quo" and "jeopardiz[e] not only [an agency's] ability to meet its deadline, but also the livelihood of [those] employees currently working" on a contract. *See IBM Corp. v. United States*, 118 Fed. Cl. 677, 685 (2014).

Based on the milestone schedules in the LSAs, the Government has invested nearly ▮▮▮▮▮ in the current LSAs—and that does not include the substantial Government resources devoted to planning the acquisition, evaluating proposals, and managing performance. *See* AR Tab 138a.2 at 41821-23 (showing ▮▮▮▮▮ in milestone payments to Blue Origin by January 2020); AR Tab 139a.2 at 42097 (showing ▮▮▮▮▮ in milestone payments to Orbital by January 2020); AR Tab 140a.2 at 42374 (showing ▮▮▮▮▮ in milestone payments to ULA by January 2020). The Government's total investment to date may be even greater than expected in the LSAs, as offerors may have reached milestones earlier than anticipated, and may have received funds separately for components like the RPS; the Government has already invested more than ▮▮▮▮▮ into Orbital's LSA alone, and nearly ▮▮▮▮▮ into the OmegA launch system. ▮▮▮ Decl. ¶ 12.

Orbital and the other LSA awardees also have invested significant resources. Orbital has invested approximately ▮▮▮▮▮ under its LSA, and approximately ▮▮▮▮▮ overall in its OmegA launch vehicle. *Id.* Through these investments, Orbital has reached critical levels of development for many of its systems. Orbital

14

1   has successfully performed numerous milestone tests ████████████

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ██████████████████████

8          These investments are particular to the OmegA launch system, which is being

9   developed specifically to support the Government's national security payloads. If the

10  Court were to force the Air Force to rescind Orbital's LSA, and as a result jeopardize

11  the viability of Orbital's OmegA launch system, much of that investment would be

12  rendered useless, as the technologies developed do not readily transfer to other

13  systems or other customers. *Id*. ¶ 13. The other LSA awardees – Blue Origin and

14  ULA – could suffer similar levels of wasted development, with corresponding loss

15  of the Air Force's investments in their LSA development, if the Court grants SpaceX

16  the injunctive relief it seeks.

17         Orbital has devoted a significant part of its skilled workforce to its OmegA

18  efforts, of which its LSA is a critical part. In the event of a termination or even a

19  temporary work stoppage, Orbital would lose numerous employees, including many

20  who are highly skilled, to turnover and layoffs. *Id*. ¶¶ 14-15.

21         The likelihood that an injunction would cause such unnecessary waste is

22  heightened by the impending Phase 2 launch services procurement. To compete in

23  Phase 2, offerors must propose a launch vehicle that will be certified for EELV

24  launches by the time of award, *see* AR Tab 4 at 191, which is currently expected in

25  June 2020. ██████ Decl. ¶ 16. Any delay in Orbital's efforts under its LSA would

26  prevent Orbital from meeting this deadline. (This is likely the case for the other two

27  LSA awardees as well.) Orbital and the Government have invested significant

28  amounts in taking the OmegA systems through varying levels of design review, and

15

1   critical milestones are quickly approaching. For example, ████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████  Thus,

5   the harm to Orbital from injunctive relief that would interrupt the planned

6   development process, even if Orbital's LSA is ultimately left in place, is substantial.

7          Injunctive relief will cause irreparable and substantial harm to the

8   Government, the LSA awardees, and the public interest, both by impeding a critical

9   mission of United States national security, and by causing substantial waste of public

10  funds and resources. No error in the procurement process, and certainly none of those

11  alleged by SpaceX, is insufficient to warrant such harms. Accordingly, SpaceX's

12  request for injunctive relief should be denied.

13         **C.    SpaceX Has Failed to Show Irreparable Harm.**

14         In comparison to the certain and substantial harm to the Government, the LSA

15  awardees, and the public interest, SpaceX's asserted harms are fatally speculative.

16  *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2015) (movant

17  "must establish a likelihood of irreparable harm that is grounded in evidence, not in

18  conclusory or speculative allegations of harm"). SpaceX claims it will suffer a "long-

19  term competitive disadvantage" in Air Force launch services because it will miss "the

20  cooperative process and insights that the Air Force will provide to LSA awardees"

21  and "input as each awardee designs vehicles that will ultimately compete against

22  SpaceX's proposed launch vehicles in the Phase 2 Competition." *See* Pl.'s Mot. J.

23  Admin. R. ("MJAR"), Exh. A, at 10-11.

24         But SpaceX has repeatedly claimed its launch vehicles for the Phase 2

25  competition are "proven" and "already capable of launching all Category A/B

26  payloads." MJAR at 24. Furthermore, SpaceX's suggestion that, absent injunctive

27  relief, it will not have the "ability to anticipate and fully address the Agency's design

28  priorities and technical requirements for the Phase 2 Competition and in the future,"

1  *see* MJAR 24, ignores the Agency's thorough description of its priorities and

2  technical requirements in the RFP for the Phase 2 Competition. *See* Suppl. Compl.,

3  Exhs. A-D.

4      Even with the relief SpaceX seeks – *i.e.,* a chance to compete again for an LSA

5  award – SpaceX is not guaranteed an LSA award. Furthermore, it is unclear what

6  activities an LSA award would cover that SpaceX is not already pursuing at its own

7  expense for commercial purposes. SpaceX already has two EELV-certified vehicles

8  it can propose for the Phase 2 procurement (Falcon and Falcon Heavy), and it

9  continues to develop its third vehicle, Starship, for commercial uses without an LSA.

10  The result of injunctive relief—indeed, perhaps the ultimate goal of SpaceX's

11  protest—appears to be to remove competitors from the Phase 2 launch services

12  procurement as SpaceX secures additional Government funding for its Mars-shot

13  Starship vehicle.

14      With LSP awards expected by June 2020 (just three months after the earliest

15  date on which the Court could grant SpaceX's relief), an injunction would have no

16  meaningful effect on the harms SpaceX alleges. SpaceX cites its loss of a competitive

17  advantage in the LSP procurement as the primary source of its nonmonetary harm,

18  but that competition will be over long before SpaceX can even begin to perform under

19  an LSA. And SpaceX does not suggest the LSP awards should be delayed; to the

20  contrary, it publicly announced its support for their award as originally planned in

21  2019. *See supra* at 8, ¶ 21.

22      Given the futility of the injunctive relief SpaceX seeks, the only feasible relief

23  available to SpaceX is recovery of its bid and proposal costs, for which SpaceX has

24  an adequate remedy at law. *See Armstrong & Armstrong, Inc. v. United States*, 514

25  F.2d 402, 403 (9th Cir. 1975) (affirming award of bid and proposal costs to

26  disappointed bidder); *see also Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115,

27  1125-26 (C.D. Cal. 2009) ("If the harm to plaintiff is merely monetary, it 'will not

28  usually support injunctive relief.'" (quoting *Am. Trucking Ass'ns, Inc. v. City of Los*

17

1  *Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009)). Under the circumstances, that is the
2  only relief worthy of the Court's consideration in this case.

