1 │ KEVIN M. LALLY (SBN 226402)
    │ klally@mcguirewoods.com
2 │ McGUIREWOODS LLP
    │ Wells Fargo Center, South Tower
3 │ 355 S. Grand Ave., Suite 4200
    │ Los Angeles, California 90071-3103
4 │ Telephone:  213.457.9862
    │ Facsimile:   213.457.9882
5 │
6 │ TODD R. STEGGERDA (*Pro Hac Vice*)
    │ tsteggerda@mcguirewoods.com
7 │ 2001 K Street N.W.
    │ Washington, D.C. 20006-1040
8 │ Telephone:  202.857.1700
    │ Facsimile:   202.857.1737
9 │ Attorneys for Defendant-Intervenor United Launch Services, LLC

10 │ **UNITED STATES DISTRICT COURT**

11 │ **CENTRAL DISTRICT OF CALIFORNIA**

12 │ **WESTERN DIVISION**

13 │ Space Exploration Technologies Corp.,          No. CV 19-7927-ODW (GJS)
    │                                                 Honorable  Otis D. Wright II
14 │          Plaintiff,
    │                                                 ████████ **OPPOSITION OF**
15 │      v.                                         **DEFENDANT-INTERVENOR,**
    │                                                 **UNITED LAUNCH SERVICES,**
16 │ United States of America,                       **LLC, TO PLAINTIFF'S MOTION**
    │                                                 **FOR JUDGMENT ON THE**
17 │          Defendant,                             **CERTIFIED ADMINISTRATIVE**
    │                                                 **RECORD**
18 │      v.
    │                                                 Hearing Date: March 2, 2020
19 │ Blue Origin, LLC, *et al.*,                     Hearing Time: 1:30 p.m.
    │                                                 Courtroom:     5D, 5th Floor
20 │          Defendant-Intervenors.                                 First Street Courthouse
    │                                                                 350 W. First Street
21 │                                                                 Los Angeles, CA 90012

22 │

23 │

24 │ ████████████████████████████████████████████

25 │                    ████████████████

26 │

27 │

28 │

    │ ── ULS' ███████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1  [Caption page continued]

2  EDWIN O. CHILDS (*Pro Hac Vice*)

3  echilds@mcguirewoods.com
   ABRAM L. PAFFORD (*Pro Hac Vice*)

4  apafford@mcguirewoods.com

5  NATHAN R. PITTMAN (*Pro Hac Vice*)
   npittman@mcguirewoods.com

6  KARLEE S. BLANK (*Pro Hac Vice*)

7  kblank@mcguirewoods.com
   BLAKE R. CHRISTOPHER (*Pro Hac Vice*)

8  bchristopher@mcguirewoods.com

9  2001 K Street N.W.
   Washington, D.C. 20006-1040

10 Telephone:  202.857.1700

11 Facsimile:   202.857.1737
   Attorneys for Defendant-Intervenor United Launch Services, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................... 1

II.    BACKGROUND ........................................................................................ 4

    A.    The Air Force's Strategy to Spur Development of a  Next-Generation Launch Vehicle for National Security Space Missions. ................................................................................... 4

    B.    The RFP Requirements and Evaluation Framework. ........................... 5

    C.    ULS' Proposed Launch Solution, the Top-Rated "Vulcan" Rocket. ................................................................................. 8

    D.    The Air Force Graded Vulcan as the "Most Advantageous" Proposal. ............................................................................... 10

    E.    The Air Force Rated SpaceX's Starship as "High" Risk and Too Costly. ................................................................................... 12

III.   ARGUMENT ........................................................................................... 15

    A.    Administrative Procedure Act Standard of Review............................ 15

    B.    The Air Force's Decision to Award an LSA to ULS for its Top-Rated Vulcan Proposal Was Not Arbitrary, Capricious, or Contrary to Law. .................................................................... 17

    C.    The Air Force's Decision to Deny an LSA Award for SpaceX's Starship Proposal Due to Its Risk and Cost Was Well Justified and Documented. ................................................................... 19

        1.    The Air Force's LSA Award Decision Was Entirely Consistent with Congressional "Direction" Regarding NSS Acquisition Strategy. .................................................... 19

            a.    The Air Force Properly Leveraged  Commercial Solutions in Its Portfolio Award Decision. .................... 20

            b.    The Air Force's Decision to Award LSA Funds  for Vulcan Development Did Not Violate the  "Assured Access to Space" Mandate of 10 U.S.C. § 2273............. 22

            c.    The Air Force Award Decision Did Not Violate Any Congressional Mandate to End Reliance on Russian Engines. ........................................................ 24

2.   The Air Force Reasonably Recognized the Substantial Risk in SpaceX's Approach and Properly Assigned ████ Significant Weaknesses to its Category C Solution. ................................................................. 26

   a.   The Air Force Did Not "Improperly  Discount" Category A/B Mission Risks. ........................................... 26

   b.   The Air Force Reasonably Assigned ████████ to SpaceX's Proposal Based on the RFP's Express Requirements. ......................................... 28

   c.   The Air Force Reasonably Found that SpaceX's Untested Starship Presented "High" Schedule Risk. ...... 30

3.   The Air Force's Cost Evaluation Was Consistent with the RFP and Entirely Reasonable. .................................... 33

   a.   The Air Force Properly Excluded Costs from ULS' Prior  ELC Contract, Which Were Not Within the Scope of LSA. ................................................................. 34

   b.   The Air Force Properly Excluded Costs for Certain ████ Components from the Government Cost Share. ................................................................. 36

   c.   The Air Force Properly Considered BE-4 Development Costs in Its Cost Evaluation of ULS' Proposal. ................................................................. 36

   d.   The Air Force Properly Added to SpaceX's Proposed  Cost a ████████████ Which Was a Required Capability Under the RFP. ................................................................. 37

   e.   The Air Force Properly Concluded that ULS'  Cost Proposal Included ████████████ ████████████. ..................................... 39

   f.   The Air Force Properly Excluded the  Potential "Buy Down" Costs of Future  Category A/B Launches in the LSA Cost Evaluation. .......................... 40

D.   SpaceX Has Not Met its Burden for Obtaining Injunctive Relief. ...... 41

IV.   CONCLUSION ................................................................. 43

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arrington v. Daniels*,
   516 F.3d 1106 (9th Cir. 2008) ................................................................ 15

*Banknote Corp. of America, Inc. v. United States*,
   365 F.3d 1345 (Fed. Cir. 2004) ............................................................... 27

*Beta Analytics Int'l, Inc. v. United States*,
   67 Fed. Cl. 384 (2005) ............................................................................ 16

*Blue & Gold Fleet, L.P. v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007) ......................................................... 20, 24

*Cactus Corner, LLC v. U.S. Dep't of Agriculture*,
   346 F. Supp. 2d 1075 (E.D. Cal. 2004) ................................................. 21

*Cal. Ins. Guarantee Ass'n. v. Price*,
   252 F. Supp. 3d 948 (C.D. Cal. 2017) ................................................... 41

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ................................................................. 41

*E.W. Bliss Co. v. United States*,
   77 F.3d 445 (Fed. Cir. 1996) ................................................................. 16

*Elmendorf Support Servs. Joint Venture v. United States*,
   105 Fed. Cl. 203 (2012) ......................................................................... 43

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
   238 F.3d 1324 (Fed. Cir. 2001) ............................................................. 16

*Klamath Siskiyou Wildlands Ctr. v. NOAA Nat'l Marine Fisheries
   Serv.*,
   109 F. Supp. 3d 1238 (N.D. Cal 2015) .................................................. 46

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ............................................................... 15

*Linc Gov't Servs., LLC v. United States*,
   96 Fed. Cl. 672 (2010) ......................................................................... 43

*Nat'l City Bank v. Prime Lending, Inc.*,
   737 F. Supp. 2d 1257 (E.D. Wa. 2010) ............................................. 42

*Nat'l Wildlife Fed'n v. Burford*,
   871 F.2d 849 (9th Cir. 1989) ...................................................... 15, 16

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) ............................................................ 15

*Patriot Contract Servs. v. United States*,
   388 F. Supp. 2d 1010 (N.D. Cal. 2005) ........................................... 16

*Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*,
   415 F.3d 1078 (9th Cir. 2005) ............................................................ 15

*Sci. Applications Int'l Corp. v. United States*,
   108 Fed. Cl. 235 (2012) .............................................................. 16, 25

*Textron Inc. v. United States*,
   74 Fed. Cl. 277 (2006) ........................................................................ 29

**Statutes**

5 U.S.C. § 706 .............................................................................. 4, 15, 41

10 U.S.C. § 2273 ................................................................................ 20, 22

10 U.S.C. § 2371b ............................................................................. 5, 6, 20

51 U.S.C. § 50132 ..................................................................................... 20

Fiscal Year 2017 National Defense Authorization Act ("2017 NDAA")
   Pub. L. 114-328, 130 Stat. 1999 (2016) ........................................... 24

**Other Authorities**

*Assuring Assured Access to Space Before the H. Committee on Armed
   Services*,
   114th Cong. 21 (2015) (Statement of Gwynne Shotwell, President &
   CEO of SpaceX) ................................................................................ 21

ULS' ███████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

*Assuring National Security Space: Investing in American Industry to End*
    *Reliance on Russian Rocket Engines,*
    114th Cong. 45 (June 26, 2015) ..................................................................36

*Military Space Launch and the Use of Russian-Made Rocket Engines*
    *Before the Committee on Armed Services,*
    Statement by the Honorable Deborah Lee James, 114th Cong. 608 (Jan.
    27, 2016) ..................................................................................................36

*Military Space Launch and the Use of Russian-Made Rocket Engines*
    *Before the Committee on Armed Services,*
    Testimony of Under Secretary Frank Kendall, 114th Cong. 608 (Jan.
    27, 2016) ..................................................................................................36

Sandra Erwin,
    *Air Force soon to release revised launch solicitation in response to GAO's*
    *ruling,* SPACENEWS (Dec. 5, 2019), https://spacenews.com/air-force-soon-to-
    release-revised-launch-solicitation-in-response-to-gaos-ruling ........................42

Stephen Clark,
    *Astrobotic lunar lander to launch on ULA's first Vulcan rocket,*
    SPACEFLIGHT NOW (Aug. 20, 2019), https://spaceflightnow.com/
    2019/08/20/astrobotic-lunar-lander-to-launch-on-ulas-first-vulcan-
    rocket ..........................................................................................................21

ULA, Missions,
    https://www.ulalaunch.com/missions/-in-
    category/categories/customer/commercial ..........................................................21

William Harwood,
    *Dream Chaser spaceplanes to launch on ULA Vulcan rocket,* CBS
    NEWS (Aug. 14, 2019), https://www.cbsnews.com/news/dream-chaser-
    spaceplanes-to-launch-on-ula-vulcan-rocket/ .......................................................21

iii

## I.    INTRODUCTION

The Vulcan Centaur Launch Vehicle ("Vulcan") from United Launch Alliance ("ULA") offered the U.S. Air Force every technical capability it hoped to cultivate in a next-generation launch vehicle for national security space ("NSS") missions.   The Air Force sought to achieve this goal through Launch Service Agreement ("LSA") investments in a portfolio of prototype launch vehicles like the state-of-the-art Vulcan.   As detailed in ULA's Final LSA Proposal (submitted through its subsidiary, United Launch Services ("ULS")), Vulcan is powered by a "U.S.-developed [BE-4] commercial booster engine," incorporating ███████ ████████████████████████████" and it relies on an upgraded "Centaur" upper stage engine with one of the strongest pedigrees in space launch history.  (ULS Proposal, Tab 120, 35226.)   Building on the unmatched performance legacy of ULA's Atlas and Delta rockets, which have achieved an unprecedented 100 percent mission success across more than 120 space launch missions since ULA's formation in 2006, the next-generation Vulcan rocket "████████████████████ █████████████████████████████" in the Air Force LSA Request for Proposals ("RFP").  (*Id*.)  Most critically, the Vulcan can perform *all nine* of the RFP's required reference orbits for NSS missions, including the most challenging "Category C" missions, delivering "████████████████ ██████████████████████████████████ ████████████████." (*Id*., 35236 (emphasis added).)

