**BARNES & THORNBURG LLP**
Scott E. Pickens (admitted *pro hac vice*)
scott.pickens@btlaw.com
Scott N. Godes (admitted *pro hac vice*)
Scott.Godes@btlaw.com
Michael A. Hordell (admitted *pro hac vice*)
Michael.Hordell@btlaw.com
Matthew J. Michaels (admitted *pro hac vice*)
MMichaels@btlaw.com
1717 Pennsylvania Avenue N.W., Suite 500
Washington, D.C. 20006-4623
Telephone:   202-289-1313
Facsimile:   202-289-1330

**BARNES & THORNBURG LLP**
Matthew B. O'Hanlon (SBN 253648)
matthew.ohanlon@btlaw.com
2029 Century Park East, Suite 300
Los Angeles, CA 90067-3012
Telephone:   310-284-3880
Facsimile:   310-284-3894

Attorneys for Defendant-Intervenor
Blue Origin, LLC

REDACTED VERSION

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No. 2:19-cv-07927-ODW-GJS <br><br> **DECLARATION OF SCOTT E. PICKENS IN SUPPORT OF DEFENDANT-INTERVENOR BLUE ORIGIN, LLC'S OPPOSITION TO PLAINTIFF SPACE EXPLORATION TECHNOLOGIES CORP.'S MOTION FOR JUDGMENT ON THE CERTIFIED ADMINISTRATIVE RECORD** <br><br> ███████████████ <br><br> Date:      March 2, 2020 <br> Time:      1:30 p.m. <br> Courtroom:   5D, 5th Floor <br> First Street Courthouse <br> 350 W. 1st Street <br> Los Angeles, CA 90012 |

## DECLARATION OF SCOTT E. PICKENS

I, Scott E. Pickens, declare:

1.      I am an attorney duly admitted to practice in the District of Columbia and the United States Court of Federal Claims, and I am a partner at the law firm of Barnes & Thornburg LLP, counsel of record for Defendant-Intervenor Blue Origin, LLC ("Blue Origin") in the above-entitled proceeding.  I have been admitted to practice in the Central District of California *pro hac vice* in connection with this proceeding.  As lead counsel for Blue Origin with personal knowledge of the proceedings and the administrative record therein, I have personal knowledge of the matters set forth herein, and, if called as a witness, I could and would testify competently thereto.

2.      For the Court's convenience, attached hereto as Exhibit 1 is a true and correct copy of the United States Court of Federal Claims' decision in this proceeding dated August 28, 2019.   That decision has been published as *Space Exploration Technologies Corp. v. United States*, 144 Fed. Cl. 433 (2019).

3.      For the Court's convenience, attached hereto as Exhibit 2 is a true and correct copy of the document entitled "AGREEMENTS OFFICER'S DECISION" in connection with "REFERENCE:  Objection of Space Exploration Technologies Corp. Under Request for Proposal No. FA8811-17-9-0001."  The foregoing document forms part of the administrative record previously lodged with the Court at Tab 152, pages 43100 to 43106.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 17, 2020.

/s/ Scott E. Pickens
Scott E. Pickens

Barnes &
Thornburg LLP
Attorneys At Law
Los Angeles

# EXHIBIT 1

.

144 Fed.Cl. 433
United States Court of Federal Claims.

**SPACE EXPLORATION TECHNOLOGIES
CORP.**, Plaintiff,
v.
The UNITED STATES, Defendant,
v.
Blue Origin, LLC, et al., Defendant-Intervenors.

No. 19-742C
|
Filed Under Seal: August 26, 2019
|
Reissued: August 28, 2019·

**Synopsis**
**Background:** Unsuccessful bidder on United States Air Force's (USAF) **Space** and Missile System Center's request to provide **space** launch services for national security missions, pursuant to Department of Defense's (DoD) authority to enter into "other transactions," filed post-award bid protest seeking declaratory and injunctive relief. Government moved to dismiss and unsuccessful bidder moved to transfer venue.

**Holdings:** The Court of Federal Claims, Lydia Kay Griggsby, J., held that:

[1] USAF's launch service agreement request for proposals was not a "procurement contract," as would give rise to Court of Federal Claims' jurisdiction, under Tucker Act, and

[2] USAF's launch service agreement request for proposals was not "in connection with a procurement," for Tucker Act purposes.

Motions granted.

West Headnotes (8)

[1]    **United States**
⟜Dismissal
**United States**

⟜Construction and presumptions as to pleadings

When deciding a motion to dismiss upon the ground that court does not possess subject-matter jurisdiction, Court of Federal Claims must assume that all factual allegations in complaint are true and must draw all reasonable inferences in non-movant's favor. RCFC, Rule 12(b)(1).

[2]    **United States**
⟜As to jurisdiction

Plaintiff bears burden of establishing subject-matter jurisdiction of Court of Federal Claims, and it must do so by a preponderance of the evidence.

[3]    **Public Contracts**
⟜Judicial Remedies and Review
**United States**
⟜Judicial Remedies and Review

Since Tucker Act's bid protest language granting Court of Federal Claims jurisdiction is exclusively concerned with procurement solicitations and contracts, relief in bid protest matters is unavailable outside the context of a procurement or proposed procurement. 28 U.S.C.A. § 1491(b)(1).

[4]    **Public Contracts**
⟜Judicial Remedies and Review
**United States**
⟜Judicial Remedies and Review

To establish jurisdiction under Tucker Act to challenge government's award of contract, a

EXHIBITS-2

Space Exploration Technologies Corp. v. United States, 144 Fed.Cl. 433 (2019)

contractor must show that the government at least initiated a procurement, or initiated the process for determining a need for acquisition. 28 U.S.C.A. § 1491(b)(1).

[5]  **Federal Courts**
⇐In general; transfer between divisions

Party seeking transfer to cure want of jurisdiction has burden to identify proposed transferee court and show that jurisdiction would be proper there. 28 U.S.C.A. § 1631.

[6]  **Public Contracts**
⇐Judicial Remedies and Review
**United States**
⇐Judicial Remedies and Review

United States Air Force's (USAF) launch service agreement request for proposals to perform prototype development for national security space missions was not a "procurement contract," as would give rise to Court of Federal Claims' jurisdiction, under Tucker Act, to hear unsuccessful bidder's protest; USAF entered into launch service agreement pursuant to authority that Congress granted to Department of Defense (DoD) to enter into "other transactions," and launch service agreement was not subject to federal laws and regulations applicable to procurement contracts. 10 U.S.C.A. §§ 2371(a), 2371b; 28 U.S.C.A. § 1491(b)(1); 32 C.F.R. § 3.2.

[7]  **Public Contracts**
⇐Judicial Remedies and Review
**United States**
⇐Judicial Remedies and Review

United States Air Force's (USAF) launch

service agreement request for proposals to perform prototype development for national security space missions was not "in connection with a procurement," as would give rise to Court of Federal Claims' jurisdiction, under Tucker Act, to hear unsuccessful bidder's protest; although USAF employed a four-phase strategy, using different solicitations and other steps to be implemented following prototype development, fact that development of prototype launch vehicles could eventually lead to USAF's later acquisition of launch services was insufficient, alone, to render its decision "in connection with" a procurement, especially given that agency would not purchase or own the prototypes in the first phase, which was focus of bid challenge. 10 U.S.C.A. §§ 2371(a), 2371b; 28 U.S.C.A. § 1491(b)(1); 32 C.F.R. § 3.2.

[8]  **Federal Courts**
⇐Other particular cases, contexts, and questions

Transfer of case from United States Court of Federal Claims to the United States District Court for the Central District of California was in the interest of justice where Court of Federal Claims lacked jurisdiction, under Tucker Act, to hear plaintiff's claim challenging United States Air Force's (USAF) selection of prototype developers for space launch services for national security missions, matter could have been brought in District Court in California, where plaintiff's place of business was located and USAF award decision was made, and plaintiff alleged a nonfrivolous claim that USAF based its portfolio award decision on an arbitrary and unequal evaluation process. 28 U.S.C.A. §§ 1491(b)(1). 1631.

