1  John D. Lombardo (Bar No. 187142)
   john.lombardo@arnoldporter.com
2  Arnold & Porter Kaye Scholer LLP
   777 South Figueroa Street, 44th Floor
3  Los Angeles, CA 90017-5844
   Telephone: 213.243.4000
4  Facsimile: 213.243.4199

5  Craig A. Holman (*admitted pro hac vice*)
   craig.holman@arnoldporter.com
6  Arnold & Porter Kaye Scholer LLP
   601 Massachusetts Ave., N.W.
7  Washington, D.C. 20001
   Telephone: 202.942.5000
8  Facsimile: 202.942.5999

9  Attorneys for Plaintiff
   *Space Exploration Technologies Corp.*

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                    **WESTERN DIVISION**

14  Space Exploration Technologies Corp.,        Case No. 2:19-cv-07927-ODW(GJS)
                                                  Honorable Otis D. Wright II
15                 Plaintiff,

16       v.                                       ▮▮▮▮ **REPLY IN SUPPORT OF**
                                                  **MOTION FOR JUDGMENT ON**
17  United States of America,                     **THE CERTIFIED**
                                                  **ADMINISTRATIVE RECORD**
18                 Defendant,
                                                  Date:   March 2, 2020
19       v.                                       Time:   1:30 p.m.
                                                  Ctrm:   5D, 5th Floor
20  Blue Origin, LLC, *et al.*,                           First Street Courthouse
                                                          350 W. First Street
21                 Defendant-Intervenors.                 Los Angeles, CA 90012

22

23                    ┌──────────────────────────┐
                      │    **REDACTED VERSION**    │
24                    └──────────────────────────┘
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26

27

28

   ▮▮▮▮ REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – ▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    [Caption page continued]

2    Kara L. Daniels (*admitted pro hac vice*)
      kara.daniels@arnoldporter.com

3    David M. Hibey (*admitted pro hac vice*)
      david.hibey@arnoldporter.com

4    Sonia Tabriz (*admitted pro hac vice*)
      sonia.tabriz@arnoldporter.com

5    Nathaniel Castellano (*admitted pro hac vice*)
      nathaniel.castellano@arnoldporter.com

6    Eric A. Valle (*admitted pro hac vice*)
      eric.valle@arnoldporter.com

7    Arnold & Porter Kaye Scholer LLP
      601 Massachusetts Avenue, N.W.

8    Washington, D.C. 20001
      Telephone: (202) 942-5000

9    Facsimile:   (202) 942-5999

10    Attorneys for Plaintiff
      *Space Exploration Technologies Corp.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – ██████

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   THE COURT SHOULD GRANT JUDGMENT IN SPACEX'S FAVOR........ 5

    A.    SpaceX Challenges Final Agency Action At This Court. ....................... 5

    B.    SMC Violated The RFP And Congressional Direction........................... 6

    C.    SMC Improperly Discounted Category A/B Mission Risks. ................ 10

    D.    The Cost Evaluation Was Anticompetitive And Irrational. ................. 13

        1.    SMC Understated the Government Investment in ULA. ............ 13

        2.    SMC Treated SpaceX's Cost Unequally. .................................... 17

        3.    SMC Relied On Unstated Criteria To Find Risk For SpaceX. .... 19

        4.    SMC Arbitrarily Evaluated SpaceX's Schedule........................... 21

III.  SPACEX IS ENTITLED TO INJUNCTIVE RELIEF ................................... 23

IV.   CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

CASES                                                                      Page(s)

*All. for the Wild Rockies v. United States Forest Serv.,*
   907 F.3d 1105 (9th Cir. 2018)..................................................................23

*Asarco, Inc. v. E.P.A.,*
   616 F.2d 1153 (9th Cir. 1980)..................................................................22

*Bennett v. Spear,*
   520 U.S. 154 (1997)..................................................................................5

*Blue & Gold Fleet, L.P v. United States,*
   492 F.3d 1308 (Fed. Cir. 2007)................................................................1

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018)....................................................................24

*City of Sausalito v. O'Neill,*
   386 F.3d 1186 (9th Cir. 2004)..................................................................6

*Dairy Maid Dairy, Inc. v. United States,*
   837 F. Supp. 1370 (E.D. Va. 1993)....................................................23, 25

*Darby v. Cisnero,*
   509 U.S. 137 (1993)..........................................................................1, 5, 6

*Dubinksy v. United States,*
   43 Fed. Cl. 243 (1999).............................................................................19

*Eco Tour Adventures, Inc. v. Zinke,*
   249 F. Supp. 3d 360 (D.D.C. 2017).........................................................24

*EP Prods., Inc. v. United States,*
   63 Fed. Cl. 220 (2005).............................................................................17

*Greater Yellowstone Coal., Inc. v. Servheen,*
   665 F.3d 1015 (9th Cir. 2011)..................................................................13

*Greeson v. Imperial Irrigation Dist.,*
   59 F.2d 529 (9th Cir. 1932)......................................................................22

*Gull Airborne Instruments, Inc. v. Weinberger,*
   694 F.2d 838 (D.C. Cir. 1982)..................................................................25

*Latecoere Intern., Inc. v. U.S. Dep't of Navy,*
   19 F.3d 1342 (11th Cir. 1994)..................................................................17

*Mark Dunning Indus., Inc. v. Perry,*
   890 F. Supp. 1504 (M.D. Ala. 1995)...................................................24, 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012).................................................................................6

REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – ███

*Palantir USG, Inc. v. United States*,
   129 Fed. Cl. 218 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) ............................ 23

*Pit River Tribe v. Bureau of Land Mgmt.*,
   939 F.3d 962 (9th Cir. 2019) ................................................................................ 7

*Sackett v. E.P.A.*,
   566 U.S. 120 (2012) ............................................................................................. 6

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
   137 S.Ct. 954 (2017) ............................................................................................ 1

*Seattle Audubon Soc'y v. Evans*,
   771 F. Supp. 1081 (W.D. Wash.), *aff'd*, 952 F.2d 297 (9th Cir. 1991) ................ 25

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ............................................................................. 23

**STATUTES**

5 U.S.C. § 704 ........................................................................................................... 6

10 U.S.C. § 2273 ................................................................................................... 7, 8

10 U.S.C. § 2371b(b)(2) .......................................................................................... 1

28 U.S.C. § 2401(a) ................................................................................................. 1

51 U.S.C. § 50101 ................................................................................................... 2

Pub. L. No. 115-91, § 1605, 131 Stat. 1283, 1724-25 (2017) ........................... 7, 8, 9

**REGULATIONS**

48 C.F.R. § 16.301-1 .............................................................................................. 14

48 C.F.R. § 16.307(a)(1) ........................................................................................ 14

REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD –

# GLOSSARY OF TERMS

| | |
|---|---|
| AFSPC | Air Force Space Command |
| AO | Agreements Officer |
| APA | Administrative Procedure Act |
| COFC | U.S. Court of Federal Claims |
| DoD | Department of Defense |
| EELV | Evolved Expendable Launch Vehicle |
| ELC | EELV Launch Capability |
| FY | Fiscal Year |
| LSA | Launch Service Agreement |
| NDAA | National Defense Authorization Act |
| NSS | National Security Space |
| SMC | Air Force Space and Missile Systems Center |
| SSA | Source Selection Authority |

## I.    INTRODUCTION

Plaintiff Space Exploration Technologies Corp. ("SpaceX") challenges the final agency action by the Air Force Space and Missile Systems Center ("SMC" or "Agency"), awarding $2.3 billion in government investment through Launch Service Agreements ("LSAs") to United Launch Alliance ("ULA"), Blue Origin, LLC ("Blue Origin"), and Orbital Sciences Corp. ("Orbital"), and excluding SpaceX. Relying on the certified record, SpaceX's motion demonstrated that the award decision (i) broke from the competition grounds rules in the Request for Proposals ("RFP"), (ii) disregards Congressional mandates to end U.S. reliance on Russian rockets and maintain assured access to space using commercial providers, and (iii) resulted from an anticompetitive evaluation contrary to SMC's authority in 10 U.S.C. § 2371b(b)(2).

