**Redacted Version**

1  KEVIN M. LALLY (SBN 226402)
   klally@mcguirewoods.com
2  McGUIREWOODS LLP
   Wells Fargo Center, South Tower
3  355 S. Grand Ave., Suite 4200
   Los Angeles, California 90071-3103
4  Telephone:  213.457.9862
   Facsimile:   213.457.9882
5
6  TODD R. STEGGERDA (*Pro Hac Vice*)
   tsteggerda@mcguirewoods.com
7  2001 K Street N.W.
   Washington, D.C. 20006-1040
8  Telephone:  202.857.1700
   Facsimile:   202.857.1737
9  Attorneys for Defendant-Intervenor United Launch Services, LLC

10           **UNITED STATES DISTRICT COURT**

11           **CENTRAL DISTRICT OF CALIFORNIA**

12                **WESTERN DIVISION**

13  Space Exploration Technologies Corp.,       No. CV 19-7927-ODW (GJS)
                                                 Honorable  Otis D. Wright II
14              Plaintiff,
                                                 ███████  **SUR-REPLY OF**
15         v.                                    **DEFENDANT-INTERVENOR,**
                                                 **UNITED LAUNCH SERVICES,**
16  United States of America,                    **LLC, IN OPPOSITION TO**
                                                 **PLAINTIFF'S MOTION FOR**
17              Defendant,                       **JUDGMENT ON THE CERTIFIED**
                                                 **ADMINISTRATIVE RECORD**
18         v.
                                                 Hearing Date:  March 2, 2020
19  Blue Origin, LLC, *et al.*,                  Hearing Time: 1:30 p.m.
                                                 Courtroom:      5D, 5th Floor
20              Defendant-Intervenors.                           First Street Courthouse
                                                                 350 W. First Street
21                                                               Los Angeles, CA 90012

22

23

24  ███████████████████████████████████████████████████████████

25                    ████████████████████████

26

27

28

[Caption page continued]

EDWIN O. CHILDS (*Pro Hac Vice*)
echilds@mcguirewoods.com
ABRAM J. PAFFORD (*Pro Hac Vice*)
apafford@mcguirewoods.com
NATHAN R. PITTMAN (*Pro Hac Vice*)
npittman@mcguirewoods.com
KARLEE S. BLANK (*Pro Hac Vice*)
kblank@mcguirewoods.com
BLAKE R. CHRISTOPHER (*Pro Hac Vice*)
bchristopher@mcguirewoods.com
2001 K Street N.W.
Washington, D.C. 20006-1040
Telephone:   202.857.1700
Facsimile:    202.857.1737
Attorneys for Defendant-Intervenor United Launch Services, LLC

1

ULS' ████████ SUR-REPLY IN OPP. TO PLAINTIFF'S MOT. FOR JUDGMENT ON THE CERTIFIED RECORD

1

# **TABLE OF CONTENTS**

2

3   I.    INTRODUCTION ..................................................................................... 1

4   II.   ARGUMENT ............................................................................................. 3

5        A.    The LSA Award Decision Did Not Contravene Congressional
              Policy .............................................................................................. 3

6

7        B.    The Air Force Reasonably Evaluated Category A/B Schedule
              Risk ................................................................................................ 6

8        C.    The Air Force Reasonably Evaluated SpaceX's Proposal .................... 7

9        D.    SpaceX's Cost Arguments Have No Merit .......................................... 11

10       E.    SpaceX Is Not Entitled to Injunctive Relief ........................................ 15

11  III.  CONCLUSION ....................................................................................... 15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ULS' ███████ SUR-REPLY IN OPP. TO PLAINTIFF'S MOT. FOR JUDGMENT ON THE CERTIFIED RECORD

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Banknote Corp. of Am., Inc. v. United States*,
   365 F.3d 1345 (Fed. Cir. 2004) ...................................................................... 7

*Blue & Gold Fleet, L.P. v. United States*,
   492 F.3d 1308 (Fed. Cir. 2007) ...................................................................... 6

*City & Cnty. of San Francisco v. United States*,
   130 F.3d 873 (9th Cir. 1997) .......................................................................... 3

*C.S. McCrossan Constr., Inc. v. Minn. Dep't of Transp.*,
   946 F. Supp. 2d 851 (D. Minn. 2013) ............................................................ 6

