1 **MORRISON & FOERSTER LLP**
KEVIN P. MULLEN (*admitted pro hac vice*)
2 KMullen@mofo.com
2000 Pennsylvania Ave., N.W.
3 Washington, D.C. 20006-1888
Telephone: 202.887.1500
4 Facsimile: 202.887.0763

5 Attorney for Defendant-Intervenor
Orbital Sciences Corporation
6

7

8 UNITED STATES DISTRICT COURT

9 CENTRAL DISTRICT OF CALIFORNIA

10 WESTERN DIVISION

11

12 SPACE EXPLORATION TECHNOLOGIES CORP., | Case No. 2:19-cv-07927-ODW-GJS

13 | Honorable Otis D. Wright II

14 Plaintiff, | **ORBITAL SCIENCES CORPORATION'S SUR-REPLY TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED RECORD**

15 v.

16 UNITED STATES OF AMERICA,

17 Defendant. | Date: March 2, 2020
Time: 1:30 p.m.
18 and | Ctrm: 5D, 5th Floor
First Street Courthouse
19 UNITED LAUNCH ALLIANCE, LLC, BLUE ORIGIN, LLC, and ORBITAL | 350 W. First Street
Los Angeles, CA 90012
20 SCIENCES CORPORATION,

21 Defendant-Intervenors.

22

23

24

25

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27

28

**ORBITAL SCIENCES CORPORATION'S** ▮▮▮ **SUR-REPLY TO PLAINTIFF'S MJAR –**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

DISCUSSION ......................................................................................................... 2

    I.    The Balance of Harms and Public Interest Weigh Overwhemlingly Against Injunctive Relief. ................................................................. 2

    II.    SpaceX's Statutory Claims Are Procedurally and Substantively Defective. ........................................................................................... 4

    III.    The Air Force's Cost Evaluation Was Fair and Reasonable. .................. 7

        A.    The Air Force Properly Evaluated ELC Contract Costs. ............. 8

        B.    The Air Force Properly Evaluated Costs for Payload Fairings and BE-4 Engine Development. ................................................... 9

        C.    The Air Force Did Not Engage in Disparate Treatment. .......... 10

    IV.    The Air Force Reasonable Evaluated Risks in SpaceX's Proposal. ..... 11

        A.    The Air Force Properly Considered Schedule Risk for Category A/B Launches. ............................................................................. 11

        B.    The Air Force Reasonably Identified Risks in SpaceX's Technical Approach. .................................................................... 14

        C.    The Air Force Understood the Significant Risk SpaceX's Starship Poses to Category C Launches. ................................... 14

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*COMINT Sys. Corp. v. United States,*
   700 F.3d 1377 (Fed. Cir. 2012) .................................................................. 13

*Hazardous Waste Treatment Council v. Thomas,*
   885 F.2d 918 (D.C. Cir. 1989) ...................................................................... 5

*Lexmark Intern. Inc. v. Static Control Components, Inc.,*
   572 U.S. 118, 134 S. Ct. 1377 (2014) .......................................................... 5

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ......................................................................................... 4

**Statutes**

10 U.S.C. § 2273 ............................................................................................. 3, 5

28 U.S.C. § 2401(a) ............................................................................................. 7

28 U.S.C. § 2501 .................................................................................................. 7

# INTRODUCTION

Space Exploration Technologies Corp. ("SpaceX") has failed to present any justifiable basis for the Court to disrupt the Launch Services Agreements ("LSAs") awarded by the United States Air Force ("Air Force" or "Agency"). Not surprisingly, SpaceX disagrees with the Air Force's decision to award LSAs to its competitors United Launch Alliance ("ULA"), Blue Origin, LLC ("Blue Origin"), and Orbital Sciences Corporation ("Orbital"). But SpaceX's mere disagreement is insufficient to overturn the Agency's reasoned judgment, particularly where, as here, that judgment requires specialized technical expertise and implicates national security.

