1  John D. Lombardo (Bar No. 187142)
   john.lombardo@arnoldporter.com
2  Arnold & Porter Kaye Scholer LLP
   777 South Figueroa Street, 44th Floor
3  Los Angeles, CA 90017-5844
   Telephone: 213.243.4000
4  Facsimile: 213.243.4199

5  Craig A. Holman (*admitted pro hac vice*)
   craig.holman@arnoldporter.com
6  Arnold & Porter Kaye Scholer LLP
   601 Massachusetts Ave., N.W.
7  Washington, D.C. 20001
   Telephone: 202.942.5000
8  Facsimile: 202.942.5999

9  Attorneys for Plaintiff
   *Space Exploration Technologies Corp.*
10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13                      **WESTERN DIVISION**

14  Space Exploration Technologies Corp.,        Case No. 2:19-cv-07927-ODW(GJS)
                                                 Honorable Otis D. Wright II
15                      Plaintiff,

16          v.                                   ███████ **JOINT RESPONSES TO
                                                 COURT QUESTIONS**
17  United States of America,

18                      Defendant,

19          v.                                   ┌────────────────────────┐
                                                 │   **FINAL REDACTED**    │
20  Blue Origin, LLC, *et al.*,                  │  **VERSION 08/12/2020** │
                                                 └────────────────────────┘
21                      Defendant-Intervenors.

22

23

24

25

26

27

28

1 | [Caption page continued]

2 | Kara L. Daniels (*admitted pro hac vice*)
kara.daniels@arnoldporter.com

3 | David M. Hibey (*admitted pro hac vice*)
david.hibey@arnoldporter.com

4 | Sonia Tabriz (*admitted pro hac vice*)
sonia.tabriz@arnoldporter.com

5 | Nathaniel Castellano (*admitted pro hac vice*)
nathaniel.castellano@arnoldporter.com

6 | Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.

7 | Washington, D.C. 20001
Telephone: (202) 942-5000

8 | Facsimile:  (202) 942-5999

9 | Attorneys for Plaintiff
*Space Exploration Technologies Corp.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1)     At the hearing, Plaintiff argued that the U.S. Air Force Space and Missile Systems Center's ("Agency" or "SMC") portfolio decisions violated federal law and thus deserve no deference. According to Plaintiff, this argument is separate from its contention that the Agency acted in an arbitrary and capricious manner.

       a)     <u>Plaintiff only (half a page) (due to Defendants by July 8, 2020)</u>: Clarify whether this part of your oral argument corresponds to your written argument in Part IV(A) of your Motion (ECF No. 170).

**Response:** Congress, across a series of Acts, directed SMC to: i) invest in domestic "commercially available space launch vehicles" to maintain assured access to space; ii) transition off the Russian rockets used by ULA; iii) discontinue the launch capability subsidies provided to ULA and account for the impact of those subsidies in competitions; and iv) implement "procedures for a fair competition."  SMC has no discretion to violate Congressional direction.  *Kingdomware Tech., Inc. v. United States*, 136 S.Ct. 1969 (2016) (unanimous Court reversing bid protest denial).  The record shows that SMC's evaluation and award decision contravenes these statutory directions as detailed in oral argument and explained in ECF 170, Part IV.A and ECF 182, Part II.B.  Similarly, SMC's evaluation and award also violate Congress's direction "for a fair competition" and the "competitive procedures" required by 10 U.S.C. § 2371b(b)(2), as detailed at oral argument and in ECF 170, Parts IV.B. and C. and ECF 182, Parts II.C. and D.

       b)     <u>Plaintiff only (one page) (due to Defendants by July 8, 2020)</u>: Identify every statute and regulation that Plaintiff argues the Agency violated in making its portfolio decisions and provide a short explanation for how the Agency violated each of them.

**Response:** (i) SMC violated <u>FY 2018 NDAA, Pub. L. No. 115-91, § 1605 (2017) and 10 U.S.C. § 2273</u> by selecting for investment <u>two</u> launch systems "purpose-built" for NSS requirements (not developed for commercial space flight), diverting all <u>three</u> awards to supporting ULA's solution, and excluding SpaceX, the leading U.S. commercial spaceflight company and only competitor already-capable, certified, and successfully flying U.S. made rockets for all Category A/B missions.  SMC also undermined Congress' assured access to space direction because (a) <u>only</u> SpaceX

presents no risk to the Category A/B operational need date, and (b) the awards to ULA and ULA's providers, each with common propulsion systems, undermine system independence needed for two viable competitors–Orbital and ULA use the GEM-63XLT motor and Blue Origin and ULA use the BE-4 engine.

(ii)   The portfolio award decision thwarts Congress' direction to end reliance on Russian rocket engines in <u>FY 2015 NDAA, Pub. L. No. 113-291, § 1608(a) (2014) as amended by FY 2017 NDAA Pub. L. No. 114-328, § 1602 (2016)</u>.   SMC's evaluation evidences that all three awardees and their developmental systems materially risk the April 1, 2022 operational need date for Category A/B missions and the agency intends to mitigate the substantial risk through use of ULA's Russian powered Atlas V or SpaceX's Falcon 9 (which the Agency excluded).

(iii)  SMC also violated <u>FY 2016 NDAA, Pub. L. No. 114-92, § 1608(a), (d)(1)(C), and (d)(2)(A) (2015)</u> by (a) basing the award decision on unfair procedures, (b) not counting as government investment the over $1.6 billion in subsidies that ULA received since February 2018, and (c) effectively continuing those ULA subsidies by awarding to ULA and two ULA providers.

(iv)  SMC also violated <u>10 U.S.C. § 2371b's</u> "competitive procedures" mandate by the unequal and arbitrary cost, risk, and schedule evaluations.

c)   <u>Defendants (two pages for all Defendants combined) (due to Plaintiff by July 14, 2020)</u>:   Respond to Plaintiff's answers. Defendants shall coordinate their responses to avoid duplication.

**Response:**   The Agency's LSA decision is subject to the APA's highly deferential standard of review, including allegations that the Agency has not acted in accordance with the law.   "A court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, *or otherwise not in accordance with law*.'   This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for the decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife*

*Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)) (emphasis added).

