**O**

# United States District Court
# Central District of California

| | |
|---|---|
| SPACE EXPLORATION TECHNOLOGIES CORP., | Case № 2:19-cv-07927-ODW (GJSx) |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE CERTIFIED ADMINISTRATIVE RECORD [170][215]** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant, | |
| v. | |
| BLUE ORIGIN, LLC, *et al.*, | |
| Defendant-Intervenors. | |

## I.    INTRODUCTION

Before the Court is Space Exploration Technologies, Corp.'s ("SpaceX" or "Plaintiff") Motion for Judgment on the Certified Administrative Record, filed on December 10, 2019, challenging a final award decision made by the United States Air Force Space and Missiles Systems Center ("SMC" or "Agency"). (Mot., ECF No. 170.) SpaceX argues that SMC acted unlawfully, arbitrarily, and capriciously in awarding certain Launch Service Agreements ("LSAs") to Defendant-Intervenors Blue Origin,

LLC ("Blue Origin"), United Launch Services, LLC ("ULS"[1] or "ULA"), and Orbital Sciences Corporation ("Orbital") (collectively along with Plaintiff, "Offerors"). (Mot. 6, 20.)  The Motion has gone through multiple rounds of briefing,[2] and the Court heard argument from the Parties on June 19, 2020.

Paraphrasing Dr. Leonard McCoy, "I'm a Judge, not a rocket scientist."  The Court's role is not to second-guess the Agency's technical reasoning, but rather to consider whether SMC sufficiently identified its needs and provided a rational explanation for its award decision.  SpaceX may be the revolutionary leader in space technology, as it repeatedly claims in its papers.  Still, it had the sole responsibility to craft its LSA proposal with due consideration for the Agency's stated needs and mission, no matter how limited those needs may have been compared to SpaceX's ambitious vision.  For the following reasons, the Court **DENIES** SpaceX's Motion.

## II.   BACKGROUND

### A.   Historical Context

The National Security Space Launch Program ("NSSL Program")—previously known as the Evolved Expendable Launch Vehicle Program ("EELV Program")[3]—is charged with "procuring launch services to meet national security space (NSS) launch requirements."  (Certified Administrative Record ("AR") Tab 19, 786, filed under seal, ECF No. 204.)  Among other things, the NSSL Program is vital to the delivery of satellites that serve as "the nation's eyes and ears."  (*See* AR Tab 19, 786 (describing the role of NSS satellites in secure communications and GPS systems, weather imaging, and warfighting).)

For over 20 years, the United States has been trying to cease using Russian-made

---

[1] The ULS is a subsidiary of United Launch Alliance ("ULA").  The Parties refer to that Intervenor interchangeably as ULS and ULA.  The Court will refer to it as "ULA."

[2] There is significant duplication in the arguments raised by the Government and Intervenors.  The Court will mostly cite to the Government's arguments without cross citations.

[3] Congress renamed the EELV Program in the National Defense Authorization Act ("NDAA") of 2019.  Pub. L. No. 115-232, § 1603(b), 132 Stat. 1636, 2105 (2018).

rocket engines for national security reasons.  *Hr'g on Mil. Space Launch & the Use of Russian-Made Rocket Engines Before the Senate Comm. on Armed Servs.*, 114th Cong. 2–3 (2016) (opening statements of Sen. John McCain, Chairman), https://fas.org/irp/congress/2016_hr/engines.pdf.  This goal has been plagued by significant inaction and delays.  *See id.* at 2 ("Yet 20 years later, after numerous stalling efforts rooted in corporate greed and naïve assertions of defense cooperation with Russia, little progress has been made in limiting the influence of Russia on space launch.").  Notwithstanding these obstacles, Congress remains committed to "transition from the use of non-allied space launch engines to a domestic alternative" for delivering NSS payloads into space.  NDAA of 2015, Pub. L. No. 113-291, § 1604(a)(1), 128 Stat. 3292, 3623 (2014).

In 2011, SMC crafted a multi-phase strategy to comply with Congress's directive.  (*See* AR Tab 19, 787.)  In the LSA Phase in question, SMC sought to "increase the pool of launch vehicles that meet the Air Force's needs by 'invest[ing] in industry to develop enhanced configurations to support all [National Security Space] requirements.'" *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 444 (2019) (quoting AR Tab 19, 789).  In other words, the purpose of the LSA Phase was not to acquire any goods or services, but instead to foster a competitive field in preparation for Phase 2 in which SMC would procure launch services.  *Id.* (citing AR Tab 19, 786; AR Tab 38, 1261).

## B.    The LSA Request for Proposals

On October 5, 2017, pursuant to its authority to enter into "other transactions" agreements ("OTs"),[4] SMC issued a Request for Proposals ("RFP") related to the LSAs

---

[4] OTs are agreements that are not procurement contracts, cooperative agreements, or grants and thus are not required to comply with the Federal Acquisition Regulation ("FAR").  *See* 10 U.S.C. § 2371(a); 32 C.F.R. § 3.2.  The Department of Defense may use OTs to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." 10 U.S.C. § 2371b(a)(1).  "To the maximum extent practicable, competitive procedures shall be used when entering into agreements to carry out the prototype projects under subsection (a)."  10 U.S.C. § 2371b(b)(2).

in question.  (AR Tab 38, 1256.)  SMC amended the RFP three times in early 2018. (AR Tab 38, 1256.)  According to SMC, the RFP "continue[d] the [NSSL Program's] strategy to quickly transition from the use of non-allied space launch engines, implement sustainable competition for [NSS] launch services, and maintain assured access to space as required by [Congress]."  (AR Tab 38, 1260.)  Specifically, SMC's strategy involved leveraging commercial launch solutions to secure at least two domestic, commercial launch service providers that meet NSS requirements.  (AR Tab 38, 1260.)

SMC sought proposals for two payload categories: (1) Category A/B missions, which comprise the majority of the NSS launches and constitute the most imminent need; and (2) Category C missions, which will carry the heaviest payloads.  (AR Tab 38, 1261, 1286, 1288.)  The need dates for Category A/B missions were April 1, 2022 (for launches from the east or west coast) and October 1, 2024 (for launches from the west coast).  (AR Tab 38, 1284, 1288.)  The need dates for Category C were September 1, 2025 (tentative) for the Polar 2 mission and October 1, 2026 (firm) for the GEO 2 mission.  (AR Tab 38, 1288.)

SMC evaluated the Offerors' proposals based on three main criteria, including EELV Approach, Technical, and Investment Cost.  (AR Tab 38, 1262, 1281–85.)  The second factor was divided into two subfactors; Design and Schedule.  (AR Tab 38, 1281.)  Under the EELV Approach factor, SMC evaluated whether the Offerors' development and qualification approaches met the launch system requirements.  (AR Tab 38, 1281–83.)  The Design subfactor assessed the risks associated with the Offerors' designs of their launch vehicles' booster systems and upper stages.  (AR Tab 38, 1283–84.)  The Schedule subfactor evaluated the risk that the Offerors' proposals would be unable to meet the required need dates.  (AR Tab 38, 1284.)  Finally, under the Investment Cost factor, SMC evaluated the Offerors' proposed costs, including the total investments by the Government, private industry, and the Offerors themselves.  (AR Tab 38, 1284.)

Using these evaluation factors, SMC set out to choose the portfolio of solutions that was "most advantageous in achieving the Government's goal of assured access to space via two or more domestic commercial launch providers that also meet NSS requirements." (AR Tab 38, 1285.) The Government's stated preference was for a portfolio containing at least three LSAs. (AR Tab 38, 1285.)

### C. The LSA Competition

SpaceX and the Intervenors were the only companies that competed for the LSAs. (AR Tab 132, 41419.) SpaceX proposed a family of launch vehicles, including its NSS-certified Falcon 9, NSS-certified Falcon Heavy, and Starship (formerly known as the Big Falcon Rocket or "BFR"). (AR Tab 132, 41421.) SpaceX proposed these three vehicles for the Category A/B missions and the third only for the Category C missions. (AR Tab 132, 41579.)

ULA proposed its Vulcan Centaur Launch System powered by a booster engine, BE-4, that is made by Blue Origin. (AR Tab 132, 41420.) Blue Origin proposed its New Glenn vehicle powered by its own BE-4 engine. (AR Tab 132, 41420.) Finally, Orbital proposed its OmegA vehicle powered by Aerojet Rocketdyne engines. (AR Tab 132, 41421.)