3  **II.    PLAINTIFF HAS NOT SUCCEEDED ON THE MERITS.**

4       SpaceX's claims also fail on their merits. As an initial matter, SpaceX
5  misstates the applicable standard of review in this case. The APA establishes the
6  standard of review here, not the Competition in Contracting Act of 1984, a statute
7  from which Congress intentionally exempted other transaction agreements like the
8  LSAs. When awarding such agreements, Congress requires the Department of
9  Defense only to use "competitive procedures" to "the maximum extent practicable,"
10  and there is no disputing that the LSA awards were competitive. *See* 10 U.S.C.
11  § 2371b(b); AR Tab 38 (RFP) at 1262 ("Competition Process"). To prevail, SpaceX
12  must show the Air Force carried out this charge – to use competitive procedures to
13  the maximum extent practicable – in an arbitrary, capricious, or unlawful manner.
14  *See* 5 U.S.C. § 706. Both the APA and the underlying statute on which SpaceX relies
15  confer enormous deference to the Agency, deference that is only heightened in cases
16  like this, where implications for national security are severe and the rationale
17  underlying the Agency's judgment is technically complex. *See*, *infra*, Sections II.A,
18  II.D.

19       Under any standard, SpaceX fails to show a prejudicial error in the Agency's
20  evaluation or its source selection decision. The Air Force considered proposals
21  evenhandedly and to the letter of the RFP. The Agency justifiably concluded
22  SpaceX's proposal was ███████████████████████████████████████
23  ████████████████████████████████████████████████████████████████
24  ██████████████████████████████████ primarily because SpaceX relied on development of
25  a vehicle capable of interplanetary travel, the potential benefits of which the Agency
26  determined are greatly outweighed by the cost and risk. That conclusion was not
27  arbitrary or capricious; it was well-documented and rational. Accordingly, SpaceX's
28  claims should be denied.

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ███████████

## A.     Standard of Review

Under the APA, a court may set aside agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(a)(2). "This standard of review is narrow; a reviewing court may not substitute its own judgment for that of the agency." *City and County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). The Ninth Circuit has recognized this deference in the context of Government procurement decisions: "Courts, it has been said, should overturn procurement decisions only if there is no rational basis for them." *S.J. Amoroso Constr. Co. v. United States*, 981 F.2d 1073 (9th Cir. 1992) (*citing Steinthal v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). Also relevant here, when Congress has charged the Agency by statute to carry out legislative initiatives, "great deference is given to an agency's interpretation of the statute it is charged to administer." *S.J. Amorsos Constr.*, 981 F.2d at 1073 (citing *Udall v. Tallman*, 380 U.S. 1, 16 (1965)).

Courts accord a procuring agency an even higher degree of deference for matters important to the national security and matters that are technical in nature. The Air Force's decision here satisfies both of these criteria. First, the Air Force's use of its agreement authority to carry out prototype projects is critical to the national security. The courts thus owe "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Congress has expressed the need for courts to "give due regard to the interests of national defense or national security," in particular when reviewing challenges to government acquisition decisions. *See* Pub. L. 97-164, 96 Stat. 25, Sec. 132 (Apr. 2, 1982); 28 U.S.C. § 1491(b)(3) (requiring the Court of Federal Claims to give due regard to national defense and national security in shaping its relief in bid protests); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-27 (Fed. Cir. 2004) (emphasizing that the court is not required to set aside even an arbitrary, capricious, or otherwise unlawful

19

1   award if doing so would jeopardize national defense or national security interests).

2   Second, the Ninth Circuit has noted that "[d]eference to the agency's

3   determinations is warranted with respect to the[] allegations in particular due to their

4   detail and technical nature." *City and County of San Francisco*, 130 F.3d at 877

5   (citing *Elcon Enters. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1478-

6   79 (D.C. Cir. 1992)). When adjudicating bid protests challenging federal agency

7   acquisition decisions, the Court of Federal Claims has long noted that it must be

8   "particularly deferential to an agency's technical evaluation." *McVey Co., Inc. v.*

9   *United States*, 111 Fed. Cl. 387, 417–18 (2013); *see also E.W. Bliss Co. v. United*

10  *States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (noting that agencies' technical evaluations

11  "involve discretionary determinations of procurement officials that a court will not

12  second guess"). Similarly, this Court has recognized it must defer to an agency's

13  technical conclusions so long as "the agency's reasoning is not totally implausible."

14  *Animal Legal Def. Fund v. U.S. Dep't of Ag.*, 223 F.Supp.3d 1008, 1022 (C.D. Cal.

15  2016).

16  In addition to this well-established and deferential standard, there are two

17  further principles related to a court's review of agency procurement decisions that

18  are relevant here. The first is that the Court's review is generally limited to the

19  evaluation record; that is the contemporaneous record material available to the Air

20  Force leading up to and including the award decisions. Plaintiff attempts to bolster

21  its case by relying on verbal statements made at the post-award debriefings. *See, e.g.*,

22  Suppl. Compl. ¶ 184. Although these arguments are factually flawed, as explained

23  below, it is important to distinguish the probative value of the contemporaneous

24  record material from an agency's post-award statements.

25  The Court of Federal Claims and the Government Accountability Office

26  ("GAO") have long recognized that post-award statements, particularly verbal

27  statements made at debriefings, are of limited value to adjudicating disputes,

28  particularly where the post-award statements are not supported by the official and

20

contemporaneous evaluation record. *See RX Joint Venture, LLC v. United States*, 140 Fed. Cl. 13, 24 (2018) (rejecting the plaintiff's assertion that statements made at the post-award debriefing demonstrated agency error because "there is no such evidence in the administrative record"); *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 731–32 (2008) (finding that the evaluation record did not contain evidence to support the plaintiff's position "despite what the Army may have indicated in the postaward debriefing"); *JSA Healthcare Corp.*, B-242313; B-242313.2, Apr. 19, 1991, 91-1 CPD ¶ 388 at (Apr. 19, 1991) ("[S]ince a debriefing is only an after-the-fact explanation of the selection decision and not the selection itself . . . we are primarily concerned with the evaluation record and not the reference to 'new blood' at the debriefing.") (internal citations omitted).

The second principle, which is well-established in the U.S. Court of Appeals for the Federal Circuit, is that a plaintiff who "has the opportunity to object to the terms of a Government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007). This rule has been applied strictly in myriad cases at the Court of Federal Claims to dispose of untimely post-award challenges to solicitation terms. District courts evaluating challenges to government procurements that are, like here, outside the context of the Court of Federal Claims' Tucker Act jurisdiction likewise have rejected late challenges to a government solicitation. *See Nat'l Mall Tours of Washington, Inc. v. United States Dep't of the Interior*, No. CV 15-0529 (ABJ), 2016 WL 8711706, at *16, n.15 (D.D.C. Mar. 18, 2016), aff'd in part, vacated in part, 862 F.3d 35 (D.C. Cir. 2017); *Hi-Tech Bed Sys. Corp. v. United States Gen. Servs. Admin.*, No. 11-CV-293-S, 2012 WL 12871622, at *8, n.8 (D. Wyo. Mar. 8, 2012); *C.S. McCrossan Const., Inc. v. Minnesota Dep't of Transp.*, 946 F. Supp. 2d 851, 862, n.17 (D. Minn. 2013). As explained below, some of SpaceX's arguments are plain or thinly veiled challenges to the terms of the LSA RFP. Such arguments—

21

which SpaceX is asserting more than two years *after* the submission of proposals on
November 20, 2017—have long been waived and must be rejected.