Based on its own thorough review of ULA's technical offering for Vulcan's continued development, and as documented in an extensive evaluation record, the Air Force concluded that Vulcan offered a "low risk, high confidence launch capability." (LSA Final Evaluation Document ("FED"), Tab 132, 41439.)  ULA, a joint venture of The Boeing Company and Lockheed Martin Corporation, backed its cutting-edge offering with an unmatched launch vehicle design and development heritage dating back to the dawn of the American space program, leading the Air

1

1   Force to find that █████████████████████████████████████
2   ███████████████████████████████████████████████████████
3   ███████████████████████████████████████████████████████
4   ███████." (*Id.*, 41443.)   Indeed, ULA's knowledge base, design expertise, and
5   commitment to operational excellence resulted (at the time of LSA proposal
6   submission) in an unprecedented string of 128 straight successful launches,
7   including 73 NSS launches, making ULA "the only provider in the history of NSS
8   to accomplish such a feat," according to the Air Force.  (*Id.*, 41439.)

9         After conducting an extremely detailed evaluation process, poring over
10   thousands of pages of proposal materials, engaging in multiple rounds of discussions
11   with offerors, and distilling a nearly year-long analytical effort into a 248-page
12   evaluation document, a portfolio recommendation, and an October 9, 2018 final
13   award decision document, the Air Force scored the Vulcan offering as the highest-
14   rated proposal, and selected ULS for an LSA award.  In fact, the Air Force gave ULS
15   the highest possible rating in each evaluation category under the LSA RFP,
16   recognizing ULS as the *only* offeror whose proposal was "Low" risk in each
17   technical and schedule risk category proscribed by the RFP.  (Award Decision
18   Document, Tab 136, 41752.)  The Air Force also found that ULS' cost proposal was
19   reasonable and complete, concluding that ULS offered an industry cost share of
20   ████, well above the one-third threshold required in the RFP.  (FED, Tab 132, 41473;
21   RFP, Tab 38, 1275-76.)  The extensive and well-documented evaluation record make
22   plain that ULS offered superior technology, unmatched experience, low risk, and
23   reasonable cost, leading the Air Force to conclude that ULS's solution was "the most
24   advantageous proposal" for the Air Force.  (Portfolio Recommendation, Tab 135,
25   41742.)  In short, ULS was awarded an LSA because Vulcan gave the Air Force
26   precisely what it wanted and more.  There was nothing "arbitrary," "capricious," or
27   "contrary to law" about the LSA award to ULS, and SpaceX has not come close to
28   meeting its high burden for proving otherwise.

In stark contrast to the "low risk, high confidence approach" to ULA's Vulcan launch vehicle (FED, Tab 132 at 41439), SpaceX chose an approach that resulted in a wide gap between what it promised and what the Air Force believed it reliably could deliver. This gap appeared specifically in relation to the most challenging Category C reference orbits, which required the greatest performance capabilities from the offered launch vehicles. Rather than proposing a traditional launch vehicle for these missions, such as a new variant of its Falcon Heavy launch vehicle ███████ ███████████████████████████████████████, SpaceX instead asked the Air Force to embrace and subsidize a vehicle SpaceX calls "Starship." As its name suggests, Starship is a spacecraft that SpaceX is attempting to build for the express and overriding purpose of achieving manned interplanetary flight to and from Mars. ████████████████████████████ According to SpaceX's own LSA proposal, the baseline version of the Starship was designed with "████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████" that clearly have nothing to do with placing critical NSS payloads into Category C orbits in support of the Air Force's national security mission. (*Id.*, 39766-68.)

In this competitive LSA process, where SpaceX proposed an extremely high price for the development of a technical approach with a stunning level of risk associated with its Starship spacecraft, SpaceX's exclusion from the LSA portfolio award should not surprise them. In the end, the Air Force was understandably (and reasonably) reluctant to embrace "████████████████████" reflecting substantial "██████████████████" that presented "████████████████████████████████ ████" especially in a setting where its expert technical evaluators assigned ████ ████████████████████████████████████████████████████. (FED, Tab 132, 41602, 41620-21, 41651.) Although SpaceX's motion launches a three-part attack on the Air Force's decision, which we address in Sections III.C.1,

C.2, and C.3 below, the voluminous administrative record ultimately proves an insurmountable hurdle for SpaceX's challenge to this predictable result, especially considering the heavy burden of proving, under the deferential Administrative Procedure Act ("APA") standard of review, that the Air Force's painstaking evaluation process was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A). As demonstrated by the administrative record citations in this Opposition, the Air Force's LSA portfolio decision was entirely reasonable, thoroughly analyzed, and well-documented, and, on that basis, ULS respectfully requests that the Court deny SpaceX's Motion for Judgment on the Certified Record.

## II. BACKGROUND

### A. The Air Force's Strategy to Spur Development of a Next-Generation Launch Vehicle for National Security Space Missions.

The LSA award was a critical step in the Air Force's strategy to develop the United States' domestic launch capabilities for National Security Space ("NSS") missions and satisfy the congressional mandate of "Assured Access to Space" through the Evolved Expendable Launch Vehicle ("EELV") program. Since its formation as a joint venture in 2006, ULA and its subsidiary ULS[1] have launched rockets for NSS, civil, and commercial spaceflight missions with an unprecedented level of success. As detailed in its LSA proposal and as recognized by the Air Force in its evaluation, ULA had launched 128 consecutive successful missions at the time of proposal submission, including 73 consecutive successful NSS missions. (ULS Proposal, Tab 120, 35227; FED, Tab 132, 41430.) Achieving unprecedented 100% mission success through its Atlas and Delta families of launch vehicles, ULA has reliably launched our nations' most precious national security payloads into precise

---

[1] ULS is a subsidiary of ULA, a joint venture of The Boeing Company and Lockheed Martin Corporation formed in 2006. Although ULS is the actual offeror and OTA awardee, the record refers to ULA and ULS interchangeably, which we do so here, as well.

1   orbits, including missions with the heaviest payloads and most challenging orbits,

2   which the Air Force defines as "Category C" missions.

3   Following Russia's invasion of Ukraine in 2014, Congress directed the

4   Department of Defense ("DoD") to phase out the use of Russian-made engines,

5   meaning that DoD will be unable to order services using ULA's "Atlas V" launch

6   vehicle after 2022.  At the same time, ULA is in the process of phasing out its "Delta

7   IV Heavy" launch vehicle, the only existing Category C launch vehicle.  (FED, Tab

8   132, 41556.)  To address these realities in light of its obligation to meet the statutory

9   requirements of Assured Access to Space, the Air Force developed a multi-step

10  acquisition strategy to ensure the availability of at least two families of launch

11  vehicles for future NSS missions.  The LSA awards, properly issued pursuant to

12  DoD's "Other Transaction" ("OT") authority,[2] allowed the Air Force to enter into

13  public-private funding partnerships to "facilitate development of at least three EELV

14  Launch System prototypes as early as possible."  (RFP, Tab 38, 1260.)[3]  As such,

15  the Air Force intended for the LSAs to "leverage industry's commercial launch

16  solutions and ensure they are modified to meet NSS requirements."  (Id.)

17  **B.**    **The RFP Requirements and Evaluation Framework.**

18  The RFP required the proposed prototypes to meet all NSS requirements,

19  including the ability to accurately insert payloads into all nine NSS reference orbits,

20  including the most difficult Category C orbits.  (Id., 1260-61.)  The RFP stated that

21  the Air Force "plan[ned] to award a portfolio of at least three [LSAs]," although it

22  "reserve[d] the right to award any number of agreements, including none," after

23  considering, among other things, government funding limitations.   (Id., 1263.)

24

25

26  [2] Congress granted DoD OT authority to "carry out prototype projects," 10 U.S.C. § 2371b(a)(1),
    and DoD's ability to enter into OT agreements is "not subject to the Federal laws and regulations

27  limited in applicability to contracts" or the Federal Acquisition Regulations, 32 C.F.R. § 32.

28  [3] The Air Force amended the RFP three times during the proposal process.  For ease of reference,
    all "RFP" cites are to the final version of the RFP following Amendment No. 3 at Tab 38.

Consistent with 10 U.S.C. § 2371b, the RFP established the competitive process for the evaluation and award of LSAs.  The RFP provided that the Air Force would evaluate three factors to select the portfolio that would be "most advantageous" to the government:

Factor 1 (EELV Approach):  Each offeror was required to describe its approach to develop and qualify a launch system meeting EELV launch service requirements.  (*Id.*, 1269.)  The Air Force identified eight performance metrics, or criteria, that the offeror had to meet to be eligible for an award, and against which the Air Force would evaluate the proposals.  (*Id.*)  Among these criteria, offerors were required to demonstrate their "ability to meet all" nine of the "EELV reference orbits," to integrate payloads in a vertical orientation, and to be able to launch from the East and West Coasts.  (*Id.* (citing SPRD, Tab 18, 757).)

Factor 2 (Technical):  The Air Force required offerors to discuss two subfactor areas: (1) design, which included a "technical feasibility analysis" of an offeror's proposed launch vehicle's booster and upper-stage systems, and (2) schedule, with a schedule file and narrative demonstrating how the offeror would complete its prototype for Category A/B launches by April 1, 2022 and Category C launches to the Polar 2 orbit by September 1, 2025.  (*Id.*, 1270-71, 1284.)