**Attorneys and Law Firms**

*434 Craig A. Holman. Attorney of Record, Kara L. Daniels, David M. Hibey. Sonia Tabriz, Nathaniel E. Castellano. Of Counsel. Arnold & Porter Kaye Scholer

EXHIBITS-3

LLP, Washington, DC, for plaintiff.

Tanya B. Koenig, Trial Attorney, Douglas Edelschick, Of Counsel, Douglas K. Mickle, Assistant Director, Robert E. Kirschman, Jr., Director, Joseph H. Hunt, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; Erika Whelan Retta, Air Force Legal Operations Agency; Gregory Yokas, Space and Missile Systems Center, Office of the Staff Judge Advocate, for defendant.

Scott E. Pickens, Counsel of Record, Michael A. Hordell, Matthew J. Michaels, Scott N. Godes, Of Counsel, Barnes & Thornburg LLP, Washington, DC, for Blue Origin, LLC, defendant-intervenor.

Todd R. Steggerda, Counsel of Record, Benjamin L. Hatch, Edwin O. Childs, Jr., Nathan R. Pittman, Karlee S. Blank, Blake R. Christopher, Of Counsel, McQuireWoods, LLP, Washington, DC, for United Launch Services, LLC, defendant-intervenor.

Kevin Patrick Mullen, Counsel of Record, David A. Churchill, Sandeep N. Nandivada, R. Locke Bell, Lauren J. Horneffer, Charles L. Capito III, Of Counsel, Morrison & Foerster, LLP, Washington, DC; Maureen F. Del Duca, Kenneth M. Reiss, Of Counsel, Northrop Grumman Corporation, Falls Church, VA, for Orbital Sciences Corporation, defendant-intervenor.

BID PROTEST

Post-Award Bid Protest; Motion to Dismiss; Rule 12(b)(1); Other Transactions; 10 U.S.C. §§ 2371 and 2371b.

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I. INTRODUCTION

In this post-award bid protest matter, **Space Exploration Technologies Corp.** ("SpaceX") *435 challenges the United States Air Force **Space** and Missile Systems Center's (the "Air Force") evaluation and portfolio award decisions for a request for proposals to provide **space** launch services for national security missions, issued pursuant to the Department of Defense's ("DoD") authority to enter into other transaction agreements. *See generally* Compl. The government has moved to dismiss this matter for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). *See generally* Def. Mot. SpaceX has also moved to transfer this matter to the United States District Court for the Central District of California. *See generally* Pl. Resp. For the reasons discussed below, the Court: (1) **GRANTS** the government's motion to dismiss; (2) **GRANTS** SpaceX's motion to transfer venue; and (3) **DISMISSES** the complaint.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Factual Background

SpaceX provides **space** launch services to the United States Government and to commercial customers. Compl. at ¶ 90. In this post-award bid protest matter, SpaceX challenges the Air Force's evaluation and portfolio award decisions for launch service agreement ("LSA") request for proposal, Solicitation No. FA8811-17-9-001 (the "LSARFP"), to facilitate the development of launch systems in the United States. Compl. at 1. As relief, SpaceX requests, among other things, that the Court: (1) declare the Air Force's portfolio award decision to be contrary to Congress's mandate for assured access to **space**; (2) enjoin any further investment in the launch service agreements awarded by the Air Force; (3) enjoin further performance by the awardees; and (4) require the Air Force to reevaluate proposals. *Id.* at 78.

EXHIBITS-4

## 1. DoD's Authority To Use Other Transaction Agreements

As background, Congress granted the Department of Defense the authority to enter into other transactions ("OT"). 10 U.S.C. §§ 2371(a) and 2371b(a). OTs are agreements that are not procurement contracts, cooperative agreements, or grants. *See, e.g.*, 10 U.S.C. § 2371(a) (authorizing "transactions (other than contracts, cooperative agreements, and grants)"); 32 C.F.R. § 3.2 (defining "other transactions" as "transactions other than contracts, grants or cooperative agreements"); *see also* United States Department of Defense, Other Transactions Guide (2018), at 5 ("OT Guide"), https://www.dau.mil/guidebooks/Shared% 20Documents/Other% 20Transactions% 20(OT)% 20Guide.pdf (defining OTs as "NOT: a. FAR-based procurement contracts; b. Grants; c. Cooperative Agreements; or d. Cooperative Research and Development Agreements (CRADAs)").

While not defined by statute, the Government Accountability Office ("GAO") has defined OTs as follows:

> An 'other transaction' agreement is a special type of legal instrument used for various purposes by federal agencies that have been granted statutory authority to use 'other transactions.' GAO's audit reports to the Congress have repeatedly reported that 'other transactions' are 'other than contracts, grants, or cooperative agreements that generally are not subject to federal laws and regulations applicable to procurement contracts.'

*MorphoTrust USA, LLC*, B-412711, 2016 WL 2908322, at \*4 (Comp. Gen. May 16, 2016). The DoD's OT Guide also provides that OTs are intended "to give DoD the flexibility necessary to adopt and incorporate business practices that reflect commercial industry standards and best practices into its award instruments." OT Guide at 4. And so, OTs are "generally not subject to the Federal laws and regulations limited in applicability to contracts, grants or cooperative agreements" and these agreements are "not required to comply with the Federal Acquisition Regulation (FAR) and its supplements." 32 C.F.R. § 3.2.

**\*436** Pursuant to 10 U.S.C. § 2371b, DoD may use its other transaction authority to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." 10 U.S.C. §

2371b(a).[2] But, DoD may only use this authority if one of the four conditions set forth below have been met:

> (A) There is at least one nontraditional defense contractor or nonprofit research institution participating to a significant extent in the prototype project.

> (B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. [§] 638)) or nontraditional defense contractors.

> (C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.

> (D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

10 U.S.C. § 2371b(d)(1); *see also* OT Guide at 13-14; 32 C.F.R. § 3.5. In addition, Congress has required that, "[t]o the maximum extent practicable, competitive procedures shall be used when entering into [OT] agreements to carry out the prototype projects." 10 U.S.C. § 2371b(b)(2).

## 2. The National Security Space Launch Program

The National Security Space Launch program—previously known as the EELV program (the "Program")—is charged with procuring launch services to meet the government's national security space launch needs. AR Tab 19 at 786. The Program has an overarching need through FY30 to address the challenges of maintaining affordability and assured access to space, which requires the Air Force to sustain the availability of at least two families of space launch vehicles and a robust space launch infrastructure and industrial base. *Id.* at 787; *see also* 10 U.S.C. § 2273(b). The actions necessary to ensure continued access to space have been defined by Congress to include:

> (1) the availability of at least two space launch vehicles (or families of space launch vehicles) capable of

EXHIBITS-5

delivering into space any payload designated by the Secretary of Defense or the Director of National Intelligence as a national security payload

(2) a robust space launch infrastructure and industrial base; and

(3) the availability of rapid, responsive, and reliable space launches for national security space programs to—

(A) improve the responsiveness and flexibility of a national security space system;

(B) lower the costs of launching a national security space system; and

(C) maintain risks of mission success at acceptable levels.

10 U.S.C. § 2273(b).

As shown below, the Program involves a multi-phase strategy that will be implemented by the Air Force between FY 2013 and FY 2027 to accomplish the aforementioned actions. AR Tab 19 at 788.

*437



*Id.*

### a. The LSA Competition

The LSA RFP involves a competition for the development of space launch vehicles (the "LSA Competition"). *Id.* at 788. During the LSA Competition, the Air Force sought to develop "launch system prototypes, to include the development and test of any required [rocket propulsion systems], the launch vehicle and its subsystems, infrastructure, manufacturing processes, test stands, and other items required for industry to provide domestic commercial launch services that meet all [National Security Space] requirements." AR Tab 38 at 1261. The prototype sought to be developed during the LSA Competition includes "[a] fully developed and certified EELV Launch System, including the validation of all non-recurring engineering (NRE) work." *Id.* And so, the awardees of the LSA will receive funding from the Air Force and these awardees "will perform prototype development, including system design and development, risk reduction activities, test and evaluation activities, and technical demonstration of system capabilities." AR Tab 19 at 796.