Defendants' oppositions raise procedural and substantive objections, many of which distort SpaceX's arguments and all of which lack merit.[1]   For instance, Defendants misdescribe SpaceX's challenges as disagreements with discretionary judgments and demand deference under the Administrative Procedure Act ("APA") review standard.   But agency decisionmakers lack discretion to act contrary to the competition's ground rules or Congressional mandates, or to treat the offerors unequally.  Moreover, because SpaceX seeks to enforce—not object—to the RFP, the factual predicate for Defendants' reliance on *Blue & Gold Fleet, L.P v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), is wrong.  Defendants' invocation of that judicially-imposed timeliness rule (applicable to procurement protests at the Court of Federal Claims ("COFC")), and the exhaustion arguments raised by Blue Origin and SMC also fail under Supreme Court precedent. *Darby v. Cisnero*, 509 U.S. 137, 144-154 (1993).[2]

---

[1] Given that it takes less effort to throw mud than it does to clean it and the page limitations, SpaceX cannot address every distortion of its arguments and the record facts.  Instead, SpaceX must rely on the record and its motion to counter many of the baseless assertions.  Accordingly, the silence of SpaceX's Reply on any particular assertion should not be construed as acceptance of its accuracy.

[2] The judicially-created *Blue & Gold* waiver rule does not apply where, as here, Congress has legislated a six-year statute of limitations to commence suit against the government. 28 U.S.C. § 2401(a); *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S.Ct. 954, 959-61 (2017).

1   All offerors proposed to develop new launch vehicles in response to the RFP.

2   Each awardee proposed to develop new solutions for all three missions—Category A,

3   B, and C.   By contrast, SpaceX offered fully operational, and flight proven

4   commercial launch vehicles (Falcon 9 and Falcon Heavy) for Category A/B missions,

5   addressing the Agency's most imminent operational timeline, and proposed to

6   develop the "groundbreaking" Starship solution for the two Category C missions, not

7   required for operation until September 2025.   (Tab 132 at 41594.)   As SMC

8   recognized, "[s]uccessful completion of the [Starship] would be game-changing for

9   national security space because of its ability to ███████████████████ at a

10  low cost ...." (Tab 132 at 41656.)[3]

11   The RFP, consistent with Congressional direction, required SMC to award to

12  the portfolio of solutions that, based on the stated criteria, were "most advantageous

13  in achieving the Government's goal of assured access to space via two or more

14  domestic commercial launch services providers that also meet the NSS requirements."

15  (Tab 38 at 1285.)   Accordingly, any rational decision would ensure the award

16  portfolio invested in only "commercial launch services providers that also meet NSS

17  requirements" and balanced any risks to all covered mission requirements, Category

18  A, B, and C.  SMC's award decision failed on both accounts.

19   First, the ULA and Orbital solutions are both undeniably "purpose-built" for

20  the government's requirements threatening the RFP's competition and program

21  affordability objectives.   (Tab 2 at 107, 109; Tab 46 at 1343, Tab 38 at 1260.)

22  Defendants' rebuttals that Congress and the RFP meant to limit awards only to private

23  companies as defined by 51 U.S.C. § 50101, without regard to whether the company

24  is commercially competitive, finds no support in the statutory text or record.  SMC's

25

26  [3] Unsurprisingly, Intervenors deride SpaceX's innovative Category C approach, errantly suggesting
SMC lacked interest in the enhanced capabilities SpaceX offered.  But those capabilities align with
27  the RFP Statement of Objectives and direction to leverage commercial solutions (Tab 38 at 1260,
1291), and the White House Space Policy Directive 1. https://www.whitehouse.gov/presidential-
28  actions/presidential-memorandum-reinvigorating-americas-human-space-exploration-program/

- 2 -

1  decision not to leverage commercial launch systems for investment, *as mandated by*

2  *Congress and the RFP criteria*, materially prejudiced SpaceX, the leading

3  commercial space flight provider offering SMC commercial launch solutions.

4   Second, SMC judged each developmental approach as risking SMC's timeline:

5  the proposals of ULA, Orbital, and Blue Origin risked missing SMC's Category A/B

6  timeline, and SpaceX risked missing the Category C timeline.[4]  Yet, due to an

7  unannounced backup plan SMC employed for its evaluation, SMC assigned lesser

8  risk ratings to the developmental solutions for Category A/B missions.  Under that

9  plan, SMC assumed it would either purchase SpaceX's Category A/B solutions under

10  a separate contract or continue to purchase services using ULA's Atlas vehicle

11  powered by a Russian engine.[5]  SMC thus gave a competitive advantage to the

12  awardees and disadvantaged SpaceX, which had no Category A/B schedule risk to

13  "buy down" and proposed instead a developmental solution to Category C.  This

14  anticompetitive evaluation prejudiced SpaceX.  Based on the improper (and

15  unannounced) buy-down plan, SMC awarded LSA agreements to three solutions that

16  all risked the required Category A/B timeline, and excluded the one competitor that

17  posed no risk to those requirements.[6]

18

19

20  [4] As described in Sections II.C.2 and C.3, SMC's risk assessment of SpaceX also was anticompetitive because SMC relied on unstated criteria and unsupported findings.

21
22  [5] ULA's Opposition touts its monopolistic experience as "unmatched" (ULA.Br. 1), burying the lead that every successful launch of the Atlas vehicle depended on a Russian rocket engine.

23  [6] Unable to defend the evaluation merits, Intervenors seek to use the Department of Defense ("DoD") Office of Inspector General investigation of Acting Secretary of Defense Shanahan, claiming it is an admission against interest.  (BO.Br. 18;Orb.Br. 3 n.2.)  The DoD report (focused
24  on whether the DoD Secretary improperly involved himself in matters related to Boeing—ULA here), describes a meeting between Mr. Musk and the Secretary that occurred a few months after
25  the award decision. The report, which does not include a transcript of the conversation, has no relevance here, is not part of the record, and is taken out of context.  Whether Mr. Musk suggested
26  that SpaceX missed the Agency's mark has nothing to do with whether SMC broke with law and the RFP in moving the mark as subsequent facts have proven.  And, without access to the administrative
27  record, Mr. Musk did not know about the backup plan by which SMC denied SpaceX an LSA (based on risk) yet relied on SpaceX as a safety valve for the three LSA awardees.  If the Court is inclined
28  to take additional evidence, SpaceX welcomes the opportunity to present witnesses.

- 3 -

1       Defendants urge the Court to ignore the buy-down plan—expressed in the

2  record discussions between the Agreements Officer ("AO") and the awardees—

3  because the final decision does not reference the plan.  Defendants invite legal error

4  which the Court should decline.  The AO explained to each that, *without the backup*

5  *plan*, SMC would have rated their weaknesses and significant weaknesses higher risk.

6  (Tab 101, LSA Convo with O7 [Orbital] on Rating at 33:10 to 36:00; Tab 101, LSA

7  Convo with O6 [Blue Origin] on Rating at 24:40 to 28:20; Tab 101, LSA Convo with

8  O5 [ULA] on Rating at 39:45 through 42:27.)  And, the lesser risk ratings resulting

9  from SMC's reliance on the improper plan were incorporated into and relied on in the

10  final award decision. (Tab 136 at 41753 (Source Selection Authority ("SSA") stating

11  decision is "[b]ased on the ratings.").)