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ........................................................................ 11

**Statutes**

51 U.S.C. § 50101 ................................................................................................ 6

51 U.S.C. § 50131 ................................................................................................ 6

Fiscal Year 2017 National Defense Authorization Act ("2017 NDAA"),
   Pub. L. No. 114-328, 130 Stat. 1999  (2016) ................................................ 6

Fiscal Year 2018 National Defense Authorization Act ("2018 NDAA"),
   Pub. L. No. 115-81, 131 Stat. 1283 (2017) ................................................... 4

## I.   INTRODUCTION

In this Launch Service Agreement ("LSA") competition, the Air Force relied on its technical expertise in a thorough assessment of competing proposals for the development of next generation space launch systems, carefully evaluating each proposed solution pursuant to the detailed framework established by the Request for Proposals ("RFP").   The Government has continued its rigorous approach in addressing SpaceX's Administrative Procedure Act ("APA") challenge, offering a compelling and comprehensive rebuttal to SpaceX's inaccurate and unpersuasive claim that the Air Force's well-grounded exercise of its technical judgment and administrative discretion was somehow arbitrary, capricious, or contrary to law.

SpaceX's reply breaks no new ground and instead repeats various assertions already addressed and rebutted by the Government and the intervenors.   As the Government's sur-reply notes, SpaceX has a tendency to distort portions of the record – the RFP, competing proposals, evaluation documents, and governing statutes – in an effort to create support for arguments that otherwise have no foundation.   (Gov. Sur-Reply ("Gov. SR") 1-2.)   Specific as to the award to ULS, SpaceX supplements these tactics by simply ignoring the arguments and record materials that provide strong support for the Air Force's decision to include ULA's Vulcan launch vehicle as part of its LSA portfolio decision.

The core themes in SpaceX's reply brief echo the flawed approach of its initial motion.   SpaceX insists the Air Force's award violated "Congressional direction" (SpaceX Reply 6-10), while refusing to acknowledge that (a) the broad Congressional objectives it invokes cannot be applied apart from or in contradiction to the RFP evaluation criteria; (b) Vulcan constitutes a "commercially available space launch vehicle," however defined; and (c) the award fosters "assured access to space" by having ULS' "Low" risk, comprehensive solution in the portfolio, improving the odds of successful launches across the full range of national security space ("NSS") orbits, including the most difficult Category C missions.

1

1    SpaceX's reply fares no better with its attacks against the Air Force's

2    thoroughly-documented risk evaluation.   As the Government and ULS have

3    explained, the Air Force did not "improperly discount" Category A/B mission risks

4    because (1) it properly ████████████████████████████████████████████████

5    ████████████████████████, and (2) there is no evidence its final award decision

6    incorporated or depended upon the supposed "buy-down" plan that so preoccupies

7    SpaceX.  (Gov. SR 6-8; ULS Br. 26-28.)  The substantial record supports the Air

8    Force's conclusion that SpaceX's Starship presented "████████████████████████

9    ████████████████████."   (Final Evaluation Document ("FED"), Tab 132, 41651.)

10   Indeed, as an experimental Mars rocket with novel capabilities ████████████████

11   ████████████████s, Starship earned ████████████████████████████████████████

12   ████████████████.   Of these ████ Significant Weaknesses, SpaceX's reply says

13   virtually nothing about ████ of them ████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████).  (*See* ULS Br. 30-32.)  On the

16   remaining ████ SpaceX's reply mischaracterizes the RFP, misstates the content of

17   its proposal, and misapprehends the rationale underlying the Air Force's risk

18   evaluation. (Gov. SR 8-11.)

19   Finally, the Government's sur-reply confirms the key flaw in SpaceX's

20   challenge to the Air Force's cost evaluation: the RFP specifically required that

21   certain costs be excluded when calculating the "projected Total Costs" of a proposed

22   solution, and all the costs SpaceX claims the Air Force "missed" are encompassed

23   within one or more of these exclusion categories.  (Gov. SR 11-13.)