At the culmination of a thorough, interactive, and well-documented evaluation process, the Air Force chose to invest in LSAs with ULA, Blue Origin, and Orbital because it reasoned that portfolio "represents the best value to the Government, both technically and financially," and "is most advantageous in achieving the goal of assured access to space via two or more domestic commercial launch providers that also meet National Security Space requirements on the required timeline." AR Tab 136 at 41753. SpaceX's proposal, which relied heavily on the company's ability to develop its Mars-bound Big Falcon Rocket ("BFR") or "Starship" vehicle in the next five years, was "innovative," but introduced "significant risk to schedule" and ▮ ▮. *Id*.

In its Reply, as in its Motion for Judgment on the Administrative Record ("MJAR"), SpaceX does not seriously challenge the substance of the Air Force's conclusions. Instead, SpaceX tortures broad statutory policies to fabricate requirements that are absent from the evaluation criteria announced in the Air Force's request for proposals ("RFP"). SpaceX mischaracterizes the administrative record, for example, in suggesting the Air Force's final evaluation relied on an "undisclosed backup plan" when evaluating schedule risks for Category A/B launches, even though there is no reference to this "backup plan" anywhere in the final evaluation

1

record. Yes, Air Force personnel, during negotiations and before final proposals were even submitted, suggested that the Agency could mitigate risk by relying on its existing sources for Category A/B launches. But this rationale (1) was not a basis for the Agency's final decision, (2) is entirely consistent with the evaluation criteria in the RFP, and (3) was well known by SpaceX during its pre-award negotiations with the Air Force – yet SpaceX raised no objection then.

In addition to the shortcomings in its merits arguments, SpaceX has utterly failed to meet its burden of justifying the injunctive relief it seeks. SpaceX has not proven the Air Force's LSA award decision to be irrational or unlawful, but even if it had, SpaceX has not articulated any credible reason for this Court to insert itself into the Air Force's national security space launch mission and disrupt the LSA development efforts that began more than 16 months ago. The relief SpaceX ostensibly seeks – its own LSA award – is futile in light of the Air Force's impending launch services procurement contract awards that, whether SpaceX wins or loses, will obviate SpaceX's alleged competitive harms. On the other hand, the relief SpaceX actually seeks – disruption of the Air Force's and its competitors' investment in competing launch systems – risks wasting hundreds of millions in taxpayer and industry investments and will have grave consequences for national security.

For these reasons, SpaceX's motion for judgment on the administrative record and its request for injunctive relief should be denied.

## DISCUSSION

To prevail, SpaceX must show not only that the Air Force's source selection decision was arbitrary, capricious, or unlawful, but also that SpaceX has incurred irreparable harm as a result, and that the balance of harms and public interest warrant injunctive relief. SpaceX has done none of these.

**I.     THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH OVERWHEMLINGLY AGAINST INJUNCTIVE RELIEF.**

More than 16 months ago, the Air Force entered into three agreements for the

2

1  development of launch systems to deliver critical national security payloads into
2  orbit, in furtherance of its Congressionally-mandated mission to achieve assured
3  access to space through two or more domestic commercial launch service providers.
4  *See* AR Tab 136 at 41753; 10 U.S.C. § 2273. SpaceX asks this Court to interfere
5  with that mission by halting the Government's investment in alternative launch
6  systems and by forcing the Air Force to reopen a competition and reevaluate
7  proposals that are years out of date. In its Reply, like its MJAR, SpaceX fails to
8  explain why the Court should do so in the face of overwhelming harm to the Air
9  Force, the LSA awardees, and the public interest.

10     ***First***, SpaceX fails to show injunctive relief is necessary to prevent irreparable
11  harm. SpaceX alleges that, without injunctive relief, it will be deprived of the
12  relationships its competitors are building with the Air Force, hamstringing SpaceX's
13  ability to compete for the Phase 2 launch services procurement ("LSP") contracts.
14  Pl.'s Reply 23-24. Yet meanwhile, all competitors, including SpaceX, just re-
15  submitted proposals in the LSP competition, which will be completed in just a few
16  months, long before SpaceX could even begin performing an LSA. *See* Orbital Resp.
17  7, ¶ 20. Thus, the harm SpaceX describes is fleeting, and the relief it seeks futile.