*Kingdomware Tech., Inc. v. United States*, 136 S. Ct. 1969 (2016) is not to the contrary. There, the Court said that where "statutory language is unambiguous," an agency must follow that language; *i.e.*, where a statute stated that an agency "shall" take an action, the agency could not decide that it need not take that action. *Id.* at 1976-77. That is not this case. The Agency has not ignored mandatory duties; rather, SpaceX disagrees with *how* the Agency has complied with its duties. For example, had the Agency said that 10 U.S.C. § 2273(b), which requires the United States take steps to sustain "the availability of at least two space launch vehicles," only required sustainment of one vehicle, that decision would have conflicted with statute. But the question of *how* to sustain the availability of at least two vehicles is a technical judgment to which the Agency is entitled to deference.

In any event, the Agency complied with all applicable Congressional direction.

*First*, the 2018 NDAA requires investment in "existing or planned commercially available space launch vehicles." The Agency invested in commercial vehicles per 51 U.S.C. § 50101, and determined that each planned vehicle would be commercially available, a factual finding SpaceX fails to challenge. Nor is there a prohibition against vehicles "purpose built" for national security missions. In fact, the NDAA calls for the development of "capabilities necessary to enable existing or planned commercially available space launch vehicles . . . that are primarily for national security space missions." U.S. Opp'n at 35-37; U.S. Surreply at 3-5.

*Second*, the Agency complied with 10 U.S.C. § 2273's assured access to space requirement by investing in the development of a portfolio of launch system prototypes the Agency determined best met national security requirements. The entire launch program, including the LSAs, is focused on supporting that objective. Tab 19, 787-88. The Agency is entitled to deference about how best to satisfy that mandate. SpaceX says the Agency ignored its existing Category A/B rockets which

"present no risk." Not so: the Agency (1) *credited* SpaceX for its existing rockets; (2) found there was a schedule risk for those rockets; and (3), looked at risk across mission categories A, B, and C in accordance with the RFP and, more broadly, section 2273(b). The Agency's treatment of common components was also proper; these components were not forbidden by statute or the RFP, and the Agency concluded that awarding developmental agreements for vehicles that used such components was appropriate and risks were mitigated. U.S. Opp'n at 37-41; U.S. Surreply at 5-6.

*Third*, the Agency's decision was consistent with the requirement to cease using Russian rocket engines by 2022. SpaceX has not alleged that the Agency has actually violated that provision, and the Air Force's decisions about schedule risk were reasonable and entitled to deference. U.S. Opp'n at 41-43; U.S. Surreply at 6.

*Fourth*, the Agency did not violate FY 2016 NDAA 1608, which required that the EELV program provide "procedures for fair competition." While these provisions are not even mentioned in the argument section of SpaceX's brief, *see* Pl.'s Mot at 17-35, the Agency's procedures meet these basic statutory requirements and its cost evaluations were reasonable, *see* U.S. Opp'n at 26-35; U.S. Surreply at 11-14.

*Fifth*, the Agency did not violate 10 U.S.C. § 2371b's "competitive procedure mandate." Rather it held a fair competition, and if SpaceX thought the procedures unfair, it should have challenged them before submitting its proposal, as required. In any event, the Agency's cost, risk, and schedule determinations were reasonable.

    2)    The Government argues that the Agency neither encouraged nor discouraged any particular solution and offerors were responsible for submitting the most competitive bid in accordance with the RFP requirements. (U.S. Opp'n 17 n.6, ECF No. 177.) However, Plaintiff appears to argue that the Agency treated Category C solutions that did not rely on existing payload processing procedures as riskier per se. (Pl.'s Reply 19, ECF No. 182.)

    a)    <u>Government only (two pages) (due to Plaintiff by July 8, 2020)</u>: Did the Agency treat solutions that did not rely on existing payload processing procedures as riskier per se? Why did the Agency not specify in the RFP that offerors who used their own facilities for payload processing may incur a higher risk rating?

    **Response:** The Agency did not treat solutions that did not rely on existing payload processing procedures as riskier *per se*. Rather, the RFP set out specific

- 4 -

technical requirements that the proposed systems must satisfy, including that the offeror must demonstrate "[t]he ability of the launch system to meet the payload orientation requirement in SPRD 3.2.7." Tab 38, 1269. The RFP further stated that the Agency would assess technical risk based on the proposals' potential "to cause disruption of schedule, increased cost or degradation of performance." Tab 38, 1282. That was the basis for the Agency's rating: SpaceX's proposal was not assessed as riskier because it did not use existing payload procedures; it was assessed as riskier because the Agency's independent, rigorous assessment determined that the particular procedures SpaceX proposed "introduce[d] risk" to critical, billion-dollar national security payloads in a way that was "likely to cause significant disruption of schedule, increased cost, or degradation of performance." Tab 132, 41586; U.S. Opp'n, at 16-18, ECF No. 177. In other words, the issue was that SpaceX's proposed procedures insufficiently mitigated a number of risks, including that their payload handling approach required either costly facility changes or extra spacecraft movement steps that increased the risk of damaging delicate spacecraft. *Id.*

The RFP specified the general requirements that each proposal must satisfy, *see* Tab 38, 1282-84, as well as the general criteria that would be applied to evaluate those requirements, *id.* 1281-82. The RFP did not set out, in advance, every single risk with which potential approaches could be assessed, as such a requirement would be incompatible with the purpose of an RFP. The LSA awards were issued pursuant to the Air Force's Other Transaction Authority, 10 U.S.C. § 2371b, which are explicitly for *prototypes*. The Air Force was soliciting new and innovative systems: it could not prejudge the risks of those proposals in the abstract before it saw the specific technical proposals the offerors advanced. Nor is there a requirement that it do so. Indeed, RFPs in the procurement context generally do not do so: "[a]lthough solicitations must provide sufficient information to enable offerors to compete intelligently and on an equal basis, they are not required to disclose the government cost estimate or the precise details of the proposed evaluative process." *QualMed, Inc.*, 73 Comp. Gen.

235 (1994); *see also Iron Bow Techs. Inc. v. United States*, 133 Fed. Cl. 764 (2017) ("Government agencies need not 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal").

The Air Force did, however, provide SpaceX information about the risks the government assessed in SpaceX's approach. The RFP set out a process for agreement-by-negotiation, in which the Air Force and the offerors specifically negotiated over the proposal before it was finally submitted. *See* Tab 38, 1285. As part of these negotiations, SpaceX was explicitly informed that the Air Force judged that its payload processing approach "increases the risk of cost increases, schedule delays and performance degradation," Tab 108, 31838, and that if SpaceX's "response during negotiations remains in the Final Proposal, this significant weakness would remain," Tab 119d, 35186. SpaceX was on notice about the Government's concern, *and* how the Government would assess that concern, and had the opportunity to change their proposal to mitigate that risk (or otherwise convince the Air Force that it was mistaken in its assessment). SpaceX failed to do so – but this failure stems from the nature of its particular proposal, not because it was unaware of the Air Force's considerations.

　　　　b) <u>Plaintiff only (two pages) (due to Defendants by July 14, 2020)</u>: Respond to the Government's answer.