### D. SMC's LSA Award Decision

On October 9, 2018, SMC awarded LSAs to ULA for $967 million, Orbital for $792 million, and Blue Origin for $500 million. (AR Tab 135, 41732; AR Tab 136, 41752–53.) SMC rated ULA's proposal the highest for having an outstanding approach, low risk, and reasonable costs. (AR Tab 136, 41753.) SMC determined that Orbital's proposal had a good approach with mostly low risk at a reasonable cost. (AR Tab 136, 41753.) Although SMC concluded that Blue Origin had an outstanding approach at a reasonable cost, it suffered from moderate risk that would need to be monitored. (AR Tab 136, 41753.) On the other hand, SMC did not award an LSA to SpaceX because SMC concluded that SpaceX's "outstanding technical approach" was offset by the risks in its approach and schedule. (AR Tab 136, 41753.) In addition, SMC noted that

SpaceX's innovative approach was the costliest in terms of Government investment and overall total cost.  (AR Tab 136, 41753.)

SpaceX moves the Court to: (1) "declare the LSA award decision arbitrary, capricious, and unlawful;" (2) "award SpaceX an appropriate LSA or enjoin any further investment [and performance] under the LSAs;" (3) in the alternative, "direct the [SMC] to reevaluate the LSA proposals" or "revise the RFP to reflect the [SMC]'s actual needs, reopen the competition, and make a new LSA award decision;" and (4) "provide such other relief as the Court deems just and appropriate."  (Notice of Mot. & Mot. 1–2, ECF No. 170.)

### III.   STANDARD OF REVIEW

Section 706(2)(A) of the Administrative Procedure Act ("APA") requires a reviewing court to uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under this standard, courts will "sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made."  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005).  In determining whether an agency determination violated the APA, courts must focus their review on the administrative record, "not some new record made initially in the reviewing court."  *Jet Inv., Inc. v. Dep't of the Army*, 84 F.3d 1137, 1139 (9th Cir. 1996) (internal quotation marks omitted).

The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99 (1977); *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).  Although the court's inquiry must be "searching and careful, . . . the ultimate standard of review is a narrow one."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).  Thus, "[e]ven when an agency explains its decision with less than ideal

clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (internal quotation marks omitted). It is not the reviewing court's task to "make its own judgment about" the appropriate outcome. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). "Congress has delegated that responsibility to the [agency]." *Id*. "The court's responsibility is narrower: to determine whether" the agency complied with the APA. *Id*.

This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise. *Marsh*, 490 U.S. at 377; *see also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."). As part of this deference, courts afford the agency discretion to choose among scientific models and "reject an agency's choice of a scientific model only when the model bears no rational relationship to the characteristics of the data to which it is applied." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014) (internal quotation marks omitted).

Nevertheless, the deference owed to agencies is not unlimited. Courts may not automatically defer to an agency's conclusions, even when those conclusions are scientific. *See Marsh*, 490 U.S. at 378. Rather, a court's review must be sufficiently probing to ensure that the agency has not:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A different approach "would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that

agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh*, 490 U.S. at 378 (internal quotation marks omitted).

## IV.   DISCUSSION

SpaceX accuses SMC of an uncompetitive scheme to serve the needs of ULA, the company that, allegedly, formerly monopolized the commercial space industry. (Mot. 1–2, 5, 19.)  SpaceX notes that the two other Intervenors, Blue Origin and Orbital, are currently developing major components for ULA's new rocket.  (Mot. 5.)  Thus, SpaceX believes that, in choosing to award the three LSAs to ULA and its two business partners, SMC was simply "subsidizing the development of a new launch system offered by ULA."  (Mot. 5.)[5]

SpaceX makes three principal arguments for why the Court should grant it judgment, including that: (1) SMC violated the RFP and Congressional direction; (2) SMC's cost evaluations were anticompetitive and irrational; and (3) SMC's risk assessments were anticompetitive and irrational.  (*See* Mot. 17–35.)   To avoid duplicative analysis, the Court will begin by addressing the latter.  However, as a preliminary matter, Blue Origin argues that SpaceX has failed to comply with the legal standard governing the Motion, which required SpaceX to have challenged and appealed the "final" agency action.  (*See* Blue Origin Opp'n 8, ECF No. 179.) Accordingly, before addressing the merits of SpaceX's arguments, the Court will address Blue Origin's threshold argument.

### A.   Final Agency Action

APA claims must address "'final agency action for which there is no other adequate remedy in court.'"  *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1103 (9th Cir. 2007) (quoting 5 U.S.C. § 704).  An agency action is "final" under the APA

---

[5] The Court declines SpaceX's invitation to question the Agency's true motives.  The Supreme Court has cautioned that judicial inquiry into "executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (internal quotation marks omitted).  In addition, SpaceX ignores that SMC has outlined other rational explanations for its portfolio decisions.

when "(1) the agency reaches the 'consummation' of its decisionmaking process and (2) the action determines the 'rights and obligations' of the parties or is one from which 'legal consequences will flow.'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Blue Origin argues that the Court cannot review the agency action that SpaceX objects to because it does not constitute a reviewable final decision.  (*See* Blue Origin Opp'n 11.)  Instead, Blue Origin contends that SpaceX should have focused on addressing the Agreements Officer's ("AO") decision, which rejected SpaceX's administrative objections.  (*See* Blue Origin Opp'n 10.)  SpaceX responds that the decision in question is a final action because it was not tentative or interlocutory and had direct and appreciable legal consequences.  (Reply 5, ECF No. 182.)  SpaceX also argues that the RFP is neither a statute nor regulation mandating exhaustion.  (Reply 6.)

Although somewhat persuasive, Blue Origin's argument ultimately fails because it relies on the unsupported conclusions that the RFP's appeal provision was mandatory and that the AO reviewed SpaceX's objections de novo.  Contrary to Blue Origin's contentions, section 1.4 of the RFP does not expressly require administrative exhaustion before judicial review.  *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993) (holding that exhaustion is only required where expressly required by statute or an agency rule). Instead, section 1.4 merely sets forth the requirements that the Offerors had to follow if they wished to present an objection to the AO.  *Compare* (AR Tab 35, 1068 (RFP section 1.4)) *with Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (citing 7 U.S.C. § 6912(e) which specifically requires "[e]xhaustion of administrative appeals").

Blue Origin's strongest argument is that SMC's initial decisions became nonfinal when SpaceX opted to seek the AO's reconsideration.  (*See* Blue Origin Sur-Reply 7, ECF No. 191 (quoting *ICC v. Locomotive Eng'rs*, 482 U.S. 270 (1987)).)  But the cases that Blue Origin cites involved de novo administrative appeals.  Here, Blue Origin fails to support its claim that the AO reviewed the matter de novo in considering SpaceX's

objections.  Indeed, the Court cannot find any indication in the RFP or the AO's record that the AO's review was de novo.  Instead, it appears that the AO simply affirmed SMC's analysis after finding that SpaceX's objections lacked merit.  (*See* AR Tab 152, 43100.)  The fact that the AO issued its decision in a mere six pages, compared to SMC's thousands of pages of analysis, further undermines Blue Origin's claim.  Indeed, if limited to the AO's summary dismissal of SpaceX's objections, the Court would be hard-pressed to carry out its duty to review the Government's award decisions.

Accordingly, the Court rejects Blue Origin's threshold argument and proceeds to consider SpaceX's objections.

## B.    SMC's Risk Assessments

SpaceX argues that SMC's risk assessments violated statutory mandates and the principles of fair play, thus constituting an abuse of discretion.  (Mot. 24–25 (quoting *Dubinsky v. United States*, 43 Fed. Cl. 243, 259 (1999)).)  First, SpaceX argues that SMC improperly negated risks in the Intervenors' proposals for the Category A/B missions.  (Mot. 25.)  Second, SpaceX contends that SMC's risk assessments were anticompetitive because it assigned a "high risk" to SpaceX's Category C solution based on unstated criteria that deviated from the RFP.  (Mot. 29.)  Lastly, SpaceX argues that SMC arbitrarily concluded that SpaceX's Category C solution would not meet the RFP need date.  (Mot. 31.)

### 1.    SMC's Category A/B Mission Risk Assessments

SpaceX asserts that SMC wrongly negated schedule risks created by the Intervenors' proposals to its Category A/B missions.  (Mot. 25.)  According to SpaceX, the RFP did not advise the Offerors that SMC deemed these risks less critical to assured access to space or that it would excuse offeror risk based on an unstated backup plan.