**B.    The Air Force Was Not Required, By The RFP Or By Statute, To Award SpaceX An LSA To Promote Its Commercial Spaceflight Aspirations.**

SpaceX leads its Motion with the argument that, by omitting SpaceX's
proposal from the portfolio of awards, the Air Force defied Congress and violated
the RFP. Any result in which SpaceX did not receive an LSA, SpaceX seems to argue,
was impermissible. One wonders, if SpaceX's position were correct, why the Air
Force would even hold a competition, when instead it could simply set aside a
directed award to SpaceX and let the others compete for the remainder of the launch
requirements. The RFP made evident the Agency's decision to conduct an LSA
competition, one in which SpaceX was not guaranteed an award, and SpaceX's
arguments now, suggesting any reasonable portfolio of awards must necessarily
include SpaceX, are untimely. *See*, *supra*, Section IV.A. In any event, the relevant
statutes and the RFP do not support the merits of SpaceX's claim.

As a threshold matter, SpaceX is not a suitable party-in-interest to assert its
statutory claims. To seek judicial review under the APA, a plaintiff must assert
interests falling "arguably within the zone of interest to be protected or regulated."
*Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396, 107 S.Ct. 750, 93 L.Ed.2d 757
(1987). Such interests must be asserted either by intended beneficiaries of a statute
or by other "suitable challengers," *i.e.* "parties whose interests coincide systemically,
not fortuitously with those of intended beneficiaries." *See Twin Rivers Paper Co.
LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (internal quotation omitted).

SpaceX is not an intended beneficiary of the appropriations statutes it cites,
which were enacted to remove a foreign dependency (the Russian RD-180 engine)
from the defense industrial base and provide for the common defense by maintaining
a responsive, cost-effective, and reliable NSSL program. *See* 10 U.S.C. § 2273; Pub.
L. No. 114-92, § 1608, 128 Stat. 3292, 3626 (2014). Indeed, as a contractor pursuing

22

its own business interests, SpaceX does not have legal standing to present a "claim . . . under an appropriations law in order to challenge the Defense Department's decision to purchase one type of weapon rather than another." *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C. Cir. 1989) (holding by analogy that such a challenger is not suitable because "[t]he interest of such a firm in profits is not limited by the public's need for its type of weapon, and notwithstanding the sometimes contrary impression one encounters, the annual defense appropriation is not passed *in order* to benefit defense contractors, benefit them though it may" (emphasis in original)). Thus, to the extent SpaceX's claims rest on alleged violations of appropriations statutes or the policy regarding assured access to space under 10 U.S.C. § 2273, they must be dismissed.

Furthermore, even if SpaceX were a suitable party to raise a statutory challenge to the Air Force's LSA awards, the statutes do not say what SpaceX suggests. The "[p]olicy regarding assured access to space" at 10 U.S.C. § 2273 is just that: a "*policy* of the United States for the President to undertake actions appropriate to ensure, to the maximum extent practicable, that the United States has the capabilities necessary to launch and insert United States national security payloads into space whenever such payloads are needed in space." 10 U.S.C. § 2273(a) (emphasis added). In undertaking these actions, the President is to provide "resources and policy guidance" to sustain at least two capable launch vehicles, a robust infrastructure and industrial base, and the availability of rapid, responsive, and reliable space launches. 10 U.S.C. § 2273(b). Similarly, Section 1605 of the National Defense Authorization Act for Fiscal Year 2018 limits the Air Force's use of funds under the EELV program to three purposes, one of which is to "develop a domestic rocket propulsion system to replace non-allied space launch engines" (*i.e.*, the RPS program), and another is to "develop capabilities necessary *to enable* existing *or planned* commercially available space launch vehicles or infrastructure *that are primarily for national security space missions*." Pub. L. No. 115-91, §1605, 131 Stat. 1283, 1724-25 (2017)

23

(emphasis added). These statutes do not require an LSA award to an existing commercial vehicle, as SpaceX demands. To the contrary, they ***support*** the development of new alternatives. SpaceX's statutory claims are based on flawed inferences of Congress's intent, which have no basis in the statutes' plain language.

SpaceX also twists the language of the RFP to support its statutory claims. The RFP did not contain evaluation criteria requiring "currently viable, commercial launch vehicles," or "operational, domestically-produced rockets already certified." *Contra* MJAR 17-18. Instead, the RFP stated the Agency would select a portfolio of solutions that, based on the identified evaluation criteria (EELV Approach, Technical Risk, and Investment Cost), were "***most advantageous in achieving the Government's goal*** of assured access to space via two or more domestic commercial launch service providers that also meet NSS requirements," taking into consideration funding limitations. AR Tab 38 at 1285 (emphasis added).

Contrary to SpaceX's position, the stated purpose of the RFP was not to award LSAs to existing commercial launch service providers, but for "shared public-private investment in the ***development*** of launch system prototypes . . . for industry to provide domestic commercial launch services that meet all NSS requirements." *Id*. at AR 1261 (emphasis added). As indicated in the RFP, the Agency intends to realize "Government's goal of assured access to space via two or more domestic commercial launch service providers" upon award of the LSP procurement contracts this year, and a portfolio that maximizes competition for those awards by establishing multiple viable options is the "most advantageous in achieving" that goal.

SpaceX's allegations that the Agency deviated from the RFP's evaluation criteria are specious as well, each rehashing SpaceX's complaint that the other offerors did not propose preexisting vehicles for their prototype solutions. SpaceX presents no evidence of an "unstated preference for reliance on existing Government processes and facilities," nor any improper "favoring [of] companies proposing development solutions for all NSS missions." *See* MJAR 18-19.

24

In this regard, SpaceX's argument the Agency should have amended the RFP to include an evaluation criterion related to the use of common engines is both untimely and irrelevant to the Agency's adherence to the RFP as written. And contrary to SpaceX's claim, the evaluation record is clear that the Agency did not "[give] each awardee a pass in the risk evaluation" with regard to Category A/B launches: ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

All told, SpaceX's request for relief under Claim V must be dismissed in part because SpaceX has no legal standing to bring its statutory claims and because the claims are untimely. Moreover, the Court should deny those claims in their entirety for lacking support in the administrative record.

## C.   The Air Force's Cost Evaluation Was Fair and Reasonable.

SpaceX contends the Air Force disparately evaluated the offerors' Investment Cost proposals, but the administrative record shows the Agency performed a fair and equal cost evaluation and rationally concluded SpaceX's proposal required the greatest government investment. SpaceX's allegations to the contrary reflect nothing more than SpaceX's mere disagreement with the Air Force's reasonable evaluation judgments.

### 1.   *The Air Force Properly Considered Government Investments in ULA's and SpaceX's Respective LSA Solutions.*

SpaceX alleges the Air Force's government investment calculation for ULA is "artificially low" and the result of disparate treatment. In particular, SpaceX claims the Air Force did not account for payments to ULA under separate government contracts to "subsidize" ████████████████████████████████, but included government payments related to SpaceX's ████████████████████ when calculating SpaceX's total government investment. MJAR at 21-23. SpaceX's contentions are without merit.

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████████

The RFP required offerors to "provide the projected total costs to complete the EELV Launch System prototype, including all scope proposed in the SOW." AR Tab 38 at 1271. An EELV Launch System prototype is a fully developed and certified launch system—including facilities and infrastructure—that meets applicable LSA requirements. *See id.* at 1292-93. The RFP specified offerors should not include certain costs when calculating Total Costs, including "[s]unk costs or costs incurred before the reference date listed above in Section 3.1.4.5 [(i.e., February 21, 2018)]" and "[p]arallel research or investment (i.e., research or other investments that might be related to the proposed project but which will not be part of the SOW)." *Id.* at 1276-77.