Factor 3 (Cost):  The Air Force required the offerors to provide "the projected total costs to complete the EELV Launch System prototype," and to state how much the government would share in that development cost.  (*Id.*, 1271.)  The RFP excluded from this amount, among other things, (1) costs incurred prior to February 21, 2018; and (2) "[p]arallel research or investment (*i.e.*, research or other investments that might be related to the proposed project but which will not be part of the SOW); typically these activities will be undertaken regardless of whether the proposed project proceeds."  (*Id.*, 1276-77).  Thus, the RFP required offerors to propose those non-recurring costs specifically associated with completing the prototype for NSS missions.  The RFP required that the industry share of the

1   development cost comprise at least one third of the total cost.  (*Id.*, 1275.)

2   The RFP stated that Factor 1 (EELV Approach) was the single most important
3   factor, while Factors 2 and 3 were of equal importance.  Factors 2 and 3 were more
4   important combined than Factor 1.   Factor 2, subfactor 1, Design, was more
5   important than Factor 2, subfactor 2, Schedule.  (*Id.*, 1281.)

6   The Air Force evaluated the criteria in Factor 1 for Weaknesses, Significant
7   Weaknesses, Strengths, and Deficiencies.   As relevant here, the RFP defined a
8   "Weakness" as "a flaw that increases the risk of unsuccessful agreement
9   performance." (*Id.*, 1281.)  A "Significant Weakness" was defined as "a flaw that
10  appreciably increases the risk of unsuccessful agreement performance." (*Id.*)  Once
11  evaluated, each proposal would be assigned a color/adjectival rating, ranging from
12  Red/Unacceptable to Blue/Outstanding.  (*Id.*, 1282.)  The RFP also required the Air
13  Force to evaluate each offeror's proposed launch vehicle solution for the overall
14  level of risk, under both Factor 1 (EELV Approach) and both subfactors of Factor 2
15  (*i.e.*, Design and Schedule).

16  Under the risk evaluation, the RFP defined three levels of risk – Low,
17  Moderate, and High, which were evaluated in terms of Weaknesses and Significant
18  Weaknesses.  (*Id.*)  A proposal with "Low" risk has a Weakness or Weaknesses that
19  have "little potential to cause disruption of schedule, increased cost or degradation
20  of performance.  Normal Participant effort and normal Government monitoring will
21  likely be able to overcome any difficulties." (*Id.*)  The Weaknesses in a "Moderate"
22  risk proposal "may potentially" cause disruption, which can likely be overcome by
23  "Special Participant emphasis and close Government monitoring." (*Id.*)  A "High"
24  risk proposal "contains a significant weakness or combination of weaknesses which
25  is likely to cause significant disruption of schedule, increased cost or degradation of
26  performance" that is "unlikely to overcome any difficulties, even with special
27  Participant emphasis and close Government monitoring." (*Id.*, 1282.)

28

7

ULS' █████████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

**C.**     **ULS' Proposed Launch Solution, the Top-Rated "Vulcan" Rocket.**

Meeting the precise requirements of the RFP, ULS proposed to continue development of Vulcan, the successor launch system to Delta IV and Atlas V. (ULS Proposal, Tab 120, 35237.)  With decades of experience and proven results, ULA "████████████████████████████████████████████ ███████████████████████████." (*Id.*, 35249.)  As demonstrated in the below figure (*id.*, 35308), ULA's heritage dates to the beginning of the U.S. Space Program, with its member companies and predecessors having been involved in the design of some of the most successful rocket programs in our nation's rich history:



Proposing the development of Vulcan for the LSA award, ULS offered a Vulcan launch vehicle that used "████████████████████████████ ████████" (*id.*, 35236) and assured the Air Force that lessons learned from these vehicles "████████████████████████" Vulcan's design, representing an evolutionary approach to satisfying the Air Force's needs. (*Id.*, 35237.)  As shown in the following graphics (*id.*, 35236.), Vulcan addresses all of the key objectives for the LSA in the Air Force's NSS acquisition strategy:

ULS' ████████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1

2

3

4

5

6

7

8

9

10

11   As detailed in the ULS proposal, Vulcan supplements its legacy systems with

12   new cutting-edge technology like the domestically-produced BE-4 engine.  (*Id.*,

13   35226, 35236.)  For example, Vulcan uses the BE-4 engine together with "███████

14   ████████████████████████████████████."  (*Id.*, 35254.)  The

15   Centaur upper stage is also evolved "████████████████████████████

16   ████████████████████."  (*Id.*, 35256.)  This approach promised to provide

17   the Air Force with the proven capabilities of ULS' heritage launch vehicles together

18   with "████████████████████████████████," giving the Air

19   Force confidence that Vulcan would be an affordable, reliable, and effective solution

20   to its most difficult NSS missions.  (*Id.*, 35237.)

21   Vulcan met all of the Air Force's requirements for Category A/B and Category

22   C missions, and it did so as a single launch vehicle system design, with different

23   Vulcan configurations accommodating a wide range of payloads for each of the nine

24   required orbits.  (*Id.*, 35246.)  As further demonstrated in ULS' proposal, Vulcan's

25   capabilities did not just satisfy the government's requirements, they handily

26   exceeded them, including ██████████████████.  (*Id.*, 35238.)

27   Vulcan also guaranteed accuracy by incorporating ████████████ used in

28   Atlas V, and ████████████ used in both Atlas V and Delta IV.  (*Id.*)  These

9

proven designs provide accuracy for inserting NSS satellites into the intended orbit well in excess of government requirements.  (FED, Tab 132, 41430.)  Vulcan was also designed, as the RFP required, for vertical integration (marrying the payload to the rocket in a vertical position, which is necessary to protect sensitive NSS satellites) on both coasts, adopting ███████████████████████████ ████████████████████████████████████████.”  (*Id.*, 35242.)

## D.     The Air Force Graded Vulcan as the "Most Advantageous" Proposal.

Based on its overall evaluation of the RFP's evaluation criteria, the Air Force concluded that ULS submitted "the most advantageous proposal" for the Air Force. (Portfolio Recommendation, Tab 135, 41742.)  This conclusion was based on an extensive evaluation in which Air Force personnel with technical and cost expertise carefully analyzed thousands of pages of complex proposal materials.  As shown below, the Air Force assigned ULA the highest marks across the board (FED, Tab 132, 41752):

| | Factor 1 EELV Approach (Technical & Risk) | Factor 2 Technical Subfactor 1 Design (Risk) | Factor 2 Technical Subfactor 2 Schedule (Risk) | Factor 3 Cost (Complete & Reasonable) | Compliance |
|---|---|---|---|---|---|
| **ULA** United Launch Alliance | Outstanding / Low | Low | Low | Complete / Reasonable | Compliant |
| **BLUE ORIGIN** | Outstanding / Moderate | Moderate | Moderate | Complete / Reasonable | Compliant |
| **Orbital ATK** | Good / Low | Low | Moderate | Complete / Reasonable | Compliant |
| **SPACEX** | Outstanding / High | Moderate | Moderate | Complete / Reasonable | Compliant |

For Factor 1 (EELV Approach), ULA was the only offeror that received an "Outstanding" EELV Approach and "Low" risk rating, the single most important Factor in the evaluation (RFP, Tab 38, 1281.)  In so finding, the Air Force determined that ULA's approach included ████████████ and ████████████. (FED, Tab 132, 41444.)  The Air Force recognized that ULA "████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████.” (*Id.*, 41430.)  Recognizing that Vulcan is an

3 evolution of those past systems, the Air Force found it important that ████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████.” (*Id.*,

8 41429.)  This included Vulcan's critical upper stage Centaur vehicle, which ULA

9 had "████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████.” (*Id.*)  The Air Force also drew confidence from ULA's

12 "████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████.” (*Id.*, 41439.)

15 Reasoning that ████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████,"

18 (*id.*, 41443), the Air Force concluded that "ULA had the most advantageous

19 proposal" for the EELV Approach.  (Portfolio Recommendation, Tab 135, 41736.)

20       For Factor 2 (Technical), the Air Force found ████████████ in ULA's

21 proposal under Technical Subfactor 1 (Design), concluding that "████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████.”

24 (FED, Tab 132, 41455.)  ULA was "████████████████████████████████

25 ████████████████████████████████████████████████████████

26 ████████████████████████.” (Portfolio Recommendation, Tab 135, 41736.)  The

27 Air Force found ████████████████ Technical Subfactor 2 (Schedule), recognizing

28 that ULS proposed ████████████████████████████████████████████



1 ███████████████████████████████████████████████████████

2 ███████. (Tab 135, Portfolio Recommendation, 41457.)  Assessing this proposed

3 schedule, the Air Force found ████████████████████████████████

4 ████████████████████████████████████████," and thus concluded that

5 ULA's approach presented a "Low" schedule risk.  As the only offeror to ██████

6 ████████████████████████████████  the Air Force found that ULA's

7 proposal had "the best possible risk ratings under the solicitation."  (*Id.*, 41741.)

8      Applying the RFP criteria, the Air Force found ULA's cost proposal

9 reasonable and complete, with an industry cost share of ██████, well above the one-

10 third threshold required in the RFP.  (FED, Tab 132, 41473; RFP, Tab 38, 1275-76.)

11 In fact, the record shows that ULA properly consulted with the government during

12 the evaluation notice period and responded to the Air Force's concerns, ██████████

13 ████████████████████████████████████████.  (*Id.*, 41461.)

14 Ultimately, ULA proposed a government cost share of $967 million, as reflected in

15 the actual awarded OTA value.  (Executed LSA, Tab 140, 42319.)  The Air Force

16 ███████████████████████████████████████████████████████

17 ███████████████████████████████████████████████████████

18 ████████████████████████████████.  (*See, e.g.*, FED, Tab 132, 41461;

19 Portfolio Recommendation, Tab 135, 41721.)

20 **E.    The Air Force Rated SpaceX's Starship as "High" Risk and Too Costly.**

21      SpaceX proposed the Falcon 9 and Falcon Heavy launch vehicles for Category

22 A/B launches under the RFP.  However, those vehicles are ███████████████████

23 ████████████████████████████████████████████████████████.

24 (FED, Tab 132, 41579.)  For its Category C solution, SpaceX proposed the Starship

25 launch vehicle (also referred to as the Big Falcon Rocket or BFR).  The Air Force

26 aptly described the Starship as "████████████████████" with little connection to

27 heritage components or systems, (FED, Tab 132, 41596), and evaluated it as a

28 "High" risk proposal.  The Air Force's justification for declining to award SpaceX



12

an LSA are plain from the voluminous agency record:  SpaceX submitted a very costly proposal, asking the Air Force to partially fund the (very early) development of a new, extremely expensive spacecraft designed to take humans to Mars.  (SpaceX Final Proposal, Tab 123, 39768-845 (stating that the "███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████); *see also* O8 [SpaceX] Rating Debrief 27 Jul @ 1600 01:23:15-01:23:33, Tab 143 ███████████████████████████████████████████ █████████████████████████████████).)

As an experimental Mars rocket, the SpaceX proposal admitted that Starship offered complex and novel capabilities that ███████████████████████████, such as: "████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████" (SpaceX Proposal, Tab 123, 39766-68.)  Indeed, all of SpaceX's ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████ (FED, Tab 132, 41602), with the ████████████████████████ █████████████████████████████ (*id.*, 41582).  Further compounding this approach, SpaceX was also unresponsive to the Air Force's guidance when crafting its final proposal, as explained in detail below.