The Air Force expects that following its investment "in the development of prototypes for launch systems," those systems can be "used to provide commercial launch services that will also be extended to provide [National Security Space] launch services." *Id.* at 793. The Air Force also acknowledges that the LSAs will "facilitate development of at least three EELV Launch System prototypes as early as possible, allowing those launch systems to mature prior to a future selection of two [National Security Space] launch service providers for Phase 2 launch service procurements, starting in FY 20[20]." AR Tab 38 at 1260.

### b. The Phase 2 Procurement

During Phase 2 of the Program, the Air Force anticipates awarding two requirements contracts for launch services, delivering multiple national security space missions with annual ordering periods from FY 2020 through FY 2024. Compl. Ex. B at 2. Congress has mandated that, with some exceptions, "the Secretary of Defense may not award or renew a contract for the procurement of property or services for space launch activities under the [Program] if such contract carries out such space launch activities using rocket engines designed or manufactured in the Russian Federation." FY 2015 National Defense Authorization Act, Pub. L. No. 113-291, 128 Stat. 3292, 3626 (2014). And so, a key goal of the Program is to transition from the use of non-allied space launch engines. AR Tab 38 at 1260.

The Air Force has described the Phase 2 Procurement as a "follow-on activit[y]." AR Tab 19 at 807; *see also id.* at 810 ("The follow-on activity will be procurement of launch services.") The Air Force has also stated that the "LSA is designed to work in *438 synergy with

EXHIBITS-6

commercial launch vehicle development efforts that will lead in **space** for decades to come." AR Tab 47 at 1351.

The Phase 2 Procurement is open to all interested offerors. AR Tab 19 at 807. And so, this procurement will not be limited to the organizations that have received awards during the LSA Competition. *See* AR Tab 19 at 786 ("FAR-based procurement contracts will be competitively awarded to certified EELV launch service providers, which could include companies that were not previously awarded LSAs"); *id.* at 807 ("[T]he Air Force intends to use a full and open competition to award FAR-based [firm-fixed priced] contracts to two launch providers for [National Security **Space**] launch service procurements ..."); *see also* Status Conf. Tr. at 17:1-17:5, 18:15-18:18.

### 3. The LSA Award

The Air Force issued the LSARFP on October 5, 2017. *See generally* AR Tab 35. On March 21, 2018, the Assistant Secretary of the Air Force (Acquisition, **Technology** & Logistics) determined that "exceptional circumstances surrounding the [Program] and the domestic launch industry justify the use of a transaction that provides for innovative business arrangements and provide[s] an opportunity to expand the defense supply base in a manner that would not be feasible under a contract." AR Tab 47 at 1349. And so, the Air Force issued the LSARFP pursuant to DoD's authority to enter into other transactions. *Id.*

SpaceX and three other companies—United Launch Alliance, LLC ("ULA"), Blue Origin, LLC ("Blue Origin") and Orbital Sciences Corporation ("Orbital ATK")—submitted proposals in response to the LSARFP. *See* AR Tab 136 at 41752. Following discussions, negotiations and the receipt of revised proposals, the Air Force awarded LSAs to Blue Origin, ULA, and Orbital ATK in October 2018. *Id.* at 41753. The LSAs awarded to ULA, Blue Origin, and Orbital ATK provide these awardees with investment funding to develop launch vehicle prototypes. AR Tab 38 at 1261.

SpaceX filed an objection to the aforementioned portfolio awards with the Air Force on December 10, 2018. Compl. at ¶ 76; Compl. Ex. R at 2. The Air Force subsequently denied SpaceX's objection on April 18, 2019. Compl. at ¶ 79; Compl. Ex. R at 1. SpaceX commenced this post-award bid protest action on May 17, 2019. *See*

*generally* Compl.

### B. Procedural Background

SpaceX commenced this post-award bid protest matter on May 17, 2019. *See generally id.* On May 21, 2019, Blue Origin and ULA filed unopposed motions to intervene in this matter. *See generally* Blue Origin Mot. to Intervene; ULA Mot. to Intervene. On May 22, 2019, the Court granted these motions and entered a Protective Order in this matter. *See generally* Scheduling Order, dated May 22, 2019; *see also* Protective Order, dated May 22, 2019. On May 22, 2019, Orbital ATK filed an unopposed motion to intervene. *See generally* Orbital Mot. to Intervene. On May 23, 2019, the Court granted this motion. *See generally* Order, dated May 23, 2019.

On June 11, 2019, the government filed the administrative record. *See generally* Initial AR. On June 13, 2019, the government filed a motion to dismiss this matter for lack of subject-matter jurisdiction. *See generally* Def. Mot. On June 26, 2019, the government filed a corrected administrative record. *See generally* AR.

On June 28, 2019, SpaceX filed a response and opposition to the government's motion to dismiss and, in the alternative, a motion to transfer venue. *See generally* Pl. Resp. On July 9, 2019, the government filed a reply in support of its motion to dismiss and a response to SpaceX's motion to transfer venue.³ *See generally* Def. Reply. On August 15, 2019, the Court held oral argument on the parties' motions. *See generally* Oral Arg. Tr.

These matters having been fully briefed, the Court resolves the pending motions.

### *439 III. LEGAL STANDARDS

#### A. RCFC 12(b)(1)

[1] [2] When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all factual allegations in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); RCFC 12(b)(1). But, a plaintiff bears the burden of establishing subject-matter

EXHIBITS-7

jurisdiction, and it must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969)). Should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3).

## B. Bid Protest Jurisdiction

[3]The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has held that the Tucker Act's bid protest language "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010); *see also United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) ("[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' ") (citation omitted). And so, relief in bid protest matters pursuant to the Tucker Act is unavailable outside the context of a procurement or proposed procurement. *Res. Conservation*, 597 F.3d at 1245; *see, e.g.*, *Hymas v. United States*, 810 F.3d 1312, 1329-30 (Fed. Cir. 2016) (finding no jurisdiction over cooperative farming agreements).

[4]The Tucker Act does not define the term "procurement." *See generally* 28 U.S.C. § 1491(b)(1). But, the Federal Circuit has relied upon the definition of procurement set forth in 41 U.S.C. § 111 to determine whether a procurement has occurred. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (this section was formerly cited as 41 U.S.C. § 403(2)). Section 111 defines procurement to cover "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111; *see also AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330 (Fed. Cir. 2018); 10 U.S.C. § 2302(3) (stating that the term "procurement" has the meaning provided in chapter 1 of title 41. United States Code). And so, the Federal Circuit

has held that, to establish jurisdiction, a contractor must show " 'that the government at least initiated a procurement, or initiated the process for determining a need for acquisition.' " *AgustaWestland*, 880 F.3d at 1330 (quoting *Distributed Sols.*, 539 F.3d at 1346) (internal quotations omitted).

Specifically relevant to this dispute, in *Hymas*, the Federal Circuit held that the competitive requirements of CICA did not apply to the United States Fish and Wildlife Service's cooperative farming agreements, because the cooperative farming agreements were not procurement contracts under the Federal Grant and Cooperative Agreement Act. 810 F.3d at 1320, 1329-30. And so, the Federal Circuit concluded that this Court must dismiss a bid protest action challenging the government's award of these agreements for lack of subject-matter jurisdiction. *Id.* at 1330.

The Federal Circuit has also considered the meaning of the phrase "in connection with a procurement or a proposed procurement." *See* 28 U.S.C. § 1491(b)(1). In this regard, the Federal Circuit has held that "[t]he operative phrase 'in connection with' is very sweeping in scope." *440 RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). The Federal Circuit has also held that an alleged statutory violation suffices to supply Tucker Act jurisdiction, so long as the statute has a connection to a procurement proposal. *Id.* In addition, the Federal Circuit has recognized that Congress intended for all objections connected to a procurement or proposed procurement to be heard by this Court. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) (noting that the Administrative Dispute Resolution Act of 1996 made clear that "Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims"). And so, the Federal Circuit has held that "a narrow application of section 1491(b)(1) does not comport with the [Tucker Act's] broad grant of jurisdiction over objections to the procurement process." *Sys. App. & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012).