12       The final decision to exclude SpaceX from an LSA award also must be set aside

13  because it arose from an anticompetitive cost evaluation that understated the true costs

14  to the government of the Defendant-Intervenor solutions and overstated SpaceX's

15  cost.  The critical facts are not in dispute.  SMC concedes that it did not account for

16  the significant government payments to ULA and other material costs SpaceX

17  identified.  Nevertheless, SMC argues that it properly overlooked the hundreds of

18  millions of dollars of government payments to ULA and excluded Blue Origin's

19  engine development costs from ULA's proposal to prevent double counting. (Gov.Br.

20  27-32.)  SMC's arguments find no support in the RFP (or how SMC evaluated

21  SpaceX's costs) and evidence that SMC improperly presupposed an LSA award to

22  both ULA and Blue Origin during the evaluation.  SpaceX suffered prejudice as a

23  result of each cost evaluation error and the resultant flawed tradeoff analysis because

24  SMC wrongly deemed SpaceX the most expensive LSA solution, impeding SpaceX's

25  ability to receive an award.  (Tab 135 at 41732; Tab 136 at 41753.)[7]

26

27  [7] ULA mischaracterizes SpaceX's proposal to develop the most technically-advanced launch vehicle at the lowest Government cost share (███ government share in Category C (Tab 132 at 41623)) as a request for a "king's ransom," but the record confirms it is ULA, which has gouged taxpayers for

28  decades, that has enjoyed the royal treatment. (ULA.Br. 34.)

- 4 -

1    Accordingly, for the reasons noted herein and in SpaceX's motion, the Court
2  should grant declaratory judgment in SpaceX's favor on the Administrative Record.
3  The Court also should grant SpaceX injunctive relief because, as explained in Section
4  III, the balance of harms and public interest tip decisively in favor of injunction.

5  **II.    THE COURT SHOULD GRANT JUDGMENT IN SPACEX'S FAVOR**

6  **A.    SpaceX Challenges Final Agency Action At This Court.**

7    Blue Origin alone contends that SMC's award decision was not final agency
8  action and that the RFP's objection process was a mandatory administrative remedy
9  that SpaceX had to exhaust a second time after SMC produced the record in response
10  to SpaceX's court action.  (BO.Br. 8-18.)  Blue Origin misunderstands the doctrines
11  of finality and exhaustion.

12    A "final agency action" (i) "marks the consummation of the agency's
13  decisionmaking process," and is (ii) "one by which rights or obligations have been
14  determined," or "from which legal consequences will flow."  *Bennett v. Spear*, 520
15  U.S. 154, 177-78 (1997) (internal quotation marks omitted).  SMC's final action of
16  awarding LSAs to each SpaceX competitor and not SpaceX satisfies this test.  (Tab
17  136 at 41753.)  The award decision is not tentative or interlocutory; it has "direct and
18  appreciable legal consequences." *Bennett*, 520 U.S. at 178.  Based on the challenged
19  decision, SMC executed the LSAs, committing to invest hundreds of millions in each
20  awardee's proposed launch system.  (Tab 138 at 41774; Tab 139 at 42028; Tab 140 at
21  42319.)

22    Blue Origin's reliance on the RFP objection process is also misplaced.
23  Exhaustion "is a prerequisite to judicial review [under the APA] *only* when expressly
24  required by statute or when an agency rule requires appeal before review and the
25  administrative action is made inoperative pending that review."  *Darby*, 509 U.S. at
26  154 (emphasis in original) (holding "[c]ourts are not free to impose an exhaustion
27  requirement as a rule of judicial administration" where APA applies and exhaustion
28  is not statutorily required).  The RFP provision is neither a statute nor regulation

- 5 -

REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD –

1    mandating exhaustion, nor does it make the challenged award decision "inoperative
2    pending that review." The awarded LSAs are not conditioned on the outcome of any
3    agency-level objection. (*See generally* Tabs 138-140.) During the months the AO
4    reviewed SpaceX's objection, LSA performance continued. Nothing about the RFP
5    objection process or the AO's objection denial alters the finality of the award decision.
6    *See* 5 U.S.C. § 704 ("agency action otherwise final is final ... whether or not there has
7    been presented or determined an application for ... any form of reconsideration");
8    *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012).[8]

9        **B.    SMC Violated The RFP And Congressional Direction.**

10        SpaceX asks the Court to set aside the award decision because it contravenes
11   the RFP criteria and Congressional direction. Orbital alone objects to prudential
12   standing, claiming "SpaceX is not an intended beneficiary of the appropriation
13   statutes it cites." (Orb.Br. 22-23.) Orbital misstates the law.

14        The Supreme Court rejects the intended beneficiary standard, confirming
15   prudential standing does not require "'an indication of congressional purpose to
16   benefit the would-be plaintiff.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi*
17   *Indians v. Patchak*, 567 U.S. 209, 225 (2012) (explaining this rule accomplishes
18   "Congress's evident intent when enacting the APA to make agency action
19   presumptively reviewable") (quotation omitted). "APA plaintiffs need only show that
20   their interests fall within the general policy of the underlying statute...." *City of*
21   *Sausalito v. O'Neill*, 386 F.3d 1186, 1200 (9th Cir. 2004) (internal quotation omitted).

22        SpaceX satisfies the test. Congress directed SMC to: (i) transition EELV
23   launch services providers off Russian engines, (ii) implement a new acquisition
24   strategy that provides for "fair competition," (iii) discontinue the launch capability

25

26   _____
     [8] Even assuming that a prudential exhaustion consideration existed (which it did not), SpaceX
27   followed the non-mandatory Agency process and repeatedly asked for alternative dispute resolution,
     placing SMC on notice of each SpaceX objection. (Tab 150.) Under *Darby*, SpaceX had no
28   obligation to engage that informal process at all much less to re-engage it to supplement its original
     objections with record facts that SMC only produced to SpaceX during judicial review.

- 6 -

subsidy to ULA ("ELC payments"), and (iv) invest in commercially-available launch systems to maintain assured access to space. (SpX.Br. 7-8.) Accordingly, the RFP required SMC to invest in at least two commercially-viable domestic launch providers, end reliance on Russian-powered rockets, and meet the assured access to space requirements in 10 U.S.C. § 2273. (Tab 38 at 1260, 1285; Tab 34 at 1036; Tab 46 at 1342-43.) SpaceX challenges the award decision because, contrary to the RFP, SMC selected purpose-built designs rather than commercial launch solutions, risked assured access to space, and thwarted Congress's direction to end reliance on Russian-rocket engines, based on an anticompetitive evaluation. (SpX.Br. 17-21.) The result: SMC invested in every offeror except SpaceX, the only LSA competitor that (a) leads commercial space flight with the only currently viable, commercial launch vehicles; (b) offered operational, domestically-produced rockets already certified to perform the Category A/B missions and to develop another solution with enhanced capabilities for the two Category C missions not needed until late 2025; and (c) has saved the taxpayer and the NSS program hundreds of millions of dollars. SpaceX's interests (and the relief sought) fully align with the legislative mandates.

The substantive defenses also fail. For instance, to support SMC's unstated preference for solutions "purpose-built" to NSS requirements, rather than commercial launch systems modified for the requirements, Defendants claim that references to "commercially available space launch vehicles," "commercial launch solutions," and "domestic commercial launch service providers" in the RFP and Section 1605 of the National Defense Authorization Act ("NDAA") for Fiscal Year ("FY") 2018 mean "commercial provider" and "United States commercial provider" as defined in 51 U.S.C. §§ 50101 and 50131, and include a private company, without any commercial business. (*Compare* FY 2018 NDAA, Pub. L. No. 115-91, § 1605, 131 Stat. 1283, 1724-25 (2017) and Tab 38 at 1260 *with* Gov.Br. 35-37.) If Congress had intended to incorporate Title 51's definitions into Section 1605 it would have referenced Title 51 (as it did with 10 U.S.C. § 2273) or used the terms defined in those provisions. *Pit*

- 7 -

1  *River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 970-71 (9th Cir. 2019) (courts
2  presume Congress meant to convey different concepts when it used different words)
3  (*citing SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003)).   But Congress chose
4  different language, "commercially available space launch vehicles" to describe those
5  eligible for the Section 1605 funding.