24   The bottom line is that SpaceX's belated attempts to second-guess the Air

25   Force's painstaking evaluation process lack merit.   As to the Air Force's well-

26   reasoned decision to award an LSA to ULS, SpaceX has almost nothing to say.  It

27   offers no challenge to the multiple strengths assigned to ULS' proposed Vulcan

28   solution, and no reason to question the Air Force's expert technical evaluators, who

concluded that Vulcan provides a "low risk, high confidence launch capability" making it "the most advantageous proposal" among all offerors. (FED, Tab 132, 41439; Portfolio Recommendation, Tab 135, 41742.) SpaceX's motion should be denied, and its APA challenge dismissed with prejudice.

## II.    ARGUMENT

SpaceX's arguments amount to a post-hoc disagreement with the manner in which the Air Force articulated its needs through the RFP, formulated the RFP evaluation criteria, and exercised its technical judgment and expertise in assessing proposals under this well-defined criteria. Such disagreement is insufficient to vacate agency action under the APA. *See City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 881 (9th Cir. 1997) (affording agencies substantial discretion in using expertise to determine what is most advantageous for their needs).

**A.    The LSA Award Decision Did Not Contravene Congressional Policy**

SpaceX's "Congressional direction" arguments return to the same themes it attempted to advance in its opening brief, again claiming the Air Force award decision is somehow inconsistent with broad Congressional policy concerning commercial availability, "assured access to space," and curtailment of reliance on Russian-made rocket engines. (SpaceX Reply 7-10.) These arguments have not become more persuasive the second time around. It bears emphasis that SpaceX has never acknowledged a fundamental flaw in its "Congressional direction" arguments: "commercial availability" and "assured access to space" are *not* part of the detailed comparative evaluation framework described in the RFP. The RFP provided no mechanism for rating offerors based upon perceived degrees of relative success in relation to commercial availability and assured access to space. SpaceX's suggestion that the Air Force should have used an amorphous assessment of these criteria to substitute for or override the ratings and rankings earned by each offeror under the RFP's actual comparative evaluation framework would have resulted in a clear violation of the RFP's ground rules.

***Commercial Availability.***   The Government explains why SpaceX's self-serving attempt to define "commercial" solutions is contradicted by statutory language establishing the characteristics of a "commercial" provider in the context of federal space launch procurements. (Gov. SR 3-5 (citing 51 U.S.C. §§ 50101(1), 50131).)   The 2018 NDAA's goals concerning commercial availability and the RFP's plain language take a forward-looking approach, encompassing "*planned* commercially available space launch vehicles," 2018 NDAA § 1605(a)(1)(C), Pub. L. No. 115-81, 131 Stat. 1283 (2017) (emphasis added), and seeking "*new* and/or upgraded launch system solutions" (RFP, Tab 38, 1260 (emphasis added)).   This negates SpaceX's continued insistence that the use of its Falcon vehicle for commercial launches renders SpaceX uniquely "commercial" in a manner that should have dictated the outcome of the LSA competition.   The Air Force evaluation also accounted for the "commercial viability" policy concerns invoked by SpaceX and concluded that ULS (and the other awardees) met the RFP's "commercial availability" requirement because they certified that their proposed systems would be available to commercial purchasers and had provided projected commercial pricing and market forecasts as part of their proposals.   (Gov. SR 4 n.1.)

Moreover, no matter what definition of "commercial" one might employ, SpaceX cannot dispute that ULA's Vulcan launch vehicle (to use the wording of the 2018 NDAA and the RFP) is a "commercially available space launch vehicle[.]" 2018 NDAA § 1605(a)(1)(C); RFP, Tab 38, 1274.   With a diverse portfolio that includes a substantial number of civil and commercial launches, ULA has already sold two Vulcan certification flights to non-government customers.   (ULS Br. 21.) SpaceX concedes these facts and does not dispute that launch systems (such as Vulcan) that meet baseline commercial launch industry requirements and the more demanding NSS requirements are "dual use."   (FED, Tab 132, 41469.)

***Assured Access to Space.***   No one disputes that Congress has articulated a goal of achieving "assured access to space," or that the ongoing Phase 2 launch

4

1    service procurement (not at issue here) seeks to achieve that goal by awarding two

2    requirements contracts to providers capable of performing the full range of NSS

3    missions.  The LSA competition, however, facilitated the development of new or

4    upgraded domestic launch systems capable of meeting all NSS needs in advance of

5    Phase 2. (RFP, Tab 38, 1260.)  The Air Force's strategic approach for achieving this

6    goal of maturing new or upgraded launch systems is, in turn, reflected in the RFP's

7    competitive evaluation criteria, and these criteria (none of which were challenged in

8    a timely fashion by SpaceX) cannot be trumped by SpaceX's opinions concerning

9    what does and does not promote "assured access to space."