18     ***Second***, by contrast, if SpaceX is granted the relief it seeks, severe harm will
19  be done to the United States and to SpaceX's competitors. Without explanation,
20  SpaceX claims the Defendants will "suffer no hardship" if the Court upends the
21  existing LSA awards. Pl.'s Reply 24. This is flatly contradicted by the substantial
22  evidence before the Court. As Orbital noted in its Response Brief, the Government
23  has invested more than ▮▮▮▮ in Orbital's LSA alone, while Orbital has
24  invested approximately ▮▮▮▮ of its own resources. *See* Orbital Resp. 6, ¶ 12.
25  Moreover, a delay or cancellation of Orbital's LSA will have a grave impact on
26  Orbital's skilled workforce. *Id.* ¶¶ 14-15. These harms are not unique to Orbital's
27  LSA – SpaceX's requested relief would impose the same harms on ULA and Blue
28  Origin too.

3

ORBITAL SCIENCES CORPORATION'S          RESPONSE TO PLAINTIFF'S MJAR

SpaceX asks the Court to ignore these harms because the LSAs contemplate termination upon award of the LSP contracts or for the Government's convenience. Pl.'s Reply 24-25. The mere fact that the Air Force can terminate one or more of the LSAs does not negate the harm (and the harm to the LSA participants) if this Court forces it to do so. Ironically, the fact that one or more LSAs will terminate upon award of the LSP contracts only highlights the futility of the relief SpaceX requests. Indeed, SpaceX's harm is illusory in light of the impending LSP awards: if SpaceX is given an LSA and then loses the LSP competition, its LSA immediately will terminate; and if SpaceX wins the LSP competition, it will have overcome any supposed competitive harm. There can be no question that the harm done to the United States and the LSA participants by enforcing injunctive relief at this stage greatly outweighs any minimal harm to SpaceX that might be avoided by injunctive relief so close to LSP contract awards.

*Third*, the public interest also lies overwhelmingly against the Court interfering with the United States' national security mission. SpaceX glosses over the "great deference [owed] to the professional judgment of military authorities concerning the relative importance of a particular military interest," asking this Court instead to substitute its judgment for that of the Agency officials. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In cases such as this, where injunctive relief implicates national defense and security, courts routinely deny injunctive relief out of concern for the public interest and national welfare. *See* Orbital's Resp. 11-12 (collecting cases). SpaceX has not presented any reason for this Court to make an exception here.

## II. SPACEX'S STATUTORY CLAIMS ARE PROCEDURALLY AND SUBSTANTIVELY DEFECTIVE.

SpaceX repeatedly ties its request for relief to the assertion that the Agency's award decisions "violate[] Congress's mandate." *See* Compl. 79; *see also id.* 4, 6, 10, 15, 40, 75, 77; Pl.'s MJAR 3, 18, 24. The "mandate" from Congress the Agency

4

purportedly violates derives from precatory language in appropriations statutes. In its opposition to SpaceX's MJAR, Orbital demonstrated that SpaceX (i) does not have standing to the extent it seeks to enforce these statutory provisions and (ii) mischaracterizes as "congressional mandates" statutory language outlining Congressional policy with respect to assured access to space. *See* Orbital Resp. 22-24.

SpaceX's Reply addresses its standing problem with a strawman argument. SpaceX erroneously characterizes Orbital as challenging the unremarkable principle that agency action is presumptively reviewable. *See* Pl.'s Reply 6. This is not in dispute. The salient question is whether the court can reasonably assume that Congress authorized SpaceX to sue the Agency to adhere to Congressional direction to apply the policy and guidance espoused under 10 U.S.C. § 2273 or, on the other hand, whether SpaceX's interests are only marginally related to the statute's implicit purpose. *See Lexmark Intern. Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130, 134 S. Ct. 1377, 1389 (2014).