**Response:** The evaluation record belies Defendant's response. SpaceX's launch solution meets all eight EELV Approach criteria. (Tab 132 at 41580 ("The Offeror's proposed approach meets this element with two strengths"), 41583 ("The Offeror's development and qualification approach meets this requirement"), 41585 (same), 41587 ("The Offeror's proposed approach meets this element with one strength"), 41589 ("The Offeror's development and qualification approach meets this requirement"), 41590 ("The Offeror's proposed approach meets this element with one strength"), 41591 (same), 41592 ("The Offeror's development and qualification approach meets this requirement").) SMC, nevertheless, assessed risk to SpaceX's

Category C solution because SpaceX proposed to meet the Category C requirements with SpaceX's own facilities for payload processing (which would also service commercial payloads) and not the "specifically-designed and tailored Government facilities" that SMC had always used. (*Compare* Tab 123 39775 ("████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████.") *with id.* at 41595 ("Therefore, ***while meeting the Government's requirements, the Offeror's approach requires a tailored integration approach that is unique to only this Offeror***. Because the intent of LSA is for the Offeror to develop a prototype that is a complete launch system, under the Offeror's approach the launch system is not complete and capable of executing the Government's missions without these changes in CONOPS, processing, and infrastructure for the East Coast.") (emphasis added).) SMC's evaluation contravenes Congress's direction and the RFP mandates to invest in, and leverage, commercial solutions. FY 2018 NDAA, Pub. L. No. 115-91, § 1605; Tab 38 at 1260, 1285; Tab 2 at 109 (commercially viable launch system is vital).

Defendant's reliance on SMC's discussions with SpaceX is also misplaced. First, negotiations do not permit SMC to deviate from the stated criteria. *Cf.* 48 C.F.R. § 15.306(d)(2) ("The primary objective of discussions is to maximize the Government's ability to obtain best value, ***based on the requirement and the evaluation factors set forth in the solicitation***.") (emphasis added). Second, the discussions expose the risk evaluation as a moving target. In its early July 2018 exchanges with SpaceX, SMC noted "potential changes to CONOPS" as a weakness that could be overcome with close monitoring. (Tab 108 at 31838.) Thereafter, on September 10, 2018, with the request for final proposals within seven days, SMC raised a concern that SpaceX's proposed CONOPS approach would require SMC to

supply ground support equipment, tooling, etc. (Tab 119d at 35186.) To resolve the noted concern, SpaceX proposed to supply all BFR-unique ground support equipment and specified that "these BFR CONOPS do not require special tooling from the customer." (Tab 123 at 39776.) In the final evaluation, SMC ignored SpaceX's resolution, and found that without adopting and using SMC's current Category C CONOPs facilities and procedures, SpaceX's fully compliant launch system was not complete, which drove "a High risk rating." (Tab 132 at 41595.)

In sum, Congress and the RFP mandated that SMC leverage commercial solutions. Yet, SMC declared SpaceX "not complete" because SpaceX proposed to build and use a facility that could handle both NSS payloads (all categories) and commercial payloads. Under a fair competition, if SMC deemed government CONOPs and facilities required for a complete system, SMC had an obligation to amend the RFP.

3) Plaintiff argues that the Agency deviated from the RFP in evaluating Plaintiff's Category C Polar 2 solution. (Mot. 30.)

a) Government only (two pages) (due to Plaintiff by July 8, 2020): In deciding to allow east coast launches for the Polar 2 mission, did the Agency take into consideration if solutions proposing east coast launches may be more expensive and create schedule risks? Why did the Agency not specify in the RFP that offerors who proposed east coast launches for the Polar 2 mission might incur a higher risk rating?

**Response:** The Agency had initially determined that "a west coast launch solution for Category C missions" was a mission requirement. Tab 37, 1252. In March 2018, it revaluated that position, determining that because polar launches from the east coast were technically possible, it would not *require* west coast launches. The Agency stated that "[t]he fact that a pathway to Polar orbit is possible from [the east coast] is a new approach, and only takes into account the safety of life and property aspects of space launch." Tab 37, 1252-53. The Agency therefore announced that "[t]he Government will evaluate each offeror's specific approach, make an integrated assessment, and assign an appropriate risk rating under the Schedule Factor." *Id.* at 1253. Thus, the Agency was neutral on whether east or west coast launches were

1  better in any specific context, until it had the opportunity to perform a full assessment

2  of the offerer's specific approach.

3        Accordingly, the Agency's decision to allow east coast Category C launches

4  was based on whether these launches could satisfy the Agency's technical

5  requirements.  This was appropriate – the point of the RFP is to inform offerors which

6  requirements are necessary to satisfy the Government's national security objectives,

7  and then to let the individual offerors structure their proposals to maximize innovation

8  while minimizing potential risk and cost.  Tab 38, 1282.

9        For that reason, the RFP did not specify that east coast Category C launches

10  might incur a higher risk rating – that is not the point of the RFP.  Rather, as discussed

11  in Question 2, the RFP does not and cannot detail how every proposal's risk will be

12  assessed in advance: it specifies the requirements and the principles by which those

13  requirements will be assessed (including risk and cost).

14        Moreover, SpaceX was well-aware of the Agency's concerns with its proposed

15  approach, and SpaceX had the opportunity to update or alter its proposal in any way

16  it deemed necessary in response to that feedback.  As part of the negotiation process

17  set out in the RFP, *see* Tab 38, 1285, the Government explicitly stated in May 2018,

18  well before SpaceX finalized its proposal, that it had concerns with the fact that

19  SpaceX's approach "requires the Government to relocate mission specific Polar 2

20  processing capabilities to the East Coast."  Tab 92, 29528.  SpaceX did not address

21  that concern, *id.* 29529, though it could have proposed ways of mitigating that risk or

22  explained why such infrastructure was not necessary.  Indeed, SpaceX mitigated other

23  risks that the Air Force had identified, such as the overflight risk of its Polar 2 plan,

24  showing it was certainly capable of responding to the Air Force's concerns.  *E.g.*, Tab

25  108, 31830.  SpaceX was then again told in July 2018, before it submitted its final

26  proposal, that its "approach relies upon launching Polar 2 flights from the East Coast

27  which would necessitate relocation of critical Government infrastructure for mission

28  processing to the East Coast, driving additional cost and schedule impacts to the

Government." Tab 108, 31839. SpaceX did not address that concern. Finally, in September 2018 –before it submitted its final proposal – SpaceX was again told that this approach drove cost and schedule risk. Tab 119d, 35185. SpaceX again did not address that concern.