(Mot. 25.)  SpaceX argues that it would have proposed differently had it known that Category C mission risks would drive SMC's LSA decisions.  (Mot. 25.)[6]

"Schedule risks" refer to the Offerors' ability to: (1) launch Category A/B payloads from either the east or west coast by April 1, 2022 ("Criteria 1"); (2) launch Category A/B payloads from the west coast by October 1, 2024 ("Criteria 2"); and (3) launch Category C payloads to a specific orbit, Polar 2, by September 1, 2025 ("Criteria 3").  (*See* AR Tab 132, 41427.)  In evaluating schedule risk, SMC considered, among other things, the proposals' margin of time between final certification flight and the Criteria need dates (hereinafter, "Final Certification Margin").  (*See, e.g.*, AR Tab 132, 41618.)  The purpose of this time period was to allow the Government to assess the prototype for any remaining issues and make necessary repairs or design changes.  (*See* AR Tab 132, 41457 (noting that, on average, it takes the Government two months to conduct its post-flight analysis).)

SpaceX's arguments fail for several reasons.  Most importantly, SpaceX incorrectly claims that SMC *requires* a Final Certification Margin benchmark of 14 months to achieve a "low risk" schedule rating.  (Mot. 26.)  SpaceX emphasizes it was the only Offeror that proposed a Final Certification Margin longer than 14 months. Although the Government admits that the 14-month benchmark is a historical predictor for low risk, it argues that the benchmark is merely a *guideline* subject to deviation depending on the special circumstances of a particular project.  (U.S. Opp'n 11, ECF No. 177.)  Indeed, the evidence which SpaceX claims supports its argument actually undermines it.  (*See* AR Tab 135, 41725 (referring to the 14-month Final Certification Margin as only "*typical* of a low risk schedule" (emphasis added)).)

Although SMC did not require a 14-month Final Certification Margin to qualify for a low risk rating, it did carefully consider that benchmark in evaluating the Offerors'

---

[6] To begin, the Court finds no support in the record for SpaceX's conclusory argument that SMC assigned more weight to the Category C missions.  (*See, e.g.*, AR Tab 38, 1282–86.)  Accordingly, the Court will only consider SpaceX's other arguments.

proposals.  For instance, with respect to ULA, far from "negat[ing] the impact of risk to the Category A/B missions" as SpaceX argues, SMC acknowledged that ULA's proposed 9.5-month Final Certification Margin for Criteria 1 was a weakness.  (*See* AR Tab 132, 41457 ("Any anomalies or outstanding certification liens may result in a delay to the Government's [need date].").)  Nevertheless, SMC concluded that 9.5 months was enough time to conduct post-flight analysis and make necessary repairs without impacting its deadline.  (*See* AR Tab 132, 41457.)  Indeed, SMC noted its confidence that ULA could likely overcome this weakness with only normal Government monitoring, as opposed to close monitoring.  (*See* AR Tab 132, 41457; AR Tab 135, 41720–21; ULA Opp'n 18, ECF No. 180 (citing AR Tab 38, 1282).)

SMC also carefully considered Orbital's and Blue Origin's divergence from the 14-month benchmark, which ultimately hurt both of their schedule risk scores.  (*See* AR Tab 132, 41510 (classifying Blue Origin's Final Certification Margin of 11 months as a weakness), 41555 (classifying Orbital's Final Certification Margin of 6.5 months as a significant weakness).)  In addition, contrary to SpaceX's argument, (*see* Mot. 27), SMC did consider the Intervenors' development experience in determining their risk ratings.  For instance, SMC classified the fact that Orbital had never developed an EELV class launch vehicle as a "significant weakness" and gave Blue Origin a higher risk rating than ULA—despite Blue Origin's better Final Certification Margin of 11 months—because of additional development weaknesses.  (AR Tab 132, 41510–14 ("The uncertainty of the new design . . . is a flaw that increases the risk of unsuccessful performance."), 41555–58 (finding that Orbital's experience did not justify a 6.5 month Final Certification Margin).)

Nevertheless, SpaceX argues that SMC assessed a lower risk to Blue Origin and Orbital because SMC had a backup plan to use SpaceX's or ULA's Russian-powered solutions in the event Blue Origin's and Orbital's proposals failed.  (*See* Mot. 25.)  The Government argues that no such backup plan was considered in evaluating the Intervenors' schedule risk.  (U.S. Opp'n 15.)  Although no such plan is mentioned in

key evaluation documents,[7] there is evidence that SMC considered this option in arriving at its ratings.  (*See* AR Tab 101, LSA Conversation with Orbital on Rating 33:10–36:00; AR Tab 101, LSA Conversation with Blue Origin on Rating 24:40–28:20; AR Tab 101, LSA Conversation with ULA on Rating 39:45–42:27.)  However, the Court is not persuaded that SMC acted arbitrarily or capriciously in buying down some of the Intervenors' risks based on this backup plan, even if unstated.  *See Dep't of Commerce*, 139 S. Ct. at 2573 ("[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons.").  That SMC was willing to fall back on SpaceX's proposal if absolutely necessary does not mean that SpaceX's proposal should have been selected, as SpaceX appears to argue.

Finally, the Government and Intervenors argue that in attacking the Intervenors' schedule risk ratings, SpaceX minimized its own schedule risks.  (U.S. Opp'n 13; ULA Opp'n 28.)  The Court agrees.  Specifically, SpaceX ignores that it had yet to develop the vertical integration capability[8] required for Category A/B launches.  (U.S. Opp'n 13 (citing AR Tab 132, 41584).)  SMC found this to be a weakness, albeit one that could be managed through "[s]pecial Participant emphasis and close Government monitoring."  (AR Tab 132, 41616.)  However, SpaceX argues that SMC erred in ignoring SpaceX's offer to begin the vertical integration project earlier.  (Mot. 28 n.13 (citing AR Tab 123, 39864).)  But that offer came with conditions—only if a clear mission need arose or enough funding became available—which SMC was within its discretion to refuse.  (*See* AR Tab 123, 39864.)  SpaceX also argues that its Final

---

[7] For instance, the backup plan is not mentioned in the documents prepared by the AO and Evaluation Team Chairperson, (U.S. Opp'n 15 (citing AR Tab 132, 41413–41660)), the Source Selection Authority Award Briefing document, (U.S. Opp'n 15 (citing AR Tab 134, 41664–41713)), Portfolio Recommendation document, (U.S. Opp'n 15 (citing AR Tab 135, 41714–44)), or the award decision itself, (U.S. Opp'n 15 (citing AR Tab 136, 41745–53)).

[8] According to the Government, "vertical integration" refers to the launch system's ability to "maintain the EELV Primary Payload in the Vertical Orientation for all operations until Liftoff."  (AR Tab 18, 757.)  ULA states that vertical integration is necessary to protect sensitive NSS satellites.  (ULA Opp'n 10.)

Certification Margin was actually 18 months when measured according to the Air Force's east coast vertical integration need date, rather than the RFP need date. (Mot. 28 n.13 (citing AR Tab 132, 41615).)  However, SMC was right to rely on the official RFP dates, known to the Offerors, as opposed to the Air Force's tentative plan to push an east coast launch requiring vertical integration until late 2023.

In sum, SMC's risk determinations concerning the Category A/B missions were rational considering the administrative record.  SMC's decisions deserve substantial deference given the high-level technical expertise required to assess the proposals' risks. *See Marsh*, 490 U.S. at 377.  Accordingly, the Court rejects SpaceX's arguments that SMC acted arbitrarily and capriciously in assessing the Offerors' risks to the Category A/B missions.

### 2. *SpaceX's High-Risk Schedule Rating for Category C Missions*

Next, SpaceX argues that SMC's risk assessment process was anticompetitive because it graded SpaceX's Category C solution based on unstated criteria that deviated from the RFP.  (Mot. 29.)  SpaceX offers two main arguments in support of its position.

First, SpaceX contends that SMC erred in deeming SpaceX's Category C solution incomplete simply because it was not tailored to the Government's current Category C payload processing procedures ("CONOPs"), which use Government facilities and processes.  (Mot. 29.)  SpaceX argues that the RFP did not direct the Offerors to process Category C payloads in specifically-designed and tailored Government facilities or to incorporate the Government's CONOPs into their proposals.  (Mot. 29.)  The RFP also did not warn the Offerors that changing current processes might result in an incomplete rating.  (Mot. 29.)  SpaceX argues that if SMC considered its specifically designed and tailored CONOPs and infrastructure to be critical for a complete launch solution, then SMC had an obligation to amend the RFP to say so.  (Mot. 29–30.)  Had SMC amended the RFP in this way, SpaceX claims that it would have proposed differently.  (Mot. 30.)