SpaceX identified ▮ government investments in ULA that the Air Force allegedly overlooked: (1) an $832 million modification to ULA's EELV Contract to cover "mission assurance, program management, systems engineering… launch site and range operations, and launch infrastructure maintenance and sustainment" from September 27, 2017 through September 30, 2018; (2) an $867 million modification to ULA's EELV Contract to cover this same scope through September 30, 2019; ▮

▮

▮

▮. ULA and the Air Force, however, properly excluded these government payments from ULA's Total Costs.

ULA and the Air Force correctly did not account for government payments under the two modifications to ULA's EELV Contract because the modifications were limited to sustainment activities for predecessor space launch vehicles and infrastructure that the Air Force intends to replace with new launch vehicles and infrastructure developed under the LSA OTAs. The EELV contract modifications therefore constitute parallel research or investment that do not further the "complet[ion] [of ULA's] EELV Launch System prototype." *See* AR Tab 38 at 1271,

26

1277 (noting parallel research or investments will typically "be undertaken regardless of whether the proposed project proceeds"). Accordingly, the RFP did not require ULA or the Air Force to include the costs of these sustainment activities in ULA's Total Costs buildup.[6] *See id.*

ULA and the Air Force were also correct not to include in ULA's Total Costs ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. ULA proposed to █████████████████████ ████████████████████████████████████████████████████████████, for the LSA effort. In its proposal, ULA distinguished between ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████ ████████████

---

[6] To the extent SpaceX contends the Agency was nevertheless required to consider the government payments under these modifications, that contention is effectively an untimely challenge to the RFP's prohibition on including parallel research and investment costs in the Total Costs calculation. If SpaceX objected to the RFP's evaluation criteria, it was required to object prior to the close of the bidding process. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████████

1     ULA's treatment of ███████████ is consistent with the RFP's

2    prohibition on including costs for parallel research and investment in an offeror's

3    Total Costs calculation. AR Tab 38 at 1277. ULA excluded ███████████

4    costs incurred independent of the LSA effort because such costs reflected parallel

5    research and investment that would been "undertaken regardless of whether the

6    proposed project proceeds." *See id.*; AR Tab 120 at 35377. In contrast, where ████

7    ███████████████████████████████ ULA included those

8    development costs in its proposal because they reflected costs incurred specifically

9    to "complete the EELV Launch System prototype, including all scope proposed in

10   the SOW." AR Tab 38 at 1271; AR Tab 120 at 35377.

11    Similarly, ULA did not include ███████████████████ in

12   its proposal because ██████████████████████████████████

13   ███████████████████████████████████████████████

14   ███████████████████████████████████████████████

15   ███████████ The ███████████ costs therefore represent parallel research and

16   investment "undertaken regardless of whether the proposed project [(i.e., ULA's

17   LSA effort)] proceeds," which the RFP required ULA and the Air Force to exclude

18   from ULA's Total Costs. *See* AR Tab 38 at 1277. Accordingly, ULA's proposal

19   included ██████████████████████████████████████████

20   ███████████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ███████ To include the ███████████████████ costs in both Blue Origin's

23   proposal and ULA's proposal would have been inconsistent with the RFP and would

24   have resulted in a double-counting of those costs to the Air Force.

25    Significantly, the Air Force's evaluation of ULA's Total Costs was consistent

26   with how the Air Force evaluated SpaceX's Total Costs. Although SpaceX attempts

27   to contrast the Air Force's decision not to include the above-referenced government

28   investments when calculating ULA's Total Costs, with the Air Force's decision to

28

1   add ████████ in government investments to SpaceX's Total Costs, SpaceX

2   ignores the fact that it expressly proposed to ████████████████

3   ████████████████████████. As the Air Force found when deciding

4   SpaceX's agency-level bid protest:

5       SpaceX also alleges that ████████████████████████

6       should not have been included in the total investment costs, and that

7       other offerors were not treated the same. The inclusion of these costs

8       reflects the fact that SpaceX proposed ████████████████

9       ██████████████████████████████████

10      ██████████████████████████████████

11      ██████████████████████████████████

12      ██████████████████████████████████

13      ██████████████████████████████████

14      ██████████████████████████████████

15      ██████████████████████████████████

16      The RFP was specific with respect to the costs that must be included as

17      well as the cutoff date to begin cost share, and there was never any

18      disagreement or confusion about the issue throughout the source

19      selection. In the Objection, it appears that SpaceX is making an

20      untimely challenge to the established evaluation criteria and is

21      attempting to supplant Government judgment with its own opinion.

22      Moreover, I did not find any unfair or unequal treatment with respect

23      to the Government's evaluation, and no bias against SpaceX in this

24      regard. Each proposal was evaluated on its own merits in accordance

25      with the RFP.

26   ████████████████████████████ In other words, the RFP required the Air

27   Force to include the ████████ costs in SpaceX's Total Costs because SpaceX

28   identified ████████████████████████████████████████

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████
MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH COURT PROTECTIVE ORDER

1 ██████████████. *See id;* AR Tab 38 at 1271 (requiring offerors to "provide the

2 projected total costs to complete the EELV Launch System prototype, including all

3 scope proposed in the SOW").

4     SpaceX thus has failed to demonstrate any error in the Agency's government

5 investment evaluation.[7]

6         *2.*    *The Air Force Did Not Overstate SpaceX's Total Costs or*

7                *Understate the Awardees' Total Costs.*

8     SpaceX contends the Air Force overstated SpaceX's Total Costs by assuming

9 the "most expensive scenario" in the cost evaluation, while understating the

10 awardees' respective Total Costs by assuming the "best case scenario." MJAR at 23.

11 In particular, SpaceX claims the Agency unreasonably added ████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████ *Id.* It also claims the Air Force unreasonably assumed

15 ████████████████████████████████████████████████████

16 ████████████████████████. *Id.* at 24. And SpaceX asserts the Air Force

17 unreasonably assumed it could "buy down" the risk posed by "the awardees'

18 developmental solutions to the Category A/B mission date." *Id.* The administrative

19 record, however, does not support these claims.

20     ***First***, notwithstanding SpaceX's belief that ████████████████████

21 ████████████████████████████████ the administrative record shows the

22 Air Force always intended to evaluate ████████████████████████████

23 ████████████████ and that SpaceX was aware of this fact. Indeed, that is why

---

24 [7] To the extent SpaceX contends the Agency erroneously required SpaceX to include the cost of

25 ████████ in its proposal, that allegation is an untimely challenge to the underlying RFP and is waived. *See* AR Tab 38 at 1292 (noting development includes certification); *see also Blue*

26 *& Gold Fleet*, 492 F.3d at 1314 ("In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal

27 loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-

28 the-fact litigation.").



1   SpaceX ███████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████

5          As noted above, the RFP required offerors to "provide the projected total costs

6   to complete the EELV Launch System prototype, including all scope proposed in the

7   SOW." AR Tab 38 at 1271. It further provided that offerors must demonstrate ██████

8   ████████████████████████████████████. AR Tab 38 at 1291

9   (requiring  program  reviews  covering  the  "[s]tatus  of  EELV  Launch  System

10  development, including development of a launch vehicle that can launch Payload

11  Category C payloads and ████████████████████████████." (emphasis

12  added)); *id.* at 1293 (defining "Full Operational Capability" as "the point at which an

13  EELV Launch System is capable of launching all payloads, ██████████████████

14  ████████████████ (emphasis added)); ██████████████████████████

15  ████████████████████████████████████████████████████████████

16  It therefore necessarily follows that the RFP required the Air Force to include ██████

17  ████████████████████████ when calculating Total Costs. *See* AR Tab 38 at 1271,

18  1291, 1293; AR Tab 152 at 43104 ("The RFP explicitly stated that investment costs

19  would be determined based on all proposed costs to complete the work proposed.