The Air Force's Portfolio Recommendation outlined severe technical challenges at the core of SpaceX's proposal, which garnered ████████████████ ███████████████████████████████████.  The Air Force's technical evaluation described ████████████████████████████████████████ as follows:





grounded the Air Force's assignment of a "High" risk rating to SpaceX's proposal, which had the highest risk rating of all offerors. (Portfolio Recommendation, Tab 135, 41741.) Moreover, the Air Force noted that it "███████████████████████████████████████████████ ████████████████████████████████████████." (*Id.*, 41742.) SpaceX had "███████████████" to revise its "██████████████████ ████████████████," but it nonetheless failed to do so. (*Id.*) Given SpaceX's decision to propose Starship, the Air Force concluded that "█████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████."

14

1    (*Id.*, 41735.)

2    Finally, the Air Force concluded that including SpaceX in " █████████████

3    ████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ███████████████. (*Id.*, 41742.)  As it specifically warned SpaceX in July 2018 –

6    in advance of final proposals – the Air Force would not ██████████████████

7    ████████████████████████████████████████████████████████████

8    ██████████████████████████"  (O8 [SpaceX] Rating Debrief 27 Jul @

9    1600 01:12:03-01:14:48, Tab 101.)

10   ## III.    ARGUMENT

11   **A.    Administrative Procedure Act Standard of Review.**

12   SpaceX brings the instant complaint for review of the Air Force's award

13   decision under the Administrative Procedure Act, § 706(2)(A).  Supp. Compl. ¶ 136-

14   37.   Under that standard, a court may only set aside final agency action if it is

15   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

16   law."  5 U.SC. § 706(2)(A).  "As the Supreme Court has frequently stressed, this

17   type of review is very narrow and highly deferential to the agency."  *Nat'l Wildlife*

18   *Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).   Therefore, a court must

19   "presum[e] the agency action to be valid and affirm[] the agency action if a

20   reasonable basis exists for its decision."  *Nw. Ecosystem All. v. U.S. Fish & Wildlife*

21   *Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v.*

22   *California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quotation marks omitted)).   "A

23   reasonable basis exists where the agency 'considered the relevant factors and

24   articulated a rational connection between the facts found and the choices made.'"

25   *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (quoting *Ranchers*

26   *Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir.

27   2005)).   Thus, to survive judicial review, the agency's action "need be only a

28   reasonable, not the best or most reasonable, decision."  *Nat'l Wildlife Fed'n*, 871

15

F.2d at 855.  In addition, a "reviewing court considers the reasonableness of an action not from an entirely fresh perspective but on the basis of the administrative record in existence at the time of the decision to act." *Id.*

In an agency acquisition setting, "there is a 'strong public interest in avoiding disruptions in procurement, and for withholding judicial interjection unless it clearly appears that the case calls for an assertion of an overriding public interest." *Patriot Contract Servs. v. United States*, 388 F. Supp. 2d 1010, 1018 (N.D. Cal. 2005). "Because of the deference courts give to discretionary procurement decisions, 'the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'"[4]  *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  "The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Beta Analytics Int'l, Inc.*, 67 Fed. Cl. at 395.  Therefore, "challenges concerning 'the minutiae . . . in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.'" *Id.* (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).  In procurement matters, courts addressing these issues have afforded even greater deference to agencies operating in the national security arena.  *See, e.g.*, *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 249 n.11 (2012) ("[D]eference to military evaluation in the merits of a protest goes beyond the high discretion afforded technical ratings, to an even higher plane when the decisions implicate national security.").

---

[4] Although this is not a bid protest case subject to the Court of Federal Claims' jurisdiction, precedent from that court, which routinely addresses government contract matters, is instructive. Indeed, SpaceX invites this comparison by urging the Court to apply the Competition in Contracting Act's standard to this case.  (*See* SpaceX Mot. at 15-16.)

1

2

**B.**     **The Air Force's Decision to Award an LSA to ULS for its Top-Rated Vulcan Proposal Was Not Arbitrary, Capricious, or Contrary to Law.**

3

4

5

6

7

8

The Air Force concluded that ULS' Vulcan launch system met or exceeded all RFP requirements, and presented an "Outstanding" EELV Approach and "Low" risk for the development of its next generation NSS launch vehicle.   This "Outstanding" rating under the most important factor, Factor 1 (EELV Approach), arose from the Air Force's recognition of ███████ Strengths in ULS' proposal, as follows:

9

10

11

12

13

14

15

16

17

18

19

20

21

████████████████████████████████████████████████

22

23

24

25

26

27

As set out in more detail in Section II.C, Vulcan met or exceeded all of the Air Force's requirements as stated in the RFP, and ULS' experience in developing and operating heritage launch vehicles gave the Air Force confidence that it would evolve this success into its next-generation launch vehicle.   Out of all the offerors, ULS was the only one to receive an "Outstanding" technical rating for its EELV Approach and "███████████████████████████████████████

28

1   ██████████████████████████████████████████.” (Portfolio

2 Recommendation, Tab 135, 41734.) Thus, the Air Force concluded "there is little

3 potential that ULA will not achieve its Outstanding rated approach" (*id*.), and

4 SpaceX does not dispute or challenge the validity of a single one of the technical

5 Strengths assigned to the Vulcan system, even though it carries the tremendous

6 burden of showing precisely how the Air Force acted arbitrarily.

7       Even with respect to the ████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████

12 ██████████" and (b) the Air Force evaluators, with their collective technical

13 expertise, were in the best position to make such a determination (which has not

14 been challenged by SpaceX). Through this well-documented technical finding, the

15 Air Force's evaluation of a "Low" schedule risk rating to Vulcan was not only well

16 justified, but required by the express terms of the RFP, which mandated a "Low"

17 rating where potential difficulties could likely be overcome via "normal" levels of

18 participant effort and government monitoring. (RFP, Tab 38, 1282.) Although

19 SpaceX asserts that a 14-month schedule margin was the Air Force's "benchmark"

20 for assigning "low risk" to a proposal, (SpaceX Mot. at 19), it is telling that SpaceX

21 does not cite to the RFP for its claim, citing instead to the Portfolio

22 Recommendation, which states only that a 14-month margin is "██████████████

23 ██████." (Tab 135, 41725.) Because a 14-month margin was not a requirement

24 for a "Low" risk rating, the Air Force could (and did) reasonably determine that

25 ████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████

27 ██████████████████████████████) were exactly the type of proposal features that

28 bridged any "risk gap" between the Air Force's preferred schedule margin of 14

1   months and the ▓▓▓▓▓ proposed by ULS.

2   **C.    The Air Force's Decision to Deny an LSA Award for SpaceX's Starship**

3   **Proposal Due to Its Risk and Cost Was Well Justified and Documented.**

4   SpaceX has not come close to meeting its heavy burden of demonstrating that

5   the Air Force erred in denying an LSA award for SpaceX's offering.  Although none

6   of its arguments are compelling, SpaceX attacks the Air Force's LSA evaluation on

7   three grounds, alleging that the award decision:   (1) contravened congressional

8   direction and goals for the NSS launch program; (2) irrationally overstated the risk

9   arising from SpaceX's Starship solution for Category C and irrationally assessed

10  Significant Weaknesses against SpaceX based on unstated criteria; and (3)

11  understated costs in the ULS proposal and overstated costs in the SpaceX proposal.

12  **1.    The Air Force's LSA Award Decision Was Entirely Consistent with**

13  **Congressional "Direction" Regarding NSS Acquisition Strategy.**

14  SpaceX's lead argument (framed around Count V of its Supplemental

15  Complaint) relies on fundamentally flawed (and unsupported) characterizations of

16  the RFP and the overarching objectives guiding the Air Force's acquisition strategy

17  for the development of its next-generation NSS launch vehicles.  As a threshold

18  matter, we note that, although the RFP discusses these congressional objectives, they

19  are not free-floating evaluation factors, to be applied independently of the RFP's

20  detailed evaluation criteria designed to implement these objectives through a

21  competitive procurement.  Nowhere does the RFP have any mechanism for assigning

22  scores or ratings pursuant to the congressional "direction" upon which SpaceX

23  relies.  Nor did the RFP provide evaluators with a framework for drawing relative

24  distinctions between competing offerors with respect to these general objectives.[5]

25  _____

26  [5] If SpaceX believed these objectives were required to be independent evaluation factors, it was

27  required to protest the RFP's terms prior to the submission of proposals.  Instead, SpaceX waited

28  to sample the evaluation results, and then filed a lawsuit attempting belatedly to challenge the RFP

Yet, even apart from the foundational weakness of SpaceX's first argument, the notion that the Air Force is not following congressional direction is not supportable.

      a.      The Air Force Properly Leveraged
                  Commercial Solutions in Its Portfolio Award Decision.

SpaceX wrongly suggests that the Air Force adopted an unstated preference for reliance on solutions tailored to the government's needs and that the government was essentially *required* to invest in Falcon as the only true commercial launch system. (SpaceX Mot. at 18.) SpaceX offers no proof for its assertion that the other launch vehicles are not "commercial," other than to allege without support that the awardees have "little to no commercial launch experience." (*Id.*) SpaceX's theory appears to be that only it should receive an LSA OT agreement for its current Falcon launch vehicles on unfounded allegations that it currently has the only true "commercial" launch vehicle, at least as it defines the term. This incorrect assertion belies the very purpose of DoD's OT authority, which here was to invest in the development of next generation launch vehicles, *i.e.*, to develop prototypes. 10 U.S.C. § 2371b. SpaceX's argument also contradicts the congressional direction that DoD maintain a robust space launch industrial base, 10 U.S.C. § 2273(b)(2).[6] Its argument should be discounted for these reasons alone.

Nonetheless, ULS' proposal evidences in multiple places that Vulcan is a commercial solution. (*See, e.g.*, ULS Proposal, Tab 120, 35240-41 ( ███████████

---

ground rules and overturn the Air Force's careful and thorough evaluations of technology, schedule, risk, and cost, because the outcome of the competition was not to its liking. This ill-conceived strategy is barred by the plain language of the RFP (Tab 38, 1263) and established precedent strictly prohibiting tactics of this sort. *See, e.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).

[6] As a technical matter, *all* space launch services for the government are commercial by definition. *See* 51 U.S.C. § 50132 (stating that "[a]cquisitions of space transportation services by the Federal Government shall be carried out in accordance with applicable acquisition laws and regulations," and that, "[f]or purposes of such law and regulations, space transportation services shall be considered to be a commercial item").