There are, however, limits to the Court's bid protest jurisdiction under the Tucker Act. For example, the Federal Circuit held in *AgustaWestland* that an execution order regarding the use of Army helicopters was not "in connection with a procurement or proposed procurement," "because it did not begin 'the process for determining a need for property or services.' " 880 F.3d at 1331 (quoting *Distributed Sols.*, 539 F.3d at 1345). In *Geiler/Schrudde & Zimmerman v. United States*, the Federal Circuit also held that the Department of Veterans

EXHIBITS-8

Affairs' revocation of a bidder's status as a service-disabled veteran-owned small business was not a decision "in connection with a procurement or a proposed procurement," because the revocation had no effect upon the award or performance of any contract. 743 Fed. App'x 974, 977 (Fed. Cir. 2018).

Similarly, in *BayFirst Sols, LLC v. United States*, this Court addressed the limits of the phrase "in connection with a procurement or proposed procurement" in determining whether the Federal Acquisition Streamlining Act's bar on challenges in connection with the issuance or proposed issuance of a task or delivery order would bar the cancellation of a solicitation. 104 Fed. Cl. 493, 507 (2012). In that case, the Court determined that the cancellation decision was not "in connection with" the task order award, because the cancellation decision was "a discrete procurement decision and one which could have been the subject of a separate protest." *Id.* Lastly, in *R & D Dynamics Corp. v. United States*, this Court held that a Phase II Small Business Innovation Research ("SBIR") non-procurement award was not "in connection with" a Phase III procurement, because the SIBR Phase II program appeared to be "of a developmental nature." 80 Fed. Cl. 715, 722 (2007). And so, the Court determined that the SBIR award was not "in connection with" a procurement, notwithstanding the possibility that the SBIR award "may ultimately lead to the development of a capacity to provide goods or services in Phase III." *Id.*

### C. 10 U.S.C. §§ 2371 And 2371b

Title 10, United States Code, section 2371 generally provides DoD with the statutory authority to enter into other transaction agreements in carrying out "basic, applied, and advanced research projects." 10 U.S.C. § 2371(a). Pursuant to Title 10, United States Code, section 2371b, DoD may use its OT authority to carry out certain prototype projects. 10 U.S.C. § 2371b. Specifically, this statute provides that DoD may:

> carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed

forces.

10 U.S.C. § 2371b(a)(1). Section 2371b also requires that, "[t]o the maximum extent practicable," DoD use competitive procedures when entering into agreements to carry out the prototype projects. *Id.* at § 2371b(b)(2). In addition, the statute provides that DoD may only use this authority if one of the following conditions are met:

> (A) There is at least one nontraditional defense contractor or nonprofit research *441 institution participating to a significant extent in the prototype project.

> (B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. [§] 638)) or nontraditional defense contractors.

> (C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.

> (D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

*Id.* at § 2371b(d)(1).

### D. Transfer Of Venue

[5]Lastly, Title 28, United States Code, section 1631 provides that:

> Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall. if it is in the interest of justice. transfer such action or appeal to any other such court ... in which the action or appeal could have been brought at the time it

was filed or noticed.

28 U.S.C. § 1631. The Federal Circuit has held that the burden is on the party seeking transfer "to identify the proposed transferee court and show that jurisdiction would be proper there." *Maehr v. United States,* 767 Fed. App'x 914, 916 (Fed. Cir. 2019) (per curiam) (citing *Hill v. Dep't of the Air Force,* 796 F.2d 1469, 1470-71 (Fed. Cir. 1986)). And so, the Court may transfer a matter to a district court, if the Court determines that it lacks subject-matter jurisdiction to consider a matter and that a transfer of venue would be in the interest of justice. 28 U.S.C. § 1631.

## IV. LEGAL ANALYSIS

The government has moved to dismiss this post-award bid protest matter for lack of subject-matter jurisdiction upon the ground that SpaceX's challenges to the Air Force's evaluation and portfolio award decisions are not "in connection with a procurement or proposed procurement," as contemplated by the Tucker Act. Def. Mot. at 24-32. The government also argues that the Court should dismiss this matter for want of subject-matter jurisdiction, because SpaceX does not allege a violation of a procurement statute. *Id.* at 32-33. And so, the government contends that the claims asserted in this bid protest matter fall beyond the boundaries of the Tucker Act. *Id.* at 20-24.

In its response and opposition to the government's motion to dismiss, SpaceX counters that the Court may entertain this bid protest matter because SpaceX alleges non-frivolous violations of law that are in connection with the Air Force's ongoing procurement of launch services during Phase 2 of the National Security Space Launch Program. Pl. Resp. at 19-25. SpaceX also contends that the Court possesses subject-matter jurisdiction to consider its claims, because the Air Force violated 10 U.S.C. § 2371b and the Administrative Procedure Act, 5 U.S.C. §§ 551-59, during the LSA Competition. *Id.* at 31-37. And so, SpaceX requests that the Court deny the government's motion to dismiss, or, alternatively, transfer this matter to the United States District Court for the Central District of California. *Id.* at 37-39.

For the reasons set forth below, SpaceX has not shown that the Court possesses subject-matter jurisdiction to consider any of its claims. And so, the Court: (1) **GRANTS** the government's motion to dismiss; (2)

**GRANTS** SpaceX's motion to transfer venue; and (3) **DISMISSES** the complaint.

### A. The Court May Not Consider SpaceX's Claims

The parties appear to agree that the launch service agreements at issue in this bid protest matter are not procurement contracts and that the LSARFP was not a procurement. *See* Def. Mot. at 1-2, 24; Pl. Resp. at 5, 16; Def. Reply at 4-6; Oral Arg. Tr. 9:20-10:10. The parties disagree, however, about *442 whether the Air Force's evaluation and the portfolio award decisions for the LSA Competition are, nonetheless, "in connection with a procurement or proposed procurement," as contemplated by the Tucker Act. Def. Mot. at 24-32; Pl. Resp. at 19-25.

In this regard, SpaceX argues that the Air Force's evaluation and portfolio award decisions are "in connection with" the ongoing procurement of launch services during Phase 2 of the Program, because the LSA Competition "was the third step in a multi-stage procurement process that the [Air Force] devised to fulfill the [a]gency's identified need to procure domestic launch services." Pl. Resp. at 2; *see also Id.* at 19-25. The government counters that the Air Force's decisions are not "in connection with a procurement or proposed procurement," because the LSA Competition involved a solicitation that was separate and distinct from the Phase 2 Procurement. Def. Mot. at 28-32; Def. Reply at 11-16. For the reasons set forth below, the Court agrees.

### 1. LSAs Are Not Procurement Contracts

As an initial matter, there can be no genuine dispute that the LSAs at issue in this dispute are not procurement contracts that fall within the purview of this Court's bid protest jurisdiction. The administrative record shows that the Air Force entered into the LSAs pursuant to the authority that Congress granted to the DoD to enter into other transactions under 10 U.S.C. §§ 2371 and 2371b. AR Tab 38 at 1263; 10 U.S.C. §§ 2371 and 2371b; *see also* Def. Mot. at 1-2, 18, 24; Pl. Resp. at 5, 16, 26. Neither this Court nor the Federal Circuit has examined the question of whether the Court's bid protest jurisdiction extends to disputes involving the award of LSAs. But, the Federal Circuit has made clear that the

Tucker Act's bid protest language "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010); *see also United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) ("[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' ") (citation omitted). And so, this dispute must concern a procurement solicitation or contract to fall within the boundaries of the Tucker Act.

The Federal Circuit has also held that this Court must dismiss a bid protest action challenging the award of cooperative farming agreements for lack of subject-matter jurisdiction, because cooperative farming agreements are not procurement contracts. *Hymas*, 810 F.3d at 1320, 1329-30. And so, the Court reads *Hymas* to require that it must dismiss a bid protest matter challenging agency decisions that are related to the award of an agreement that is not a procurement contract. *Id.*

[6]In this case—like in *Hymas*—the record evidence makes clear that the LSAs are not procurement contracts. *See* 10 U.S.C. § 2371(a); *see also* 32 C.F.R. § 3.2. Rather, the administrative record shows that the Air Force entered into the LSAs pursuant to the authority that Congress has granted to DoD to enter into other transactions pursuant to 10 U.S.C. § 2371b. The administrative record also shows that LSAs are are not subject to the federal laws and regulations applicable to procurement contracts. AR Tab 38 at 1263; *see also MorphoTrust USA, LLC*, B-412711, 2016 WL 2908322, at *4 (Comp. Gen. May 16, 2016). Given this, the Court agrees with the government that this Court may not exercise its bid protest jurisdiction under the Tucker Act to consider a challenge to the Air Force's evaluation and portfolio award decisions.[4] *Hymas*, 810 F.3d at 1320, 1329-30; *Res. Conservation Grp.*, 597 F.3d at 1245 (stating that the Tucker Act's bid protest language "is exclusively concerned with procurement solicitations and contracts"); RCFC 12(b)(1).