6       Defendants' contrived reading also runs head long into the Business Case
7  Analysis and Memorandum on Compliance with NDAA Section 1605—Agency-
8  developed documents for the competition that SMC's Opposition ignores.   The
9  Business Case Analysis confirms the need for "two or more systems that meet NSS
10  requirements *while being commercially competitive*," explaining that a
11  "***commercially viable launch system is vital to reducing the risk to the Air Force*** of
12  having to keep launch service providers financially viable during periods of low
13  demand for NSS launches." (Tab 2 at 109; Tab 34 at 1036.)[9] Similarly, the Section
14  1605 Memorandum makes clear that SMC understood it could invest only in a
15  "prototype that is a commercially domestic produced EELV-class launch system
16  capable of meeting the EELV launch service requirements ***and not be limited in scope***
17  ***to only the primarily NSS capabilities***." (Tab 46 at 1343.)   ULA's and Orbital's
18  admitted approaches of proposing solutions "purpose-built" for NSS requirements
19  plainly contravene Section 1605 and the RFP award criteria for "two or more domestic
20  commercial launch service providers *that also meet NSS requirements*." (Tab 38 at
21  1285; *see also* ECF 168 ¶¶ 24, 25; 10 U.S.C. § 2273; Orb.Br. 15.)

22       Defendants also misconstrue SpaceX's challenge to the award decision based
23  assured access to space.   SpaceX does not argue for a portfolio award that delivers
24  only some of the requirements.   (Gov.Br. 38.)[10]   Rather, SpaceX maintains that any
25  rational decision focused on assuring access to space would ensure the portfolio
26

27  ---
    [9] All emphasis to quoted material has been added unless noted otherwise.

28  [10] SMC's suggestion that SpaceX's LSA solution did not meet all NSS requirements is defied by
    SMC's own evaluation record and SpaceX's Outstanding technical rating.  (Tab 132 at 41579-94.)

REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – ███

1  covered all mission requirements. But, based on its improper backup plan, SMC

2  invested only in solutions that risked the Category A/B timeline and excluded the one

3  competitor that posed no risk to those, most-urgent requirements.

4        Equally problematic to assured access to space, SMC invested in solutions that

5  have common propulsion components, using all three LSA awards to subsidize the

6  development of ULA's new launch system. (Tab 136 at 41753.) SMC's opposition

7  contends the risk is acceptable because SMC has used common propulsion systems

8  in the past. (Gov.Br. 39-40.) But SMC's prior decisions—which negatively impacted

9  assured access to space[11]—are not at issue and cannot excuse the fact that the current

10 award decision departs from the RFP which mandates, consistent with FY 2018

11 NDAA Section 1605, award to the portfolio "*most advantageous* in achieving …

12 assured access to space." (Tab 38 at 1285; SpX.Br. 19-20.) SMC's Opposition also

13 suggests that the common components themselves present no risk, but the record

14 shows otherwise. (Gov.Br. 40-41.) SMC documented the ██████████████████

15 ████████████████████████████████████████████,

16 and integration will bring other challenges. (Tab 98 at 30720.) The award decision

17 itself acknowledges the common component risk, but wrongly dismisses it because

18 "the Government did not include an RFP evaluation criteria related to the use of

19 common engines." (Tab 136 at 41753.) SMC ignores the award criteria and offers

20 no valid explanation for proceeding with an award decision that commits $2.3 billion

21 to launch solutions that risk assured access to space. Instead, SMC urges the Court

22 to ignore this error under the guise of exhaustion. As explained in Section I.A,

23 however, the RFP objection process is not a prerequisite to judicial review, and

24 SpaceX raised this common component defect in its objection to SMC in any event.

25 (Tab 150 at 42806-09.)

26

27 [11] *See* Sandra Erwin, *Atlas 5 and Delta 4 launch delays caused by common component in upper stage*, SpaceNews (July 17, 2019), https://spacenews.com/atlas-5-and-delta-4-launch-delays-

28 caused-by-common-component-in-upper-stage/.

Finally, the Court should set aside the unlawful award decision because it thwarts Congressional direction to end reliance on Russian rocket engines for NSS missions. SMC predicates its opposition on the flawed premise that the evaluation found each awardee would be fully capable of Category A/B missions by April 1, 2022. (Gov.Br. 42.) Not true. As discussed in further detail below, the record establishes SMC's substantial concern that none of the conceptual rockets selected for award would meet the RFP's April 1, 2022 need date, but SMC assessed lesser risk ratings to those offerors based on the improper buy-down plan. So, while an LSA award to SpaceX would have ensured an end to reliance on Russian engines, the award decision ensures such reliance will continue for the Category A/B missions.

**C.    SMC Improperly Discounted Category A/B Mission Risks.**

SpaceX neither asks this Court to excuse SpaceX from any RFP requirement nor to substitute its technical judgment for SMC's. SpaceX objects to the fact—established through record evidence—that SMC held the awardees to less scrutiny against the RFP requirements and assigned better risk ratings to their developmental systems because SMC crafted an undisclosed backup plan to meet the RFP's most urgent Category A/B needs through other contracts.

The certified record confirms that SMC assumed it would procure another launch system to address the risk that none of the awardees' developmental Category A/B launch solutions would meet the April 1, 2022 Category A/B need date. Evidencing plain relevance to the award decision, the AO advised each awardee during discussions that SMC would reduce their risk ratings *based on SMC's plan* to "buy down" risk by paying for an Atlas (from ULA using a Russian engine) or Falcon (from SpaceX). (SpX.Br. 25-28.) The record recordings leave no doubt that, but for this undisclosed backup plan, the awardees would have received higher risk ratings:

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

1 ████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ██████████████████████████████████████

5 (Tab 101, LSA Convo with ██████████ on Rating at 33:10 to 36:00; Tab 101, LSA

6 Convo with ██████████████ on Rating at 24:40 to 28:20 ███████████████

7 ████████████████████████████████████████████

8 (Tab 101, LSA Convo with ████████ on Rating at 39:45 through 42:27 ██████

9 ████████████████████████████████████████████

10 █████████████████████████████████████████████████").)

11      SMC's undisclosed plan to mitigate offerors' Category A/B mission risk by

12 purchasing services using a Falcon or Atlas to meet the RFP schedule is

13 anticompetitive. First, it essentially waives the RFP's Category A/B need date for

14 each awardee (among other requirements), allowing their proposed solutions to risk

15 missing RFP requirements without full evaluative consequence because SMC will

16 meet that need through other contracts.[12] This is especially prejudicial and unequal

17 here given that the SSA decided not to award to SpaceX due to the purported

18 ████████████████████████████████ the Category C timeline. (Tab

19 136 at 41753.)[13] Second, SMC hid from SpaceX the true ground rules of the

20 competition. The RFP did not advise offerors that risks to Category A/B mission

21 needs were less critical or that SMC would apply the backup plan to give better risk

22 ratings for developmental Category A/B solutions. Had the RFP announced that

23 Category A/B mission risks would get a pass, leaving Category C mission risks to

24 drive award decision, SpaceX would have proposed differently. (SpX.Br 25.)