10         SpaceX's arguments boil down to the assertion that it could best achieve

11   assured access to space because it (a) had the best Category A/B solution; and (b)

12   did not rely on common components. (SpaceX Reply 8-10.)  Of course, as discussed

13   in ULS' brief, the Air Force's RFP prioritized comprehensive solutions that served

14   the full range of NSS requirements, and SpaceX fell short by proposing its ███████

15   risky, and expensive Mars spacecraft for the most difficult and challenging Category

16   C missions. (ULS Br. 22-28.)  The Government echoes these points, emphasizing

17   that the Air Force evaluated the collective mission risk posed by each proposal and

18   selected the portfolio most advantageous to meeting all NSS needs. (Gov. SR 5.)

19         As to common components, although SpaceX focuses on ULS' proposed use

20   of the BE-4 engine being developed by Blue Origin (SpaceX Reply 9), it still has

21   not identified any specific BE-4 technical risk it believes was overlooked.  This is

22   not surprising, as the Air Force evaluators did not identify meaningful technical or

23   schedule risks in relation to BE-4, concluding that BE-4 development efforts were

24   fully on track and finding no Weaknesses in relation to the BE-4 portion of Blue

25   Origin's proposal. (*See* FED, Tab 132, 41480, 41497.)  SpaceX's argument further

26   misconstrues an Evaluation Notice ("EN") in which the Air Force referenced█

27   ████████████████████████████. (SpaceX Br. 9.)  That EN addresses ████████

28   ████████████████████████████████████████████████████████████████

1 ███████████████████████████████████████████████.  (*See*
2 Blue Origin ENs, Tab 98, 30720.)   In the end, SpaceX's common components
3 argument is reduced to the suggestion that the RFP should have treated this supposed
4 "common component" risk as a higher priority, notwithstanding that the RFP
5 dictated otherwise.[1]  (ULS Br. 23, n.11.)[2]

6     ***Russian Engines.***   SpaceX continues to claim that the Air Force award
7 decision "thwarts Congressional direction to end reliance on Russian rocket engines
8 for NSS missions" (SpaceX Reply 10), theorizing that the awardees' launch vehicles
9 will not meet the Category A/B April 1, 2022 anticipated need date.  However, the
10 Air Force's expert technical evaluators determined otherwise, rating the ULS
11 proposal "Low" risk on this specific point.  (FED, Tab 132, 41460-61.)  Further,
12 SpaceX misstates the pertinent statutory requirement, which explicitly permits the
13 Department of Defense to procure launches using Russian engines through
14 December 31, 2022 (within certain numerical limitations).  2017 NDAA § 1602,
15 Pub. L. No. 114-328, 130 Stat. 199 (2016).  Thus, even if the LSA launch vehicles
16 were *not* ready by April 1, 2022, there is nothing that bars use of Russian engines to
17 perform NSS launches through the end of 2022.  The Air Force's award decision
18 should not be overturned because of a supposed Congressional directive neither
19 evaluated in the RFP nor present in the statute upon which SpaceX's argument relies.

20 **B.**    **The Air Force Reasonably Evaluated Category A/B Schedule Risk**

21     SpaceX remains fixated on isolated statements made by an Air Force official

---

[1] SpaceX's citation to an article from 2019 (SpaceX Reply 9, n.11) is outside the record and irrelevant, relating to launch vehicles other than the prototype here and post-dating the evaluation.

[2] Although SpaceX says it seeks merely to enforce the RFP rather than object to it, this is contradicted by SpaceX's initial claim that "the Agency should have amended" the LSA RFP to include evaluation criteria addressing common components risk.  (SpaceX Mot. 20.)  Contrary to SpaceX's assertions, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007) has been applied outside the Court of Federal Claims.  *See C.S. McCrossan Constr., Inc. v. Minn. Dep't of Transp.*, 946 F. Supp. 2d 851, 862 n.17 (D. Minn. 2013).