Congress enacted section 2273 to announce a public policy related to assured access to space, not to protect the commercial interests of competitors competing to provide such access. *See* Orbital Resp. 22-23 (citing *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C. Cir. 1989) (holding by analogy that such a challenger is not suitable because "[t]he interest of such a firm in profits is not limited by the public's need for its type of weapon, and notwithstanding the sometimes contrary impression one encounters, the annual defense appropriation is not passed in order to benefit defense contractors, benefit them though it may")). As such, SpaceX, as a matter of statutory interpretation, cannot be said to be within the zone of interests under section 2773 for purposes of an APA challenge in connection with the agency's LSA awards.

Moreover, as demonstrated in Orbital's Response, SpaceX mischaracterizes precatory language in section 2773 and other defense appropriation statutes as

5

congressional mandates or directives for the Agency, in essence, to effectively award all appropriations in connection with space-related launch services to SpaceX. *See* Orbital Resp. 23-24. Such a proposition is, of course, contrary to the discretion Congress delegated to the Agency to further its policies. *See id.*; Def.'s Resp. 35-37.

SpaceX has continuously tried to recast the Agency's requirement as one that compels award to SpaceX as the self-proclaimed sole commercial provider of launch services. As the Government correctly notes, "the LSA program is fundamentally a development effort" and, not surprisingly, the RFP conspicuously omits any express or implied requirement that the LSA awardees meet SpaceX's fictional and self-interested definition of "operational." *See* Def.'s Resp. 35-36. Plaintiff's arguments in this respect are based on repeated mischaracterizations of the RFP as a directed award based on notions of commercial maturity. As is plain in the RFP and elsewhere in the record, the purpose of the LSA is to "facilitate the ***development*** of at least three EELV Launch System prototypes as early as possible, allowing those ***to mature*** prior to a future selection of two NSS launch service providers." AR Tab 38 at 1260 (emphases added).

Finally, SpaceX embeds an untimely challenge to the RFP in its argument that the awards are contrary to law. Specifically, SpaceX challenges the Agency's decision to award to commercial companies that use common propulsion components. *See* Pl.'s Reply at 9. As the Government correctly notes and as is documented in the record, the Agency identified, evaluated, and "sufficiently mitigated" any potential risk associated with the common use of components. *See* Def.'s Resp. 40-41 (citing Tab 132 at 41445-46).

Moreover, as a challenge to the fact that the RFP plainly did not require the Agency to assess risk for the use of common components, SpaceX has waived this argument (and others identified by Defendant and Intervenors). SpaceX casually dismisses the well-established rule in bid protest litigation that challenges to a solicitation must be made, if at all, prior to the agency's receipt of proposals. Its

argument is that, because of the generally applicable six year statute of limitations for civil actions against the government (28 U.S.C. § 2401(a)), the "judicially-created *Blue & Gold* waiver rule does not apply" to APA challenges. *See* Pl.'s Reply at 1. But this serves only to bolster the rationale for the Court to reject untimely challenges to solicitation terms.

Like district courts, disappointed bidders challenging contracts awards at the Court of Federal Claims have six years to file suit. *See* 28 U.S.C. § 2501. Notwithstanding this generally applicable limitations period, the Federal Circuit and the Court of Federal Claims regularly apply a more limited window within which plaintiffs must challenge solicitation terms. *See* Orbital Resp. 21 (citing cases in which the same or similar principles have been cited to reject untimely challenges to procurement terms). Moreover, as the Government points out, SpaceX's argument ignores the plain text of the RFP, which required any objections to the terms of the RFP to be presented to the Agency within 10 days of the RFP's release. *See* Def.'s Sur-Reply 2 (citing AR Tab 38 at 1263). This Court should enforce the terms of the RFP and likewise apply this tried and true waiver rule here, where SpaceX waited far too long to complain about the terms of the competition.

## III. THE AIR FORCE'S COST EVALUATION WAS FAIR AND REASONABLE.

SpaceX contends the Air Force, when conducting the cost evaluation, "overlooked the hundreds of millions of dollars of government payments to ULA," but neither the RFP nor the administrative record supports SpaceX's claim. Pl.'s Reply 13.