Accordingly, while the RFP appropriately did not specify how east coast launches could add risk in a general sense, because that was impossible to say as a general matter without making an assessment of SpaceX's proposal, the negotiation process established by that RFP conveyed that SpaceX's *specific* proposal was risky, explained why, and gave the company repeated opportunities to mitigate that risk. SpaceX's failure to avail itself of that opportunity does not constitute arbitrary or capricious behavior on the part of the Agency.

        b)   <u>Plaintiff only (two pages) (due to Defendants by July 14, 2020)</u>: Respond to the Government's answer.

**Response:** Defendant's response evidences that SMC merely changed the use of "a west coast launch solution for Category C missions" from an express requirement to and unspoken requirement: "In March 2018, it [SMC] reevaluated that position, determining that because polar launches from the east coast were technically possible, it would not *require* west coast launches." Stated otherwise, SMC decided it would not prohibit the solution; instead (at some later point) SMC determined the approach prohibitively risky from an infrastructure cost perspective, without notice.

The record establishes that SMC had no concern about SpaceX's ability to launch the Polar 2 missions from the East Coast. (Tab 132 at 41588.) Instead, SMC assessed a high risk to SpaceX's proposal because an East Coast launch (regardless of which company performed the mission) created the possibility that SMC may require additional infrastructure on the East Coast. (*Id.* at 41595-96, 41621.) To hold a fair competition, SMC should not have revised the RFP if SMC deemed the potential for additional East Coast infrastructure costs too risky for investment.

Moreover, SMC mischaracterizes SpaceX's efforts to address the concerns (however unfounded) that SMC raised in discussions. For instance, to address the cost concern, SpaceX's explained that it did not need additional government infrastructure: "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." (Tab 123 at 39780.) SMC failed to credit this approach or the dual use facility (commercial and government).

SMC's risk assessment also ignores SpaceX's basing study, which evidences SpaceX's commitment to work collaboratively with SMC to find the optimal launch location, including specifically the Western Range. SpaceX proposed to "complete a basing study, *with Government participation,* to determine the optimal location" for the Starship's launch facility. (Tab 123 at 39987 (emphasis added).) "Successful completion of the study will require *Government input* into a business-case analysis weighing NSS requirements with launch site costs" and SpaceX's commercial launch strategy, and will include expressly "Launch from the Western Range." (*Id.* (emphasis added). SpaceX committed to "ensure satisfaction of NSS requirements." (*Id.*) Thus, no risk existed in any event as SpaceX committed to launch from the Western Range, if necessary. Indeed, SpaceX already is a primary Western Range tenant. (*E.g.*, Tab 123 at 397761 ("SpaceX already launches routinely from the Eastern and Western Ranges") *id.* at 39762 ("SpaceX's Cape Canaveral and Vandenberg Air Force Base facilities....").)

4)     If the Court finds that the Agency violated federal law or acted arbitrarily and capriciously with respect to only some of its evaluations, can the Court remand back to the Agency to: (a) Redo only parts of the LSA competition (e.g., only Category C*)? (b) Redo only its evaluation of some of the competitors (e.g., only ULA and SpaceX as to Category C*)? (*These are only examples. The Court does not want the Parties to address these specific scenarios. Rather, the Parties should focus their responses on the question in general.)

a)     <u>Plaintiff only (two pages) (due to Defendants by July 8, 2020)</u>: Respond to (a) and (b).

**Response:** If the Court finds SMC violated federal law or acted arbitrarily and capriciously, under 5 U.S.C. § 706, the Court "shall … hold unlawful and set aside" the final award decision, and remand to SMC to take corrective action. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020) (enjoining Department of Homeland Security: "in a case where § 706(2)(A) applies, there is a statutory directive. . . to 'set aside' any unlawful agency action.'"). Moreover, "Supreme Court precedent reveals that, when federal statutes are violated, the test for determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional purpose behind the statute." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002) (citing *TVA v. Hill*, 437 U.S. 153, 194 (1978)). Here, effectuating Congress' intent requires the issuance of an injunction of the current awards.

Beyond the need to set aside the unlawful agency action (i.e., the final source selection decision and resulting awards), the Court may tailor the relief to fit its findings. *Irvin Indus. Canada, Ltd. v. United States*, 924 F.3d 1068 (D.C. Cir. 1990) (reversing district court judgment with instruction to require the agency to issue a new solicitation); *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1059 (1st Cir. 1987) (setting aside award, finding awardee ineligible, and directing agency to "review the remaining bids and award the contract to one of the remaining bidders"); *Choctaw Mfg., Co., Inc. v. United States*, 761 F.2d 609 (11th Cir. 1985) (directing award to protester); *Superior Oil Co. v. Udall*, 409 F.2d 1115 (D.C. Cir. 1963) (upholding district court's order to issue a lease to plaintiff).

Traditional bid protest tribunals, applying 28 U.S.C. § 1491(b)(4), also routinely enjoin awards resulting from improper or unlawful process and remand to the agency for corrective action.  *See Palantir USG, Inc. v. United States*, 904 F.3d 980, 995 (Fed. Cir. 2018) (enjoining award of military intelligence platform contract where Army violated <u>Congressional commercial item directive</u>: "Only after the Army has complied with 10 U.S.C. § 2377 should it proceed to award…."); *ARxiUM, Inc. v. United States*, 136 Fed. Cl. 188 (2018) (declaring award unlawful, and finding that injunction would promote public interest despite prospective harm claimed by Air Force); *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471 (2012) (same); 31 U.S.C. § 3554(b) (identifying bid protest relief Government Accountability Office "shall recommend").