To start, SpaceX's argument is flawed because SMC did not actually deem SpaceX's proposal to be incomplete.  Had SMC intended to do so, it would have stated

that the proposal had a "deficiency," which is a material failure to meet an RFP requirement.  (*See* AR Tab 135, 41716 (defining different technical ratings, including "weakness," "significant weakness," "deficiency," and "strength").)   Instead, SMC found SpaceX's proposal to have a "significant weakness," which is a "flaw that appreciably increases the risk of unsuccessful agreement performance."  (AR Tab 132, 41585; AR Tab 135, 41716.)

Moreover, SMC denies that SpaceX's rating was based merely on its decision not to use existing CONOPs.  (*See* U.S. Opp'n 17.)  Instead, SMC was concerned about the significant accommodations and costs it would take to implement SpaceX's approach, not to mention the risks that would arise from it.  At the time, the Government processed Category C payloads in a specifically designed and tailored Government facility.  (AR Tab 132, 41586.)  SMC found that SpaceX's proposal "introduce[d] risk to the payload by adding an additional step of repackaging and transferring to [SpaceX's] facility before final assembly[, which] increase[d] the risk of spacecraft damage and significant changes to the Government's vertical integration CONOPs."  (AR Tab 132, 41586.)  Although SMC's technical analysis deserves great deference, SpaceX's argues that SMC should have amended the RFP to clarify its preference for existing CONOPs.

This is SpaceX's most persuasive argument, and resolving this issue is a close call.  "[M]aking offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition."  *Dubinsky*, 43 Fed. Cl. at 259. Ultimately, though, the Court agrees that it would have been impossible and unreasonable for SMC to foresee every single potential risk that could arise from the Offerors' proposals.  (*See* Sealed Joint Resps. to Ct. Questions ("Joint Resps.") 2–3, ECF No. 210 ("The Air Force was soliciting new and innovative systems: it could not prejudge the risks of those proposals in the abstract before it saw the specific technical proposals the offerors advanced.")); *QualMed, Inc.*, 73 Comp. Gen. 235, 235 (1994) ("Although solicitations must provide sufficient information to enable offerors to

compete intelligently and on an equal basis, they are not required to disclose . . . the precise details of the proposal evaluation process.").[9]  In addition, SpaceX was on notice about SMC's concerns before it submitted its final proposal.  (*See* AR Tab 108, 31838 ("[A]ccommodat[ing] these changes [to current Government CONOPs] increases the risk of cost increases, schedule delays and performance degradation . . . ."); AR Tab 119d, 35186 ("If [SpaceX's] response during negotiations remains in the Final Proposal, this significant weakness would remain.").)  The Court is not persuaded that SpaceX had no expectation that its proposal would suffer based on its substantial deviation from established practices.

Second, SpaceX argues that SMC also erred in criticizing SpaceX's proposal to launch the Category C Polar 2 mission from the east coast.  (Mot. 30.)  SpaceX notes that in Amendment 2, SMC removed any requirement to launch that mission from the west coast.  (Mot. 30 (citing AR Tab 37, 1246 & AR Tab 38, 1284).)  SpaceX claims that it would have proposed to launch Category C missions from the west coast had it known that SMC required that.  (Mot. 30.)  SpaceX also argues that it actually committed to consider several alternatives to satisfy the NSS requirements, including launching from the western range.  (Mot. 31 (quoting AR Tab 123, 39987–88).)

The Government admits that the RFP did not require Category C missions to be launched from the west coast.  (U.S. Opp'n 18.)  Nevertheless, SMC determined that SpaceX's "East Coast infrastructure could be insufficient to support the [east coast] Polar-based orbits, thus resulting in duplication of West Coast launch infrastructure on the East Coast."  (AR Tab 132, 41588.)  Because of this issue, SMC was concerned about the potential impact to cost and schedule.  (*See* AR Tab 132, 41588.)

---

[9] Although not binding, protest decisions by the Government Accountability Office ("GAO") are accorded great deference by courts.  *See NCR Corp. v. United States*, No. 89-1454, 1990 WL 135887, at *1 (Fed. Cir. Sept. 20, 1990) ("In view of the Comptroller General's long and extensive experience in the resolution of contested procurement decisions, his holdings are entitled to great deference."); *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 97 Fed. Cl. 568, 577 n.17 (2011) (citing cases for the proposition that GAO decisions may be considered expert opinion).

Again, the Court is not convinced that SpaceX had no clue that its proposal might create more risk than an alternative that launched the Category C Polar 2 mission from the west coast. On the contrary, SpaceX knew that SMC had initially required a west coast launch. (*See* AR Tab 37, 1252.) Although SMC eventually allowed east coast launches, SpaceX was on notice that such proposals might face additional scrutiny. Specifically, SMC noted that:

> This change recognizes the *potential* path out to a Polar orbit out of [the east coast] and indicates that the Government will *consider the risk on schedule* of a Category C launch solution, *without specifying which coast the launch solution must concern.* The fact that a pathway to Polar orbit is possible from [the east coast] is a *new approach* . . . . The Government will evaluate each offeror's specific approach, make an integrated assessment, and *assign an appropriate risk rating under the Schedule Factor.*

(AR Tab 37, 1252–53 (emphases added).) Further, SMC informed SpaceX of its concerns multiple times to no avail. (*See, e.g.*, AR Tab 92, 29528–59 (asking SpaceX to explain how it would manage the risk of its "unproven approach" to launch from the east coast).)

For these reasons, the Court rejects SpaceX's argument that SMC improperly graded its Category C solution based on unstated criteria that deviated from the RFP.

### 3. SMC's Conclusion That SpaceX's Category C Solution ("Starship") Would not Meet the RFP Need Date

SpaceX argues that SMC arbitrarily found a significant likelihood that SpaceX's Category C proposal would not meet the RFP need date. (Mot. 31 (quoting AR Tab 136, 41753).) SpaceX disagrees with SMC's conclusions regarding (1) "upper stage recovery" for the Starship's third certification flight, (2) the timing for testing the functionality of the Starship design, and (3) the Starship's completion date.

First, SpaceX contends that SMC improperly concluded that the third certification flight for its Starship would require "upper stage recovery." (Mot. 31

17

(quoting AR Tab 132, 41620–21).)  In other words, SMC determined that SpaceX's proposal relied on successful recovery of the upper stage part of the launch system, which would break off and return to earth after delivering the vehicle to space.  But SpaceX argues that its proposal stated the opposite.  (Mot. 31.)  In response, the Government provides additional detail about SMC's concerns with SpaceX's solution.

SMC acknowledged that SpaceX's Category C proposal was "truly revolutionary," yet it proved to be too revolutionary for SMC.  (U.S. Opp'n 19–20.)  SMC concluded that, while SpaceX's "proposed capabilities [were] exquisite, representing extraordinary opportunity for advancement of NSS capabilities," they came at "extraordinary cost, technical, and schedule risk."  (AR Tab 132, 41651.)

In particular, SMC found that SpaceX's novel plan to "incrementally deconstruct" its reusable design into an expandable upper stage design introduced considerable risk.  (See AR Tab 132, 41603–04, 41608–09, 41621.)  Contrary to SpaceX's position that such "expendability by subtraction" would require only minor configuration changes, SMC determined that transitioning to an expendable upper stage approach would require substantial design changes to the machine's reusable baseline.  (See U.S. Opp'n 20 (quoting AR Tab 132, 41620)).  In addition, even if the alternative expandable version was used, SMC was concerned about the technical challenges that would arise from relying on the machine's reusable baseline.  (See AR Tab 132, 41620 ("Even though [SpaceX] proposed the expendable BFR upper stage as an option for NSS missions, the reusable BFR upper stage configuration still remains the development baseline for all system tests, meaning there is a strong dependency between the expendable and reusable BFR schedules.").)  The Court does not second-guess SMC's reasoned technical determinations.  See Marsh, 490 U.S. at 377.

Second, SpaceX argues that SMC erred in concluding that SpaceX would not test the functionality of the Starship design until "very late in the development."  (Mot. 32.)  SpaceX notes that it offered a 29-month Final Certification Margin for Category C, which far surpassed SMC's 14-month benchmark as well as the margins offered by the

Intervenors for Category A/B missions.  (Mot. 32.)