20  ████████████████████████ was required by the RFP, and was proposed by

21  SpaceX. Thus, the RFP required the Government to consider the proposed ██████████

22  ████████████████████████ costs.").

23          The administrative record shows SpaceX was aware the Air Force would

24  include ████████████████████ costs in the Total Costs calculation. As the

25  Air Force explained when deciding SpaceX's agency-level bid protest:

26          Additionally, the record shows that SpaceX knew how the Government

27          would calculate total investment costs. During negotiations, a SpaceX

28          representative  acknowledged  that  ██████████████████████  costs

31

1             would be included in the Government's consideration of total

2             investment costs and stated that he "hoped" the SSA would also

3             consider ███████████████████████████████████████.

4             Inclusion of this cost in SpaceX's evaluated cost was not unreasonable

5             or inconsistent with the RFP, and is not a basis to sustain SpaceX's

6             Objection.

7     AR Tab 152 at 43104-05; AR Tab 131 at 41391 ("The Government made the Offeror

8     aware that the total evaluated price would include the costs associated with ██████

9     ██████████████████████████████"). The Air Force thus has been consistent

10    regarding the ████████████████████████ costs from the beginning of the LSA

11    solicitation, and SpaceX has no basis to complain now.[8]

12          Even if SpaceX's allegation had merit, it still would fail for lack of competitive

13    prejudice. By arguing the Air Force should not have included ████████████████████

14    ████████ costs in SpaceX's Total Costs, SpaceX is effectively claiming the Air

15    Force should have treated its proposal differently from those of the other offerors.

16    SpaceX, however, cannot complain of disparate treatment on the one hand, and then

17    support it on the other. If the RFP required the Air Force to ignore offerors' ██████

18    ████████████████████—which it did not—then it would have required the

19    Air Force to do so for each of the offerors. Because SpaceX has failed to demonstrate

20    that any across-the-board adjustment ████████████████████████████████

21    would have affected its likelihood of receiving an LSA award, its protest fails on this

22    basis as well. *See Statistica, Inc.* v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996)

23    (holding a protester must demonstrate that, but for the alleged procurement error, it

24    had a "substantial chance" of receiving award).

25          ***Second***, the record shows the Air Force did not understate ULA's Total Costs

26    by unreasonably assuming ████████████████████████████████

---

27   [8] If SpaceX objected to the ████████████████████████████ in the RFP, it was required to

28   object prior to the close of the bidding process. Having failed to do so, it has waived that protest
allegation. *See Blue & Gold Fleet*, 492 F.3d at 1313-14.

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████████████

1       ████████████████. ULA explained its funding for ███████████ as follows:

2       ████████████████████████████████████████

3       ████████████████████████████████████████

4       ████████████████████████████████████████

5       ████████████████████████████████████████

6       ████████████████████████████████████████

7       ████████████████████████████████████████

8       ████████████████████████████████████████

9       ████████████████████████████████████████

10      ████████████████████████████████████████

11      ████████████████████████████████████████

12      ████████████████████████████████████████

13      ████████████████████████████████████████

14      ██████

15      ██████████████ █████████████████████████

16      ███████████████████████████████████████████

17      ███████████████████████████████████████████

18      ██████

19          Contrary to SpaceX's contentions, the Air Force did not blindly accept ULA's

20      proposed approach. Rather, the Air Force accepted ULA's approach only after

21      concluding that ███████████████████████████████████

22      ███████████████████████████████████████████

23      ███████████████████████████████████████████

24      ███████████████████████████████████████████

25      ███████████████████████████████████████████

26      ███████████████████████████████████████████

27      ███████████████████████████████████████████

28      ███████████████████████████████████████████

**ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR –** █████████

1

2

3          ████████████████████████   The Government thus correctly calculated

4    ULA's price based on the cost share and risk allocation contemplated by ULA's

5    proposal, and not on any speculative modification to the government/industry cost

6    share percentage that may be necessary in the future.

7          ***Third***, the record shows the Air Force did not understate the awardees' Total

8    Costs by assuming it could "buy down" the risk posed by the awardees'

9    "developmental solutions to the Category A/B mission date." MJAR at 24. SpaceX

10   objects to the Air Force's suggestion that the Air Force could "buy down" the risk

11   that any of the LSA awardees fail to perform by, among other things, relying on

12   SpaceX for Category A/B missions. *Id.* at 6, 20, 24. According to SpaceX, if the Air

13   Force was proposing to mitigate the risks associated with any of the awardees' LSA

14   solutions, it should have added the costs of relying on SpaceX (or any other

15   mitigation) to the awardees' respective Total Costs. *Id.* at 24.

16         SpaceX, however, ignores the fact that the RFP required offerors to identify

17   only "***projected*** total costs to complete the ELV Launch System prototype." AR Tab

18   38 at 1271 (emphasis added). Each of the awardees projected it would be able to

19   complete all Category A/B missions consistent with the costs identified and the

20   RFP's timeline for completion. Accordingly, the RFP prohibited the Air Force from

21   adding the cost of potential mitigations to offerors' proposals to account for the

22   possibility that awardees would not perform as planned.[9] *See id.*

23         Moreover, there is no evidence in the record that the Agency based its LSA

24   awards on its ability to "buy down" the risk associated with the awardees' LSA

25   solutions. The Agency's mere acknowledgment of potential risk mitigations is not

26   evidence the Agency considered such options integral—or even relevant—to the

27

28   ───────────────────
     [9] Again, if SpaceX objected to the RFP's evaluation criteria for Total Costs, it was required to
     object prior to the close of the bidding process. *See Blue & Gold Fleet*, 492 F.3d at 1313-14.

1  award decision. Thus, SpaceX has failed to identify any error in the Air Force's cost

2  evaluation. The Court therefore should deny this protest ground.

3      **D.**    **The Air Force's Evaluation of Technical Risk Was Reasonable.**

4      SpaceX's challenges to the Air Force's technical risk assessments also fail.

5  Specifically, SpaceX disagrees with the risks the Air Force assessed for SpaceX's

6  proposed approach to Category C missions, and argues that the Agency should have

7  assigned more weight to risks it evaluated in the other offerors' ability to meet

8  Category A/B missions. SpaceX fails, however, to identify an error in the Air Force's

9  evaluation, much less one that had an effect on the Agency's award selection. SpaceX

10  builds its arguments on false assumptions – for example, that Category A/B missions

11  are more important than Category C missions because they fly on more reference

12  orbits, or that a contingency nearer in time is *per se* more risky than a contingency

13  later in time – none of which is reflected in the RFP itself.

14      SpaceX proposed existing vehicles to perform Category A/B missions, but it

15  proposed a conceptual Starship destined for Mars to perform Category C. Other

16  offerors proposed prototype vehicles for all categories, but for Category C missions,

17  they proposed heavy-class vehicles that are variations on the same Category A/B

18  design – variations specifically tailored to the Government's unique Category C

19  needs. At the risk of oversimplifying the Agency's evaluation, it essentially

20  determined the Orbital, ULA, and Blue Origin launch vehicles are more likely to

21  reach low Earth orbit by 2022, than SpaceX's Starship is to have the capability to

22  reach Mars by 2025. That conclusion is reasonable, well within the Agency's

23  technical expertise and discretion, and consistent with the RFP.