ULS' ███████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

1　███████████████████████████████████████████

2　████████████████████████████████████), 35248 (███████

3　████████████████████████.)  Indeed, through its historical monitoring of

4　ULS operations for NSS launch scheduling purposes, the Air Force is acutely aware

5　of ULS' historical launch manifest of both NSS and non-NSS (civil and commercial)

6　launches.[7]  And, to the extent the Court entertains SpaceX's extra-record allegations,

7　publicly-announced awards show that the Air Force's expectation about Vulcan's

8　commercial viability was exactly right, as ULA has already sold two Vulcan

9　certification flights to non-government entities.[8]  As its proposal makes plain, ULA

10　is a commercial provider and is developing Vulcan as a commercial launch system.

11　　　SpaceX also claims that Vulcan cannot be commercial because it was

12　"purpose built" for NSS mission requirements, relying on an extra-record quote from

13　the ULA CEO.[9]  (SpaceX Mot. at 18 n.9.)  However, as the Air Force's evaluation

14　documents clarify, the capabilities needed for NSS launches exceed the requirements

15

16　─────────────────

17　[7] ULS has been awarded multiple FAR Part 12 (commercial item) contracts by NASA and the Air

18　Force, and ULS has historically launched multiple successful commercial missions using its Atlas V and Delta launch vehicles.  *See* ULA, Missions, https://www.ulalaunch.com/missions/-in-category/categories/customer/commercial (last accessed Jan. 17, 2020).  We note that many of

19　SpaceX's arguments rely on evidence outside the record, and are therefore improper.  *See Lands*

20　*Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005).  Although the record here is sufficient to defeat SpaceX's arguments, to the extent the Court considers them, ULS asks that the Court take

21　judicial notice of the publicly available facts ULS presents to refute these extra-record assertions. *See Cactus Corner, LLC v. U.S. Dep't of Agriculture*, 346 F. Supp. 2d 1075, 1098 (E.D. Cal. 2004)

22　("a court may properly take notice of public facts and public documents").

23　[8] *See* William Harwood, *Dream Chaser spaceplanes to launch on ULA Vulcan rocket*, CBS NEWS (Aug. 14, 2019), https://www.cbsnews.com/news/dream-chaser-spaceplanes-to-launch-on-ula-

24　vulcan-rocket/; Stephen Clark, *Astrobotic lunar lander to launch on ULA's first Vulcan rocket*,

25　SPACEFLIGHT NOW (Aug. 20, 2019), https://spaceflightnow.com/ 2019/08/20/astrobotic-lunar-lander-to-launch-on-ulas-first-vulcan-rocket/.

26　[9] We note that SpaceX, too, has stated that it "designed the Falcon 9 and Falcon Heavy from the

27　outset to meet the EELV design specifications."  *Assuring Assured Access to Space Before the H. Committee on Armed Services*, 114th Cong. 21 (2015) (Statement of Gwynne Shotwell, President

28　& CEO of SpaceX).

for commercial missions.  (FED, Tab 132, 41469).  The Air Force concluded, specific as to ULS, that any launch system capable of meeting NSS requirements is also capable of meeting commercial launch industry requirements, making such systems "dual-use."  (*Id.*)  Therefore, any viable LSA approach would have to incorporate capabilities exceeding those present in the commercial market.

> b.  The Air Force's Decision to Award LSA Funds for Vulcan Development Did Not Violate the "Assured Access to Space" Mandate of 10 U.S.C. § 2273.

In the second part of its "congressional direction" argument, SpaceX complains that the Air Force's decision to award an LSA for Vulcan development somehow undermines the goal of "Assured Access to Space."[10]  Yet, driven by the actual RFP evaluation criteria that SpaceX seems determined to overlook, the Air Force's inclusion of ULS in its portfolio award actually *increases* the probability that the Air Force will have access to at least two providers capable of meeting the full range of NSS needs for all reference orbits, including the "heaviest and most complex" NSS payloads, precisely as envisioned by Section 2273 of Title 10.

SpaceX's argument is misguided for numerous reasons.  First, the LSAs are OT agreements, which (by definition) are development contracts.  Proposing to develop a next-generation launch vehicle – a "paper rocket," as SpaceX calls it – is exactly what the RFP demanded.  SpaceX itself proposed a "paper rocket," Starship, which at the time of proposal ██████████████████████████████ ████████  (FED, Tab 132, 41586), and ████████████████████████.  (SpaceX Proposal, Tab 123, 39754-55.)  The LSA competition was not for any launch service

---

[10] The policy of Assured Access to Space, codified at 10 U.S.C. § 2273, sets out a series of goals to ensure that the "the United States has the capabilities necessary to launch and insert United States national security payloads into space whenever such payloads are needed in space."  Among the "actions" identified to achieve that goal is providing the resources and policy guidance to sustain "at least two space launch vehicles (or families of space launch vehicles)."  *Id.* § 2273(b)(1).

(as SpaceX's arguments continually imply), but rather to select the most advantageous government investments for next generation launch vehicles to mature the domestic launch market in advance of Phase 2.  (RFP, Tab 38, 1260.)

SpaceX also argues that the Air Force's award creates a risk to Assured Access to Space because it supposedly discounted "common component" risk with Vulcan, in that it relies on components developed by Blue Origin (BE-4 engine) and Orbital ATK (GEN 63XL solid rocket motor).  (SpaceX Mot. at 19-20.)  However, SpaceX concedes that the Air Force's evaluation did not incorporate a "common component" risk criterion, in part because the RFP contained no suggestion whatsoever that use of "common components" was discouraged, or that (at the other end of the spectrum) "siloed" (and potentially inefficient and duplicative) development of each launch vehicle component was preferred.[11]  (*Id.*)  Nevertheless, the Air Force squarely addressed this issue in its evaluation documents, concluding that it chose *not* to include a common components risk criterion in the RFP "█████████████████████████████████████████████████████████████████████████████"  (Award Decision Document, Tab 136, 41753.)  And even then, the Air Force also found that the common components in Vulcan did "█████████████████████████████████████████████████████████████████████████.  (*Id.*)

Finally, SpaceX has failed to identify any specific technical "risk" it believes should have been assigned to ULS for using the BE-4 engine.  For example, the Air Force evaluators set forth a detailed rationale for concluding that BE-4 engine design efforts were fully on track, and determined ████████████████████████████████████████████████████████████████████████████████.  (FED, Tab

---

[11] In fact, the RFP indicated the opposite, requiring each offeror to promise that rocket propulsion systems developed under this LSA will be available for purchase "by all space launch providers of the United States."  (RFP, Tab 38, 1280.)

1   132, 41497).  The Air Force concluded that Blue Origin's ██████████████

2   ████████████████████████████████████████████████████████████████████

3   ████████████" (*Id.*, 41480.)[12]  The Air Force's analysis of BE-4 engine development

4   status was grounded on clear evidence of record, including the fact that the BE-4

5   engine had █████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████.

7   (ULS Proposal, Tab 120, 35260.)

8               c.    The Air Force Award Decision Did Not Violate Any
9                     <u>Congressional Mandate to End Reliance on Russian Engines.</u>

10           Denying SpaceX's costly and risky Starship an LSA award does not somehow

11   "thwart[] Congressional direction to end reliance on Russian rocket engines for NSS

12   missions."  (SpaceX Mot. at 20.)  SpaceX's argument appears to depend entirely on

13   its claim that none of the other offerors will be ready with their proposed EELV

14   systems by April 1, 2022, potentially resulting in the Air Force ordering backup

15   launches on Atlas V, which uses a Russian-made engine.  Yet, SpaceX's suggestion

16   that any further orders of Russian engines is prohibited by law is simply wrong.  The

17   2017 National Defense Authorization Act ("NDAA") *allows* DoD to order a number

18   of Russian-made engines on contracts "awarded during the period beginning on the

19   date of the enactment of the [FY17 NDAA] and ending December 31, 2022 . . ."

20   Pub. Law No. 114-328, § 1602 (2018).  Therefore, Congress specifically provided

21   for the award of a contract using a Russian-made engine if one was needed for any

22   contract *awarded* prior to December 31, 2022, which would obviously include a

23   contract with an April 1, 2022 NSS launch date.  SpaceX's unsupported assumption

24   _____

25   [12] Although they are nearly two years too late, SpaceX attempts to fall back on the untimely
26   suggestion that the Air Force should have amended the RFP to include a common component risk
     criterion.  (SpaceX Mot. at 20.)  The RFP warned potential offerors that any objection to the terms
27   of the RFP must be presented in writing "within ten calendar days" of the release of the RFP, or
     the date the objector knew or should have known of the basis for its objection.  (RFP, Tab 38,
28   1263).  SpaceX has thus waived any such objection.  *See Blue & Gold Fleet L.P.*, 492 F.3d at 1315.

24

that ULS' Vulcan rocket will not successfully launch by the first (Category A/B) deadline is also contradicted by the Air Force's detailed technical evaluation. The Air Force's rigorous evaluation process concluded the risk of schedule overruns was "Low" and could effectively be mitigated through "normal Participant effort and normal Government monitoring." (Portfolio Recommendation, Tab 135, 41717, 41740.) In other words, the Air Force expressed high confidence that Vulcan will be ready to successfully launch on time.

Finally, SpaceX improperly conflates the goals of the LSA competition, which sought to "transition from the use of non-allied space launch engines," with the specific evaluation criteria the Air Force set out in the RFP to achieve that goal. (*See* RFP, Tab 38, 1260.) The Air Force developed a detailed multi-factor technical and risk evaluation framework designed to achieve a developmental LSA portfolio that would maximize the value of the limited congressional funding to enable a viable competitive field for future NSS launches using domestic engines. Under that framework, the record demonstrates that the Air Force's LSA portfolio award decision (including its decision to exclude SpaceX) was reasonably premised on the very legitimate concern about the " █████████████████████████████ " associated with Space X's proposed Category C solution. (FED, Tab 132, 41651.) On the other hand, the Air Force's decision to award ULS an LSA to further develop its Vulcan system without any reliance on Russian-made engines clearly aids in the congressionally-directed transition. Although SpaceX apparently disagrees, and believes the Air Force was wrong to choose the comprehensive value of ULA's Vulcan, this is a quintessential discretionary judgment committed to the Air Force's reasonable exercise of its informed and expert discretion. *See, e.g.*, *Sci. Applications Int'l Corp.*, 108 Fed. Cl. at 249 n.11.

**2.     The Air Force Reasonably Recognized the Substantial Risk in SpaceX's Approach and Properly Assigned ████ Significant Weaknesses to its Category C Solution.**

Challenging the Air Force's well-justified conclusion that SpaceX's Starship spacecraft was simply too risky, SpaceX's second argument (framed around Counts II-IV of its Supplemental Complaint) takes aim at three aspects of the Air Force's application of the RFP's evaluation criteria, alleging that:  (1) the Air Force improperly mitigated the risk that other Category A/B solutions would not be ready on time; (2) certain of Starship's ████████████ were based on unstated criteria; and (3) the Air Force's conclusion that Starship would not meet the Category C need date was arbitrary.   Each of these arguments is disproved by the administrative record.

         a.     The Air Force Did Not "Improperly Discount" Category A/B Mission Risks.