### 2. SpaceX Has Not Shown That The Air Force's Decisions Are In Connection With A Procurement

SpaceX also has not shown that the Air Force's evaluation and portfolio award decisions *443 during the LSA Competition are "in connection with a procurement or proposed procurement." The Federal Circuit has held

that "[t]he operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d at 1286, 1289 (Fed. Cir. 1999). But, the Federal Circuit has also recognized that there are limits to this Court's bid protest jurisdiction under the Tucker Act. *See, e.g., AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1330 (Fed. Cir. 2018). And so, not every decision *related* to a procurement is "in connection with a procurement or proposed procurement" as contemplated by the Tucker Act.

In this case, SpaceX argues with some persuasion that the Air Force's evaluation and portfolio award decisions are related to the Air Force's Phase 2 Procurement, because the LSA portfolio award will lead to the development of launch vehicles to be bid during the Phase 2 Procurement. Pl. Mot. at 2; Oral Arg. Tr. at 36:23-36:25. In this regard, the administrative record shows that the LSA Competition and Phase 2 Procurement share the mission of assuring the Nation's access to **space** and eliminating reliance upon Russian-made rocket engines. AR Tab 19 at 791; *see also* AR Tab 19 at 786; AR Tab 38 at 1260 (stating the goal of the Program "is to leverage commercial launch solutions in order to have at least two domestic, commercial launch service providers that also meet [National Security **Space**] requirements, including the launch of the heaviest and most complex payloads"). During oral argument, SpaceX also correctly observed that the funding provided by the Air Force pursuant to the LSAs will aid the development of prototype launch vehicles that Blue Origin, Orbital ATK and ULA will bid during the Phase 2 Procurement. Oral Arg. Tr. at 29:21-29:25; 36:21-37:1; 57:5-57:12. And so, the record evidence shows that the funding provided pursuant to the LSAs will help the Air Force competitively procure launch services during the Phase 2 Procurement. AR Tab 38 at 1260.

But, the record evidence also shows that, while related to the Phase 2 Procurement, the Air Force's evaluation and portfolio award decisions are not "in connection with" that procurement for several reasons.

[7]First, as the government persuasively argues in its motion to dismiss, the administrative record shows that the LSA Competition and the Phase 2 Procurement involve separate and distinct solicitations. Def. Mot. at 28-29; Def. Reply at 12-13. It is a well-established tenet of procurement law that a selection decision made under one procurement or solicitation does not govern the selection under a different procurement or solicitation. *SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001); *see also Griffy's Landscape Maint. LLC v. United States*, 51 Fed. Cl. 667, 671 (2001) ("[A]n attack upon a new

solicitation or upon any other aspect of the administration of the previous contract, must stand on its own."). And so, generally, the Court must view the Air Force's evaluation and portfolio award decisions during the LSA Competition separately from the selection of awardees for the Phase 2 Procurement for launch services contracts. *Id.*

In this case, the Air Force's Acquisition Strategy Document for the Program makes clear that the Program consists of a four-phase strategy that will employ different solicitations and other steps to be implemented by the Air Force between FY 2013 to FY 2027. *See* AR Tab 19 at 788. Specifically, this document provides that the LSA Competition sought certified launch service providers to develop launch system prototypes and that this competition commenced in FY 2017 and will conclude in FY 2024. *Id. Id.* at 786, 788. By comparison, the Air Force's Acquisition Strategy Document shows that the Phase 2 Procurement will involve a procurement for launch services and that this procurement will commence in FY 2020 and will conclude in FY 2024. *Id.* at 788. And so, the record evidence supports the government's view that the LSA Competition and the Phase 2 Procurement are two separate and distinct parts of a multi-phase program.

Second, the administrative record also shows that the LSA Competition and the Phase 2 Procurement involve different acquisition strategies. Def. Mot. at 29-30; Def. Reply at 13. As discussed above, the Air Force issued the LSARFP to facilitate the \*444 successful development of launch systems pursuant to the DoD's authority to enter into other transactions. AR Tab 38 at 1263. And so, the LSA Competition was not subject to the requirements of the FAR. AR Tab 35 at 1068 ("[T]he FAR and its supplements do not apply to this selection process"); *see also* AR Tab 19 at 794-95; 10 U.S.C. §§ 2371 and 2371b; Def. Mot. at 29. In contrast, the Phase 2 Procurement will involve a FAR-based competition. AR Tab 19 at 807 (stating that "the Air Force intends to use a full and open competition to award FAR-based [firm-fixed priced] contracts to two launch providers for [National Security Space] launch service procurements"). Given this, the record evidence makes clear that the LSA Competition and the Phase 2 Procurement also differ with regards to how bidders will compete and the legal requirements that govern each solicitation.

The administrative record also makes clear that the specific goals of the LSA Competition and the Air Force's Phase 2 Procurement differ. The goal of the LSA competition is to increase the pool of launch vehicles that meet the Air Force's needs by "invest[ing] in industry to develop enhanced configurations to support all [National

Security Space] requirements." AR Tab 19 at 789. By comparison, the goal of the Phase 2 Procurement is to procure, through requirements contracts awards, "launch services." *Id.* at 786.

In addition—and perhaps more significantly—the administrative record makes clear that the LSA Competition did not involve the procurement of any goods or services by the Air Force. AR Tab 38 at 1261; *see also* Oral Arg. Tr. at 21:3-21:12. While it is undisputed that the Air Force will provide funding to develop launch service prototype vehicles under the LSAs, the Air Force will not purchase or own these prototypes. AR Tab 38 at 1261; Oral Arg. Tr. at 21:3-21:20. Nor will the Air Force acquire any services under the LSAs. AR Tab 38 at 1261; Oral Arg. Tr. at 21:15-21:16; 26:15-26:22. And so, unlike the Phase 2 Procurement, the LSA Competition did not involve an acquisition of goods or services.

Given the aforementioned differences between the LSA Competition and the Phase 2 Procurement, the record evidence supports the government's view that the evaluation and portfolio award decisions during the LSA Competition are distinct agency decisions that are not connected to the Phase 2 Procurement. *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 507 (2012).

The Court is also not persuaded by SpaceX's arguments that the Court may consider its claims, notwithstanding the evidence showing that the LSA Competition and Phase 2 Procurement are distinct and separate solicitations.

First, SpaceX argues without persuasion that Tucker Act jurisdiction is established in this case, because the Air Force's portfolio award decision will impact the government's acquisition of launch services in the future. Pl. Resp. at 21-23. But, in *R&D Dynamics Corp. v. United States*, this Court recognized that the fact that resources expended by the government during one phase of a government program may lead to the development of the capacity to provide goods and services in the future does not, alone, render an award a "procurement." 80 Fed. Cl. 715, 722 (2007) (holding that a Phase II Small Business Innovation Research ("SBIR") award was not a procurement, and therefore the award could not be "in connection with" a Phase III procurement as contemplated by the Tucker Act). Similarly here, the fact that the development of prototype launch vehicles could eventually lead to the Air Force's acquisition of launch services is not sufficient, alone, to render the Air Force's decisions "in connection with" the Phase 2 Procurement in this case. *Id.*

SpaceX's argument that the LSA Competition must be "in connection with" the Phase 2 Procurement is also contradicted by the undisputed fact that the Phase 2 Procurement will be a fully open competition. Notably, the administrative record shows that the Phase 2 Procurement will be open to all interested offerors and that this procurement will not be limited to the three companies that have been awarded LSAs. AR Tab 19 at 786 ("FAR-based procurement contracts will be competitively awarded to certified EELV launch service providers, which could include companies that were not previously awarded *445 LSAs"); *id.* at 807 ("[T]he Air Force intends to use a full and open competition to award FAR-based [firm-fixed priced] contracts to two launch providers for [National Security **Space**] launch service procurements ...").