25

26 [12] SMC's Category A/B risk "buy down" evaluation approach also tempered SMC's ████████

27 ████████████████████████████████. (Tab 132 at 41483-84, 41493.) which if unsuccessful or delayed would result in

28 [13] Further evidencing the disparate treatment, SMC never considered "buy down" as a risk mitigation approach for SpaceX despite that SMC will have at least two other Category C providers.

- 11 -

1     Defendants claim no evidence exists that SMC discounted the Category A/B

2    risks because the "buy down" plan is not expressly referenced in the final award

3    decision. (Gov.Br. 15-16; ULA.Br. 27; Orb.Br. 40.) Defendants urge the Court to

4    ignore the AO's recorded explanation of the risk ratings relied on and incorporated

5    into the final decision. (*See, e.g.*, Tab 136 at 41753 ("I agree with the Agreement

6    Officer's detailed assessment of the proposals.").) Contrary to Defendants' post-hoc

7    characterizations, the AO's statements are verbal rationale for why the awardees did

8    not receive higher risk ratings. (*See* Tab 101, LSA Convo with O7 [Orbital] on Rating

9    at 0:00 through 0:10 (identifying AO as the speaker); Tab 101, LSA Convo with O5

10   [ULA] on Rating at 0:00 through 0:30 (same).) The AO explained to each that,

11   ████████████████████████████████████████████████████████

12   ███████████████████████[14]

13     Significantly, the lesser risk ratings resulting from SMC's improper backup

14   plan evaluation were incorporated into the final award decision that SMC wishes to

15   hide behind. (Tab 134 at 41677; Tab 135 at 41720-21, 41722-23, 41725-26, 41728-

16   30; Tab 136 at 41746-53.) The SSA states that the decision is "[b]ased on the ratings."

17   (Tab 136 at 41753.) Thus, the SSA either knew SMC assigned lesser risk ratings

18   based on the buy-down plan but did not further document that fact or the SSA was

19   misled by the ratings, believing inaccurately that, as evaluated, only SpaceX's

20   Category C approach risked the RFP timeline. Either way, the award decision

21   resulted from an anticompetitive evaluation that significantly prejudiced SpaceX. But

22   for the backup plan, the final decision would have showed that each Intervenor's

23   Category A/B approach risked the RFP's most urgent operational timeline.

24

---

25   [14] The AO's record statements describing the effect of the unequal "buy down" evaluation approach
disprove Orbital's suggestion that the weaknesses assessed mollify the harm. The AO made clear

26   that, for ███████████████████████████████████. It is also
irrelevant whether the RFP formally required offerors to satisfy SMC's internal 14-month margin

27   low-risk benchmark. (Gov.Br. 11; ULA.Br. 18.) The recordings and the evaluation documents
confirm both that SMC applied the 14-month standard and, because none of the awardees satisfied

28   it, SMC would have assigned them higher risk ratings without the backup plan.

- 12 -

1    Intervenors' other arguments weaken their main contention.  ULA and Orbital
2    suggest that SMC's unannounced mitigation was merely a fulsome assessment of the
3    strengths and weakness of the competing solutions under the RFP.  (ULA.Br. 40-41;
4    Orb.Br. 40-41.)  Not so.  The RFP risk definitions discuss "Government monitoring"
5    to overcome the *offeror's* unsuccessful LSA performance (Tab 38 at 1282) and do not
6    contemplate SMC purchasing more Russian rockets through another contract to meet
7    the RFP's timeline because an LSA competitor will miss it.  *See Greater Yellowstone*
8    *Coal., Inc. v. Servheen*, 665 F.3d 1015, 1027-28 (9th Cir. 2011) (agency acted
9    irrationally when it expressed a need and relied on something less to meet it).

10   **D.**    **The Cost Evaluation Was Anticompetitive And Irrational.**
11          **1.    SMC Understated the Government Investment in ULA.**
12   SpaceX demonstrated that, contrary to the RFP (Tab 138 at 1284) and how
13   SMC evaluated SpaceX, SMC did not account for government payments made to
14   ULA under separate contracts for critical components that ULA proposed to leverage
15   for its LSA solution. (SpX.Br. 21-24.)  SMC concedes that it did not account for the
16   significant  government  payments  and  other  material  costs  SpaceX  identified.
17   Nevertheless, SMC argues that it properly overlooked the hundreds of millions of
18   dollars of government payments to ULA based purportedly on the RFP instructions
19   and excluded Blue Origin's engine development costs to prevent double counting.
20   (Gov.Br. 27-32.)  These arguments lack merit and evidence that SMC improperly
21   presupposed an LSA award to both ULA and Blue Origin during the evaluation.

22   ████████████████████████  The critical facts are not in dispute.
23   Since 2006, SMC has paid ULA's costs to operate, maintain, and sustain its launch
24   infrastructure and personnel.  (ULA.Br. 34 (stating the ELC contract is cost-based
25   and has existed since 2006; *id.* at 35 (stating that ELC contract includes within its
26   scope launch infrastructure); ECF 168 ¶¶ 35, 39, 153-59.)  For this competition, ULA
27   proposed to ██████████████████████████████████████████
28   ████████████████████.  (*See e.g.,* Tab 120 at 35230 (██████████████████

- 13 -

1　██████████████████████████████████████████████████

2　██████████████████████████████████████████████████

3　████████████████████████████████); *see also* Gov.Br. 27-

4　28.)  And, yet, neither ULA's proposal nor SMC's evaluation accounted for the ELC

5　payments as Government Investment in ULA's prototype.

6　　　　SMC discounts SpaceX's objection as mere "quibbling" and argues that it had

7　no obligation to account for hundreds of millions of dollars SMC paid to ULA because

8　the government funding either pre-dated February 21, 2018 or constitutes "[p]arallel

9　research or investment."  SMC is wrong on both accounts.  First, the two cost-

10　reimbursement modifications on which SpaceX relies involve government payments

11　to ULA *after* February 21, 2018.  SMC awarded the first on September 27, 2017 in

12　an amount not to exceed $832 million with a performance period *through September*

13　*30, 2018*.  SMC awarded the second on September 27, 2018, in an amount not to

14　exceed $867 million with a performance period of *through September 2019*.  (ECF

15　168 ¶¶ 158-59.)  Although its Opposition suggests otherwise, SMC knows it does not

16　pay ULA the full modification amount on day one.  By regulation, cost-

17　reimbursement modifications provide "an estimate of total cost for the purpose of

18　obligating funds and establishing a ceiling," against which the contractor invoices its

19　costs *throughout the performance period*.  48 C.F.R. §§ 16.301-1, 16.307(a)(1).

20　　　　Second, SMC's characterization of the ELC payments as excludable "[p]arallel

21　research or investment" is untenable.  The RFP defines these costs as "research or

22　other investments that might be related to the proposed project but which will not be

23　part of the SOW." (Tab 38 at 1277.)  The "parallel research" instruction is included

24　in paragraph 8 of RFP Section 3.1.4.5, a paragraph listing *company* costs (e.g., sunk

25　costs, foregone fee, bid and proposal costs, value claimed for intellectual property,

26　etc.).  (*Id.* at 1276-77.)  Company "parallel research or investment" contemplated in

27　paragraph 8 does not cover *government payments* to ULA for launch operation and

28　sustainment costs.  Further undermining SMC's reading, ULA's SOW includes the

- 14 -

1    work scope covered by the ELC payments.  For instance, the ULA SOW leads with

2    ███████ ████████████████████████████ covered by the ELC

3    payments.  (*Compare* Tab 140a.1 at 42351-53, 42357-59 *with* SpX.Br. 21-22.)[15]

4    ULA's SOW also includes ██████ ███ ████████ ███ ██████ ████████

5    ████████ also covered by the ELC payments.  (Tab 140a.1 at 42355, 42361.)