during discussions following the submission of initial proposals, insisting these statements reflected an Air Force strategy to "buy down" schedule risk through a back-up plan for purchasing Category A/B launch services.  (SpaceX Reply 10-13.) The problem for SpaceX, as the Government explains in detail, is that the final Air Force award decision and underlying evaluation documents upon which that decision was based contain no reference to this supposed "buy down" plan.[3]  (Gov. SR 6-8.)   And, the statements cited by SpaceX were made months *before* the submission of final proposals by each offeror.  (*Id.* 6-7.)  SpaceX presents no evidence that these final proposals had the same levels of perceived schedule risk referenced in initial discussions or that the Air Force sought  to use a "buy-down" plan to mitigate any residual risk.  Indeed, ULS' final proposal increased its Category A/B schedule margin ███████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████." (FED, Tab 132, 41455.)   SpaceX does not challenge this ███████████ and, because the RFP required either a Significant Weakness or multiple Weaknesses for a "Moderate" or "High" risk rating, ███████████████████████ in fact entitled ULS to a "Low" risk rating.  (*See* RFP, Tab 38, 1282.)

## C.       The Air Force Reasonably Evaluated SpaceX's Proposal

SpaceX's contentions concerning the significant technical and schedule weaknesses of its proposal continue to ignore the requirements of the RFP and the content of the Air Force's detailed and thorough evaluation.  The ████ Significant

---

[3] Even if the Air Force did consider the potential availability of non-LSA sources to meet near-term Category A/B needs, it would have had every right to use this consideration in its risk assessment when evaluating proposals. *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1357 (Fed. Cir. 2004).  SpaceX tries to co-opt this point, claiming the Air Force should have mitigated SpaceX's Category C risks by using other offerors' LSA solutions.  (SpaceX Reply 11 n.13.)  This makes little sense, because the alleged "buy down" plan relied on existing solutions, and there is no existing Category C solution aside from ULS' soon-to-be-retired Delta IV Heavy.

7

1   Weaknesses assigned to SpaceX can be placed into two categories – ██████

2   ████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ██████████████.  SpaceX does little to deny the existence of the risks identified in

5   the Air Force's evaluation, but instead argues the Air Force was required to *ignore*

6   costs and risks because to do otherwise would supposedly amount to an unstated

7   preference or requirement for government facilities and practices.  (SpaceX Br. 19.)

8   SpaceX is incorrect, and the RFP in fact required the Air Force to consider the

9   potential for "disruption of schedule, increased cost or degradation of performance"

10  when assessing risk.  (RFP, Tab 38, 1282.)  The Air Force properly identified and

11  evaluated the significant technical and schedule risks associated with novel and

12  unproven features of SpaceX's proposed Category C solution.

13      ***SpaceX's Significant Weaknesses*** ████████████████.  SpaceX complains

14  that the Air Force assigned a ████████████████████████████████████████

15  ████████████████████████████████████, accusing evaluators

16  of harboring an "████████████████████████████████████████████

17  ████████████████████."[4]  (SpaceX Reply 19.)  But, as the Government

18  observes, SpaceX "████████████████████████████████████████████

19  ██████████"  (Gov. SR 8.)  Unfortunately for SpaceX, "different" is not always

20  "better," as its approach involved (as the Government explains) "████████████

21  ████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████."'"  (*Id.*)

24  _____

25  [4] Contrary to SpaceX's claims, the ████████████████████ it received was not ████

26  ████████████████████████████████████████████████████.  (FED, Tab 132,

27  41586.)  The Air Force concluded that the nature ████████████████████████

    ████████████████ (*id.*), ████████████████████████████████████████

28  ████████████████.  (SpaceX Proposal, Tab 123, 39775-78.)

SpaceX also objects to the Air Force's assignment of a ███████████ arising from SpaceX's choice to ███████████████████, and its lack of a ████████████████████. The Air Force reasonably explained that SpaceX's decision to ███████████████████████████ would necessitate "████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████" and risked ████████████████████████ ████████████████████████████████████████████████ ████████████." (FED, Tab 132, 41588.) Remarkably, SpaceX also tries to blame the Air Force for SpaceX's own choice to ███████████████████████ ████████, claiming the ███████████████████████████ ██████████████████████. (SpaceX Reply 20.) This is particularly brazen, given that the record demonstrates the Air Force ████████████ ██████████████████████████. (*See* O8 [SpaceX] Rating Debrief 27 Jul @ 1600 20:40-22:34 Tab 101 ("██████████████████████ ███████████████████").) SpaceX cannot ███████████████ ████████████████████████████████████████████████ ██████, and then, simultaneously, ██████████████████████ ████████████████████████████████████████████████.