The RFP required offerors to "provide the projected total costs to complete the EELV Launch System prototype, including all scope proposed in the SOW." AR Tab 38 at 1271. It further specified that offerors should not include certain costs when calculating Total Costs, including costs incurred before February 21, 2018, and parallel research or investment. *Id*. at 1276-77. These RFP provisions *required* ULA

7

and the Air Force to exclude each of the costs SpaceX now contends ULA and the Air Force improperly omitted.

**A. The Air Force Properly Evaluated ELC Contract Costs.**

The RFP prohibited ULA and the Air Force from including, as part of ULA's Total costs, government payments related to two contract modifications to ULA's EELV Launch Capability Contracts ("ELC Contract"), for three reasons.

First, the ELC Contract payments did not support the development of ULA's Vulcan launch system for the LSA procurement. *See* AR Tab 38 at 1271. Instead, ULA's ELC Contract supported the operation of ULA's then-active fleet of NSS launch vehicles: Atlas V, Delta II, and Delta IV. *See* ULA Resp. 42. To the extent ULA believed it could leverage portions of this work in support of the LSA effort, it included those costs in its Total Costs. *See, e.g.*, AR Tab 120 at 35662-95, 35811-18.

SpaceX offers virtually no rebuttal to these facts. Although it notes that ULA's statement of work ("SOW") for the LSA procurement and the ELC Contract both require "Systems Engineering and Program Management," it does not explain how any work ULA performed under the ELC Contract in these two general areas furthered development of ULA's Vulcan launch system for the LSA procurement. Pl.'s Reply 15. SpaceX also notes that the LSA SOW and the ELC Contract both require launch site infrastructure and launch operation development, but it completely ignores the fact that ULA's proposal included ███████ ███████████████████████████████████████████████████. *Id.*; AR Tab 120 at 35662-95, 35811-18.

Second, the ELC Contract payments reflect costs incurred prior to the reference date listed in the RFP—February 21, 2018. Def.'s Resp. 27. Although SpaceX disputes this fact, it provides no evidence to support its claim. Pl.'s Reply 14. Nor does it even allege that any costs incurred after February 21, 2018 are sufficient to overcome the gap between ███████

8

1 ██████████████████████████. *Id.*

2 Finally, the ELC Contract payments represent parallel research or investment
3 that the RFP required ULA and the Air Force to exclude from ULA's Total Costs.
4 AR Tab 38 at 1276-77. SpaceX claims parallel research and investment refers only
5 to "company costs," Pl.'s Reply 14, but the RFP does not support this limited reading,
6 AR Tab 38 at 1275-77. RFP Paragraph 8, which contains the parallel research and
7 investment exclusion, identified the types of costs "[t]he Offeror shall not
8 include…as part of the projected ***Total Costs***." AR Tab 38 at 1276 (emphasis added).
9 And it described Total Costs as the combination of both Government Investment and
10 Non-Government Investment. *See, e.g., id.* at 1276. Thus, Paragraph 8 required
11 offerors to exclude the costs of parallel research and development from ***both*** the
12 Government Investment and Non-Government Investment totals. *See id.* at 1276-77.
13 SpaceX's contentions therefore are without merit.

**B. The Air Force Properly Evaluated Costs for ████████████ and BE-4 Engine Development.**

16 The RFP also prohibited the Air Force and ULA from including, as part of
17 ULA's Total Costs, development costs associated with ████████████
18 ████████ and the BE-4 engine, because those costs were incurred independent of
19 the LSA effort. AR Tab 38 at 1277; Orbital Resp. 27-28. Indeed, SpaceX appears
20 to concede this fact. ████████████████████████████████████████████
21 ████████████████████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████████████████████
23 ████████████████████████████████████████████████.[1] Pl.'s Reply 15-16.
24 And SpaceX does not even try to claim Blue Origin's BE-4 engine was developed

---

[1] SpaceX also asserts the Air Force should not have included the costs of SpaceX's ████ in SpaceX's Total Costs because that mission would go forward irrespective of an LSA award. Pl.'s Reply 16. However, the record shows SpaceX ████████████████████████████████ ████████████████████████ The Air Force therefore was required to include the costs of that mission in SpaceX's Total Costs. *See* AR Tab 38 at 1271.