Here, in addition to setting aside the award decision (which will be rendered obsolete by the corrective action), the Court may identify the issues SMC should address as part of the corrective action.  For instance, if SMC requires government processes and facilities for Category C payload processing, then SMC should issue a solicitation amendment and receive new proposals.  But if SMC's needs have not changed, SMC could correct that evaluation defects through a new evaluation and award decision.  If discussions with an offeror may be warranted, the "competitive procedures" and "fair competition" requirements mandate that SMC give all offerors the opportunity to submit revised proposals.  The RFP also permits a fourth award.

Alternatively, the Court could issue a substantive ruling in SpaceX's favor and direct the parties to ADR to propose a remedy to the Court within a proscribed period (e.g., fourteen days) before the Court issues one.  *See* Air Force FAR Supplement, 5333.214(b) (directing acquisition personnel to use ADR to resolve award challenges). SpaceX has stated its willingness to use ADR since December 2018.

b) <u>Defendants (three pages for all Defendants combined) (due to Plaintiff by July 14, 2020):</u>  Respond to Plaintiff's answers.  Defendants shall coordinate their responses to avoid duplication.

**Response:**  If this Court finds that part of the Agency's evaluation violated the APA, and that this error caused SpaceX prejudice, it should remand to the Agency for further proceedings consistent with its opinion.  In light of the disruption that would result from vacatur, *see infra* Question 5, it should not vacate the awards, at least not without further briefing.  Nor should it issue specific relief, or otherwise specify the Agency's conduct post-remand, as such relief is beyond the scope of an APA challenge.

To obtain APA relief, SpaceX must show that it was harmed by any Agency error.  *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004); *Rybachek v. EPA*, 904 F.2d 1276, 1295 (9th Cir. 1990).  If this Court identifies a prejudicial error on the part of the Agency, it should identify that error (noting, for example, if that error implicates only a part of the Agency's award analysis), and remand for further proceedings.  "If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.  The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."  *Fla. Light & Power Co. v. Lorian*, 470 U.S. 729, 744 (1985).  The Supreme Court has repeatedly re-emphasized this holding, with respect to both questions of law and fact.  *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (a court "should remand a case to an agency for decision of a matter that statutes place primarily in agency hands"); *Gonzales v. Thomas*, 547 U.S. 183, 185 (2006) (remand rule applies to factual circumstances and application of law to fact); *Negusie v. Holder*, 555 U.S. 511, 524-25 (2009) (same).

Because of the significant disruption caused by vacating the awards, this Court should not vacate the awards upon remand, at least not without further briefing.  The Ninth Circuit does not require vacatur in the event that agency action is found to be

improper. *See, e.g.*, *Nat'l Family Farm Coal v. EPA*, 960 F.3d 1120 (9th Cir. 2020); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). "[C]ourts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. 3:10-CV-01397-SI, 2012 WL 13042847, at *3 (D. Ore. Dec. 10, 2012). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 1456, 150-51 (D.C. Cir. 1993)). Given the magnitude of the consequences of vacatur in terms of time, money, and particularly in terms of national security, *infra* Question 5, Defendants submit that vacatur is not appropriate, at least before the parties can brief the seriousness of any error and, importantly, the disruption caused by vacatur (including with declaration support).

Nor should this Court issue specific relief, as this Court's power under the APA is limited to vacating the agency decision (if necessary) and "remand[ing] for further action consistent with its opinion." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *see also id.* ("The district court had no jurisdiction [under the APA] to order specific relief."); *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) ("Not only was it unnecessary for the court to retain jurisdiction to devise a specific remedy for the Secretary to follow, but it was error to do so."); U.S. Opp'n at 43-45. To the extent courts have identified any exception to this principle (and such an exception would be difficult to square with the APA's text, and the Supreme Court's more recent case law discussed above), it is only for "exceptional cases," where there "simply is no possibility for a different result." *Sierra Club v. U.S. EPA*, 346 F.3d 955, 963 (9th Cir. 2003). That is not this case here: as even SpaceX acknowledges, LSA awards involve a number of technical determinations

1     that require agency judgment; with any number of potential scenarios that could occur

2     during a hypothetical remand, there is no outcome that could justify directed relief.

3           Because the remedy for a claim brought under 5 U.S.C. § 706(2) is limited to

4     "hold[ing] unlawful and set[ting] aside agency action," SpaceX's contention that this

5     "Court may tailor the relief to fit its findings," *supra*, is wrong.  Indeed, none of the

6     cases it cites support that contention.  *Irving Indus. Canada, Ltd. v. United States*, 924

7     F.2d 1068 (D.C. Cir. 1990) merely remanded for the agency to comply with the law,

8     without directing a specific result—the usual result in an APA case; *Ulstein Maritime,*

9     *Ltd. v. United States*, 833 F.2d 1052 (1st Cir. 1987) remanded for the agency to award

10     a contract to *one* of the bidders, without specifying which, and even then only in a

11     sealed-bid procurement context distinct from the discretionary award at issue here;

12     while *Choctaw Manufacturing Co. v. United States*, 761 F.2d 609, 621 (11th Cir.

13     1985); and *Superior Oil Co. v. Udall*, 409 F.2d 1115, 1121 (D.C. Cir. 1963), awarded

14     a lease or a contract to a losing bidder only after there is a showing that the company

15     "would have been awarded" the bid.  Indeed, even if these out-of-circuit cases remain

16     persuasive in light of the Supreme Court's current remand precedent, this is not a case

17     where the record dictates only one contractual outcome.  *See, e.g.*, *Scanwell Lab., Inc.*

18     *v. Shaffer*, 424 F.2d 859, 869 (D.C. Cir. 1970) ("It is indisputable that the ultimate

19     grant of a contract must be left to the discretion of a government agency; the courts

20     will not make contracts for the parties.").  As to the bid protest cases cited by SpaceX,

21     they simply hold that a court should vacate and remand improper awards, not that it

22     should direct the result or micromanage the award process on remand.  Courts also

23     have presumptively broader remedial powers under the Tucker Act (for procurement

24     bid protests) than the APA.  *Compare* 28 U.S.C. § 1491(b)(2), *with* 5 U.S.C. § 706(2).

25           Accordingly, while SpaceX suggests certain outcomes that the agency can

26     implement in the event of a remand (including allowing the submission of revised

27     proposals or issuing a solicitation amendment), under the APA, it is the *Agency*, not

28     SpaceX (or the Court) that should decide how best to proceed.  The APA does not

provide jurisdiction compelling specific relief (through ADR or otherwise), nor does it contemplate a role for the plaintiff in determining the agency's conduct on remand.