The Government explains that SpaceX's Final Certification Margin was insufficient for several reasons.  Again, SMC was wary of SpaceX's revolutionary proposal and determined that it "stresse[d] the state of the art" in at least five different areas.  (AR Tab 132, 41620.)  Notwithstanding a delay due to any one of these five areas, SMC further concluded that "[c]ombining all of these state of the art approaches into one prototype significantly increase[d] the risk of delay for a working prototype." (AR Tab 132, 41620.)  Because of the magnitude of risk created by SpaceX's innovative proposal, it was not irrational for SMC to deviate, this time upwards, from its 14-month historical benchmark.  In fact, SMC would have violated the APA had it *not* addressed the Starship's significant technological risks.  *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (holding that courts must ensure the agency did not "entirely fail[] to consider an important aspect of the problem").

SpaceX complains that SMC magnified the errors in its evaluation by unfairly favoring ULA's and Blue Origin's Category C proposals.  With respect to ULA, SpaceX contends that SMC made a mistake in calculating ULA's Final Certification Margin for Category C by ignoring that ULA's solution depended on the development of the Centaur V+ engine, which would not be fully certified until August 21, 2024, approximately 12 months prior to the Category C Polar 2 need date.  (Mot. 32.)  The Government and ULA respond, however, that SpaceX misreads ULA's proposal, which proposes the Centaur V, rather than the Centaur V+, for Polar 2 missions.  (U.S. Opp'n 23; ULA Opp'n 32 n.16.)

The record includes evidence supporting both theories.  (*Compare* AR Tab 120, 35217–18 (stating that ULA is offering the Centaur V to satisfy Category A/B mission requirements and Centaur V+ to satisfy Category C mission requirements) *with* AR Tab 120, 35255 (listing Centaur V as the upper stage for the Category C Polar 2 mission).)  In response to the Court's written questions regarding this apparent conflict, the Parties clarified their respective positions.  (*See* Joint Resps. 23–26.)  According to

the Government and ULA, under ULA's proposed two-step development plan for its Centaur upper stage, Centaur V would perform the Polar 2 mission until Centaur V+ was ready to take over.  (*See* Joint Resps. 24.)  Thus, they argue that SMC reasonably calculated ULA's Final Certification Margin based on the availability of the Centaur V. (*See* Joint Resps. 24–25.)   In response, SpaceX complains that ULA should have clarified this proposal in its schedule narrative or Category C schedule.  (*See* Joint Resps. 25.)

SpaceX's argument is unconvincing.  Even if ULA erred in ensuring that its Category C schedule accurately represented its two-step proposal, SpaceX offers no legal basis to strip SMC of the authority to rely on its understanding of ULA's actual proposal.  As the Court noted, there is evidence in the record from which SMC could have plausibly concluded that ULA intended to rely on the Centaur V for the Polar 2 mission, such that SMC's reasoning "may reasonably be discerned." *Alaska Dep't of Env't Conservation*, 540 U.S. at 497.

As for Blue Origin, the Government contends that SpaceX is comparing apples to oranges because Blue Origin's proposal was "simpler, less novel, and more mature" than SpaceX's.  (U.S. Opp'n 23 (citing AR Tab 132, 41650–51).)   According to the record, Blue Origin's proposal had a technological readiness level ("TRL")[10] of 5, compared to SpaceX's level of 3.  (AR Tab 132, 41650–51.)  Thus, even if SpaceX's and Blue Origin's proposals were at similar early stages of development, SMC reasonably concluded that Blue Origin's solution was less risky with respect to Criteria 3.  *See Marsh*, 490 U.S. at 377 (discussing that courts must generally defer to agency on actions involving a high level of technical expertise).

Third, SpaceX argues that SMC improperly concluded that SpaceX's Starship would not complete development until 2026, rendering it late for the tentative

---

[10] TRL measures the maturity level of a particular technology.  TRL 1 is the lowest and TRL 9 is the highest level possible.  Thuy Mai, *Technology Readiness Level*, NASA (last updated Aug. 7, 2017), https://www.nasa.gov/directorates/heo/scan/engineering/technology/txt_accordion1.html (last visited August 20, 2020).

September 1, 2025 Category C need date.  (Mot. 33.)  SMC based this finding on the eleven years NASA took to develop the Space Shuttle.  (Mot. 33.)   According to SpaceX, SMC's analogy to the Space Shuttle was improper because (1) SpaceX uses technology that did not exist in the 1970s, (2) the Starship configuration is simpler than that of the Space Shuttle, (3) SpaceX has a proven record of developing launch vehicles in less than half of that time, and (4) SpaceX develops all major systems in house as opposed to relying on subcontractors, which saves time.  (Mot. 33.)  Because of these differences, SpaceX argues that SMC's comparison to the Space Shuttle was arbitrary and capricious.  (Mot. 34.)

As an initial matter, the Government objects to SpaceX's reliance on the declaration of Lee W. Rosen, SpaceX's vice president of customer operations and integration, and urges the Court to limit its review to the administrative record.  (U.S. Opp'n 23 (quoting *San Luis*, 776 F.3d at 992).)[11]  "In general, a court reviewing agency action under the APA must limit its review to the administrative record."  *San Luis*, 776 F.3d at 992.  A narrow exception exists when the extra-record evidence is "necessary to determine whether the agency has considered all relevant factors and has explained its decision."  *Id.* (internal quotation marks omitted).  But the exception does not apply "[w]here the record contains sufficient information to explain how the agency used the information before it and why it reached its decision."  *Forestkeeper v. La Price*, 270 F. Supp. 3d 1182, 1228 (E.D. Cal. 2017) (internal quotation marks and alterations omitted).  If the Court does consider the extra-record evidence, it must do so only "to develop a background against which it can evaluate the integrity of the agency's analysis [because] the exception does not permit district courts to use extra-record evidence to judge the wisdom of the agency's action."  *San Luis*, 776 F.3d at 993.

SpaceX argues that its declaration is admissible because it shows material

---

[11] Blue Origin also filed formal evidentiary objections to the Rosen declaration.  (Blue Origin Evid. Objs., ECF No. 179-2.)  The Court considers Blue Origin's objections only to the extent it might rely on certain parts of Rosen's declaration.  All other objections are **OVERRULED as moot**.

differences between its proposal and the Space Shuttle development that SMC ignored. (Reply 22.)   However, SMC's analysis is thorough, and it provides sufficient justification for comparing the Starship to the Space Shuttle, as discussed below. Accordingly, the Court **SUSTAINS** the Government's objection and does not consider Rosen's testimony.

SMC compared SpaceX's Starship to the Space Shuttle development for multiple reasons.  First, SMC determined that SpaceX's prototype was closer to the Space Shuttle in form, function, and complexity than other potential comparator launch vehicles.  (AR Tab 132, 41619–20.)[12]  As previously discussed, SMC believed that SpaceX's prototype was a revolutionary vehicle, which lends support to SMC's analogy.  Second, SMC did not blindly adopt the analogy; on the contrary, it distinguished SpaceX's proposal and the Space Shuttle in several ways.  For example, SMC acknowledged that SpaceX's model was "somewhat simplif[ied]" compared to the Shuttle and credited SpaceX's plan to avoid relying on major subcontractors.  (*See* AR Tab 132, 41583, 41658.)  SMC also gave credit to SpaceX's experience and heritage benefits.  (*See* AR Tab 132, 41579.)  Ultimately, the analogy to the Space Shuttle was but only one aspect of SMC's determination of SpaceX's schedule Criteria 3 risk.  (*See* AR Tab 132, 41619 (referring to the Space Shuttle analogy as a "relevant benchmark").)  The Court sees no reason to second-guess SMC's technical analysis and determinations.

In summary, the Court finds that SMC did not violate the APA in finding a significant likelihood that SpaceX's Category C solution would not meet the RFP need date.

## C.    RFP and Congressional Direction

SpaceX's next principal argument is that SMC contravened Congressional direction and the RFP criteria by denying SpaceX an LSA award.  (Mot. 17.)  To support this assertion, SpaceX proffers three arguments: (1) SMC adopted an unstated

---

[12] For example, SMC identified several "state of the art" components that could introduce schedule delays.  (*See* AR Tab 132, 41620.)

preference for reliance on existing Government processes and facilities; (2) SMC favored competitors that proposed developmental solutions; and (3) SMC's portfolio decisions thwarted Congressional direction to end reliance on Russian rocket engines for NSS missions. (Mot. 18–20.) Therefore, SpaceX concludes that SMC's award decisions were unlawful. (Mot. 17.)

### 1. Threshold Arguments

Before diving into the Parties' substantive arguments, the Court considers two threshold issues: (1) SpaceX's argument that SMC's determinations are not entitled to deference because it violated federal law in making its award decisions; and (2) Orbital's contention that SpaceX does not have standing to pursue its statutory claims.