24      The RFP identified three areas in which the Agency would evaluate risk:

25  (1) EELV Approach – *i.e.*, an offeror's proposed approach for meeting the RFP's

26  reference orbits and EELV specifications; (2) the offeror's Technical Design,

27  specifically the feasibility of its Booster System and Upper Stage designs; and (3) the

28  offeror's proposed Schedule against specific launch milestones. AR Tab 38 at 1281-

35

84. The RFP provided that the Air Force would place more weight on risks in an offeror's EELV Approach than risks in either Technical Design or Schedule. *Id*. at 1281. SpaceX does not directly dispute the Agency's evaluation of Technical Design risks, for which it received a Moderate Risk (*see* AR Tab 132 at 41595),[10] and focuses instead on EELV Approach and Schedule.

In EELV Approach, the Agency evaluated SpaceX's proposal as High risk because ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████ By contrast, the Agency found Blue Origin's proposed EELV Approach to be a Moderate risk, and ULA's and Orbital's approaches to be a Low risk. *Id*. at AR 41423.

With regard to Schedule, the Agency evaluated SpaceX's proposal as a Moderate risk due to ███████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████. The Agency similarly evaluated Blue Origin's and Orbital's Schedule to be Moderate risk for ██████████████ ██████████████████████████████, and determined ULA's Schedule warranted a Low risk because ██████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████.

These technical risk evaluations are reasonable and consistent with the RFP. SpaceX has presented no persuasive reason to second-guess the Agency's technical expertise. "Courts, as a general matter, ought to defer an agency's scientific or

---

[10] The Agency also evaluated Blue Origin's Technical Design to be a Moderate risk, and evaluated ULA's and Orbital's to be Low risks. *See* AR Tab 132 at 41595. SpaceX does not directly challenge these ratings either.

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████████

technical expertise," particularly "where, as here, the agency's decision involves a high level of technical expertise," *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) (internal quotation omitted), and where "resolution of [a] dispute involves primarily issues of fact." *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, Bureau of Land Mgmt*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989)). The Ninth Circuit has held that this same deference applies to challenges to an agency's evaluation and rating of technical proposals "in particular due to [the] detail and technical nature" of such allegations. *City & County of San Francisco v. United States*, 130 F.3d 873, 881 (9th Cir. 1997) (affirming contract award made by the National Park Service). SpaceX's mere disagreement with the results of the Agency's technical evaluation are insufficient to overcome that deference or to demonstrate the Air Force's conclusions were arbitrary or capricious.

### 1. The Air Force Reasonably Considered Risks in SpaceX's Category C Missions, Like It Considered Risks in the Other Offerors' Category A/B Missions.

SpaceX complains that the Air Force gave too much weight to risks in Category C missions, and too little weight to risks in Category A/B missions, but that simply is not borne out by the record.

With respect to Schedule risk, the RFP provided that the Agency would evaluate the "risk of delayed development" in meeting three milestones: (i) launching Category A/B payloads from either Coast by April 1, 2022, (ii) launching Category A/B payloads from the West Coast by October 1, 2024, and (iii) launching Category C payloads to a Polar orbit by September 1, 2025. AR Tab 38, at AR 1284. Using these three events as fence-posts, the Agency performed a holistic evaluation of each offeror's risk profile: an offeror might present more risk in meeting one or both of the Category A/B dates, while another might present more risk in meeting the Category C date, and each could be evaluated equally in accordance with RFP. *See* AR Tab 143 at 36:10-37:00 ("We didn't . . . explicitly say okay we're going to

37

1    weight, or do some sort of average, we just looked at our risk profile from Schedule.

2    . . . On Schedule you can't get . . . a technical color rating, that was only on EELV

3    Approach, there was just a risk, so then, we looked at, okay, what's the risk, the

4    overall approach, and that includes everything [*i.e.*, milestone dates for Category A/B

5    and Category C payload launches]."").

6            The RFP *did not state any relative weighting* for these milestones, contrary to

7    SpaceX's suggestion that the Category A/B launch dates should have been more

8    important simply because they encompass more of the reference orbits identified the

9    RFP. There is no basis for SpaceX's interpretation in the text of the RFP, and SpaceX

10   has waived any objection to the RFP's terms. *See Blue & Gold Fleet, L.P. v. United*

11   *States*, 492 F.3d 1308 (2007). Moreover, the RFP's equal treatment of risks in

12   Category A/B launches to risks in Category C launches is reasonable: the fact there

13   are more reference orbits on which the Air Force intends to deploy smaller Category

14   A/B payloads, does not mean that Category C payloads are any less important to the

15   NSSL program. To the contrary, the capability to launch Category C payloads was

16   an equally critical element of the RFP. *See* AR Tab 4 at 199 (Industry Day slides

17   noting the RFP will contain evaluation criteria related to Category C payload

18   capabilities, and adding that the Agency's intended "Baseline is More than One

19   Provider with Category C Lift Capability"); AR Tab 38 (RFP) at 1290 ("The

20   Government's objectives are to . . . develop an EELV Launch System prototype that

21   provides launch capability for Payload Categories A and B by 1 April 2022 and

22   Payload Category C by 1 September 2025."); *id*. at 1291 (noting the Government will

23   conduct quarterly reviews to determine the "[s]tatus of EELV Launch System

24   development, including development of a launch vehicle that can launch Payload

25   Category C payloads").

26           SpaceX relies on an out-of-context statement made at its post-award debriefing

27   to suggest the Air Force treated the Category C milestone as a "driving factor" in its

28   evaluation, as a priority over the Category A/B criteria. *See* Complaint ¶¶ 184-87.

38

1    The recording, however, reveals the Agency's comment was in response to a SpaceX
2    question suggesting Category A/B risks should have been given more weight than
3    Category C risks. The Agency explained why Category C missions are as important
4    as Category A/B missions, and pointed out that the RFP was drafted accordingly:

5        [**Question from SpaceX:**] But there's no contemplation that there are
6        very few Category C missions and a large number of A/B missions?
7        That didn't factor in?

8        [**Answer from Agency:**] We did the evaluation based on the RFP, so
9        if we didn't say we were going to weight it, we didn't. But, more than
10       that, if we take a step back, because I also was involved in creating the
11       RFP . . . we had two main goals, right, overarching that we have to
12       accomplish this with LSA: one of them is getting off the RD-180 . . .
13       but then the other overarching goal we had to do in order for mission
14       effectiveness was to get off the Delta IV Heavy. . . . Beyond these three
15       purchases that we're doing sole source for the Delta IV Heavy, if we
16       can't get off the Delta IV Heavy, we have to decide between launching
17       fewer missions, but launching them on the Delta IV Heavy, or finding
18       a replacement for it and launching as many missions as we actually
19       want to do, so it was an absolute, like, driving factor of this RFP.

20   AR Tab 143 at 37:05-38:20. The Agency's equal weighting of Category A/B
21   payloads to Category C payloads is consistent with the RFP's omission of any
22   relative weighting between them. *See* AR Tab 38 at 1282, 1284, 1286.[11]

23       SpaceX's reliance on a statement at its post-award debriefing is telling: there
24   simply is no support for SpaceX's claim in the contemporaneous evaluation record.

25   ██████████████████████████████████████████████

26   ██████████████████████████████████████████████

27

28   _____
     [11] The court's review under the APA is limited to the Agency's evaluation record, and such post-award discussions carry little, if any, probative value. *See*, *supra*, at Section II.A.

ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR – ████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5  Furthermore, even SpaceX's debriefing itself – when viewed in context -- confirmed

6  the fairness and balance of the Agency's evaluation, contrary to SpaceX's claim. *See*

7  AR Tab 143 at 36:10-37:00 ("So if you look . . . at the schedule, two of the three

8  criteria were pertaining to A/B and only one was pertaining to C, but we didn't . . .

9  explicitly say okay we're going to weight, or do some sort of average, we just looked

10 at our risk profile from Schedule. . . . On Schedule you can't get . . . a technical color

11 rating, that was only on EELV Approach, there was just a risk, so then, we looked at,

12 okay, what's the risk, the overall approach, and that includes everything. . . . Other

13 offerors were more risky for the A/B, and much less risky for the C; and you guys

14 [SpaceX] were more risky for the C, and much less risky for the A/B.").

15  The evaluation record also disproves SpaceX's claim that the Agency

16 downgraded risks with respect to Category A/B launch dates. The Agency assessed

17 weaknesses or significant weaknesses in ████ of the other three proposals, but—***as***

18 ***with SpaceX's proposal***—concluded either normal or close Government monitoring

19 or special contractor emphasis will likely be able to overcome those difficulties. *See*

20 AR Tab 135 at ████████████████. SpaceX relies on isolated statements

21 made during discussions with offerors to suggest the Air Force downgraded risks in

22 Category A/B milestones because the Government has alternate sources (SpaceX and

23 ULA) already available for those Category A/B missions. *See* MJAR at 26-27. When

24 viewed in the context of the Agency's actual evaluation record, however, it is clear

25 these statements are taken from candid discussions of the Government's risk profile

26 generally, not explanations of the evaluation ratings themselves.

27  Moreover, to the extent the Agency took into account the ready availability of

28 alternatives for Category A/B payload launches in the near future, its doing so is

40

1   consistent with the RFP. The RFP's relative technical risk ratings provide that the
2   Government will consider the extent to which it can overcome any difficulties
3   through monitoring, AR Tab 38 at 1282, and the availability of Government-procured
4   alternatives is a reasonable and foreseeable factor in that consideration. It is not unfair
5   to any offeror for the Government to weigh its actual risks in determining the
6   portfolio of awards that best meet its stated needs. To the extent the Agency
7   determined that, given the alternatives presently available, risks in meeting Category
8   A/B launch dates were more easily overcome by Government monitoring than risks
9   in meeting the Category C launch date, the Agency was reasonable and well within
10  its technical discretion under the RFP to do so.

11          2.      *The Air Force Reasonably Applied the RFP's Evaluation
                    Criteria.*
12

13          The administrative record also bears no evidence to support SpaceX's claims
14  that the Air Force relied on unstated evaluation criteria; each weakness or significant
15  weakness SpaceX contests has direct support in the RFP.

16          ***First***, SpaceX disputes ████████████████████████████████
17  ████████████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████████████
20  ████████████████████████████████████████████████████████████████
21  ████████████████████████████████████████████████████████████████
22  ████████████████████████████████       SpaceX claims the Air Force deemed its solution
23  "incomplete," when the Agency ***actually*** stated SpaceX's Starship launch system █
24  ████████████████████████████████████████████████████████████████
25  ████████████████████████████████████████████████████████████████
26  ██████████████████       The Air Force experts reasonably concluded these additional
27  accommodations, unique to SpaceX's proposal, infused risk into its EELV Approach.
28

41

1    SpaceX, citing its declarant, claims "[n]one of the RFP requirements directed

2    offerors ██████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████." MJAR at 29.

5    SpaceX mischaracterizes the Air Force's risk assessment and its connection to the

6    RFP requirements. The RFP stated the Agency would evaluate risk in ████████████

7    ████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10    ███████████████████████████ It also stated the Agency would evaluate risk in the

11    ability to ██████████████████████████████████████████████████████████████

12    █████████ The █████████████ of SpaceX's Starship design, coupled with █████████

13    ████████████████████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████████████████

15    introduce risk in the Starship's █████████████████████████████████████████

16    ███████████████ The Agency's assignment of risk in this area was not only reasonable,

17    but well-founded in the RFP's terms.

18    **Second**, SpaceX contends the RFP did not allow the Air Force to assign a

19    significant weakness for SpaceX's proposed plan to ███████████████████████████

20    ██████████████████████████████████████████████ *See* MJAR at

21    30-31. Again, SpaceX misstates the basis of the Agency's risk assessment and its

22    basis in the RFP. Simply because the Air Force ██████████████████████████████

23    ████████████████████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████████████████████

25    ████████████████████████████ *See* AR Tab 132 at 41588.

26    Although the RFP did not state the Air Force would reject any proposal to

27    ███████████████████████████████████████████, it clearly indicated to offerors that the

28    Agency would assess risks in an offeror's ability to do so. The RFP provided the Air

42

1   Force would evaluate risk in the █████████████████████████████████

2   ███████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████ Furthermore, the RFP

4   required offerors to demonstrate their ability to ███████████████████

5   ███████████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████[12]

10      As the Agency evaluators explained, SpaceX's ███████████████████

11   ███████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████ SpaceX's

13   approach also necessitated ████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████

17   ████████████████████████████ SpaceX has identified no reason why these concerns,

18   held by the Air Force technical experts, were irrational or inconsistent with the RFP.

19          3.      *The Air Force Reasonably Assessed Weaknesses in SpaceX's*
                    *Category C Solution.*
20

21          Finally, SpaceX disagrees with a handful of the Air Force's technical

22   conclusions, but fails to demonstrate the Agency technical experts misinterpreted or

23   otherwise misevaluated the SpaceX proposal in an arbitrary or capricious manner.

24   Nor has it demonstrated that any of these alleged errors had an effect on the Agency's

25   ultimate source selection decision.

26   _____

27   [12] SpaceX points to its commitment "to ***consider*** several alternatives in partnership with SMC," *see*
     MJAR 31 (emphasis added), but such consideration of alternatives does not obviate the risk in
     SpaceX's proposed baseline approach, which was ████████████████████████████████████
28   █████████████.

43

1    ***First***, SpaceX disagrees with the Air Force's concern that ███████████

2    ████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ███████████ As the Agency evaluators noted, █████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ██████████████████████████████████ SpaceX has not identified any

10   reason to find the Agency's technical judgment unreasonable in this respect.

11   ***Second***, SpaceX disagrees with the Air Force's concern that SpaceX ███████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   █████████████████ SpaceX glosses over the Agency's actual concern, implying it

18   relates to the schedule margin ███████████████████████████

19   ██████████████████████. But the Agency's concern is not with schedule margin;

20   it is with SpaceX's ████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ██████████████████████████████████████ As is clear from the

24   evaluation record, it is ████████████████████████████████████

25   █████████████████████████, not merely SpaceX's proposed schedule margin, that

26   underlies the Agency's concern.

27   ***Third***, SpaceX disagrees with the Air Force's reference to the Space Shuttle

28   when describing the Schedule risk in developing SpaceX's "truly revolutionary"

44

1    Starship vehicle. *See* MJAR 33 (citing AR Tab 132 at 41619-20). A review of the

2    record reveals the Agency used the Space Shuttle, which was developed over 11 years

3    from 1971 through 1981, as a "relevant benchmark" for SpaceX's Starship proposal.