The Air Force reasonably identified a legitimate risk that Starship, a spacecraft designed to take humans to Mars and other interplanetary destinations, would very likely not be ready on the Air Force's timetable.  SpaceX's own brief insists that an agency should not "fail to consider an important aspect of the problem" when evaluating possible choices.  (SpaceX Mot. at 15.)  Indeed, the Air Force's risk assessment carefully considered all angles when evaluating potential risks presented by competing proposals.  In relation to ULS, the Air Force determined that if ULS' proposed Vulcan solution encountered challenges, any risk to the Air Force's timetable for upcoming Category A/B missions could be mitigated through "[n]ormal Participant emphasis and normal Government monitoring."  (Portfolio Recommendation, Tab 135, 41720.)  SpaceX has not challenged this assessment, but it does complain about statements in pre-award discussions, in which an agency official noted that ████████████████████████████████████ ████████████████████████████████ (which the Air Force ultimately did not find)

1  could be mitigated or "bought down" by the government through available
2  alternatives.  (SpaceX Mot. at 27.)

3      As an initial matter, there is no evidence that the Air Force technical
4  evaluation grounded its decision on this "buy down" plan, which is absent from any
5  of the final evaluation award documents.  In fact, this discussion arose during the
6  discussion period, at which point ULS had offered only a ████████████ margin,
7  far less than the ████████ it ultimately proposed.  But, even if the Air Force did
8  contemplate this in its final evaluation, it had every right to "consider an important
9  aspect of the problem" when making its overall portfolio selection, including
10  potential risks against possible mitigation options.  Such analysis would not be
11  equivalent to an "unstated evaluation criterion," because it is part and parcel of
12  evaluating the overall strengths, weaknesses, and operational risks associated with
13  competing proposals.  *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d
14  1345, 1357 (Fed. Cir. 2004) (rejecting assertion that agency had used unstated
15  evaluation criteria where agency permissibly recognized that an awardee's lack of
16  technical capacity in one task area could be mitigated by capabilities available from
17  other sources in relation to same task area).

18      In fact, it is SpaceX that seeks an approach inconsistent with the RFP, by
19  arguing that the Air Force was obliged to ignore the operational implications of the
20  substantial technical and schedule risks associated with SpaceX's flawed Category
21  C approach.  The RFP required offerors to propose a solution "meeting the full range
22  of EELV requirements," (RFP, Tab 38, 1269), and demonstrating an "ability to meet
23  *all* EELV reference orbits," (*id.*, 1265 (emphasis added)).  Nothing in the RFP
24  suggests, as SpaceX argues, that a less risky solution for Category A/B could make
25  up for a high-risk approach for Category C missions.  To the contrary, the RFP
26  emphasized that Category C missions were the "heaviest and most complex," (*id.*,
27  1260), and Category C solutions, unlike Category A/B solutions, were beyond what
28  could be solved by the commercial market.  (FED, Tab 132, 41463 ("[T]he

1   Government is not aware of any past or future commercial satellites that require

2   Category C capability.").)

3        In any event, ULS ███████████████████████████████████

4   ██████████████████████████████████████, and SpaceX received full

5   credit for the perceived Strengths of its proposed Category A/B solution.  Because

6   SpaceX, like all the other offerors, was required to propose a *complete* proposal, the

7   Air Force properly cited the ████████████████ and "High" risk in SpaceX's

8   proposed Category C solution as part of the basis for not awarding an LSA to

9   SpaceX.

10        b.    The Air Force Reasonably Assigned ████████████████ to

11        SpaceX's Proposal Based on the RFP's Express Requirements.

12        The ██████████████ assigned to SpaceX's novel and unproven Mars

13   spacecraft were reasonable under the terms of the RFP and justified by the

14   administrative record.  The Air Force was required to evaluate potential risks against

15   possible mitigation options, properly recognizing the practical impact of SpaceX's

16   failure to offer a reliable solution for the most challenging and complex NSS

17   missions.   To that end, the Air Force evaluated SpaceX's proposal as having a

18   ███████████████████████████████████████████████████████████████.

19   (FED, Tab 132, 41585.)  It also determined that the ██████████████████████

20   █████████████████████████████████████████████████████████████████

21   ██████.  (*Id.*, 41585-86.)  For example, the Air Force concluded that SpaceX's

22   approach would █████████████████████████████████████████████████

23   █████████████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████████

25   █████████████████████████████████████████]."  (*Id.*, 41586.)

26        SpaceX does not challenge the Air Force's conclusion about the increased ████

27   ███ risk.  Instead, it asserts that because the RFP did not specifically forbid SpaceX

28   from using its pre-existing ████████████ procedures, the Air Force was obliged

28

to ignore the ████████ risks associated with applying those procedures to NSS

missions. (SpaceX Mot. at 29-30.)  This makes little sense, and contrary to SpaceX's

assertions, its insistence on proposing a risky ████████████████ method

did not result in SpaceX's proposal being "deemed incomplete." (*Id.* at 29.)  An

"incomplete" proposal would have been excluded from competition, but a proposed

approach that increased ██████ risk to reach completeness might earn a Significant

Weakness while still being eligible for award.  SpaceX is wrong to conflate the two

concepts.[13]  *See Textron Inc. v. United States*, 74 Fed. Cl. 277, 321 (2006) (agency

reasonably assigned "significant weakness" even where technical proposal met

baseline RFP requirements and thus did not warrant a "deficiency").

Similarly, SpaceX received a ██████████████ under the RFP's

requirement that offerors propose █████████████████████████

████████████████████████████████████████████████

████████████████.  (FED, Tab 132, 41586, 41588.)  Because the existing

government facilities for ████████████████████████████████

████████████████████████████████████████████████

████████.  (*Id.*, 41588.)  Again, SpaceX does not dispute that the Air Force

correctly identified the ██████ risks of its proposal.  Rather, it mistakenly claims

that the government removed the requirement for ███████████████████

██████, and thus could not count SpaceX's decision to ████████████████

against it.  (SpaceX Mot. at 30.)  However, the Air Force did *not* remove the

---

[13] SpaceX's reliance on the RFP's "tailoring" provision (SpaceX Mot. at 29) is also misplaced. The Air Force was required under the RFP *first* to evaluate each proposal under the evaluation criteria set forth in Section 4 of the RFP.  Then, *after* the evaluation was complete and the Air Force had selected its portfolio of awardees, it would execute LSAs.  The "tailoring" clause invoked by SpaceX takes the "NSS requirements" as a given, and on its face addresses only the content of agreements between the Air Force and each awardee.  (RFP, Tab 38, 1260.)  It does not suggest the Air Force could change NSS requirements, ignore the RFP's evaluation criteria, and overlook costs and risks imposed by an offeror's proposal, when selecting its portfolio of awardees in the first place.

1 requirement to █████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 █████████████████████████████████.  (RFP, Tab 38, 1269 (citing

4 SPRD, Tab 18, 757.)) ████████████████████████████████████

5 █████████████████████████████████████████.  (RFP,

6 Tab 38, 1284.)  The risks ███████ of SpaceX's approach were therefore properly

7 and reasonably considered in the Air Force's evaluation.[14]

8             c.       The Air Force Reasonably Found that SpaceX's

9                      <u>Untested Starship Presented "High" Schedule Risk.</u>

10       The ████████████████████ complexity of SpaceX's Starship justified the

11 Air Force's conclusion that "███████████████████████████████████

12 ██████████████████████████████████████████████████████

13 ██████████"  (Portfolio Recommendation, Tab 135, 41735.)  SpaceX disputes this

14 reasonable conclusion by asserting the Air Force erred:  (1) in concluding that

15 ████████████████████████████████████████████████████████;

16 (2) in assigning risk because ██████████████████████████████

17 ████████████████████████████; and (3) in comparing Starship to the

18 Space Shuttle.

19       The  Air  Force  assigned  ████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23

24 _____

25 [14] SpaceX also argues that, late in the game, it offered an option to █████████████████

██████████████████"  (SpaceX Mot. at 31.)  But this vague offer was unaccompanied by any

26 explanation of *how* SpaceX intended to accomplish █████████████████████████████

███████████.  (*See* Air Force Response to SpaceX Debriefing

27 Questions, Tab 146, 42675.)  SpaceX did not explain its ██████████████ approach,

and  instead  appeared  to  assume  without  explanation  that  any  concerns  with  respect  to  ████

28 ██████████████████  could be resolved during the course of performance.  (*Id.*)

1   █████████████████████████████████. (FED, Tab

2 132, 41603-04.)  SpaceX cannot dispute that it is designing Starship to be a fully

3 reusable vehicle.  As SpaceX told the government, "████████████████████

4 ████████████████" (O8 Rating Debrief 27 Jul @ 1600 01:23:15-

5 01:23:33, Tab 101.)  SpaceX reiterated this in its final proposal, declaring that

6 Starship would be ████████████████████████████████████████

7 ██████████████████████████████████." (SpaceX

8 Proposal, Tab 123, 39858-59.)  It was therefore reasonable for the Air Force to

9 conclude that "████████████████████████ (FED, Tab 132,

10 41604), because the █████████████████████████████████████

11 ████████████████████████████████████████████████

12 █████████████████"[15] (*id.*, 41620).

13      SpaceX asserts that the Air Force misread its proposal with respect to ██████

14 ██████████████████████████████████. (SpaceX Mot. at

15 31.)  In this regard, SpaceX proposed that a key purpose of ███████████████

16 ████████████████████████████████████████████████

17 ███████. (SpaceX Proposal, Tab 123, 39831.)  But SpaceX also hedged its

18 bets,  suggesting  that  if  ███████████████████████████████████

19 ████████████████████████████████████████████████

20 _____

21 [15] The Air Force's technical evaluation explored this issue in some detail.  (FED, Tab 132, 41603-

22 04, 41608-09, 41613.)  The evaluators observed that the ███████████████ SpaceX's proposal contemplated ██████████

23 ██████████████████████████████████████████████. (*Id.*,

24 41604, 41621.)  This sequence left the Air Force with ██████████████████████

25 ████████████████████████████ (*Id.*, 41603-04, 41608-09.)  Moreover, even if those challenges could be overcome, SpaceX's plan to achieve what might be called

26 ████████████████████████████████████ (*Id.*, 41613.)  These reasonable

27 conclusions explain why it was not arbitrary or capricious for the Air Force to assign ████████

28 ████████████████████████████.

1   ███████████████████████████████████. (*Id.*)  This did nothing

2   to ameliorate the Air Force's well-founded concerns about SpaceX's plan for

3   building a reusable interplanetary Starship, and then ██████████████████

4   ████████████████. Accordingly, the Air Force reasonably found that SpaceX's

5   conditional ██████████████████ did not eliminate the basis for █████████

6   ██████████████ Starship's high-risk Category C approach.

7        SpaceX next complains that the Air Force assigned a Schedule risk despite

8   SpaceX having proposed ███████████████████████████████████████

9   ████████████████████████ September 2025 Category C need date.