During oral argument, SpaceX acknowledged that it will compete for the award of a launch services contract during the Phase 2 Procurement, even though SpaceX was not awarded a launch service agreement during the LSA Competition. Oral Arg. Tr. at 37:14-37:21. Given this, the record evidence makes clear that the Air Force's portfolio award decision during the LSA Competition will not dictate the outcome of the Phase 2 Procurement, as **Space X** suggests. Pl. Resp. at 23.

Indeed, while SpaceX raises understandable concerns that it may be disadvantaged in the future by the fact that the Air Force is funding the development of launch vehicle prototypes by Blue Origin, ULA and Orbital, such concerns involve a potential challenge to the *Phase 2 Procurement*—which is not the subject of this dispute. Oral Arg. Tr. at 37:5-37:8; 39:22-40:6. The Court also acknowledges that the question of whether the decisions made by the Air Force during the LSA Competition are "in connection with" the Phase 2 Procurement is a close one, given the evidentiary record in this case. But, the Court must answer this question based upon the totality of the record evidence and this evidence indicates that, while related, the LSA Competition and the Phase 2 Procurement are separate and distinct solicitations for the National Security **Space** Launch Program.

The Court also takes into consideration the intent expressed by Congress to remove the LSAs—which are not procurement contracts—from the legal requirements and process that govern procurement contracts. *See* 10 U.S.C. §§ 2731, 2731b; *see also* Def. Mot. at 6-7; Oral Arg. Tr. at 17:21-18:8. And so, for these reasons, the Court **GRANTS** the government's motion to dismiss this bid protest matter for lack of subject-matter jurisdiction. RCFC 12(b)(1).

Because the Court finds that the LSAs are not procurement contracts and that the Air Force's evaluation and portfolio award decisions during the LSA Competition are not "in connection with" the Phase 2 procurement, the Court does not reach the remaining jurisdictional issues raised in the government's motion to dismiss.

### B. Transfer Of This Matter Is In The Interest Of Justice

As a final matter, the Court agrees with SpaceX that a transfer of this matter to the United States District Court for the Central District of California would be in the interest of justice. SpaceX requests that the Court transfer this matter to the United States District Court for the Central District of California, should the Court determine that it lacks subject-matter jurisdiction to consider its claims. Pl. Resp. at 37-39. Title 28, United States Code, section 1631 provides that the Court "shall" transfer an action to another federal court when: (1) the transferring court finds it lacks jurisdiction; (2) the proposed transferee court is one in which the case could have been brought at the time it was filed; and (3) the transfer is in the interest of justice. 28 U.S.C. § 1631; *see also Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1303 (Fed. Cir. 2008). Each of these circumstances has been met here.

[8]First, SpaceX persuasively argues that the claims asserted in the complaint could have been brought in the United States District Court for the Central District of California at the time **Space X** commenced this action. Pl. Resp. at 37-38; *see also* 28 U.S.C. § 1391(b)(2) (stating that a civil action may be brought against the United States in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"). SpaceX represents that its principal place of business is located within the Central District of California and that the Air Force office that made the evaluation and portfolio award decisions for the LSARFP is also located within that district. Pl. Resp. at 38. And so, **Space X** has shown that that the events giving rise to its claims occurred within in the Central District of California.

SpaceX has also shown that it would be in the interest of justice to transfer this case to the district court. *See* Pl.

EXHIBITS-13

Space Exploration Technologies Corp. v. United States, 144 Fed.Cl. 433 (2019)

Resp. at 38-39; *see* *446 *also Galloway Farms, Inc. v.
United States*, 834 F.2d 998, 1000 (Fed. Cir. 1987)
(stating that "[t]he phrase 'if it is in the interest of justice'
relates to claims which are nonfrivolous and as such
should be decided on the merits (citing *Zinger Constr. Co.
v. United States*, 753 F.2d 1053, 1055 (Fed. Cir. 1985)).
SpaceX alleges nonfrivolous claims in this matter that the
Air Force's evaluation and portfolio award decisions were
unreasonable and in violation of federal law. Compl. at ¶¶
101, 209. Specifically, SpaceX alleges, among other
things, that the Air Force based the portfolio award
decision on an arbitrary and unequal evaluation process
and that the Air Force's portfolio award decision violates
the assured access to **space** requirements mandated by
Congress. *See* Compl. at ¶ 227. Given the non-frivolous
nature of SpaceX's claims, the Court believes that
SpaceX should be afforded the opportunity to pursue
these claims in the district court. And so, the Court
**GRANTS** SpaceX's motion to transfer venue to the
United States District Court for the Central District of
California.

## V. CONCLUSION

In sum, the administrative record in this bid protest matter
makes clear that the LSAs are not procurement contracts
and that the Air Force's evaluation and portfolio award
decisions during the LSA Competition were not "in
connection with" the Phase 2 Procurement. **Space** X has
also shown that it is in the interest of justice to transfer
this matter to the United States District Court for the
Central District of California. And so, for the foregoing
reasons, the Court:

1. **GRANTS** the government's motion to dismiss;

2. **GRANTS** SpaceX's motion to transfer venue; and

3. **DISMISSES** the complaint.

The Clerk is directed to transfer the above captioned case
to the United States District Court for the Central District
of California.

Each party to bear its own costs.

The Clerk shall enter judgment accordingly.

Some of the information contained in this Memorandum
Opinion and Order may be considered protected
information subject to the Protective Order entered in this
matter on May 22, 2019. This Memorandum Opinion and
Order shall therefore be filed **UNDER SEAL**. The parties
shall review the Memorandum Opinion and Order to
determine whether, in their view, any information should
be redacted in accordance with the terms of the Protective
Order prior to publication.

The parties shall **FILE** a joint status report identifying the
information, if any, that they contend should be redacted,
together with an explanation of the basis for each
proposed redaction, on or before **October 30, 2019**.

**IT IS SO ORDERED.**

**All Citations**

144 Fed.Cl. 433

## Footnotes

\*    This Memorandum Opinion and Order was originally filed under seal on August 26, 2019 (docket entry no. 75). The
     parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be
     redacted from the Memorandum Opinion and Order. The parties filed a joint status report on August 27, 2019 (docket
     entry no. 76) indicating that no redactions are necessary. And so, the Court is reissuing its Memorandum Opinion and
     Order, dated August 26, 2019 as the public opinion.

1    The facts recited in this Memorandum Opinion and Order are taken from the complaint ("Compl."); the corrected
     administrative record ("AR"); and the government's motion to dismiss ("Def. Mot."). Except where otherwise noted, the
     facts stated herein are undisputed.

2    Title 10, United States Code, section 2358 authorizes DoD to "engage in basic research, applied research, advanced
     research, and development projects." 10 U.S.C. § 2358(a).

3    ULA, Blue Origin, and Orbital ATK have not participated in the briefing of the government's motion to dismiss.

4    The Court does not reach the issue of whether other transactions generally fall beyond the Court's bid protest
     jurisdiction under the Tucker Act. The Court simply concludes that the specific facts in this case show that the LSAs at

EXHIBITS-14

**Space Exploration Technologies Corp. v. United States, 144 Fed.Cl. 433 (2019)**

issue are not procurement contracts and therefore, the Air Force's decisions related to the award of these agreements may not be reviewed by the Court pursuant to the bid protest provision of the Tucker Act.

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBITS-15

# EXHIBIT 2

AGREEMENTS OFFICER'S DECISION

TO:     Charles A. Blanchard
        Mark D. Colley
        Kara L. Daniels
        Sonia Tabriz
        601 Massachusetts Ave., N.W.
        Washington, D.C. 20001
        *Counsel for Space Exploration Technologies Corp.*

REFFERENCE: Objection of Space Exploration Technologies Corp. Under Request for Proposal
No. FA8811-17-9-0001

SUMMARY

I have reviewed the referenced objection from Space Exploration Technologies Corp. (SpaceX)
in detail in coordination with the Space and Missile Systems Center Competition Advocate.
After careful consideration of the arguments presented, I find no basis to sustain the objection or
otherwise take corrective action, and therefore no reason to enter into Alternative Dispute
Resolution.