6        Finally, SMC's fallback position serves only to highlight the unbalanced

7    treatment of the offerors.  SMC errantly equates ████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ██████████████████████, and (ii) the over $1.5 billion in costs SMC has paid

10    (on a sole source basis) to ULA to maintain its operations through the ELC payments.

11    SpaceX, however, did not propose ████████████████████████████████

12    ████████ just as ULA did not propose to leverage for its LSA solution the $351 million

13    contract ULA won in March 2018 for delivering AFSPC-8 and AFSPC-12 satellites

14    into orbit.[16]  The salient difference is that ULA proposed to leverage for the LSA

15    prototype the critical components maintained by the government's ELC payments.

16        ██████████████ ULA also failed to include the costs of various launch

17    service components developed by its subcontractor ██████ using other government

18    contract dollars, and SMC confirms that it did not account for these costs in its

19    evaluation.  (SpX.Br. 22; Gov.Br. 28-29.)  SMC, however, suggests that the ██████

20    ████████████████ are "general-purpose components that were developed

21    independently" and not for the Vulcan.  (Gov.Br. 29.)  Again, the record shows

22    otherwise.  For instance, ULA's proposal explains that *for the Vulcan system*, ULA

23    intends to ████████████████████████████████████████████████████



---

[15] ULA's proposal obscures ████████████████████████ and SMC never sought clarification.  But, several tables in ULA's proposal show that ULA may be ████████████████████████████████████████████ (*See, e.g.,* Tab 120 at 35380-82.)

[16] Joanna Crews, *ULA to Help Launch 2 AFSPC Satellites Under Potential $355M Contract*, GovCon Wire (March 15, 2018), https://www.govconwire.com/2018/03/ula-to-help-launch-2-afspc-satellites-under-potential-355m-contract/

1    the ████████████████████████████████████████████

2    ████████████████████████████████████████████

3    ████████████████████████████ (Tab 120 at 35282.)  ULA also describes the

4    ████████████████████████ as a ██████████████████

5    ████████████████████████ (*Id.*)  No dispute exists that the ULA team will

6    complete design and development of these components as part of the LSA.  ULA's

7    own schedule and SOW identify ████████████████████████████████

8    ████████████ (*Id.* at 35332; Tab 140a.1 at 42354, 42360.)

9        Even assuming, as SMC appears to argue, that ███████ would complete

10   development of these components even without an LSA award to ULA, the same

11   holds true for SpaceX's ███████████. The Air Force ████████████████

12   ████████████████████, and that contract, not the LSA, obligated SpaceX to

13   perform the mission.  SMC offers no explanation for treating the ███████████

14   as Government Investment but not the ███████████ components that ██████ and

15   ULA have developed under the ████████████ (Tab 120 at 35377-78, 35249.)[17]

16       *BE-4 Development:* All agree that ULA proposed a solution contingent on the

17   development of the BE-4 engine, but ULA's proposal did not ████████████████

18   ████████████. (Tab 132 at 41644 (SMC recognizing that ULA's proposal was

19   ████████████████████████████).)  Nevertheless, SMC argues

20   that its decision to exclude the BE-4 engine costs from ULA's proposal was

21   reasonable to prevent "double-count[ing] for both Blue Origin and ULA."  (Gov.Br.

22   30.)  SMC's argument makes clear that by accepting the risk of common components,

23   SMC unfairly permitted ULA to spread the development costs of its proposed solution

24   across multiple LSA proposals, thereby understating the total development costs and

25   the percentage of Government Investment in the Vulcan prototype.  SMC also

---

27   [17] ULA, but not SMC, makes the incredible and unsupported suggestion that ██████ development
28   work on the Atlas program was not government funded.  (*Compare* ULA.Br. 36 *with* Tab 120 at
     35293 ████████████████████████████████████████████).)

confirms it improperly presupposed an LSA award to Blue Origin during its evaluation of ULA rather than the Total Costs of each proposed LSA solution as the RFP contemplated.   The record disproves the errant suggestion that SMC's anticompetitive evaluation was harmless.  Blue Origin's proposal states that the total development cost of its prototype is $█████████ and Blue Origin seeks $500 million from SMC, i.e., a ██████ Government Investment share. (Tab 121 at 37018 (showing government will finance █████ of milestone activities).)  The $██████████ includes ████████ for ████████████████████████████████████████████████ ████████████████████████████████. (*Id.* at 37020; *see also id.* at 36841-44.) Applying the ██████ Government Investment share to the ██████████ in BE-4 development costs specified in SMC's final evaluation, it is clear that SMC will fund at least ██████████.  (Tab 132 at 41644.)   SMC's failure to account for this Government Investment as well as the other payments discussed herein *materially understated* the Government Investment in ULA's solution by hundreds of millions of dollars to SpaceX's competitive prejudice and renders the award decision irrational. *Latecoere Intern., Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1360-62 (11th Cir. 1994).

### 2.  SMC Treated SpaceX's Cost Unequally.

In its motion, SpaceX showed that SMC overstated the Government's Investment in SpaceX by ██████████ by including ██████████████████ ████████████████████████████████████████. (SpX.Br. 23.)  Contrary to SMC's Opposition, the record confirms that SMC advised SpaceX to include ████████ ████████████████████████████████████████████. (*See* Tab 101, LSA Convo with O8 [SpaceX] ██████ - 28 Aug. @ 1230 at 2:10 through 3:10 (SMC proposing ██████████); *id.* at 17:55 through 18:20 (AO stating: ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████).)  The law charges SMC with identifying its needs and ensuring that its evaluation accurately reflects those needs. *See EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 224-25

- 17 -

1   (2005) (holding that agency must "avoid award decisions not based on the agency's

2   most current view of its needs" (citations omitted)).   Once SMC knew it had no

3   mission requirement for ██████████████████—a fact publicized in the

4   Phase 2 RFP—it was irrational for SMC to increase SpaceX's evaluated costs to cover

5   ████████████████. (SpX.Br. 23.)

6         Conversely, SMC did not assume the "most expensive scenario" when

7   evaluating the other offerors.   For instance, ULA's final proposal sought to recover

8   from the government a share of the difference in the "likely" possibility that ULA

9   ██████████████████████████████████████. (Tab

10  120 at 35863-64.) ████████████████████████████

11  (Tab 97 at 30566-67), ██████████████████████

12  ████████████████. Although the SMC and ULA Oppositions attempt

13  to walk back the arrangement (Gov.Br. 34; ULA.Br. 39-40), no one can dispute that

14  ULA's final proposal contained the caveat: ██████████████████████

15  ██████████████████ (Tab 120 at 35864; Orb.Br. 33.)

16  SMC offers no explanation for the difference in evaluative treatment.

17        Nor does SMC explain why it did not account for the costs to "buy down" the

18  Category A/B risk posed by the awardees, electing instead to emphasize the ratings

19  borne from the improper plan. (Gov.Br. 42-43.) ULA makes a convoluted argument

20  that the buy down "cost could itself be mitigated entirely by requiring the offerors to

21  provide a backup option at the LSA prototype cost." (ULA.Br. 40-41.) But the RFP

22  contains no such requirement.   Orbital's reliance on the RFP instructions similarly

23  fails. (Orb.Br. 34-35.) Given SMC's decision to credit each Intervenor with a lower

24  risk based on the "buy down" plan, an equal cost evaluation would have accounted

25  for the dual integration costs as Government Investment for each.   SpaceX suffered

26  prejudice as a result of a flawed cost evaluation and tradeoff analysis because SMC

27  wrongly identified SpaceX as the most expensive LSA solution, impeding SpaceX's

28  ability to receive an award. (SpX.Br. 24.)