Finally, while SpaceX insists the Air Force was required to ██████ ███████████████████████ in lieu of an actual plan to meet the RFP requirement, ████████████████████████████████████████████ █████████████. (Air Force Resp. to SpaceX Debriefing Questions, Tab 146a, 42672-75.) This ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. (*Id.*)

***SpaceX's Significant Weaknesses*** ██████████████ SpaceX earned ██████

ULS' ██████████ SUR-REPLY IN OPP. TO PLAINTIFF'S MOT. FOR JUDGMENT ON THE CERTIFIED RECORD

1  Significant  Weaknesses  █████████████████████████████████████

2  ███████████████████████████████████████. (*See supra* at 2.)  As

3  to the ████ – a Significant Weakness for ██████████████████████

4  ███████████████████████████ – SpaceX avoids even acknowledging

5  the Air Force's rigorous technical analysis.  As to the single element that is addressed

6  by SpaceX, ████████████████████████████████████████████████

7  ███████████████████████████████████ (SpaceX Reply 21) ███████

8  ████████████████████████████████████████████████.

9      ULS' brief surveyed in some detail the key technical grounds for the Air

10  Force's conclusion on this point, including ████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  █████████████████████. (ULS Br. 32-31; FED, Tab 132, 41604, 41620-21.)  The

14  Government likewise details the Air Force's justifiable technical skepticism towards

15  SpaceX's claim that its "██████████" Starship would somehow mitigate the

16  development schedule risk arising from Starship's planned reusability, a concern

17  that SpaceX essentially ignores in its briefing.  (Gov. SR 9-10.)

18      SpaceX's suggestion that ULS' Category C solution presented its own

19  ████████████████████████████████████████████████ is entirely

20  unfounded.  Contrary to SpaceX's claims, ULS clearly proposed using ████████

21  ████████████████████. (ULS Proposal, Tab 120, 35229, 35254.)  ULS stated that ████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████. (*Id.* 35254

24  (stating that ██████████████████████████████████████████████████

25  ████████████████████████████████").)

26      Finally, SpaceX cannot overturn the results of a thorough competitive

27  evaluation process merely because it disagrees with the Space Shuttle analogy

28  suggested by Air Force evaluators in light of the well-documented technical

complexity and design risk associated with SpaceX's Mars spacecraft. (ULS Br. 33; FED, Tab 132, 41620.) SpaceX may dislike this comparison, but the second-guessing of a single analogy in a complex technical setting cannot provide a legitimate basis for vacating agency action under the APA's standard of review. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("Th[e] traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise.").

## D.     SpaceX's Cost Arguments Have No Merit

The Air Force determined that the cost of the SpaceX proposal – seeking $████████ in Government investment, the most expensive proposal submitted in the competition – was simply too high given the extraordinary risk of its Starship solution for Category C orbits. (FED, Tab 132, 41424.) Contrary to SpaceX's arguments, the Air Force also reasonably evaluated the cost of ULS' proposed Vulcan launch vehicle, properly applying three principal ground rules in the RFP:

- Offerors must "provide the total projected costs to complete the EELV Launch System Prototype, including all scope proposed in the SOW" (RFP, Tab 38, 1271);
- Offerors must exclude from "projected Total Costs" any "costs incurred before" February 21, 2018 (*id.* 1276); and
- Offerors must exclude from the "projected Total Costs" "[p]arallel research or investment" that would "be undertaken regardless of whether the proposed project proceeds" (*id.* 1277).[5]

████████████████. Although SpaceX continues to fixate on ULS' separate ELC contract, the reality (as confirmed by the Government's briefing) is that the specific scope of work under the most recent (2013) ELC contract related only to

---

[5] SpaceX asserts that exclusion of "[p]arallel research or investment" only applies to Company costs (SpaceX Reply 14), but there is nothing in the RFP to support this contention. The RFP is clear that this consideration pertains to the exclusion from all "Total Costs." (RFP, Tab 38, 1277.) Indeed, the exclusion of costs incurred prior to February 21, 2018 also applies to "Total Costs," and SpaceX effectively admits that this exclusion applies in equal measure to Government and industry costs. (SpaceX Reply 14-15.)