1  specifically for ULA's LSA effort.² *Id.* at 16-17. Thus, SpaceX has failed to show
2  that the Air Force and ULA were required to include these costs in ULA's Total
3  Costs.

### C. The Air Force Did Not Engage in Disparate Treatment.

SpaceX's final attempt to cast doubt on the Air Force's cost evaluation is to reiterate the same allegations of disparate treatment raised in its MJAR. SpaceX contends the Air Force overstated the Government Investment in SpaceX "by including ███████████████████████████████████████ ███████████████." Pl.'s Reply 17-18. The RFP, however, explicitly required the Air Force to evaluate such costs. AR Tab 38 at 1291, 1293; AR Tab 132 at 41435; AR Tab 152 at 43104-05. Similarly, SpaceX contends the Air Force understated ULA's costs by not acknowledging the possibility that "ULA would not be able to cover certification flights through commercial customers." Pl.'s Reply 18. But, as the record again shows, the Air Force did not ignore this possibility; it simply reasoned, correctly, that ULA had assumed the risk that it would not be able to fund all certification flights through commercial customers. AR Tab 132 at 41462. Finally, SpaceX complains that the Air Force did not add the costs of relying on SpaceX (or any other mitigation) to the awardees' respective Total Costs, but it does not even attempt to explain how such actions would be consistent with the RFP, which required offerors to identify only "projected total costs to complete the ELV Launch System prototype." AR Tab 38 at 1271. SpaceX also ignores the complete lack of record evidence that the Air Force based its LSA awards on such considerations. Pl's Reply 18.

---

² In its Reply, SpaceX argues (for the first time) that the Air Force "unfairly permitted ULA to spread the development costs of its proposal solutions across multiple LSA proposals, thereby understating the total development costs and percentage of Government Investment in the Vulcan prototype." Pl.'s Reply 16. However, the mere fact that ULA proposed to use an engine developed by a competitor—an option also available to SpaceX—does not mean ULA's costs are understated. It means only that ULA proposed to leverage an existing solution rather than develop a new one. SpaceX cannot fault the Air Force for its own independent decision to pursue a more costly alternative.

For the foregoing reasons, SpaceX's challenge to the Air Force's cost evaluation fails.

## IV. THE AIR FORCE REASONABLE EVALUATED RISKS IN SPACEX'S PROPOSAL.

In its Reply, SpaceX repeats its claims that the Air Force downplayed risks in Category A/B launches (Pl.'s Reply 10-13), applied unstated evaluation criteria when assessing risks in SpaceX's proposal (*id.* 19-20), and misunderstood SpaceX's proposed schedule (*id.* 21-23). The record simply does not support these claims.

### A. The Air Force Properly Considered Schedule Risk for Category A/B Launches.

SpaceX admonishes the Air Force for relying on an allegedly "undisclosed backup plan" when evaluating Schedule risk to Category A/B launch needs. Pl.'s Reply 10-13. SpaceX's claim is based entirely on verbal statements the Air Force made when engaging offerors in negotiations prior to submission of final proposals. *See* Pl.'s MJAR 26-27; Pl.'s Reply 10-11. As the Government correctly notes, SpaceX has not provided any evidence that these statements reflect the Air Force's ultimate evaluation of final proposals or its source selection decision, nor can SpaceX point to any evidence in the Agency's written evaluation record. *See* Def.'s Sur-Reply 6-8.

Furthermore, although SpaceX makes much of these statements, there is nothing improper about the Air Force considering its ability to mitigate risks in meeting Category A/B launch needs. The RFP informed offerors that the Agency would "determine the risk of delayed development" for launch systems capable of launching Category A/B payloads by the Agency's need dates, and that it would assign a Technical Risk rating based on the level of "Participant emphasis" and "Government monitoring" that would be required to overcome any difficulties. AR Tab 38 at 1282, 1284.