     5)    How disruptive, in terms of time and money, would it be for the Government and Intervenors if the Court remanded the competition back to the Agency for additional consideration?

         a)    <u>Defendants (one page for each Defendant) (due to Plaintiff by July 8, 2020)</u>: Respond.

**Government Response:**   Remand could delay critical national security missions and result in substantial costs, though the extent of disruption depends on whether the Court vacates the LSAs.  The LSAs supports technological development as a precursor to Phase 2 award.  U.S. Opp'n at 5.  At least one Phase 2 will go to an offeror that received an LSA.

If the Court vacates the LSA awards before the Phase 2 contracts are awarded, the Agency could ask Phase 2 offerors to update their proposals, as several were prepared while expecting to receive LSA money. This could delay the Phase 2 award. If the Court vacates the LSA after Phase 2 contracts are awarded, the LSA offeror(s) that would have been awarded Phase 2 expecting hundreds of millions of federal LSA dollars would face serious shortfalls as that funding vanishes.  That unplanned deficit could delay these launch systems, as development premised on that funding falters.

Delay of Phase 2 could disrupt the readiness of these new vehicles, which are expected to launch sensitive national security payloads within the next five years. This could frustrate the assured access to space policy, and a delay of launching sensitive national security assets could harm national security.  The Agency would also need to explore alternatives to launch these critical payloads, which would be expensive to procure and potentially impractical because viable launch alternatives may not exist, particularly for Category C.  Vacatur could thus potentially drive hundreds of millions of dollars in extra costs and delay launches by months or years.

Even remand without vacatur would also be disruptive, as it would pull limited Government experts from launch operations and development projects to revisit their

LSA analysis, which could cost between $766,000 and $4.6 million and take between 3 and 18 months, depending on the scope of a remand. If the Court determines that remand is appropriate, the Agency requests the opportunity to supplement this answer, including with a declaration. *See* U.S. Opp'n at 44-45.

**Blue Origin Response:** Remand, regardless of the outcome, would be tremendously disruptive to Blue Origin in both the LSA and Phase 2 Launch Services Procurement (LSP) competition. Remand would interfere with New Glenn launch system certification and halt build out of infrastructure required to meet requirements in the Phase 2 LSP acquisition. This infrastructure—and other aspects which otherwise are not needed for the commercial launch market—are included in Blue Origin's pending LSP proposal, and costs to develop them are included under the terms of the LSA cost-share provisions. Should a remand occur, these activities and associated milestone payments would be uncertain; thus the costs and added technical uncertainty would materially alter Blue Origin's LSP proposal. Further, Blue Origin and the Air Force conduct extensive technical information exchanges, as agreed-to in the LSA, to provide insight for the Air Force to certify the New Glenn launch system and BE-4 engines for National Security Space missions. A remand would cause the cessation of all such communications and halt the progress of certification of the New Glenn launch system.

If remand results in reversal of the LSA awards, the harms increase exponentially. To date, while Blue Origin has received ████████████ in Government funding, it has spent well ████████ of its own money to develop the New Glenn launch system, much of which was spent to incorporate Government-specific requirements such as an enlarged second stage and vertical integration capability. Blue Origin spent these sums in reliance on the LSA awards and need not have spent these amounts to meet the requirements of commercial launch customers. Given the huge investment of time and money over the last 22 months since award, the New Glenn's design cannot now be altered to omit government requirements.

Were its LSA award to be cancelled, Blue Origin would be ███████████████████
██████████████████████████████████. Moreover, due to LSA directed activities, Blue Origin has been offering and contracting to commercial customers a New Glenn launch vehicle design heavily influenced by Government LSA requirements. Abrupt cancellation of the contract would cause unconscionable harm.

**ULA Response:** Any remand and vacatur at this late stage would substantially disrupt the penultimate step in the Air Force's five-year strategy to develop next generation launch vehicles to carry out time-sensitive national security space launches. (RFP, Tab 38, 1260.) The Air Force grounded its acquisition strategy on the LSA awards and uninterrupted LSA development in support of the upcoming Phase 2 missions. (RFP, Tab 38, 1260.) Through an LSA award for Vulcan's development *almost two years ago*, the Air Force committed to fund nearly half of this development effort (LSA, Tab 140, 42319), and the combined ULA/Air Force investment in Vulcan is already ████████████████████. ULA has relied on and budgeted that funding, and removal of future LSA funds would create a shortfall of ██████ ██████████████ just as ULA is performing critical, highly technical work ████ ████████████████████████████████████████████████████████████ ██████ (ULS Proposal, Tab 120, 35264, 35293, 35309), including upcoming certification launches, in order to meet the Air Force's April 2022 capability requirement. (RFP, Tab 38, 1284.)

Therefore, even if the Air Force were deemed to have engaged in unlawful or arbitrary conduct (which, respectfully, the record does not support), vacating the LSAs or discontinuing LSA funding during any remand is not warranted. With the Phase 2 award imminent, remand and vacatur would be highly disruptive to launch vehicle development by one or both Phase 2 awardees, because any remand could not be promptly resolved (owing to the fact SpaceX has "fundamentally changed" Starship's design (*see* Govt. Reply Br., 44)), and it would take months for the Air

Force to solicit and evaluate new proposals. This prolonged disruption jeopardizes the April 2022 Category A/B date, inhibits timely development of Category C solutions (for which there will soon be no alternative), and undermines the national policy of assured access to space – i.e., the very goals the LSA seeks to achieve. *Cf. Cal. Comtys. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012).

**Orbital Response:**  Remand to the Agency at this late date, 21 months into performance of the LSAs, would fundamentally disrupt this national security space launch development program—a program that, by direction of Congress, must achieve space launches by 2022. A lot has changed in the almost two years since award: the three successful LSA contractors have materially advanced their designs, while SpaceX has apparently abandoned its originally proposed Starship vehicle and would substitute a different rocket (Falcon Heavy) for Category C missions. *See* Stephen Clark, "SpaceX Drawing Up Plans for Mobile Gantry at Launch Pad 39A," Spaceflight Now (Jan. 3, 2020), *https://spaceflightnow.com/2020/01/03/spacex-drawing-up-plans-for-mobile-gantry-at-launch-pad-39a/*. Remand would require the Air Force to stop performance on all LSAs and solicit revised proposals based on these changed circumstances. The Agency's reevaluation could consume another full year. Meanwhile, the Air Force's planned Phase 2 LSP awards needed to fulfill Congress's 2022 launch mandate—expected THIS month—would have to be deferred indefinitely.