First, at the hearing, SpaceX sought to distinguish its RFP and Congressional direction arguments from the traditional arbitrary and capricious standard that courts employ in reviewing agency action. In response, Defendants argue that SpaceX's allegations that SMC violated the law are also subject to the APA's highly deferential standard of review. (Joint Resps. 2–3.)

In considering SpaceX's arguments, the Court will not defer to SMC's judgment if it finds that the Agency violated an unambiguous statute. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1979 (2016). On the other hand, the APA's deferential standard applies to disputes regarding the extent to which SMC endeavored to comply with Congress's broad pronouncements. *See* 5 U.S.C. § 706(2)(A) (defining the APA's standard as prohibiting agency action that is "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law*" (emphasis added)); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984) (applying APA's arbitrary and capricious standard to agency actions aimed at filling gaps in congressional directives). Although the Court considers SpaceX's statutory arguments,

most of SpaceX's arguments properly fall under the APA's standard.[13]

Second, Orbital argues that SpaceX "is not a suitable party-in-interest to assert its statutory claims" because its interests do not fall within the zone of interest that Congress intended to be protected or regulated.  (*See* Orbital Opp'n 22, ECF No. 178 (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388 (1987)).)  SpaceX counters that the Supreme Court has rejected that intended beneficiary standard for purposes of prudential standing.  (*See* Reply 6 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)).)

In *Patchak*, the Supreme Court noted that the prudential standing test does not require any "indication of congressional purpose to benefit the would-be plaintiff."  567 U.S. at 225 (internal quotation marks omitted).  All that is required is that the plaintiff's interest is "arguably within the zone of interests to be protected or regulated by the statute."  *Id.* at 224–25 (internal quotation marks omitted) ("We apply the test in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'").  The prudential standing test is not meant to be especially demanding, and courts must give the benefit of any doubt to the plaintiff.  *Id.* at 225.

Here, the Court is satisfied that SpaceX meets the lenient prudential standing test.  SpaceX's interest in a fair and legal competition that complies with Congress's intent to assure access to space without reliance on Russian rockets is arguably within the relevant zone of interests.  Accordingly, the Court rejects Orbital's prudential standing argument.

### 2. Unstated Preference for Existing Government Processes and Facilities

SpaceX argues that SMC contravened the RFP criteria by adopting "an unstated preference for reliance on existing Government processes and facilities rather than

---

[13] For instance, SpaceX argues that SMC violated 10 U.S.C. § 2371b(b)(2) by failing to establish fair procedures for the LSA competition.  (Joint Resps. 1.)  However, SMC's efforts to comply with that mandate are best reviewed under the APA's standard given the statute's high level of generality.

investing in commercial systems adaptable to the Government's needs, as the RFP required." (Mot. 18 (citing AR Tab 46, 1342–43).)  According to SpaceX, SMC failed to leverage commercial launch systems because none of the Intervenors proposed a commercially available or operational launch vehicle.  (Mot. 18.)  Instead, the Intervenors had little to no commercial launch experience, and their proposals were still in development. (Mot. 18.)  In contrast, SpaceX claims that it is the only company that offered existing, certified, American-made launch vehicles that do not rely on Russian engines and have a meaningful commercial market.  (Mot. 18.)

The Government maintains, however, that SMC followed the RFP requirements and leveraged commercial launch systems.  (U.S. Opp'n 35.)  The Court agrees.  First, as already addressed above, SMC's preference for existing Government processes and facilities was not improper.  SMC was not obligated to blindly accept SpaceX's risky proposal simply because it offered a "commercial" alternative to the Government's existing practices.

Second, the 2018 NDAA did not require proposed vehicles to be "operational." *See* NDAA of 2018, Pub. L. No. 115-91, § 1605(a)(1)(C), 131 Stat. 1283, 1724 (2017). In fact, the RFP acknowledged that funding *new* launch solutions was vital to accomplishing Congress's directive.  (*See* AR Tab 38, 1260 ("[T]he key step to transition from the use of non-allied space launch engines, maintain assured access to space, and introduce sustainable competition for future EELV NSS launch services will be public private partnership agreements that partially fund industry's *new* and/or upgraded launch system solutions." (emphasis added)).)

Third, SpaceX's narrow definition of "commercially available" as referring to missions launched for private clients is unsupported.  As the Government notes, "commercial" is a term of art that Title 51 of the U.S. Code (which governs national and commercial space programs) defines.  Specifically, section 50101 defines "commercial provider" as "any person providing space transportation services or other space-related activities, primary control of which is held by persons other than Federal,

State, local, and foreign governments." 51 U.S.C. § 50101(1).  Each of the Intervenors meets that definition.

For these reasons, the Court rejects SpaceX's argument that SMC violated the RFP's criteria.

### 3.    *Developmental Solutions Favoritism*

SpaceX argues that SMC jeopardized American access to space and caused continued dependence on Russian rockets by favoring the Intervenors' developmental proposals, which may not be operational by SMC's need dates.  (Mot. 19 (reiterating that each of the Intervenors proposed a Final Certification Margin of less than 14 months for the Category A/B missions).)  SpaceX notes that none of the selected launch vehicles had been built, much less tested or certified.  (Mot. 19.)  In contrast, SpaceX's proposed vehicles were fully operational and capable of meeting SMC's deadlines.  (Mot. 19.)  According to SpaceX, including its vehicles in SMC's portfolio would have reduced the risk of delays and better ensured access to space.  (Mot. 19.)

This argument is essentially duplicative of SpaceX's claims that SMC erred in evaluating the schedule risks of the Intervenors' proposals.   Although SMC acknowledged that SpaceX's fully operational vehicles were a strength, (*see* AR Tab 132, 41579), SMC ultimately concluded that SpaceX's proposal as a whole was too risky and expensive.   SpaceX's new arguments do nothing to change the Court's conclusion that SMC did not act arbitrarily in making its portfolio decisions for the Category A/B missions.[14]   (*See* AR Tab 136, 41753 ("[T]his portfolio is most advantageous in achieving the goal of assured access to space via two or more domestic commercial launch service providers that also meet National Security Space

---

[14] The Government also disagrees with SpaceX's focus on the alleged superiority of its Category A/B solution.  According to the Government, the RFP required SMC to evaluate whether the Offerors' met *all* requirements, not just the Category A/B ones.  (U.S. Opp'n 38–39.)  The Government reiterates that SpaceX's Category C solution was by far the most complicated and risky, which hurt SpaceX's entire proposal.  (U.S. Opp'n 38.)  The Court finds that SMC's conclusions are not irrational based on the record.

requirements on the required timeline.  This selection represents the best value to the Government, both technically and financially, toward achieving this objective.")); *Marsh*, 490 U.S. at 377 (holding that courts must generally defer to the agency on actions involving a high level of technical expertise).

In addition, SpaceX argues that SMC failed to address the risk of choosing a portfolio that relies on common components, wherein the chosen vehicle solutions largely depend on each other for successful development.  (Mot. 19–20 (claiming, for example, that ULA depends on both Blue Origin and Orbital for development of an engine and solid side booster).)  Although SMC recognized this risk, SpaceX argues that it simply ignored it instead of amending the RFP to add evaluation criteria for the use of common components.  (Mot. 20.)

SpaceX is wrong.  SMC did consider the risk of relying on common components yet deemed it acceptable, given that the Government had used common propulsion systems in other launch systems.  (*See* AR Tab 136, 41753.)  Further, SMC explicitly chose not to include RFP evaluation criteria related to common engines "because it was not considered critical in assessing the design approaches or the likelihood of achieving the Government's objectives."  (AR Tab 136, 41753.)  SMC's technical decision is entitled to deference.  *See Marsh*, 490 U.S. at 377; *Alaska Dep't of Env't Conservation*, 540 U.S. at 497 (holding that courts must uphold rational agency action even if the agency explained its decision with "less than ideal clarity").  In addition, it appears that SpaceX failed to administratively exhaust its argument that the RFP should have been amended.  (*See* AR Tab 38, 1263 ("Any objection to the [RFP] . . . must be presented . . . within 10 calendar days of (1) the release of this solicitation or (2) the date the objector knows or should have known the basis for its objection.").)  For these reasons, the Court rejects SpaceX's argument that SMC arbitrarily favored developmental solutions and failed to address the risks of relying on common components.