4    AR Tab 132 at 41619-20. As the evaluators noted, the Starship is ███████████

5    ████████████████████████████████████████████████████████ *Id.*

6        SpaceX has offered only its disagreement with this comparison, but has failed

7    to provide a basis to question the judgment of the Air Force's technical experts'

8    judgment in making it. Moreover, the role of this benchmark in the evaluation is

9    limited. The Agency evaluators did not use it to alter or minimize SpaceX's proposed

10   schedule margin, but simply as an apt comparison for the scale of effort SpaceX has

11   undertaken with the Starship. *See* AR Tab 132 at 416219-20. That is, unlike Orbital's

12   OmegA, ULA's Vulcan Centaur, or Blue Origin's New Glenn, which are designed

13   to introduce payloads (government and commercial) into orbit, SpaceX proposed a

14   vehicle that, if achieved, will be capable of transporting human passengers, not just

15   into low Earth orbit like the Space Shuttle, but to Mars. The Air Force reasonably

16   assessed significant technical risk in SpaceX's interplanetary goals and rightfully

17   declined to subsidize its Mars-shot with taxpayers' money.

18                                 **CONCLUSION**

19       For the foregoing reasons, Orbital respectfully requests that the Court DENY

20   Plaintiff's motion for judgment on the administrative record and request for a

21   preliminary injunction.

22    Dated: January 17, 2020

23                                By: */s/* Kevin P. Mullen
                                      Kevin P. Mullen (*admitted pro hac vice*)

24
                                      *Attorney for Defendant-Intervenor*
25                                    *Orbital Sciences Corporation*

26

27

28

45

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2020, I caused a true and correct copy of the foregoing document to be served by email on:

**Joseph Evan Borson**
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
Email: joseph.borson@usdoj.gov
Counsel for United States of America

**Scott E. Pickens**
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel: 202-371-6349
Fax: 202-289-1330
Email: Scott.Pickens@btlaw.com
Counsel for Blue Origin, LLC

**Todd R. Steggerda**
McGuireWoods LLP
2001 K Street, N.W., Suite 400
Washington, D.C. 20006
Tel: 202-857-2477
Fax: 202-828-2968
Email: tsteggerda@mcguirewoods.com
Counsel for United Launch Services, LLC

**Craig A. Holman**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
Email: craig.holman@arnoldporter.com
Counsel for Space Exploration Technologies Corp.

By: /s/Kevin P. Mullen
KEVIN P. MULLEN (*pro hac vice*)
*Attorney for Orbital Sciences Corporation*

46

**ORBITAL SCIENCES CORPORATION'S SEALED RESPONSE TO PLAINTIFF'S MJAR –** ███████

# EXHIBIT A

1   **MORRISON & FOERSTER LLP**
  KEVIN P. MULLEN (SBN 422275)
2   KMullen@mofo.com
  2000 Pennsylvania Ave., N.W.
3   Washington, D.C.  20006-1888
  Telephone: 202.887.1500
4   Facsimile: 202.887.0763

5   Attorney for Defendant-Intervenor
  Orbital Sciences Corporation
6

7

8                 UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   WESTERN DIVISION

11

12   SPACE EXPLORATION            | Case No. 2:19-cv-07927-ODW-GJS
  TECHNOLOGIES CORP.,
13                      | Honorable Otis D. Wright II

14           Plaintiff,       | **DECLARATION OF** ▮▮▮▮
15                      | **▮▮▮ IN SUPPORT OF**
      v.                  | **INTERVENOR DEFENDANT**
16                     | **ORBITAL SCIENCES**
  UNITED STATES OF AMERICA,    | **CORPORATION'S BRIEF IN**
17                     | **RESPONSE TO PLAINTIFF'S**
         Defendant.     | **MOTION FOR JUDGEMENT**
18   and                   | **ON THE CERTIFIED RECORD.**

19   UNITED LAUNCH ALLIANCE, LLC,
  BLUE ORIGIN, LLC, and ORBITAL
20   SCIENCES CORPORATION,

21          Defendant-Intervenors.

22

23

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26

27

28                   47

**DECLARATION OF** ▮▮▮▮▮▮▮▮ – ▮▮▮▮▮▮▮▮▮▮

EXHIBIT A

1          **DECLARATION OF** ████████████████

2          I, ████████████████, being over 21 years of age and competent to give

3    testimony, declare as follows:

4          1.     I am the ████████████████████████ for the OmegA program

5    at Orbital Sciences Corporation ("Orbital"). My office address is ████████████

6    ████████████.  The information in this declaration is based on my personal

7    knowledge and my review of Orbital business records.  If called as a witness in a trial

8    or proceeding, I could and would competently testify to all facts stated herein.

9          2.     I earned a Bachelor's of Science degree in Mechanical Engineering from

10   ████████████████████.  I have worked for Orbital for ██ years, and the

11   OmegA program specifically for ██ years. ██████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████.

16         3.     On October 10, 2018, the Government and Orbital executed an LSA

17   with a total value ██████████████████████████████████████

18   of which ████████████ will be invested by Orbital.  To date, the Government has

19   obligated more than ████████████ to that LSA.

20         4.     Under the LSA, Orbital is developing, and will qualify and certify, the

21   OmegA launch system.  Specifically, Orbital is developing three critical capabilities

22   under the LSA:  (1) the Intermediate series OmegA vehicle (for Category A and B

23   class missions); (2) the Heavy series OmegA vehicle (for Category C class missions);

24   and (3) completing development on a Rocket Propulsion System ("RPS") initially

25   developed under a separate agreement.

26         5.     Orbital also is developing and building vehicle processing and launch

27   infrastructure, including production, integration, and testing facilities in multiple

28   states, as well as an East Coast and a West Coast Launch Site.

**DECLARATION OF** ████████████████ – ████████████████████████

EXHIBIT A

6. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

7.    Orbital's LSA contains numerous milestones, many of which Orbital has completed and received payment from the Air Force.

8.    For example, ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

9. ██████████████████████████████████████
████████████████████████████████████████████
███████████████████

10. █████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

11. █████████████████████████████████████
█████████████████████████████████████

12.    To date, the Government has invested more than ████████████ in Orbital's LSA alone, and nearly ████████████ in the OmegA launch system.  Orbital has expended approximately ████████████ performing the LSA.  This is just a mere fraction of the overall ████████████ Orbital has spent developing its OmegA launch

49

1   vehicle and RPS.

2       13.     Those investments are not fungible.  The components Orbital is building
3   are unique, optimized for the OmegA launch system, and cannot readily be used on
4   other programs.

5       14.     Orbital currently has more than ███ employees working full-time on its
6   OmegA launch system, many of whom could be laid off if the program is terminated.
7   Even in the event of a temporary work stoppage, Orbital likely would lose many
8   highly skilled employees to turnover or layoffs.

9       15.     Termination or temporary work stoppage also would cause severe harm
10   to Orbital's subcontractors and suppliers, which are many and span the country.
11   Orbital has designated substantial work to major subcontractors ███████████
12   ███████ as well as many small businesses, such as ████████████████
13   ████████████████████████████████████ all of whom
14   would be affected by removal of Government funding from Orbital's LSA.

15       16.     Based on public announcements by the Air Force, Orbital expects the
16   Air Force to award two Phase 2 Launch Services Procurement ("LSP") contracts by
17   June 2020.  To compete in Phase 2, offerors must propose a launch vehicle that will
18   be certified for National Security Space Launch ("NSSL") (previously Evolved
19   Expendable Launch Vehicle ("EELV")) launches within two years of award.

20

21   I declare under penalty of perjury that the foregoing is true and accurate to the best
22   of my knowledge.  Executed this 16th day of January, 2020, in ████████.

23

24                          By: ████████████

25

26

27

28

50

EXHIBIT A