10  (SpaceX Mot. at 32.)   SpaceX misconceives the nature of ██████████████

11  ███████████████████████████████████████████████████████

12  ██████████████. (FED, Tab 132, 41621.)   SpaceX proposed to ███

13  ███████████████████████████████████████████████████████

14  ████████████████████████████. (SpaceX Proposal, Tab 123,

15  39830.)   If this ██████ revealed problems ██████████████████████

16  ███████████████████████████████████████████████████████

17  ████████████████. (Air Force Resp. to SpaceX Questions, Tab 146, 42679.)

18  Contrary to SpaceX's assertions, this ████████████████████████████

19  ██████████████, but rather the ████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ████████████████████.[16]

22        Finally, SpaceX asserts the Air Force improperly analogized development of

23  Starship to the development of the Space Shuttle.  (SpaceX Mot. at 33.)  As an initial

24  _____

25  [16] SpaceX also asserts that the Air Force erred in evaluating the ULS ██████████ Category C

26  development, alleging that ULS' █████████████████████████████████████████

27  ██████████████. (SpaceX Mot. at 32.)  SpaceX has misread ULS' proposal.  ULS proposed
    ██████████████████████████████, (ULS Proposal, Tab 120, 35229, 35254), which the

28  government recognized in its evaluation (FED, Tab 132, 41458).



matter, this comparison appears primarily to have been an analogy used when discussing likely development costs, not schedule risk.  (FED, Tab 132, 41641, 41656-58.)  The Air Force's evaluation of the Starship ████████████████ ████████ (and the corresponding Moderate risk rating), did not depend upon the Space Shuttle analogy, but was instead driven by three specific schedule-related technical risks that SpaceX did not adequately address  (*Id.*, 41620-21.)

Nonetheless, the Air Force's expert technical evaluators did state that Starship was "███████████████████████████████████████████████████████ ████████████████," and referenced the eleven years that it took to develop the Space Shuttle.  (*Id.*, 41620.)  While SpaceX cites various technical and process advances it claims will inevitably speed Starship development in comparison to the Space Shuttle, the Air Force was equally specific in citing the various features and assemblies within the Starship design that were believed to ████████████████ ████████████████████████████████████████████████.  (*See id.*, 41620  (identifying █████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████")).)  Predicting the likely net outcome when SpaceX's manufacturing tools and processes are applied to these Starship design challenges is a classic example of a technical judgment call where agency discretion is at its apex.

### 3.    The Air Force's Cost Evaluation Was Consistent with the RFP and Entirely Reasonable.

Similar to the analytical work performed by its technical evaluation team, the Air Force's cost evaluation team engaged in a detailed review of thousands of pages of cost-related narrative, data, and supporting materials.   ULS' cost proposal described the company's proposed investment costs across more than 1,000 pages

of material alone, and its team engaged in multiple rounds of discussions with the Air Force.   Following those discussions and at the Air Force's request, ULS ultimately proposed to: (1) ███████████████████████ (2) ███████████████████████████████████████████████ (3) ███████████████████████████████████ and (3) ███████████████████████████████.   (*See* ULS Proposal, Tab 120, 35371.) Ultimately, the Air Force found these costs complete, reasonable, and compliant with all of the RFP's requirements.   (FED, Tab 132, 41424.)   The Air Force evaluated ULS' proposed total investment as ████████████, with the cost share split ████████████████████████ between the Air Force and ULS/Industry respectively.   (*Id.*)   The evaluated SpaceX proposal exceeded ULS' ██████████ ████████████████████████████████████████████████ ██████████████████████████████████ (*Id.*)



SpaceX seeks to challenge the Air Force's reasonable evaluation by asserting (framed around Count I of its Supplemental Complaint) that the Air Force failed to include certain government costs in ULS' proposal and unfairly included certain costs in SpaceX's proposal, which would have made ULS more expensive than SpaceX.   It is telling that SpaceX does not discuss the costs the RFP required the offerors to either include or exclude.

a.   The Air Force Properly Excluded Costs from ULS' Prior <u>ELC Contract, Which Were Not Within the Scope of LSA.</u>

Contrary to SpaceX's assertions, the Air Force properly excluded payments that ULS received from the Air Force under the EELV Launch Capability contracts (the "ELC contract") from its cost evaluation of the ULS proposal.   The ELC contract is a series of negotiated, cost-based contracts that ULS performed for the Air Force from its inception in 2006 until last year.   The ELC contract applied to the original periods of the EELV program, the most recent of which was known as

"Phase 1," during which time ULS operated in a sole source capacity (*see* LSA Industry Day Charts, Tab 4, 164).[17]   ULS' work under Phase 1A (the current operational phase of the NSS program involving competition between ULS and SpaceX), LSA, and Phase 2 (if awarded a contract) are not covered by the ELC contract.  ULS performed a specific scope of work under the ELC contract, only in connection with ULS' then-active fleet of NSS launch vehicles, Atlas V, Delta II, and Delta IV.[18]   Nothing in the record even remotely suggests that the ELC contract, executed in 2013, included the development of the Vulcan launch system.

As its own contracts, the Air Force understood the differing scopes of the ELC contract (supporting Atlas V and Delta) versus LSA (supporting Vulcan development) and ensured they were properly accounted for in the LSA competition.  For example, the ELC contract included within its scope certain launch infrastructure costs related to the facilities used by the Atlas V and the Delta family of launch vehicles under Phase 1.  When ULS considered the future need for these types of costs as they pertained to the completion of Vulcan (*i.e.*, Vulcan-specific enhancements), ULS properly included them.  (*See, e.g.*, ULS Proposal, Tab 120, 35662-95, 35811-18 (proposing ████████████████████████████████ ████████████████████████████████████████ ██████ ).)  And, the Air Force recognized and included such Vulcan-specific costs as

---

[17] To the extent the Court entertains this argument from SpaceX with materials outside of the record, it might consider that senior Air Force and DoD officials have recognized that the ELC contract was "not a subsidy," as SpaceX asserts, but instead "an effective way to cover the government-mandated costs for the EELV," critical to assuring access to space during Phase 1. *See Military Space Launch and the Use of Russian-Made Rocket Engines Before the Committee on Armed Services*, Testimony of Under Secretary Frank Kendall, 114th Cong. 608 (Jan. 27, 2016); *Military Space Launch and the Use of Russian-Made Rocket Engines Before the Committee on Armed Services*, Statement by the Honorable Deborah Lee James, 114th Cong. 608 (Jan. 27, 2016).
[18] *See*, *e.g.*, DoD Contracts for September 27, 2017 (Sept. 27, 2017), https://www.defense.gov/Newsroom/Contracts/Contract/Article/1327363/.

---

ULS' ██████████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD ██████

1  part of the cost evaluation of ULS' proposal.[19]  (FED, Tab 132, 41643.)

2  **b.  The Air Force Properly Excluded Costs for Certain**
3  ██████ **Components from the Government Cost Share.**

4  SpaceX also wrongly asserts that the Air Force failed to include the costs for

5  one of ULS' subcontractors, ██████ to develop and produce ██████

6  for Vulcan as part of the government's cost share.  (SpaceX Mot. at 22.)  This

7  argument hinges on one "fact" that SpaceX has italicized, presumably so that the

8  Court does not miss it:  that ██████

9  ██████"  *Id.*  This assertion misrepresents the record, as the

10  portions of the record that SpaceX cites clarify that ██████

11  ██████

12  ██████"  (ULS Proposal, Tab 120, 35249, 35377.)

13  These citations do not state that ██████, and the

14  record is devoid of any such other evidence that would support SpaceX's argument.

15  **c.  The Air Force Properly Considered BE-4**
16  **Development Costs in Its Cost Evaluation of ULS' Proposal.**

17  The Air Force properly accounted for costs associated with the development

18  of the BE-4 engine in ULS' proposal, notwithstanding SpaceX's assertion that

19  unidentified BE-4 engine development costs should have been included.  In support

20  of this claim, SpaceX notes that the Final Evaluation Document states, when

21  discussing the treatment of engine development costs, that "██████

22  ██████

23

24

25  [19] We note that SpaceX has itself also received billions of dollars of government funding.  *See*
*Assuring National Security Space: Investing in American Industry to End Reliance on Russian*
26  *Rocket Engines*, 114th Cong. 45 (June 26, 2015).  To this end, SpaceX expressly states in its brief
that it would ██████" to develop Starship.
27  (SpaceX Mot. at 33.)  The Air Force did not include any such costs in its evaluation of the SpaceX
proposal although SpaceX admits that ██████
28  ██████.

1   ██████████████████████████████████████████." (SpaceX Mot. at 23 (citing FED,

2   Tab 132, 41644).)  The reality is that the Air Force appropriately considered BE-4

3   development costs in a manner fully consistent with the RFP, as ULS did include

4   costs related to BE-4 that ████████████████████████████████████████████

5   █████████████████████████████████████████████████████████████████████

6   █████████████████████████████████████████████████████████████████████

7   ██████████████████████████████████████. (*Id.*; ULS Proposal, Tab 120, 35892-

8   93, 35981-83, 36063, 36261.)

9       Likewise, the Air Force did not ignore other costs to develop BE-4: ██

10  █████████████████████████████████████████████████████████████████████

11  █████████████████████████████████████████. (FED, Tab 132,

12  41516.)   The Air Force specifically considered and included "███████████████

13  █████████████████████████████████████████████████████████████████████

14  ████████████████████████████. (FED, Tab 132, 41475.)  That is, █████████████

15  ██████████████████████████████████████████████████████████████████████.

16  Notably, a significant portion of ████████████████████████████████████████

17  █████████████████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████████

19  ████.  (*See* ULS Proposal, Tab 120, 35370.)  In addition, the record also

20  demonstrates that ████████████████████████████████████████. (*See, e.g.*, Blue

21  Origin Compliance ENs, Tab 98, 30705; Blue Origin Proposal, Tab 121, 36788.)

22  Thus, even if such cost ████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████████████

24  ████████████████████.  Any error was therefore harmless.

25       d.    The Air Force Properly Added to SpaceX's Proposed

26             Cost a ███████████████████████████████████

             Which Was a Required Capability Under the RFP.

27

28       The Air Force properly increased the total government investment to

SpaceX's proposal by ███████ account for the ████████ ██████████████████████████████████████████████████ ████. (SpaceX Proposal, Tab 123, 39922.)  SpaceX objects to the inclusion of this cost because, according to an extra-record declaration from a SpaceX employee, SpaceX proposed that ability ████████████████ and the Air Force did not have a need for ████████████ in the upcoming Phase 2 procurement. (SpaceX Mot. at 23.)  This assertion plainly ignores the actual requirements of the RFP, and conflates the LSA competition with Phase 2.  What the Phase 2 RFP may require is irrelevant (indeed, the final Phase 2 RFP had not been published as of the date of the LSA awards).  The LSA RFP at issue here required the offerors to propose a launch vehicle system that met the ██████████████████ ████████████████████████. (RFP, Tab 38, 1269 (citing SPRD, Tab 18, 757).)