The Launch Services Agreement (LSA) award decision was made fairly and in accordance with
the Request for Proposals (RFP).  The RFP specified that proposals would be selected for award
based on technical merit and proposed investment cost.  Of the four offerors competing for LSA
awards, SpaceX submitted the lowest rated and highest cost proposal.  The LSA decision not to
award to SpaceX did not come down to one or two small issues, but rather stemmed from the
fact that SpaceX's proposed prototype development of the ███████████ was much riskier
than the prototype solutions proposed by other offerors, and the SpaceX investment costs were
the highest in terms of both Government and industry total investment.

SpaceX made a conscious decision to bid the ██████████████, presumably to support its
long-term business goals, and the Air Force fully apprised SpaceX of the ████████████
████████████████████████.  In comparison, the other offerors all submitted lower risk,
lower cost proposals.  The next costliest proposal, the Vulcan launch system proposed by United
Launch Alliance (ULA), was a much lower risk approach and, therefore, was more advantageous
to the Government.  The closest other proposal in terms of risk, the New Glenn launch system
proposed by Blue Origin, was not only lower risk than the SpaceX proposal, but also required
████████████ Government funding.  Therefore, it too was more advantageous to the
Government.  Because the award decision and the competition were consistent with the RFP, and
because I find no basis to sustain any of the arguments in SpaceX's objection, I deny the
objection and find the LSA award decision should not be disturbed.

**AR 43100**

## BACKGROUND

The LSA acquisition began on 14 December 2016 with an industry day to facilitate communication between the Air Force and interested potential launch service providers or subcontractors. This initiated a multi-month period where Government and industry stakeholders had opportunities to provide input and feedback on the LSA development effort. The Air Force issued an early draft RFP on 14 March 2017, and after several rounds of comments with interested parties, issued the final RFP on 5 October 2017. The RFP requested proposals for the development of a complete launch system prototype that meets all National Security Space (NSS) requirements. The evaluation criteria included three factors: Evolved Expendable Launch Vehicle (EELV) Approach, Technical, and Investment Cost. The Technical Factor contained two subfactors: Design and Schedule. The Investment Cost Factor included consideration of whether proposed investment costs for a complete launch system prototype were Complete and Reasonable, including consideration of proposed cost information such as Total Government Investment, Total Non-Government Investment, Total Combined Investment, Industry Cost Share and Time Phasing of Government Investment. After completing the initial proposal evaluations of the four offers received in accordance with the RFP, the Air Force determined on 15 February 2018 that all four offerors should be included in the competitive field. At this point the Air Force and offerors officially initiated negotiations.

The first stage of negotiations consisted primarily of written evaluation notices where the Air Force notified offerors of flaws in their proposals and asked clarifying questions. These written notices were followed up with phone conferences as necessary to facilitate communication, and on 25 July 2018 the Air Force notified all of the offerors that they had been selected for entry into the final round of negotiations. Final negotiations were then conducted with all of the offerors until 10 September 2018, when the Government issued its request for final proposal updates. While SpaceX did improve its proposal during initial and final negotiations, the SpaceX proposal was ultimately determined to be the lowest rated proposal among the offers after submission of final proposal updates.

On 10 October 2018, based on an integrated assessment of the proposals received, considering the relative ratings and evaluation findings, and based on the technical risk issues with and overall cost of the SpaceX proposal, the SSA determined that SpaceX was not among the most advantageous proposals and, therefore, would not receive an LSA award. SpaceX requested a debriefing and received one on 19 October 2018. SpaceX had a number of questions following the debriefing, and therefore requested an extended debriefing, which I granted. SpaceX submitted the referenced objection on 10 December 2019.

## OBJECTION RESPONSE

The SpaceX objection advances a number of different grounds. I have reviewed the objection thoroughly and have extensively considered the objection grounds. I did not find any instances where the Government acted improperly, unfairly or unequally. Some of the SpaceX objection grounds concern bias, unequal treatment, use of unstated criteria, proposal requirements that do not reflect Government needs, failure to follow the stated RFP evaluation scheme, unreasonable double counting of risks, prejudicial Government misunderstanding of the SpaceX proposal, lack of meaningful negotiations, and unreasonable technical and cost evaluation. I do not find any basis to sustain any of these objection grounds.

██████████ ▌█ ████████████████████████████

For purposes of this response, I grouped the principal objection grounds into four main
categories: Government failure to follow the terms of the RFP, Government misunderstanding of
the SpaceX proposal, bias or unequal treatment compared to other offerors, and incorrect cost
evaluation. While I thoroughly considered all of the SpaceX arguments and concluded that none
of them provide a basis to sustain SpaceX's Objection to the LSA award decision, this response
does not detail my analysis on every objection ground. I have summarized below my analysis of
some of the objection grounds that fall within each of the four principal categories identified
above. I find that none of the SpaceX objection grounds provides a basis for corrective action or
to sustain the objection.

First, SpaceX alleged that the Government failed to follow the terms of the RFP in multiple
areas. I reviewed each of these allegations and did not find any instances where the Government
deviated from the RFP.

For example, SpaceX alleges that, contrary to the RFP, the Government made ███████████
██████████████████████ a requirement. This is incorrect. The Government did not
require ████████████████████████, as evidenced by the fact that SpaceX
was not found to be deficient for proposing ████████████████████████████
████. On the contrary, SpaceX received an Outstanding technical rating for the EELV
Approach factor. While the Government allowed an ████████████████████████
████████, the RFP properly called for a risk assessment and rating of that approach. SpaceX
████████████████████████████████████████ Since ██████
risk ratings are awardable, it is incorrect to state that the government required █████████
████████████████████. Moreover, SpaceX's mere disagreement with the
assignment of this High risk rating is not a basis to sustain the Objection. To the extent SpaceX
disagrees with the stated evaluation scheme of the RFP, the objection ground is untimely.

SpaceX also alleges that, contrary to the RFP, the award decision undercut the objectives of the
RFP because commercial launch systems were not leveraged. I reject the false distinction
between "commercial" and "Government-specific" launch systems in SpaceX's objection. For
purposes of this acquisition, all offerors proposed commercial solutions. The RFP contained no
restrictive interpretation of a commercial solution which required past commercial experience or
success, or even consideration of future commercial business or market projections. Rather the
Government accepted all offers as commercial using existing definitions in Title 51, United
States Code, and considered the commercial availability of the launch systems as prescribed by
Section 1605 of the Fiscal Year 2018 National Defense Authorization Act.

SpaceX further alleges that, contrary to the RFP, the Air Force changed the language that the
Government "valued" a portfolio of three awards into a mandate. The Government did not treat
the language as a mandate. The objection suggests variously that the Government was obligated
to negotiate two awards (presumably including SpaceX) or four awards, but no obligation exists
within the RFP or as a matter of general contracting principle. The RFP provided the SSA with
the option of awarding any number of awards, including none. In a competitive acquisition the
Government does not have to award to every offeror. As is typical and as announced in the RFP
award basis, budget realities were considered in forming the LSA portfolio. It is both common
sense and well within the guidelines of the RFP that the Government would award a portfolio to

**AR 43102**

████████████ ▌█ ████████████████████████████

████████████████████████████

the best proposals, and those that it could pay for. SpaceX may disagree with the SSA's decision
to make three awards, but this mere disagreement is not a basis to sustain SpaceX's Objection.

Second, SpaceX raised multiple allegations claiming that the Government did not fully
understand the SpaceX proposal. I reviewed each of these objection grounds and did not find
any basis to sustain any of them.

For example, SpaceX alleges that the Government misunderstood the proposed ████████
███████████████, and therefore failed to give SpaceX credit for the ability to ██████████
████████████████████████████████. This was not an area of misunderstanding
for the Government. The Government understood the terms proposed by SpaceX. Simply put,
an ███████████████████████████ is not something that the Government could count on
to be exercised at all, let alone in a required timeframe. The prospect of a future ██████
███████ after contract award was rightfully not accepted as a current proposal commitment.
SpaceX's mere disagreement with the Government's evaluation judgment on the merits of its
proposal does not mean that the Government misunderstood the proposal, nor does such
disagreement provide a basis to sustain SpaceX's Objection.