- 18 -

### 3.   SMC Relied On Unstated Criteria To Find Risk For SpaceX.

Defendants mischaracterize SpaceX's objections to SMC's risk evaluation of SpaceX as mere disagreement with technical judgments or untimely RFP challenges. Not true.  SpaceX challenges the fact that SMC based the risk assessment *on different ground rules* than what the RFP stated and, SpaceX has shown that, had SMC revised the RFP to reflect the actual evaluation, SpaceX would have proposed differently. (SpX.Br. 29-31; *Dubinsky v. United States*, 43 Fed. Cl. 243, 259 (1999) ("[M]aking offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition.").)

For instance, SMC's evaluation repeatedly faulted SpaceX for ███████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████. (Tab 132 at 41586.)  The RFP, however, did not ████████████████████████████████████ ███████ ███ ████████ as  requirements,  or  indicate  a  preference  for ██████████████████. Instead, the RFP advised offerors that ███████ ██████████████████████████████████████████████████████████ ████████████████ (Tab 38 at 1260.)  SMC's risk assessment of SpaceX thus contravenes the RFP and evidences an unstated preference for ████████ ████████████████████████████████. Defendants' Oppositions errantly suggest that SMC assessed risk to SpaceX's proposal not only because SpaceX ████████████████ but because SpaceX ████████████ ████████████ (Gov.Br. 17.)  But the record shows that SpaceX proposed ██ ██████████████████████████████. (*Compare* Tab 123 at 39777-78 *with* Tab 120 at 35242.)[18]  If SMC deemed its ████████████ ██████████████ SMC had an obligation to revise the RFP.

---

[18] ULA proposed having the ██████████████████████████████████ ██████████████████████████████████

██ REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – █████
████████████████████████████████

1    Defendants' opposition to the flawed risk assessments involving SpaceX's

2   proposal to ███████████████████████ also fails. (Gov.Br. 42-43.)

3   SMC had no concern about SpaceX's ability to perform ████████████████

4   ████████[19]   Rather, SMC faulted SpaceX because ████████████████

5   ██████████████████████████████████████████████████████

6   █████. (Tab 132 at 41595-96, 41621.)  This possibility, however, originated from

7   SMC's decision to permit ███████████████████████, not from

8   SpaceX's approach.  If SMC did not want to ████████████████████

9   █████, SMC should not have revised the RFP to allow such launches. (*Compare* Tab

10   38 at 1284 *with* Tab 37 at 1246.)  SMC's flawed risk assessment also ignores SpaceX's

11   ████████, which evidences SpaceX's commitment ████████████

12   ██████████████████████████████████████████████████.

13   SpaceX proposed ████████████████████████████████

14   ████████████████████████. (Tab 123 at 39987.)

15   ██████████████████████████████████████████████

16   █████████████████████████████████ and SpaceX's

17   commercial launch strategy, and will ████████████████████

18   █████ (*Id.*)  Thus, SMC's statement that SpaceX ████████████████

19   ██████████████████ is inaccurate. (Tab 132 at 41584.)

20   Just as SMC found it reasonable to credit Blue Origin for its intended approach to

21   meet the ███████████████████ (Tab 132 at 41481-82), SMC should have

22   credited SpaceX's approach ████████████████████████████

23   █████████.

24   _____

25   █████████████████████████████████████████████████████

26   █████ (Tab 120 at 35242.)  SpaceX proposed ██████████████████████

27   ████████████████████████████ (Tab 123 at 39777-78.)

28   [19] Although SMC originally ███████████████, the final evaluation shows that SpaceX addressed those concerns.  (Tab 132 at 41588.)

- 20 -

1    **4.     SMC Arbitrarily Evaluated SpaceX's Schedule.**

2    SMC relied on inaccurate and unequal findings to conclude that SpaceX's

3    Category C solution would not meet the RFP need date.  (SpX.Br. 31-34.)  The

4    Opposition arguments reinforce SpaceX's challenge.  For example, the evaluators

5    found that SpaceX's ███████████████████████████████████████████████

6    ████████ (Tab 132 at 41620-21), contradicting SpaceX's proposal that ███████

7    █████████████████████████████████████ (Tab 123 at 39831.)

8    SMC now claims that its actual, but unwritten concern, was that SpaceX may █████

9    ██████████, contending that although SpaceX proposed ██████████████████

10   █████████████████████ SMC was ██████████████████████████████

11   ████████ (Gov.Br. 21.)  But SpaceX's proposal also soundly defeats SMC's post-

12   hoc rationale, specifying that ████████████████████████████████████████

13   ████████████████████████████████████ and providing ██

14   ███████████████████████████ (Tab 123 at 39832 █████████████

15   █████████████████████).)

16   In contrast to SMC's purported doubts that SpaceX's proposal means what it

17   says, the record and SMC Opposition show that SMC gave ULA the benefit of all

18   doubt even when ULA proposed different, conflicting approaches.  Specifically,

19   ULA's ██████████████████████ state ████████████████████████

20   ████████████████████████ directly contradicting other statements in

21   ULA's proposal.  (Tab 120 at 35312.)  Although all agree that the only ██████

22   ████████████████████████ SMC persists in ignoring ULA's own schedule

23   ground rule to make the dubious claim that the schedule risk evaluation of ULA was

24   properly based on ULA ████████████████████████████████████████.

25   (Gov.Br. 22-23.)

26   SMC's post-hoc focus on SpaceX's ████████████████ also brings the unequal

27   treatment of the offerors in stark relief.  Although SMC ███████████████████

28   █████████████████████ in SpaceX's schedule assessment, the evaluators were silent as

- 21 -



1    to Blue Origin's noted ███████████████████████. (Tab 132

2    at 41509-14.)    Blue Origin failed to ████████████████████

3    ███████████████████████████████████████████████

4    ████████████████████████████████████ (*Id.* at 41483-84

5    ███████████████████████████████████████████████

6    ████████████████████; *id.* at 41493 (same); Tab 135 at 41735.)

7         Similarly, although SMC criticizes SpaceX's proposal ███████

8    ███████████████████████████████████████—SMC

9    had no issue with Blue Origin's approach of ███████████████

10   ███████████████████████████████████████████████

11   █████████ (Tab 121 at 37006.)   SMC claims that Blue Origin's design was █████

12   ████████████████████ (Gov.Br. 23), but ████████████████

13   ███████████████████████████████ (*Compare* Tab 134 at 41708

14   ██████████████████████████████ *with id.* at 41707, 41709,

15   41710 ██████████████████████████████████████████.)

16        Finally, SMC presents no persuasive defense to its reliance on the decades-old

17   Space Shuttle schedule to assess the realism of the Starship's development schedule.

18   First, SMC misstates the purpose of SpaceX's declaration. (Gov.Br. 24.)  SpaceX did

19   not proffer the ██████ Declaration "as a basis for judging the wisdom of the agency's

20   [] analysis." (*Id.*)  Rather, on this point the Declaration serves as a tool to show the

21   obvious and material differences between SpaceX's proposed approach and the Space

22   Shuttle development—relevant considerations SMC ignored. *Asarco, Inc. v. E.P.A.*,

23   616 F.2d 1153, 1160 (9th Cir. 1980).  SpaceX's proposal describes the technology and

24   manufacturing processes SpaceX uses in any event, and the Court can take judicial

25   notice of the unremarkable fact that those technologies and processes did not exist in

26   the 1970s. *Greeson v. Imperial Irrigation Dist.*, 59 F.2d 529, 531 (9th Cir. 1932).