11

ULS' then-active fleet of NSS launch vehicles – Atlas V, Delta II, and Delta IV. The ELC contract, which originated in 2006 as part of Phase 1 of the Air Force's launch services acquisition plan, was not designed for the development of a next-generation launch vehicle like Vulcan. (ULS Br. 34-35; Gov. Br. 27-28.) Thus, the scope of work under the ELC contract was either too old to be included in Vulcan's costs or involved parallel research and investment specifically related to different launch systems. (*Id.*) There is nothing in the RFP requiring costs of launch vehicles *not* proposed under the LSA to be included when calculating LSA costs. Although SpaceX argues that both the ELC contract and the LSA were used for " ███ ████████████████████████████████████████████████████████ ██████ (SpaceX Reply 14-15), this shows only that such categories of costs are necessary to operate a launch system. Even if personnel who have historically worked on Atlas and Delta later work on the Vulcan development effort, that does not mean that routine or recurring ELC contract maintenance and operational costs relating to the *Atlas and Delta* launch vehicles are somehow transformed into *Vulcan* development costs. SpaceX's assertions otherwise do not make it so.

███████████████. The costs associated with certain components developed by a commercial supplier ████████ were also properly excluded from the ULS proposed government cost share. (ULS Br. 36; Gov. SR 12-13.) SpaceX continues to assert that the government funded RUAG's development efforts, suggesting for the first time that a ██████████████ may have been developed with government funds under the Atlas program. (SpaceX Reply 15-16.) SpaceX once again fails to produce any evidence for this claim, despite calling ULS' assertion to the contrary "incredible." (*Id.* 16, n.17.) Nothing in the record suggests that government funding was used to develop ████████████████████████████ ███████████████████. Furthermore, even if any components were developed for the Atlas rocket, such cost would have been properly excluded as "[p]arallel research or investment" that would "be undertaken regardless of whether

1   the proposed project proceeds." (RFP, Tab 38, 1277.) As to Vulcan specifically,

2   the record demonstrates that ULS took into account the costs of ████████

3   ████████████████████ (ULS Proposal, Tab 120, 35377 (stating that

4   ████████████████████████████████████████████████

5   ████████████████████████████████████")).

6       ***BE-4 Development***. SpaceX asserts that ULS' proposal should have included

7   all BE-4 development costs. Although SpaceX engages in a confusing and

8   speculative analysis of Blue Origin's statement of work in an effort to conjure up

9   additional government costs not already accounted for, both Blue Origin's proposal

10  and the Air Force's evaluation contradict SpaceX's claims. (*See* Blue Origin

11  Compliance ENs, Tab 98, 30705; Blue Origin Proposal, Tab 121, 36788; FED, Tab

12  132, 41515-18.) The Air Force properly accounted for BE-4 development costs as

13  they pertain to ULS, ██████████████████████████████████

14  ████████████████████████████████████. (ULS

15  Br. 36-37; Gov. SR 13-14.) SpaceX argues that by not double-counting the BE-4

16  development cost, the Air Force somehow "presupposed an LSA award to Blue

17  Origin during its evaluation of ULA[.]" (SpaceX Reply 17.) This makes little sense,

18  as there is no evidence that Blue Origin would suddenly halt BE-4 development and

19  abandon hundreds of millions of dollars in sunk costs in the absence of an LSA

20  award. It therefore was entirely appropriate for the Air Force to allocate ██████

21  ████████████████████████, rather than improperly double-

22  counting such costs ██████████████████████████████.

23      ***The Air Force Evaluated SpaceX's Costs Equally***. SpaceX's challenge to

24  the Air Force's inclusion of ████████████████ ignores the RFP, which

25  required it to propose a complete launch system, including ██████████████

26  ██████████. (RFP, Tab 38, 1269 (citing SPRD, Tab 18, 757).) The fact that

27  the Phase 2 procurement may not have required ████████████████ is

28  irrelevant, and indeed the Phase 2 RFP was not published until more than 6 months

*after* the LSA award decision.  (Gov. SR 14.)  The Air Force also advised SpaceX prior to submission of final proposals that "███████████████████████████ ████████████████████████████████████████."  (SpaceX Final Negotiation Memorandum, Tab 131, 41391.)  And contrary to SpaceX's allegation of unequal treatment, the Air Force treated Blue Origin the same way, ████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████."  (Blue Origin Final Negotiation Memorandum, Tab 129, 41334.)