When the Air Force held the negotiation sessions at issue, it had assigned each

1 | offeror ████████████████████████████████████
2 | ████████████████████████████████████████████
3 | ████████████████████████████████████████████
4 | ████████████████████████████████████████████
5 | ████████████████████████████████████████████
6 | ████████ As the Agency explained verbally at the time, it evaluated risks in each
7 | offeror's proposed schedule and, with respect to Category A/B launches, concluded
8 | that the parties "will likely be able to overcome difficulties" through "close
9 | Government monitoring," specifically the Government's ability to monitor schedule
10 | and, if necessary, procure launch services through existing alternatives. *See* AR Tab
11 | 101, LSA Convo with ██ on Rating Debriefing at 36:00-37:00 (July 27, 2019)
12 | (noting the Agency considered "the fact that we have other options early on in the
13 | program to launch on different vehicles" to be "extra Government effort" in the form
14 | of "the Government stepping in very proactively" to address schedule risk); AR Tab
15 | 101, LSA Convo with ██ on Rating Debrief at 41:25-42:10 (July 27, 2019) ("In that
16 | general vein of close Government monitoring, I included the government taking
17 | proactive measures to make sure we launch that mission on time, even if it's not on
18 | ██████."). Thus, the Agency followed the risk rating definitions in the RFP
19 | exactly.
20 | In fact, not only was the Air Force's consideration of alternatives appropriate,
21 | but ***SpaceX was fully aware of it*** prior to submitting its final proposal. The Air Force
22 | held the same negotiation meeting with SpaceX that it held with other offerors, and
23 | during that meeting explained to SpaceX that ████████████████████████
24 | ████████████████████████████████████████████
25 | ████████████████ based on the Government's ability to rely on alternatives to
26 | mitigate risks to the Category A/B launch schedule:
27 | We have the ability to dual integrate to protect, so probably, if we had
28 | a ████████████ need, that's what we would end up doing: We

12

ORBITAL SCIENCES CORPORATION'S ████ RESPONSE TO PLAINTIFF'S MJAR

> would dual integrate on probably an Atlas so we can protect [the Government]. This is an area where we're kind of in a weird situation in EELV where . . . we're doing these development programs but we also have an operational need, and so we have to launch. If we have something we have to launch, then we'll find a different way to do it. ***And so that's one aspect where we took that capability into account when we were looking at our ratings with regard to the Schedule factor.***

AR Tab 101, LSA Convo with ▊ on Rating Debrief at 106:55-108:05 (July 27, 2019) (emphasis added).

As with many of its other arguments, SpaceX "had ample time and opportunity to raise its objections" to the Air Force's interpretation of the RFP, "but chose instead to wait and see whether it would receive an award." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (internal quotation omitted). Having done so, it "cannot now come forward with its objections to restart the bidding process and get a second bite at the apple." *Id.* (internal quotation omitted); *see also* Def.'s Sur-Reply 1-2.

SpaceX repeatedly asserts that, had it been aware of the Air Force's interpretation of the RFP, it would have submitted a different proposal. *See* Pl.'s MJAR 25; Pl.'s Reply 11. This, of course, is not supported by the evidence before the Court, given SpaceX was fully aware of the Air Force's interpretation prior to submitting its final proposal. But even now, SpaceX cannot explain how its proposal would be different – it merely asserts that would be the case. *See* Pl.'s Reply 11 (citing Pl.'s MJAR 25); Pl.'s MJAR 25 (citing Exh. A, ▊ Decl. ¶ 35); Pl.'s MJAR, Exh. A, ▊ Decl. ¶ 35 ("Had the Air Force advised SpaceX that the Air Force intended to put much greater weight on risks associated with Category C than risks associated with Category A/B solutions, SpaceX would have proposed differently."). SpaceX's conclusory statements are insufficient to show the Air