This disruption would have severe financial effects. As of January 2020, the Air Force invested ▮▮▮▮▮ in Orbital's LSA alone, and ▮▮▮▮▮▮ in the OmegA launch system. *See* Orbital Resp., Exh. A, Laidley Decl. ¶ 12, ECF No. 178. Orbital invested ▮▮▮▮ under its LSA, and ▮▮▮▮▮ overall in the OmegA system. *Id*. Since January, Orbital has achieved further LSA performance milestones at additional shared investment. These investments in the OmegA system cannot simply transfer to other programs; they would be lost. Furthermore, Orbital has more than ▮▮ employees working on the OmegA system, many of whom possess unique

technical expertise. Remand and the resulting interruption of LSA performance would require Orbital to layoff many of these specialized professionals, leaving Orbital short-handed when the Air Force issues the new LSA award decision a year or so later. *Id.* ¶¶ 14-15. Thus, even if remand results in the same LSA awards, Orbital (and Blue Origin and ULA) would suffer severe economic harm.

> b) <u>Plaintiff (three pages) (due to Defendants by July 14, 2020)</u>:
Respond to Defendants' answers.

**Response:** Defendants' responses confirm the irreparable harm experienced by SpaceX (each of its Phase 2 competitors are relying on government investment and insight to structure their launch solutions for the ongoing Phase 2 procurement and beyond) and verify that the improper awards harm the public interest and threaten national security. (ECF 170-1 at ¶¶ 47-51 ( █████ Declaration outlining SpaceX irreparable harm).) As noted throughout SpaceX's briefing, Congress recognized the national security risks created by ULA's dependence on Russian rockets and substantial taxpayer subsidies. Through multiple statutory provisions, Congress set parameters for the challenged competition to overcome those threats and maintain assured access to space. The unlawful and arbitrary awards to ULA and its providers undermine Congress' objectives and violate the RFP.

There is one company in this competition fully certified and capable of delivering cost effective, NSS launch services, on schedule, using American-made rockets (SpaceX), and it did not get a contract to advance its latest technology which promised even greater capabilities. (Tab 132 at 41580.) Only one company before the Court competes effectively in the commercial market today, without which NSS spaceflight becomes prohibitively expensive. Applying Congress' statutory direction and overturning SMC's arbitrary evaluative conduct does not harm national security, it supports national security. Moreover, the public interest requires compliance with procurement law and competitive integrity.

Defendant (despite multiple briefing opportunities) neither rebutted SpaceX's evidence of harm nor offered evidence of counterbalancing harm. Defendant's belated attempt to shield its actions under the guise of national security (still without even a declaration) necessarily fails. SMC does not operate above procurement law. Traditional protest tribunals routinely protect the procurement system and public interest by sustaining protests against Department of Defense ("DoD") procurements and providing meaningful remedies. This is so even in the largest and most significant DoD procurements. For instance, just a few months ago, the United States Court of Federal Claims enjoined the $10 billion Joint Enterprise Defense Infrastructure ("JEDI") contract award based on an evaluation error. To borrow from the court: "'There is an overriding public interest in preserving the integrity of the procurement process'. . . The court does not find, under the present circumstances, that the benefits of the JEDI program are so urgently needed that the court should not review the process to ensure the integrity of the procurement." *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146 (2020); *see also Sys. Application & Techs., Inc., v. United States,* 100 Fed. Cl. 687, 722 (2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012) (issuing injunction in missile testing contract despite national security claims); *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 493 (2012) (enjoining contract despite national security claims and noting: "National defense and national security concerns will be considered in tandem with concerns for the public interest and the integrity of the procurement system….") SMC's claims that Court action will interfere with the Phase 2 competition likewise fail. (ECF 51 at 30 (government stating the LSA and Phase 2 competitions are "not 'mutually dependent'").)

Intervenors' claims of harm further establish that the balance of harms tips decisively in SpaceX's favor. The launch service agreements ("LSAs") are not ordinary development contracts; they are partnership agreements that commit SMC to work hand-in-glove with the awardees to craft the systems that SMC will purchase for decades. (ECF 170-1 at ¶¶ 47-51.) No money damages can cure SpaceX's loss (or

its competitors' undue gain).  In fact, what Intervenors seek to protect is the wrongful by-product of holding contracts they did not lawfully win and receiving payments that they did not lawfully deserve.  The improper LSA awards serve only to swell Intervenors' bottom-lines and confer an unfair advantage in the ongoing Phase 2 competition and future launch service procurements. Moreover, Defendants cannot claim harm from an early cancellation of the LSAs.  Each LSA provides SMC the right to terminate "for any reason".  (*See*, *e.g.*, Tab 138 at 41779.) Still further, each intervenor is a sophisticated contractor well aware that thousands of protests occur each year, many resulting in reopened competitions.   U.S. Government Accountability Office ("GAO") statistics show that, in 2019, 44% of procurement challenges resulted in some form of corrective action.  *See* GAO Bid Protest Annual Report to Congress for Fiscal Year 2019 (Nov. 5, 2019).[1] There is nothing extreme or unusual about forums requiring agencies to conduct fair competitions and spend taxpayer money as Congress required.  *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970) (seminal APA bid protest case:  "The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit....but the suit itself is brought in the public interest by one acting essentially as a 'private attorney general'").

Finally, SpaceX (as it continues to do today) repeatedly has attempted to resolve this matter through alternative means, seeking to mitigate impact to the Agency and the NSS program at each turn.  Defendants should not benefit from a refusal to consider more expeditious and flexible dispute resolution.

6) There is conflicting evidence on whether ULA proposed the ███████ or ███████ missions. (*Compare* Certified Administrative Record ("CAR") Tab 120, 35217-18 (stating that ULA is offering the ███████ ███████ *with id.* Tab 120, 35255 (listing ███████ ███████).)

---

[1] Available at https://www.gao.gov/assets/710/702551.pdf.

a) <u>Government and ULA only (one page for both Defendants combined) (due to Plaintiff by July 8, 2020)</u>: Respond. These Defendants shall coordinate their responses to avoid duplication.