1                 **4.**    *Congressional Direction to End Reliance on Russian Rocket*

2                     *Engines*

3          SpaceX argues that SMC's portfolio decisions were arbitrary and capricious

4    because they thwarted Congressional direction to end reliance on Russian rocket

5    engines for NSS missions.   (Mot. 20.)   Specifically, SpaceX argues that SMC

6    recognized the substantial risk that none of its chosen vehicles would be ready by the

7    Category A/B missions' deadlines yet pardoned the Intervenors by noting that it could

8    still rely on ULA's Russian-powered rockets or even SpaceX's Falcon 9 vehicle as

9    alternatives.   (Mot. 20.)   In other words, instead of simply choosing SpaceX's proven

10   product, SMC chose proposals that might ultimately force SMC to continue relying on

11   Russian rockets.   (Mot. 20–21.)

12         SpaceX's arguments fail for several reasons.   First and foremost, section 1602 of

13   the 2017 NDAA expressly allows SMC to award launch services programs that include

14   the use of Russian rocket engines, with certain limitations, until December 31, 2022.

15   *See* NDAA of 2017, Pub. L. No. 114-328, § 1602, 130 Stat. 1999, 2582 (2016).   SMC

16   acted rationally because the RFP schedule evaluation criteria for Category A/B

17   considered the risk that the Intervenors would not fulfill the contract by April 1, 2022,

18   nine months earlier than the NDAA deadline.   SpaceX does not argue that SMC violated

19   section 1602 of the 2017 NDAA; rather, SpaceX's argument is that SMC is violating

20   Congress's broader goal to cease reliance on Russian rocket engines.   In other words,

21   SpaceX does not argue that nine months is an insufficient amount of buffer time, (*see*

22   Reply 10), and even if it did, the Court would not second-guess SMC's acceptance of

23   that risk.   It is also not up to the Court to judge whether Congress's December 31, 2022

24   deadline conforms with its broader goal to expeditiously eliminate the use of non-allied

25   rocket engines.

26         Second, SMC did not actually find a substantial risk that the Intervenors would

27   fail to meet the RFP Category A/B timeline.   In fact, ULA received a low risk rating for

28   the Schedule subfactor.   (AR Tab 132, 41460–61 (concluding that the risk in ULA's

Schedule subfactor had "little potential to cause disruption of schedule").)  Although SMC gave Blue Origin and Orbital a moderate risk rating, it nonetheless determined that such risks could likely be overcome with special participant emphasis and close Government monitoring.  (*See* AR Tab 132, 41514 (Blue Origin schedule evaluation), 41558 (Orbital schedule evaluation).)  Notably, SMC also deemed SpaceX's schedule risk rating as moderate, and therefore liable to "potentially cause disruption of schedule, increased costs or degradation of performance."  (AR Tab 132, 41621–22.)

Thus, the Court also rejects SpaceX's broad argument that SMC's portfolio decisions violated Congressional intent.

### D.   Cost Evaluation

SpaceX asserts that SMC's cost evaluations were anticompetitive and that it irrationally concluded that SpaceX required the greatest Government investment. (Mot. 21.)  First, SpaceX argues that the record exposes ULA's proposal as incomplete, and thus, SMC's calculation of ULA's total Governmental investment is artificially low.  (Mot. 21.)  Second, SpaceX argues that SMC overstated SpaceX's total price by $125 million.  (Mot. 23.)

#### 1.   The Nature and Cost of ULA's Proposal

SpaceX argues that ULA failed to count certain Government payments as Government investment, resulting in SMC failing to account for those payments in its cost evaluation for ULA.  (Mot. 22.)  Specifically, ULA's Government investment numbers did not include federal subsidies for launch infrastructure and personnel, certain launch service components (*e.g.*, payload fairings, interstage adaptor, payload attach fitting, and multi-launch internal canister), or development of the BE-4 engine. (Mot. 21–23.)  SpaceX argues that SMC should have considered those payments as Government investment because ULA's proposal leveraged those resources for its LSA solution.  (Mot. 21–23.)  According to SpaceX, SMC's failure to account for all of ULA's Government investments prejudiced SpaceX and rendered the decision to award ULA's contract irrational.  (Mot. 23.)

As an initial matter, the Government and Intervenors argue that SpaceX should not be allowed to contest SMC's cost evaluations at all because SpaceX benefited from the same guidelines. (U.S. Opp'n 28; ULA Opp'n 36 n.19.) Specifically, the Government argues that SpaceX did not have to report billions of dollars in federal funds as Government investment even though it planned to leverage those projects to support its LSA bid. (*See* U.S. Opp'n 28.) The Court disagrees. SpaceX's proposal to leverage prior Government investment to perfect its methodology (for example, to "accurately estimate timeframes for BFR and minimize potential schedule risk") is not comparable to ULA's plan to leverage prior tangible Government investments such as facilities and workforce. (AR Tab 123, 39771, 39862.)

Further, SpaceX's arguments fail on the merits because the RFP's reporting requirements for the Government investment category excluded "costs incurred before" February 21, 2018 from the LSA proposals. (U.S. Opp'n 27 (quoting AR Tab 38, 1276–77).) The RFP also excluded "[p]arallel research or investment . . . [because] typically these activities will be undertaken regardless of whether the proposed project proceeds." (AR Tab 38, 1277.) Thus, the Government argues, ULA did not have to report prior Government investment that fell into one of these exceptions. For instance, with respect to whether the cost of certain launch service components should count as Government investment, ULA did differentiate between costs chargeable to the LSA program and those that would be undertaken regardless. (*See, e.g.*, AR Tab 120, 35377–58 (differentiating between development costs "being accomplished independently from the LSA efforts" from those "driven by the need to accommodate [RFP] requirements" and including the latter in the proposal).)

SpaceX also argues that SMC irrationally accepted ULA's breakdown of the development costs of the BE-4 engine made by Blue Origin. (Mot. 23.) However, SpaceX ignores that ULA has a cost-sharing agreement with Blue Origin and that ULA appropriately accounted for its share of the costs. (U.S. Opp'n 29–30; ULA Opp'n 37.) ULA included the costs to manage Vulcan-specific BE-4 requirements and procurement

of BE-4 engines for its four certification flights.  (*See* AR Tab 120, 35371, 35373, 35892–93, 35981–83, 36063, 36261; AR Tab 132, 41644.)  Accordingly, forcing ULA to include all BE-4 development costs would have resulted in duplicative costs for ULA and Blue Origin.

Moreover, the majority of the BE-4 development period preceded February 21, 2018; thus, ULA properly excluded such costs from its proposal as allowed under the RFP.  (U.S. Opp'n 29 (citing AR Tab 120, 35370, 35374).)  Blue Origin also stated during its evaluation that the costs to develop the BE-4 engine were an "entirely industry cost share," rather than federally funded.  (U.S. Opp'n 29–30 (citing AR Tab 98, 30705).)  For these reasons, the Court concludes that SMC did not act arbitrarily or capriciously in evaluating the cost of ULA's proposal.

Nonetheless, SpaceX argues that SMC treated it unequally by adding to its proposed costs $56.9 million in federal payments for the Falcon Heavy mission (the "STP-2"), even though those payments were made under a different federal contract from 2012.  (Mot. 23 (citing AR Tab 131, 41390–91).)  The Government admits that SMC included some of the costs associated with the STP-2 as LSA costs but counters that the RFP requirements mandated their inclusion.  (U.S. Opp'n 30–31.)

The RFP required each Offeror to include a certification plan as part of its statement of work to demonstrate the efficacy of its launch system.  (AR Tab 38, 1278.)  Costs associated with the statement of work had to be included in the LSA proposal.  (AR Tab 38, 1277.)  The reason why SpaceX had to include costs associated with a prior Government award was that it was the only Offeror that included a certification flight (*i.e.*, STP-2) that was also subject to another Government contract.  (AR Tab 132, 41622; AR Tab 152, 43104.)  Even then, SMC excluded non-LSA Government costs associated with the STP-2 acquisition.  (AR Tab 132, 41622; AR Tab 123, 39868 (SpaceX's Projected Investment Costs separating LSA and non-LSA Government investment).)  Thus, the Court is persuaded that SMC acted rationally in including these costs.

As evidenced by the discussion above, SMC's cost evaluations were complex and involved several steps and requirements. SpaceX's oversimplification of the circumstances surrounding SMC's cost evaluation determinations undermines SpaceX's arguments. For these reasons, the Court concludes that SMC properly considered all costs required by the RFP.

### 2. The Total Price of SpaceX's Solution

SpaceX argues that SMC overstated its total cost to the Government by $125 million. (Mot. 23 (citing AR Tab 144, 42655).) According to SpaceX, SMC assumed the most expensive scenario with regard to SpaceX's solution by adding the cost of the east and west coast vertical integration options, even though SMC knew that only the east coast option would conceivably be exercised. (Mot. 23.) On the other hand, SpaceX argues SMC did *not* assume the most expensive scenarios for the other Offerors; for example, SMC assumed the best-case scenario when calculating ULA's total cost. (Mot. 23–24.) Thus, it claims that SMC wrongly deemed SpaceX the most expensive LSA solution. (Mot. 24.)