Moreover, the Air Force repeatedly discussed this requirement with SpaceX during the competition.[20]  For example, SpaceX originally proposed ████████ █████████████████████████████████ █████████████████████████████████ ██████████.  (SpaceX Final Negotiation Memorandum, Tab 131, 41394.) SpaceX then ███████████████████████████ ███████████████████████████████ ███████████████████████████████ ████████████ (SpaceX Proposal, Tab 123, 39910, 39922.)  The Air

---

[20] SpaceX argues that it was "discouraged" in negotiations from proposing an ████████ ████████████████████. (SpaceX Mot. at 29 n.14).  In its Final Evaluation Document, the Air Force noted that SpaceX proposed an ████████████████████████████ ████████████████████████████████████████ which the Air Force informed SpaceX was "████████." (Tab 132, 41623; SpaceX Compliance ENs, Tab 100, 30924-25).

1   Force repeatedly informed SpaceX █████████████████████████████

2   ████████████████████.  (*See* LSA Convo with O8 on ████████████ - 28 Aug

3   @ 1230 at 3:10-3:45, Tab 101; LSA Convo with O8 on BFR Baseline, Slot VI, Cert

4   FS 04 Sep @ 0942 at 2:20-3:05, Tab 101; SpaceX LSA Debriefing, Tab 144, 42650.)

5   SpaceX did not protest this application of the RFP's cost criteria or amend its final

6   proposal and, consistent with these discussions, the Air Force allowed SpaceX to

7   propose its LSA with this option.

8         Because this ████████ was necessary to meet an RFP requirement, the Air

9   Force included the cost of ████████████████ in in its evaluation thereof.  (*See*

10  RFP, Tab 38, 1271 (requiring offerors to propose the *total* costs of an offeror's

11  prototype, including *all* scope proposed in the statement of work).)  The Air Force's

12  decision to do so was not only reasonable, it was required under the express terms

13  of the RFP.

14            e.    The Air Force Properly Concluded that ULS'

15                Cost Proposal Included ███████████

16                ███████████████████████-

17        The Air Force required ULS to include the cost of █████████████ in its

18  proposal (like SpaceX).  (ULS Compliance ENs, Tab 97, 30567.)  SpaceX claims,

19  however, that the Air Force █████████████████████████████████

20  ███████████████████████████████████████████████

21  in the executed ULS LSA. (SpaceX Mot. at 24 (citing ULS Notification of Award,

22  Tab 140, 42321).)  Based on this, SpaceX asserts that the Air Force evaluated the

23  "most expensive scenario" for the SpaceX proposal █████████████████

24  █████████████████ but not for the ULS Proposal, in that it (allegedly) allowed ULS

25  ████████████████████████████████████ (SpaceX

26  Mot. at 23-24.)  This assertion, again, is plainly contradicted by the record.  Under

27  the final terms of the RFP, the final dollar amount of the LSA is fixed.  (ULS

28  Notification of Award, Tab 140, 42321.)

There is nothing in the LSA that supports, as SpaceX suggests, that ULS and the Air Force plan to ████████████████████████████████████████████████████.” (SpaceX Mot. at 24 (citing ULS Notification of Award, Tab 140, 42321).)  To the contrary, Section 3 of the ULS LSA, relied upon by SpaceX, ████████████ ████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████ ██ ██ █ ██ ██ █ █
████████████████████████████████████████

(*Id*, 42320-21.)  It is not a provision specific to some later adjustment to the cost █ ██████████████████████.

**f.   The Air Force Properly Excluded the Potential "Buy Down" Costs of Future Category A/B Launches in the LSA Cost Evaluation.**

SpaceX complains that it was treated unequally because the Air Force did not count the cost of "buying down" the Category A/B risk against the other offerors (SpaceX Mot. at 24), yet there is nothing in the record suggesting that the Air Force considered this "buy down" option as a material part of its final evaluation of proposals (if it did so at all).  Instead, the Air Force based its "Low" risk rating for ULS on the fact that the ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.”  (Award Decision Document, Tab 136, 41747.)  Even if the Air Force did consider this "buy down" option as a material part of its evaluation, SpaceX points to no RFP provision that requires the Air Force to include the costs of a "backup" option to an offeror's eventual Phase 2 proposal as part of its LSA cost evaluation.  Indeed, such a cost reasonably could be mitigated

1   entirely by requiring offerors to provide a backup option at the LSA prototype cost.[21]

2   **D.    SpaceX Has Not Met its Burden for Obtaining Injunctive Relief.**

3   Finally, SpaceX has failed to demonstrate that a permanent injunction is

4   warranted in this matter.  In seeking a permanent injunction, SpaceX "must satisfy

5   a four-factor test before a court may grant such relief," demonstrating:  "(1) that it

6   has suffered an irreparable injury; (2) that remedies available at law, such as

7   monetary damages, are inadequate to compensate for that injury; (3) that,

8   considering the balance of hardships between the plaintiff and defendant, a remedy

9   in equity is warranted; and (4) that the public interest would not be disserved by a

10  permanent injunction."  *Cal. Ins. Guarantee Ass'n v. Price*, 252 F. Supp. 3d 948,

11  958 (C.D. Cal. 2017).[22]  SpaceX must also show actual success on the merits.  *Edmo*

12  *v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019).  Under this well-established

13  criteria, SpaceX's request for injunctive relief is not viable, having failed to

14  demonstrate on the administrative record that the Air Force's award decision was

15  arbitrary, capricious, an abuse of discretion, or contrary to law, 5 U.S.C.

16  § 706(2)(A), *i.e.*, SpaceX has failed to demonstrate actual success on the merits and

17  redressable injury.

18  All of SpaceX's arguments for irreparable harm seem to be premised upon

19  obtaining relief before Phase 2.  (*See* SpaceX Mot. at 34.)  Yet, as SpaceX already

20  has admitted on the record, its lack of an LSA award did not preclude SpaceX from

21  submitting a Phase 2 offer (which it submitted in October 2019).  Moreover, we

22  anticipate that SpaceX will be submitting a second Phase 2 proposal before the end

23  of briefing in this matter, as the Phase 2 competition remains ongoing.  Given that

24

25

26  [21] Although not at issue here, this is precisely what the Air Force required in the Phase 2 RFP.

27  [22] With respect to SpaceX's request for a directed LSA award in particular, SpaceX cites no

28  authority for that portion of its requested relief, nor does the APA provide for it.

1   the Air Force has committed to awarding Phase 2 contracts by third quarter 2020,[23]

2   SpaceX fails to explain how an injunction, even if one was justified here (which it

3   is not), could remedy this alleged harm. *See Nat'l City Bank v. Prime Lending, Inc.*,

4   737 F. Supp. 2d 1257, 1269 (E.D. Wa. 2010).

5       SpaceX also claims harm in its inability to engage with and obtain insight

6   from the Air Force. (SpaceX Mot. at 34.) However, this assertion is contradicted

7   by SpaceX's own proposal, which touts the company's close and ongoing work with

8   the Air Force. (*See*, *e.g.*, SpaceX Proposal, Tab 123, 39752 ("██████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████"),

12  39763 ("████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████").) The SpaceX Certification Plan also provides ██████

15  ████████████████████████████████████████████████.

16  (Tab 126, 41014.) As such, SpaceX admits that it is already receiving the remedy –

17  Air Force insight – that it seeks to obtain through a permanent injunction.

18      SpaceX also fails to demonstrate how the balance of hardships warrants an

19  equitable remedy. Although SpaceX would receive no benefit in Phase 2 from a

20  permanent injunction, any discontinuation of development funding will disrupt

21  ongoing development activities, potentially waste government funds already

22  disbursed, and undermine the Air Force's overall acquisition strategy to obtain

23  launch services for its Phase 2 national security missions. Moreover, SpaceX failed

24  to seek a preliminary injunction upon filing this lawsuit in May 2019, and almost 19

25  months will have passed from award before this case is ripe for decision. *See*

---

27  [23] *See* Sandra Erwin, *Air Force soon to release revised launch solicitation in response to GAO's
ruling*, SPACENEWS (Dec. 5, 2019), *available at* https://spacenews.com/air-force-soon-to-release-
28  revised-launch-solicitation-in-response-to-gaos-ruling/.

ULS' ██████ OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD

*Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 212 (2012) ("Undue delay is relevant in determining the extent to which it has magnified the harm to defendant.").

Finally, whatever public interest may inhere in a fair contracting process, the public also has a strong interest, as expressed by Congress, in Assured Access to Space for national security.  To that end, SpaceX asks this Court to disrupt three long ongoing development projects for national security launch vehicles, a critically important public interest.  *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 702 (2010) (holding that, "[o]f paramount import is the public interest in national defense and security" (internal quotations omitted)).

In any event, for the same reasons, the Court should not vacate the agency's action under the APA.  To determine whether vacatur is the appropriate remedy, courts look to "(1) the seriousness of an agency's errors and (2) the disruptive consequences that would result from vacatur."  *Klamath Siskiyou Wildlands Ctr. v. NOAA Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal 2015).  SpaceX has failed to demonstrate that any error here was serious, and as shown above the disruption from vacating the awards is plain.

## IV.    CONCLUSION

For the reasons detailed above, ULS respectfully requests that this Court deny SpaceX's Motion for Judgment on the Administrative Record, dismiss the Supplemental Complaint with prejudice, and enter judgment in favor of the Defendant and Intervenor-Defendants.

MCGUIREWOODS LLP

TODD R. STEGGERDA

Dated:  January 17, 2020

By:    */s/ Kevin M. Lally*
KEVIN M. LALLY (SBN 226402)

Counsel for Intervenor-Defendant
*United Launch Services, LLC*

43

## PROOF OF SERVICE

I hereby certify that on this 17th day of January, 2020, I caused a true and correct copy of the foregoing Sealed Reply of Untied Launch Services, LLC, in Opposition to Plaintiff's Motion for Judgment on the Certified Administrative Record and Memorandum of Points and Authorities to be served by email on:

Joseph Evan Borson
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
Email: joseph.borson@usdoj.gov
*Counsel for United States of America*

Scott E. Pickens
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel: 202-371-6349
Fax: 202-289-1330
Email: Scott.Pickens@btlaw.com
Counsel for Blue Origin, LLC

Kevin P. Mullen
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel: 202-887-1500
Fax: 202-887-0763
Email: KMullen@mofo.com
*Counsel for Orbital Sciences Corporation*

1
2
3
4
5
6

Craig A Holman
Arnold and Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
202-942-5722
Fax: 202-942-5999
Email: craig.holman@arnoldporter.com
*Counsel for Space Exploration Technologies Corp.*

7   Dated:  January 17, 2020

8

9

10

By:    */s/ Kevin M. Lally*
KEVIN M. LALLY (SBN 226402)

Counsel for Intervenor-Defendant
*United Launch Services, LLC*

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28