SpaceX also alleges that the Government misunderstood the ███████████ approach of
████████████████████████████████. It is well documented in the evaluation
notices that the evaluation team understood the proposed ████████████. ███████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████ Thus, the Government understood SpaceX's proposal.
SpaceX's disagreement with the evaluation findings is not a basis to disturb the LSA award
decision.

Third, SpaceX raised multiple grounds alleging that the Government either was biased against
SpaceX or that the Government treated SpaceX unequally. I reviewed each of these objection
grounds and found no evidence of bias or disparate treatment.

For example, SpaceX alleges that the Government erred by finding other "paper rockets" to be
less risky than the SpaceX family of vehicles, which include launch vehicles that have flown,
such as the Falcon 9 and Falcon Heavy. However, I did not identify any unfair or unequal
treatment with respect to the Government's evaluation, and no bias in favor of other offerors in
this regard. Each proposal was evaluated on its own merits in accordance with the RFP. I also
reject SpaceX's attempt to substitute its opinion as to the risk of the offerors' proposals for that
of the Government's reasoned determination. Notably, this ground also evidences SpaceX's
misunderstanding of the RFP. The RFP did not require the Government to assign an overall
lower risk rating because a portion of the SpaceX offer had few weaknesses. The RFP did not
have separate risk ratings for Category A/B missions and Category C missions. The Government
correctly evaluated the complete prototype development proposed ███████████████████

The fact that Falcon 9 and Falcon Heavy were assigned ███████████ for Category A/B
missions does not make the Government's assessment that BFR is a ██████████ launch solution
for Category C missions unreasonable, nor does it call into question the ████ risk rating given

**AR 43103**

████████████████████████████

██████████████████████████

that the solution for Category C missions impacts the risk with respect to SpaceX's proposed solution for the overall prototype development.

SpaceX also alleges that ████████ for the ████████████████ should not have been included in the total investment costs, and that other offerors were not treated the same. The inclusion of these costs reflects the fact that SpaceX proposed the ████████████████████. In the original submission, SpaceX omitted ████████████████ altogether, so the cost volume was ████████████ ████████████████████████████ When the Government notified SpaceX of this omission, ████████████████. Rather, SpaceX submitted the costs with the ████████████████████. SpaceX chose which ████████ to propose. The RFP was specific with respect to the costs that must be included as well as the cutoff date to begin cost share, and there was never any disagreement or confusion about the issue throughout the source selection. In the Objection, it appears that SpaceX is making an untimely challenge to the established evaluation criteria and is attempting to supplant Government judgment with its own opinion. Moreover, I did not find any unfair or unequal treatment with respect to the Government's evaluation, and no bias against SpaceX in this regard. Each proposal was evaluated on its own merits in accordance with the RFP.

SpaceX further alleges that the Government failed to assign the same risk to all offerors for common components. However, SpaceX cites no risks assessed against common components that should be attributed to another proposal, and I am aware of none. SpaceX also appears to assert that risks should have been identified *because* of the commonality of a component across launch systems or because of reliance on common subcontractors. The SSA did consider risk from common components in making the award determination. The SSA stated, "the Government has used common propulsion systems in its current launch systems, demonstrating that this is an acceptable approach. In addition, the Government did not include an RFP evaluation criteria related to the use of common engines as part of the overall portfolio selection because it was not considered critical in assessing the design approaches or the likelihood of achieving the Government's objectives." I disagree with SpaceX's untimely objection to the RFP evaluation criteria; the source selection handled this issue properly. Moreover, the Government, using reasoned judgment, has discretion in developing evaluation criteria to meet its requirements.

Last, SpaceX raises several objection grounds alleging that the Government improperly handled the cost evaluation. I reviewed each of these objection grounds and did not find any evidence of this. The Government conducted the cost evaluation in accordance with the RFP.

For example, SpaceX alleges that the Air Force overstated the SpaceX proposed total investment by including ████████████████████. The RFP explicitly stated that investment costs would be determined based on all proposed costs to complete the work proposed. ████████████████████ was required by the RFP, and was proposed by SpaceX. Thus, the RFP required the Government to consider the proposed ████████████████ costs. Additionally, the record shows that SpaceX knew how the Government would calculate total investment costs. During negotiations, ████████████████████████ ████████

████████████████████████████

████████████████████████                    **AR 43104**

██████████████████████████████████████

███████████████████ Inclusion of this cost in SpaceX's evaluated cost was not unreasonable or inconsistent with the RFP, and is not a basis to sustain SpaceX's Objection.

SpaceX also alleges that the Air Force inappropriately rejected SpaceX's proposal as unaffordable even though the Government did not identify any reasonableness issues. The SpaceX proposal was not "rejected" as unaffordable. SpaceX did not receive an award because, based on an integrated assessment of the proposals and in accordance with the RFP's stated criteria for award, the SSA determined that SpaceX's proposal was not among the best rated proposals. In any event, reasonableness does not equate to affordability from a portfolio perspective. A cost can be determined reasonable for acceptance by a prudent person, but still uncompetitive for inclusion in a portfolio. Moreover, the Government was not required to inform SpaceX that its costs – including its Total Government Investment – were less competitively priced than other offerors while being reasonable, or that when combined with the total Government investment of other Offerors, it rendered various portfolio choices "unaffordable." With respect to the latter, the total investment costs of the various proposals were not finalized until submission of final proposal updates after the conclusion of final negotiations, and the Government was not required to reopen negotiations to allow further proposal updates.

SpaceX further alleges that the Government "changed the posture of the competition" by evaluating Factor 3 based almost entirely on Total Government Investment. However, the SSA did not place improper emphasis on the Total Government Investment in making the award decision. In the final comparative analysis the SSA reasonably exercised discretion and determined that taking into account the totality of the evaluations, including the relative importance of the factors, and given Government funding limitations, the lower-risk proposals that were also less expensive to the Government provided the best value to the Government and should be included in the award portfolio.

CONCLUSION

I have thoroughly reviewed all of SpaceX's arguments and, for the reasons stated above, find that there is no basis to take corrective action or sustain the Objection, and therefore no reason to enter into Alternative Dispute Resolution.


*David Sharp*
DAVID SHARP
Agreements Officer
Launch Systems Enterprise Directorate
Space and Missile Systems Center

██████████████████████████████████████

I have coordinated with the Agreements Officer on the adjudication of the SpaceX Objection.

███████████████

████████████████, USAF
Competition Advocate
Space and Missile Systems Center

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 2029 Century Park East, Suite 300, Los Angeles, CA 90067.

On January 17, 2020, I served the foregoing document(s):

**DECLARATION OF SCOTT E. PICKENS IN SUPPORT OF DEFENDANT-INTERVENOR BLUE ORIGIN, LLC'S OPPOSITION TO PLAINTIFF SPACE EXPLORATION TECHNOLOGIES CORP.'S MOTION FOR JUDGMENT ON THE CERTIFIED ADMINISTRATIVE RECORD**

on the interested parties in this action as follows:

Craig A. Holman
craig.holman@arnoldporter.com
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
*Counsel for Plaintiff*
*Space Exploration Technologies*
*Corp.*

Kevin P. Mullen
KMullen@mofo.com
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel: 202-887-1500
Fax: 202-887-0763
*Counsel for Orbital Sciences Corporation*

Joseph Evan Borson
joseph.borson@usdoj.gov
U.S. Department of Justice
Federal Programs Branch - Civil
Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
*Counsel for United States of*
*America*

Todd R. Steggerda
tsteggerda@mcguirewoods.com
McGuireWoods LLP
2001 K Street, N.W., Suite 400
Washington, D.C. 20006
Tel: 202-857-2477
Fax: 202-828-2968
*Counsel for United Launch Services, LLC*

☒    **BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION:**  Based on an agreement of the parties to serve copies of documents by e-mail or electronic transmission, I caused the document(s) to be sent to the respective e-mail address(es) of the party(ies) as stated above.

☒    **FEDERAL**:  I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2020, at Los Angeles, California.

/s/ Matthew B. O'Hanlon
Matthew B. O'Hanlon

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1