27        The substantive arguments likewise fail.  Defendants claim that the Starship "is

28   closer to the Space Shuttle … than it is to other launch vehicles." (Gov.Br. 24

- 22 -

1  (quoting Tab 132 at 41619-20); Orb.Br. 44-45; ULA.Br. 33.)  That logic is flawed: a

2  polaroid is closer to an oil painting than it is to a sketch, but it does not follow that it

3  takes as long to develop a polaroid as it does to paint a picture.  And, even if the Space

4  Shuttle is analogous to the Starship (it is not), nowhere in the record has SMC

5  explained why, in 2018, it would take SpaceX as long to manufacture a launch vehicle

6  as it took the government in 1971.[20]  *See W. Watersheds Project v. Kraayenbrink*, 632

7  F.3d 472, 492 (9th Cir. 2011) (affirming holding of arbitrary decision where agency

8  "offered no reasoned analysis whatsoever in support of its conclusion").  That

9  arbitrary evaluation materially impacted the award decision and prejudiced SpaceX.

10  (Tab 134 at 33 (███████████████████████████████████████████

11  ████████████████████████████████████████).)

## III. SPACEX IS ENTITLED TO INJUNCTIVE RELIEF

13       SMC does not contest that SpaceX satisfies the factors for injunctive relief, and

14  offers no evidence of counterbalancing harm.  Instead, SMC urges "remand to the

15  agency." (Gov.Br. 43-44.)  Despite attempts to avoid "the presumption of vacatur"

16  that "normally accompanies a remand," SMC fails to even argue much less evidence

17  that equity warrants such extraordinary action in this case.  *All. for the Wild Rockies*

18  *v. United States Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018).

19       Intervenors belittle SpaceX's irreparable harm and request for a full remedy.

20  But, courts routinely recognize that a contractor's "denial of the right to have its bid

21  fairly and lawfully considered constitutes an irreparable injury."  *Dairy Maid Dairy,*

22  *Inc. v. United States*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993); *Palantir USG, Inc. v.*

23  *United States*, 129 Fed. Cl. 218, 294-95 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).

24  SpaceX presented proof of this harm (SpX.Br. 34-35), and Defendants have not

25

26  _____

[20] SMC's Opposition admits that the Agency found that the Starship's "████████████
27  █████████████████████" and that SpaceX proposed an "█████████████████████
28  ████████"  (Gov.Br. 25 (internal quotation marks omitted).)  Yet, SMC did not factor these
discriminators into its schedule assessment.

- 23 -

████ REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – ████
████████████████████████████████████████████

refuted it.   Instead, Blue Origin admits SpaceX suffered harm, but suggests an
injunction will not remedy SpaceX's harm (BO.Br. 33 ("Unfortunately, these
purported harms have already occurred...").)   Orbital urges the Court to limit
SpaceX's relief to bid and proposal costs. (Orb.Br. 3-4.) Intervenors' arguments are
unfounded. Whether SpaceX has contracted with SMC in the *past* and continues to
*independently* develop its prototype launch solutions *without valuable LSA
partnership* misses the point. (ULA.Br. 41-42; Orb.Br. 17.)   The LSAs are not
ordinary development contracts; they are partnership agreements that commit SMC
to work hand-in-glove with the awardees to craft the systems that SMC will purchase
for decades.   Without injunctive relief, SpaceX will not attain those non-monetary
benefits, and SpaceX's direct competitors will benefit long after the Phase 2 award.
To be sure, the anticompetitive award decision has already and continues to harm
SpaceX, but SMC-input delayed is better than SMC-input denied.   No money
damages can cure SpaceX's loss (or its competitors' undue gain) of the LSA
partnership. *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 386 (D.D.C.
2017) (bidder irreparably harmed where injury "is certain but difficult to value").

The balance of harms and public interest also weigh in favor of injunction. This
Court has options for crafting appropriate injunctive relief. *See California v. Azar*,
911 F.3d 558, 584 (9th Cir. 2018).   If this Court remands for SMC to reconsider
whether SpaceX should receive an LSA, Defendants suffer no hardship. Even if SMC
reopens the entire competition on remand, the balance of harm still favors injunction.
The primary harm Intervenors (but not SMC) claim is potential "waste of resources"
from cancelling an LSA before completion. (Orb.Br. 13-14; ULA.Br. 42-43; BO.Br.
34-35.)   But SMC anticipated and advised all competitors of this exact result in the
RFP, which makes clear that LSA funding terminates if the recipient does not win a
Phase 2 award. (Tab 38 at 1261.)   Therefore, SMC and the awardees have already
accepted the risk that at least one and perhaps two of the three LSA awards will be
terminated early. *See Mark Dunning Indus., Inc. v. Perry*, 890 F. Supp. 1504, 1518

- 24 -

1    (M.D. Ala. 1995).  Moreover, each LSA provides SMC the right to terminate "for any

2    reason" without liability for any termination costs.  (*See e.g.*, Tab 138 at 41779.)  And,

3    unlike Intervenors, SMC tacitly recognizes its own delays contributed to the time that

4    has passed since award.  Nevertheless, SpaceX has diligently pursued its rights with

5    SMC (and in the courts) since the improper award decision, justifying injunctive

6    relief.  *See, e.g., Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 844

7    (D.C. Cir. 1982) (reversing denial of injunctive relief and noting "it would be an

8    injustice to unsuccessful bidders if [the courts] penalized them for exhausting

9    administrative remedies").

10          Further, no Defendant offers evidence of the time required to reevaluate

11   proposals (common relief), so the suggestion that a reevaluation would "seriously"

12   delay performance is unfounded.  Even if they had, SMC's backup plan makes clear

13   that it has other resources to meet its most urgent operational needs, and the injunction

14   of the LSA awards will not stop the Phase 2 competition.  (ECF 51 at 30 (government

15   stating that the LSA and Phase 2 competitions are "not 'mutually dependent'").)

16   Accordingly, the relief SpaceX seeks furthers the public interest in ensuring

17   government award decisions follow the law.  *Seattle Audubon Soc'y v. Evans,* 771 F.

18   Supp. 1081, 1096 (W.D. Wash.), *aff'd,* 952 F.2d 297 (9th Cir. 1991); *Mark Dunning*

19   *Indus., Inc.*, 890 F. Supp. at 1518; *Dairy Maid Dairy, Inc.*, 837 F. Supp. at 1381.

20   **IV.  CONCLUSION**

21          For the reasons detailed above, the Court should grant judgment in SpaceX's

22   favor on the Certified Administrative Record.

23   Dated: January 31, 2020              ARNOLD & PORTER KAYE SCHOLER LLP

24                                        By: */s/  Craig A. Holman*
25                                             Craig A. Holman (*admitted pro hac vice*)

26                                             Attorney for Plaintiff
                                               *Space Exploration Technologies Corp.*
27

28

- 25 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### PROOF OF SERVICE

I hereby certify that on this 31st day of January 2020, I caused a true and correct copy of the foregoing Sealed Reply in Support of Motion for Judgment on the Certified Administrative Record to be served by email on:

Joseph Evan Borson
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
Email: joseph.borson@usdoj.gov
*Counsel for United States of America*

Scott E. Pickens
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel: 202-371-6349
Fax: 202-289-1330
Email: Scott.Pickens@btlaw.com
*Counsel for Blue Origin, LLC*

Todd R. Steggerda
McGuireWoods LLP
2001 K Street, N.W., Suite 400
Washington, D.C. 20006
Tel: 202-857-2477
Fax: 202-828-2968
Email: tsteggerda@mcguirewoods.com
*Counsel for United Launch Services, LLC*

REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE CERTIFIED RECORD – █████

Kevin P. Mullen
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel:  202-887-1500
Fax:  202-887-0763
Email: KMullen@mofo.com
*Counsel for Orbital Sciences Corporation*

Dated:  January 31, 2020          ARNOLD & PORTER KAYE SCHOLER LLP


By:  */s/ Craig A. Holman*
     Craig A. Holman (*admitted pro hac vice*)

     Counsel for Plaintiff
     *Space Exploration Technologies Corp.*