SpaceX also incorrectly claims the Air Force failed to consider the "most expensive scenario" for ULS, as it pertains to ███████████████████.  SpaceX now asserts that language in ULS' proposal ████████████████████████████ ██████████████████████████████" somehow means the Air Force will be forced to invest some undefined additional costs later on.  (SpaceX Reply 18.) However, the document cited for this proposition disproves SpaceX's point. Specifically, the Air Force (1) ███████████████████████████████████████ ████████████████████████████, and (2) ████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████. (ULS Compliance ENs, Tab 97, 30566.)  In its final proposal, ULS properly ███████████████████████████████████████████████████████████████████████ ██████████████████████████  Moreover, the LSA establishes a fixed government investment amount, meaning that ULS unilaterally bears the risk of increased costs incurred in LSA performance.  (ULS Notification of Award, Tab 140, 42320-21.)

Finally, SpaceX's argument that the Air Force should have counted the supposed "costs" of buying down Category A/B risk in the awardees' proposals is incorrect.  As explained above, there was no "buy down" plan (*supra* at 7), and, in any event, the Air Force was not actually procuring launch services through the LSA competition.  (ULS Br. 40-41.)  The RFP simply did not require LSA offerors to include costs relating to performance of tasks in a later procurement.



14

**E.  SpaceX Is Not Entitled to Injunctive Relief**

SpaceX has not demonstrated any entitlement to injunctive relief.  SpaceX asks this Court, more than a year after the LSA awards, to suspend ongoing development programs, even though offerors (presumably including SpaceX) have already submitted proposals in Phase 2, the competition for which these prototypes were developed.  SpaceX fails to justify this extraordinary remedy under the factors required for permanent injunctive relief.  (ULS Br. 41-43.)  The record also shows that SpaceX already works closely with the Air Force, and will obtain no unique benefit from belated award of an LSA, especially where the Phase 2 proposal process is already complete.  Finally, as the Government noted, the Starship that exists today has undergone significant design changes.  (Gov. Br. 44.)  It would be futile to require re-evaluation of proposals for a solution that no longer exists as proposed.

## III.   CONCLUSION

For the reasons detailed above and in ULS' Opposition to Plaintiff's Motion for Judgment on the Certified Administrative Record (ECF 180), ULS respectfully requests that this Court deny SpaceX's Motion for Judgment on the Administrative Record, dismiss the Supplemental Complaint with prejudice, and enter judgment in favor of the Defendant and Intervenor-Defendants.

MCGUIREWOODS LLP

TODD R. STEGGERDA

Dated:  February 14, 2020          By:     */s/ Kevin M. Lally*
                                                    KEVIN M. LALLY

Counsel for Intervenor-Defendant
*United Launch Services, LLC*

15

**PROOF OF SERVICE**

I hereby certify that on this 14th day of February, 2020, I caused a true and correct copy of the foregoing Sealed Sur-Reply of United Launch Services, LLC, in Opposition to Plaintiff's Motion for Judgment on the Certified Administrative Record and Memorandum of Points and Authorities to be served by email on:

Joseph E. Borson
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
Email: joseph.borson@usdoj.gov
*Counsel for United States of America*

Scott E. Pickens
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel: 202-371-6349
Fax: 202-289-1330
Email: Scott.Pickens@btlaw.com
Counsel for Blue Origin, LLC

Kevin P. Mullen
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel: 202-887-1500
Fax: 202-887-0763
Email: KMullen@mofo.com
*Counsel for Orbital Sciences Corporation*

1
2
3
4
5
6

Craig A Holman
Arnold and Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
202-942-5722
Fax: 202-942-5999
Email: craig.holman@arnoldporter.com
*Counsel for Space Exploration Technologies Corp.*

7   Dated:  February 14, 2020          By:   */s/ Kevin M. Lally*
8                                             KEVIN M. LALLY

9                                             Counsel for Intervenor-Defendant
10                                            *United Launch Services, LLC*

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ULS' ███████ SUR-REPLY IN OPP. TO PLAINTIFF'S MOT. FOR JUDGMENT ON THE CERTIFIED RECORD