1 Force's interpretation of the RFP had any effect on SpaceX's proposal or the ultimate
2 source selection decision.

3    B.    **The Air Force Reasonably Identified Risks in SpaceX's Technical**
4          **Approach.**

5 SpaceX complains about being assigned risks for two aspects of its proposal:
6 (1) its failure to provide a ███████████████████████████████████████████
7 ████████████████████████████████████████████████████████████, and (2) its
8 proposed plan to ████████████████████████████████████████████████████████
9 ████████████████████████████. See Pl.'s Reply 19-20. SpaceX's arguments
10 rely on its underlying presumption that any solution allowed by the terms of the RFP
11 must be accepted by the Agency as risk-free. See id. (framing the risk in SpaceX's
12 ████████████████████ capabilities as an "unstated preference" for existing
13 government facilities and practices, and claiming the risk related to SpaceX's plan to
14 ████████████████████████████████ "originated from [the Agency's] decision
15 to permit ████████████████████████████████████, not from SpaceX's
16 approach"). SpaceX's logic is patently flawed and inconsistent with the terms of the
17 RFP, which clearly provided that the Agency would assess risks in offerors' proposed
18 approaches for ████████████████████████████████████████████████████
19 ████████████████████████████████████████████████████. See AR Tab 38 at
20 1282.

21    C.    **The Air Force Understood the Significant Risk SpaceX's Starship**
22          **Poses to Category C Launches.**

23 Lastly, SpaceX again objects to the Air Force's reference to the Space Shuttle
24 program as a benchmark for the development risk SpaceX has undertaken with its
25 Starship vehicle. SpaceX amplifies this analogy well beyond its place in the
26 evaluation record, which reveals the Air Force's technical evaluators assigned a
27 significant weakness to SpaceX's proposal based on ███████████████████████
28 ████████████████████████████████████████████ including SpaceX's ████████

1. ██████████████████████████████████████
2. ██████████████████████████████████████
3. ██████████████████████████████████████
4. ██████████████████████████████████████
5. ██████████████████████████████████████
6. ██████████████████████████████████████
7. ██████████████████████████████████████
8. ██████████████████████████████████████
9. ██████████████████████████████████████
10. ██████████████████████████████████████
11. ████████  AR Tab 132 at 41620-21.

SpaceX shies away from addressing these specific technical conclusions, preferring instead to argue about a stray analogy to the Space Shuttle that appears nowhere in the technical evaluators' description of the significant weakness. SpaceX can dispute the Agency evaluators' comparison of the passenger-bearing, Mars-bound Starship to the Space Shuttle all it wants, but at the end of the day, its disagreement is just a distraction from the reasoned conclusions in the Air Force's evaluation record.

## CONCLUSION

For the foregoing reasons, Orbital respectfully requests that the Court DENY Plaintiff's motion for judgment on the administrative record and request for injunctive relief.

February 14, 2020

By: /s/ Kevin P. Mullen
Kevin P. Mullen (*admitted pro hac vice*)

*Attorney for Defendant-Intervenor Orbital Sciences Corporation*

# CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, I caused a true and correct copy of the foregoing document to be served by email on:

**Joseph Evan Borson**
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
Email: joseph.borson@usdoj.gov
Counsel for United States of America

**Scott E. Pickens**
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel: 202-371-6349
Fax: 202-289-1330
Email: Scott.Pickens@btlaw.com
Counsel for Blue Origin, LLC

**Todd R. Steggerda**
McGuireWoods LLP
2001 K Street, N.W., Suite 400
Washington, D.C. 20006
Tel: 202-857-2477
Fax: 202-828-2968
Email: tsteggerda@mcguirewoods.com
Counsel for United Launch Services, LLC

**Craig A. Holman**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
Email: craig.holman@arnoldporter.com
Counsel for Space Exploration Technologies Corp.

By: /s/Kevin P. Mullen
KEVIN P. MULLEN (*pro hac vice*)
*Attorney for Orbital Sciences Corporation*