**Response:** ULA proposed ████████████████████████████████████, which it would evolve ████████████████████. Thus, ULA proposed to develop its ██████████████ in two steps. ULA's proposal states that ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████" Tab 120, 35254 (emphasis added). ULA reiterated ████████████████████ ████████████████████ in its proposal, including in a prominent graphic on page 5, stating ████████████████████████████████████████████████████████ ██████████ *Id.* at 35229; *See also id.* at 35189, 35229-30, 35254-55, 35279-81, 35286, 35306-07, 35227, 35254. ██████████, the second step, expands Vulcan's capabilities so it can ████████████████████████████████████████████ ████████████████████████████████████████████████. *Id.* at 35229-30, 35254-55, 35279-80, 35300, 35307.

This two-step development plan demonstrates there is no conflict between ULA's repeated statements that it offered ████████████████████████ ████████████████████████████████████████ and the few instances where the proposal provided a high level general summary of each configuration's capabilities, including the glossary definition cited by the Court. *See id.* at 35217. ULA's proposal does not state that ████████████████████████████████████████ ████████████████████████, but states instead that ████████████████████ ████████████████████ is ready. The Air Force thus reasonably (and correctly) found that ULA proposed ██████████████████████████████████████ ██, as SpaceX alleges)—which ULA confirmed in formal, recorded discussions *see* Tab 101, O5 on Initial Negotiations 8 Aug @ 1300 13:00-14:38—providing more

- 24 -

than ██████████████████████████████████ need date.  Tab 132, at 41429, 41444, 41449, 41456-57, 41458-59; *see* Tab 38, 1284, 1288.

        b)    <u>Plaintiff (one page) (due to Defendants by July 14, 2020)</u>: Respond to Defendants' answers.

**Response:**  Absent from Defendants' response is any citation to or discussion of ULA's schedule section *in the final proposal* – the final ULA offer post-discussions.  The RFP requires each offeror to propose a schedule for the development of launch systems for Category A and B and a schedule for the development of launch systems for Category C, and to provide a "narrative that describes the assumptions, methodology, and supporting data used to formulate the provided schedules.  (Tab 38 at 1270-71.)  The Schedule subfactor required SMC "to *evaluate the Offeror's schedule* to determine the risk of delayed development for Launch system(s) capable of launch Category C payloads to Polar 2 by 1 September 2025."  (*Id*. at 1283.)

ULA's ████████████████████████ states: ████████████ ████████████████████████████."  (Tab 120 at 35312.)  Nothing in ULA's schedule narrative or ████████████ schedule itself contemplate ████████ ████████████████████████.  At best for ULA, its technical and schedule proposals are contradictory.  Nevertheless, the RFP required SMC to evaluate the proposed schedule under the Schedule subfactor and ULA's schedule assumes ████████████████████████████████.  Thus, under a reasonable and fair evaluation of ULA's schedule, SMC would have noted and assigned risk to the fact that ULA proposed to complete ██████████ █████████████████████████████████████████████ ████████.  (*Compare* Tab 120 at 35316 *with* Tab 38 at 1288.)  By contrast, SpaceX proposed to ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████.  (Tab 150a at 43036; Tab 123 at 39380.)  Yet, SMC assigned SpaceX a Moderate risk rating, and the awarding official noted a

████████████████████████████████████████████

████████████████. (Tab 136 at 41751.)

Dated:  July 17, 2020        ARNOLD & PORTER KAYE SCHOLER LLP


By:  */s/ Craig A. Holman*
       Craig A. Holman (*admitted pro hac vice*)

       Attorney for Plaintiff
       *Space Exploration Technologies Corp.*



U.S. DEPARTMENT OF JUSTICE

DAVID M. MORRELL
Deputy Assistant Attorney General
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
*/s/ Joseph E. Borson*
JOSEPH E. BORSON
REBECCA CUTRI-KOHART
Trial Attorneys, Civil Division, Federal Programs
Branch

Attorneys for Defendant
*United States of America*

BARNES AND THORNBURG LLP


By:  */s/ Scott E. Pickens*
       Scott E. Pickens (*admitted pro hac vice*)

       Attorney for Defendant-Intervenor
       *Blue Origin, LLC*

MCGUIREWOODS LLP


By:  */s/ Todd R. Steggerda*
       Todd R. Steggerda (*admitted pro hac vice*)

       Attorney for Defendant-Intervenor
       *United Launch Services, LLC*

1

MORRISON AND FOERSTER LLP

2

3    By: /s/ Kevin P. Mullen
        Kevin P. Mullen (admitted pro hac vice)

4        Attorney for Defendant-Intervenor
5        Orbital Sciences Corporation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>SIGNATURE ATTESTATION</u>

All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content, and have authorized the filing.

ARNOLD & PORTER KAYE SCHOLER LLP

By:     */s/ Craig A. Holman*
         Craig A. Holman (*admitted pro hac vice*)

         Attorney for Plaintiff
         *Space Exploration Technologies Corp.*

## **PROOF OF SERVICE**

I hereby certify that on this 17th day of July 2020, I electronically filed the foregoing Joint Responses to Court's Questions under seal by using the CM/ECF system and that service to the other counsel will be accomplished via email as follows:

Joseph Evan Borson
U.S. Department of Justice
Federal Programs Branch - Civil Division
1100 L Street, N.W.
Washington, D.C. 20005
Tel: 202-514-1944
Fax: 202-616-8460
Email: joseph.borson@usdoj.gov
*Counsel for United States of America*

Scott E. Pickens
Barnes and Thornburg LLP
1717 Pennsylvania Avenue, N.W., Suite 500
Washington, D.C. 20006-1313
Tel: 202-371-6349
Fax: 202-289-1330
Email: Scott.Pickens@btlaw.com
*Counsel for Blue Origin, LLC*

Todd R. Steggerda
McGuireWoods LLP
2001 K Street, N.W., Suite 400
Washington, D.C. 20006
Tel: 202-857-2477
Fax: 202-828-2968
Email: tsteggerda@mcguirewoods.com
*Counsel for United Launch Services, LLC*

Kevin P. Mullen
Morrison and Foerster LLP
2000 Pennsylvania Avenue, N.W., Suite 6000
Washington, D.C. 20006
Tel: 202-887-1500
Fax: 202-887-0763
Email: KMullen@mofo.com
*Counsel for Orbital Sciences Corporation*

Dated: July 17, 2020                    ARNOLD & PORTER KAYE SCHOLER LLP


                                        By: */s/ Craig A. Holman*
                                        Craig A. Holman (*admitted pro hac vice*)

                                        Counsel for Plaintiff
                                        *Space Exploration Technologies Corp.*