SpaceX's argument fails because the Government has established that it acted according to the RFP's requirements. The RFP required the Offerors to have vertical integration capabilities at both the east and west coasts. (AR Tab 38, 1282, 1288.) Yet SpaceX structured its vertical integration plans at both coasts as a set of options that could be exercised *bilaterally* at any time, but *unilaterally* by the Government only under certain circumstances. (*See* AR Tab 123, 39922; AR Tab 132, 41584.) For this reason, it was rational for SMC to include the cost of exercising both options to properly account for the entire cost of meeting the RFP requirement for vertical integration at both coasts.

SpaceX claims that "[o]nce SMC knew it had no mission requirement for West Coast vertical integration—a fact publicized in the Phase 2 RFP—it was irrational for SMC to increase SpaceX's evaluated costs to cover an option SMC would not exercise." (Reply 18.) But SMC could not have considered the Phase 2 requirements in its

evaluation because they were not published until May 3, 2019, months after SMC made its LSA decisions on October 9, 2018.[15]  (*See* AR Tab 136, 41753.)

Further, SpaceX explains that ULA proposed to recover from the Government some of the $500 million for certification flights that ULA would not be able to charge commercial customers.  (Mot. 23–24 (citing AR Tab 120, 35371, 35863–64).))  However, SpaceX argues, SMC assumed the *best*-case scenario, *i.e.*, that ULA would fund all the certification costs through commercial customers, instead of accounting for the Government cost share.  (Mot. 24.)  SpaceX claims SMC failed to count the cost of "buying down" the risk posed by the Intervenors' Category A/B proposals.  (Mot. 24.)

The Government contradicts SpaceX's version of SMC's evaluation.  According to the Government, SMC asked ULA to amend its proposal to include the certification flight costs to the cost of its proposal.  (U.S. Opp'n 34 (citing AR Tab 85, 16275–76).)  In response, ULA added the costs of four certification flights with a *fixed* Government cost share.  (AR Tab 120, 35863; AR Tab 132, 41462; AR Tab 140, 42320.)  Stated otherwise, ULA agreed to bear the cost risk of securing commercial customers for those flights.  (*See* AR Tab 132, 41462 ("Although [ULA] does not currently have contracts in place for commercial customers for the certification flights, it is included in the industry share of the proposal, so the responsibility for those costs lies with the prime contractor.").)  Although SMC and ULA agreed to modify the Government/industry cost share percentage for certification flights in the future, (AR Tab 140, 42321), they

---

[15] SpaceX cites the Rosen declaration to argue that SMC knew there was no need for west coast vertical integration.  (*See* Mot. 23 (citing Ex. A, Rosen Decl. ¶ 46).)  As previously noted, the Government and Blue Origin object to SpaceX's declaration as extra-record evidence and lacking foundation for the quotes therein.  (U.S. Opp'n 33; Blue Origin Evid. Objs. 24–25.)  The Government also notes that SpaceX's quote regarding the Phase 2 RFP did not definitively state that a west coast vertical integration capability was not required.  (U.S. Opp'n 33.)  The Phase 2 RFP merely stated that such capability was not *currently* required, but that does not mean SMC would not include the requirement later.  (U.S. Opp'n 33–34.)  The Court concludes that SpaceX fails to establish that Rosen's statement is admissible under any of the *San Luis* exceptions for extra-record evidence.  *See San Luis*, 776 F.3d at 992.  Accordingly, the Government's and Blue Origin's objections to extra-record evidence are **SUSTAINED**.  All other objections are **OVERRULED as moot.**

also agreed that "[r]egardless of the intended Government cost share percentage, Government investment will be a fixed dollar amount, not a percentage of costs incurred," (AR Tab 140, 42321).  Thus, even if SMC and ULA agreed to modify the cost percentage, the Government investment would remain the same.  (U.S. Opp'n 34.)  In any event, the Government is under no obligation to agree to any future modifications.  (*See* AR Tab 140, 42321 ("The Government/Industry Cost Share percentage for future modifications is subject to *mutual* agreement of the parties." (emphasis added)).)

SpaceX's arguments are not persuasive because SMC acted properly in accounting for the Government cost share in ULA's proposal.  To the extent that ULA did not include certain certification flight costs in its proposed Government cost share figure, it is because ULA agreed to absorb those costs.  (*See* AR Tab 132, 41462 (noting that ULA agreed to take responsibility for certification flight costs not covered by commercial customers).)   SMC's agreement with ULA with respect to the Government/industry cost share percentage is hard to decipher.  But what is clear is that the total Government investment will remain the same, and in any event, the Government is not obliged to modify the cost share percentage in the future.

Finally, the Court rejects SpaceX's argument concerning the costs of SMC's "buy down" option.  The Court already concluded that the record supports SpaceX's claim that SMC had a backup plan in the event some of the chosen proposals failed.  Nevertheless, SpaceX fails to establish that the RFP required SMC to account for these potential backup costs.  The RFP only required the Offerors to include "*projected* total costs to complete the ELV Launch System prototype." (*See* AR Tab 38, 1271 (emphasis added).)  In other words, under the RFP requirements, the Offerors only had to identify the costs necessary to develop *their proposals*.

In sum, the Court finds that SMC did not violate the APA in calculating the total cost of SpaceX's and ULA's proposals.

### E.    SpaceX's Motion to Supplement Court Record

Following the hearing on this matter, the Parties notified the Court that SMC made two contract awards under Phase 2 to SpaceX and ULA.  (*See* Joint Notice 3, ECF No. 214.)  On August 26, 2020, SpaceX filed a Motion to Supplement Court Record, asking the Court to consider SMC's redacted Phase 2 award decision.  (*See* Mot. to Suppl. 1, ECF No. 215.)  SpaceX clarifies that it "does not ask the Court to consider the Phase 2 award decision to find the Agency's [LSA] evaluation and award decision flawed."  (Reply ISO Mot. to Suppl. 1, ECF No. 222.)  Rather, SpaceX claims the decision is relevant to determining the relief to be granted if the Court concludes that SMC violated federal law and the APA.  (*See* Reply ISO Mot. to Suppl. 1.)  Each Defendant filed an opposition to SpaceX's Motion to Supplement.  (*See* U.S. Opp'n to Suppl., ECF No. 220; ULA Opp'n to Suppl., ECF No. 216; Orbital Opp'n to Suppl., ECF No. 219; Blue Origin Opp'n to Suppl., ECF No. 218.)

For the reasons discussed, the Court concludes that SMC did not violate federal law or the APA in evaluating the Offerors' proposals and selecting its LSA portfolio.[16]  Accordingly, SpaceX is not entitled to any relief in this action.  For this reason, notwithstanding whether the Phase 2 decision is relevant to the question of remedies, SpaceX's Motion to Supplement is moot.  Thus, the Court **DENIES** SpaceX's Motion to Supplement Court Record.[17]

## V.    CONCLUSION

For the reasons set forth above, the Court **DENIES** SpaceX's Motion for Judgment on the Certified Administrative Record.  In their Joint Stipulation for Ordered

---

[16] Blue Origin asks the Court to also consider an alleged admission by SpaceX's CEO Elon Musk that SpaceX lost the LSA competition because it wrote a poor proposal that "missed the mark."  (*See* Blue Origin Opp'n 18–19.)  In support of its request to consider this extra-record evidence, Blue Origin relies on an unpublished District of Arizona decision from 2009.  (*See id.* at 19 (quoting *Gemmel v. Systemhouse, Inc.*, No. 04-189, 2009 WL 3157262 (D. Ariz. Sept. 28, 2009)).)  The Court need not consider that alleged admission given that the administrative record is sufficient to deny SpaceX's Motion.

[17] Accordingly, the Court **VACATES** the October 5, 2020 hearing.  (ECF No. 215.)

Briefing Schedule filed on November 20, 2019, the Parties agreed that this matter could be "adjudicated on briefing on the Certified Administrative Record." (Joint Stipulation for Briefing ¶ 13, ECF No. 161.) Accordingly, the Court **ORDERS** the Parties to **SHOW CAUSE**, in writing, no later than **October 2, 2020**, as to whether the Court should enter judgment in favor of Defendants given this decision, thereby closing the case. SpaceX's response is limited to two pages and Defendants may also file a combined two-page response.

**IT IS SO ORDERED.**

September 24, 2020

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**